**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MATTHEW GREEN ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:16-cv-1492 |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................ 1

STATUTORY BACKGROUND ........................................................ 4

    1.  Digital Millennium Copyright Act ("DMCA") .................... 4

    2.  DMCA's Triennial Rulemaking Requirement ...................... 7

PROCEDURAL HISTORY ............................................................. 11

STANDARD OF REVIEW ............................................................. 13

ARGUMENT ................................................................................ 15

    I.      PLAINTIFFS LACK STANDING TO CHALLENGE § 1201(a)(1) AND 1201(a)(2) UNDER THE FIRST AMENDMENT ............................................. 15

           A.     Plaintiffs Fail To Assert a Credible Threat of Prosecution ...................... 16

           B.     Plaintiffs Fail to Identify an Intent to Engage in Constitutionally-Protected Conduct that Would Violate § 1201(a)(1)(A) or § 1201(a)(2)  18

    II.     PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM SHOULD BE DISMISSED (COUNT I) ............................................................ 21

           A.     Section 1201(a) Is Not Subject to the First Amendment's Overbreadth Doctrine Because the Provision on Its Face Does Not Regulate Speech  21

           B.     Plaintiffs' Overbreadth Claim Is Also Inappropriate Because It Primarily Seeks to Assert Plaintiffs' Own First Amendment Rights Rather Than the Rights of Third Parties Not Before the Court  ............... 24

           C.     Plaintiffs Cannot Establish Substantial Overbreadth in Light of the Many Obvious Constitutional Applications of the Statute ...................... 25

    III.    PLAINTIFFS' CLAIM THAT THE DMCA'S TRIENNIAL RULEMAKING IS AN UNCONSTITUTIONAL PRIOR RESTRAINT SHOULD BE DISMISSED (COUNT II) ........................................................................ 30

    IV.    PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CHALLENGES TO THE DMCA SHOULD BE DISMISSED (COUNTS III, IV, AND V) ............... 36

A.      Section 1201(a)(1)(A) Does Not Violate the First Amendment As
Applied to Plaintiffs ................................................................................. 37

B.      Section 1201(a)(2) Does Not Violate the First Amendment as Applied
to Plaintiffs .............................................................................................. 38

V.      PLAINTIFFS' CHALLENGES TO THE 2015 FINAL RULE SHOULD BE
DISMISSED (COUNTS VI AND VII) ................................................................. 42

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.,*
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) ............................................. 20, 26, 29, 39, 40, 41

*Am. Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992) .................................. 16, 18

*A.N.S.W.E.R. v. Dist. of Columbia*, 589 F.3d 433 (D.C. Cir. 2009) ...................................... 16, 18

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......................................................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 13, 14, 17, 25

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)...................................... 15, 18

*Balogh v. Lombardi*, 816 F.3d 536 (8th Cir. 2016) .................................................... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................... 13, 14

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................ 44

*Blum v. Holder*, 744 F.3d 790 (1st Cir.), *cert. denied*, 135 S. Ct. 477 (2014)............................. 15

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010) ................................. 31, 34-35

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................ 21, 24

*Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491 (1985) ............................................... 24

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) .................................................. 14

*Campbell v. Acuff-Rose Music, Inc.*, 510 US 569 (1994) ............................................... 26

*Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624 (7th Cir. 2003) ................................... 27

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 760 (1988) ...................................... 22

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ............................................. 14, 15

*Clark v. Library of Cong.,* 750 F.2d 89 (D.C. Cir. 1984) ............................................. 43

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)............................................... 13, 14

*Dalton v. Specter*, 511 U.S. 462 (1994) .............................................................. 44

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015),
    *as amended* (July 21, 2015) ................................................................... 14-15

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) .............................. 14

*\*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................. 27, 28, 29, 32

*Ethnic Employees v. Boorstin,* 751 F.2d 1405 (D.C. Cir. 1985) ....................................... 43

*FDIC v. Meyer,* 510 U.S. 471, 475 (1994) .............................................................. 42

*Forsyth Cty., Ga. v. Nat'list Movement*, 505 U.S. 123 (1992) ...................................... 35

*Freedman v. Maryland*, 380 U.S. 51 (1965) ........................................................... 31

*Golan v. Holder*, 132 S. Ct. 873 (2012) .................................................... 27, 28, 29

*Green Valley Investments v. Winnebago Cty.*, 794 F.3d 864 (7th Cir. 2015) ........................... 31

*Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539 (1985) ........................... 23, 27

*Hastings v. Judicial Conf.,* 829 F.2d 91 (D.C. Cir. 1987) ............................................ 22

*H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) .............................. 31

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ....................................................... 20, 23

*Hubbard v. Adm'r, EPA,* 982 F.2d 531 (D.C. Cir. 1992). ............................................... 42

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) ............................... 13

*Johnson v. District of Columbia.*, 71 F. Supp. 3d 155 (D.D.C. 2014) ................................. 16

*Johnson v. Veterans Affairs Med. Ctr.,* 133 F. Supp. 3d 10 (D.D.C. 2015) ............................ 42

*Kemp v. Eiland*, 139 F. Supp. 3d 329 (D.D.C. 2015) ............................................... 13-14

*Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136 (1979) ............... 42, 43

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ........................................... 13

*L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999) ............................. 21-22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................ 14

*Mahoney v. Dist. of Columbia*, 662 F. Supp. 2d 74 (D.D.C. 2009),
   *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) ............................ 22, 24

\*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ......................... 24, 25

*Nat'l Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907 (D.C. Cir. 1998) .............. 44

*Ord v. District of Columbia,* 587 F.3d 1136 (D.C. Cir. 2009) ...................................... 16

*Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895 (9th Cir. 2007) ........................... 31

*Parker v. District of Columbia,* 478 F.3d 370, 375 (D.C. Cir. 2007) .................................... 16, 17

*Roulette v. City of Seattle*, 97 F.3d 300 (9th Cir. 1996),
   *as amended on denial of reh'g and reh'g en banc* (Sept. 17, 1996) ............................... 22

*Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005) ....................................... 16

*State of W. Virginia v. U.S. Dep't of Health & Human Servs.*,
   145 F. Supp. 3d 94 (D.D.C. 2015) ............................................................ 13

*Stone v. Holder*, 859 F. Supp. 2d 48 (D.D.C. 2012) ............................................ 13, 42

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) ................................... 15, 18

*Temple v. Abercrombie*, 903 F. Supp. 2d 1024 (D. Haw. 2012) ................................. 17

*Terveer v. Billington*, 34 F. Supp. 3d 100 (D.D.C. 2014) ...................................... 43

*Texas v. Johnson*, 491 U.S. 397 (1989) ...................................................... 37

*Thomas v. Chicago Park Dist.,* 534 U.S. 316 (2002) ............................................ 31

*United States v. Caputo*, No. 1:15-CR-00175, 2016 WL 4435176 (D.D.C. Aug. 19, 2016) .40-41

*United States v. Elcom Ltd.*,
   203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................................... 4, 22, 23, 26, 28, 39, 40, 41

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................................. 40

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001)............. 5, 26, 28, 39, 40, 41

*Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000) ..................... 23

*Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101 (D.D.C. 2012) ............................. 16

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) .................................................................................................... 14

*\*Virginia v. Hicks*, 539 U.S. 113 (2003) ...................................................................... 21

*Whitaker v. Thompson*, 353 F.3d 947 (D.C. Cir. 2004) ............................................. 20

*Wright v. City of St. Petersburg*, No. 15-10315, 2016 WL 4269796 (11th Cir. Aug. 15, 2016) . 34

*\*Zemel v. Rusk*, 381 U.S. 1 (1965) ........................................................... 19-20, 23, 33

## **Statutes**

Pub. L. No. 94-553, § 701(d), 90 Stat. 2541, 2591 (1976)
(codified as amended at 17 U.S.C. § 701(e)) ................................................... 43

Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998) ...... 1

5 U.S.C. § 551 .............................................................................................................. 43

5 U.S.C. § 552 .............................................................................................................. 43

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 .................................. 3-4

5 U.S.C. § 701 .............................................................................................................. 43

5 U.S.C. § 702 .............................................................................................................. 43

5 U.S.C. § 704 .............................................................................................................. 44

5 U.S.C. § 706 .............................................................................................................. 43

17 U.S.C. § 102 ............................................................................................................ 27

17 U.S.C. § 106 .............................................................................................. 6, 26, 27

17 U.S.C. § 106A ...................................................................................................... 26, 27

17 U.S.C. § 107 ......................................................................................................... 5-6, 26

17 U.S.C. § 501 .............................................................................................................. 5

17 U.S.C. § 701 ......................................................................................................... 43, 44

17 U.S.C. § 802 ............................................................................................................ 44

17 U.S.C. § 1201 ............................................................................................... *passim*

17 U.S.C. § 1203 .................................................................................................. 7, 17

17 U.S.C. § 1204 .......................................................................................... 7, 15, 17, 18

## Legislative Materials

144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties),
    1998 WL 785674 (Cong. Rec.) ............................................................................ 4

H.R. Rep. No. 94-1733 (1976) ............................................................................... 43

H.R. Rep. No. 105-551(I) (1998) ................................................................... 6, 23, 36

H.R. Rep. No. 105-551(II) (1998) ............................................................... 7, 30, 35, 36

H.R. Rep. No. 105-796 (1998) ............................................................................... 9

S. Rep. No. 105-190 (1998) ........................................................... 4, 5, 6, 25, 35

Section-by-Section Analysis of H.R. 2281 as Passed by the U.S. House of Representatives on
    Aug. 4, 1998 ("House Mgr. Rpt.") (1998), *available at*
    http://congressional.proquest.com ............................................................... 8, 35

WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997),
    1997 WL 447232 ......................................................................................... 4

*Chapter 12 of Title 17, Hearing Before the Subcomm. on Courts, Intellectual Property and the*
    *Internet of the H. Comm. on the Judiciary ("Chapter 12 Hearing"),* 113th Cong., 2d Sess.
    (Sept. 17, 2014), *available at* https://judiciary.house.gov/hearing/hearing-chapter-12-of-
    title-17/ ..................................................................................................... 5

## Administrative Materials

37 C.F.R. § 201.40 ............................................................................................ 9

65 Fed. Reg. 64556-01 (2000 Final Rule) .................................................................. 9

68 Fed. Reg. 62011-01 (2003 Final Rule) .................................................................. 9

71 Fed. Reg. 68472-01 (2006 Final Rule) .................................................................. 9

75 Fed. Reg. 43825-01 (2010 Final Rule) ...................................................................................... 9

77 Fed. Reg. 65260-01 (2012 Final Rule) ...................................................................................... 9

80 Fed. Reg. 65944 (2015 Final Rule) ................................................................... 8, 9, 10, 32, 35

## **INTRODUCTION**

Plaintiffs in this case bring a preenforcement challenge to provisions of the Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998), that prohibit circumvention of technological measures that control access to copyrighted works, sometimes referred to as "access controls" (such as passwords or other authentication tools, payment screens, or encryption), as well as trafficking in devices that enable such circumvention. Plaintiffs claim that these prohibitions violate the First Amendment on their face and as applied, and they also challenge a 2015 Final Rule issued by the Librarian of Congress pursuant to the DMCA's triennial rulemaking process—a process for identifying temporary exemptions from the anti-circumvention provision.

Plaintiffs' claims should be dismissed in their entirety. As an initial matter, Plaintiffs lack standing to raise their First Amendment claims on a preenforcement basis because the assertions in their Complaint fail to establish a credible threat of prosecution, under the DMCA's criminal enforcement provision, for engaging in constitutionally-protected activity. None of the Plaintiffs claims to have been threatened with criminal prosecution. Plaintiffs' conclusory assertion that others have been prosecuted under the DMCA in the past, for unidentified reasons, is insufficient to establish that *Plaintiffs* face a credible threat, as is their assertion that third parties might bring suit against them under a separate civil private right of action. Moreover, Plaintiffs fail plausibly to assert that the acts of circumvention and trafficking that they wish to undertake qualify as speech or expressive conduct that is entitled to First Amendment protection but prohibited by the DMCA.

If the Court does proceed to consider the merits of Plaintiffs' claims, these claims should be dismissed for failure to state a claim upon which relief can be granted. The provisions of the

DMCA that Plaintiffs challenge have previously been upheld by all courts to have addressed them. For the same reasons that those courts have explained, Plaintiffs' First Amendment claims fail. First, the First Amendment's overbreadth doctrine provides no basis to strike down the DMCA's anti-circumvention and anti-trafficking provisions. For one thing, the provisions on their face do not regulate speech or expressive conduct; they merely prohibit the circumvention of access controls and the trafficking in anti-circumvention devices. Indeed, laws barring unauthorized circumvention of access controls do not regulate speech any more than laws barring unauthorized access to museums or libraries. As a matter of law, such provisions cannot be deemed facially overbroad regulations of speech. In addition, the First Amendment's overbreadth doctrine is essentially a third-party standing doctrine that allows someone to challenge a law based on its potential chilling effect on others' speech. Here, because Plaintiffs rely almost exclusively on their own asserted First Amendment rights, an overbreadth claim is inappropriate.

These DMCA provisions are also unquestionably constitutional in the vast majority of applications, and indeed Plaintiffs have identified no instance where the provisions would violate the First Amendment. Plaintiffs' reliance on the "fair use doctrine" cannot establish that the DMCA is unconstitutionally overbroad under the First Amendment. The Copyright Act contains a statutory provision limiting the exclusive rights of copyright owners so that users may make "fair use" of copyrighted materials, but that provision affords no First Amendment right to gain access to such materials in the first place. Indeed, nothing in the fair use doctrine requires that copyright owners or the Government allow the unauthorized circumvention of access controls, nor the trafficking in devices that allow circumvention. Plaintiffs thus raise no plausible allegation that the provisions are substantially overbroad relative to their plainly legitimate

sweep.

Second, the DMCA does not place an unconstitutional prior restraint on speech. In raising this claim, Plaintiffs point specifically to the triennial rulemaking process that Congress included in the statute as a means of identifying exemptions to the anti-circumvention provision. However, the triennial rulemaking process is in no way equivalent to laws, such as those that require licenses or permits before conducting demonstrations or distributing leaflets, that are traditionally subject to scrutiny under the prior restraint doctrine. The rulemaking identifies exemptions based on classes of copyrighted works, such as "motion pictures," for categories of uses. This process does not delegate unbridled discretion to a decisionmaker to make individualized assessments and thus poses no risk of government censorship based on the content of speech. Indeed, the rulemaking does not prohibit users' speech. Rather, it provides a process whereby otherwise unlawful access to others' copyrighted works is allowed.

Third, Plaintiffs' as-applied First Amendment claims also fail. For the same reasons that the anti-circumvention provision cannot be deemed a regulation of speech, the First Amendment is simply not implicated by Green's desire to circumvent access controls without permission, in order to conduct security research on industrial security systems, nor by Huang's and Alphamax's desire to use a third party's "master key" to create a device that enables circumvention of the access controls on HDMI digital content. Moreover, while such assertions are absent from the Complaint, even assuming that Plaintiffs seek to distribute their own speech in the form of computer code that allows circumvention, the DMCA's anti-trafficking provisions survive the intermediate scrutiny applicable to that kind of content-neutral, "functional" speech.

Finally, Plaintiffs challenge the 2015 Final Rule, issued by the Librarian of Congress after the most recent triennial rulemaking process, under the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701-706. This claim should be dismissed because federal courts, including this Circuit, have uniformly held that the Librarian of Congress is not subject to the APA. Although Congress has extended the APA to the Register of Copyrights, the recommendation that the Register provides in the course of the triennial rulemaking process does not qualify as a final agency action subject to APA review. For all these reasons, Plaintiffs' claims should be dismissed in their entirety.

## STATUTORY BACKGROUND

**1.      Digital Millennium Copyright Act ("DMCA")**

Congress enacted the DMCA in 1998 in order to facilitate electronic commerce, communications, research, development, and education while addressing new challenges stemming from the rise of digital technology. S. Rep. No. 105-190 (1998), at 1-2; *see United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1138 (N.D. Cal. 2002) (recognizing that Congress enacted the DMCA pursuant to its Commerce Power). While technology allows artists and authors to make their work available online, it also makes possible digital piracy, through unauthorized access to and distribution of copyrighted works.

Amidst growing concerns by the late 1990s regarding such piracy and its effect on domestic and international markets, the United States joined other nations in entering into an international treaty, the World Intellectual Property Organization ("WIPO") Copyright Treaty. S. Rep. No. 105-190, at 2.[1] The WIPO treaty requires contracting states to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights. *See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997), 1997 WL 447232, at *13. The DMCA among

---

[1] The United States signed the WIPO Copyright Treaty on April 2, 1997, and the Senate ratified it on October 21, 1998. 144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties), 1998 WL 785674 (Cong. Rec.).

other things implements the WIPO treaty. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001) (discussing DMCA's background); *Elcom Ltd.*, 203 F. Supp. 2d at 1119 (same). In enacting the DMCA, Congress understood that "the law must adapt to make digital networks safe places to disseminate and exploit copyrighted materials" and that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S. Rep. No. 105-190, at 2, 8. Thus, Congress intended the DMCA to provide this protection and thereby to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works." *Id.* at 2.[2]

The DMCA sets forth three prohibitions, codified at 17 U.S.C. § 1201, that address the concern with digital piracy. Only the first two prohibitions, both in § 1201(a), are at issue here. First, the DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act. 17 U.S.C. § 1201(a)(1)(A). Second, the DMCA prohibits the manufacture of or trafficking in products or technology designed to circumvent such access controls. *See id.* § 1201(a)(2). Third, in a separate provision that Plaintiffs do not challenge in this case, the DMCA prohibits the manufacture of or trafficking in products or technology designed to circumvent measures that protect a copyright owner's rights under the Copyright Act, sometimes referred to as copy controls. *See id.* § 1201(b). Notably, § 1201 does *not* forbid the act of circumventing copy controls. If such circumvention occurred, any subsequent copying activity would be assessed as a potential copyright infringement, *see id.* § 501, and the traditional defenses to infringement liability, including the fair use defense, *see id.*

---

[2] *See also Chapter 12 of Title 17, Hearing Before the Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. on the Judiciary ("Chapter 12 Hearing")*, 113th Cong., 2d Sess., at 2 (Sept. 17, 2014) (opening remarks of Mr. Goodlatte) ("When the DMCA was enacted, there was significant concern that the digitization of our economy would result in mass piracy becoming an unfortunate reality for many copyright owners. TPMs were intended to enable copyright owners to engage in self-help to protect their works from theft."), *available at* https://judiciary.house.gov/hearing/hearing-chapter-12-of-title-17/.

§ 107, would be available if they applied.[3]

Thus, the prohibitions at issue here, in § 1201(a), address circumvention of technology that blocks *access* to a copyrighted work—such as technology that prevents people from viewing an article on an Internet website unless they have a password or pay a fee. *See id.* § 1201(a)(3)(A) (explaining that to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner"). The prohibitions in § 1201(b), on the other hand (which as noted are not at issue here), address circumvention of technology that protects the exclusive rights afforded to a copyright owner of the work—such as technology on the same website that prevents someone from *copying* the article once it is accessed.[4] *See* S. Rep. No. 105-190, at 11-12.

The DMCA sets forth several permanent exemptions to the § 1201 prohibitions. The statute permits circumvention of an access control on a copyrighted work, or in certain limited circumstances, the sharing of circumvention technology, in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage

---

[3] S. Rep. No. 105-190, at 12 (explaining that "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)" because "[t]he copyright law has long forbidden copyright infringements, so no new prohibition was necessary"); H.R. Rep. No. 105-551(I), at 18 (1998) ("Paragraph (a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures. . . . In a fact situation where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable.")

[4] In addition to the right of reproduction, the exclusive bundle of rights provided by copyright includes the rights of distribution, display, public performance, and preparation of derivative works. 17 U.S.C. § 106.

in security testing of a computer, computer system, or computer network. *See* 17 U.S.C. § 1201(d)-(j).

The Government may bring criminal charges against those who violate the DMCA's anti-circumvention and anti-trafficking provisions pursuant to 17 U.S.C. § 1204. Persons injured by violations of these provisions may also seek civil remedies pursuant to 17 U.S.C. § 1203.

**2.      DMCA's Triennial Rulemaking Requirement**

The DMCA also directs the Librarian of Congress to make a determination every three years, through a rulemaking proceeding, regarding categories of copyrighted materials that should be exempted for the next three-year period from the anti-circumvention prohibition in § 1201(a)(1)(A). *See id.* § 1201(a)(1)(C). This triennial rulemaking is intended to serve as a "'fail-safe' mechanism" to account for possible changes in the online marketplace after the DMCA's enactment. *See* H.R. Rep. No. 105-551(II), at 35-37 (1998).

Such a mechanism was originally proposed by the House Commerce Committee when considering an earlier version of the bill that became the DMCA. The Committee raised a concern that "marketplace realities" might evolve in a manner that would unjustifiably diminish access for lawful purposes to copyrighted materials. *See id.* at 36. The Committee thus proposed a "'fail-safe' mechanism" to "monitor developments in the marketplace for copyrighted materials," and to allow the prohibition on circumvention of access controls in § 1201(a)(1)(A) "to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials." *Id.* at 35.

As enacted, this "fail-safe mechanism" directs the Librarian of Congress to determine, through the triennial rulemaking, whether users of certain categories of copyrighted works should be exempted from the access control anti-circumvention prohibition set forth in

7

§ 1201(a)(1)(A) because the restriction adversely affects their ability to make noninfringing use

of copyrighted material. 17 U.S.C. § 1201(a)(1)(C). The Librarian's determination is made

"upon the recommendation of the Register of Copyrights," who in turn must "consult with the

Assistant Secretary for Communications and Information of the Department of Commerce." *Id.*

In conducting the rulemaking, the statute directs the Librarian to examine "(i) the

availability for use of copyrighted works; (ii) the availability for use of works for nonprofit

archival, preservation, and educational purposes; (iii) the impact that the prohibition on the

circumvention of [access controls] has on criticism, comment, news reporting, teaching,

scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or

value of copyrighted works; and (v) such other factors as the Librarian considers appropriate."

*Id.* § 1201(a)(1)(C). In order to grant an exemption through this process, the Librarian must

conclude "(1) that uses affected by the prohibition on circumvention are or are likely to be

noninfringing; and (2) that as a result of [an access control], the prohibition is causing, or in the

next three years is likely to cause, an adverse impact on those uses." 80 Fed. Reg. 65945. A

proponent of an exemption must establish these requirements "by a preponderance of the

evidence." *Id.*

The Manager's Report issued by the House Judiciary Committee, containing an analysis

of the final bill, noted that the Librarian need not identify any exemptions in a given triennial

rulemaking if it is determined "that the conditions for the exemption do not exist." Section-by-

Section Analysis of H.R. 2281 as Passed by the U.S. House of Representatives on Aug. 4, 1998

("House Mgr. Rpt."), at 8 (1998).[5]  "Such an outcome would reflect that the digital information

marketplace is developing in the manner which is most likely to occur, with the availability of

---

[5]  The Report is available at http://congressional.proquest.com/ (using search term
"Section-by-Section Analysis of H.R. 2281").

copyrighted materials for lawful uses being enhanced, not diminished, by the implementation of technological measures and the establishment of carefully targeted legal prohibitions against acts of circumvention." *Id.*

The final conference report before the DMCA's enactment describes the intended procedure for the rulemaking described in § 1201(a)(1)(C). The report states that, "in recognition of the expertise of the Copyright Office, the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate." H.R. Rep. No. 105-796, at 64 (1998). The Register will then "recommend[] final regulations in the report to the Librarian." *Id.*

After the Register issues recommendations, the Librarian then determines whether to accept or reject the Register's recommendations and issues a Final Rule setting forth this determination and promulgating the temporary exemptions for the next three-year period at 37 C.F.R. § 201.40. *E.g.*, 65 Fed. Reg. 64574. Thus far, the Librarian has issued six Final Rules pursuant to this procedure. *See* 65 Fed. Reg. 64556-01 (2000 Final Rule); 68 Fed. Reg. 62011-01 (2003 Final Rule); 71 Fed. Reg. 68472-01 (2006 Final Rule); 75 Fed. Reg. 43825-01 (2010 Final Rule); 77 Fed. Reg. 65260-01 (2012 Final Rule); 80 Fed. Reg. 65944-01 (2015 Final Rule).[6]

During the first three-year period beginning October 28, 2000, the Librarian adopted two exemptions for classes of copyrighted works. *See* 65 Fed. Reg. 64574. Most recently, the Librarian adopted twenty-two exemptions for classes of copyrighted works during the three year period beginning October 28, 2015. *See* 80 Fed. Reg. 65961-659663. Examples of classes of

---

[6] Materials relevant to the rulemaking process, including the Register's recommendations as well as all exemption proposals and comments submitted during the rulemaking process, are available on the Copyright Office website at http://www.copyright.gov/1201/ .

copyrighted works that have been granted exemptions through this process include literary works distributed in electronic form (such as e-books) that are protected by access controls that prevent read-aloud or other assistive technologies used by visually impaired persons, 80 Fed. Reg. 65950; motion pictures, where circumvention is undertaken "solely in order to make use of short portions of the motion pictures for the purpose of criticism or comment" in specified circumstances, *id.* at 65948; and computer programs that control access to devices or machines "primarily designed for use by individual consumers," such as motorized land vehicles and medical devices designed for implantation, where the circumvention is undertaken "solely for the purpose of good-faith security research," *id.* at 65956.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 21, 2016, asserting challenges to the DMCA's "anti-circumvention" and "anti-trafficking" provisions relating to circumvention of access controls, 17 U.S.C. § 1201(a). Compl. ¶ 1. Notably Plaintiffs do not claim that these provisions have ever been enforced against them; however, they assert that the threat of enforcement "chills" their "protected and noninfringing speech that relies on copyrighted works, including independent technical research into computer security systems and the discussion of that research, and accessing copyrighted works in order to shift the content to a different format, space, or time." *Id.*

Specifically, Plaintiff Green asserts that he is professionally engaged in investigating the security of electronic systems and that he notifies manufacturers "of vulnerabilities in the interest of having them fixed." *Id.* ¶ 75. He also publishes academic work regarding this research and is currently writing a book in which he would like to include "detailed information regarding how to circumvent security systems." *Id.* According to Green, he wishes to conduct investigations that

involve the circumvention of technical restrictions on "non-consumer-oriented devices" and

"non-implanted medical devices." *Id.* ¶ 85. Green acknowledges that the DMCA contains a

permanent exemption for security research in § 1201(j) but asserts that that exemption is too

narrow for his purposes. *Id.* ¶ 79. Green also acknowledges that the Librarian granted a further

exemption for certain security research in the 2015 Final Rule, relating to access controls on

devices or machines primarily designed for consumer use, on motorized land vehicles, and on

medical devices designed for implantation, but he again asserts that that exemption is insufficient

for his intended research.[7]  *Id.* ¶¶ 84-85. Green further asserts that the risk of civil liability and/or

criminal prosecution for violation of § 1201(a) prevents him from engaging in research and from

"selling a book that might garner significant commercial sales discussing how to circumvent

access controls." *Id.* ¶¶ 86-87.

Plaintiffs Huang and Alphamax, a company owned by Huang, assert that they would like

to create and commercially distribute a device called NeTVCR, which would allow people to

save high-definition digital video content transmitted from devices like computers, DVD players,

and video game consoles to televisions and computer monitors, move the content to other

devices, and convert the content to other formats. Compl. ¶¶ 90-91, 101. Huang and Alphamax

further assert that, in order to create this device, they would have to circumvent existing

technology developed by Intel Corporation, called High-bandwidth Digital Content Protection

("HDCP"), that restricts access to High-Definition Multimedia Interface ("HDMI") video

---

[7] During the 2015 rulemaking process, the Register of Copyrights noted the statutory obligation
to craft an exemption based on the evidentiary showing of adverse effects. When considering an
exemption for security research, which Green, among others, had proposed, the Register
observed that the record was limited to consumer-oriented software and products, and no
showing was made to explain how an exemption would work in relation to other types of
software, "including highly sensitive systems such as nuclear power plants and air traffic control
systems," and the Register limited her recommendation accordingly. Register's
Recommendation at 317, available at http://www.copyright.gov/1201/.

signals. *Id.* ¶¶ 92-93. According to the Complaint, Huang and Alphamax wish to engage in such circumvention by using a "master" cryptographic key that an anonymous third party uploaded to the Internet in 2010, which makes it possible to bypass Intel's HDCP restrictions by avoiding the need to obtain a "secret" key from Intel. *Id.* ¶¶ 93, 95. After creating the NeTVCR device, Huang and Alphamax assert that they wish to "use and enable others to use" the device for various alleged purposes, including "use of excerpts of motion pictures for commentary, educational uses, creation of narrative fair use film, and space- and format-shifting." *Id.* ¶ 107. Huang and Alphamax assert that their fear of prosecution under § 1201(a) deters them from "engaging in the circumvention of HDCP," and from "commercially distributing the NeTVCR device, software that would upgrade [a previous device, the NeTV] into a NeTVCR, or information about how to build NeTVCR." *Id.* ¶¶ 109-110.

Plaintiffs seek declaratory and injunctive relief through seven separate claims: Count I challenges 17 U.S.C. § 1201(a) as facially unconstitutional under the First Amendment's overbreadth doctrine; Count II alleges that the triennial rulemaking process set forth in § 1201(a)(1) establishes a prior restraint on speech in violation of the First Amendment; Count III alleges that § 1201(a) violates the First Amendment as applied to Plaintiff Green; Counts IV and V allege that § 1201(a) violates the First Amendment as applied to Plaintiffs Huang and Alphamax; and Counts VI and VII allege that the 2015 Final Rule violates the First Amendment and the APA insofar as the Librarian denied exemptions that would have applied to Green's security research and to Huang and Alphamax's creation and use of NeTVCR. *See* Compl. ¶¶ 111-162. As set forth below, all seven claims are subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## STANDARD OF REVIEW

Defendants move to dismiss under Rule 12(b)(1) for lack of standing (Counts I-V) and because sovereign immunity has not been waived (Counts VI, VII). In reviewing a 12(b)(1) motion, a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Thus, "a federal court must presume that it 'lack[s] jurisdiction unless the contrary appears affirmatively from the record.'" *State of W. Virginia v. U.S. Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 97 (D.D.C. 2015) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n. 3 (2006)). "The burden of demonstrating the contrary, including establishing the elements of standing, 'rests upon the party asserting jurisdiction.'" *Id.* (quoting *Kokkonen*, 511 U.S. at 377); *see also Stone v. Holder*, 859 F. Supp. 2d 48, 51 (D.D.C. 2012) ("the plaintiff bears the burden of establishing that sovereign immunity has been abrogated").

When considering jurisdiction based on the face of a plaintiff's complaint, a court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). However, the court need not "assume the truth of legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor "accept inferences that are unsupported by the facts set out in the complaint,'" *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Rather, in order to avoid dismissal, a complaint must "contain sufficient factual matter 'to state a claim [of standing or waiver of sovereign immunity] that is plausible on its face.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Defendants also move in the alternative for dismissal under Rule 12(b)(6). A Rule 12(b)(6) challenge "tests the legal sufficiency of a complaint." *Kemp v. Eiland*, 139 F. Supp. 3d

329, 335 (D.D.C. 2015) (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). Thus,

the plausibility requirement of *Iqbal* and *Twombly* applies to the merits of a plaintiff's claims.

*See id.* To survive a 12(b)(6) motion to dismiss, "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The

court may "consider only the facts alleged in the complaint, any documents either attached to or

incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC*

*v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO CHALLENGE § 1201(a)(1) AND 1201(a)(2) UNDER THE FIRST AMENDMENT

Plaintiffs lack standing to assert First Amendment challenges to the DMCA's

anti-circumvention and anti-trafficking provisions, 17 U.S.C. § 1201(a)(1) and (a)(2), and Counts

I-V of their Complaint should accordingly be dismissed for lack of subject matter jurisdiction.

"The judicial power of the United States" is limited by Article III of the Constitution "to the

resolution of 'cases' and 'controversies,'" *Valley Forge Christian Coll. v. Americans United for*

*Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), and the demonstration of a

plaintiff's standing to sue "is an essential and unchanging part of the case-or-controversy

requirement," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry must

be "especially rigorous" when reaching the merits of a claim would force a court to decide the

constitutionality of actions taken by a coordinate Branch of the Federal Government. *Clapper v.*

*Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). A plaintiff "'must demonstrate standing for each

claim he seeks to press.'" *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 10 (D.C.

Cir. 2015), *as amended* (July 21, 2015) (quoting *DaimlerChrysler Corp.*, 547 U.S. at 352). Thus,

to establish standing for their claims here, for which Plaintiffs seek only injunctive and declaratory

relief, Plaintiffs must identify for each an injury in fact, fairly traceable to the statutory language at issue in the specific claim, and redressable by a favorable ruling, that is "concrete, particularized, and actual or imminent." *See id.*

Courts apply a specific formulation of the standing requirements where a plaintiff's asserted injury rests on the prospect of Government enforcement. Here, Plaintiffs seek to bring preenforcement challenges to the DMCA's anti-circumvention provision, 17 U.S.C. § 1201(a)(1), and its anti-trafficking provision, 17 U.S.C. § 1201(a)(2). Violations of these provisions are subject to criminal prosecution pursuant to 17 U.S.C. § 1204. In this context, in order to establish that threatened enforcement is "sufficiently imminent," a plaintiff must "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there [must] exist[] a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Clapper,* 133 S. Ct. at 1147 (the threatened injury cited by the preenforcement plaintiff must be "certainly impending"); *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir.), *cert. denied*, 135 S. Ct. 477 (2014) (applying *Clapper* to a preenforcement First Amendment challenge). As discussed below, Plaintiffs fail to satisfy these requirements with respect to their preenforcement challenges to § 1201(a)(1) and § 1201(a)(2).

### A.       Plaintiffs Fail To Assert a Credible Threat of Prosecution

For one thing, Plaintiffs fail to allege a credible threat of prosecution under 17 U.S.C. § 1204 for violation of either § 1201(a)(1) or § 1201(a)(2). In addition to the elements set forth in those provisions, such a prosecution would also require the Government to prove that the violation was committed both willfully and "for purposes of commercial advantage or private financial gain." 17 U.S.C. § 1204(a).

Where, as here, a plaintiff in the preenforcement context alleges an infringement of the freedom of speech, "'[s]ubjective "chill" alone will not suffice to confer standing.'" *Johnson v. Dist. of Columbia*, 71 F. Supp. 3d 155, 159 (D.D.C. 2014) (quoting *A.N.S.W.E.R. v. Dist. of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009)). Rather, Plaintiffs' ability to establish a credible threat of prosecution "depends on how likely it is that the government will attempt to use [the challenged] provisions against them[,] . . . not on how much the prospect of enforcement worries them." *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992). In assessing the likelihood of enforcement, a court may consider factors such as "the history of enforcement of the challenged statute to like facts" and "any threats of enforcement." *Johnson*, 71 F. Supp. 3d at 160.

"[C]ourts often find the absence of a specific threat [of enforcement] fatal" to preenforcement standing. *Id.* (citing *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005)). Indeed, in the D.C. Circuit, in order to establish a credible threat of prosecution, a preenforcement plaintiff must "prove not only that the threat is credible, but also that it is imminent." *Urban Health Care Coal. v. Sebelius*, 853 F. Supp. 2d 101, 113 n.11 (D.D.C. 2012). In other words, the plaintiff must show "that the potential prosecution 'results from a special law enforcement priority,'" *id.* (quoting *Ord v. District of Columbia,* 587 F.3d 1136, 1140 (D.C. Cir. 2009)), "or that the plaintiff has been 'singled out or uniquely targeted' for prosecution," *id.* (quoting *Parker v. District of Columbia,* 478 F.3d 370, 375 (D.C. Cir. 2007)).

Plaintiffs here make no allegation that they have received any threat of enforcement, nor do they allege facts that plausibly suggest that the Government considers it a special priority to prevent *them*, in particular, from violating the DMCA's anti-circumvention or anti-trafficking provisions in § 1201(a), "or a particular interest in punishing *them* for having done so." *See*

16

*Parker*, 478 F.3d at 375. Nor do Plaintiffs cite any specific instance of criminal prosecution in similar circumstances. Rather, Plaintiffs simply allege that "[f]ederal prosecutors have prosecuted alleged violations of Section 1201 on multiple occasions." Compl. ¶ 28. Such a conclusory assertion fails to support standing at the pleading stage. *See Iqbal*, 556 U.S. at 678. Indeed, Plaintiffs place greater emphasis on their fear that third parties will bring suit against them under the DMCA's private right of action provision, set forth in 17 U.S.C. § 1203, than they do on the possibility of criminal prosecution pursuant to § 1204. *See, e.g.*, Compl. ¶¶ 81-83, 86 (asserting a need to assess "the litigiousness of manufacturers" before engaging in security research, and alleging numerous instances where manufacturers have threatened legal action in regard to security research); *id.* ¶ 97 (asserting that Intel has threatened to sue anyone who used a publicly available "master key" to circumvent its access controls on HDMI digital content). But courts have recognized that the threat of private lawsuits has no bearing on a plaintiff's standing to bring a preenforcement challenge against the Government. *See, e.g.*, *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016) (holding in a preenforcement challenge that the causation prong of standing was not satisfied by plaintiffs' allegation that third parties might invoke a private cause of action against them); *Temple v. Abercrombie*, 903 F. Supp. 2d 1024, 1034–35 (D. Haw. 2012) (plaintiff nonprofit religious organizations lacked standing to sue state officials in order to challenge state's Civil Unions Law based on assertions that plaintiffs' employees might bring suit against them under the law's private right of action).

Because Plaintiffs fail to allege any facts suggesting it is likely, much less imminent, that the Government will attempt to enforce the challenged DMCA provisions against them, their purported fears of potential enforcement amount to no more than a subjective chill, which is insufficient to confer preenforcement standing to assert a First Amendment challenge to a federal

statute. *See Am. Library Ass'n*, 956 F.2d at 1193; *A.N.S.W.E.R.,* 589 F.3d at 435. Accordingly, the challenges that Plaintiffs assert in Counts I-V of their Complaint should be dismissed for lack of subject matter jurisdiction.

> **B.**     **Plaintiffs Fail to Identify an Intent to Engage in Constitutionally-Protected Conduct that Would Violate § 1201(a)(1)(A) or § 1201(a)(2)**

Apart from the fact that Plaintiffs fail to identify a credible threat of enforcement under 17 U.S.C. § 1204 based on a violation of either of the DMCA provisions that they challenge, Plaintiffs' allegations also fail to establish that their intended violations of those two provisions, § 1201(a)(1)(A) and § 1201(a)(2), implicate any constitutionally-protected interest. They therefore fail adequately to allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," *Susan B. Anthony List*, 134 S. Ct. at 2342, and lack standing to assert their First Amendment challenges to those provisions for this additional reason.

Applying this requirement in *Susan B. Anthony*, the Supreme Court held that the plaintiffs had standing to challenge an Ohio statute that prohibited dissemination of false statements about candidates, knowing that, or with reckless disregard of whether, the statements were false. *Id.* at 2338, 2343. The Court reasoned that the plaintiffs had sufficiently alleged an intent to engage in a course of conduct arguably affected with a constitutional interest because they had "pleaded specific statements they intend to make in future election cycles." *Id.* at 2343. These statements qualified as "political speech" and thus were "certainly 'affected with a constitutional interest.'" *Id.* at 2344 (quoting *Babbitt*, 442 U.S. at 298). The Court also concluded that these statements were "arguably . . . proscribed by" the Ohio law. *Id.*

This case presents quite a different situation. First, none of the Plaintiffs alleges an intent to engage in First Amendment-protected speech or expressive conduct that is proscribed by the

DMCA's anti-circumvention provision, § 1201(a)(1)(A). Rather, Green alleges a desire to circumvent access controls protecting access to various electronic devices or systems, such as medical devices, medical record systems, and toll collection systems. *See* Compl. ¶¶ 75, 77. Huang and Alphamax allege a desire to circumvent access controls that protect HDMI digital content. *Id.* ¶¶ 90, 93. Plaintiffs do *not* allege that such acts of circumvention—which are what § 1201(a)(1)(A) prohibits—qualify as speech or expressive conduct protected by the First Amendment. Rather, Plaintiffs appear to rely on activities that would take place *after* they violate § 1201(a)(1)(A). Green alleges that, if he were able to engage in his desired acts of circumvention, he would then be able to inform manufacturers of vulnerabilities in their devices or systems, and he would also be able to publish "detailed information regarding how to circumvent security systems" in a book. *Id.* ¶ 75. Huang and Alphamax allege that their acts of circumvention would enable them subsequently to create and market a device that would allow purchasers to copy and alter copyrighted material in HDMI format. *Id.* ¶¶ 100-102.

Such assertions clearly fail to satisfy the requirements for preenforcement standing articulated in *Susan B. Anthony*. Indeed, the Supreme Court previously has made clear that the subsequent *use* an individual intends to make of certain information does not confer any First Amendment right to *acquire* that information in the first place. *See Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965). In *Zemel*, the plaintiff argued that the Secretary of State's decision to refuse to validate his passport for travel to Cuba impaired his ability to investigate and subsequently report to others the effects of the federal government's Cuban policies. *Id.* at 3, 16. The Court confirmed that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Id.* at 17. Thus, for example, even though "the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find

19

relevant to his opinion of the way the country is being run," "entry into the White House" is not "a

First Amendment right." *Id.*; *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 10-11 (1978) (finding

no constitutional violation in the denial of access to a jail for the purpose of investigating jail

conditions). Accordingly, Plaintiffs fail plausibly to allege an intention to engage in conduct

protected by the First Amendment but prohibited by § 1201(a)(1)(A).

   The same is true in regard to § 1201(a)(2). Indeed, Green does not identify a "technology,

product, service, device, component, or part thereof" that he wishes to disseminate in violation of

that provision, nor does he allege that any such item would qualify as speech. It is unclear, based

solely on the allegations in the Complaint, whether the "detailed information regarding how to

circumvent security systems" that Green wishes to publish, Compl. ¶ 75, would violate the

anti-trafficking provision in § 1201(a)(2). Similarly, while Huang and Alphamax assert an

intention to commercially distribute the NeTVCR device, after it is developed, they fail to identify

any element of speech at issue in such distribution. *See* Compl. ¶¶ 90, 102.[8]  Again, it is unclear

from the allegations in the Complaint whether the NeTVCR device will contain the "master

[cryptographic] key" that they describe, nor do Plaintiffs allege any facts establishing how this key

qualifies as speech. *See id.* ¶¶ 93-95. Rather, Huang and Alphamax appear to rely on the

convoluted notion that those who purchase the NeTVCR might use it to gain unauthorized access

to copyrighted material and might then make noninfringing uses of that material. *See id.*

¶¶ 106-107. (Of course, it seems likely that a device that allows users to gain unauthorized access

to copyrighted material could also allow subsequent uses that do infringe the rights of copyright

---

[8]  Notably, the act of selling or offering for sale the NeTVCR device is not entitled to First
Amendment protection as commercial speech because such an offer would relate to illegal
activity. *See Whitaker v. Thompson*, 353 F.3d 947, 952 (D.C. Cir. 2004) ("[C]ommercial speech
enjoys First Amendment protection only if it concerns a lawful activity and is not misleading.");
*see also 321 Studios v. Metro Goldwyn Mayer Studios, Inc*., 307 F. Supp. 2d 1085, 1098-99 (N.D.
Cal. 2004) (holding that the commercial marketing of DVD copying software in violation of the
DMCA's anti-trafficking provisions was not protected by the First Amendment).

holders.) However, even assuming that such subsequent uses implicate the First Amendment, such

a prospect cannot transform the initial commercial distribution of such a device into First

Amendment-protected activity. Plaintiffs' challenges to § 1201(a)(1)(A) and § 1201(a)(2) in

Counts I-V of their Complaint should therefore also be dismissed because Plaintiffs fail to allege

an intention to engage in conduct that is protected by the First Amendment but proscribed by those

provisions.

## II.    PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM SHOULD BE DISMISSED (COUNT I)

### A.    Section 1201(a) Is Not Subject to the First Amendment's Overbreadth Doctrine Because the Provision on Its Face Does Not Regulate Speech

Even if Plaintiffs' First Amendment claims are not dismissed for lack of standing, they

are subject to dismissal for failure to state a claim upon which relief can be granted. In Count I of

their Complaint, Plaintiffs claim that § 1201(a)[9] is facially invalid under the First Amendment's

overbreadth doctrine. This claim necessarily fails—first and foremost because § 1201(a) on its

face does not regulate speech. The overbreadth doctrine provides a narrow exception to

"traditional rules of standing" by allowing a plaintiff to bring a facial First Amendment challenge

to a regulation of "spoken words" or patently "expressive or communicative conduct" based on

its chilling effect on others. *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973). When the

doctrine applies, a law may be held facially invalid only if it "punishes a 'substantial' amount of

protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v.*

*Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick*, 413 U.S. at 615). However, the Supreme

Court has emphasized that "the overbreadth doctrine is 'strong medicine' [that should be]

employed . . . with hesitation, and then 'only as a last resort.'" *L.A. Police Dep't v. United*

---

[9]  Although the enumerated Counts of the Complaint do not specify which provision of § 1201 they
purport to challenge, the Complaint elsewhere makes clear that Plaintiffs' challenge is limited to
§ 1201(a). *See, e.g.*, Compl. ¶ 1.

*Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) (citations omitted). Moreover, an overbreadth challenge is not appropriate "against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks*, 539 U.S. at 124 (recognizing such a challenge could succeed "[r]arely, if ever"); *accord Mahoney v. Dist. of Columbia*, 662 F. Supp. 2d 74, 86 n.5 (D.D.C. 2009), *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011).

In *Hicks*, the Court accordingly held that a city housing authority's trespass policy could not be deemed unconstitutionally overbroad because, on its face, the policy was not directed at First Amendment-protected activity; rather, the same rules applied regardless of whether a person sought to enter the property for speech-related (leafletting) or non-speech-related (loitering) purposes. *Hicks*, 539 U.S.; *see also Hastings v. Judicial Conf.,* 829 F.2d 91, 106–07 (D.C. Cir. 1987) (rejecting overbreadth challenge to judicial misconduct statute because statute was "directed against serious judicial transgressions, not against protected speech"); *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (Sept. 17, 1996) (overbreadth doctrine did not apply to a city ordinance prohibiting sitting or lying on the sidewalk because it was not "directed narrowly and specifically at expression or conduct commonly associated with expression" (quoting *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 760 (1988)).

Plaintiffs' overbreadth challenge here fails for just this reason. As at least one court has recognized, § 1201(a) "[b]y its terms" is "not directed narrowly and specifically at expression or conduct commonly associated with expression." *Elcom Ltd.*, 203 F. Supp. 2d at 1133 (internal quotation omitted). Rather, § 1201(a)(1) prohibits circumvention of access controls on copyrighted works, and § 1201(a)(2) prohibits trafficking in any anti-circumvention technology,

product, service, device, or component. Access controls—for example, a webpage that requires a password or payment of a fee, CSS encryption techniques applied on DVDs, or firmware controls preventing the modification or removal of software—are types of "digital locks" that can be analogized to a physical lock on the door of a room containing a book. H.R. Rep. 105-551(I), at 17 ("The act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book."). Such controls, which regulate *access* to copyrighted material rather than the *use* of copyrighted material *after* it has been lawfully obtained, do not implicate the First Amendment. *Cf. Zemel*, 381 U.S. at 16-17; *Houchins*, 438 U.S. at 10-11. After all, the First Amendment does not require a museum to admit patrons who refuse to pay the price of admission, or an author to provide his or her book for readers to peruse for free. *Cf. Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 552–53 (1985) (recognizing that copyright necessarily includes the right *not* to publish). Instead, it is accepted that the museum or author may limit access to the copyrighted works to those willing to pay a fair price.[10] The prohibition in § 1201(a)(2) on trafficking in anti-circumvention technologies, products, services, devices, or components on its face similarly does not regulate pure speech or expressive conduct. *Elcom Ltd.,* 203 F. Supp. 2d at 1133. Thus, as *Elcom* concluded, because § 1201(a) on its face does not implicate the First Amendment, "an overbreadth facial challenge is not available." *Id.* at 1133; *see also Universal City Studios, Inc. v. Reimerdes,* 111 F. Supp. 2d 294, 337-38 (S.D.N.Y. 2000) (dismissing overbreadth challenge to 1201(a)(2) and noting "the issue concerns dissemination of technology that is principally functional in nature" rather than "pure speech").

---

[10] As indicated above, § 107 of the Copyright Act ensures that users who have already lawfully accessed the copyrighted works may make fair use of the works. Thus, § 1201 does not bar circumvention of technological protection measures that prevent *copying* of works once access has been authorized; such controls may thus be circumvented for purposes of making fair and other noninfringing uses of those works.

23

**B.      Plaintiffs' Overbreadth Claim Is Also Inappropriate Because It Primarily
Seeks to Assert Plaintiffs' Own First Amendment Rights Rather Than the
Rights of Third Parties Not Before the Court**

Even if § 1201(a) were deemed to implicate the First Amendment, the Court should

dismiss Plaintiffs' overbreadth claim because, instead of focusing on third parties not before the

Court, Plaintiffs seek only to assert their own First Amendment rights. As indicated above, the

overbreadth doctrine is essentially a third-party standing doctrine. *See Broadrick*, 413 U.S. at 612.

Courts therefore have rejected overbreadth challenges when "the parties challenging the statute are

those who desire to engage in protected speech that the [supposedly] overbroad statute purports to

punish.'" *See Mahoney*, 662 F. Supp. 2d at 85–86 (quoting *Brockett v. Spokane Arcades, Inc.,* 472

U.S. 491, 504 (1985)). In such instances, claimants need not rely on an asserted chill on the speech

of third parties to make their desired First Amendment argument; rather, they may—as Plaintiffs

have indeed done here—simply raise as-applied First Amendment claims on their own behalf. *See

id*. Thus, in *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984), the Supreme

Court held that it would be "inappropriate . . . to entertain an overbreadth challenge" to an

ordinance that prohibited posting signs on city-owned property because the plaintiff in that case

had "failed to identify any significant difference" between its overbreadth claim and its as-applied

claim. *Id.* at 802 (noting that if the ordinance could be validly applied to the plaintiff, it could be

validly applied "to most if not all of the signs of parties not before the Court"). The Court thus

concluded there was no "realistic danger" that restricting its consideration to an as-applied analysis

would "significantly compromise First Amendment protections of individuals not before the

Court." *Id.*

Here, Plaintiffs' overbreadth claim focuses almost exclusively on Plaintiffs' own alleged

injuries. *See* Compl. ¶¶ 111-20. Indeed, the Complaint's allegation that "many others," in addition

to Plaintiffs, are allegedly "chilled" by § 1201(a) from exercising their First Amendment rights, Compl. ¶¶ 113-14, is vague and conclusory, and is thus insufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 678. Moreover, Plaintiffs appear to assert identical First Amendment arguments on their own behalf and on behalf of the unidentified "many others," essentially relying on the notion that the First Amendment protects the "fair use" of copyrighted material, and the assertion that § 1201(a) chills Plaintiffs and others from engaging in such fair use. *See* Compl. ¶¶ 113-14; *see also* ¶¶ 129-35 (Green's as-applied claim), 136-49 (Huang's and Alphamax's as-applied claims). As in *Taxpayers for Vincent*, because Plaintiffs have not identified any significant difference between their overbreadth and as-applied claims, it would be inappropriate for this Court to consider Plaintiffs' overbreadth challenge, and the claim should be dismissed on that basis alone.

### C. Plaintiffs Cannot Establish Substantial Overbreadth in Light of the Many Obvious Constitutional Applications of the Statute

.      Even if the Court does not dismiss Plaintiffs' overbreadth claim for either of the threshold reasons identified above, the claim would necessarily fail because Plaintiffs cannot identify "real" and "substantial" overbreadth, "judged in relation to the statute's plainly legitimate sweep." *Taxpayers for Vincent*, 466 U.S. at 800. The DMCA's anti-circumvention and anti-trafficking provisions are plainly legitimate in the vast majority of applications. As described above, at the time of the DMCA's enactment, digital piracy was recognized internationally as a global problem, resulting in the WIPO treaty that the DMCA implemented, and § 1201 was enacted "to make digital networks safe places to disseminate and exploit copyrighted materials." S. Rep. No. 105-190, at 2, 8. Section 1201's anti-circumvention and anti-trafficking provisions are overwhelmingly aimed at discouraging digital piracy while fostering the widespread dissemination of creative works by establishing legal protections for those who seek to protect

copyrighted content through technological means.

On the other side of the balance, Plaintiffs appear to rest their First Amendment overbreadth challenge on the "fair use doctrine." *See* Compl. ¶¶ 23, 113. The fair use provision of the Copyright Act, § 107, provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research is not an infringement of copyright." 17 U.S.C. § 107. The Supreme Court has recognized that this provision codifies an "affirmative defense" to a claim of copyright infringement under 17 U.S.C. §§ 106 or 106A. *Campbell v. Acuff-Rose Music, Inc*., 510 US 569, 576, 590 (1994). However, there is no fair use defense to alleged violations of § 1201(a)(1)(A) or § 1201(a)(2), which, as discussed above, prohibit circumvention of access controls and trafficking in devices that allow such circumvention—not the use of copyrighted works after circumvention has occurred. When Congress enacted the DMCA, it did not amend § 107 to make it applicable to § 1201, nor did it codify elsewhere a fair use defense to alleged violations of § 1201.

To the extent Plaintiffs seek to contend that Congress's omission of a fair use defense to § 1201(a) renders that provision unconstitutionally overbroad, their claim must fail. Courts have never recognized "fair use" as a First Amendment right independent of § 107. *E.g., Corley*, 273 F.3d at 459 (recognizing that there was "no authority for the proposition that fair use, as protected by [§ 107 of] the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original," such that the fair use doctrine could be asserted in a DMCA prosecution as providing a "guarantee of access to copyrighted material"); *321 Studios,* 307 F. Supp. 2d at 1101–02 (rejecting notion that there is "absolute First Amendment protection for fair use of copyrighted works"); *Elcom Ltd.,* 203 F. Supp. 2d at 1134 n.4 ("There is no direct authority for the proposition that the doctrine of fair use is coextensive with the First

Amendment, such that 'fair use' is a First Amendment right."); *see also Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 631 (7th Cir. 2003) ("The First Amendment adds nothing to the fair use defense.").

While the Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), recognized the fair use defense in § 107, along with the ideas/expression distinction set forth in 17 U.S.C. § 102(b)[11], as "built-in First Amendment accommodations" within the Copyright Act, it did so in the course of analyzing a statute that changed the duration of certain copyright terms, and that thus implicated copyright holders' exclusive rights under §§ 106 and 106A of the Act. *See Eldred*, 537 U.S. at 195, 219. The Court rejected the applicability of "uncommonly strict scrutiny" to the plaintiffs' First Amendment challenge because, it reasoned, "[t]he Copyright Clause and First Amendment were adopted close in time," indicating that, "in the Framers' view, copyright's limited monopolies are compatible with free speech principles." *Id.* at 219. The Court further observed that copyright law, which "protects authors' original expression" from "exploitation" by others, did not implicate "the heart of the First Amendment"; to the contrary, "[t]he First Amendment . . . bears less heavily when speakers assert the right to make other people's speeches." *Id.* at 220-21. While the Court declined to rule that First Amendment challenges to copyright laws were precluded altogether, it deferred to Congress's judgment where the challenged law did not "alter[] the traditional contours of copyright protection." *Id.* at 221.

The Court reached the same conclusion in *Golan v. Holder*, 132 S. Ct. 873 (2012), regarding a law that extended copyright protections to foreign works. *Id.* at 890. In both cases, the Court recognized that copyright itself served "as an 'engine of free expression'" because it

---

[11] The idea/expression dichotomy "distinguishes between ideas and expression and makes only the latter eligible for copyright protection," allowing for the "free communication of facts while still protecting an author's expression." *Eldred*, 537 U.S. at 788-89 (internal quotation marks omitted) (quoting *Harper & Row*, 476 U.S. at 556).

"'supplie[d] the economic incentive to create and disseminate ideas.'" *Id.* (quoting *Eldred*, 537 U.S. at 219). At the same time, the Court also recognized that "some restriction on expression is the inherent and intended effect of every grant of copyright." *Golan*, 132 S. Ct. at 889. Ultimately, the Court in both cases deferred to the balance Congress had struck in the fair use provision, § 107.

Here, as in *Eldred* and *Golan*, the law at issue has no bearing on the "traditional contours of copyright protection." Indeed, Congress enacted the DMCA pursuant to its commerce power, not under the Copyright Clause. *Elcom Ltd.*, 203 F. Supp. 2d at 1138. Nevertheless, the DMCA's purpose to encourage digital dissemination of copyrighted works by protecting those works from digital piracy is consistent with the goals of copyright, and the DMCA expressly states it does not "affect rights, remedies, limitations, or defenses to copyright infringement, including fair use," or "enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products." 17 U.S.C. § 1201(c)(1), (4); *see Elcom, Ltd.*, 203 F. Supp. 2d at 1141. Courts have repeatedly recognized that "the DMCA does not eliminate fair use or substantially impair the fair use rights of anyone." *Id.* at 1134; *accord Corley*, 273 F.3d at 459.

The court in *Elcom* thus rejected the defendant's argument that the DMCA was unconstitutionally overbroad because it interfered with fair use. *See Elcom, Ltd.*, 203 F. Supp. 2d at 1135. Similarly in *Corley*, a case that concerned the CSS encryption applied to DVDs, the court rejected the defendants' assertion that a fair use defense to the DMCA's anti-trafficking provision was constitutionally required because the defendants' DMCA violation—"trafficking in a decryption code that enables unauthorized access to copyrighted materials"—did not implicate fair use. *See Corley*, 273 F.3d at 459 (further noting that "[f]air use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred

28

technique or in the format of the original"). Likewise, the court in *321 Studios* held that "[i]t is the technology itself at issue [in § 1201(b)(1)], not the uses to which the copyrighted material may be put," and that "legal downstream use of the copyrighted material by customers is not a defense to [a] software manufacturer's violation of . . . § 1201(b)(1)." *321 Studios*, 307 F. Supp. 2d at 1097-98.

This Court should similarly reject the notion that the fair use doctrine has any bearing on the constitutionality under the First Amendment of the DMCA provisions at issue. As discussed above, these DMCA provisions prohibit circumvention of access controls and trafficking in circumvention devices; they do not prohibit fair use of works after someone has gained lawful access to them, and § 107 continues to provide a defense to a claim of copyright infringement based on such fair use. The fair use doctrine therefore provides no basis for holding the DMCA provisions unconstitutionally overbroad.

However, even if the Court were to credit the notion that the DMCA requires its own "First Amendment accommodations" similar to the fair use provision in § 107, it should defer, as the Supreme Court did in *Eldred* and *Golan*, to Congress's judgment and conclude that the accommodations that Congress provided in the DMCA are adequate. In fact, while Congress declined to provide a broadly-applicable fair use defense to the anti-circumvention and anti-trafficking provisions in § 1201(a), it did accommodate protections for users and other speech concerns in at least three ways. First, as described above, § 1201(c) ensures that § 1201(a) cannot be interpreted to affect copyright infringement defenses, "including fair use," or to alter free speech rights "for activities using consumer electronics, telecommunications, or computer products." 17 U.S.C. § 1201(c). Second, as noted above, Congress established seven permanent exemptions to the prohibition on circumvention and, in certain cases, the sharing of circumvention

technology—including one for security research. *See id.* § 1201(d)-(j). Third, and of particular note, Congress established the triennial rulemaking process as a mechanism to address fair use considerations, thereby ensuring that "the right against anti-circumvention would be qualified to maintain balance between the interests of content creators and information users." H.R. Rep. No. 105-551(II), at 26, 35-37. In doing so, Congress emphasized the importance of "ensur[ing] that the concept of fair use remains firmly established in the law," but it also recognized that "fair use principles certainly should not be extended beyond their current formulation." *Id.* at 26. This Court should defer to Congress's assessments in this area and hold that Plaintiffs' assertions regarding fair use cannot sustain an overbreadth challenge to § 1201(a).

Aside from their assertions regarding fair use, which the Court should reject for the reasons explained above, Plaintiffs fail to identify a single circumstance where the First Amendment would require an exception to the anti-circumvention or anti-trafficking prohibitions of § 1201(a). They therefore fail to set forth a plausible allegation that the overbreadth they seek to assert is "substantial" in relation to the statute's plainly legitimate sweep. Count I of Plaintiffs' Complaint should therefore be dismissed.

## III.   PLAINTIFFS' CLAIM THAT THE DMCA'S TRIENNIAL RULEMAKING IS AN UNCONSTITUTIONAL PRIOR RESTRAINT SHOULD BE DISMISSED (COUNT II)

In Count II of their Complaint, Plaintiffs allege that the triennial rulemaking process required under 17 U.S.C. § 1201(a)(1)(C) serves as a prior restraint on speech in violation of the First Amendment. However, the prior restraint doctrine is wholly inapplicable to a process that does not restrain speech but instead is directed at exempting certain classes of copyrighted material from the anti-circumvention restriction in § 1201(a)(1)(A). This claim should thus be dismissed.

The prior restraint doctrine addresses laws that impose licensing or permit prerequisites on

private speech in such a way that the government is able to censor the speech of specific applicants based on its content. *See Thomas v. Chicago Park Dist.,* 534 U.S. 316, 320 (2002) (explaining the doctrine arose as a reaction to an English licensing system requiring books and pamphlets to be submitted to the government for advance approval before publication); *see also Freedman v. Maryland*, 380 U.S. 51, 57 (1965) (holding a state law requiring films to be submitted to a state board of censors before it was shown in movie theaters within the state was an invalid prior restraint). Regulations subjected to review under this doctrine include, for example, permit requirements for demonstrations or leafletting on public land, *see*, *e.g.*, *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 512 (D.C. Cir. 2010) (addressing regulation requiring permits in order to conduct demonstrations, parades, or distribution of printed matter in national parks), or zoning requirements for adult-oriented businesses or signs, *see, e.g.*, *Green Valley Investments v. Winnebago Cty.*, 794 F.3d 864, 866, 868–69 (7th Cir. 2015) (addressing conditional use permit requirement for "adult entertainment" establishments); *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 620–21 (6th Cir. 2009) (addressing scheme requiring business owners to "apply for special zoning approval as a condition of operating", as well as permit requirements for sign-posting); *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 904–05 (9th Cir. 2007) (addressing city's conditional use permit requirement for signs). The concern underlying application of the doctrine in this context is that, "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323.

Here, the triennial rulemaking provided by § 1201(a)(1)(C) simply does not qualify as a prior restraint on speech, for three reasons. First, as opposed to regulations requiring *each individual* person or group to obtain a permit or license before engaging in their own speech (for

example, by demonstrating, leafletting, or posting a sign), the triennial rulemaking described in § 1201(a)(1)(C) does not create exemptions to the prohibition on circumvention in § 1201(a)(1) on an individual, case-by-case basis. Rather, through the triennial rulemaking, the Librarian of Congress makes a determination regarding whether, as a general matter, those who wish to gain access to a general *class* of copyrighted works of others are "adversely affected . . . in their ability to make noninfringing use" of those works. 17 U.S.C. § 1201(a)(1)(C). The Final Rule identifies exemptions according to the content-neutral class of copyrighted material, with possible reference to intended categories of noninfringing uses of such material. *See* 17 U.S.C. § 1201(a)(1)(C); *see, e.g.*, 2015 Final Rule, 80 Fed. Reg. 65961-64.[12] The risk of censorship based on content, which arises when a law delegates overly broad licensing discretion to a government official making decisions on a case-by-case basis, is wholly absent because there is no individualized determination involved.

Second, as discussed above, the DMCA's prohibition on circumventing access controls does not impose direct limitations on an individual's *own* speech; rather, the access controls restrict *access* to *someone else's* copyrighted material. The Supreme Court has made clear that "[t]he First Amendment bears less heavily when speakers assert the right to make other people's speeches," *Eldred*, 537 U.S. at 219, and any speech interest is significantly more attenuated when the issue concerns the right to access, without authorization, other people's copyrighted speech to which they have applied technological protection measures. Although Plaintiff Green appears to claim that he cannot write his desired book on security research, and Plaintiffs Huang and

---

[12] The 2015 Final Rule identified classes of copyrighted material such as "motion pictures," "literary works," or "computer programs that enable smart televisions to execute lawfully obtained software applications." *See id.* In connection with certain classes, the 2015 Final Rule identified specific noninfringing uses such as "in noncommercial videos," "for educational purposes," or "for the sole purpose of enabling interoperability of [lawfully obtained software] applications with computer programs on the smart television." *See id.*

Alphamax appear to claim that they cannot create, distribute, and use a device that allows for manipulation of certain digital media content, unless they access material copyrighted by others, they cannot suggest that their inability to do so is due to a direct government prohibition on those activities, such that § 1201(a)(1)(C) constitutes a prior restraint on speech. Indeed, if such an attenuated connection between a law and the claimant's speech were sufficient, any law could be subject to review under the prior restraint doctrine. Pilot or medical licensing requirements could be challenged as prior restraints by someone who wants to write a book about his experience flying an airplane or performing open heart surgery. Restrictions on access to government facilities, such as prisons, nuclear reactors, or records storage facilities, could be challenged as prior restraints by someone who wants to make a film or conduct research for a book inside those facilities. As indicated above, the Supreme Court has rejected the notion of a First Amendment "right to gather information" that would be threatened by such laws, which simply impose general access restrictions unrelated to speech. *See Zemel*, 381 U.S. at 17. Again, such access restrictions do not implicate the government censorship concerns that the prior restraint doctrine is meant to address. The DMCA's triennial rulemaking process similarly raises no such concerns.

The third distinction between § 1201(a)(1)(C) and laws properly subject to consideration under the prior restraint doctrine is that the triennial rulemaking process required under § 1201(a)(1)(C) is a mechanism for identifying *exceptions* to an already-existing prohibition, in § 1201(a)(1), on circumventing access controls protecting copyrighted works. As explained above, § 1201(a) on its face does not violate the First Amendment. The triennial rulemaking process cannot properly be subject to independent First Amendment scrutiny, whether under the prior restraint doctrine or otherwise, separate from the anti-circumvention provision for which it provides exemptions.

In a similar situation, the Eleventh Circuit recently held that the prior restraint doctrine was inapplicable to a city ordinance that allowed those who had previously been banned from access to a public park, due to trespass violations, to seek suspension of the prohibition for the purpose of engaging in expressive activity, such as joining a demonstration taking place in the park. *Wright v. City of St. Petersburg,* No. 15-10315, 2016 WL 4269796, at *5–6 (11th Cir. Aug. 15, 2016). As the court noted, the provision allowing for consideration of such a suspension request "offered a way in which [the plaintiff] could engage in speech or other First Amendment activities in one place where he would otherwise not be permitted to be present." *Id.* at *6. The provision therefore was "the opposite of a censorial prior restraint because it allow[ed] more speech, not less." *Id.*

Similarly here, the triennial rulemaking allows for exceptions to the already-existing prohibition in § 1201(a)(1) on circumventing access controls. Indeed, like the general trespass statute at issue in *Wright*, the anti-circumvention prohibition in § 1201(a)(1) does not regulate speech on its face and for that reason, as explained above, is not subject to facial First Amendment scrutiny. *See id.* at *4. Thus, as in *Wright*, the process of creating exceptions to that prohibition for the purpose of allowing noninfringing uses to occur is the opposite of a prior restraint.[13] The prior restraint doctrine is therefore inapplicable to § 1201(a)(1)(C).

Even if the Court were to analyze § 1201(a)(1)(C) under the framework applicable to prior restraints, Plaintiffs' claim would necessarily fail. If § 1201(a)(1)(C) is deemed to implicate the First Amendment at all, it clearly does so in a content neutral manner. The provision does not identify any speech or expressive activity by reference to its content. *See Boardley*, 615 F.3d at

---

[13]  This is so even assuming that the noninfringing uses permitted through the triennial rulemaking process would implicate the First Amendment. In *Wright*, the city ordinance at issue expressly allowed for exceptions to a trespass ban in order to engage in First Amendment-protected activities. *Id.* at *5. Here, in contrast, the triennial rulemaking process creates exemptions that ultimately allow noninfringing uses to occur, but as explained above, noninfringing uses, including fair use, do not themselves necessarily implicate the First Amendment in the first place.

34

516 (recognizing National Park Service regulation was "indisputably content-neutral on its face" and was not motivated "by its agreement with or hostility toward any particular message or speaker"). As such, § 1201(a)(1)(C) would be analyzed under an intermediate scrutiny framework and should be upheld if it does not "delegate overly broad licensing discretion to a government official," is "narrowly tailored to serve a significant governmental interest," and "leave[s] open ample alternatives for communication." *Id.*

Applying that framework here, the triennial rulemaking provision should be upheld. It does not delegate overly broad licensing discretion to a government official. Rather, it requires the Librarian to undertake a rulemaking process, solicit public comments, consider recommendations from the Register of Copyrights as well as a Department of Commerce Assistant Secretary, and assess specified factors to determine if an exemption would be appropriate, and ultimately to set forth the reasoning behind these determinations in a final rule. *See* 17 U.S.C. § 1201(a)(1)(C); *see, e.g.*, 2015 Final Rule, 80 Fed. Reg. 65944. This process is far removed from those that have been held to delegate overly broad discretion. *Cf. Forsyth Cty., Ga. v. Nat'list Movement*, 505 U.S. 123, 132–33 (1992) (invalidating permitting process that identified no "objective factors," did not require "any explanation for [a permitting] decision," and allowed the decisionmaker to assess widely differing fees based solely on his own judgment of what was appropriate in a specific case).

The process is also narrowly tailored to serve a significant governmental interest. The DMCA was enacted to further a significant government interest in fostering the growth and development of a thriving and flexible digital marketplace by ensuring adequate legal protections for copyrighted content. *See, e.g.*, House Mgr. Rpt. at 2, 6 (noting "the law must adapt in order to make digital networks safe places to disseminate and exploit material in which American citizens have rights in an unregulated and beneficial environment"); S. Rep. No. 105-190, at 1-2, 8 (same);

H.R. Rep. No. 105-551(II), at 21, 23 (noting "mutually supportive goals" of "promoting the continued growth and development of electronic commerce and protecting intellectual property rights"); H.R. Rep. No. 105-551(I), at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet."). The triennial rulemaking process ensures that the DMCA is narrowly tailored to serve these important interests by providing a "fail-safe" mechanism that would "monitor developments in the marketplace for copyrighted materials, and allow the enforceability of [§ 1201(a)(1)(A)] to be selectively waived, for limited time periods," in order to maintain an appropriate balance in the digital environment, "for the benefit of both copyright owners and users." H.R. Rep. 105-551(II), at 26, 35-37.

Finally, the process leaves open ample alternatives for communication. Indeed, neither § 1201(a)(1)(A) nor the triennial rulemaking process prohibits or regulates any form of communication; rather, they simply prohibit circumvention of access controls used to protect copyrighted works and provide a process for establishing exemptions to that prohibition. Individuals, including Plaintiffs, remain able to use copyrighted works in any way that is otherwise permitted so long as such works are accessed in a way that does not circumvent access controls without authorization. Count II of Plaintiffs' Complaint should therefore be dismissed.

## IV.    PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CHALLENGES TO THE DMCA SHOULD BE DISMISSED (COUNTS III, IV, AND V)

The three Plaintiffs set forth three separate Counts asserting that § 1201(a) violates the First Amendment as applied to each of them. None of these claims is cognizable. Plaintiff Green asserts that he has a First Amendment right to "circumvent access controls applied to copyrighted works, in the course of security research," even though his intended circumvention would violate § 1201(a)(1)(A). Compl. ¶¶ 130, 133. He also asserts a right to publish information

"related to security research," which includes "detailed information regarding how to circumvent security systems," allegedly in violation of § 1201(a)(2). Compl. ¶¶ 75, 87, 131.

Plaintiffs Huang and Alphamax assert that they have a First Amendment right to circumvent "HDCP technology applied to copyrighted works" in order to build and use the NeTVCR device that they wish to develop, even though such circumvention would violate § 1201(a)(1)(A). Compl. ¶¶ 137, 141, 144, 148. They also assert a First Amendment right to "traffic in NeTVCR devices and information" although such trafficking would violate § 1201(a)(2). Compl. ¶¶ 138, 145. As discussed below, Plaintiffs' as-applied challenges to both § 1201(a)(1)(A) and § 1201(a)(2) should be dismissed.

### A.    Section 1201(a)(1)(A) Does Not Violate the First Amendment As Applied to Plaintiffs

In regard to § 1201(a)(1)(A), Plaintiffs' as-applied claims fail because, as explained above, the anti-circumvention prohibition in § 1201(a)(1) does not implicate the First Amendment. The provision on its face does not regulate speech or expressive conduct, and Plaintiffs do not assert that they regard the acts of circumvention that they wish to undertake to be expressive. This case is unlike *Texas v. Johnson*, 491 U.S. 397 (1989), where Johnson intended the act prohibited by law—burning a flag—to convey a message of protest. *See id.* at 406 (recognizing that the "expressive, overtly political nature of [Johnson's] conduct was both intentional and overwhelmingly apparent"). Here, Plaintiffs' proposed acts of circumvention are merely a means to an end. Green, for example, wishes to circumvent access controls as a means of assessing weaknesses in those controls so that he can then inform vendors of those weaknesses, and he also wishes to use the information gleaned through this circumvention in his published work. Compl. ¶¶ 75-76, 82, 131-33. A parallel situation in *Johnson* would have existed if Johnson had burned a flag in order to assess the fire-retardant properties of the flag's material, with the

ultimate goals of reporting any flaws to the flag's manufacturer and publishing an article discussing the information learned through the flag-burning process. Conduct undertaken for such a purpose is merely functional rather than expressive. As for Huang and Alphamax, they wish to circumvent HDCP access controls as a means of developing a device for commercial distribution that would allow others to circumvent HDCP access controls. Compl. ¶¶ 90-102. Again, such conduct in furtherance of commercial goals is not itself intended to convey a message and cannot be deemed expressive within the meaning of *Johnson*.

Green appears to assert that his ultimate use of information gleaned through circumvention would qualify as a "fair use" of the access control software. Compl. ¶ 133. Huang and Alphamax also assert that their proposed development and commercial distribution of a NeTVCR device would facilitate a "vast amount of valuable new expression" by enabling third party circumventions. Compl. ¶¶ 140-47. However, these claims are irrelevant to the analysis because, as explained above, even assuming there is a First Amendment "right" to engage in fair use, a desire to make "fair use" of copyrighted material does not afford someone a First Amendment right to access that material in the first place. Plaintiffs' as-applied challenges to § 1201(a)(1)(A) should therefore be dismissed.

### B.  Section 1201(a)(2) Does Not Violate the First Amendment as Applied to Plaintiffs

Plaintiffs' as-applied challenges to § 1201(a)(2) likewise fail. By its terms, this provision does not prevent Green from publishing books discussing his security research. Rather, the provision is only implicated to the extent Green seeks to publish or disseminate any anti-circumvention "technology, product, service, device, component, or part thereof." *See* 17 U.S.C. § 1201(a)(2). While examples of computer code that Green ultimately concludes can be used to circumvent the access controls that he wishes to research might fall into this category, the

Complaint contains no specific allegation that Green intends to publish such code. As for Huang and Alphamax, § 1201(a)(2) appears to apply to them to the extent the NeTVCR device that they wish to commercially distribute contains the "master [cryptographic] key" that allows users to circumvent HDCP access controls on HDMI digital content. *See* Compl. ¶¶ 93-99. However, the Complaint nowhere alleges that this master key is a form of speech.[14]  As explained above, in light of these pleading deficiencies, Plaintiffs lack standing to challenge § 1201(a)(2) on First Amendment grounds. However, even assuming that Plaintiffs have plausibly asserted an intention to violate § 1201(a)(2) in a manner that implicates the First Amendment, their as-applied claims should be dismissed.

At least three other courts have upheld the DMCA's anti-trafficking prohibitions in § 1201(a)(2) or (b)(1) against as-applied First Amendment challenges where the challenger sought to disseminate computer code for circumvention purposes. *See Corley*, 273 F.3d at 454, 458 (upholding both § 1201(a)(2) and (b)(1) against as-applied First Amendment challenge by civil defendants seeking to overturn an injunction on posting and linking to DeCSS, computer code that allows circumvention of access controls on DVDs); *321 Studios*, 307 F. Supp. 2d at 1101 (upholding both § 1201(a)(2) and (b)(1) against as-applied First Amendment challenge by plaintiff seeking authority to market and sell software and instructions for copying DVDs); *Elcom Ltd.*, 203 F. Supp. 2d at 1132 (upholding § 1201(b)(1) against as-applied First Amendment challenge by criminal defendant charged with illegally selling a product containing software that would convert ebooks to different formats). While the courts in these cases held that computer code or software does qualify as speech entitled to First Amendment protection,

---

[14]  It is unclear from the Complaint whether this "master key" is a form of computer code. In addition, it appears that the master key originates from a source other than Huang or Alphamax. *See* Compl. ¶ 95 (asserting that the master key was "anonymously uploaded to the Internet" in 2010). Thus, to the extent the master key qualifies as speech, Huang and Alphamax seek to use a third party's speech to develop a device that they hope to commercially distribute.

all three courts also concluded that the application of the DMCA's anti-trafficking provisions to computer code resulted in a content neutral regulation of speech subject to intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968). *Corley*, 273 F.3d at 453; *321 Studios*, 307 F. Supp. 2d at 1101; *Elcom Ltd.*, 203 F. Supp. 2d at 1129.

Applying intermediate scrutiny, the courts held that the DMCA's anti-trafficking provisions "further important and substantial interests unrelated to the suppression of free expression, and that the incidental restrictions on First Amendment freedoms are no greater than essential to the furtherance of those interests." *321 Studios*, 307 F. Supp. 2d at 1101; *see also Corley*, 273 F.3d at 454 ("The Government's interest in preventing unauthorized access to encrypted copyrighted material is unquestionably substantial, and the regulation of DeCSS by the posting prohibition plainly serves that interest."); *Elcom Ltd.*, 203 F. Supp. 2d at 1130 ("Without the ban on trafficking in circumvention tools, the government's interest in promoting electronic commerce, preserving the rights of copyright holders, and preventing piracy would be undermined.").

As in *Corley*, *321 Studios*, and *Elcom*, the application of § 1201(a)(2) to decryption code or to a master cryptographic key is content neutral. The provision's application does not depend on the content of any computer code that might be involved; rather, the provision "target[s] only the nonspeech component" of the code—its functional capacity to circumvent access controls on copyrighted works. *See Corley.*, 273 F.3d at 454 ("The DMCA . . . applie[s] to DeCSS solely because of its capacity to instruct a computer to decrypt CSS. That functional capability is not speech within the meaning of the First Amendment."). As a content neutral regulation of Plaintiffs' speech, § 1201(a)(2) withstands First Amendment scrutiny under the four-prong test of *O'Brien*, 391 U.S. at 377. *See United States v. Caputo*, No. 1:15-CR-00175, 2016 WL

40

4435176, at *4 (D.D.C. Aug. 19, 2016). Under that test, (1) "the challenged regulation must be

'within the constitutional power of government," (2) it must "further[] an important or substantial

government interest," (3) that interest must be "unrelated to the suppression of free expression,"

and (4) the "incidental restriction on First Amendment freedoms must be no greater than is

essential to the furtherance of that interest." *Id.* (internal quotation omitted).

This test is satisfied here for the same reasons explained by the courts in *Corley*, *321

Studios*, and *Elcom*. Section 1201(a)(2) indisputably falls within Congress's power to regulate

online commerce, and it indisputably furthers the important government interest in preventing

trafficking in devices and technologies that would undermine the access controls that protect

copyrighted works, as explained in detail above. This interest is not related to the suppression of

speech. The fourth prong is also satisfied because the anti-trafficking restriction in § 1201(a)(2)

would be less effective if individuals and companies such as Plaintiffs were allowed to

disseminate decryption technologies, even if they intended the dissemination to serve a limited

purpose. After all, if Green were able to publish decryption code as part of a publication

discussing his security research, there would be no guarantee that the recipients of the code

would similarly restrict their use of the code to security research or other likely noninfringing

uses. Similarly, even if Huang and Alphamax intend that the NeTVCR device they wish to

commercially distribute would be used by others for noninfringing purposes, once the device was

available, there would be a far higher risk that others might use the device in ways that would

facilitate copyright infringement, including piracy. Such results would undermine the

effectiveness of access controls, thus interfering with the online market for copyrighted works by

deterring copyright owners from making works available online at all. Section 1201(a)(2) is

therefore valid under the First Amendment as applied to Plaintiffs, and the Court should thus

dismiss Counts III, IV, and V.

## V.   PLAINTIFFS' CHALLENGES TO THE 2015 FINAL RULE SHOULD BE DISMISSED (COUNTS VI AND VII)

In Counts VI and VII of their Complaint, Plaintiffs challenge the 2015 Final Rule issued by the Librarian of Congress pursuant to § 1201(a)(1)(C) insofar as the Rule failed to grant exemptions that would have covered Plaintiffs' desired circumvention activities. *See* Compl. ¶¶ 150-162. Plaintiffs raise these challenges under the First Amendment and the APA. These claims also necessarily fail. As an initial matter, to the extent Plaintiffs seek to raise independent challenges to the Final Rule under the First Amendment, those challenges require no separate analysis because they essentially duplicate Plaintiffs' as-applied First Amendment claims, addressed above. The Final Rule sets forth the Librarian's determination regarding exemptions to the anti-circumvention prohibition in § 1201(a)(1). However, as explained above, the anti-circumvention prohibition is valid under the First Amendment as applied to Plaintiffs. The denial of an exemption that would have allowed Plaintiffs to engage in circumvention must therefore also be valid under the First Amendment because it simply leaves the anti-circumvention prohibition, which is constitutional, in place.

Plaintiffs' APA claims should also be dismissed because the APA, including the APA's waiver of sovereign immunity in 5 U.S.C. § 702, does not apply to the Librarian's determination under the § 1201(a)(1)(C) rulemaking process.[15]  Courts "may not find a waiver [of sovereign immunity] unless Congress' intent is 'unequivocally expressed' in the relevant statute." *Stone*, 859 F. Supp. 2d at 51 (quoting *Hubbard v. Adm'r, EPA,* 982 F.2d 531, 532 (D.C. Cir. 1992)).

The Supreme Court recognized in *Kissinger v. Reporters Comm. for the Freedom of the*

---

[15] *Cf. Johnson v. Veterans Affairs Med. Ctr.,* 133 F. Supp. 3d 10, 14 (D.D.C. 2015) ("If sovereign immunity has not been waived, a claim is subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction." (citing *FDIC v. Meyer,* 510 U.S. 471, 475 (1994))).

*Press*, 445 U.S. 136 (1979), that the Library of Congress "is not an 'agency'" within the meaning

of the term used in the Freedom of Information Act ("FOIA"), *id.* at 145, which is the same

definition that applies to the APA, *see* 5 U.S.C. § 552(e) (incorporating APA definition of

agency in 5 U.S.C. § 551(1)). Indeed, the Court granted certiorari in that case to determine

whether a FOIA requester could obtain Kissinger's notes through a FOIA request to the State

Department, even though the notes were then "wrongfully in the possession of a party not an

'agency'"—namely, the Library of Congress. *See id.* at 139. Following *Kissinger*, courts

including the D.C. Circuit have repeatedly held that the APA's waiver of sovereign immunity in

5 U.S.C. § 702 does not apply to claims against the Library of Congress, nor can the APA's right

of action in 5 U.S.C. § 706 be invoked against the Library of Congress. *See, e.g.*, *Ethnic

Employees v. Boorstin,* 751 F.2d 1405, 1416 n. 15 (D.C. Cir. 1985) ("the Library [of Congress] is

not an agency under the A[PA]"); *Clark v. Library of Cong.,* 750 F.2d 89, 102 (D.C. Cir. 1984)

(plaintiff "may not take advantage of th[e] broad waiver of sovereign immunity" in § 702 "since

the Library of Congress is not an 'agency' as defined under the A[PA]"); *Terveer v. Billington*, 34

F. Supp. 3d 100, 123 n.10 (D.D.C. 2014) ("[T]he actions of the Library of Congress are not

reviewable under the A[PA] because the judicial review provisions of the APA only permit review

of actions taken by an 'agency' and the Library of Congress is not an agency as defined in APA

§§ 551(1) and 701(b).").

　　　The Supreme Court's position is also consistent with the position taken by Congress,

which in 1976 amended the Copyright Act to bring actions of the Register of Copyrights—an

officer within the Library of Congress—within the scope of the APA. *See* Pub. L. No. 94-553,

§ 701(d), 90 Stat. 2541, 2591 (1976) (codified as amended at 17 U.S.C. § 701(e)); H.R. Rep.

No. 94-1733, at 81 (1976) (explaining that the amendment "made the A[PA] applicable to the

Copyright Office"). Such an amendment would have been unnecessary if the Library of Congress in its entirety, including the Librarian, was already within the scope of the APA.

The statute subjecting the Register of Copyrights to the APA, 17 U.S.C. § 701(e), does not make the APA applicable in this case because review under the APA is limited to "final agency action." 5 U.S.C. § 704. It is the Librarian's final decision, not the Register's recommendation, that "mark[s] the 'consummation'" of the rulemaking process and actually establishes an exemption from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (explaining "final agency action" for purposes of the APA); *see also* 17 U.S.C. § 1201(a)(1)(D) (providing that an exemption takes effect upon the Librarian's publication of the exemption). As the Supreme Court made clear in *Dalton v. Specter*, 511 U.S. 462 (1994), interim recommendations, even if they play a vital role in the regulatory process, are not "final agency action" subject to review under the APA. *See id.* at 468–71.

In *Nat'l Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907 (D.C. Cir. 1998), the D.C. Circuit held the APA did not apply when examining a similar regulatory structure in which Congress directed the Librarian of Congress to take administrative action based on a recommendation provided by the Register of Copyrights. *See id.* at 913 (quoting 17 U.S.C. § 802(f) (1994) (amended 2004)). Before Congress established this scheme, the administrative decisions at issue had been made by a tribunal whose decisions were subject to APA review. *Id.* The petitioners argued that the APA's "arbitrary and capricious" standard of review should still apply to the Librarian's actions under the new scheme, but the court rejected that argument. *Id.* at 919 ("In light of the Congress's decision to remove from the judicial review provision of the 1993 Act any reference to the APA, we . . . conclude that [the petitioners] err in suggesting that the arbitrary and capricious standard continues to control our subsection 802(g) review."). In

44

light of this precedent, the APA claims that Plaintiffs assert in Counts VI and VII should be

dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should dismiss this action with prejudice.

September 29, 2016                    Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
CHANNING D. PHILLIPS
United States Attorney
ERIC R. WOMACK
Assistant Director, Federal Programs Branch

<u>/s/ Kathryn L. Wyer   </u>
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*