BRIAN M. WILLEN (D.C. BN 490471)
WILSON SONSINI
    GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Tel. (212) 999-5800

STEPHEN GIKOW (CA SBN 302484)
LAUREN GALLO WHITE (CA SBN 309075)
WILSON SONSINI
    GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Tel. (415) 947-2000

CORYNNE MCSHERRY
(CA SBN 221504)
KIT WALSH (CA SBN 303598)
ADAM SCHWARTZ (CA SBN 309491)
ELECTRONIC FRONTIER
    FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel. (415) 436-9333

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| Matthew Green, Andrew Huang, and Alphamax, LLC, <br><br> Plaintiff, <br><br> v. <br><br> U.S. Department Of Justice, Loretta Lynch, Library Of Congress, Carla Hayden, U.S. Copyright Office, and Maria Pallante, <br><br> Defendants. | Civil Case No. 16-cv-01492-EGS <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION ON BEHALF OF PLAINTIFF MATTHEW GREEN PURSUANT TO FED. R. CIV. P. 65(a)** <br><br> Judge:  Emmet G. Sullivan <br><br> Hearing Requested |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND.................................................................................2

    A.    To Perform His Important Security Research, Dr. Green Must Be Able to Circumvent Access Controls On The Works He Studies.......................................2

    B.    For His Research To Be Effective, Dr. Green Must Be Able To Discuss How To Circumvent Access Controls and Publish His Results............................4

    C.    Section 1201 Curtails Dr. Green's Research And Communications .....................5

    D.    Section 1201's Triennial Rulemaking Process.......................................................7

    E.    Dr. Green's Unsuccessful Efforts to Secure An Exemption From The Circumvention Ban .............................................................................................10

ARGUMENT.........................................................................................................12

I.    Dr. Green Is Likely To Succeed On The Merits ...........................................13

    A.    Section 1201's Anti-Circumvention Rule Is A Prior Restraint That Lacks The Required Substantive and Procedural Safeguards .........................................13

        1.    The Anti-Circumvention Rule Burdens Activities Protected By The First Amendment ................................................................................13

        2.    The Triennial Rulemaking Is an Unlawful Speech-Licensing Regime that Lacks The Narrow, Clear Standards and Procedural Safeguards Required By the First Amendment......................................15

            a.    Speech licensing schemes must satisfy strict standards...............16

            b.    Section 1201 is an unconstitutional speech licensing scheme.......................................................................................17

    B.    Section 1201 Violates The First Amendment As Applied To Dr. Green's Research And Publication Efforts........................................................................20

        1.    Section 1201 Inhibits Dr. Green's Research and Publication..................21

        2.    Section 1201 Is Subject to Strict Scrutiny ..............................................22

3.    Section 1201 Cannot Survive Strict Scrutiny As Applied To Dr. Green's Research and Publication Activities..............................................24

4.    Even If The Anti-Trafficking And Anti-Circumvention Rules Were Not Content-Based, They Fail Intermediate Scrutiny ..............................25

5.    The Triennial Rulemaking Process Confirms That Section 1201 Is Not Narrowly Tailored ..............................................................................28

II.    Dr. Green Will Suffer Irreparable Injury Without Preliminary Relief ............................29

III.    The Balance of Equities Favors an Injunction ..................................................................30

IV.    The Public Interest Would Be Served by an Injunction ...................................................31

CONCLUSION.......................................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .......................................................... 13

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ........................... 14

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ........................................................... 13, 21

*Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) ......................... 16

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010) ......................... 26, 27

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) .......... 27

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .................................. 32

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ............................................................... 29

*Edenfield v. Fane*, 507 U.S. 761 (1993) ..................................................................... 26

*Edwards v. Dist. of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) .............................. 26, 29

*\*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ........................................... 14, 15, 25, 27

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................... 29

*Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182 (D.D.C. 1990) ................................. 17

*\*Freedman v. Maryland*, 380 U.S. 51 (1965) .......................................... 16, 17, 19, 20

*Frisby v. Schultz*, 487 U.S. 474 (1988) ................................................................. 26, 27

*FTC v. CCC Holdings Inc.*, No. CV 08-2043 (RMC), 2009 WL 10631282
(D.D.C. Jan. 30, 2009) ............................................................................................... 2

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ........................................................... 16

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ............................... 31

*\*Golan v. Holder*, 132 S. Ct. 873 (2012) ...................................................... 15, 25, 27

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ............................................... 29, 32

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) ......................................... 16

*Lee v. Weisman*, 505 U.S. 577 (1992) ......................................................................... 32

*\*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ...................................... 22, 23, 24, 26

*MDY Indus., LLC, v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010) .................. 27

-iii-

*Minn. Star & Tribune Co. v. Minn. Commr. of Revenue*, 460 U.S. 575 (1983) ............................ 14

*Minney v. United States OPM*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) .................................... 32

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) .................................................................. 29

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) ................................................................. 14

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 32

*Pursuing Am.'s Greatness v. FEC*, No. 15-5264, 2016 U.S. App. LEXIS 13979
(D.C. Cir. Aug. 2, 2016) ........................................................................ 29, 30, 31, 32

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ............................................................... 22, 23

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .................................................... 14

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ............................................ 21

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) .................................................................... 16

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012) ................... 32

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...................................................................................... 24

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ......................... 21

*Taucher v. Born*, 53 F. Supp. 2d 464 (D.D.C. 1999) ................................................................... 17

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .......................................................... 25, 26

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ............................................................... 26

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012) ...................... 32

*United States v. O'Brien*, 391 U.S. 367 (1968) ..................................................................... 25, 26

*Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001) ................................ 22, 27, 28, 29

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................................... 26

*\*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ........................................................... 12, 29, 30, 31

## STATUTES

17 U.S.C. § 1201 .................................................................................................................... *passim*

17 U.S.C. § 1203 ............................................................................................................................. 6

17 U.S.C. § 1204 ................................................................................................... 6, 21, 22, 32

## RULES

75 Fed. Reg. 43,825 (July 27, 2010) ........................................................................... 19

77 Fed. Reg. 65,260 (Oct. 26, 2012) ............................................................................. 9

80 Fed. Reg. 65,944 (Oct. 28, 2015) ............................................................................. 9

## MISCELLANEOUS

U.S. Const. art. I, § 8, cl. 8 .................................................................................... 24, 31

Mem of Points and Authorities ISO Mot. for Preliminary Injunction
Case No. 16-cv-01492-EGS

# INTRODUCTION

This case challenges Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 ("Section 1201"), a provision that broadly prohibits anyone—including researchers, artists, tinkerers, and hobbyists—from "circumventing" measures used to control access to copyrighted works or "trafficking" in the "tools" that can be used to circumvent those access controls. This prohibition has been interpreted to apply no matter the reason for the circumvention, and even where it is intended to serve a lawful purpose, such as a fair use. The only way around this blanket restriction is to apply to the Librarian of Congress for an exemption, a process that is litigious, burdensome, and highly constrained. Any such exemption, if granted, is good only for three years.

Laws that protect copyright are compatible with the First Amendment only to the extent that they respect copyright's traditional boundaries. Eighteen years of enforcement provide ample evidence that Section 1201 does not do so. Instead, Section 1201 imposes strong restrictions on the fair use of copyrighted works, paired with a rigid speech-licensing scheme that offers little real protection for such uses. The result has been extraordinary collateral damage to speech and innovation, with little—if any—corresponding benefit to the purposes that animate copyright law. Indeed, the Copyright Office has observed that "the prohibition on circumvention impacts a wide range of consumer activities that have little to do with the consumption of creative content or the core concerns of copyright."[1]

Plaintiff Matthew Green is one victim of Section 1201's broad reach. Dr. Green is a professor at the Johns Hopkins Information Security Institute where he researches the security of computer systems. His research aims to expose design flaws in computer systems so that they

---

[1] http://copyright.gov/1201/2015/2015_1201_FAQ_final.pdf

can be made more secure. To do this important work, Dr. Green must access those computer systems—which sometimes requires him to circumvent certain copyright protections. Dr. Green wishes to write a book documenting his research, so that others can test and learn from his results.

These activities—research and publication—are entirely normal pursuits for any professor. Yet Dr. Green faces an impossible dilemma. Even though these academic pursuits would traditionally be understood to be fully protected by the fair use doctrine and the First Amendment, Section 1201 threatens Dr. Green with criminal and civil penalties for engaging in circumvention research and related publication activities.

Dr. Green's situation perfectly illustrates how Section 1201 has subverted the traditional contours of copyright, and why it cannot survive constitutional scrutiny. Dr. Green therefore seeks a preliminary injunction barring the Government from enforcing Section 1201's anti-circumvention and anti-trafficking provisions against him.

## FACTUAL BACKGROUND

### A.  To Perform His Important Security Research, Dr. Green Must Be Able to Circumvent Access Controls On The Works He Studies

Matthew Green is an Assistant Professor of computer science and applied cryptography at the Johns Hopkins Information Security Institute. Declaration of Matthew Green, dated September 28, 2016 ("Green Decl.") ¶ 1.[2] He studies the security of computer systems and teaches others how to do the same, in order to improve the safety and security of those who rely upon computers and computerized devices, and contribute to the disciplines of computer science and cryptography. *Id.* ¶¶ 2, 3.

---

[2] Dr. Green's sworn declaration is admissible on a motion for preliminary injunction. *See, e.g., FTC v. CCC Holdings Inc.*, No. CV 08-2043 (RMC), 2009 WL 10631282, at *1 (D.D.C. Jan. 30, 2009).

-2-

Many computer systems used today have serious vulnerabilities. Wrongdoers commonly identify these vulnerabilities and then exploit them for their own malicious purposes—to defraud, to steal someone's identity, to stalk, or just to invade people's privacy. *Id.* ¶ 3. Independent security researchers like Dr. Green identify those vulnerabilities so they may be fixed. *Id.* To analyze the security of a given technology, Dr. Green or a member of his team will first purchase a copy of the system they wish to test. *Id.* ¶ 5. This might be software, or a device, or a set of devices. *Id.* Dr. Green then seeks to understand how the system works, and where it might be vulnerable. *Id.* ¶ 6.

A rigorous and effective audit of a computer system's security requires that Dr. Green analyze the software controlling the system. *Id.* ¶ 7. Often, secure computer systems prevent access to their software code through technological protection measures ("TPMs") such as encryption, username/password combinations, or physical memory restrictions preventing a user from accessing certain stored information. *Id.* ¶ 8. An adversary seeking to extract information about the software code or about the system's user, or to install their own malicious software, would seek to bypass these measures in order to maximize their ability to locate and exploit vulnerabilities. *Id.* To identify security flaws, Dr. Green must do the same; indeed, finding and reporting on the vulnerability of these access controls is a critical part of auditing the security of the system. *Id.*

If he does not bypass access controls in a computer system, Dr. Green's research is significantly limited. *Id.* ¶ 9. While he may be able to discover some vulnerabilities, he cannot determine with confidence whether devices are secure against an adversary willing to circumvent access controls. *Id.* Often, they are not. *Id.*

**B.     For His Research To Be Effective, Dr. Green Must Be Able To Discuss How To Circumvent Access Controls and Publish His Results**

When Dr. Green locates security vulnerabilities, he discusses them with his research team and, where possible, with the company responsible for fixing them. *Id*. ¶ 12. He may also reach out to people affected by the vulnerability, particularly if malicious actors may already be exploiting it. *Id*. ¶¶ 13-17. For instance, when Dr. Green discovered a significant vulnerability in the Secure Sockets Layer (SSL)—a cryptographic protocol that is widely used to protect sensitive information online—he contacted the Federal Bureau of Investigation (FBI), so that it could avoid using those systems until they were secured. *Id*. ¶ 16.

Dr. Green also discusses his work with peers, device manufacturers, students, and the general public. *Id*. ¶¶ 10, 11. He and other security researchers communicate not only through verbal descriptions of where vulnerabilities lie and how they may be exploited, but also via computer code that communicates the ideas being discussed with greater clarity and less ambiguity than verbal communication. *Id*. ¶ 11. Sharing the code also helps others verify the accuracy of instructions embodied in code, since it is possible to run the code and see whether it works. *Id*.

To these same ends, Dr. Green is currently writing an academic book on computer system security research. He seeks to instruct readers in the methods of security research, including how to identify vulnerabilities in computer systems. *Id*. ¶ 19. He would like to include in the book examples of code capable of bypassing security measures. *Id*. ¶¶ 19-22. Dr. Green wishes to publish this information for several important reasons.

*First*, like any scientific research, Dr. Green's findings are credible only to the extent that other scientists can replicate them. *Id*. ¶ 20. So his book must show fellow computer scientists how to repeat the steps he took and circumvent the same security measures.

-4-

*Second*, like any scholar, Dr. Green hopes that others will build upon his work. *Id*. ¶ 21. When he finds a security flaw in a TPM or in its underlying software code, he knows that others might be able to find additional security flaws that he might have missed. Other scholars are less likely to find additional flaws if they must first re-discover the same flaws that Dr. Green already found. So Dr. Green's book must show others how to circumvent the measures that he already circumvented.

*Third*, as an advocate of computer security, Dr. Green hopes that the people who design computer systems (both TPMs and their underlying software code) will use his book to learn how to design better systems that do not contain the kinds of flaws that he discovered. *Id*. ¶ 22. So Dr. Green's book must show these computer system designers how he circumvented security measures.

Dr. Green would like to offer his book for sale via typical distribution channels, such as bookstores and online retailers, and to receive royalties from its sale. *Id*. ¶ 23. He also wishes to highlight the detailed information contained in the book about bypassing security measures in order to market the book, since that will be part of what makes his book effective for teaching how to engage in cutting-edge security research. *Id*. ¶ 24. As the law now stands, Section 1201 puts Dr. Green at risk of criminal and civil penalties for doing so.

## C.     Section 1201 Curtails Dr. Green's Research And Communications

The DMCA was enacted in 1998. Section 1201(a)(1), the anti-circumvention rule, prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected [by copyright]." 17 U.S.C. § 1201(a)(1).[3] This prohibition threatens security research

---

[3] The anti-circumvention rule provides in full: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

that relies on bypassing security measures in order to gain access to copyrighted computer code. As discussed above, this research is essential to performing a rigorous computer security analysis. The anti-circumvention rule likewise prevents users of vulnerable devices from discovering vulnerabilities and protecting themselves from potential attacks.

Section 1201(a)(2), the ban on trafficking in circuvmention tools, prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that … is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2)(A).[4] This provision separately threatens the legitimate security research described above, because it threatens the communication of ideas about security research embodied in verbal expressions and in computer code. For instance, scientific research articles, code for bypassing security measures, conference presentations, and books describing security research all are threatened by the ban.

Violation of either provision gives rise to a private right of action. 17 U.S.C. § 1203. Moreover, if there is a commercial purpose, a violation of either provision is criminally punishable by up to $500,000 in fines and imprisonment up to 5 years. 17 U.S.C. § 1204(a). The possibility of criminal or civil enforcement of these provisions deters Dr. Green and many other

---

[4]  The anti-trafficking rule provides in full: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2).

security researchers from pursuing similar lines of research. Green Decl. ¶¶ 30, 33, 47. For instance, in the fall of 2015, Dr. Green chose to perform a limited analysis on one of the subjects of his research, treating it as a "black box" with certain inputs and outputs rather than looking inside to explore the code that controlled it. *Id.* ¶ 30. This approach limited his ability to understand (and fix) the system and its potential flaws. *Id.* Similarly, the possibility of criminal or civil enforcement of the anti-trafficking rule deters Dr. Green from sharing the results of his research, such as by publishing his book. *Id.*

**D.     Section 1201's Triennial Rulemaking Process**

When Congress enacted Section 1201, it recognized that the statute's remarkable breadth could adversely impact a range of legitimate and socially benefical activity. But, rather than narrowing the law to address that problem, Congress included an unusual provision directing the Librarian of Congress to conduct a rulemaking process every three years in order to determine "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under this title of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C). The statute then instructs the Librarian to

> publish any class of copyrighted works for which the Librarian has determined . . . that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

*Id.* § 1201(a)(1)(D).[5]

---

[5]   This exemption process applies only to the circumvention ban. The Librarian of Congress has no authority to create any exemptions from the statutory ban on trafficking in circumvention tools.

Section 1201(a)(1)(C) instructs the Librarian to examine the following specific factors when deciding whether to grant an exemption:

> (i) the availability for use of copyrighted works;
>
> (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;
>
> (iii) the impact of the anti-circumvention rule on criticism, comment, news reporting, teaching, scholarship, or research; and
>
> (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works.

On top of these factors, Section 1201 allows the Librarian to consider "such other factors as the Librarian considers appropriate." *See* 17 U.S.C. § 1201(a)(1)(C)(v). This catch-all provision empowers the Librarian to deny exemptions based on all manner of issues that have nothing to do with fair use or indeed with the ostensible purpose of the DMCA: to protect copyrighted works.

In addition to the statutory considerations, the Librarian and the Copyright Office (the "Rulemaking Defendants") have imposed a variety of additional requirements on applicants seeking exemptions, including:

- Imposing the burden of proof on the party seeking an exemption. *See* Declaration of Brian M. Willen (dated September 29, 2016) ("Willen Decl."), Exhibit ("Ex.") 2 (U.S. Copyright Office, "Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights" ("2015 Recommendation")), at 14-15.

- Requiring an applicant to demonstrate the rule's widespread impact on noninfringing uses. *See id.* at 16.

- Requiring evidence that people are already engaging in circumvention, though this invites criminal and civil jeopardy. *See id.*

- Requiring a showing that there is no viable alternative means of engaging in the prohibited use, even if the alternative is significantly more onerous and expensive, or results in lower quality. *See, e.g., id.* at 85-87.

-8-

- Denying exemptions based on wide-ranging policy issues that have nothing to do with copyright law and that fall outside the competence of the Rulemaking Defendants, such as automobile pollution and energy policy. *See* Willen Decl. Ex. 1 ("Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies," 80 Fed. Reg. 65,944 (Oct. 28, 2015) ("2015 Final Rule")) at 65,954; Willen Decl. Ex. 1 (2015 Recommendation) at 241.

Exemptions lapse every three years and there is no presumption of renewal. In fact, the Rulemaking Defendants have failed to renew several previously granted exemptions, including an exemption to allow mobile phone owners to change carriers. Willen Decl. Ex. 9 ("Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies," 77 Fed. Reg. 65,260, 65,264-66 (Oct. 26, 2012) ("2012 Final Rule")). The public therefore cannot rely on the continued existence of an exemption to protect its activities beyond the initial three-year period.

Nonetheless, every three years, thousands of members of the public approach the Copyright Office to explain how the ban on circumvention interferes with their noninfringing speech, and to seek (or support) exemptions from the ban. In the most recent rulemaking, the requested exemptions included:

- Documentary and narrative films. *See* Willen Decl. Ex. 2 (2015 Recommendation) at 81-82, 87.

- Short videos that "remix" content from other videos into a new work. *Id.* at 70, 71, 86, 91.

- Multimedia ebooks discussing movies. *Id.* at 86, 91.

- Educational uses to teach media criticism and analysis. *Id.* at 87, 88, 92.

- Security research. *Id.* at 188-89.

- Conversion of media to accessible formats for the visually impaired. *Id.* at 135.

- Restoration of lawfully acquired video games where such games are no longer supported by the maker. *Id.* at 344-47.

- Analysis of medical data on medical devices. *Id.* at 397, 401.

- Educational uses by museums, libraries, and nonprofits. *Id.* at 92.

- "Format shifting" (converting lawfully-acquired media from one format to another). *Id.* at 124.

- "Space shifting" (moving lawfully-acquired media from one device to another). *Id.*

In each case, the applicants elaborated on the scope and nature of the noninfringing speech that was burdened by Section 1201. To take just a few examples: The Joint Filmmakers pointed to "narrative" films that rely upon fair use of clips from copyrighted works encumbered by access controls, and offered numerous accounts of filmmakers who censored themselves;[6] the American Foundation for the Blind showed that over 60 million Americans are impaired by technological protection measures in their ability to read e-books;[7] and authors of multimedia e-books described how the anti-circumvention rule prevents them from including fair use quotations of videos in their own works.[8]

## E.   Dr. Green's Unsuccessful Efforts to Secure An Exemption From The Circumvention Ban

Dr. Green participated in the 2015 Rulemaking process, hoping to obtain an exemption to cover his security research. As required, he explained that the research is otherwise lawful and noninfringing. The Rulemaking Defendants recognized both that the ban on circumvention has an adverse effect on computer security research like Dr. Green's, and that this adverse effect was

---

[6]  Willen Decl. Ex. 3 (Comment of the Joint Filmmakers in 2015 Rulemaking) at 7; Willen Decl. Ex. 4 (Reply Comment of Joint Filmmakers in 2015 Rulemaking) at 5-6.

[7]  Willen Decl. Ex. 6 (Reply Comment of American Foundation for the Blind in 2015 Rulemaking) at 3-4.

[8]  Willen Decl. Ex. 5 (Reply Comment of Authors' Alliance in 2015 Rulemaking) at 3-14.

not cured by any of the potentially relevant statutory exemptions. *See* Willen Decl. Ex. 1 (2015 Final Rule) at 65,956; Willen Decl. Ex. 2 (2015 Recommendation) at 3, 307-10.[9]

Nonetheless, the Rulemaking Defendants denied portions of the exemption, delayed its implementation, and imposed other restrictions based on considerations outside the scope of copyright law. The final exemption for security research is confined to circumvention on "a device or machine that is primarily designed for use by individual consumers (including voting machines)," motorized land vehicles (*e.g.*, cars), and medical devices that are designed for "implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care." Willen Decl. Ex. 1 (2015 Final Rule) at 65,956. And the exemption includes further restrictions on how research may be conducted and how researchers may use or distribute the information they glean from their inquiries. *Id.* By limiting the exemption to consumer-oriented devices, the Rulemaking Defendants prevented security researchers like Dr. Green from researching non-consumer-oriented devices, and in effect forced proponents of that research to identify each non-consumer-oriented device or technology (like voting machines and medical devices) that they wished to investigate in order for it to be included in the exemption. Dr. Green's research includes industrial-grade firewall and virtual

---

[9]   Indeed, the statutory exemptions have been widely criticized as inadequate to protect researchers like Dr. Green. The interoperability exemption, Section 1201(f), applies only if the researcher's "sole purpose" for circumvention is to achieve computer interoperability, but researchers like Dr. Green must be able to communicate about the security flaws they find. *See* Green Decl. ¶¶ 12-22. The encryption research exemption, Section 1201(g), is limited to circumvention that advances "knowledge in the field of encryption technology" or "the development of encryption products"; researchers like Dr. Green may focus on security flaws that have nothing to do with encryption, such as username/password combinations and read-restricted memory. Green Decl. ¶ 8. And the security testing exemption, Section 1201(j), requires the researcher to circumvent "solely" for purposes of investigating and correcting security flaws, which would exclude every good faith security researcher who had any additional purpose, such as earning a financial reward from a client for locating vulnerabilities in their systems. *Id.* ¶ 33.

private network modules, hardware encryption devices, toll collection systems, and other devices excluded from the rulemaking exemption.

Because his research and publication efforts continue to be stymied by Section 1201's broad bans on circumvention and trafficking, Dr. Green, along with Plaintiff Andrew "bunnie" Huang, filed this lawsuit to challenge the constitutionaly of those prohibitions and obtain refief from the burdens they impose. Complaint, ECF No. 1 ("Compl.").[10]

## ARGUMENT

Dr. Green seeks a preliminary injunction preventing the Government from enforcing Section 1201's anti-circumvention and anti-trafficking provisions against him during the pendency of this litigation. To obtain a preliminary injunction, Dr. Green must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

All four factors favor a preliminary injunction in this case. Section 1201 violates the First Amendment on its face and as applied to Dr. Green, and the statute is currently impeding his ability to conduct valuable research on computer security and publish his work for the benefit of the academic community and the public at large.

---

[10] Although he is not currently moving for a preliminary injunction, Dr. Huang is also burdened by Section 1201's prohibitions. He would like to create and sell a tool called NeTVCR that would allow people to mix all manner of images and texts on screens. For example, NeTVCR would allow users to display on a single screen both a live Presidential debate and the text of a commentator's live blog. But this would require circumvention of a TPM on the video stream, so Section 1201 forbids it, notwithstanding the fact that it is a clearly protected fair use. Compl. ¶¶ 6, 88-110.

# I.     DR. GREEN IS LIKELY TO SUCCEED ON THE MERITS

Dr. Green is likely to succeed on the merits of his First Amendment claims. While Plaintiffs in this case have challenged Section 1201 on a variety of bases, this motion focuses on two fundamental constitutional flaws. *First*, the DMCA anti-circumvention rule establishes a complex speech-licensing regime that operates as a prior restraint on speech without meeting the stringent substantive and procedural requirements for such regimes. *Second*, Section 1201's anti-circumvention and anti-trafficking provisions violate the First Amendment as applied to Dr. Green because they are content-based restrictions that cannot survive strict scrutiny. Nor can they survive intermediate scrutiny, as the provisions are not sufficiently tailored to the Government's purpose and burden substantially more speech that is necessary to advance that purpose.

## A.     Section 1201's Anti-Circumvention Rule Is A Prior Restraint That Lacks The Required Substantive and Procedural Safeguards

Section 1201's ban on circumvention has two related components: (1) a broad prohibition on most forms of circumvention; and (2) a supposed "fail-safe" in the triennial rulemaking process that allows the Librarian of Congress to exempt certain classes of copyrighted from the prohibitions on circumvention for a three-year period. *See* 17 U.S.C. § 1201(a)(1)(D). These two facets of the law combine to create a speech-licensing regime that does not comport with the First Amendment's requirements.

### 1.     The Anti-Circumvention Rule Burdens Activities Protected By The First Amendment

The first component—the statute's blanket ban on circumvention—directly burdens First Amendment rights, including Dr. Green's. The First Amendment protects activities that are a "necessary predicate" to the subsequent exercise of "rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). Indeed, "[t]he right to

publish … would be insecure, or largely ineffective" if the necessary antecedent acts of gathering information were "wholly unprotected." *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (upholding First Amendment right to record off-duty police officers); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (upholding First Amendment right to monitor court proceedings).

Accordingly, courts have extended First Amendment protection to myriad other conditions-precedent to speech. While barrels of ink are not by themselves speech, for example, they are protected as a necessary tool to publish a newspaper. *Minn. Star & Tribune Co. v. Minn. Commr. of Revenue*, 460 U.S. 575 (1983) (striking down an ink tax directed at large newspapers). Similarly, "a decision to contribute money to a [political election] campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring). Likewise, "the process of creating" (*e.g.*, applying ink to human skin) is as protected as "the product of these processes" (*e.g.*, a tattoo). *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) ("we have not drawn a hard line between the essays that John Peter Zenger published and the act of setting the type").

Section 1201 penalizes citizens for taking necessary antecedent steps to exercise their rights to make fair uses and engage in other noninfringing activities, such as those that rely on detecting and making use of ideas and facts contained within a work. Applied here, the anti-circumvention rule prevents Dr. Green from conducting security research, information gathering that is the necessary predicate to speech about security flaws. It therefore intrudes on speech as surely as a law that prohibits reading books or recording public officials.

-14-

Nor can the Government simply invoke copyright law to avoid having to measure Section 1201 against the First Amendment. To be sure, in *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003), the Supreme Court found that Congress has substantial authority to legislate under the Copyright Clause without running afoul of the First Amendment, but that holding was subject to a vital qualification: such legislation must adhere to the "traditional contours" of copyright. *Id.* at 221. The Court specifically identified the idea/expression dichotomy and fair use as "built-in First Amendment accomodations" that mark those contours. In *Golan v. Holder*, 132 S. Ct. 873, 890 (2012), the Court renewed its recognition that copyright law embraces the idea/expression dichotomy and fair use as "speech-protective purposes and safeguards" that, if disturbed, would subject the law at issue to ordinary First Amendment scrutiny. *Id*.

That is precisely the situation here. Section 1201, on its face, prohibits Dr. Green, and many others, from engaging in lawful fair uses such as researching security vulnerabilities in everyday devices, unless they run the gauntlet of a complex, limited, and discretionary speech-licensing rulemaking that occurs only every three years. As set forth below, that process is far from adequate to protect the "traditional contours" of copyright law. The Government therefore cannot rely on the Copyright Clause to exempt Section 1201 from the requirements of the First Amendment.

        2.      <u>The Triennial Rulemaking Is an Unlawful Speech-Licensing Regime that Lacks The Narrow, Clear Standards and Procedural Safeguards Required By the First Amendment</u>

Congress sought to avoid the obvious conflict between Section 1201 and fair use by authorizing the Rulemaking Defendants to issue limited exemptions from the law's broad prohibitions. It did not succeed. To the contrary, that exemption process only exacerbates the First Amendment problems with Section 1201 by turning the statute into a complex, burdensome, and unfair speech-licensing regime.

-15-

a.    *Speech licensing schemes must satisfy strict standards*

Speech-licensing regimes are presumptively unconstitutional. *See Freedman v. Maryland*, 380 U.S. 51 (1965); *see, e.g* , *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) (ordinance requiring a permit to operate a business selling sexually explicit books and movies); *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) (regulation requiring a license to export encryption technology). As the Supreme Court has explained, a scheme making the "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS*, 493 U.S. at 226 (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). Such schemes create an unacceptably high risk that licensors will abuse their excessive discretion, and such abuses would be very difficult to prove on a case-by-case basis. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988).

Accordingly, a regulation "subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must include "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth*, 394 U.S. at 150-51; *accord Lakewood*, 486 U.S. at 770-72. The Supreme Court underscored the importance of clear standards in this context in *Lakewood*, where a license could be denied under a vague standard like "public interest": "To allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guaranty against censorship little more than a high-sounding ideal." *Lakewood*, 486 U.S. at 769-70; *see also Bernstein*, 974 F. Supp. at 1308 (holding that "national security and foreign policy interests" are "illusory constraints" in the hands of a licensor exercising unbounded discretion).

In addition, any viable speech-licensing regimes must also employ procedural safeguards designed to limit the inherent dangers of a censorship system. Specifically, (1) the licensing decision must be prompt; (2) there must be prompt judicial review; and (3) when a censor denies a license, it must go to court to obtain a valid judicial order and, once there, must prove the gag is justified. *See Freedman*, 380 U.S. at 58-60 (explaining that "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint").

Applying these principles, courts in this judicial circuit have not hesitated to strike down licensing regimes as unlawful prior restraints. *See, e.g., Taucher v. Born*, 53 F. Supp. 2d 464, 481-82 (D.D.C. 1999) (ban on publishing impersonal commodity trading information absent prior registration with government); *Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182, 1194-96 (D.D.C. 1990) (ban on government employees giving interviews without prior written permission from government)

        b.    *Section 1201 is an unconstitutional speech licensing scheme*

Section 1201's exemption process is plainly a speech-licensing regime and, therefore, presumptively unconstitutional.

As discussed, the statute begins with a blanket ban on a broad array of actitivities protected by the First Amendment, and then requires citizens to obtain the Government's permission before they are allowed to engage in those activities. This permission system is exceedingly rigid: once every three years, members of the public may ask the Copyright Office to exempt them from the anti-circumvention prohibitions of Section 1201(a)(1) but only for particular activities relating to particular classes of copyrighted works. Willen Decl. Ex. 1 (2015 Final Rule) at 65,945-46. The Rulemaking Defendants then decide, in their discretion, whether to

-17-

grant that permission by making case-by-case judgments about the speech that will result from the circumvention—judgments that necessarily must pick and choose one fair use over another.[11] Because the Rulemaking Defendants commonly rewrite proposed exemptions, even if granted the permission may or may not cover the activities for which it was sought. If an exemption is granted, it is good only for a three-year period. Willen Decl. Ex. 2 (2015 Recommendation) at 4. The would-be speaker must start the process all over again in the next triennial rulemaking, with no promise (or even presumption) that the exemption will be renewed. Any activities that the Rulemaking Defendants have not expressly approved for an exemption remain banned and subject to civil and criminal penalties.

And Section 1201's licensing system has none of the safeguards that the First Amendment requires. First, the triennial rulemaking procedure lacks definite standards. The statute instructs that a class of copyrighted work is to be exempted from the ban on circumvention if "noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected." 17 U.S.C. § 1201(a)(1)(D). But it also provides that the Librarian of Congress "shall examine" several factors that speak to whether a use is infringing or is adversely affected by the ban, including "*such other factors as the Librarian considers appropriate.*" *Id.* § 1201(a)(1)(C)(i)-(v) (emphasis added). This open-ended and amorphous clause empowers the Librarian to consider anything and everything when deciding whether to permit speech-enabling circumvention. *See* Willen Decl. Ex. 2 (2015 Recommendation) at 248 n.1663 ("Section 1201 allows the Librarian to deny exemptions outright, including based on the

---

[11]   For example, in the most recent rulemaking, the Rulemaking Defendants opted to prefer "documentary" film to "narrative" film, remixes of film over remixes of video games, multimedia e-books and classroom courses doing "close analysis" of film clips over other fair uses, and research on consumer devices over research on infrastructure. Willen Decl. Ex. 1 (2015 Final Rule) at 65,949-50, 65,956; Willen Decl. Ex. 2 (2015 Recommendation) at 77-82, 85-86, 90.

assessment of 'such other factors as [he] considers appropriate' under the fifth statutory factor of section 1201(a)(1).")." Thus, even though the rulemaking process is supposed to protect fair uses from being swept up in the circumvention ban, the Rulemaking Defendants have used the statute's latitude to interpret Section 1201 as granting the Librarian broad discretion to deny and narrow exemptions based on considerations wholly unrelated to fair use or copyright, with real and substantial consequences for lawful speech.[12]

The triennial rulemaking regime also lacks the procedural protections demanded by *Freedman*, *see* 380 U.S. at 58-60. Under Section 1201, as discussed, necessary predicates to speech (such as Dr. Green's circumvention research) are presumptively banned. The burden falls on would-be speakers to vindicate their right to do so, and to reassume the same burden every three years. *See* Willen Decl. Ex. 2 (2015 Recommendation) at 13-15. By the same token, would-be speakers cannot obtain prompt licensing decisions. To the contrary, they can apply for licenses only once every three years, when the rulemaking window opens. And they can be forced to wait an indeterminate period for a decision, since there are no fixed deadlines for the Librarian to rule on an exemption request—in 2009 the process took nearly two years. Willen Decl. Ex. 8 ("Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies," 75 Fed. Reg. 43,825, 43,826 (July 27, 2010) ("2010 Final Rule"))

---

[12]  For example, in the 2015 Rulemaking, the Librarian delayed implementation of exemptions for security research and automobile repair because of their uncertain impact on, among other things, automobile pollution and energy policy. *See* Willen Decl. Ex. 1 (2015 Final Rule) at 65,954; Willen Decl. Ex. 2 (2015 Recommendation) at 241. The Rulemaking Defendants have also imposed other burdens on would-be speakers through their application of the standards. They have determined that anyone who wishes to obtain a license to speak must also establish that numerous others share the same request. *See* Willen Decl. Ex. 2 (2015 Recommendation) at 15-16. This often requires evidence the requestor cannot provide. For example, a journalist might need to circumvent in order to report on encrypted, newsworthy documents in her possession. If she could not show this is a common enough scenario, the Librarian would deny the request.

(rulemaking commenced October 6, 2008; final rule published July 27, 2010). Finally, the regime does not include a mechanism for swift judicial review. Indeed, the Librarian has even denied that Administrative Procedures Act review applies to its rulemaking. Willen Decl. Ex. 7 (stipulation of dismissal in *TracFone Wireless, Inc. v. Billington et al*).[13]

All of this is incompatible with the First Amendment. Congress cannot broadly prohibit activities protected by the First Amendment and then require those who wish to speak to bear the cost and burden of satisfying a government agency that their expressive activities should be permitted. That is especially so when the standards for making those decisions are so broad and ill-defined and the relief that can be granted is so limited.

Because Section 1201's circumvention provision operates as an unconstitutional speech-licensing regime, Dr. Green is likely to succeed on the merits of his First Amendment claim and has satisfied the first factor for obtaining a preliminary injunction.

### B.      Section 1201 Violates The First Amendment As Applied To Dr. Green's Research And Publication Efforts

Dr. Green is also likely to succeed in showing that Section 1201(a)'s prohibitions on circumvention and trafficking cannot constitutionally be applied to his academic research and publication activities. Those prohibitions are content-based restrictions on speech and activities incident to speech, and thus are subject to strict scrutiny, a test they cannot pass. Neither can they survive even intermediate scrutiny, because they place an impermissible burden on Dr. Green's protected expression in ways that are not narrowly tailored to advance any sufficient governmental interest.

---

[13]   Because of these impediments, even speech that is ultimately exempted through the rulemaking process is impermissibly burdened. *See Freedman*, 380 U.S. at 58-59.

-20-

1.    Section 1201 Inhibits Dr. Green's Research and Publication

Dr. Green wants to publish a book about his independent computer security research. *See* Green Decl. ¶ 19. His book proposes to document the security flaws that his research has uncovered in various computer systems, including the TPMs that protect them, and instruct others about how to locate and fix such flaws. *Id.* ¶¶ 19-22. As part of his research, Dr. Green must circumvent TPMs, and an integral aspect of his book would be documenting his work by publishing the software code he uses to do the circumvention. *Id.*

As explained above, the First Amendment applies both to Dr. Green's proposed book about computer security flaws and to the computer security research itself, because that research is the necessary predicate to Dr. Green's speech about security flaws. *See* Section I.A.1 *supra*; *Pico*, 457 U.S. at 867 (the First Amendment protects the gathering of information that is a "necessary predicate" to speech about that information). Moreover, Dr. Green's research efforts, to the extent they involve the reproduction and reverse-engineering of copyrighted computer software, are paradigmatic examples of non-infringing fair use. *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992) (copying incidental to reverse engineering of video game program is a protected fair use); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-603 (9th Cir. 2000) (copying incidental to reverse engineering video game operating system is a protected fair use). The Rulemaking Defendants have recognized as much. *See* Willen Decl. Ex. 2 (2015 Recommendation) at 303.

Unfortunately, however, Dr. Green's research and publishing efforts potentially run afoul of the DMCA's anti-circumvention and anti-trafficking rules. With respect to the former, Section 1201 criminally punishes the intentional circumvention of TPMs that protect copyrighted works, 17 U.S.C. § 1201(a)(1)(A), with a commercial purpose, 17 U.S.C. § 1204(a). Dr. Green's

research is obviously intentional, and part of that intention is to publish a book that will, among

other things, hopefully lead to commercial as well as academic success.

As for trafficking, Dr. Green has good reason to believe that his book would (i) "offer to

the public" and "provide" (ii) a "technology" (iii) forbidden by the Section 1201. Specifically,

portions of Dr. Green's book would be "primarily designed or produced for the purpose" of

circumventing TPMs that control access to copyrighted works, would have no "commercially

significant purpose or use" other than doing so, and would be "marketed . . . for use" in doing so.

17 U.S.C. § 1201(a)(2). Because Dr. Green seeks to earn royalties from the commercial sale of

his book, Dr. Green's trafficking could be considered a crime punishable by incarceration. 17

U.S.C. § 1204(a). *Cf. Universal City Studios v. Corley*, 273 F.3d 429, 455 (2d Cir. 2001)

(applying the anti-trafficking rule to prohibit step-by-step narrative instructions, instructions

written in a computer programming language, and speech that merely identifies a source of

circumvention software).[14]

### 2.   Section 1201 Is Subject to Strict Scrutiny

Both the circumvention and trafficking prohibitions are content-based: they "defin[e]

regulated speech" by "particular subject matter" and by "its function and purpose." *Reed v. Town

of Gilbert*, 135 S. Ct. 2218, 2227 (2015). The anti-trafficking provision bans speech on the

particular subject matter (or for the purpose) of circumventing TPMs, while allowing speech on

every other subject matter and purpose. Moreover, the provision's selective ambit "require[s]

'enforcement authorities' to 'examine the content of the message that is conveyed to determine

---

[14]   As discussed above, the statutory exemptions to the anti-trafficking and anti-circumvention provisions are not adequate to protect Dr. Green's research and publication. *See* n.9 *supra*; Willen Decl. Ex. 2 (2015 Recommendation) at 307-10 (analyzing these exemptions and finding them inadequate to protect security research).

MEM. OF LAW ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 16-CV-01492-EGS

whether' a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (citation omitted). That is precisely what Section 1201 authorizes: to determine whether Dr. Green's proposed book violates the anti-trafficking rule, one would have to examine its contents.

The triennial rulemaking process reinforces the relationship between the circumvention ban and the content of the material at issue. In determining which speech-related activities to exempt from the ban and which should remain prohibited, the Rulemaking Defendants have made innumerable content-based distinctions. For example, according to the Rulemaking Defendants, the statute authorizes them "to refine a class [exemption] by reference to the use or user." Willen Decl. Ex. 1 (2015 Final Rule) at 65,946. Under this authority, the Rulemaking Defendants have granted exemptions for use of video clips in "documentary" film but not "narrative" film, for ebooks offering close media critique but not others, for research on some devices but not others, and for educational uses at universities but not grade schools or adult education programs. The statute also requires the Rulemaking Defendants to "examine" the ban's impact on "the availability for use of works for nonprofit archival, preservation, and educational purposes" and on "criticism, comment, news reporting, scholarship, or research." 17 U.S.C. § 1201(a)(1)(B)-(C). Thus, it "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen*, 134 S. Ct. at 2531 (citation omitted).

Content-based speech restrictions like Section 1201's rules against circumvention and trafficking are presumptively unconstitutional and subject to strict scrutiny. *Reed*, 135 S. Ct. at 2226-27, 2231. Such restrictions can survive only upon a showing that they are "the least restrictive means of achieving a compelling state interest." *McCullen*, 134 S. Ct. at 2530; *see also Reed*, 135 S. Ct. at 2226, 2231. This test applies with special force here, as Dr. Green's

book would be addressed to matters of significant public concern: the security of computer systems used by large numbers of Americans. *See* Green Decl. ¶¶ 4, 19-22.[15]; *accord Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values.") (citation omitted). As discussed below, the Government cannot meet that stringent burden here.

3. <u>Section 1201 Cannot Survive Strict Scrutiny As Applied To Dr. Green's Research and Publication Activities</u>

If the Government has any compelling interest in enforcing the anti-trafficking and anti-circumvention rules against Dr. Green, it is the interest stated in the Copyright Clause: "to promote the progress of science and the useful arts." U.S. Const. art. I, § 8, cl. 8. But barring Dr. Green from publishing his book is hardly "the least restrictive means" of accomplishing that goal. *McCullen*, 134 S. Ct. at 2530. There are a wide range of other tools, including the ordinary enforcement of copyright law, that advance the goal of protecting the copyrighted computer software that Dr. Green would be accessing, without significantly restricting protected speech by banning Dr. Green from publishing his book or undertaking his predicate academic research. Indeed, the application of Section 1201 to Dr. Green's book and research *undermines* the Government's interest in "the progress of science": it deprives research and design communities—and the public at large—of Dr. Green's insights regarding how to conduct security research and design more secure systems.

Insofar as the Government seeks to assert a compelling interest in the prevention of copyright infringement, that too is insufficient. To accommodate First Amendment values,

---

[15] *See, e.g.,* Nicole Perlroth, *iPhone Users Urged to Update Software After Security Flaws Are Found*, N.Y. Times (8/25/16), http://www.nytimes.com/2016/08/26/technology/apple-software-vulnerability-ios-patch.html. *See generally* Data Breach Today, http://www.databreachtoday.com/news.

copyright laws must respect the "traditional contours" of copyright—which includes fair use.

*Eldred*, 537 U.S. at 219; *Golan*, 132 S. Ct. at 890. As discussed above, however, Section 1201

does not do that; its only potentially meaningful protection for fair use is a rigid triennial

rulemaking process that actually exacerbates the statute's First Amendment infirmity. Moreover,

Dr. Green's research is a clear example of fair use, and so applying the statute to him would not

advance any interest in preventing copyright infringement. But even if there were some threat of

actual infringement here, Section 1201 still could not withstand strict scrutiny because the

Government cannot prove that prohibiting Dr. Green from publishing his book, or undertaking

his antecedent research efforts on computer security, is the "the least restrictive means" to

prevent copyight infringement. Here again, the application of ordinary copyright law would be a

far less restrictive means of advancing that goal.

> 4. <u>Even If The Anti-Trafficking And Anti-Circumvention Rules Were Not
> Content-Based, They Fail Intermediate Scrutiny</u>

Even if strict scrutiny were not applicable, Section 1201's anti-trafficking and anti-

circumvention rules still would violate the First Amendment because they cannot survive

intermediate scrutiny either.

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct,

a sufficiently important governmental interest in regulating the nonspeech element can justify

incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367,

376 (1968). However, a government regulation is only "sufficiently justified if it is within the

constitutional power of the Government; if it furthers an important or substantial governmental

interest; if the governmental interest is unrelated to the suppression of free expression; and if the

incidental restriction on alleged First Amendment freedoms is no greater than is essential to the

furtherance of that interest." *Id.* at 377; *see also, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S.

622, 662 (1994). Simply put, a burden on speech must be "narrowly tailored to serve a significant governmental interest." *McCullen*, 134 S. Ct. at 2534; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The narrow tailoring requirement ensures "a close fit between ends and means." *McCullen*, 134 S. Ct. at 2534. To pass muster, the burden on speech must be "no greater than is essential" to advance the Government's interest. *Edwards v. Dist.of Columbia*, 755 F.3d 996, 1001-02 (D.C. Cir. 2014) (quoting *O'Brien*, 391 U.S. at 377). That is, the Government's rule must "target and eliminate no more than the exact source of the 'evil' they seek to remedy." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 522-23 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Edenfield v. Fane*, 507 U.S. 761, 777 (1993) (citation omitted).

The Government bears the burden of proving narrow tailoring. *Edwards*, 755 F.3d at 1003. To do so, it must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (plurality). It cannot rest on "mere speculation or conjecture." *Edwards*, 755 F.3d at 1003. Rather, it needs "substantial evidence." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997)).

The Government cannot meet that burden here. Applying the anti-trafficking and anti-circumvention rules to Dr. Green's research and publication activities will not promote the progress of science or the prevention of copyright infringement. Instead, it sweeps up Dr. Green's non-infringing fair use of copyrighted works and targets far "more than the exact source

of the 'evil' [that the laws] seek to remedy." *Boardley*, 615 F.3d at 522-23 (quoting *Frisby*, 487 U.S. at 485).

Dr. Green seeks to conduct independent security research in order to speak with others about security flaws and improve computer security for everyone. Without circumventing TPMs, he cannot fully identify and understand flaws in the TPMs or the computer systems behind the TPMs. Green Decl. ¶¶ 7-9.

Similarly, Dr. Green's book will explain how he circumvented TPMs. *Id.* ¶ 19. Many readers will use this information for the valuable purposes that Dr. Green intends. For example, computer scientists will use this information to determine whether they can replicate Dr. Green's findings and thus verify their scientific validity. Likewise, academic scholars will use this information to build upon Dr. Green's research by seeking out other security flaws that Dr. Green may have missed. Also, computer designers will use this information to design more secure computer systems with fewer security flaws.

Yet, despite these valuable and noninfringing purposes, many of Dr. Green's desired research and publication activities are prohibited. This application of Section is not narrowly tailored to preventing infringement. To the contrary, it burdens a significant amount of protected and non-infringing speech.[16]

---

[16] The Government will not be able to avoid Dr. Green's claim by relying on the Second Circuit's ruling in *Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001). First, that case was decided before the Supreme Court had clearly stated that fair use is constitutionally required. 273 F.3d at 458. Since then, as discussed, the Supreme Court has clarified that fair use is one of the "traditional contours" that makes copyright law compatible with the First Amendment. *Eldred*, 537 U.S. at 219; *see also Golan*, 132 S. Ct. at 890. Underscoring how *Eldred* altered the landscape, later circuit courts decisions have split as to how Section 1201 interacts with copyright's traditional contours. *Compare Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) (requiring a reasonable relationship between circumvention and copyright infringement), *with MDY Indus., LLC, v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010) (holding that Section 1201 liability does not depend on a nexus to copyright infringement

-27-

5.     The Triennial Rulemaking Process Confirms That Section 1201 Is Not Narrowly Tailored

The Government cannot save Section 1201 by pointing to the triennial rulemaking process. First, while the most recent version of the anti-circumvention rulemaking included an exemption for security research, that exemption is artificially limited to devices "primarily designed for use by individual consumers." *See* Willen Decl. Ex. 1 (2015 Final Rule) at 65,956. That does not help Dr. Green, because much of his research concerns the security of industrial-grade encryption systems used to secure, for example, ATM transactions and medical records. Green Decl. ¶ 46. Moreover, the rulemaking exemption opens the door to potential liability if a third party, outside the researcher's control, misuses a vulnerability discovered through circumvention. *See* Willen Decl. Ex. 1 (2015 Final Rule) at 65,956.

At the same time, while this exemption does not adequately protect Dr. Green, it does undermine any argument that prohibiting his research is narrowly tailored to preventing copyright infringement. The Rulemaking Defendants have decided to allow researchers to circumvent TPMs in a consumer device, notwithstanding the risk that it might lead to infringement. Yet they simultaneously continue to bar those same researchers from circumventing TPMs in other devices. If the goal is to prevent copyright infringement, that distinction is utterly irrational. "[A]n arbitrary exemption from or underinclusiveness of the scheme chosen by the government" can show "the asserted interests either are not pressing or are

---

but nonetheless leaving the door open to a fair use defense). Second, while *Corley* (decided shortly after Section 1201's enactment) found "scanty" evidence of the law's impact on fair use, the past 15 years—and five rulemakings—have supplied ample evidence of its substantial curtailment of free expression. Third, while *Corley* relied on the possibility of alternative ways for the defendant to make the fair uses at issue, for Dr. Green, there simply are no such alternatives. *See* Green Decl. ¶¶ 12-22; pp. 2-5 *supra*. Finally, *Corley* did not address whether Section 1201 was an unlawful speech licensing regime, an issue squarely presented by this case.

not the real objects animating the restriction on speech." *Edwards*, 755 F.3d at 1007; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (exceptions from speech limits "may diminish the credibility of the government's rationale for restricting speech in the first place") (citation omitted).

In sum, the Government cannot show that Section 1201's anti-trafficking and anti-circumvention provisions are narrowly tailored as applied to Dr. Green's research and his book. Dr. Green thus is likely to succeed in establishing that those prohibitions violate the First Amendment.

## II.    DR. GREEN WILL SUFFER IRREPARABLE INJURY WITHOUT PRELIMINARY RELIEF

In addition to having demonstrated a clear likelihood of success on the merits of his First Amendment claim, Dr. Green faces clear and irreparable harm unless a preliminary injunction is granted. *Winter*, 555 U.S. at 20.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971); *Pursuing Am.'s Greatness v. FEC*, No. 15-5264, 2016 U.S. App. LEXIS 13979, at *20 (D.C. Cir. Aug. 2, 2016). As a result, this prong is almost always satisfied in First Amendment cases if the plaintiff has shown a likelihood of success on the merits. *See Pursuing Am.'s Greatness*, 2016 U.S. App. LEXIS 13979, at *20 ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis."); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (citations omitted)).

-29-

So it is here. The First Amendment fully applies to both Dr. Green's speech and his predicate research. Dr. Green's computer security book would advance the general state of knowledge in these academic and professional fields, which further contributes to computer security for everyone, and his speech touches on a matter of general public concern (the security of our software systems). Dr. Green's research projects, including his contemplated circumvention efforts, are a necessary predicate to that speech. And these activities are classic noninfringing uses of copyrighted works that are protected by the fair use doctrine. *See* Green Decl. ¶¶ 5-18; Section I.A.1 *supra*.

Yet in the absence of a preliminary injunction, Dr. Green would have to wait until the conclusion of this lawsuit to learn whether he is free to engage in the security research needed for his book and to publish the results of his inquiries for the benefit of the academic community, the computer industry, and the public. That is more than enough to show irreparable injury. *See, e.g.*, *Pursuing Am.'s Greatness*, 2016 U.S. App. LEXIS 13979, at \*20 (finding irreparable injury where a law would have prevented the speaker from publishing the name of a candidate for public office).

## III.      THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

The third *Winter* factor, the balance of equities, also favors Dr. Green because the harm he will suffer if there is no injunction outweighs any harm such an injunction might cause the Government. *Winter*, 555 U.S. at 20. As explained above, Section 1201 deprives Dr. Green of core First Amendment rights and threatens him with criminal liability if he circumvents TPMs in the course of conducting his computer security research or speaks about how he did so. Without preliminary relief, Dr. Green will continue to be deterred from publishing his book about security flaws in computer systems. *See supra* pp. 6-7, 11-12. Without Dr. Green's book, computer

system operators and designers will be deprived of valuable information for identifying and correcting security flaws, and for making computer systems more secure for all. *Id.*

In contrast, the Government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *see also Pursuing Am.'s Greatness*, 2016 U.S. App. LEXIS 13979, at *21 (noting that "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").

If the Court grants preliminary relief, the Government will suffer no harm in its efforts to "promote the progress of science and the useful arts," U.S. Const. art. I, § 8, cl. 8. The anti-circumvention and anti-trafficking rules restrict—instead of promoting—that progress. And as applied here, they limit the ability of other security scholars to build on Dr. Green's work and discover additional security flaws. *See supra* pp. 4-5. Nor will the Government suffer harm in its effort to discourage copyright infringement. As set forth above, circumvention and trafficking do no harm in and of themselves, nor is any showing of harm or infringement necessary to establishing liability under the anti-circumvention and anti-trafficking rules. The Government has ample, and superior, alternative means of policing infringement, such as imposing liability for actual copyright infringement, which would be entirely unaffected by the preliminary injunction that Dr. Green seeks.

## IV.   THE PUBLIC INTEREST WOULD BE SERVED BY AN INJUNCTION

The final *Winter* factor—the public interest—also favors Dr. Green, for many of the same reasons that the third factor favors him. As the D.C. Circuit has recently explained: "The [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness*, 2016 U.S. App. LEXIS 13979, at

-31-

*21 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party")). Whatever the Government's cited interest, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation and, without a preliminary injunction, [Dr. Green] is unable to exercise those rights." *Pursuing America's Greatness*, 2016 U.S. App. LEXIS 13979, at *21 (citing *Gordon*, 721 F.3d at 653. In short, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.

That is especially true in this case. The Government cannot meaningfully rely on an asserted public interest in upholding copyright protections or promoting the progress of science because, as explained, Section 1201 is not narrowly tailored to those interests, and the Government has alternative methods to achieve its goals. *See supra* p. 31. Also, criminal liability under Section 1201 does not depend on any showing of copyright infringement. 17 U.S.C. §§ 1201, 1204. In any event, any government interests here are outweighed by the public interest in the Government not violating First Amendment freedoms, "among the most precious rights guaranteed under the Constitution." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 130 (D.D.C. 2012) (citing *Lee v. Weisman*, 505 U.S. 577, 589 (1992)); *see also Minney v. United States OPM*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) ("Applying the law in a way that violates the Constitution is never in the public's interest.").

In addition, the Supreme Court has recognized that the suppression of speech "harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). Given the increasing pervasiveness

of technological devices, and the increasing frequency of security breaches, members of the public have a strong interest in protecting their sensitive personal information. Dr. Green's research is devoted to advancing that interest, and chilling his ability to conduct that research contributes to public vulnerability to destructive computer security flaws. In contrast, an injunction would permit Dr. Green to conduct effective security research while this case proceeds, and to publish the results (including methodology), which would in turn enable the design of more secure computer systems and the correction of existing security vulnerabilities for the public good.

## CONCLUSION

For these reasons, Dr. Green respectfully requests that this Court enter a preliminary injunction that enjoins the Government, during the pendency of this case, from prosecuting him for (1) circumventing TPMs for purposes of independent computer security research; and (2) publishing information about how to circumvent TPMs in an academic book.

DATED: September 29, 2016

Respectfully submitted by:


*/s/ Brian M. Willen*
Brian M. Willen


Corynne McSherry (CA SBN 221504)          Brian Willen (D.C. Bar No. 490471)
Kit Walsh (CA SBN 303598)                 WILSON SONSINI
Adam Schwartz (CA SBN 309491)                GOODRICH & ROSATI
ELECTRONIC FRONTIER FOUNDATION            Professional Corporation
815 Eddy Street                           1301 Avenue of the Americas
San Francisco, CA 94109                   40th Floor
(415) 436-9333                            New York, NY 10019
                                          (212) 999-5800


                                          Stephen Gikow (CA SBN 302484)
                                          Lauren Gallo White (CA SBN 309075)
                                          WILSON SONSINI
                                             GOODRICH & ROSATI
                                          Professional Corporation
                                          One Market Plaza
                                          Spear Tower, Suite 3300
                                          San Francisco, CA 94105
                                          (415) 947-2000

                                          *Counsel for Plaintiffs*