**In the United States District Court**
**For the District of Columbia**

| | |
|---|---|
| Matthew Green, *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case No. 16-cv-01492 |
| | ) |
| U.S. Department of Justice, *et al.*, | ) Hon. Judge Emmet G. Sullivan |
| | ) |
|     Defendants. | ) |
| | ) |

**Declaration of Matthew Green In Support of Motion for Preliminary Injunction**

I, Matthew Green, declare as follows:

**A.    I am an independent computer system security researcher.**

1. My name is Matthew Green. I am an Assistant Professor of computer science and applied cryptography at the Johns Hopkins Information Security Institute.

2. I research the security of computer systems in order to speak with others about vulnerabilities that need fixing and about methods of effectively securing systems. I also seek to inform others about methods for identifying vulnerabilities, to advance the state of security research in order to make computer systems more secure. The point of my research is to communicate with others about security flaws, and the necessary predicate of that communication is my research.

3. Independent security research is a necessary endeavor because many computer systems used today by many people have serious vulnerabilities. Wrongdoers commonly identify these vulnerabilities and then exploit them for their own malicious purposes, such as fraud, identify theft, stalking, and invasion of privacy. The role of independent security researchers is to identify vulnerabilities so they may be fixed, so that wrongdoers cannot exploit them.

4. I have found serious vulnerabilities in many widely used computer systems that implicate safety and privacy, including:

   a. the automotive anti-theft systems used in millions of Ford, Toyota, and Nissan vehicles;

   b. SSL, the encryption tool that powers nearly one third of the world's websites, including Facebook and the National Security Agency;

1

      c. Apple's iMessage text messaging application; and

      d. Firewalls and Virtual Private Networking devices used by U.S. companies to secure their enterprise communication networks.

**B.**    **To effectively conduct security research, I must bypass access controls.**

5. To thoroughly analyze the security of a computer system, I or a team member will first purchase a copy of the system I wish to test. This might be software, a device, or a set of devices.

6. The process of analyzing the security of a computer system is essentially the process of understanding how it works, and how an adversary could change the way that it works in order to exploit it.

7. I can only achieve the most rigorous and effective audit of a computer system's security when I am able to analyze the software controlling the system. By scrutinizing the computer code, I can learn how the device would react to different inputs, and what an adversary could accomplish by altering the code. I can also test these conclusions by altering the code and measuring the results.

8. Often, secure computer systems prevent access to their software code through technological measures such as encryption, username/password combinations, and physical memory restrictions preventing a user from accessing certain stored information. In order to even begin an analysis of the code, I first must bypass these measures. Similarly, an adversary seeking to extract information about the software code or about the system's user, or to install their own malicious software, would have many more options if they were able to bypass these measures. Therefore, finding and reporting on the vulnerability of these access controls is itself a critical part of auditing the security of the system. That is, bypassing technological protection measures is necessary both to find vulnerabilities in those measures, and then to find vulnerabilities in the code protected by those measures.

9. If I do not attempt to bypass access controls in a computer system, I am greatly hampered in my ability to analyze the system. I can test the programmed inputs and outputs of the system and attempt to infer information about how the system functions, but the process is both more expensive and less rigorous than if I bypassed the system's access controls. I may be able to discover some vulnerabilities, but I would not be able to determine with any level of confidence whether the device is secure against an adversary who is willing to bypass access controls. Often, it is not.

**C.**    **To effectively conduct security research, I must communicate with others about how I bypassed access controls.**

10. It is customary in my professional and academic field to discuss one's work with peers, device manufacturers, students, and the general public. This includes written or oral

    communications in "natural" languages such as English, as well as communication in the form of computer code that communicates the ideas being discussed.

11. For communication about the security of computer systems, computer code provides for greater clarity and less ambiguity than verbal communication. It is also far easier to verify the accuracy of instructions embodied in code than a verbal account of how to bypass a security measure, since it is possible to run the code and see whether it works. Also, if you want to teach someone how to write a particular kind of code, it is essential to give them examples from which they can learn. The same is true in the community of researchers operating at the cutting edge of computer systems security; we share code in order to educate one another.

12. When I find security vulnerabilities in computer systems, I first communicate confidentially about them with fellow researchers on my team who may be professors, postdoctoral researchers, or students. I then attempt to communicate with the vendor responsible for fixing the vulnerability, if there is such an entity.

13. Sometimes there is no identifiable vendor responsible for fixing a vulnerability, either because the original vendor has gone out of business or announced that it will no longer support a product. The developers of TrueCrypt, for instance, have publicly stated that they are no longer supporting their disk encryption product and that users should only continue to use it at their own risk. There are also many instances where software is created through open discourse in a community of volunteer programmers, such as OpenSSL. When the Heartbleed vulnerability was discovered in OpenSSL, which is built into thousands of unrelated systems, public disclosure was the best method to ensure all affected parties, manufacturers, and end-users alike, are aware of the flaw and can take mitigating action.

14. If a vendor cannot or will not address a vulnerability in a computer system that puts people at risk, I and most other security researchers consider it ethically necessary to disclose that vulnerability to the people who are harmed by it. Sometimes public outcry can pressure a vendor into fixing a vulnerability that they would not have otherwise fixed. Other times all that can be done is to warn people away from the compromised product.

15. In many cases, bad actors are already exploiting a vulnerability when a researcher like myself locates it. In this circumstance, I and other researchers are especially likely to inform the people who might be harmed by the vulnerability just as urgently as we inform the vendor. Where the vulnerability is already widely known to bad actors, there is little possibility of additional harm flowing from the disclosure, while there is substantial upside to informing the public or particular users.

16. For instance, when I discovered the SSL vulnerability known as "FREAK," I personally informed the Federal Bureau of Investigation how its own use of SSL could render it vulnerable.

17. In some cases, repairing a vulnerability requires coordinated disclosure to many different individuals and organizations across the Internet. Simply notifying the manufacturer of the vulnerability does not effectively reach many users who are using legacy software and may not maintain an active relationship with the original manufacturer.

18. In some instances, independent computer scientists develop and distribute "patches" that repair a security vulnerability. These patches typically must bypass access controls in order to work. For example, when Steve Checkoway and I discovered a flaw in OpenSSL's random number generator, we produced a patch that would allow OpenSSL users to repair the flaw.

**D.     To effectively conduct security research, I now wish to sell an academic book about how I bypassed access controls.**

19. I am now writing an academic book titled "Practical Cryptographic Engineering," on computer system security research. In this book, I seek to instruct readers in the methods of security research, including how to identify vulnerabilities in computer systems. I would like to include examples of code capable of bypassing security measures, for readers to learn from. For example, I would like to incorporate code designed to demonstrate vulnerabilities in various protocols such as HDCP version 2, which is a protocol used to secure media communications sent over wireless networks.

20. There are numerous reasons why my book must contain detailed descriptions about how I circumvented technological protection measures. First, like any scientist, my findings are credible only to the extent that other scientists can replicate them. So my book must show my fellow computer scientists how to repeat my steps and circumvent the same security measures.

21. Second, like any scholar, I hope that other scholars will build upon my work. When I find a security flaw in a technological protection measure or in the underlying software code, I know that other scholars might be able to find additional security flaws that I might have missed. Other scholars are less likely to find additional flaws if they must first re-discover the same flaws that I already found. So my book must show other scholars how to circumvent the measures that I already circumvented.

22. Third, as an advocate of computer security, I hope that the people who design computer systems (both technological protection measures and the underlying software code) will learn from my book how to design better systems that do not contain the kinds of flaws that I discovered. So my book must show these computer system designers how I circumvented security measures.

23. I would like to offer my book for sale via typical distribution channels such as bookstores and online retailers, and to receive royalties on its sale.

24. When trying to interest people in my book, I would like to highlight the detailed information it contains about bypassing security measures, since that will be part of what

4

makes it an effective book for teaching a person how to engage in cutting-edge security research.

**E.   The DMCA curtails my security research and my communication about it.**

25. Section 1201 of the Digital Millennium Copyright Act prevents me and many others in my field from performing important security research and communicating about computer security.

26. Section 1201(a)(1), the anti-circumvention rule, threatens research that relies upon bypassing security measures in order to gain access to copyrighted computer code. As discussed above, this research is a key step in performing a rigorous security analysis.

27. The anti-circumvention rule also prevents the users of vulnerable devices from protecting themselves by applying patches that are developed by independent computer scientists, or by vendors who learn of the vulnerabilities from independent computer scientists.

28. Section 1201(a)(2), the ban on trafficking in technology that can circumvent access controls, also threatens the legitimate security research described above, because it threatens the communication of ideas about security research embodied in verbal expressions and in computer code. For instance, scientific research articles, code for bypassing security measures, conference talks, and books describing security research are all threatened by the ban.

29. When I decide what systems to investigate, I carefully consider the risk of being prosecuted or sued under Section 1201(a).

30. All else being equal, I and other security researchers will pursue a course of research that has a lower legal risk flowing from Section 1201(a). This pushes researchers like myself towards less rigorous forms of analysis, and away from certain devices. For example, in the fall of 2015, I limited my analysis of a device to measuring its inputs and outputs, rather than attempting to access the code inside the device. As a result, I expended far more time and effort and achieved a less rigorous understanding of the device and the ways it might be vulnerable. Likewise, this law deters me from including information about how to circumvent access controls in my book, even though it would benefit the field of security research and make electronic devices more secure.

31. For some people, the risk of prosecution or civil litigation under Section 1201(a) is so great that they leave the field of security research altogether. I myself have declined to communicate information about certain projects to people who are especially vulnerable to such risks, such as non-citizens working on a visa. For instance, I did this when investigating vulnerabilities in Apple iMessage, a popular messaging service.

32. Two undergraduate students I worked with at University of Maryland chose to abandon a research project evaluating the security of toll collection systems because of the legal risks imposed by Section 1201's ban on circumvention and trafficking.

33. I used to consult as part of a for-profit security firm. Because our activities were for-profit, we were particularly concerned about the potential for prosecution for circumvention or for trafficking in technology that could circumvent access controls. This limited our ability to teach employees the skills of the trade, to advertise our ability to circumvent access controls, or to inform colleagues, clients, and the public about vulnerabilities we discovered in the course of our work. These issues face every for-profit security firm in the industry, of which there are many. Researchers at such firms are a critical part of the security research community and are routinely asked to present at noted computer security conferences like DEFCON. Like me, these researchers' ability to demonstrate and discuss vulnerabilities that involve circumvention is curtailed by Section 1201.

F. **The DMCA's statutory exemptions are not adequate to protect security research and communication about it.**

34. Researchers like myself are not reassured by the statutory exemptions for interoperability, encryption research, or security testing. I am concerned that courts would consider ordinary acts of security research and communications about security research to fall outside of those exemptions, particularly because of the limitations described below.

35. Section 1201(f), the interoperability exemption, requires that a researcher's "sole purpose" must be to achieve a particular form of interoperability between computer programs. *See* Section 1201(f)(1). It further prohibits researchers from communicating the information they learn unless their "purpose" in doing so is "solely" to enable interoperability between computer programs. *See* Section 1201(f)(3). For most security research efforts, the purposes of our research and communicating about our research include fixing vulnerabilities that would otherwise allow an adversary to subvert a computer system, and educating other professionals and the public about the state of computer security and the science of identifying vulnerabilities.

36. Section 1201(g), the encryption research exemption, only applies to work that advances the state of "encryption technology" or the development of encryption products. *See* Section 1201(g)(1)(A). But a great deal of security research does not fall within this zone. As discussed above, encryption is just one of the security measures that must be bypassed in the course of security research. Further, when analyzing a computer system that does include encryption, one typically finds that vulnerabilities arise from failure to properly implement known techniques, including encryption techniques. For instance, part of the scandal that arose around automobile computer security arose from the fact that the systems suffered from vulnerabilities that have been known for decades – along with the proper programming techniques to avoid them. When research simply reveals that systems have been deployed containing well-known and well-understood flaws, as it often does, it is helpful for securing products that *use* encryption, but it may not advance the state of encryption technology or the development of encryption products.

37. Section 1201(g), includes as a "factor" whether a researcher disseminated what they learned in a manner that facilitated lawbreaking or a violation of privacy, or a breach of security. *See* Section 1201(g)(3)(A). When companies demand that researchers remain silent about the vulnerabilities they discovered, they often cite the theoretical possibility that third parties might misuse the vulnerabilities to engage in such acts. It is not possible to eliminate this risk of misuse while also informing potential victims of the risk created by the vulnerability. Thus, the work of most security researchers risks falling outside of the encryption research exemption.

38. Section 1201(g) requires the researcher to try to get permission before the circumvention. *See* Section 1201(g)(2)(C). If permission is withheld, though, they may proceed under the exemption, but the exemption does not apply – even if they would otherwise meet its requirements – if they failed to ask for permission. This requirement is problematic because researchers often encounter hostility from vendors while doing socially beneficial work. This provision requires researchers to invite that hostility before they even know whether the work is worthwhile, and particularly whether their work will advance the state of encryption technology or the development of encryption products. Given the other barriers to qualifying for the exemption and the risk of vendor hostility at an early stage, Section 1201(g) has not been helpful for vindicating security research.

39. Further, the encryption research exemption for 1201(a)(2) only applies when providing the technological means to another person with whom the researcher is working collaboratively, for the given purposes. It does not accommodate other communications with students, vendors, academics, or the public.

40. Section 1201(j), the security testing exemption, contains some of the same defects discussed above. First, it requires that a researcher act "solely" for a testing, investigating, or correction purpose. *See* Section 1201(j)(1). Second, a similar limitation applies to the portion of the exemption that addresses trafficking under Section 1201(a)(2). *See* Section 1201(j)(4). Third, the exemption includes "factors" such as whether the information derived from testing was used "solely" to promote the security of the owner or operator of the tested system, or shared with the system's developer, and whether the information was "used or maintained" in a way that facilitates lawbreaking (*i.e.*, infringement, privacy violation, or security breach) by a third party. *See* Section 1201(j)(3). These limits on the security testing exemption are deeply flawed for all the reasons above.

41. The limitations of the statutory exemptions prevent them from meaningfully protecting legitimate acts of security research and communications about security research.

F. **The DMCA's rulemaking exemptions do not allow my security research or my communication about it.**

42. I participated in the 2014-2015 Triennial Rulemaking before the Copyright Office, seeking an exemption that truly would protect security research.

7

43. The Final Rule for security research in the Triennial Rulemaking is significantly narrower than the exemptions I and other security researchers requested.

44. The exemption for security researchers identifies certain systems as permissible for circumvention, within limits. Most significant, the exemption applies only to research on specific types of computer systems, including motorized land vehicles, implantable medical devices, and a "device or machine primarily designed for use by individual consumers (including voting machines)."

45. This deters researchers like myself from investigating systems that are not clearly within the exemption, using techniques that involve bypassing access controls (as we must in order to rigorously evaluate a system's security).

46. I investigate the security of industrial-grade encryption devices used to secure cryptographic keys for purposes such as processing credit card or ATM transactions, as well as the security of medical record systems. I received a grant from the National Science Foundation to pursue this security research on medical record systems. Because the rulemaking exemption is limited to research on certain devices, I intend to refrain from research on these systems that might implicate Section 1201 due to fear of prosecution or civil litigation.

47. I would also like to investigate the security of non-implantable medical devices, toll collection systems, industrial firewall and virtual private network devices, and wireless communication systems that connect vehicles to one another and to the surrounding infrastructure. Again, because the rulemaking exemption is limited to research on certain devices, I intend to refrain from research on these systems that might implicate Section 1201 due to fear of prosecution or civil litigation.

48. The rulemaking exemption for security research also requires that "the information derived from the activity … is not used or maintained in a manner that facilitates copyright infringement." I do not believe that any of my activities constitute direct or indirect copyright infringement and is my intention not to facilitate infringement. However, I am concerned that the rulemaking exemption might not apply if a third party, outside of my control, independently decides to use the information I publish to further their own efforts at copyright infringement.

I affirm under penalty of perjury that the foregoing facts are true.

_____          September 28, 2016
Matthew Green                                                    Date