# EXHIBIT 3

*Before the*

**United States Copyright Office**

**Library of Congress**

|                                             |     |                      |
| ------------------------------------------- | --- | -------------------- |
|                                             | )   |                      |
| In the Matter of                            | )   |                      |
|                                             | )   |                      |
| Exemption to Prohibition on                 | )   | Docket No. 2014-07   |
| Circumvention of Copyright Protection       | )   |                      |
| Systems for Access Control Technologies     | )   |                      |
|                                             | )   |                      |

---

**COMMENT OF**

**INTERNATIONAL DOCUMENTARY ASSOCIATION**
**FILM INDEPENDENT**
**KARTEMQUIN EDUCATIONAL FILMS**
**NATIONAL ALLIANCE FOR MEDIA ARTS+CULTURE**
**INDIE CAUCUS**
**UNIVERSITY FILM AND VIDEO ASSOCIATION**
**CENTER FOR INDEPENDENT DOCUMENTARY**
**WOMEN IN FILM AND VIDEO**
**WOMEN IN FILM**

---

Submitted By:

**Jack I. Lerner**
UCI Intellectual Property, Arts, and
Technology Clinic
University of California, Irvine School of Law
401 East Peltason Drive, Law 4800-P
Irvine, CA 92697


With the support of Kyle Reynolds, Mike Lee,
Aaron Benmark, and Rahul Sajnani

**Michael C. Donaldson**
Donaldson & Callif, LLP
400 South Beverly Drive
Beverly Hills, CA 90212

Comment of International Documentary Association, et. al.

## I. Commenter Information

Commenters are:  International Documentary Association, Film Independent, Kartemquin Films, National Alliance for Media, Arts, and Culture, Indie Caucus, University Film and Video Association, Center for Independent Documentary, Women in Film and Video, and Women in Film.  For information about the commenters, please see Appendix A, About the Commenters.  To contact the commenters, please contact the submitter, UCI Intellectual Property, Arts, and Technology Clinic, at dmcafilm @ law.uci.edu.

## II. Proposed Class:  Class 6—Audiovisual Works—Filmmaking Uses

The Filmmaker Commenters propose the following exemption:

> Audiovisual works that are lawfully made and acquired from DVDs protected by Content Scramble System, or, if the work is not reasonably available in sufficient audiovisual quality on DVD, then from Blu-Ray discs protected by Advanced Access Content System, or, if the work is not reasonably available in sufficient audiovisual quality on DVD or Blu-Ray, then from digitally transmitted video protected by encryption measures, when the circumvention is accomplished solely in order to incorporate portions of motion pictures into new works for the purpose of fair use in filmmaking.

## III. Overview

Filmmaking serves an important social and political function in our society. Filmmakers coming from a wide range of perspectives and background create works of authorship that criticize or comment on culture, history, politics, and society; encourage debate and the exchange of ideas and opinions; and raise awareness of issues facing underrepresented individuals who struggle to be heard. Filmmakers have long held the right to make fair use of copyrighted material, and they rely on fair use in order to serve these valuable social and political purposes. This is true not just of documentary filmmakers, but of those who make narrative films as well.  As creators and rights holders themselves, filmmakers understand the importance of copyright protections and have long exercised fair use rights appropriately, as informed by the *Documentary Filmmakers' Statement of Best Practices in Fair Use* and a growing national practice of responsible fair use.[1]

But fair use is of little help if filmmakers cannot access the material they seek to use in the first place. Unfortunately, today, nearly all material is locked behind technological protection measures ("TPMs"). This is especially the case for the kind of high definition ("HD") motion picture material filmmakers need to satisfy both distributors and viewers. HD has become the firmly entrenched industry standard, and many filmmakers and distributors have already begun to look toward higher-definition formats like 4K. Thus,

---

[1] *Documentary Filmmakers' Statement of Best Practices in Fair Use*, Ctr. for Media and Soc. Impact (Nov. 18, 2005), http://www.cmsimpact.org/sites/default/files/fair_use_final.pdf.

even where low quality material is available, filmmakers cannot use it because broadcasters and distributors will discourage or reject it, or because high quality video is the only way to make the point the filmmaker is trying to get across to the viewer. The Copyright Office should recommend an exemption that encompasses all filmmakers in order to remedy this severe chill on an important form of creative expression.

While the exemption granted in 2012 has greatly helped to remedy the DMCA's harmful effects on the filmmaking community, the exemption must be modified for 2015-2018 to account for important changes in technology and practice. First, makers of narrative films with fictional content rely on fair use and the DMCA is causing harm to that use; the exemption must be modified to account for all filmmakers. Second, more content than ever before is now accessible exclusively on Blu-ray, and broadcasting standards require much higher resolution than in 2012.[2] The exemption must be modified to include TPMs on Blu-ray. Third, as filmmakers comment on current events they need access to ephemeral programming like news analysis or opinion that may never be re-aired or distributed after initial broadcast. An exemption that provides access only to online distribution sources is inadequate and should be modified to include digitally transmitted video. Fourth, the alternatives to circumvention remain impracticable and prohibitively difficult to use; the alternatives proposed in 2012 have become even more rare and difficult to utilize today.

Over the last several years, access has become a significant impediment to the filmmaking process, replacing earlier problems with legal uncertainty around fair use. Filmmakers must have access to the material they need for fair use, at a sufficient level of quality, to continue to provide viewers the world over with important creative expression, commentary, criticism, investigative reporting, and education. The proposed exemption will go a long way toward alleviating this access problem and should be granted.

## IV.    TECHNOLOGICAL PROTECTION MEASURES

As we indicated in our Petition for Exemption, filmmakers need to access motion picture material on (1) DVDs, (2) Blu-Ray discs, and (3) digitally transmitted video in order to educate, inform, comment on or analyze important social issues or history, engage in artistic or literary criticism, or investigate and report on events in the world.

### A.  Content Scramble System on DVDs

We propose an exemption that permits circumvention, in certain circumstances, of CSS on DVDs.[3] CSS employs a mix of access and use controls to protect DVD content from being copied, distributed, and viewed from unauthorized devices and the Register has previously concluded that it qualifies as a TPM subject to the DMCA's anti-circumvention provisions.[4] In general, CSS encrypts, or scrambles, the DVD content to

---

[2] Telephone Interview with David Field, Senior Director, Content Packaging, PBS (Jan. 27, 2015).
[3] *See* 37 C.F.R. § 201.40 (2010).
[4] *See* 2012 Recommendation at 126.

Comment of International Documentary Association, et. al.

prevent copying.[5] To decrypt the content, users must have a CSS-licensed hardware device, such as a DVD-ROM, which contains a fixed set of "keys" that can decrypt encryption on DVDs.[6] The CSS key was cracked in 1999 and distributed freely on the internet.[7] As a result, software that allows users to access digital files on DVDs has been available for many years. However, DVDs are still being produced with CSS and some contain content that filmmakers need and cannot obtain anywhere else.[8]  The proposed exemption is therefore necessary to allow filmmakers to access this motion picture material in order to make fair use.

## B.  Advanced Access Content System on Blu-Ray discs

The exemption we propose further permits circumvention, in certain circumstances, of AACS on Blu-Ray discs. AACS is also a mixed access and use control, and has also been previously recognized by the Register as a TPM subject to the DMCA.[9] AACS provides each individual device with a unique set of keys. If the keys are compromised, the licensor can revoke the keys associated with the device and that device will cease to decrypt future titles.[10]  It is our understanding that software exists which allows users to access digital files on AACS-protected Blu-ray.

AACS on Blu-Ray discs qualifies as a TPM within the meaning of § 1201(a)(3) because it "effectively controls access" to a work by requiring the "application of information"— namely, encryption keys—in order to gain access to the work.

## C.  Encryption Measures on Digitally Transmitted Video

The exemption we propose permits circumvention, in certain circumstances, of technologies that restrict access to digitally transmitted video through various protocols that use encryption. A considerable amount of motion picture material is ephemeral and captured exclusively on digitally transmitted video sources such as cable and online streaming. Much like CSS and AACS, the protection measures found on digitally transmitted video seek to control access through encryption and other mechanisms, and thus qualify as a TPM  within the meaning of Section 1201(a)(3) by requiring the "application of information"—namely, encryption keys—in order to gain access to the work.[11]  The Register has previously recognized that "a significant number of platforms"

---

[5] Gregory Kesden, Carnegie Mellon Univ., Lecture 33, Course: 15-412 Operating Systems: Design and Implementation (Dec. 6, 2000), https://www.cs.cmu.edu/~dst/DeCSS/Kesden.
[6] *Id.*
[7] *See* DVD Copy Control Ass'n, Inc. v. Bunner, 116 Cal. App. 4th 241, 255 (Cal. Ct. App. 2004).
[8] *See* DVD COPY CONTROL ASSOCIATION, Content Scramble System (CSS), http://www.dvdcca.org/css.aspx (last visited Feb. 3, 2015).
[9] 2012 Recommendation at 126.
[10] Ed Felten, *AACS Decryption Code Released*, FREEDOM TO TINKER (Jan. 8, 2007), https://freedom-to-tinker.com/blog/felten/aacs-decryption-code-released/ (last visited Feb. 3, 2015).

that distribute motion pictures online use encryption measures that constitute TPMs that control access to the works.[12]

In general, protection measures on digitally transmitted video operate by utilizing a combination of (i) client verification, which ensures that an authorized client is receiving the content; (ii) encryption, which ensures that the content is delivered securely only to authorized client; and (iii) access controls, which ensure that the client cannot export the content for redistribution. [13] For example, Netflix content streamed to a laptop through a web browser plug-in is protected by both encryption and other protocols. The most popular of these are Microsoft Silverlight and Adobe Flash.  A client requests media usage rights from a rights server online and downloads a DRM license or key so that he or she can play the content.[14]

The DRM systems that use these protocols are extremely diverse and in a state of constant flux.  For instance, even widely used online streaming protocols that update in real time are becoming obsolete; Microsoft and Adobe have announced that Silverlight and Flash will not be supported in the near future.[15] In addition, while most browsers are now transitioning to the new Hypertext Markup Language 5 ("HTML5") created by the World Wide Web Consortium ("W3C"), the W3C as of late 2014 has decided to postpone DRM incorporation until HTML5.1 is released, which is expected to occur later this year.[16] Put simply, filmmakers cannot predict what kind of DRM will be incorporated into HTML5. However, HTML5's clear focus on video functionality emphasizes the industry's focus on video and the high likelihood for further changes in TPM implementation.

TPMs on digitally transmitted video are not only ubiquitous, but diverse across all platforms.  For example, cable set-top boxes, DVR machines, Hulu, and Netflix are often protected by hardware encryption through High Definition Multimedia Interface ("HDMI") cable outputs as well as encryption and other protocols active within DVR and cable boxes.[17] Many of these TPMs are not fully developed yet, like HTML5. Nevertheless, a "significant number of platforms" incorporate TPMs,[18] and filmmakers nonetheless need to access them. Absent an exemption covering digitally transmitted sources, filmmakers cannot criticize, comment on, and educate others about a range of important issues, particularly those that include ephemeral content and current events affecting our society.

Given that these TPMs are widely diverse and constantly evolving, any one subset of streaming technologies cannot be identified for purposes of this exemption because it

---

[12]  *See* 2012 recommendation pg. 126.
[13] *See generally* Letter from Alex Podobas, Appendix J.
[14]*See Id.*; s*ee also* MICROSOFT.COM, Microsoft Services Agreement, http://windows.microsoft.com/en-us/windows/microsoft-services-agreement (last visited Feb. 3, 2015).
[15] *See* 2012 Recommendation at 126; *see also* Christopher Mims, *HTML5 Triumphant: Silverlight, Flash Discontinuing*, MIT TECHNOLOGY REVIEW (Nov. 9, 2011),
http://www.technologyreview.com/view/426083/html5-triumphant-silverlight-flash-discontinuing.
[16] Frederic Lardinois, *W3C Declares HTML5 Standard Complete*, TECH CRUNCH (Oct. 28, 2014),
http://techcrunch.com/2014/10/28/w3c-declares-html5-standard-done.
[17] *See generally* 2012 Comment, Section (VI)(C).
[18] 2012 Recommendation at 126.

Comment of International Documentary Association, et. al.

would become obsolete long before the exemption expired.  It is clear, however, that all of the TPMs in use today seek to control access through a combination of encryption and other mechanisms that easily qualify as TPMs within the meaning of Section 1201(a)(3).

## V. Noninfringing Uses

Filmmakers have long relied on fair use. Through fair use, filmmakers contribute substantially to society by providing criticism and commentary, educating, and reporting on the news and current events—activities that Congress has explicitly identified as fair uses.[19] In addition, independent filmmaking often provides a voice to otherwise underrepresented groups. Fair use in filmmaking has been recognized in many judicial opinions and of course by the Register and Librarian. In fact, the National Telecommunications and Information Administration has recognized fair use in documentary filmmaking as a "paradigmatic fair use of copyrighted works" that "provide[s] beneficial commentary on important issues."[20]  For over a decade, the documentary filmmaking community has worked diligently to build a practice of responsible fair use, as exemplified by the *Documentary Filmmakers' Statement of Best Practices in Fair Use*.[21]  Because documentary filmmakers are also rights holders, the best practices are carefully balanced to foster responsible use.

But it is not just documentary filmmakers who rely on fair use; filmmakers who produce narrative films with fictional content also regularly make fair use of copyrighted audiovisual works.  Just as documentary films use audiovisual clips to criticize, comment, explain, or educate about current society, scripted films incorporate aspects of reality for the same purposes. Fictional filmmaking is, of course, a long-established art form by which to conduct criticism and commentary, using techniques such as parody, reference, and pastiche.  In addition, filmmaking techniques such as "Cinema Verite," use unaltered reality as a background to present fictionalized characters and narrative, similar to the way that documentary films include copyrighted works captured incidentally.[22] Similarly, "biopics" and other fact-based narratives present information and commentary meant to educate and analyze real events.

Many courts have upheld fair use in fictional works,[23] and filmmaking is no exception. In cases such as *Sofa Entertainment v. Dodger Productions*, where Dodger used a short clip of the "Ed Sullivan Show" in the biographical musical "Jersey Boys," the court held that the use fell squarely within Dodger's fair use rights because the use was clearly transformative.[24] In *Arrow Productions. v. The Weinstein Company*, the court concluded

---

[19] Copyrights, 17 U.S.C.A. § 107 (2014).

[20] Lawrence E. Strickling, *Re: Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, RM2011-7*, NAT'L TELECOMM. AND INFO. AGENCY 23 (Sept. 21, 2012), http://copyright.gov/1201/2012/2012_NTIA_Letter.pdf.

[21] *See supra*, note 1.

[22] *See Documentary Filmmakers' Statement of Best Practices in Fair Use*, *supra* at note 1, (Category 3: "Incidental Use.")

[23] *See, e.g.*, *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 569-70 (1994). *Cf. MCA, Inc. v. Wilson*, 677 F.2d 180, 185 (2d Cir. 1981) (permissible parody should target the original, but may also reflect on life in general).

[24] *Sofa Entm't, Inc. v. Dodger Prod., Inc.*, 782 F. Supp. 2d 898, 910-11 (C.D. Cal. 2010).

Comment of International Documentary Association, et. al.

that the recreation of scenes from the pornographic film "Deep Throat" in a biopic about the star Linda Lovelace was also transformative and thus fair use.[25] Last, in *Bourne v. Twentieth Century Fox Film Corp.*, the court concluded that a parody of the song "When You Wish Upon A Star" in the show "Family Guy" was also fair use.[26] Many other examples exist.[27]

Section 1201's prohibition is preventing filmmakers who wish to make similar uses from doing so. Matt Latham, an independent filmmaker, would like to produce a fictional film satirizing the representation of women in movies. Matt would like to include a montage of clips from actual films to illustrate how truly ridiculous the treatment of women in cinema can be—the montage clips would mirror situations that occurred in Matt's film in order to make this point. However, to truly make a compelling case, Matt needs to use clips from well-known and accepted movies or else it may seem that the issue is being blown out of proportion. The use of these clips falls squarely within the traditional boundaries of fair use as a criticism on the original motion pictures from which the clips are taken. As in *Sofa*, *Arrow*, and *Bourne*, this use would clearly be transformative, as the clips would be used a new purpose beyond their original entertainment value. Unfortunately, Matt cannot make use of these clips unless the exemption embraces makers of narrative films, as his film would not be considered a documentary.[28]

As Michael C. Donaldson describes in his statement attached hereto as Appendix C, the independent narrative filmmaking community also relies on the *Documentary Filmmakers' Statement* in making fair use, and over the last several years fair use in narrative filmmaking has burgeoned into a robust practice that has been largely without controversy.[29] Critically, many scripted films with fictional content have received fair use endorsements on Errors & Omissions insurance policies.[30] In addition, organizations like Film Independent and the University Film and Video Association have hosted events to inform filmmakers about how to make fair use responsibly.[31]

We strongly urge the Register to consider our proposed exemption in light of the fair uses that we discuss in this Comment and reference in the accompanying appendices, and not based on the overall or primary purpose of the works being created.[32] Courts uniformly apply the statutory fair use factors to the case at hand and have rejected bright line assessments as to a work's overall purpose. For example, in *Wade Williams Distribution, Inc. v. Am. Broad. Co., Inc,* the court considered whether use of video clips in an entertaining morning talk show constituted fair use. The court rejected the argument that

---

[25] *Arrow Prods. v. The Weinstein Co.*, No. 13-Civ.-5488 (S.D.N.Y. 2014).

[26] *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d 499, 511 (S.D.N.Y. 2009).

[27] *See Mura v. Columbia Broad. Sys., Inc.*, 245 F. Supp. 587 (S.D.N.Y. 1965) (reproduction of a copyrighted puppet on a television program); *Jackson v. Warner Bros.*, 993 F. Supp. 585 (E.D. Mich. 1997) (depiction of copyrighted lithographs on wall of set in film); and *Amsinck v. Columbia Pictures Indus.*, 862 F. Supp. 1044 (S.D.N.Y. 1994) (display of copyrighted artwork on a mobile in a film). See also Letter from Michael C. Donaldson, Donaldson + Callif 1-2 (Feb. 5, 2015) and attachments, Appendix B.

[28] Filmmaker Testimony, Appendix I at 8-9.

[29] Letter from Michael C. Donaldson, Donaldson + Callif 1-2 (Feb. 5, 2015), Appendix C.

[30] *Id.* at 2.

[31] Events to Inform Filmmakers About Fair Use, Appendix L.

[32] *But cf.* 2012 Recommendation at 130.

Comment of International Documentary Association, et. al.

"there can be no fair use when copyrighted excerpts are used for entertainment," and held, "what is most persuasive in this case is that…use of the films was clearly transformative."[33] Similarly, the court in *Hofheinz v. Discovery Communications, Inc.* held that "[s]ection 107 does not explicitly distinguish between entertaining and serious, plausible and implausible, or weighty or frivolous commentaries."[34] The focus in these cases and the overwhelming majority of fair use decisions is on the specific use in question, not general characteristics of the genre. Both documentary and narrative films entertain as well as educate, and inspire as well as inform.

As we discuss below, Section 1201's prohibition on circumvention seriously harms the ability of filmmakers to access the copyrighted motion picture materials they need to engage in noninfringing fair use. The proposed exemption would remedy this harm by facilitating the responsible fair use of copyrighted motion picture material at a sufficient level of quality to suit filmmaker needs.

## VI. Adverse Effects

In the 2010 and 2012 rulemaking proceedings, the Register recognized that without an exemption to the DMCA, fair use in documentary filmmaking would be significantly compromised and would be adversely affected by the DMCA's anti-circumvention provisions as to certain TPMs.[35] The same continues to hold true for filmmakers facing CSS on DVDs, AACS on Blu-ray, and encryption on digitally transmitted video. Without an exemption that applies to each of the requested TPMs,[36] Section 1201's prohibition on circumvention will adversely affect filmmakers in their ability to make fair use.

The ubiquity of TPMs in the marketplace has created a serious obstacle for fair use in the filmmaking community. From Netflix[37] to YouTube[38] to Blu-ray[39] to cable set top boxes,[40] filmmakers face barriers to access caused by TPMs at every turn. These TPMs come in a variety of forms, from basic encryption on the medium that contains the material[41] to persistent hardware encryption.[42] Thus, even as filmmakers have begun to learn more about how to responsibly harness their fair use rights, they are still forced to self-censor their work because they often cannot obtain a usable copy of a copyrighted

---

[33] *Wade Williams Distrib., Inc. v. Am. Broad. Co.*, No. 00 CIV. 5002(LMM), 2005 WL 774275 at *9 (S.D.N.Y. Apr. 5, 2005).

[34] *Hofheinz v. Discovery Comm'cns, Inc.*, No. 00 Civ. 3802, 2001 U.S. Dist. LEXIS 14752 at *13 (S.D.N.Y. 2001).

[35] Recommendation of the Register of Copyrights in RM 2008-8 at 2, *Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (2010) (No. 2008-8); Recommendation of the Register of Copyrights at 3, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2012) (No. RM 2011-07).

[36] *See supra* Part IV.

[37] *See supra* Part IV.C.

[38] Letter from Alex Podobas 4 (Feb. 4, 2015), Appendix J.

[39] *See supra* Part IV.

[40] Letter from Jim Morrissette, Kartemquin Films 4 (Feb. 4, 2015), Appendix B.

[41] *See supra* Part IV.

[42] *See supra* Part IV.C.

work for fair use.[43] "Unfortunately for many," Kenn Rabin points out, the fair use statute "includes no provision or precedent for how a justified user of that right might obtain access to the physical materials . . . that are needed for the . . . expression itself."[44]

The DMCA's anti-circumvention provisions have shifted the question of fair use from "How do I use this appropriately and responsibly" to "How can I access this material at all?" At a time where filmmakers should feel empowered to create new expression through a more widespread understanding of fair use, they are instead fearful of rightsholder intimidation[45] and criminal liability. The result is an adverse effect on fair use and free expression.

### A.  Content Scramble System on Digital Video Discs

For the last six years, documentary filmmakers have had an exemption allowing them to circumvent CSS encryption on DVDs.[46] During those six years, there have been no allegations that these exemptions have harmed rights holders. In the meantime, even as Blu-Ray is becoming the new standard for physical distribution of motion picture and television material,[47] much of the material filmmakers need is still only available on DVD. Without the access to motion picture materials on CSS-protected DVDs provided by the current exemption, many films made during the current exemption period could not have been produced—and without an exemption providing for access to DVDs through this rulemaking, many films will not be made. As such, the inability to circumvent CSS on DVDs will have a substantial adverse effect on fair use in filmmaking that is far more than "de minimis."[48]

The examples provided by the following filmmakers are instructive as to this point.[49]

Joel Schroeder explained the following:

> In the past, more specifically, for a film I directed and produced in 2013 (Dear Mr. Waterson), I needed to show very brief clips of TV shows that were referenced in the film. The narration talked about how "Calvin + Hobbes" was referenced in pop culture. So we ripped DVDs to find the relevant parts of episodes from "Family Guy," "Portlandia," "Robot Chicken," and "The Big Bang Theory."

---

[43] Letter from Kenn Rabin, President, Fulcrum Media Services 1-2, (Feb. 6, 2015), Appendix D.
[44] *Id.* at 2.
[45] *Id.*
[46] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 75 Fed. Reg. 43,825 (July 27, 2010) (to be codified at 37 C.F.R. pt. 201); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 77 Fed. Reg. 65260 (Oct. 26, 2012) (to be codified at 37 C.F.R. pt. 201).
[47] *Blu-ray Wins HD Wars*, http://perfectimage.com.au/shop/index.php?main_page=page&id=4&chapter=0 (last visited Feb. 4, 2015).
[48] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 Fed. Reg. 73,856 (proposed Dec. 12, 2014) (to be codified at 37 C.F.R. pt. 201).
[49] Filmmaker Testimony, Appendix I.

Comment of International Documentary Association, et. al.

> The alternatives to ripping are very inconvenient and inefficient. Copyright holders are not set up to provide the content, and in many cases don't want you to use the content, if it is something critical of them. Docs in the rough cut stage know they want to use clips to demonstrate a point, and will need to test out tons of clips until they find the right one. Without the exemption, I would not have been able to include crucial content to make points that I wanted to make in Waterson.

Daniel McCabe explained the following:

> I produce documentaries for PBS. I've used DVD or online material exclusively in that context with legal review of the applicability of 'fair use.' For example, I did a recent documentary for PBS about walking robots in which I used a clip from a well-known science fiction film. The clip came from a DVD. Within the constraints of the production there was probably no other viable way for me to get that content. Brief excerpts such as these serve as an audio/video reference in an educational context to deepen the understanding of the work itself and larger ideas. They in no way diminish the value of the original works; if anything they increase their value by placing them in the larger context of our society. If you look at PBS documentaries, you are bound to find several other examples of 'fair use' that would be impossible without an exemption to the DMCA. If we cannot rip from DVDs/Blu Ray, there will be no way to get access to that material.

Joseph Stillman explained the following:

> My current film is about a fascinating man, former U.S. Attorney General Ramsey Clark. . . . The DMCA affects me massively. It would be iffy whether I could still make this Clark project without exemptions. The broadcaster I am working with, PBS, has told me that they want more clips of Ramsey himself. Without a DMCA exemption, I would be prevented from using clips of Ramsey during the last fifty years.

As these examples illustrate, the current exemption has had a profound impact on filmmaking—both documentary and narrative. However, these are only some of the films made possible by the current exemption. Appendix I presents more testimonials from numerous filmmakers who relate how they made use of DVDs under the current exemption.[50] That testimony indicates projects that have used the exemption or will need a similar exemption. In light of this documentary evidence, it is clear that fair use in filmmaking will be adversely affected if filmmakers do not have the ability to legally circumvent CSS on DVDs.

---

[50] *Id.*

Comment of International Documentary Association, et. al.

### B.  Advanced Access Content System on Blu-Ray

A substantial and increasing amount of motion picture material is now available exclusively on AACS-protected Blu-Ray discs.[51] Blu-Ray is quickly supplanting DVD as the predominant source of motion picture material, especially high quality HD material and bonus footage.[52] As such, filmmakers can no longer rely on DVD alone for access to the motion picture material they need to criticize, comment, or otherwise make their point to the viewer via fair use. The inability to circumvent AACS on Blu-Ray will thus have a substantial adverse effect on fair use in filmmaking.

Many filmmakers need HD to make the point they are trying to make.

As one example, the filmmakers at Finite Films wish to make a film examining the role media plays in shaping young people's identities; for example, they seek to show how "young men…bombarded with images of hyper masculinity and violence" and "young women…constantly exposed to beauty commercials and male-centric Hollywood films that teach them their worth is based on their physical appearance."[53] To do this credibly and in a way that drives home the reality of the problem, they need to show real media images, and then show the impact those images have on the main characters of their film. They have expressed, however, that they will be unable to make this film without Blu-ray caliber footage because of the standards that most film festivals use (1080p, standard Blu-ray resolution).[54] Without this exemption, they will be unable to make the film they have in mind, and that they would otherwise have the legal right to make.

Similarly, Paul Mariano of Gravitas films is currently producing a documentary about the film industry for which he would like to access Blu-ray and other high quality video sources.[55] Mr. Mariano has explained that, in order to better represent the material he is profiling in the film and to preserve the quality of the documentary, he needs the highest quality video possible—something he can only get from Blu-ray.[56] Because it is necessary for the film to explore and compare the fine grained details of existing motion pictures, and because that kind of video quality cannot be found on standard definition DVDs, Mr. Mariano needs to be able to access motion picture material on Blu-ray in order to make fair use.

Another filmmaker, who wished to remain anonymous, described the situation as follows:

> Today, DVDs are widely regarded as an old format (much like VHS used to be).  It is also a very compressed format.  Stretching the footage to meet the pixel ratio of the rest of the film severely degrades the footage's quality.  If you don't stretch it, then you will have a tiny square in the middle of a huge screen.  Imagine taking your picture off of your driver's license and

---

[51] *See supra* Part IV.B.
[52] Letter from Jim Morrissette, Kartemquin Films 2-3 (Feb. 4, 2015), Appendix B.
[53] Letter from Alex Calleros, Ryan McDuffile, and Michael Tucker, Finite Films, Appendix H.
[54] *Id.*
[55] Letter from Paul Mariano and Kurt Norton, Gravitas Docufilms (Feb. 2, 2015), Appendix E.
[56] Interview with Paul Mariano and Kurt Norton, Gravitas Docufilms (Jan. 28, 2015).

Comment of International Documentary Association, et. al.

placing it in the middle of a black movie poster.  That is what your DVD footage will look like. By giving us access to Blu-Ray footage, we are able to stay truer to the source material by not having to distort it via stretching. This pays proper respect to the artist of the original footage.  4K movies are no longer the future.  They are now.  All feature films are shot at 4K or higher resolution, and many documentaries are shot and mastered in 4K. To understand how this affects the exemption, let's return to the driver's license analogy.  This time, instead of placing the driver's license on a black movie poster, imagine it in the middle of a black billboard.  That is what a DVD's footage is like compared to 4K.[57]

These are only some of the stories of filmmakers who either need to use motion picture materials only available on Blu-Ray and could not under the current exemption or who wished to use Blu-Ray in a future project and will be adversely affected if the proposed exemption is not granted. Further evidence is available in Appendix I.[58]  In light of this documentary evidence, it is clear that fair use in filmmaking will be adversely affected if filmmakers cannot legally access material on Blu-Ray discs.

### C.  Encryption measures on digitally transmitted video

A significant amount of motion picture material is now available only through digitally transmitted video sources, protected by various encryption measures.[59] This includes ephemeral motion picture material on cable television, Netflix, Hulu, YouTube, and iTunes as well as many other online distribution sources. The TPMs that protect these motion pictures are as varied as the platforms themselves,[60] but all function to prevent filmmakers from making fair use of materials like news broadcasts, commercials, and other ephemeral content that is otherwise unavailable in any other format. Because filmmakers often require access to this material that does not exist on DVD or Blu-Ray, these various encryption measures will adversely affect fair use in filmmaking if the proposed exemption is not granted.

There are many examples in our testimonials of the necessity of high quality online streaming. For example, Laurie Ann Schag reports that on a project dealing with a controversial topic, some of the material she needs can only be obtained online.[61] This is a project so controversial that even licensing is likely not an option. Only fair use will allow her to move forward with the project. Similarly, a filmmaker who wished to remain anonymous reports that she was forced to replace footage in a documentary she made about a murder case because the resolution was too low, and she could not access the high quality footage she needed.[62]

---

[57] *Id.*
[58] *Id.*
[59] See supra Part IV.C.
[60] *See supra* Part IV.C.
[61] Filmmaker Testimony, Appendix I at 6.
[62] *Id.* at 6-7.

Danny Yourd, a filmmaker who commonly makes use of news clips, indicated the following:

> Being able to have an exemption would be great.  In my filmmaking, I have made fair use of a lot of news clips.  However, HD sources are very important, and online sources such as Youtube aren't always available in HD.  Being able to use a DVR would greatly simply a lot of things for me. It would make it easier to obtain some current news sources because I wouldn't have to scour YouTube and archives.  It would also lead to a much cleaner clearance log, making it easier to get E+O and distribution.[63]

Again, there have been no allegations that the current exemption, which embraces some forms of digitally transmitted video, has harmed rights holders. But as the above examples illustrate, filmmakers continue to require access to digitally transmitted video and must be able to circumvent the encryption measures that protect various platforms without fear of severe civil and criminal repercussions. In light of this documentary evidence, it is clear that fair use in filmmaking will be adversely affected if filmmakers do not have the ability to legally circumvent encryption measures on digitally transmitted video.

### D.  No alternatives to circumvention are reasonably available

Proposed technological alternatives to circumvention remain out of reach and a simply unrealistic option for the vast majority of filmmakers. As the entire industry has moved to HD content, the inferior quality provided by these alternatives is even less of an option than it was during the last exemption period.[64] Nonetheless, we address below some of the alternatives suggested in the last proceeding.

First, often there are simply no alternatives to circumvention available. For example, Blu-Ray and DVD players are no longer manufactured with analog outputs, meaning that older proposed alternative means of circumvention utilizing analog transfer methods are not possible for anyone without an older device that is still functional;[65] if material is only available on DVD or Blu-ray, there is now no way to access the material.

Second, the technology required for some alternatives is often entirely unavailable, too cost prohibitive, or too difficult to operate.  Even if one happens to have a legacy Blu-ray player, devices like a Teranex box,[66] that can process the image in order to make it HD-quality are far out of the price range of most independent filmmakers and require a high degree of technical skill to operate properly.

Third, even where it might be possible to utilize an alternative to circumvention, the resulting video quality is often degraded so significantly as to be unusable—either

---

[63] *Id.* at 7.

[64] Letter from Jim Morrissette, Kartemquin Films 3 (Feb. 4, 2015), Appendix B.; Letter from Kenn Rabin, President, Fulcrum Media Services 7-8, (Feb. 6, 2015), Appendix D. *See also supra* Part VI.B.

[65] Letter from Jim Morrissette, Kartemquin Films 3 (Feb. 4, 2015), Appendix B.

[66] *Id.* at 1.

Comment of International Documentary Association, et. al.

because it is not of sufficient quality to make the point the filmmaker is trying to get across to the viewer or because it does not meet distributors' technical standards.[67]

Fourth, screen capture remains an impracticable alternative for many, if not all the reasons we indicated during the last proceeding: It presents a real question of legality to filmmakers who are concerned about violating the DMCA because it is not clear whether the copyrighted material is captured before or after decryption.[68] It still has unacceptable stuttering, dropped frames, and image size issues.[69] Finally, there is no screen capture software available for Blu-ray on the Mac platform used by a majority of filmmakers.[70]

Nor is clearance from a copyright holder a realistic alternative to circumvention for filmmakers. Many rights holders often either fail to respond or simply deny usage, as any independent filmmaker can attest.[71]

Rights holders also routinely deny permission based on the content of the intended use. For example, the documentary *Inequality For All* relied on the fair use exemption for documentary films to show an interview with the president of Viacom, Inc. that painted the president in a bad light.[72] The filmmakers attempted to license the clip, but were given a no-explanation turndown letter.[73] Without fair use and the proposed exemption, they would have been unable to use the footage.

In another example, clearance specialist Kenn Rabin attempted to license a clip he had previously licensed for a previous project – a clip depicting an American soldier during the Vietnam War smoking marijuana out of his rifle.[74] He was denied use of the clip for the second project, and the reason he was given was that the rights holder did not want to license any negative depictions of American troops while we were at war.[75] Unfortunately, the DVD clip of the footage was of insufficient quality for the project, and so the filmmakers abandoned the use of the clip entirely.[76]

---

[67] Letter from Jim Morrissette, Kartemquin Films 1-4 (Feb. 4, 2015), Appendix B.; Telephone Interview with David Field, Senior Director, Content Packaging, PBS (Jan. 27, 2015), Letter from Jack Lerner and Michael Donaldson to David Carson, General Counsel, U.S. Copyright Office (July 18, 2012), http://www.copyright.gov/1201/2012/responses/usclaw_donaldson_response_letter_regarding_exemption_7_8.pdf; *see also* PBS TECHNOLOGY & OPERATIONS, TECHNICAL OPERATING SPECIFICATION: PROGRAM SUBMISSION (Nov. 2014).

[68] Letter from Jack Lerner and Michael Donaldson to David Carson, General Counsel, U.S. Copyright Office (July 18, 2012), http://www.copyright.gov/1201/2012/responses/usclaw_donaldson_response_letter_regarding_exemption_7_8.pdf.

[69] Letter from Jim Morrissette, Kartemquin Films 3 (Feb. 4, 2015), Appendix B.

[70] *Id.*

[71] Letter from Kenn Rabin, President, Fulcrum Media Services 2, (Feb. 6, 2015), Appendix D.

[72] *Id.* at 3-4.

[73] *Id.*

[74] *Id.* at 5.

[75] *Id.*

[76] *Id.*

In cases like these, filmmakers have no other recourse. Where the footage is critical to the project, the filmmakers may even have to abandon the project, preventing entry into the marketplace and silencing those opinions that copyright holders do not deem appropriate.

In fact, as we discuss above, Mr. Rabin reports that rights holder hostility presents such persistent and insurmountable obstacles to fair use as to create a pervasive environment of fear amongst filmmakers, who are often afraid even to ask for access to works for fair use purposes.[77] Of course, this climate of fear chills valuable creative expression. Filmmaker Risé Sanders-Weir provides a poignant example of this chilling effect:

> I also have learned from experience that if you ask for permission, the content holders use it as an acknowledgement that you don't believe the use is fair use.  I have been hurt by this because they either want you to pay a fee that you cannot afford or they fight your fair use claim.[78]

This is yet another continuation of the same kind of clearance issues pointed out in previous proceedings.[79] Without the proposed exemption, the DMCA will operate as an additional control valve by which copyright holders can stop the free flow of opinions and expression they disfavor—even if that expression could otherwise be made through fair use.


## VII. Statutory Factors

In conducting the rulemaking, the Librarian must examine the statutory factors listed in section 1201(a)(1)(C).[80] An analysis under these factors favors granting the proposed exemption to Section 1201(a)(1)(A)'s prohibition on circumvention codified in Section 1201(a)(1)(A) for filmmakers because the prohibition causes a substantial adverse effect on filmmakers' ability to make non-infringing use of copyrighted materials. The proposed exemption is narrowly tailored to prevent harm to expressive and educational purposes served by fair use while avoiding prejudice to the interests of rights-holders.


### A.  Availability for use of copyrighted works.

If the proposed exemption is not granted, it will severely reduce the availability for use of copyrighted works.

---

[77] *Id.* at 2.

[78] Filmmaker Testimony, Appendix I.

[79] *See* Comment of International Documentary Association, et. al., *In the Matter of Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* at 4 n.10 (2011) (No. RM 2011-07) (citing Pat Aufderheide, *Untold Stories: Creative Consequences of the Rights Clearance Culture for Documentary Filmmakers* (November 2004),  *http://www.cmsimpact.org/fair-use/best-practices/documentary/untold-stories-creative-consequences-rights-clearance-culture*); Comments of Kartemquin Educational Films, Inc., International Documentary Association, et. al, *In the Matter of Exemption to Prohibition on Circumvention of Copyright Protected Systems For Access Control Technologies* (2010) (No. RM 2008-08).

[80] Copyrights, 17 U.S.C.A. § 1201 (2014).

Comment of International Documentary Association, et. al.

In previous rulemakings, the Register has stated that the relevant inquiries into the first factor should include: (1) whether the availability of the work in protected formats enhances and/or inhibits public use of particular works; (2) whether the work protected is also available in other formats; (3) whether such alternative formats are sufficient to accommodate non-infringing uses; or (4) whether the format is part of a "use-facilitating" model that offers the public access to work in a variety of new ways, and the proposed exemption would prejudice this model.[81] A weighing of these factors favors the proposed exemption.  In addition, we urge the Register to consider the undeniable fact that more copyrighted works are available now than ever before.  Moreover, there has not been one allegation—much less any evidence—of a reduction in the availability of those works as a result of the documentary filmmakers' exemption. These truths suggest that the first factor, in particular, strongly favors granting the proposed exemption.

1. <u>Whether the Availability of the Work in Protected Formats Enhances and/or Inhibits Public Use of Particular Works</u>

Section 1201 prevents filmmakers from making fair use of works in the formats identified in the proposed class. This prohibition can force filmmakers to make edits to footage motivated entirely by the underlying work's rights holders' interests, often driving this footage out of the public sphere. For example, during the production of the award-winning feature film *Selma*, a sequence depicting archival footage of the voting rights march from Selma to Montgomery was nearly cut at the last minute because the rights holder insisted that no children could be included in the sequence.[82] Because the footage was protected by TPMs, the permission of the rights holder was critical to the footage.[83] This conflict was only resolved because top management at the production company, which is owned by Brad Pitt, was able to utilize his personal clout to talk the rights holder into allowing the footage to be used.[84]  Without such high level connections, this footage would have been left out, and the public would have been denied an accurate depiction of the march. The proposed exemption would remedy this problem by allowing fair use of these materials, allowing filmmakers to overcome arbitrary decisions by rights holders.

Nor would the proposed exemption do anything to harm the public availability of the original work on DVD, Blu-Ray, or digitally transmitted video. The Register has already considered this question for DVDs and recognized that the realities of the marketplace show that an exemption for certain non-infringing uses will not end their digital distribution.[85]

---

[81] *See* 2012 Comment at Appendix C, Statement of Eric Rescorla on Digitally Transmitted Video.
[82] Letter from Kenn Rabin, President, Fulcrum Media Services, 5-6 (Feb. 6, 2015), Appendix D.
[83] *Id.*
[84] *Id.*
[85] Recommendation of the Register of Copyrights at 129, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2012) (No. RM 2011-07).

### 2. Whether the work protected is available in other formats and whether those formats are protected by access controls

Aside from DVD, Blu-Ray, and digitally transmitted video, no viable alternative formats exist. Distribution of VHS tapes, for example, ended in 2008.[86] In any event, VHS-quality submissions are simply not acceptable in a digital filmmaking age; increasingly, even 1080p is insufficient to meet many broadcasters' technical specifications.[87]

Each of the formats in the proposed exemption are protected by TPMs that filmmakers reasonably fear are covered by Section 1201. In addition, especially in the case of Blu-ray, certain important material is only included on one particular format, making it all the more essential that filmmakers have access to all three formats.[88] The practical reality facing filmmakers is that when they need a certain piece of footage, such as certain bonus materials or outtakes, they have no alternative source for that material besides Blu-ray, and certainly no alternative that is not protected by TPMs.

### 3. If alternative formats are available, whether such formats are sufficient to accommodate non-infringing uses

Given that some motion picture material is available exclusively on a single format, such as Blu-ray, no single format is sufficient to accommodate filmmakers' non-infringing uses. For older films, it may be only DVD. For newer films, it may be only Blu-Ray or digital transmission. Additionally, as minimum quality standards increase across the board, alternatives to Blu-ray such as DVDs may no longer suffice to meet increasing demands of distributors and audiences.

Furthermore, as we discuss above in Part VI.D., proposed alternatives to circumvention such as screen capture, up-conversion, and others are even less practicable now than they were three years ago.[89] Even in the rare circumstance in which a filmmaker owns an old, out-of-production DVD or Blu-ray player with an analog output, these options remain prohibitively expensive and take a very high degree of technical skill to utilize. The result is that the practical availability of fair use material will fluctuate for arbitrary reasons having nothing to do with the underlying policy considerations motivating the exemption.

This factor favors granting the proposed exemption.

### 4. Whether the format is part of a "use-facilitating" business model that offers the public access to work in a variety of new ways and whether the proposed exemption would prejudice this model

The TPMs on DVDs, Blu-Ray, and digital transmissions are, by their nature, use limiting. They restrict public access to material to one single format by preventing the public from

---

[86] *See* Geoff Boucher, *VHS Era Is Winding Down*, L.A. TIMES (Dec. 22, 2008),

http://articles.latimes.com/2008/dec/22/entertainment/et-vhs-tapes22 (last visited Jan. 1, 2015).

[87] Telephone Interview with David Field, Senior Director, Content Packaging, PBS (Jan. 27, 2015).

[88] *See* Exclusive Blu-rays and Extra Contents, Appendix K.

[89] *See supra* Part. VI.D.

Comment of International Documentary Association, et. al.

being able to enjoy the copyrighted material in the way they see fit or through alternative means—such as through critical reviews or commentary. Audiences enjoy documentaries, parody works, and works that comment on or criticize prior works. Such works form an important part of the audience's interaction with the world of film and even an important part of their relationship with the original artwork. For example, *These Amazing Shadows* is a documentary film depicting the power of movies as a major cultural force.[90] This film was only possible to create because of the fair use exemption for documentary filmmakers.[91] When the fair use material that is necessary to create such works becomes inaccessible due to TPMs, the works themselves are not created, and audiences lose their ability to engage with both the fair use works and the original works in the method and manner that they would like.

In the case of a film like *These Amazing Shadows*, this would be particularly unfortunate, as the filmmakers reported that after screenings of the film, audience members would come to them and say that they added fifteen to twenty new films to their watch list.[92] Rather than hurting the market for the underlying source material, *These Amazing Shadows* actually increases audience appetite for the underlying works. Without the fair use exemption, this increase in market value of the original films would have never materialized.

In today's content distribution ecosystem, rights holders use TPMs to fine-tune and regulate permitted uses. For instance, while Hulu is free on PCs, it requires a fee when used on mobile devices.[93] Examples such as these demonstrate rights holders frequently use TPMs to control how their material is used in ways they otherwise would have no right to control. Such arrangements are anti-competitive and actually hurt consumers' ability to access the work in a variety of new ways; rather than being "use-facilitating," TPMs are often "use-debilitating."

### B.  Availability of use of works for nonprofit archival, preservation, and educational purposes

Documentary films continue to make many uses that fulfill educational and archival purposes, as recognized in previous proceedings. Increasingly, fictional films serve an equally important role in educational and social commentary. They are used in classroom settings as teaching tools because they often portray or illustrate historical and contemporary events.[94] Outside of the classroom setting, fictional films are often catalysts for thought and inquiry. For example, of this year's eight Academy Awards Best Picture nominees, four are biopics telling true stories of historical and modern figures.[95]

---

[90] Letter from Paul Mariano and Kurt Norton, Gravitas Docufilms (Feb. 2 2015), Appendix E.

[91] *Id.*

[92] Interview with Paul Mariano and Kurt Norton, Gravitas Docufilms (Jan 28, 2015).

[93] *Hulu Plus: Frequently Asked Questions*, http://www.hulu.com/plus (last visited Jan. 31, 2015).

[94] *See generally Teach With Movies*, www.teachwithmovies.com/teachers.htm.

[95] *Nominees – The 87th Academy Award Nominations for the 2015 Oscars*, Oscar.go.com/nominees (last visited Jan. 31, 2015).

Comment of International Documentary Association, et. al.

Both documentary and narrative films are critical to educational efforts, and the proposed exemption would greatly expand access to motion picture materials for these purposes.

### C.  Impact of the prohibition on circumvention of TPMs applied to copyrighted works on criticism, commentary, news reporting, teaching, scholarship, or research

Both documentary filmmakers and producers of narrative film continue to provide extensive commentary on important social issues. Documentary films have always been important sources of criticism, commentary, and in-depth reporting on issues that may otherwise not be widely known. Similarly, narrative films, such as this year's Best Picture nominees *Selma*, *American Sniper*, *The Theory of Everything*, and *The Imitation Game* provide important social commentary and help to educate American moviegoers as to important events in both historical and modern times.[96] As we discuss above, in many cases, the material required to make social commentary on these issues is trapped behind TPMs, making the underlying material inaccessible even though it would otherwise be usable under the fair use doctrine. Thus, the DMCA's prohibition on circumvention adversely affects these otherwise lawful fair uses and reduces the availability of criticism, commentary, news reporting, teaching, scholarship, and education to the general public. Since access to underlying fair use materials is critical for filmmakers to provide these functions, an exemption is the only appropriate remedy.

### D.  Effect of circumvention of TPMs on the market for, or value of, copyrighted works

The Supreme Court has held that rights holders have no claim on derivative market for criticism of their works[97] because rights holders of the underlying works are unlikely to desire an additional work lampooning or criticizing the original work, and would have no incentive to develop such markets. Additionally, the Register has previously concluded that transformative uses are unlikely to affect the relevant markets for the original work.[98]

As in the previous rulemaking, we are not aware of any allegations that the filmmakers' exemption has resulted in any harm done to the markets for copyrighted motion pictures. Again, this makes intuitive sense, as the class is narrowly tailored to a group of users who are already inclined to follow established best practices in fair use and thus are highly unlikely to utilize the exemption in way that harms existing markets. The same is the true for the proposed exemption.

### E.  Such Other Factors as the Librarian Considers Appropriate

---

[96] *Id.*
[97] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).
[98] Recommendation of the Register of Copyrights at 129, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2012) (No. RM 2011-07).

Comment of International Documentary Association, et. al.

In addition to the enumerated factors, the Librarian should consider that the TPMs covered under the proposed exemption are mixed access and use controls. During the 2010 Rulemaking, the Register of Copyrights emphasized that CSS on DVDs is subject to the Section 1201(a)(1) prohibition because it is a mixed use-control and access-control measure.[99] This factor weighed in favor of our proposed exemption because the "effect of the access control is not to prevent unauthorized access, but rather to restrict uses of motion pictures" in ways that harm "socially-beneficial non-infringing uses."[100] Similar logic applies to the TPMs on the formats we request here: AACS on Blu-Ray is analogous to CSS on DVD, and encryption measures on digitally transmitted video functionally restrict access with the same purpose and effect.[101] The TPMs at issue are chiefly used not to prevent unauthorized access or conceal the copyrighted material, but to prevent the public from copying the material.  The unfortunate side effect is that they also prevent the public from engaging in lawful, non-infringing uses of which the rights holder disapproves. Given its narrow tailoring, the exemption we propose will do nothing to encourage piracy. Alternatively, however, failure to grant an exemption will cast a deep pall over fair use in filmmaking.


## VIII. Reponses to the Copyright Office's Inquiries

1.      "Whether the proposed exemption should extend to commercial uses in fictional (i.e., nondocumentary) films, including whether such uses could supplant derivative markets for the copyrighted works used."

As we address above in Part V, a distinction between fictional and documentary filmmaking is both arbitrary and unnecessary. Both documentary filmmakers and makers of scripted films commonly rely on fair use, and the proposed exemption properly embraces a class of users that constitutes all filmmakers and not simply documentary filmmakers. Further, filmmakers are copyright holders themselves and thus are keenly aware of the importance of copyright protections.  Finally, there is no viable reason to believe the proposed exemption would cause any harm to existing derivative markets if it includes makers of scripted film.


2.      "Whether the exemption can be limited to use of only short portions or clips of motion pictures or, if not, the basis for a broader exemption."

We strongly object to any quantitative limitation on an exemption for filmmakers who wish to make fair use of materials on media containing TPMs. While it is our understanding that when making fair use most filmmakers do not use the entire work, some may do so while remaining within the bounds of fair use.  More importantly, such a limitation would in practice mean that many filmmakers could not utilize the exemption or would be forced to constrain their uses in order to fit into it. A quantitative limit would not provide additional guidance for those who wish to utilize the exemption, but could

---

[99] *Id.* at 126.

[100] *Id.*

[101] *See supra* Part IV.B-C.

Comment of International Documentary Association, et. al.

instead create unintended consequences by undermining the principle that when making fair use, filmmakers must use only what they need and no more. The exemption should contain restrictions that focus on the decryption process rather than place arbitrary limits on permissible use.

3.   "Specific examples of whether access to Blu-ray content or other high resolution content is necessary to meet applicable distribution standards for documentary and/or fictional filmmaking."

We direct the Register to Part VI.B. above and Appendices D, E, F, G, H, I, and M.  In addition, there is overwhelming evidence that HD is the firmly established industry standard; HD is the default, and all filmmakers need it as a matter of basic practice.  A rule that requires filmmakers to use lower-than-HD resolution or engage in complicated workarounds when HD is otherwise available will severely undermine their ability to make fair use.

4.   "Any changed circumstances in the need for an exemption over the last three years, including whether any viable alternatives have emerged or evolved during this period."

As we discuss above in Part VI.D., we know of no new alternatives that have developed in the last three years, and alternatives proposed in 2012 are either entirely unavailable, or even less practicable than before.

5.   "Whether the previously granted exemption has had an adverse effect on the marketplace for the accessed copyrighted works."

We know of no adverse effects on existing business models or the marketplace for copyrighted works created by the previous exemption, and we know of no allegations of misuse whatsoever.

Comment of International Documentary Association, et. al.

## **APPENDICES**

APPENDIX A: ABOUT THE COMMENTERS

APPENDIX B: LETTER FROM JIM MORRISSETTE

APPENDIX C: LETTER FROM MICHAEL DONALDSON

APPENDIX D: LETTER FROM KENN RABIN

APPENDIX E: LETTER FROM GRAVITAS FILMS

APPENDIX F: LETTER FROM MICHAEL MAILER

APPENDIX G: LETTER FROM PABLO CRUZ

APPENDIX H: LETTER FROM FINITE FILMS

APPENDIX I: FILMMAKER TESTIMONY

APPENDIX J: STATEMENT OF ALEX PODOBAS

APPENDIX K: EXCLUSIVE BLU-RAYS AND EXTRA CONTENTS

APPENDIX L: EVENTS TO INFORM FILMMAKERS ABOUT FAIR USE

APPENDIX M: LETTER OF ADAM FOLK

## APPENDIX A: ABOUT THE COMMENTERS

**The International Documentary Association** (IDA) is a non-profit 501(c)(3) organization that promotes nonfiction filmmaking, and is dedicated to increasing public awareness for the documentary genre. At IDA, we believe that documentary storytelling expands our understanding of shared human experience, fostering an informed, compassionate, and connected world, and we exist to serve the needs of those who create this art form. Our major program areas are: Advocacy, Filmmaker Services, Education, and Public Programs and Events. IDA also has a long history of protecting documentary filmmaking as a vital art form, and we continue to seek ways to ensure that the artists, activists and journalists who make documentaries receive the resources that they deserve. For over 30 years, IDA has worked to support the documentary art form.

**Film Independent** is a non-profit arts organization and our mission is to champion the cause of Independent film and support a community of artists who embody diversity, innovation and a uniqueness of vision. We help independent filmmakers tell their stories, build an audience for their projects and diversify the voices in the film industry, supporting filmmakers at every experience level with a community in which their works can be appreciated and sustained. With over 200 annual screenings and events, Film Independent provides access to a network of like-minded artists who are driving creativity in the film industry. Our free Filmmaker Labs for selected writers, directors, producers and documentary filmmakers and year-round educational programs serve as a bridge from film school to the real world of filmmaking – one with no defined career ladder. Project Involve is Film Independent's signature program dedicated to fostering the careers of talented emerging filmmakers from communities traditionally underrepresented in the film industry. We also produce the weekly Film Independent at LACMA film series, the Los Angeles Film Festival in June and the annual awards programs for the finest independent films of the year—the Film Independent Spirit Awards.

In 1966, **Kartemquin Educational Films** began making documentaries that examine and critique society through the stories of real people. Their documentaries, such as *The Interrupters*, *Hoop Dreams* and *The New Americans*, are among the most acclaimed of all time, leaving a lasting impact on millions of viewers. In 2014 they are having their busiest year ever, with multiple film releases and television broadcasts including *The Trials of Muhammad Ali, The Homestretch, American Arab, Almost There,* and *Life Itself*, about the film critic Roger Ebert, among others. Kartemquin Films is a home for independent media makers who seek to create social change through film. With a noted tradition of nurturing emerging talent and acting as a leading voice for independent media, Kartemquin is building on almost 50 years of being Chicago's documentary powerhouse. Kartemquin is a 501(c) 3 non-profit organization.

**The National Alliance for Media Arts and Culture** ("NAMAC") consists of 225 organizations that serve over 335,000 artists and media professionals nationwide. Members include community-based media production centers and facilities, university based programs, museums,

media presenters and exhibitors, film festivals, distributors, film archives, youth media programs, community access television, and digital arts and online groups. NAMAC's mission is to foster and fortify the culture and business of the independent media arts. NAMAC believes that all Americans deserve access to create, participate in, and experience art. NAMAC co-authored the Documentary Filmmakers' Statement of Best Practices in Fair Use and has long been an advocate for orphan works reform.

**Indie Caucus** is a national, independent group of filmmakers who believe in the public mission of public media.  It is dedicated to strengthening our collective voice both within and outside of the public media system.

**University Film and Video Association** (UFVA) aims to develop the potentialities of the motion picture and television media for purposes of instruction and communication throughout the world. UFVA works primarily in educational institutions with the goal of serving, encouraging, and assisting individuals who teach arts and sciences of motion picture and television production techniques, history, criticism and related subjects.

**Center for Independent Documentary** (CID) was incorporated in1981. Its purpose of is to support the production and distribution of high quality independently produced documentaries and the filmmakers who create them. CID describes its organization as follows:

To our knowledge, the extent of our cooperative arrangement with independent film and video producers is unique. Once we become involved in a project, we become totally committed to its successful completion and distribution. While we are neither a production house, funder or a distributor, we work with producers at all phases of the project- helping to raise project funding, manage project funds, and offer creative, technical, fundraising and distribution support.  In addition to our work with individual filmmakers on their projects, CID also is involved in professional development programs and collaborates with other organizations on initiatives that strengthen the production environment for independent filmmakers.

CID has been honored with a Commonwealth Award by the Massachusetts Cultural Council as the "Outstanding Cultural Organization in Massachusetts" for "excellence, dedication and vision in giving voice to independent documentary filmmakers and for broadening the audience for this medium."

CID has been involved in the production of over 300 films which have received national broadcast on PBS as part of American Masters, American Experience, Independent Lens and POV.  They have received national cablecasts from the Sundance, Discovery and LOGO channels along with HBO.  They have appeared at every major film festival receiving awards from Emmy's to the Peabody. Our roster of current and past productions include such notable films as: A Healthy Baby Girl and Blue Vinyl by Judith Helfand;  Downside Up, Smitten and TRUST  by Nancy Kelly;  Strange Fruit by Joel Katz;  Wild Combination: A Portrait of Arthur Russell and Teenage by Matt Wolf;  Woody Guthrie: Ain't Got No Home by Peter Frumkin;

After Stonewall , Dangerous Living and Before Homosexuals by John Scagliotti; Baby Its You and As Nutayunean by Anne Makepeace; Brother Outsider and Regarding Susan Sontag by Nancy Kates; and the mobile application Murder on Beacon Hill by Eric Stange and Michael Epstein.

CID works with filmmakers from around the United States, with representation from all regions of the country. We currently have 139 films in development and production.  The demographics of our filmmakers (age, ethnicity, gender and sexual orientation) and the subject matter of their films are equally diverse.

We have made a special effort to work with LGBT filmmakers and to support the LGBT community in creating ways for films to be seen.  For the past five years we have worked closely with the Kopkind Colony to create the Pride of the Ocean Cruise /Film Festival and seminars for LGBT filmmakers.  Our goal is to create deep connections between all layers of the field -for LGBT filmmakers to strengthen their craft, their business expertise and networks- and for audiences to benefit by having increased access to the work and its messages.

**Women in Film & Video** (WIFV) of Washington, DC is dedicated to advancing the professional development and achievement for women working in all areas of film, television, video, multimedia and related disciplines. WIFV supports women in the industry by promoting equal opportunities, encouraging professional development, serving as an information network, and educating the public about women's creative and technical achievements. WIFV, a 501(c)(3) non-profit community benefit organization founded in 1979, is the premier professional resource for people who want successful media careers in the DC-metro region. Our resources, connections and advocates support a vibrant, creative media community.

As a group we keep tabs on events related to indies and public media, and can quickly activate the national community when a crisis arises.  We aim to be a voice that represents independent filmmakers to our broadcast, programming and funding partners in public media.

Members of the Indie Caucus Steering Committee are independent producers who meet regularly, who can intervene behind the scenes, and who are pledged to activate their networks when a large outcry and action is needed.

**Women In Film** (WIF) recognizes the importance of developing pathways and opportunities to encourage current and future generations of women to explore and pursue careers in all fields of the entertainment industry. WIF actively supports women in the entertainment industry in four key ways: (1) assists independent filmmakers who have demonstrated advanced and innovative skills; (2) funds programs which provide scholarships and internships; (3) contributes financially and creatively to the production of PSAs which spotlight issues important to women and (4) creates events and seminars which are educational and creatively enlightening.

Appendix B

Letter from Jim Morrissette



Jim Morrissette
Kartemquin Films
1901 W. Wellington
Chicago, IL 60657

February 4, 2015

To whom it may concern:

I would like to thank the Copyright Office for the opportunity to speak in support of our proposed renewal of the exemption allowing us to circumvent CSS encryption on DVDs, AACS on Blu-Ray discs, and the various encryption and authentication protocols on Digital Video Transmissions (DVTs). DVTs include internet streaming, internet downloads, TV Pay-Per View, and recordings from Digital Video Recording (DVR) devices connected to cable or satellite dishes.

As the Technical Director at Kartemquin Films in Chicago, and I feel strongly the proposed exemption is necessary for filmmakers to include "fair use" or public domain works in their films. We are also requesting that the current exemption be expanded to include Blu-Ray discs because of filmmaker's ever increasing requirements for HDresolution content.

**Distribution of Documentary Films Expanded Since 2012**

Expanded documentary distribution into movie theaters for film festivals and theatrical release over the last few years requires higher resolution video sources than DVD can provide. Many documentary filmmakers, including Kartemquin Films, are showing their work as theatrical releases first, and then later on broadcast TV or cable distribution.

Over 90% of all movie theaters in the US now have digital projection, in either 2K resolution (1920x1080 pixels) or 4K resolution (3840x2160 pixels). The digital theater projectors use DCP (Digital Cinema Pac) formatted files on hard disc that must be at least 1920x1080 pixels, raising the bar for image resolution over anything a standard definition DVD (720x480 pixels) can adequately deliver.

A DVD file can be "up-converted" to 1920x1080 pixels by creating additional "fake" pixels to fill in-between the real pixels using expensive video hardware boxes like the $2000 Teranex. The process of creating a DCP for theatrical screening requires additional conversion of EVERY frame of the video into individual still frames (1,440 per minute). During this process the "fake" frames behave differently than the actual frames from the

1

DVD and create another level of image degradation beyond just the up-conversion to HD. DCP files also require conversion of the video from RGB color space to XYZ color space to adhere to the strict DCP specifications. Interpolated video frames from DVD up-conversion to HD get degraded in the conversion to XYZ color space as well. If the video being converted to DCP format has HD 1080x1920 actual real frames, the video image quality remains high despite this conversion to multiple still frames and XYZ color space.

Many documentary filmmakers are now shooting and editing programs in the new Ultra High Definition (UHD) 4K (3840x2160) format.  Required up-conversion of DVD content from 720 pixels (horizontally) to 3840 pixels (horizontally) is a difficult and costly process, and unacceptable visually on a 4K UHD TV, much less on a 60 foot wide theater screen.

Netflix and Amazon are currently streaming movies and original content in 4K, and UHD TVs are selling well at retailers such as Best Buy and Amazon. Research NPD Group said 4K TV sales now account for 7% of overall U.S. flat panel revenues, or about $668 million through October 25, 2014. UHD 4K programs are available now and people are watching them at home.

4K UHD Blu-Ray players have been announced and are due to ship by this Fall.. Roku announced this month that their streaming boxes are adding 4K in the next version.

Wired magazine states in the January 2015 issue:

"Make no mistake: this is not just hype. It is not 3-D. This is the future, and in the coming years, 4K will be as ubiquitous and essential as HD video is now. Everyone from studios and streaming services to the manufacturers are putting their full weight behind the push. This is why the TV industry expects 2015 to be a breakout year for 4K. The Consumer Electronics Association predicts UHD TV shipments will hit 4 million in 2015 and revenues will exceed $5 billion. That's up from around 800,000 shipments and $2.5 billion in revenues last year— a huge leap forward."

Documentary filmmakers will be at a distinct disadvantage if they cannot acquire at least HD (1080) content to include in their 4K productions. Thus the urgent need for an exemption that allows filmmakers to access content on Blu-Ray discs.



Here is a chart to scale showing just how small a DVD image is compared to HD and 4K.

Image resolution is measured by the number of individual pixels that make up the video picture vertically and horizontally. DVD image resolution of 720x480 pixels is represented by the small purple box in the upper left of the chart. The green area is full HD Blu-Ray image resolution of 1920x1080 pixels, and the orange area represents 4K Ultra High Definition (UHD) with 3840x2160 pixels..

The total number of pixels per video frame for each format is as follows:

DVD:        __ 345,600

Blu-Ray: _2,073,600 or 6 times more than DVD

4K UHD:_8,294,400  or 4 times more than Blu-Ray and 24 times more than DVD

**Alternatives to Circumvention More Rare and Problematic Than in 2012**

The so-called "analog" alternatives to circumvention of TPMs on HD sources are even more scarce and problematic than they were with DVD players. No Blu-Ray player available today has analog outputs, thus making the use of the "analog hole" as an alternative to circumvention no longer an option. This technique used the lower quality analog outputs of older Blu-Ray players to capture video clips from encrypted discs.

Screen capture of Blu-Ray computer playback is not available on the Mac platform used by a majority of documentary filmmakers, and has unacceptable stuttering, dropped frames, and image size issues on the PC computer platform.

**Scan Conversion:**

Shooting video of an HDTV screen with an HD capable cell phone camera or HD camcorder remains unacceptable for Broadcast or Theatrical display because of aliasing issues, poor audio, color balance shifts, and camera auto-exposure flickering. Moiré rainbow banding and aliasing often occurs when shooting a flat screen monitor or TV with an HD video camera, and is not possible to fix in post production.

**Downloads,VOD (Video on Demand), and Streaming**

Internet downloads (iTunes, Amazon, etc.) are still needed when desired content, like recent TV shows, is not yet available on DVD or Blu-Ray. They do, however, present technical issues that make these files inferior to Blu-Ray content. For example:

1. Downloaded content often has unacceptably high video  compression which is "lossy" and discards much of the picture information to keep file sizes manageable. This often causes macroblocking  and loss of  resolution in fast moving and highly detailed scenes.

2. Streaming content often cannot be captured properly because of stuttering playbackdue to internet congestion. Since all streaming media boxes like Roku, Chrome, Apple TV, and Blu-Ray players only have hardware encrypted HDMI outputs,[1] capturing streaming video using a video capture box is not possible. This is because all such boxes disable the HDMI input if protected content is detected. This same problem exists with cable, and satellite DVR recorder boxes. Many consumers use the built in streaming apps in their TV to view content, but no TV available today has any video outputs that can be captured or recorded.

3. Many films and TV shows streamed online are often not available in full 1080 HD image resolution.

**Updated Broadcast Technical Requirements Remain High**

Public Broadcasting Service (PBS) updated technical specs from November 2014 specifically state: TOS 2.1.3 "The image must be free of compression artifacts (such as macroblocking and mosquito noise), aliasing (such as the artifacts associated with scan conversion), frame dropouts, and other artifacts association with conversion and encoding."

These kinds of artifacts, associated with up-converting DVD material to HD, are difficult and costly to fix, and often cannot be brought up to the PBS standards.

**Filmmakers Need Access to Content Only Available on Blu-Ray**

Blu-Ray versions of films often contain additional material not available on the DVD version of the film. These can include director's commentaries, deleted scenes, behind the scenes footage, etc. that is not available anywhere else**.** They also offer the film in its original wide screen aspect ratio.

Here is an example of the "extras" available on the Blu-Ray version of the movie "HUGO" vs the DVD version of the same film.

---

[1] The article *HDCP 2.2: What you need to know* provides a useful overview of encryption on HDMI. *HDCP2.2: What you need to know*, http://www.cnet.com/news/hdcp-2-2-what-you-need-to-know/ (last visited Feb. 5, 2015).



## Hugo Special Features Comparison

The following chart compares the available **Hugo** special features, to show which special features are included with each version. Descriptions and details of each special feature follow.

*(GREEN = Special Feature Included. RED = Special Feature Not Included.)*

| Hugo Special Features DVDBlurayFeatures.com | 1-Disc DVD Edition | 2-Disc Combo Edition | 3-Disc Combo Edition |
|---|---|---|---|
| Hugo – Blu-ray (HD) | 🟥 | 🟩 | 🟩 |
| Hugo – Blu-ray 3D | 🟥 | 🟥 | 🟩 |
| Hugo – DVD | 🟩 | 🟩 | 🟩 |
| Hugo – Digital Copy (UltraViolet) | 🟥 | 🟩 | 🟩 |
| Shoot the Moon (The Making of Hugo) | 🟩 | 🟩 | 🟩 |
| The Cinemagician, Georges Méliès | 🟥 | 🟩 | 🟩 |
| The Mechanical Man at the Heart of Hugo | 🟥 | 🟩 | 🟩 |
| Big Effects, Small Scale | 🟥 | 🟩 | 🟩 |
| Sacha Baron Cohen: Role of a Lifetime | 🟥 | 🟩 | 🟩 |

In conclusion, over the last three years, filmmakers' need for access to a minimum of HD 1080 quality for fair use video clips has increased greatly. Theatrical distribution of documentaries in digital DCP format and the expansion of UHD 4K video streaming by Netflix and Amazon into homes are two major recent developments that have contributed to this increased need to make HD quality video accessible to filmmakers..

The resolution requirements of theatrical DCP presentation, Broadcast network requirements, and the move to 4K UHD distribution for home viewing, is why an exemption that covers not only DVD and DVT, but also Blu-Ray is so crucial now. Over the next 3 years, this need will only increase as 4K UHD production and distribution expand.

Appendix C

Letter from Michael Donaldson

# DONALDSON ✚ CALLIF

February 6, 2015

U.S. Copyright Office
101 Independence Avenue S.E.
Washington, D.C. 20559-6000


To the Register of Copyrights:

Since the beginning of cinema, narrative films have made use of copyrighted material pursuant to the fair use doctrine.  During the period when production was dominated by major studios, the practice became to license anything and everything for fear of legal consequences. Fair use cases were based on situations such as a mistake as to who to license from (in *Amsinck*, the baby crib mobile manufacturer was paid, but the artist for the creative works dangling above the crib was not), oversight (the poster on the Roc set in *Ringgold*) or honest mistakes (the Mike Tyson's tattoo in Hangover 2).  All of the fair use cases arose in studio films (as opposed to independent films), and the vast majority of them were shot on sound stages dressed by the production company.

Today, however, independent films are on the rise.  For example, six out of the eight nominees for the 2015 Best Picture Oscar are independent films.  Thirty out of the total of fifty films nominated for Oscars in 2015 are independent.  All of the nominees for Best Documentary are independent. Three years ago, I pointed out that a few narrative films were beginning to exercise their rights under the fair use doctrine and predicted that this was the beginning of a major trend.  The basis for that prediction was the mobility within the independent film community.  Filmmakers would work on a documentary one week and a narrative film the next week.  This intermingling between these two types of work was inspiring filmmakers to take what they had learned to be their rights in making a documentary and use it when they worked on scripted films.

That prediction has proven to become a reality more quickly and with greater gusto than I had imagined.  We have a prepared a chart of scripted films which our office cleared since the last round of Section 1201 Hearings (organized categorically and then in chronological order). As indicated in the chart, each of the films made fair use and obtained Errors and Omissions (E+O) insurance coverage, and these only involve the films in our small firm of just five lawyers.  The blue bar indicates decided cases on which we did not work (such as "Midnight in Paris" and "What Women Want").  Note from the chart that out of the eighteen fact-based films made between 2011 and 2015, only one had had a fair use claim, and it resulted in fair use.  Of

---

MICHAEL C. DONALDSON      LISA A. CALLIF      DEAN R. CHELEY      CHRISTOPHER L. PEREZ      MARISA S. KAPUST

400 S. Beverly Drive, Suite 400
Beverly Hills, CA 90212
Office: 310-277-8394  Fax 310-277-4870

New York Affiliate
Gray Krauss Stratford, Sandler Des Rochers, LLP
New York, NY www.gksd-law.com 212-996-6700

_____

the twelve totally fictional works in both natural and set dressed settings that were made between 2000 and 2012, eleven were insured with no claims. The only one that had a claim ("What Women Want" in 2000) resulted in fair use.

Several filmmakers have expressed to me personally that they would like to use material pursuant to fair use in fictional films, but are nervous and have figured out other ways to tell their stories. Each one expressed a preference for being able to use real footage and had concerns about access to source material. Each one represents a situation in which the DMCA has acted as censor to the storyteller. The purposes of the Copyright Law have been frustrated when authors are shackled into telling their stories that explore and comment on our life and times.

Sincerely,

Michael C. Donaldson

# FAIR USE IN SCRIPTED FILMS

| DATE | PP | TITLE | TYPE | CONTENT | ASSESTS USED | Result |
|------|-----|-------|------|---------|--------------|--------|
| | | **1. Fair Use in Live Action Films that are "Based on a True Story" such as a bio-pic.** | | | | |
| 2004 | | "Jersey Boys" | Stage Play | Hit musical about the rise of the Four Seasons in the 50's and 60's. | Clip of Ed Sullivan introducing The Four Seasons. | Fair Use. (Decided 2013.) |
| 2013 | DRC | "No" | Oscar nominated for best foreign film | About the defeat of Chilean Dictator Pinochet in a plebiscite. | Political commercial and street scenes. | Insured, no claim. |
| 2014 | CLP | Caesar Chavez" | Feature Film | Struggle during the 60's California migrant farm workers led by Caesar Chavez. | Many clips from television coverage. | Insured, no claim. |
| 2014 | | "Lovelace" | Feature Film | A biopic about the story of the seminal porn film Deep Throat | Scenes recreated from the porn film using actors | Fair Use. (Decided 2014.) |
| 2014 | | "Jersey Boys" | Feature Film | Film based on the hit musical about the rise of the Four Seasons in the 50's and 60's. | Clip of Ed Sullivan introducing The Four Seasons. | Insured, no claim. |
| 2014 | CLP | "Welcome to New York" | Feature Film | Dominique Strauss Khan's production for New York Hotel maids. | News clips - fair use and licensed. | Insured, no claim. |
| 2015 | CLP | "Ride The Thunder" | Film | Vietnamese Soldiers fighting with the U.S.A forces. | Clips from Dick Cavett's television show. | Insured, no claim. |
| 2015 | CLP | "The Experimenter" | Feature Film | Film about Stanley Milgram. | Clips from Candid Camera. | Insured, no claim. |
| Completed, release expected fall of 2015 | MCD | "Untitled Terrence Malick Project" | Feature Film | Two intersecting love triangles. Obsession and betrayal set against the music scene in Austin, Texas. Starring Christian Bale, Michael Fassbender, Natalie Portman, Rooney Mara, and Ryan Gosling. | | In post-production. |

Blue Shading = Decided Cases

| In production. | LAC | "Untitled Snowden Project" | Feature Film | Oliver Stone's take on The Edward Snowden saga. | Many news clips. | In production. |
|---|---|---|---|---|---|---|
| In pre-production. | | "The Heist" | Feature Film | | | In pre-production. |

## 2. Fair Use in Fictional Works in which real events are the launching point for the film ((i.e. "inspired by")

| | | | | | |
|---|---|---|---|---|---|
| 2011 | | "Midnight in Paris" | Woody Allen's 2011 film | An aspiring novelist visits modern day Paris with his fiancé and travels to the Paris of the 20's each night at midnight, where he meets notable writers and artists from the era such as Ernest Hemmingway, Pablo Picasso and Gertrude Stein. | Short quote from Faulkner novel. | Fair Use. (Decided 2013.) |
| 2011 | DRC | "Joi De Vivre" | Scripted Film | | Film clips. | Insured, no claim. |
| 2012 | MCD | "The Pursuit of Loneliness" | black and white film. Sundance Film Festival | Very realistic film. | Television clip of shooting channel. | |
| 2012 | CLP | "I Was There" | Scripted Film | 9/11 first respondent developes PTSD. | Many radio clips from 9/11. | Insured, no claim. |
| 2013 | DRC | "The Banshee Chapter" | | Fictional journalist experiments on U.S Citizens. | Old interviews and news footage from the 70's. A clip of President Clinton apologizing was also used. | Insured, no claim. |
| 2013 | MCD | "Farah Goes Bang" | Feature Film | A woman in her twenties who tries to lose her virginity while campaigning across America for presidential candidate John Kerry in 2004. | Many campagin clips. | Insured, no claim. |
| 2014 | MCD | "Yellow Rain" | Short Film | The U.S Government misread bee poop as a dangerous chemical during Vietnam War. | Television news clips. | Insured, no claim. |
| 2014 | DRC | "Free the Nipple" | Scripted Film | A group of young, topless women who take to the streets of New York to protest the archaic censorship laws in the U.S.A. | A lot of fair use. Superbowl clip that triggered the FCC Hearings.  IFC distributed. | Insured, no claim. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2014 | CLP | "Camp X Ray" | Scripted Film | A soldier assigned to Guantanamo Bay befriends a man who has been imprisoned there for eight years. | Readings from Harry Potter Book. | Insured, no claim. |
| 2014 | LAC | "Dear White People" | Scripted Film | Film about how the races interrelate. | Released YouTube clips, photographs, Effie Brown provided. | Insured, no claim. |
| 2014 | LAC | "Friends and Romans" | Feature Film | an extra actor who claims to have appeared in various studio feature films; comedy. | Stills and dialogue clips from Good Fellas, Guys and Dogs. | Insured, no claim. |
| 2015 | CLP | "# Horror" | Scripted Film | 13-15 year old girls cyber-bullying. | Huge montage from internet. | Insured, no claim. |
| 2015 | LAC | "Kicks" | Scripted Film | The great lengths folks go to when Nike shoes are stolen. Very dark film. | Artwork on wall, Michael Jordan Poster. | Insured, no claim. |
| In pre-production, completion in 2015 | CLP | "Mandorla" | Feature Film | A man with an over active imagination. It calls him away from the realities of corporate and family life to face a dark and magical place in a medieval French city. | Clips from Excalibur which constantly makes him want to recreate the scene in his own life. | In production. |
| In pre-production, completion in 2015 | CLP | "The Phoenix Incident" | Feature Film | Based on a real event that occurred on March 13, 1997 in Phoenix, Arizona, when thousands of people, including then-state governor Fife Symington, claimed to have simultaneously witnessed inexplicable lights in the night sky. | | In post-production. |
| In pre-production, completion expected in 2015 | CLP | "Showing Roots" | Feature Film | The film explores what it would be like for a 70's black family watching Roots. | Clips from original Roots mini TV series. | In production. |

## 3. Totally Fiction Works - Natural Settings

| | | | | | |
|---|---|---|---|---|---|
| 2000 | | "What Women Want" | Paramount Pictures 2000 film. | Mel Gibson stars as an advertising executive. | In a particular scene, Gibson brainstorms with employees to develop marketing ideas targeted at women. At some points during the scene, the Plaintiff's pinball machine appears in the background. The pinball machine is never the focus of the scene. | Fair Use. (Decided 2008.) |
| 2007 | MCD | "Once" | Oscar for best song | Modern-day musical largely shot on the streets of Dublin. | A lot of images in the background. | Insured, no claim. |
| 2009 | DRC | "Waiting for Ophelia" | IFC Release | Romantic Comedy | Artwork located in the home of a wealthy owner which was used as the set for the home of a wealthy character. | Insured, no claim. |
| 2009 | DRC | "He's Such a Girl" | IFC Release | Teen comedy about a boy with feminine traits who attempts to solidify a relationship with a girl. | Artwork on the wall of a cabin. | Insured, no claim. |
| 2012 | LAC | "Thanks for Sharing" | Film and Trailer | Mark Ruffalo stars as a sex addict. | Various copyrights protecting poster owned by Victoria's Secret. | Insured, no claim. |
| 2013 | LAC | "A Case of You" | Feature Film | Protagonist first learns about his love interest from Facebook. | Facebook clips. | Insured, no claim. |
| 2013 | DRC | "Crystal Fairy and the Magical Cactus" | Feature Film | Search for a fabled hallucinogen. | Incidental artwork. | Insured, no claim. |
| 2014 | LAC | "Heaven Knows What" | Feature Film | A vagabond couple in NYC battling addiction amidst a manic love affair. | trademarks, screen grabs from computer. | |

**4. Totally Fiction Works - Set Dressing in Natural Settings**

| | | | | | | |
|---|---|---|---|---|---|---|
| 2009 | MCD | "Big Fan" | Comedy | A hardcore New York Giants football fan is the central character of the film. | Posters in the bedroom. | Insured, no claim. |
| 2011 | MCD | "Bellflower" | | The main character is obsessed with Lord Humungus from "Mad Max II" | During the film, two friends build the copyright protected Mad Max car. Note: The studio had already won a lawsuit against a company building and selling replicas of Mad Max cars. | Insured, no claim. |
| 2013 | DRC | "Homre de Piedra" | Feature Film | Father comes up from Mexico to bond with and take care of his daughter. | Many photos were photo-shopped to add the absent mother in order to fool her daughter into believing that the mom was traveling extensively. | Insured. No claim. |
| 2014 | LAC | "Boyhood" | Richard Linklatter's film shot over 12 years | A family goes through its many changes | Shot in a realistic setting, all manner of third-party, unlicensed items appear in the film. | Insured. No claim. |

**5. Set Dressing on a Soundstage - Claims on all the following projects**

| | | | | | |
|---|---|---|---|---|---|
| 1955-1984 | "Captain Kangaroo" | Popular children's show | CBS TV Show. | A minor character from the show manipulated the puppet as hand puppets for 35 seconds. | Fair Use. (Decided 1965.) |
| 1989 | "Immediate Family" | Studio feature film | Married childless couple who want a baby. They decide to adopt from a pregnant teenage girl who later gets second thoughts. | Artistic animals affixed to a mobile which was prominently displayed over a baby crib in several scenes. | Fair Use. (Decided 1994.) |
| 1991-1994 | "ROC" | Television show | Sitcom | Artist created a painting of a story quilt which turned into a poster. Poster was used as part of background of church for a scene. | Fair Use at trial court; reversal on appeal.   (Decided 1997.) |
| 1993 | "Made In America" | Studio feature film | Zora Matthews, whose mother Sarah conceived her with the aid of an anonymous sperm donor, discovers her father is a white man named Hal Jackson. | Paintings are featured and knocked down to show evidence of the sexual activities taking place in the scene. | Fair Use. (Decided 1997.) |
| 1995 | "12 Monkeys" | Studio feature film | James Cole is a convicted criminal living beneath a post-apolcalyptic Philadelphia in the year 2035. In 1996-97, the Earth's surface had been contaminated by a virus so deadly that it forced the survivors to move underground. | A scene featured a room and a chair that resembled a graphite pencil drawing created by an artist. | Not fair use. (Decided 1996.) |
| 1995 | "Seven" | Studio feature film | Soon-to-be retiring Detective William R. Somerset is partnered with short-tempered but idealistic Detective David Mills, who recently transferred to the department.  They discover an obese man who was forced to feed himself to death, and the next day investigate a fatal bloodletting of a rich attorney. | Black and white translucent photos were hung over light board and used as the background of the crime scene. | Fair Use. (Decided 1998.) |

**6. Parody**

| | | | | | |
|---|---|---|---|---|---|
| 1999- (Episode aired in 2006) | | "Family Guy" | Animated | "Family Guy" Episode | An animated Carol Burnett is shown sweeping up a sex shop and giving her ear tug that she used as a sign off on her television show for years. | Fair use. (Decided 2007.) |
| 2011- | DRC/ MCD | "Trailer Trash" | Animated | Internet Comedy Series | Each episode contained 3 to 4 clips of a major motion picture while the characters - all occupants of a single trailer - commented on the clips and films they were from. | Insured, no claim. |
| 2013 | | "Escape From Tomorrow | A low budget, back and white horror film | A man who has a meltdown at Disneyland while on a family trip. | All manners of copyrights, trademark and personal appearances. | Insured, no claim. |

*2015 Oscar Nominated Films (minus Music; Shorts; Sound Editing; Sound Mixing; Visual Effects)*

| | FILM | COMPANY | IND or STUD | | | |
|---|---|---|---|---|---|---|
| 1 BEST PICTURE NOMINEES (8 FILMS) | American Sniper | Warner Bros | STUD | | | |
| 2 | Birdman | New Regency/20th Fox | IND | | | |
| 3 | Boyhood | IFC/Universal & Paramount | IND | | | |
| 4 | Grand Budapest Hotel | Indian Paintbrush & Scott Rudin Productions/20th Fox | IND | | | |
| 5 | Imitation Game | Black Bear/Weinstein | IND | | | |
| 6 | Selma | Cloud Eight & Harpo | IND | | | |
| 7 | Theory of Everything | Working Title/Universal | STUD | | | |
| 8 | Whiplash | Bold | IND | | | |
| 9 | Foxcatcher | Annapurna/Sony | IND | | | |
| 10 | Two Days, One Night | Les Films du Fleuve/Wild Bunch | IND | | | |
| 11 | Wild | Fox Searchlight/20th Fox | STUD | | | |
| 12 | Still Alice | BSM Studio | IND | | | |
| 13 | The Judge | Warner Bros | STUD | | | |
| 14 | Into the Woods | Lucamar/Disney | STUD | | | |
| 15 | Big Hero 6 | Disney | STUD | | | |
| 16 | How to Train Your Dragon | Dreamworks/20th Fox | STUD | | | |
| 17 | Boxtrolls | Laika/Focus Features&Universal | IND | | | |
| 18 | Song of the Sea | Big Farm | IND | | | |
| 19 | Tale of Princess Kaguya | Studio Ghibli/Wild Bunch | IND | | | |
| 20 | Inherent Vice | Warner Bros | STUD | | | |
| 21 | Ida | Opus Film/Music Box | IND | | | |
| 22 | Mr. Turner | Film4&Focus Features/Sony Pictures Classics | IND | | | |
| 23 | Unbroken | 3 Arts Ent.&Legendary Pictures/Universal Pictures | STUD | | | |
| 24 | Maleficient | Disney | STUD | | | |
| 25 | Leviathan | Non-Stop Productions/ Sony Pictures Classics | STUD | | | |
| 26 | Tangerines | All Film & Georgian Film | IND | | | |
| 27 | Timbuktu | Les Films du Worso/Cohen Media Group | IND | | | |
| 28 | Wild Tales | El Deseo/Sony Pictures Classics | IND | | | |
| 29 | Guardians of the Galaxy | Marvel/Disney | STUD | | | |
| 30 | Nightcrawler | Bold/Open Road | IND | | | |
| 31 | Interstellar | Paramount | STUD | | | |
| 32 | Gone Girl | 20th Fox | STUD | | | |
| 33 original song | The Lego Movie | Warner Bros | STUD | | | |
| 34 | Beyond The Lights | Relativity Media | IND | | | |
| 35 | Glen Campbell...I'll Be Me | PCH Films | IND | | | |
| 36 | Begin Again | Apatow Productions | IND | | | |
| 37 animated short | The Bigger Picture | Chris Hees | IND | | | |
| 38 | The Dam Keeper | Megan Bartel & Duncan Ramsay | IND | | | |
| 39 | Feast | Disney | STUD | | | |
| 40 | Me and My Moulton | Mikrofilm & National Film Board of Canada | IND | | | |
| 41 | A Single Life | Marieke Blaauw & Joris Oprins & Job Roggeveen | IND | | | |
| 42 live short | Aya | Oded Binnun & Mihal Brezis | IND | | | |
| 43 | Boogaloo and Graham | Out of Orbit | IND | | | |
| 44 | Butter Lamp | Wei Hu & Julien Feret | IND | | | |
| 45 | Parvaneh | Talkhon Hamazavi | IND | | | |
| 46 | The Phone Call | RSA Films | IND | | | |
| 47 sound editing | The Hobbit: Battle of the Five Armies | MGM & New Line (Warner Bros.) | STUD | | | |
| 48 visual effects | Captain America: The Winter Soldier | Marvel/Disney | STUD | | | |
| 49 | Dawn of the Planet of the Apes | Chemin Entertainment (Fox) | STUD | | | |
| 50 | X-Men: Days of Future Past | Marvel&20th Fox/20th Fox | STUD | | | |

SUMMARY:
Out of the 50 films nominated for Oscars, 20 are studio films and 30 are independent films.

Out of the 8 films nominated for Best Picture, 2 are studio films and 6 are independent films.

Appendix D

Letter from Kenn Rabin

# F U L C R U M    M E D I A    S E R V I C E S

PO Box 177   San Anselmo   California   94979.0177   □   Tel: 415.459.4429   Fax: 415.459.4498

February 2, 2015

Professor Jack I. Lerner
Mr. Michael C. Donaldson
c/o Donaldson + Callif
400 South Beverly Drive
Beverly Hills, California 90212

Dear Michael and Jack:

From the very beginning of my career as a producer, archival researcher and consultant on both documentaries and feature films, I've come across many barriers to the use of copyrighted, third-party owned footage, music and stills. This has resulted in a long-term pattern of difficulty in using relevant cultural touchstones, local, national and international news programs, and, in general, media that illustrates context for public debate and the examination of history and popular culture.

Many of these uses we now think of as fair, but it wasn't until the release of the Center for Social Media's *Documentary Filmmakers' Statement of Best Practices in Fair Use*, in November 2005, that I and other filmmakers began to feel empowered to demand our fair use rights and codify clear "safe harbor" instances in which we could triumph over some of these barriers. One service I now perform for studio feature producers and independent feature and documentary filmmakers alike involves explaining what fair use is, and how and when to invoke it, so that they can use all of their storytelling tools and not be hampered in their ability to present important illustrative evidence or artifacts to their audience. I also explain that, the primary *raison d'etre* of fair use is *not* to save them money, but rather to be "the lubricant that allows copyright law to work smoothly with first amendment free speech," as attorney Tony Falzone has said. In some cases, circumstances – or even whim – might push a copyright holder to withhold his/her permission for use in order to avoid the copyrighted material being criticized, re-contextualized, or otherwise transformed in a way that is not under the copyright holder's control. This document will give several examples of this situation, and my book for filmmakers, *Archival Storytelling,* deals quite extensively with fair use.

Even as clarity among filmmakers about fair use increased after the publication of the *Best Practices* document, obstacles to fair use still remain. Where, previously, film producers would often self-censor regarding their use of an item because of copyright issues ("They'll never give me permission to use that clip. I might as well not bother even trying."), now, as filmmakers better understand their right to fair use, the self-censorship hasn't necessarily gone away. It has simply re-focused on the next seemingly-insurmountable obstacle ("I'll have to fair use that clip, since the copyright holder will never give me permission. But how and where am I going to actually get a copy, so that I can put it in my film, if I don't get it directly from the copyright holder?")

Unfortunately for many, the fair use statute includes no provision or precedent for how a justified user of that right might obtain access to the physical materials (films, videotapes, digital files, lab elements, etc.) that are needed for the fair use expression itself. This is an issue that's not unique to audiovisual storytelling, but it is especially troubling because of the nature and technical needs of production in the audiovisual realm. My clients wonder what they can do when I explain that, *"if only* you could obtain that clip of your documentary subject appearing on *The Tonight Show with Johnny Carson*, or that scene from *Mississippi Burning* which illustrates your explanation of how point of view affects viewers' reactions, or *if only* you could access the videotape of Walter Cronkite telling the American people that the Vietnam War is a stalemate at best in order to talk about the turning tide of public opinion about the war, or of Richard Pryor satirizing race in a skit on an old *Saturday Night Live* show*, then licensing wouldn't be an issue, and fair use would have worked its magic once more as the lubricant between copyright and free speech. *If only."*

Of course, in many cases, the copyright holders are the gatekeepers of the unique copy of the material itself – and if you don't pay, you don't play. Understand that it is not inconceivable that going to certain copyright holders with a fair use request could result in their cooperation, both in the form of a non-objection letter and even occasionally a reel of film or videotape. This is, however, the rare exception. Normally, copyright holders view fair use with suspicion, disdain, and a bank of lawyers at the ready. In fact, the climate is so hostile that many producers are afraid even to approach copyright holders for fear they will then be "on the radar."

One rare case where I actually obtained a non-objection letter from a copyright holder came up in a Barry Levinson film I associate produced, entitled *Yesterday's Tomorrows.* We needed a specific 1940s magazine ad for a Ford automobile. Ford agreed the use was fair, provided a non-objection letter, and even found us clean art of the original ad in their archives. Another example happened when I was archival scene researcher on George Clooney's feature about Edward R. Murrow, *Good Night, and Good Luck.* I got a great deal of cooperation from both an advertising agency and the public relations department of a certain tobacco company, both

of which indicated in writing their belief that our use of a 1953 cigarette commercial for television was fair use. In this case, however, they were simply unable to provide us with a clip of the commercial, so I had to try to find a copy elsewhere.

A more typical example came during the same project: Although ultimately we opted not to do it, for a while during the post-production of *Good Night, and Good Luck*, we considered creating a montage for the end of the film which would show, in rapid-fire, the "evolution" of television news from *See It Now* to network evening news, to *60 Minutes*, to *Nightline*, to *Dateline NBC*, *A Current Affair, The O'Reilly Factor, Entertainment Tonight, The Daily Show,* and *TMZ.* Luckily for me, the idea was dropped, but for several days I sat at my desk daunted by the prospect of having to gather the actual materials for such a montage, which may have qualified as fair use, but the idea of which would not have been received positively by the copyright holders. How would I find the necessary materials if we went forward? Perhaps by recording the more current examples off-air in as high a format as I could? Finding older ones in special collections? Pulling them off YouTube? Ripping some from commercially-available DVDs might have been possible, but these types of programs are rarely released publicly on DVD, as they have the short half-life of spot news.

One of the most notable films I've worked on lately which had extensive issues with obtaining physical materials for fair use was the feature documentary, *Inequality for All,* which profiled economist and former Clinton cabinet member Robert Reich and his economic theories. The film won multiple awards at film festivals and was distributed theatrically by TWC/Radius.

In that film, we needed to use clips under fair use in a variety of ways. One type of fair use we invoked was simply to illustrate and give witness to Reich's statement (in his on-screen interview with us) that, during his tenure as Secretary of Labor, he often appeared on television – both news and talk shows – in order to present himself and the economic policies of the Clinton administration to as broad an audience as possible. To that end, we fair used clips from *The Tonight Show with Jay Leno, The Daily Show, The Conan O'Brien Show, The Rachel Maddow Show, The O'Reilly Factor* and others that showed Reich discussing the economy with the host, entertaining the audience in a skit, or presenting a quick sound bite that was smart but also humorous – thus corroborating his appearances in the public eye, and defining his sense of humor and affability.

Another example of fair use for illustration in *Inequality for All* involved clips from Fox News that we would not have been able to license from them. In fact, Fox News *does* license their broadcast footage, however, it will under no circumstances license footage that includes any on-screen talent, or anyone on their staff or payroll. Because most of what is broadcast on Fox

is intimately tied to their on-air talent, it would have been impossible to license any of the material we needed from them.

An issue similar to the Fox News one involved an interview with the president of Viacom, Inc. which appeared on the online channel of *The Wall Street Journal*, *WSJ*. I had entered negotiations with them to use the clip in good faith but then was suddenly faced with a no-explanation turndown for permission. Although we had been turned down, we had a sure bet for a fair use if we went ahead and used the clip. In the interview, the billionaire executive bemoaned the fact that he had to lay off thousands of workers because of the economic downturn and its effect on his company, never mentioning the outrageously high salary and bonuses he received, nor how many workers' jobs might have been saved had he sacrificed even a small percentage of his own income for a year. We superimposed information about his earnings over the interview clip.

The broader issue of using on-air reporters' voices or likenesses, and any branding or branded shows (*60 Minutes, Larry King Live, Anderson Cooper 360,* etc.) has been an issue not only with Fox, but with all network and cable news worldwide over the 35+ years that I've been working in this field. In recent years, these restrictions have gotten broader, and waivers to the policy more difficult to obtain. Sometimes the only solution is to find and rip an off-air recording, if one can find it in a special collection somewhere.

Feature film and television clips are even more complex if we cannot make fair use. In that case, we would have been required to pay large clip fees to the studios, but then *also* fees to the Writers Guild, the Directors Guild, and possibly the copyright holder of the underscore. But the real difficulty would be in locating, negotiating with, and obtaining signed releases from all the SAG/AFTRA actors appearing in the scene. If one actor says no, delays too much, is on location and unreachable, or demands too high a fee, the clip's use is as good as dead.

There was an additional category of fair use footage in *Inequality for All,* which was that of popular culture and entertainment. We needed to produce a segment to illustrate Reich's discussion of women entering the employment marketplace in the late 1970s as a result of the stagnation of middle class wages (even more so than because of the women's movement, which was in full swing by that time). We wanted to show how this huge cultural shift was mirrored in the popular media of the day by running short, iconic clips from "working women" TV shows such as *The Mary Tyler Moore Show, Cagney and Lacy,* and *Murphy Brown*. We also wanted to show the shift reflected in television commercials, and thus used a 1970s Enjoli perfume commercial aimed at women who went from workplace to after-work socializing to cooking for the family – to then being a sex kitten for her husband when all the chores were done – and all to the tune of the Helen Reddy song, "I'm a Woman." And finally,

we wanted to remind people of the huge popularity of the film *9 to 5* at the time. The song had become the anthem of working women and led to the formation of an organization of the same name that fought for and protected women's rights in the workplace.

Some clips in *Inequality for All* had to be ripped from commercially-available DVDs. Normally, if a feature clip is licensed, the studio provides it in a 2K or, much preferably, 4K digital scan. A 2K scan is roughly twice the resolution and quality of a Blu-ray, but it is really a 4K scan from 35mm which is considered ideal for such use – this is four times the sharpness and detail of a Blu-ray and, at this level of resolution, begins to approximate the amount of information available in a 35mm film frame. Therefore, a Blu-ray (an HD 1K scan, if you will) is generally not even adequate and is already starting to become obsolete in the face of these other formats, some of which are already in the consumer market. Blu-ray, which includes picture encoded at up to 1080 line resolution, is the *minimum* level of high definition, while a DVD is the equivalent in resolution to our old square standard definition (SD) television format (525 line resolution), in use since TV entered the consumer market in the 1940s. When projected in a theater or even seen on a broadcast, SD quality now stands out as being visually degraded, and the video scan lines are usually obvious. Fine detail—which could be critical to the point the fair use is making—is hard to discern and the audience is distracted by the sudden quality shift.

DVD quality was a barely viable option even in 2012, when we were producing *Inequality for All*. With new rules, already in effect, from broadcasters such as PBS and other gatekeepers, including theatrical and foreign broadcast distributors about delivering HD product, filmmakers are already put in a position in which, were they to continue to be restricted to DVD, they would truly have their hands tied vis fair use. To claim fair use, they would use shots that would fail minimal technical specs. This would require filmmakers to spend so much money doing needless technical improvements and alterations that not only would it deplete their budgets and wreak havoc with their production schedules, but at the end of the day, it would also yield a far inferior visual result than had they just worked from a Blu-ray or 2K or 4K scan to begin with – in other words, starting right off "within spec" instead of trying to force inferior elements to appear like high definition. All of these considerations would undoubtedly mean that producers would decide to forego exercising their fair use rights for many contemplated clips.

Now, I'd like to cite two recent examples of the lack of access to physical materials necessary for a fair use, *even when we licensed the footage from the copyright holder* simply in order to *have* access to the materials when there seemed to be no other choice (a situation that arises on many occasions). One involved a documentary about Vietnam War veterans and post-traumatic stress syndrome (PTSD), and the other relates to my work on the recent Paramount/Pathé feature film, *Selma.*

In the case of the veterans documentary, I wanted to pull an ABC News shot I had found previously for the landmark WGBH series, *Vietnam: A Television History.* The shot showed off-duty American soldiers sitting on a hillside in South Vietnam, relaxing, and using a rifle as a so-called "shotgun" with which to smoke marijuana. They were passing around the rifle; each put the barrel in his mouth and inhaled. The shot formed a complex comment about the schizoid life of the soldiers – from relaxation to fighting for their lives, sometimes in a matter of seconds. It also had disturbing overtones of suicide and conjured associations with inhaling the smoke from a recent discharge of the gun.

I had originally found the shot back in 1983. Now, in 2013, I wanted to use it again. But this time, ABC News refused, claiming "We do not want to provide a shot that shows American soldiers in a bad light at a time when we're at war. Period." In this case, the archival turndown was politically motivated. Did the fact that ABC was now Disney have anything to do with the change of heart? Did it matter?

I was furious. However, the solution seemed obvious: claim fair use, and obtain a clean master of the shot from the *Vietnam edit room* negatives. Unfortunately, the documentary I was working on had a miniscule budget for lab work, and WGBH would have requested a usage fee as well as a fee for finding the shot and having the lab make us a duplicate master. The one other alternative would have been ripping the shot from the commercially-available home DVD of *Vietnam*, but in this case, the quality wasn't sufficient for our needs and the producer simply decided it wasn't worth the trouble and didn't use the shot. An historical shot that was previously available had been quietly removed from public access, and in a tiny but important way, our audiovisual history had been altered.

For the 2014 feature, *Selma,* which focuses on the historic 1965 voting rights march from Selma to Montgomery, I had located a good deal of archival film. We had created an archival sequence we liked, showing the "real" march spanning the time the marchers cross the Edmund Pettus Bridge to the time they arrive in downtown Montgomery. It showed the marchers on the road, at rest in the evenings, being joined by celebrities such as Tony Bennett, Sammy Davis Jr., and Harry Belafonte, and crowds by the side of the road, cheering the marchers on. It's historically relevant and accurate to illustrate the participation of children in the movement, and children were very present in both the marchers and the crowds cheering the marchers on. In addition, most adult participants in the march would probably say that voting rights had to be secured for the sake of their children.

Less than a week before picture lock, a U.S. network news division, on whose footage we had relied heavily, announced that they would not allow us to show any children in their footage. When we asked for an explanation, we were told we weren't entitled to one – they were the

copyright holders and could construct the rules any way they wanted; we just had to remove any shot that included children, and there was to be no further discussion. Filmmakers reading this would instantly understand that this request would mean a major re-edit of the sequence at a point in time when that would be nearly impossible given our picture-lock date. Historians of the civil rights movement would cringe as well: To *not* show children participating in the march and cheering from the sidelines would be historically inaccurate, as children were a large part of the movement. I felt quite sure I could construct a good case for fair use, for all the reasons above, not to mention that the decision was untimely and arbitrary. The director, Ava DuVernay, was dead set against removing the shots, as was I. But if the copyright holder was refusing us the physical shots, we'd had no choice but to remove them. There was no other source for these shots.

In this situation, the problem was solved literally *after* the eleventh hour, and after many attempts – by getting the president of the network news division on the phone with the top management of the production company, which is owned by Brad Pitt. The issue was resolved within a few minutes. I had suggested taking this route because it had worked for me once before. CBS News had an issue with our using their branding all through *Good Night, and Good Luck.* And yet the whole story takes place in the studio, essentially. The CBS "eyeball" was everywhere – on the sides of cameras, on the office walls, on letterhead. Director George Clooney called the president of CBS, Leslie Moonves, and the issue was quickly resolved. However, in either case, had that solution not worked, who knows what we would have done? In the case of the Clooney film, the whole project might have had to be scrapped. In the case of *Selma,* as with the Vietnam soldiers, children would have been erased from the historical record. How many media makers and producers have access to the likes of George Clooney, Brad Pitt, or Oprah Winfrey (the other producer of *Selma*)? Practically speaking, we are sometimes in a situation where the ability to take advantage of fair use rights depends on who you know.

All this is simply to illustrate the need for another step beyond fair use in its current form, in order to render it truly practical for those media makers who would justifiably invoke it. In the print world, it is not an issue for reviewers who are quoting as part of critique or analysis – they need nothing but the words–or maybe a photo willingly supplied by the studio's PR department. But in the audiovisual world, "quoting" becomes a much more technologically complex issue, often dependent on the copyright holders themselves.

One of my next projects will be a documentary about obituaries – how they are produced for television news and newspapers, what is chosen to be said about the recently deceased, who determines which people are worthy of certain kinds of recognition and which aren't. What criteria do they use? How do they chose what aspects of a life are important enough to focus on?

For this film, I will need to access footage and stills of celebrities of various kinds, whether in fields of math or science, music, theater, film and television, politics, literature . . . I'll need illustrations of their accomplishments and the effect they had on history, and on the popular culture and imagination. I'll need materials showing *them.* In addition, I'll need to show how their obituaries were presented on news and entertainment programming, and I'll need to show newspapers. I expect much of my use of this material to qualify as fair use, but will it – can it? -- come from Blu-rays and streams of movies, television shows, live concerts, educational films and videos, or cable channel shows? And if I can't use those, how will I obtain what I need?

So when I write of the need for another step beyond fair use in its current form, I mean that we need to develop a practical system so that suitable physical assets can be obtained for a legitimate fair use. The legal right to rip a DVD or streaming file in order to yield a useful master has been a critical first step, as you can gather from the examples cited here. But, also for reasons I've cited here, that's not the whole solution. Too many assets are *only* available from the copyright holder, or are illegal to obtain from higher-resolution media like Blu-ray that begins to approach industry standards.

This question of access to *quality* master, as opposed to *any* master, is not just a cosmetic problem. Many distributors and vendors don't allow certain types of degraded visual elements. More important, especially broadcasters require every shot to pass stringent technical specifications, and while possible in most cases, the struggle to get inferior quality archival materials "to spec" can be expensive and time consuming. In my experience, PBS has the most stringent requirements. For example, they do not allowing head-switching (which is an issue with almost every news videotape from the 1970s to the 1980s), they demand that gamma be within a certain range (difficult with multi-generational film and analog tape copies), and audio must fit certain criteria as well. In the case of head-switching, the image has to be enlarged and cropped in order to remove this technical problem. Once you crop your original artifact, the resolution goes down, the sharpness disappears, the scan lines increase in relative size . . . and maybe even more important, the original artifact, the primary source material, is altered. Content in the frame is cropped out, disappears. Depending on how stringent a filmmaker, or her critics, or her audience might be about the original source material, it could be considered manipulated from its original form, a journalistic ethical lapse. All of this often requires audio and video engineers and sophisticated equipment that only can be found in an expensive post-production suite. Quality control is important of course, and certainly a positive thing, but it can present obstacles to fair use.

Studios and feature film companies are also very strict regarding technical requirements for theatrical release, as they are imagining every shot projected by digital means onto a giant

screen from some distance away. Among younger film and television producers, there's even a lack of understanding of the history of film and video technology and therefore an intolerance for materials that don't have that high definition digital "look." They demand that everything, from early Library of Congress footage to 1970s nightly news, be made to look as good as high definition material recorded yesterday.

And, finally, cosmetics are important too. Ironically, at the end of the day, both the media makers and the copyright holders usually want the same thing: for the material they own, or the film they make, to look as good as possible and represent accurately the level of craft that went into the original creation. News camerapeople, feature set designers and costumers want to see clips of their work that are clear and bright, sharp, and in the correct aspect ratio. Film directors and directors of photography want the clips to integrate well with the high-quality original footage they themselves have shot. Both also have financial concerns – many filmmakers can't afford exorbitant license fees and guild payments—and are worried that any needed correction of technical issues could add to their budgetary woes by consuming money that could otherwise be used for additional clearances – or even toward their next film.

Archives and other repositories need that income stream in order to afford the cataloguing and preservation efforts that keep that same piece of film looking good and available to media producers, historians, students and others without the loss and disintegration that plagues all media formats over time to a greater or lesser extent. But how much is enough income stream, versus extravagant profit required by an estate, a corporate owner, or its stockholders? Is it worth hobbling would-be storytellers, whose voices are important to our democracy?

I sincerely hope that access to fair use, as interpretation of its nuances change over time, will reflect the technical needs of the 21st century. While I know current legal wisdom dictates that mere convenience is not enough to warrant an exemption, the reality filmmakers face is that all archival materials are not created equal–not in the eyes of the media maker, the exhibitor *or* the audience, because of the reasons I've stated and the examples I've given. It is critical that fair users have access to high-quality copies of what can only be described as true artifacts of our recent and continuing history and culture–copies that better match producers' vision of their statement, satisfies their gatekeepers, and is of sufficient quality to actually *examine and evaluate, critique and parody,* or offer *historical evidence and illustration* in the way fair use is meant to do.

As to the additional problem—complete lack of access to *any* copy with which to make a fair use (common, because copyright holders often own the only physical copies), media makers still hit that brick wall: *Fair use is impossible. I still need to pre-censor. I still can't practice my fair use rights.*

Therefore, it is important that some common ground be reached where all parties involved recognize the social value and necessity of fair use. Such a mutual understanding could even lead to outside-the-box creative partnerships between providers and fair users, and surprising initiatives yielding solutions that honor and protect both the artifacts themselves, and the historical and cultural record.

Sincerely,

Kenn Rabin
President, Fulcrum Media Services

# F U L C R U M   M E D I A   S E R V I C E S

PO Box 177   San Anselmo   California   94979.0177   ▲   Tel: 415.459.4429   Fax: 415.459.4498

## KENN RABIN

## PRODUCTION CREDITS – SELECTED HIGHLIGHTS

**Archival Producer** - Plan B/Paramount/Pathé, *Selma*. 2013-2014.
**Archival Producer/Consultant** – Apple, Inc, various online films promoting educational software. 2013-present.
**Archival Supervisor** - Apple Corps/OVOW Productions, *Beatles Live!* 2012-present.
**Production/Archival Consultant** - 72 Productions, *Inequality for All.* 2012-2013.
**Production Consultant/Film Researcher** - HTSAP LLC, *How to Survive a Plague.* 2011-2012.
**Producer, Writer, Archivist** - Paradigm Productions, *The Storm that Swept Mexico,* 2008-2011.
**Archival Consultant** - Kovno Communications, *The Most Dangerous Man in America,* 2010.
**Archival Consultant** - Telling Pictures, *Howl,* 2008.
**Archival Film Researcher** - Smoke House/Warner Bros., *The Men Who Stare at Goats,* 2008-2009.
**Archival Film Researcher** - Groundswell/Focus Features, *Milk,* 2008.
**Archival Film Researcher** - Bauer Martinez, *I Could Never Be Your Woman,* 2004-2006.
**Archival Film Researcher** - Bauer Martinez, *Land of the Blind,* 2001-2006.
**Archival Film Researcher/Consultant** - Warner Bros/Section Eight, *The Good German,* 2001-2006.
**Archival Scene Researcher** - Warner Bros/Section Eight, *Good Night, and Good Luck,* 2002-2005.
**Film Researcher** - Interfaze Productions, *Daughter From Danang.* 1999-2002.
**Researcher/Consultant** - Tell the Truth Pictures, *Mighty Times: The Legacy of Rosa Parks.* 2001.
**Archival Consultant** - New Images Productions, *Ralph Ellison: An American Journey.* 1999-2002.
**Associate Producer/Writer** - Touchstone Television/Barry Levinson, *Yesterday's Tomorrows.* 1998-1999.
**Series Archival Consultant** - Touchstone Television, *The 20th Century: A Moving History.* 1998-1999.
**Archival Consultant** - Telling pictures, *Paragraph 175.* 1999.
**Archival Consultant/Archival Researcher** - Sonneborn Productions, *Regret to Inform.* 1998-1999.
**Archival Consultant** - American Film Foundation, *Return With Honor.* 1998.
**Production Consultant** - Paradigm Productions, *Fight in the Fields.* 1995-1997.
**Archival Consultant** - HBO Films, *Truman.* 1995. (uncredited)
**Archival Consultant** - Trans Pacific Television, *Cadillac Desert.* 1995-1996.
**Production Consultant/Researcher** - ABC News, and NHK, *The 20th Century Project.* 1993-1999.
**Archival Consultant** - HBO Films/John Frankenheimer, *Up Against the Wall.* 1994.
**Production Consultant** - Cronkite/Ward Productions, *Walter Cronkite Remembers.* 1993-1995.
**Production Consultant/Researcher** - Clarity Film Productions, *Freedom on My Mind.* 1993-1994.
**Archival Manager** - Tig/Pathways Productions, *500 Nations.* 1993. (uncredited)
**Film Researcher** - Marlon T. Riggs Films, *Color Adjustment.* 1989-1993. **(Emmy nomination)**
**Writer/Consultant** - The Rockefeller Foundation/National Video Resources, 1991-1995.
**Writer/Director of Film Research** - Blackside, Inc., NEH funding proposals, *America's War on Poverty,* and *The Great Depression.* 1991-1993.
**Film Researcher** - Columbia Pictures/Sean Penn, *The Indian Runner.* 1991. (credited Special Thanks)
**Production/Archives Consultant, Researcher** - Varied Directions, Inc., *Making Sense of the Sixties.* 1991.
**Archival Consultant** - WGBH Educational Foundation. Various projects including: *War and Peace in the Nuclear Age, American Experience, American Masters, Frontline,* specials, etc.
**Film Researcher/Consultant** - WQED-TV, *W. Eugene Smith: Photography Made Difficult.* 1989.
**Archivist, Film Research Coordinator** - Blackside, Inc., *Eyes on the Prize: America's Civil Rights Years* and *Eyes on the Prize II: America at the Crossroads.* 1985-1989. **(Emmy nomination)**
**Archivist, Film Research Coordinator** - WGBH, Educational Foundation, *Frontline: Crisis in Central America.* 1984-1985.
**Archivist, Film Research Coordinator** - WGBH, Educational Foundation, *Vietnam: A Television History.* 1980-1983.
**Production Associate/Assistant Publicist** - WNET/Thirteen, *Bill Moyers' Journal.* 1979-1980.
**Production Associate** - *The Lathe of Heaven,* WNET/13. 1978-1979.

-- more --

# TEACHING/LECTURING EXPERIENCE

**Workshop Presenter/Panelist** - EBS International Documentary Film Festival, Seoul, Korea, 2012.
**Workshop Presenter** - Independent Television Service (ITVS), 2012.
**Workshop Presenter/Panelist** - Broadcast Educators' Association, 2008-2011.
**Visiting Lecturer** - Northwestern University, Graduate Film Program. 2008.
**Visiting Lecturer** - Columbia College, Film Program. 2008.
**Visiting Lecturer** - San Francisco State University, Graduate Film Department.  1999-2005.
**Visiting Lecturer** - University of California at Berkeley, Graduate Journalism School.  1999-present.
**Visiting Lecturer** - Stanford University, Graduate Film Program. 1994-2005.
**Adjunct Faculty** - Sonoma State University, Hutchins School for Liberal Studies. 1996-2003.
**Visiting Lecturer** - Sonoma State University, Hutchins School, "The Human Enigma." 1995-1998.
**Workshop Presenter** - Miami Film Festival. 1995.
**Visiting Lecturer** - Sonoma State University, History Department. 1995.
**Visiting Lecturer** - Northeastern University, History Department. 1991-1993.
**Instructor** - Film Arts Foundation, San Francisco, CA. 1994-present.
**Instructor** - Boston Film/Video Foundation. 1983-1994.
**Instructor** - Maine International Film & Television Workshops. 1992.
**Presenter** - Woodrow Wilson Center for Scholars, Smithsonian Institution, Washington, DC
　　　　　　　Paper: "Media Coverage of Black Americans." 1988.
**Teaching Assistant** - State University of NY at Albany, School of Continuing Education. 1974.
**Teaching Assistant** - State University of NY at Albany, English Department. 1972-1974.
**Teaching Assistant** - State University of NY at Albany, Art History Department. 1970-1974.

# SELECTED PUBLICATIONS, INTERVIEWS & MISC.

Panelist, National Endowment for the Humanities, "Bridging Cultures" grants, 2013.
Juror, San Francisco International Jewish Film Festival, 2011.
Panelist, National Endowment for the Humanities, "America's Media Makers" grants, 2010.
Book, *Archival Storytelling: A Filmmaker's Guide to Finding, Using, and Licensing Third-Party Visuals and Music,*
　　　　　　　2008, Focal Press/Elsevier
Article, "Ethical Use of Archival Visuals: Memories of *Vietnam: A Television History,*"
　　　　　　　*Stills, Audio, Motion* (UK), 2008.
Winner, FOCAL International, Best Use of Archival in a Feature Film, for *Good Night, and Good Luck*. 2006.
Sidebar Article, "Fair Use: A Statement of Best Practices," in *Release Print,* January/February, 2006.
Interviewed for *Documentary Storytelling for Film and Videomakers,* Sheila Curran Bernard, Focal Press 2004.
Feature Interview, "Overheard," in the *Pacific Sun,* October 31, 2001.
Chapter, "Licensing Footage: A Researcher's Perspective," in *The Administration of Television Newsfilm*
　　　　　　　*and Videotape Collections: A Curatorial Manual,* Davidson & Lukow, eds., AFI, 1997.
Article, "Not Worth the Gamble: 10 Misconceptions about Archival Rights & Clearances,"
　　　　　　　in *The Independent Film & Video Monthly,* May 1997.
Article, "Changes in New York Film Archives," in *Focal International,* Issue #13, Autumn 1994,
　　　　　　　(reprinted in *Moving Image Review,* Summer 1994).
Subject of *NVR Reports* (newsletter of National Video Resources, Rockefeller Foundation),
　　　　　　　Issue #8, February 1992.
Interviewed for "The Archives Gets Strict," in The *Washington Post,* January 27, 1992.
Interviewed for "Black Filmmakers Re-trace the Civil Rights Struggle," in
　　　　　　　The *New York Times,* Sunday January 26, 1986.
Feature Interview, "Looking Back on War," in *Visions,* December 1983.
Interviewed for "Preserving the Best of Today's Programming For Tomorrow's Viewers," in
　　　　　　　The *New York Times,* Sunday October 2, 1983.

PLEASE ALSO SEE: WWW.FULCRUMMEDIASERVICES.COM AND WWW.IMDB.COM/NAME/NM0704899/ FOR ADDITIONAL CREDITS AND INFORMATION

Appendix E

Letter from Gravitas Films



February 2, 2015

To the Register of Copyrights,

This letter is in support of the renewal of the fair use exemption to the Digital Millennium Copyright Act proposed by IDA and Kartemquin Films for filmmakers and for its modification to include other sources of media. We believe that this exemption is essential to the continued ability of independent documentary producers to effectively and openly tell stories about our culture, history and society.

We are independent filmmakers who directed and produced *These Amazing Shadows*, a documentary about the power of the movies and the Library of Congress' National Film Registry. Our film could not have been possible without the fair use exemption allowing us to legally access the media we used.

Our story involved numerous classic American films that are in the Registry. It was imperative to the integrity of our production that we present those films in their original aspect ratio and in the highest quality possible. This goal was not only out of respect for the films themselves, but also so that our audience could fully appreciate the artistry and craft of these historically, culturally, and aesthetically significant motion pictures. Our efforts were successful as we were told time and again by our audiences. Viewers were thrilled, educated, and inspired by the visual quality of our production and the story we told. In a subtle way *These Amazing Shadows* is as much a story about the true spirit of fair use as it is about American film.

It is a simple and demanding fact for any independent documentarian that we are held by the public and the marketplace to a high standard of quality. To live up to this standard we must always be allowed to pursue, in a respectful and responsible way, the best source for the media we access. These exemptions don't encourage piracy of but rather a respect for film.

As filmmakers we must always be ahead of the curve when it comes to the digital revolution. The way we view media is changing rapidly. The home theater experience is being pushed toward the very high quality 4K format. Theaters across the country have converted to digital projection. Our personal digital devices provide incredible resolution in a very small package. What looked good enough as recently as six years ago is simply not good enough today.

What this means is that independent filmmakers must keep up with this revolution in visual quality in order to stay relevant to the public. So that we, as independent voices, can continue to tell stories that illuminate, educate, and inspire. The proposed exemption will allow us to do that.

Sincerely,

Paul Mariano                                          Kurt Norton

1 0 0 0   W e s t   A r l i n g t o n ,   M a r t i n e z ,   C a l i f o r n i a   9 4 5 5 3

Appendix F

Letter from Michael Mailer



**MICHAEL MAILER FILMS**

February 5, 2015


To Whom It May Concern:

My name is Michael Mailer and I am an independent film producer who has worked on over twenty films. I am currently working on two narrative films ("Friends and Romans" and "Showing Roots"), both of which are fictional stories that incorporate real-life events. In both of these films, I have used pre-existing copyrighted materials, including stills and audio-visual clips, to tell the story. I had to rely on fair use to utilize certain materials in my films, which I could not license for various reasons. That said, much of the material I used is protected by various Digital Rights Management Systems. Thus the restrictions of the DMCA greatly limit my creative choices. I hope the Copyright Office sees fit to expand the exemptions that were previously granted to documentary filmmakers to also include narrative films. I know my narrative films could benefit from such exemptions.


Sincerely,

Michael Mailer
President and Founder
Michael Mailer Films, Inc.

Appendix G

Letter from Pablo Cruz



CANANA
1639 11TH ST, SUITE 180
SANTA MONICA, CA 90404

T: 310-392-3031
E: Pablo@canana.net

My name is Pablo Cruz, and **I** was a producer on the narrative film "Cesar Chavez" starring Michael Pena and directed by Diego Luna.  The film told the story of Cesar Chavez's amazing leadership in organizing migrant farm workers in California. It was a long struggle.  We intercut original footage we shot with the actors with extensive footage from the actual historical events.  This added a realism and authenticity to the film that could not have been achieved any other way.  The credibility of the film and the point of view in the storytelling were strongly reinforced by the use of the historical footage.     Often the procedures we used implicated the restrictions set out in the Digital Millennium Copyright Act.  We are very hopeful that the Copyright Office sees fit to include narrative films in the exemption to the DMCA that would allow narrative filmmakers to access DVDs, Blu-ray and other material in order to gain access to material to be used pursuant to fair use.

Best,

Pablo Cruz
Partner at Canana

Appendix H

Letter from Finite Films,

Alex Calleros, Ryan McDuffie, Michael Tucker



**FINITE FILMS**

www.finite-films.com       •       5332 Russell Ave., #224       •       925-963-8577
Los Angeles, CA 90027

We are narrative filmmakers living in Los Angeles, and are very interested in examining in our films how the media defines our values and dictates how we operate as a culture. We believe the lack of media literacy is one of the most concerning issues facing us today, especially as it pertains to young people being incessantly exposed to more media than ever before. These are issues that we are eager to examine and tell stories about in our films, but we've found that this is very difficult without the ability to use actual media from film and TV--specifically, without the ability to rip DVDs and Blu-Rays.

Narrative films allow an audience to embody the perspective of a character, and sink into the world in which the character exists. They allow storytellers to access an audience not just intellectually, but emotionally. This is why we feel it would be very effective to tell stories of characters who are being directly influenced by this image-culture that we live in: young men who are bombarded with images of hyper masculinity and violence, and young women who are constantly exposed to beauty commercials and male-centric Hollywood films that teach them their worth is based on their physical appearance. The problem is simple; without being able to use actual clips from TV shows and films, much of the potential impact would be lost.

If we were to create new, artificial content for a film to *represent* the media, and then juxtaposed the characters' media-influenced behavior with this artificial content, it would feel disingenuous. This false representation of the media would be easier to write off as exaggerated than actual footage from TV and film. Using actual footage would also allow the characters to live in the same world that we do, which would make their situations and conflicts resonate more deeply with the viewer.

We know that documentary films are allowed an exemption to use copyrighted materials protected by TPMs if they fall under fair use. We feel that the usage of those same materials would have exactly the same educational purpose and effect if the exemption for fair use was extended to narrative filmmaking. We would also like to stress that it would be important to use high-quality sources for these clips in order to have the production value required to be admitted into film festivals and other important outlets where these stories should be shared. Blu-ray quality would be the minimum that we would feel comfortable with, since most, if not all, film festivals now project their films in at least 1080p resolution (standard Blu-ray resolution). Therefore, we fully support the petition to create a fair use exemption to 1201(a) for narrative filmmakers.

Alex Calleros              Ryan McDuffie              Michael Tucker

Appendix I

Filmmaker Testimony

## APPENDIX I:  FILMMAKER TESTIMONY

The following statements of filmmakers were provided to staff of the International Documentary Association or counsel for the Commenters. Several of the interviewees requested to remain anonymous.

1.    **Joel Schroeder:**

In the past, more specifically, for a film I directed and produced in 2013 (*Dear Mr. Waterson*), I needed to show very brief clips of TV shows that were referenced in the film.  The narration talked about how "Calvin + Hobbes" was referenced in pop culture. So we ripped DVDs to find the relevant parts of episodes from *Family Guy*, *Portlandia, Robot Chicken*, and *The Big Bang Theory*.

The alternatives to ripping are very inconvenient and inefficient.  Copyright holders are not set up to provide the content, and in many cases don't want you to use the content, if it is something critical of them.  Docs in the rough cut stage know they want to use clips to demonstrate a point, and will need to test out tons of clips until they find the right one. Without the exemption, I would not have been able to include crucial content to make points that I wanted to make in *Waterson*.  Quality control is a big deal with distributors, and it is daunting to deal with to be able to provide deliverables.  When broadcasters see something in a deliverable that is not good enough to meet their standards, they flag it. We had some less than optimal clips ripped from DVDs at 640 x 480 px and we had to up-res it (basically stretch it) to meet the 1920 x 1080 px standards. This was very difficult, expensive, and time-consuming. If I could have ripped the same content from a BluRay, it would have already been in the proper format.  In order to be able to deliver to Discovery and CBS, the standard has to be at least a master of 1080p or 29.9 FPS.  Sound quality cannot over-modulate.  Picture requires whites not to be too bright and blacks not to be too dark.  All of this means that if we cannot rip from Blu-ray, too much content will be too expensive for us..

2.    **Anonymous Filmmaker 1:**

On a film that I am making, we had to rip from DVDs. In my film, an interviewee talks about how space exploration was originally influenced by SciFi movies from the 50s and 60s.  Using clips to illustrate this connection is instrumental to the interview.  Thus, I showed a clip from a famous SciFi film from the 1960s that featured a space craft flying. I overlaid the footage of the interviewee and included text that referenced the film.

Also in my film, there is an interview with people talking about the commercialization of space exploration.  One interviewee mentioned a scene from a film from the 1950s.  The film is essentially about a corporation sending people to space.  To illustrate this, I

obtained from the DVD a clip featuring someone saying that the government would never send people to space, and that it is up to corporations to invest in it.

Another example is a clip from *Star Trek* (1966) where one of the crew members is speaking about the early days of space exploration, this ties into the story of the documentary because it is a fictional look at future space efforts looking back to the past, using this clip and then transitioning to people talking about the same thing today makes this relevant to the story. This footage was ripped from a DVD.

Additionally, one of the interviewees talks about how the United States and the Soviet Union were like the Tortoise and the Hare, so I used footage from Looney Tunes to illustrate this comparison, specifically the episode of Bugs Bunny as the hare, racing the Tortoise. This was from a DVD.

Part of my film talks about how President Nixon cut funding from certain programs.  I found news footage clips from the 1960s to the 1970s at Vanderbilt's News Archive and Nixon's Presidential Library.  I used this footage to add commentary and further context to the segment.

Most consumer DVDs are encrypted these days.  You have to go around this encryption to get the footage.  There are no other ways besides going to the studios for the footage. That option is too expensive to be viable for most documentary film making.  When an audience looks at archival footage, you won't be able to get the point across if it is low resolution because they cannot see the detail.  Broadcasters such as PBS and BBC will not let you get away with low resolution.  If it is grainy, they will not air it.  They actually make you remove the clip.

Today, DVDs are widely regarded as an old format (much like VHS used to be).  It is also a very compressed format.  Stretching the footage to meet the pixel ratio of the rest of the film severely degrades the footage's quality.  If you don't stretch it, then you will have a tiny square in the middle of a huge screen.  Imagine taking your picture off of your driver's license and placing it in the middle of a black movie poster.  That is what your DVD footage will look like. By giving us access to Blu-Ray footage, we are able to stay truer to the source material by not having to distort it via stretching.  This pays proper respect to the artist of the original footage.  4K movies are no longer the future. They are now.  All feature films are shot at 4K or higher resolution, and many documentaries are shot and mastered in 4K. To understand how this affects the exemption, let's return to the driver's license analogy.  This time, instead of placing the driver's license on a black movie poster, imagine it in the middle of a black billboard. That is what a DVD's footage is like compared to 4K.

Cameras recording the TV cannot be done.  It is just not an option.  Cameras are not able to record digitally projected images off a screen to the quality needed for professional film work. Additionally, the sound has to be directly ripped from the discs or source

content, as recording the speakers will create feedback effects and other unwanted sounds that are not suitable for professional work.

**3.**      **Anonymous Filmmaker 2:**

Everything made now is in HD, not SD.  Archival footage may only be available in low resolution formats and remastered on BluRay.  More and more content is appearing in HD, and there is heavy pressure for us filmmakers to deliver HD.  Think of it like shopping for clothes.  You go to a store.  You try on clothes.  Then, if you like it, you purchase it.  It should be the same thing with footage.  Yes, we can sometimes get the content without circumventing software protections, but it is extremely inefficient.  It is time consuming and costs money, and it most of the time yields no gain.  For example, I had some footage of a Gospel singer, Houston.  After her publicized death, a lot of people contacted me for my footage of her.  There are clerical fees just to handle the calls.  Then, I have to find the footage, prepare it, digitize it, avoid conflicting with others' copyrights, add a time code burn in, and deliver it.  This is very time consuming, and if none of them end up wanting it, then I did it all for nothing.  It is in the best interest of everyone to cut out the useless clerical work, get it from the DVD or BluRay or wherever, and calm the fears of the FBI busting in and arresting you, when you are often going to pay for the content, if you like it.  A lot of the time, we deal with inquiries that aren't entirely serious, and we have to stop everything and do all of this just for the promise of a couple of hundred dollars.  It simply isn't worth our time.  It would be more efficient to let them rip it, and then if they like it, they can make fair use or send a check to use it.

The exception for documentary filmmakers has been wonderful!  We don't have to feel like criminals, when we are just doing our job.  I currently am working on an unreleased project that has clips from DVD.  Being able to access DVD is great!  DVDs are all digital and can easily be turned into a file for editing.  It amazes me that this law targets filmmakers.  We are the least likely class to abuse another's copyright because we all have our own copyrights, deal with our own piracy concerns, and appreciate the work that goes into making the content. Smaller festivals these days prefer BluRay for projection.  It is HD, and it is extremely low cost.  Also, the qualities are comparable.  BluRays, I believe, are also universal.  DVDs are formatted per region (unless it is an all-region DVD), and using a foreign DVD can require a lot of work to get the content.  BluRays largely don't have these issues.  Distributors such as PBS require you provide a broadcast master in HD.  This means either expensive HD cam tapes or BluRay.

4.    **Joseph Stillman:**

*A Life of Principle... The Ramsey Clark Story* is a documentary I created.

I have been making films for 44 years.  My current film is about a fascinating man, former U.S. Attorney General Ramsey Clark.  During his tenure, he was responsible for many advances in civil rights and justice and made many speeches.  I would like to be able to use some of those speeches, many of which are on YouTube and on DVDs.  Many people have been sending me links to online content that would be ideal for my project.  There is a compilation film (DVD) that has content that I want, and the owner of the film gave me permission to use it, but I cannot find the original source.  I have the name of the source, contacted him but that person won't contact me back.  I have considered flying to L.A. to find him since the clip is so important to this project.  Ramsey Clark is responsible for the safety of James Meredith and for the safety of the marchers from Selma to Montgomery.  He was responsible for the federal stay on executions until the Timothy McVeigh/Oklahoma City bombings incident.  The clip I want is of a speech that is the "quintessential element" of my film and where Ramsey talks about the military industrial complex and American plutocracy.   I have licensed many materials in my career.  The DMCA affects me massively.  It would be iffy whether I could still make this Clark project without exemptions.  The broadcaster I am working with, PBS, has told me that they want more clips of Ramsey himself.  Without a DMCA exemption, I would be prevented from using clips of Ramsey during the last fifty years.

*From Mills River to Babylon and Back... The Jimmy Massey Story* is an anti- War Film.  PBS also said I must deliver my previous in HD. They wouldn't accept SD.  The industry is changing its resolution standards.  I have even been looking into 4k production.  The film was an anti-Iraq war documentary.  It followed a career marine who killed innocent civilians.  I am against pirating.  Being able to break even on this film was affected because so many people copied it and gave it away for free.  But the DMCA exemption these organizations are requesting wouldn't affect this issue at all.

5.    **David Zeiger:**

I am working on a picture about the student movement in the 1960s. One of the big issues in the film is how the media depicted the movement. This requires commentary of all aspects of media, including film and television shows. The footage is most likely not available in its original format anymore. It is however available online and on DVD.

In my film, *Sir! No Sir!*, I used clips from the 1970s and 1980s under fair use. Had I gone to the original source for those clips, I would not have gotten the material. I've have noticed that increasingly, for streaming distributors such as Netflix, resolution quality is a consideration. Normally, things have to be in high resolution.

6.    **Bill Lichtenstein:**

I am currently producing a film, The American Revolution, which we anticipate may utilize fair use as part of the rights clearance process and has already received significant press as a result.  The film is about a radio station and features a collection archival footage.  In order to decide what material we want to include in the final film, it has been in cases necessary to be able to access DMCA protected content as part of the editing process, as there have been DVDs we wanted to look at that were content protected.  We need to be able to access the video material and to work with it in the edit room in order to determine if and how we want to include it in the final film.  It is not enough for a filmmaker to simply view the footage and make a determination.  It has to be used as part the editing process.   The exemption is important because in some cases we are unable to find the content from any source other than protected DVDs.

7.    **Anonymous Filmmaker 3:**

I was shooting something where the subject was Dean Martin's accompanist and I needed a shot from the Dean Martin Show.  I would have never been able to afford the clip, but it was online. I looked everywhere to find ownership as well, to no avail. It was only 8 seconds.

One feature I did during the change from SD to HD that contained a collage of footage of differing resolutions.  The film festival (Woods Hole Festival) told me that the footage wasn't clear enough, and that among other possible reasons were reason enough to not accept my film.

8.    **Daniel McCabe**:

I produce documentaries for PBS.  I've used DVD or online material exclusively in that context with legal review of the applicability of 'fair use.' For example, I did a recent documentary for PBS about walking robots in which I used a clip from a well-known science fiction film.  The clip came from a DVD. Within the constraints of the production there was probably no other viable way for me to get that content.  Brief excerpts such as these serve as an audio/video reference in an educational context to deepen the understanding of the work itself and larger ideas.  They in no way diminish the value of the original works; if anything they increase their value by placing them in the larger context of our society. If you look at PBS documentaries, you are bound to find several other examples of 'fair use' that would be impossible without an exemption to the DMCA.  If we cannot rip from DVDs/Blu Ray, there will be no way to get access to that material.  In addition, online media is clearly a large and growing part of our culture.  To comment on the media of today, you have to have access to online sources to be used within the context of 'fair use.'

9. **Risé Sanders-Weir:**

Everything is moving toward software protected content. For instance, I teach a class and the vast majority of my students said that they only watch streaming content. Since these people will be the future of consumers, it is not likely that future content will be without software protections. A lot of the time, it is not viable to get the content any other way because of this. I also have learned from experience that if you ask for permission, the content holders use it as an acknowledgement that you don't believe the use is fair use. I have been hurt by this because they either want you to pay a fee that you cannot afford or they fight your fair use claim.

10. **Laurie Ann Schag:**

In the last year I consulted on two films that used DVD and online material pulled from news and other programs. We worked with a clearance consultant and our E&O attorney to determine what could be included under Fair Use exemptions and what needed to be licensed or replaced with other footage. Both films dealt with controversial current topics and if we had gone to the original licensors they would have probably denied access.

I am currently consulting on a project that deals with a controversial current topic and will need to make fair use of current news footage in high definition as well as archival footage. We are finding that some of this footage is only available on BluRay or online.

11. **Amber Dawn:**

I might use DVD footage in the future. My future project involves accessing news footage from the 1990s of a person who is no longer alive. There is also a fake/parody Denny's commercial that portrays the chain negatively that I want to access.

12. **Anonymous Filmmaker 4:**

In the past I made a documentary about union workers striking against Northwest Airlines. Networks would have made it impossible to use the footage without fair use. The footage does not paint the network in the best light, and due to the footage's controversy, odds are I couldn't license it for any cost. We ended up utilizing footage recorded on VCRs by union workers. This reduced the quality of that footage by a large amount, but we decided we needed it to show the impact of the story on the national dialogue. This may have impacted our ability to distribute the program in the end.

I have a future need for a project I am doing which involves a US story of forgiveness where a woman forgave the murderer of her son. Networks would make it impossible to

use the footage without fair use, as the fees they charge independent producers are completely inaccessible to us.  Some footage is available on YouTube, and I would use it to show the impact of the story on the national dialogue.

To me, this is a freedom of speech situation.  High resolution allows the viewer to best see the film, telling the best story.  When I produced a project for television, we wanted to use footage from the web.  However, due the resolution standards, we had to replace it.

### 13.   Danny Yourd:

Being able to have an exemption would be great.  In my filmmaking, I have made fair use of a lot of news clips.  However, HD sources are very important, and online sources such as Youtube aren't always available in HD.  Being able to use a DVR would greatly simply a lot of things for me.  It would make it easier to obtain some current news sources because I wouldn't have to scour YouTube and archives.  It would also lead to a much cleaner clearance log, making it easier to get E+O and distribution.

### 14.   Anonymous Filmmaker 5:

For the documentary I am currently working on, it will be screened at festivals, on a big screen and in a theatre, and it won't be easily visible on low resolution. I am also in the middle of talking to PBS and Discovery Health, and both of those broadcasters have higher resolution standards (HD). The film is about a rare disease, where I am using a using a clip from the television show *House MD*, and the clip is a close-up on Dr. House talking about the disease in highly technically detail. We need the HD for people to be able to understand what the clip is saying. We consciously chose to have a high visual quality film so it did not feel like a trashy medical show, we wanted a cinematic, theatrical feel. In order to get that feel, we purchased a very expensive camera for the shoots. We wanted the footage to be in super high resolution, we shot it in 2k. The contrast from that to a low quality resolution would ruin the film and be jolting to the viewers and it negates the quality and the value of the film. Bad quality would make the film not worth watching and would kill it economically.

### 15.   Erikka Yancy:

I make documentaries for HBO and need them in broadcast quality. Also, I make films that are going into theatre, thus regular definition would ruin the experience. VHS footage is no good because it deteriorates overtime and we usually have a tough time to even get the VCR to work. It is much easier to get a DVD and just pull it from there. It is consistent that way. I really need HD also to make my point-the film is about immigration reform, and it is important for the audience to see how people cross the

border in a very specific way. The Youtube version was very bad quality because it was very pixelated from being reposted over and over.

All of our distributors and broadcasters have high technical standards, such as HBO and NBC which we mainly work with. This is a huge reason why we need Blu-ray, it is the only place we could find broadcast quality. Youtube is usually not broadcast quality.

**16. Diane Carson:**

I'm working on a documentary on fair use. My documentary partner is Robert O. Johnson, Jr. and the documentary is *Other People's Footage: Copyright vs. Fair Use*. So, as you can well imagine, we need examples of fair use from a variety of documentarians to make our point, and that's what we've needed to access. In order to receive good exposure for the documentary, we absolutely need a high quality sample.

We've now completed almost two-dozen interviews and are just beginning editing of a longer version for which we'll need, again, DVD or Blu-ray clips.

**17. Rick Stevenson:**

I work for the Oxford Film Company, where I write, direct, and produce various feature films and television series.

I would appreciate the Copyright Office correcting what I believe to be a mistake in the current rules. Much of fair use material is only available on DVD and specifically Blu-Ray discs. As a filmmaker, it is essential I get the highest quality material if I am meet modern technical standards set by publishers and broadcasters. However, the DMCA's anti-circumvention law, incredibly, bars me from making fair use of important material from Blu-Ray discs. Rather, the only legal option available is to copy the very same disc in substandard ways, which make little sense and risk causing my film to be rejected by publishers. As it currently stands, the DMCA prohibits our ability to engage in lawful, creative expression. I would deeply appreciate it if the Copyright Office would correct this oversight.

**18. Matt Latham:**

I am a filmmaker who primarily works in the narrative fiction form. I am interested in bringing in elements from the real world and real existing culture—for example, other movies and television shows—into my fictional world, as a means of adding an additional layer of commentary. In the instances where it would fall under fair use, it would be immensely helpful to be able to rip a high-quality copy of existing films from a DVD or Blu-Ray, that I can incorporate into my scenes.

For example, I would like to make a narrative film that satirizes the representation of women in cinema. The film would have a woman decide to treat men the way that women are treated in movies—as secondary, passive characters in her life's story. This would be done to a ridiculous degree. At the end of the film, I would like to have a montage of clips from movies with situations that were just as ridiculous, except that they were not thought of as ridiculous, because we are used to seeing men as active characters and women as passive characters, only there to be some combination of wallpaper and eye-candy, or sometimes as a mother figure. This would really only work if we could use clips from well-known movies that people have generally accepted without much thought as to how narrative media influences actual behavior. If we did not use clips from actual movies, the audience might think that my movie was blowing this issue out of proportion, that actual movies aren't that ridiculously sexist. Being able to have a montage of these scenes would make absolutely clear that my movie is highlighting an actual problem in representation of women in cinema.

I am aware of an exemption for documentary filmmakers to be able to rip a clean copy of a DVD to use in their work, provided it falls under fair use. This is something that I would love to be able to do, but haven't pursued, for fear that it will violate copyright law. I feel that what I would like to do would be just as legitimate in terms of fair use as those documentaries, and would like to see this exemption extended to narrative filmmakers, as well.

### 19.  Nick Toti:

As a filmmaker whose approach is heavily influenced by my academic experiences, the use of quoting and the ability to enter into dialogue with other movies is very important to my creative output. Fair use laws are a necessity for the sort of creatively engaged critical work that I do. In my work there often isn't a clear line between documentary and fiction. Referencing other movies is as important for my work as sampling previously recorded music is to hiphop. An exemption would make this process easier and make my extremely low budget work more widely available would mark a major step in the right direction.

Appendix J

Letter from Alex Podobas

## STATEMENT OF ALEX PODOBAS

## FEBRUARY 4, 2015

**Biography**

Alex M. Podobas is a senior information security analyst for the UCLA Information Security Office and Juris Doctor candidate at the University of California, Irvine School of Law. He specializes in analyzing web applications and networks for security vulnerabilities, developing applications to parse "Big Data" sets to analyze anomalous security events, and reviewing web applications, databases, and other cloud-related technologies for compliance with federal and state data privacy statutes.

This statement presents his analysis alone and does not represent in any way the opinions of the University of California, Los Angeles or any other organization or person.

**Introduction**

The number of software tools and services specifically built to deliver media content online has risen as the Internet has increasingly become a distribution system for video streaming. The combination of technologies that combine high-performance data streaming with security are designed to empower content holders to distribute, but retain control, over their intellectual property. Encryption measures are routinely integrated into online distribution platforms to protect digital video files during storage and transmission.

**1.  How online distribution systems work**

At a basic level, online video streaming involves four discrete steps:

    (1) A user (the "client") visits a source that hosts video content. This may be a web application like Netflix, a software application like iTunes, or a webpage with embedded video content (such as a YouTube video);

    (2) The source sends a request to itself or, more typically, a media server that requests a specific media file;

    (3) The media server opens a connection directly with the client device or streams the file back through the requesting web server

    (4) The client's device decodes and plays the file. The client is responsible for managing the playback quality and, if requested, decrypting video content from the server. Examples of the client's device software include Apple's QuickTime player or Google's YouTube mobile application.

Statement of Alex Podobas

The methods by which the video is streamed in step 3 can employ a wide variety of protocols. RTP (real-time transfer protocol), RTSP (real-time streaming protocol), or RTCP (real-time transport control protocol), or HTTP live-streaming protocol are common technical choices used to transfer video content for client playback. Encryption can potentially occur in two places: first, in "transit," second, in "storage." The former most typically refers to any network responsible transporting data between an end or intermediate source to the client. The latter pertains to where the data is held after it reaches the client and is occasionally referred to "data in rest."[1]

## 2. Encryption mechanisms used in online distribution systems vary across platform, device, browser, and provider.

Developers and institutions have vast choice in selecting differing technical protocols to stream online video and in encrypting streamed content. Examples of several popular platforms are illustrated in this section. The diversity of options illustrates that online video distribution systems perform a similar task, but differ widely in technical implementation across operating system platforms and software applications used to facilitate video playback.

### 2.1: iTunes

Apple's developer tools make HTTP streaming available for third-party applications on its iOS and iTunes platforms. This technology provides delivery of video content to a customer's device and features media file encryption in both storage and transmission.

First, each media file (in this case, videos) may be individually encrypted in storage. Playing an encrypted video file on the client-side device (such as a customer's Apple iPad tablet) is completed by accessing decryption keys. Apple's API provides three methods for developers to decrypt protected content: 1) a static key; 2) a randomly generated key for the entire file; or 3) a randomly generated key for segments of the video file.

Second, Apple employs industry-standard protections to encrypt content in transmission over HTTPS. Each client-side device connects to the upstream video provider over a connection protected by SSL (secure socket layer) that implements an AES 128-bit encrypted file using 16-octet keys. This prevents streamed content from being intercepted with "Man-In-The-Middle" attacks because the client connects to a server it trusts, with the server identified by a trusted SSL certificate.

### 2.2: HTML5 video and MediaSource Extensions

The HTML Working Group (a collaboration of major technology companies seeking to define standards for web-based technologies) supports HTML5 as the standard for online

---

[1] https://www.owasp.org/index.php/Cryptographic_Storage_Cheat_Sheet

Statement of Alex Podobas

video playback. HTML5 is a standard for embedding video onto web pages or client applications using the <video> tag. It finds support in Internet Explorer 9.0+, Firefox 3.5+, Safari 3.0+, Chrome 3.0+, Opera 10.5+, iPhone 1.0+, and Android 2.0+.  HTML5 does have encryption capabilities, but the standard is still being developed by the World Wide Web Consortium (W3C).[2]

## 2.3: Netflix and HTML5 Video

In 2013, Netflix announced that the company's technical mechanism to securely stream video content, Microsoft Silverlight, would be replaced by a newer solution in light of Microsoft's decision to end-of-life the Silverlight software in 2015. In the future, Netflix will employ HTML5 streaming video for playback to replace Silverlight for all use cases. As of January 31st, 2015, Netflix still offers video streaming with either Silverlight or HTML 5 video.

In conjunction with its migration to HTML5, Netflix announced a new encryption technology named "Message Secure Layer" (hereafter "MSL") in October, 2014. Netflix makes the MSL source code freely available on GitHub under an Apache 2.0 license. As of January 31, 2015, the MSL project and source code are both hosted at: https://github.com/Netflix/msl. MSL seeks to protect streaming content from fundamental security issues associated with the SSL/TLS protocols discovered within the past 5 years as well as to provide faster performance and content delivery.

MSL is a security architecture developed by Netflix and used by the company to encrypt its digitally delivered videos to customers. It is not a distinct software application. Instead, different software applications (including Netflix) utilize MSL to permit different client devices (e.g. – Netflix on the Google Chrome web browser) to integrate with different authentication services (e.g. – a Netflix user account or DRM license) to encrypt the contents of delivered data (e.g. - Netflix streaming video). Therefore, MSL is best regarded as a messaging protocol that provides encryption protections that can be used to transport data between two or more communicating entities

MSL was developed and is deployed by Netflix to implement the following, broad security objectives:[3]

- **Integrity protection.** Messages in transit are protected from tampering.
- **Encryption.** Message data is protected from inspection
- **Authentication:** Messages can be trusted to come from a specific device and user
- **Non-replayable.** Messages containing non-idempotent data can be non-replayable.

Communications secured by MSL (such as Netflix streaming video) utilize the JavaScript API named "Web Crypto" to for performing basic cryptographic operations in web applications, such as hashing, signature generation and verification, and encryption and

---

[2] http://arstechnica.com/business/2013/05/drm-in-html5-is-a-victory-for-the-open-web-not-a-defeat/
[3] http://techblog.netflix.com/2014/10/message-security-layer-modern-take-on.html

Statement of Alex Podobas

decryption.

> A typical MSL message consists of a header and one or more application payload chunks. Each chunk is individually protected which allows the sender and recipient to process application data as it is transmitted. A message stream may remain open indefinitely, allowing large time gaps between chunks if desired. Each MSL message is associated with an entity (One of the participants in a MSL communication). Cryptographic keys associated with the entity are used to authenticate the entity and integrity protect the message.  Data, whether confidential or not, is typically encrypted during transport using cryptographic keys associated with the entity, but non-confidential data may also be transmitted without encryption. Messages are optionally associated with a user by including data that can be used to authenticate the user. Messages are optionally protected against replay through the use of a non-replayable ID synchronized between the communicating entities."[4]

### 3.  Encryption mechanisms in online distribution systems are constantly changing.

In recent years, online video distributors have been implementing a categorical shift from Adobe's Flash Player to HTML5-based video. Driven in part by widespread support for common web standards between different software platforms, cloud-based architectures, web browsers, and other client applications, the shift to support and prefer HTML5 video illustrates how fundamental shifts can be rapidly achieved for consumers. Furthermore, some technology companies have developed their own, in-house solutions for more discrete control over security and performance in digital content distribution. Netflix was built upon online video streaming, and elected to create the MSL architecture and cryptographic library for its own purposes. YouTube abruptly announced on January 27th, 2015 that HTML5 video and support for MediaSource Extensions will be its default video choice.[5] These innovations exemplify a continuous uncertainty as to which technical protocols will be used or even available from year to year.

Online distribution systems for video are varied in the choice of technology related to streaming and content protection protocols. However, the examples above illustrate common implementations that individually represent the same goal of online video delivery.

---

[4] https://github.com/Netflix/msl/wiki
[5] http://youtube-eng.blogspot.jp/2015/01/youtube-now-defaults-to-html5_27.html

Appendix K

Exclusive Blu-rays and Extra Contents

**Exclusive Blu-rays and Extra Contents**

Below is a list of films only available on Blu-ray and descriptions of extra contents exclusive to Blu-ray (e.g., director's commentary, interviews, blogs, deleted scenes, and behind-the-scenes footage). The list is not exhaustive, but illustrative of the amount of extra content available on Blu-ray compared to DVD.

| Title | Year | Exclusive Content Description (if available) |
|---|---|---|
| Beat the Devil | 2008 | Only available on Blu-ray<br><br>(http://www.blu-ray.com/movies/movies.php?studioid=64) |
| Eye on Extreme Monster Trucks | | Only available on Blu-ray<br><br>(http://www.blu-ray.com/movies/movies.php?studioid=64) |
| Eye on Extreme Professional Bull Riding | 2008 | Only available on Blu-ray<br><br>(http://www.blu-ray.com/movies/movies.php?studioid=64) |
| Jack & The Beanstalk | 2008 | Only available on Blu-ray<br><br>(http://www.blu-ray.com/movies/movies.php?studioid=64) |
| Marvel'S Guardians Of The Galaxy | 2014 | Audio commentary, visual effects, deleted and extended scenes, exclusive trailer, gag reel, and documentary.<br><br>(http://www.blu-ray.com/movies/Guardians-of-the-Galaxy-3D-Blu-ray/79118/) |
| Terminator Anthology | 2013 | Visual effects and music, audio commentary, deleted scenes, trailers, downloadable content through BD-Live (Blu-ray online feature).<br><br>(http://www.blu-ray.com/movies/The-Terminator-Anthology-Blu-ray/51917/) |
| The Resident Evil Collection | 2012 | Alternate ending, behind the scenes footage, deleted scenes, filmmaker and cast commentaries, music video, outtakes, and zombie special effects make-up.<br><br>(http://www.bestbuy.com/site/resident-evil-blu-ray-disc-5-disc-boxed-set/7025116.p?id=2625859&skuId=7025116) |
| Harry Potter Hogwarts Collection | 2014 | Deleted scenes, making of Harry Potter documentary, extended scenes, and interviews.<br><br>(http://www.blu-ray.com/movies/Harry-Potter-Hogwarts-Collection-Blu-ray/92712/) |
| Bond 50: The Complete 23 Film Collection with Skyfall | 2013 | The World of Bond montage; Being Bond, analysis of actors who played James Bond, Videoblogs<br><br>(http://www.blu-ray.com/movies/Bond-50-Blu-ray/81677/) |

| Fight Club 10th Anniversary Edition | 2009 | Audio commentaries, interactive search function, scene audio remix, footage of Mel Gibson, behind the scenes, deleted and alternate scenes, publicity material, and art gallery.<br><br>(http://www.blu-ray.com/movies/Fight-Club-Blu-ray/5587/) |
| Gone with the Wind 70th Anniversary Collector's Edition | 2009 | Audio commentary, documentaries, featurettes, vintage footage, a book, and soundtrack CD.<br><br>(http://www.blu-ray.com/movies/Gone-with-the-Wind-Blu-ray/758/) |
| Zodiac Director's Cut | 2014 | Director and actor commentaries, documentary on the history of the production, visual effects, computer-generated three scenes, and trailers.<br><br>(http://www.blu-ray.com/movies/Zodiac-Blu-ray/458/) |
| Blade Runner 5-Disc Complete Collector's Edition | 2007 | Audio commentaries, documentaries, deleted scenes, alternate scenes, vintage featurettes, theatrical trailers, and screen tests.<br><br>(http://www.blu-ray.com/movies/Blade-Runner-Blu-ray/545/) |
| Sleeping Beauty 50th Anniversary Platinum Edition | 2014 | Audio commentary, song selection, interviews, music video, games and activities, alternate opening, deleted songs, art galleries, cut material, and promotional goodies.<br><br>(http://www.blu-ray.com/movies/Sleeping-Beauty-Blu-ray/555/) |
| Frozen, Collector's Edition | 2014 | Documentary of the film's history and eventual production, behind the scenes, deleted scenes, music videos, animated short, and original teaser trailer.<br><br>(http://www.blu-ray.com/movies/Frozen-Blu-ray/56784/) |
| The Wizard of Oz 70th Anniversary Collector's Edition | 2009 | Audio commentary, documentaries, deleted scenes, original song recordings, still galleries, actor biographies, storybook, 4K digital restoration sample, various music tracks in different formats, radio show, radio promo, and trailers.<br><br>(http://www.blu-ray.com/movies/The-Wizard-of-Oz-Blu-ray/6366/) |
| *Any Pixar Title | Varies | Documentaries, featurettes, short films, and interactive content.<br><br>(http://www.soundandvision.com/content/100-best-blu-ray-discs-best-extras ) |
| Sin City | 2014 | Behind the scenes, interviews with actors and director, 15-minute film school education, and hyper-screen version of the movie in green. |

| | | (http://www.soundandvision.com/content/100-best-blu-ray-discs-best-extras) |
|---|---|---|
| Star Trek: The Compendium | 2014 | Gag reels, behind the scenes, the cast and crew interviews, trailers, prank scenes, audio commentaries, and documentaries.<br><br>(http://www.blu-ray.com/movies/Star-Trek-The-Compendium-Blu-ray/107044/) |

* This list is not exhaustive. Major retailers like Target, Best Buy, Walmart, and Amazon each have some exclusive distribution rights for new Blu-ray releases.

**Exclusive Digitally Transmitted Videos**

Below is a list of original network programs currently only available on digital cable and satellite television as of February 6, 2015. The list is not exhaustive but illustrative of diverse shows produced by major networks. Some shows that will be subsequently released on DVD and Blu-ray are generally released four to six months after the season finale.[1]

| Title | Genre | Network | Year Released | Content Source |
|---|---|---|---|---|
| Game of Thrones | Drama | HBO | 2011 | http://www.hbo.com/#/game-of-thrones |
| True Detective | Drama | HBO | 2014 | http://www.hbo.com/true-detective#/ |
| The Leftovers | Drama | HBO | 2014 | http://www.hbo.com/the-leftovers#/ |
| The Comeback | Comedy | HBO | 2014 | http://www.hbo.com/the-comeback#/ |
| Girls | Comedy | HBO | 2012 | http://www.hbo.com/girls#/ |
| Veep | Comedy | HBO | 2013 | http://www.hbo.com/veep#/ |
| Getting On | Comedy | HBO | 2013 | http://www.hbo.com/getting-on#/ |
| Looking | Comedy | HBO | 2014 | http://www.hbo.com/looking#/ |
| Silicon Valley | Comedy | HBO | 2014 | http://www.hbo.com/silicon-valley#/ |
| Togetherness | Comedy | HBO | 2015 | http://www.hbo.com/togetherness#/ |
| Hard Knocks | Sports Documentary | HBO | 2001 | http://www.hbo.com/hard-knocks#/ |
| Real Time With Bill Maher | Unscripted | HBO | 2003 | http://www.hbo.com/real-time-with-bill-maher#/ |
| Last Week Tonight with John Oliver | Unscripted | HBO | 2014 | http://www.hbo.com/last-week-tonight-with-john-oliver#/ |
| Vice | Unscripted | HBO | 2013 | http://www.hbo.com/vice#/ |
| HBO World Championship Boxing | Unscripted | HBO | 1973 | http://www.hbo.com/boxing#/ |
| Real Sports with Bryant Gumbel | Unscripted | HBO | 1995 | http://www.hbo.com/real-sports-with-bryant-gumbel#/ |
| Boxing After Dark | Unscripted | HBO | 1996 | http://www.hbo.com/boxing#/ |
| 24/7 | Unscripted | HBO | 2007 | http://www.hbo.com/sports#/ |
| Masterclass | Unscripted | HBO | 2010 | http://www.hbo.com/documentaries/master-class#/ |
| The Fight Game with Jim Lampley | Unscripted | HBO | 2012 | http://www.hbo.com/the-fight-game-with-jim-lampley#/ |
| | | | | |

---

[1] *E.g.*, Jen Chaney, *An Ever-Shorter Leap From Theater to DVD*, The Washington Post, (February 3, 2015), http://www.washingtonpost.com/wp-dyn/articles/A26877-2005Mar11.html; e.g., http://www.blu-ray.com/movies/releasedates.php.

| | | | | |
|---|---|---|---|---|
| Homeland | Drama | Showtime | 2011 | http://www.sho.com/sho/homeland/home |
| Ray Donovan | Drama | Showtime | 2013 | http://www.sho.com/sho/ray-donovan/home |
| Masters of Sex | Drama | Showtime | 2013 | http://www.sho.com/sho/masters-of-sex/home |
| Penny Dreadful | Drama | Showtime | 2014 | http://www.sho.com/sho/penny-dreadful/home |
| The Affair | Drama | Showtime | 2014 | http://www.sho.com/sho/the-affair/home |
| Shameless | Comedy | Showtime | 2011 | http://www.sho.com/sho/shameless/home |
| Nurse Jackie | Comedy | Showtime | 2009 | http://www.sho.com/sho/nurse-jackie/home |
| Episodes | Comedy | Showtime | 2011 | http://www.sho.com/sho/episodes/home |
| Web Therapy | Comedy | Showtime | 2011 | http://www.sho.com/sho/web-therapy/home |
| House of Lies | Comedy | Showtime | 2012 | http://www.sho.com/sho/house-of-lies/home |
| The Green Room with Paul Provenza | Talk Show | Showtime | 2010 | http://www.sho.com/sho/the-green-room-with-paul-provenza/home |
| Inside Comedy | Talk Show | Showtime | 2012 | http://www.sho.com/sho/inside-comedy/home |
| Showtime Boxing | Sports | Showtime | 1986 | http://www.sho.com/sho/sports/home |
| ShoBox: The New Generation | Sports | Showtime | 2001 | http://www.sho.com/sho/schedules/titles/134845/the-new-generation#/index |
| The Franchise | Sports | Showtime | 2011 | http://www.sho.com/sho/the-franchise/home |
| All Access | Sports | Showtime | 2011 | http://www.sho.com/sho/all-access/home |
| Jim Rome on Showtime | Sports | Showtime | 2012 | http://www.sho.com/sho/jim-rome-on-showtime/home |
| 60 Minutes Sports | Sports | Showtime | 2012 | http://www.sho.com/sho/60-minutes-sports/home |
| Polyamory: Married & Dating | Documentary | Showtime | 2012 | http://www.sho.com/sho/polyamory-married-and-dating/home |
| Oliver Stone's Untold History of the United States | Documentary | Showtime | 2012 | http://www.sho.com/sho/oliver-stones-untold-history-of-the-united-states/home |
| Gigolos | Documentary | Showtime | 2011 | http://www.sho.com/sho/gigolos/home |
| Time of Death | Documentary | Showtime | 2013 | http://www.sho.com/sho/time-of-death/home |
| | | | | |
| Da Vinci's Demons | Drama | Starz | 2013 | http://www.starz.com/originals/davincisdemons |
| Black Sails | Drama | Starz | 2014 | http://www.starz.com/originals/blacksails |

| Power | Drama | Starz | 2014 | http://www.starz.com/originals/power |
| Outlander | Drama | Starz | 2014 | http://www.starz.com/originals/outlander |
| The Missing | Drama | Starz | 2014 | http://www.starz.com/originals/themissing |
| Survivor's Remorse | Comedy | Starz | 2014 | http://www.starz.com/originals/survivorsremorse |
| Starz Inside | Unscripted | Starz | 2007 | http://www.starz.com/titles/starzinsidecomicsonscreen/1666 |
| The Chair | Unscripted | Starz | 2014 | http://www.starz.com/originals/thechair |
| | | | | |
| American Horror Story | Drama | FX | 2011 | http://www.fxnetworks.com/shows/american-horror-story/about |
| The Americans | Drama | FX | 2013 | http://www.fxnetworks.com/shows/the-americans/about |
| Fargo | Drama | FX | 2014 | http://www.fxnetworks.com/shows/fargo/about |
| Tyrant | Drama | FX | 2014 | http://www.fxnetworks.com/shows/tyrant/about |
| The Strain | Drama | FX | 2014 | http://www.fxnetworks.com/shows/the-strain/about |
| Louie | Sitcom | FX | 2010 | http://www.fxnetworks.com/shows/louie/about |
| Married | Sitcom | FX | 2014 | http://www.fxnetworks.com/shows/married/about |
| Archer | Animation | FX | 2009 | http://www.fxnetworks.com/shows/archer/about |
| | | | | |
| Strike Back | Drama | Cinemax | 2011 | http://www.cinemax.com/strike-back/ |
| Banshee | Drama | Cinemax | 2013 | http://www.cinemax.com/banshee/ |
| Knick | Drama | Cinemax | 2014 | http://www.cinemax.com/the-knick/ |
| | | | | |
| Mad Men | Drama | AMC | 2007 | http://www.amctv.com/shows/mad-men |
| The Walking Dead | Drama | AMC | 2010 | http://www.amctv.com/shows/the-walking-dead |
| Hell on Wheels | Drama | AMC | 2011 | http://www.amctv.com/shows/hell-on-wheels |
| TURИ: Washington's Spies | Drama | AMC | 2014 | http://www.amctv.com/shows/turn |
| Halt and Catch Fire | Drama | AMC | 2014 | http://www.amctv.com/shows/halt-and-catch-fire |
| Talking Dead | Unscripted | AMC | 2011 | http://www.amctv.com/shows/talking-dead |
| Comic Book Men | Unscripted | AMC | 2012 | http://www.amctv.com/shows/comic-book-men |

Appendix L

Events to Inform Filmmakers About Fair Use

## EVENTS TO INFORM FILMMAKERS ABOUT FAIR USE

Various organizations and institutions have held panels, discussions, and lectures in order to inform filmmakers about fair use of copyrighted materials.

1. **2015 - IFP Chicago - Event: Fair Use for Filmmakers with Michael Donaldson.** http://www.ifpchicago.org/event/2015/2/10/ifpchicago-presents-fair-use-for-filmmakers-with-michael-donaldson

2. **2014 - CA Lawyers For The Arts - Fair Use in Filmmaking: Counseling Clients About Footage, Music or Art in Film Projects.** Interactive presentation by CLA and UC Irvine School of Law professor Jack Lerner.  http://www.calawyersforthearts.org/event-1771902

3. **2014 - IFP Chicago - Conference: Fair Use and Copyright for Filmmakers.** Panel featuring Robert Labate, Holland & Knight; Gordon Quinn & Justine Nagan, Kartemquin Films." http://www.ifpchicago.org/news/2014/9/21/2014-conference-friday-panel-fair-use-copyright-for-filmmakers

4. **2014 - SXSW - Panel: Stand Up To Content Bullies, Know Your Copy Rights.** Panel featuring Spalding, McIntosh, and Karobonik. http://www.rebelliouspixels.com/2014/stand-up-to-content-bullies-panel-at-sxsw

5. **2014 - IFP PRO - Panel: Freeze Frame: Clearing Rights in Documentary Films.** Interactive demonstration by veteran art and entertainment attorney Walter Lehmann teams and award-winning documentary filmmaker Norah Shapiro. http://ifpmn.org/event/ifp-pro-presents-freeze-frame-clearing-rights-documentary-films

6. **2014 - CA Lawyers For The Arts - Fair Use in Filmmaking.** Seminar by CLA and USC Law Professor Jack Lerner. http://www.calawyersforthearts.org/event-804602

7. **2014 - Producers Guild of America - Fair Use Workshop.** Panel featuring litigation partner Tom J. Ferber and Of Counsel F. Robert Stein. http://www.pryorcashman.com/news-events-181.html

8. **2014 - Maryland Film - Workshop: The Nuts & Bolts of Film Production in Maryland.** Panel featuring Pierre Walcott and Talaya Grimes. http://www.eventbrite.com/e/nuts-bolts-of-film-production-in-maryland-a-creative-edge-innovation-studio-workshop-registration-13539716657

9. **2014 - New Media Rights - Workshop: Fair Use and Copyright for Filmmakers and Video Creators.** Workshop by attorney Art Neill of New Media Rights.
http://www.newmediarights.org/event/copyright_fair_use_workshop_filmmakers_and_video_creators_doculink_sponsored_event_los_angeles

10. **2014 - New York Foundation for the Arts - Workshop: Transformers, Fair Use for Media Artists.** Presentation by Thea Kerman, an attorney who specializes in intellectual property and entertainment law."
http://current.nyfa.org/post/99518913128/workshop-transformers-fair-use-for-media-artists

11. **2014 –International Documentary Association – Getting Real Conference – How Fair Use Changed the Documentary Form.** Panel featuring Michael Donaldson, Patricia Aufderheide, and Gordon Quinn. http://gettingreal2014.com/sessions/how-fair-use-changed-documentary-form/

12. **2013 - TIFF - Conference: The Fight for Fair Use.** Discussion by Lisa Calif on Fair Use. "https://www.youtube.com/watch?v=FbjkQTyNVIo

13. **2012 - Tribeca Film Institute - Event: Legal 101.** Panel discussion with the Time Warner Foundation. http://vimeo.com/52937807

14. **2012 - Santa Fe Independent Film Festival - Skype Workshop: Fair Use without Fear: How Filmmakers and Copyright Can Get Along.** Discussion by guest speaker Professor Patricia Aufderheide from the School of Communication at American Univesity.
http://santafeindependentfilmfestival.com/Detailed/377.html

15. **2012 - BYOD - What is Fair Use in a Documentary Film?** Guest lecture by entertainment lawyer Michael C. Donaldson on the key points surrounding Fair Use. https://www.youtube.com/watch?v=6uDr0LAMqws

16. **2012 - IDA - Doc U: Understanding Fair Use.** Attorney and author Michael Donaldson gives a brief history of copyright law and the impact of the DMCA.
https://www.youtube.com/watch?v=-wGS7CBlMOQ&list=PL4A07B1F4A0733569

17. **2012 - SOCDOC - Fair Use and Rights & Clearance Panel.** Panel featuring VP of Global ImageWorks Cathy Carapella, visual researcher Jim McDonnel, award winning documentary filmmaker Dana Perry, and intellectual property attorney Neil Rosini. http://mfasocdoc.sva.edu/blog/fair-use-and-rights-clearance-panel-at-socdoc-last-week/

18. **2012 - SXSW - WTFair Use?! An Interactive Fair Use Workshop.** Panel featuring attorneys Michael C. Donaldson, Deena Kalai, and Robert Kleinman http://schedule.sxsw.com/2012/events/event_FP13896

19. **2011 - Doc NYC - Panel: What's Fair in Fair Use?** https://www.youtube.com/watch?v=q_sHxjEGx8Q

20. **2011 - Sundance – ShortsLab.** Guest lecture by Jonathan Gray, a senior partner at Gray Krauss Des Rochers, LLP. http://filmmakermagazine.com/27357-a-day-at-the-sundance-shortslab/#.VNMbpGTF-Hw

21. **2011 - Center For Media & Social Impact - Media That Matters Conference: Fair Use Workshop.** Discussion led by Patricia Aufderheide and Peter Jaszi, with CSM Grad Fellow Katie Bieze." http://www.cmsimpact.org/fair-use/events/fair-use-workshop

22. **2010 - New York Women in Film and Television - Playing Fair: An Interactive Panel on Fair Use Doctrine.** Panel hosted by the Chubb Group of Insurance Companies, a leader in film package and errors and omissions insurance, and moderated by Octavia Taylor, an entertainment lawyer and member of the NYWIFT Board. http://www.nywift.org/article.aspx?id=2575

23. **2010 - IFP - Podcast: Fair Use 101.** Discussion led by Michael Donaldson of Donaldson and Hart." http://www.ifp.org/resources/fair-use-101/#.VNMs4WTF-Hw

Appendix M

Letter of Adam Folk



**BELLADONNA ● PRODUCTIONS**
WWW.BELLADONNA.BZ

February 06, 2015

My name is Adam Folk, and I was a producer on the narrative film *Welcome to New York* starring Gerard Depardieu.  The film tells the story of a wealthy French man embroiled in a very public sex scandal in New York.  The film was inspired by a true story.  We intercut original footage we shot with the actors with footage of news coverage from an actual scandal.  This added a realism and authenticity to the film that could not have been achieved any other way.  The credibility of the film and the point of view in the storytelling were strongly reinforced by the use of the news footage.   The procedures we used implicated the restrictions set out in the Digital Millennium Copyright Act.  We are very hopeful that the Copyright Office sees fit to include narrative films in the exemption to the DMCA that would allow narrative filmmakers to access DVDs, Blu-ray and other material in order to gain access to material to be used pursuant to fair use.

Sincerely,

Adam Folk
Producer, *Welcome to New York*

164 WEST 25TH ST. ● 9TH FLOOR ● NEW YORK ● N.Y. 10001 ● TEL. 212-807-0108 ● FAX: 212-807-6263 ● MAIL@BELLADONNA.BZ