# EXHIBIT 4

*Before the*

**United States Copyright Office**

**Library of Congress**

| | | |
|---|---|---|
| | ) | |
| **In the Matter of** | ) | |
| | ) | |
| **Exemption to Prohibition on** | ) | **Docket No. 2014-07** |
| **Circumvention of Copyright Protection** | ) | |
| **Systems for Access Control Technologies** | ) | |
| | ) | |

---

**REPLY COMMENT**

**OF**

**THE INTERNATIONAL DOCUMENTARY ASSOCIATION**
**KARTEMQUIN EDUCATIONAL FILMS**
**FILM INDEPENDENT**
**THE INDEPENDENT FILMMAKER PROJECT**
**NATIONAL ALLIANCE FOR MEDIA ARTS+CULTURE**
**INDIE CAUCUS**
**WOMEN IN FILM**
**WOMEN IN FILM & VIDEO**
**PHILADELPHIA INDEPENDENT FILM AND VIDEO ASSOCIATION**

---

<u>Submitted By:</u>

**UCI Intellectual Property, Arts, and Technology Clinic**
University of California, Irvine School of Law
401 East Peltason Drive, Law 4800-P
Irvine, CA 92697

Jack I. Lerner, Director

Aaron Benmark, Kyle Reynolds, and Rahul Sajnani, Certified Law Students under the Rules of the California State Bar, Title 1, Division 1, Chapter 1

MAY 1, 2015

**Donaldson & Callif, LLP**
400 South Beverly Drive
Beverly Hills, CA 90212

Michael C. Donaldson
Christopher Perez

Reply Comment of International Documentary Association et al.

# TABLE OF CONTENTS

I.    **COMMENTER INFORMATION**.................................................................................1

II.   **PROPOSED CLASS: CLASS 6 – AUDIOVISUAL WORKS – FILMMAKING USES**……………………………………………………………………………1

III.  **INTRODUCTION**……………………………………………………………..1

IV.  **DISCUSSION**……………………………………………………………..3

    **A.  Fair use has long been an important part of narrative filmmaking and the exemption should not exclude these filmmakers**………………………….3

        **1.**  The primary purpose of a genre is irrelevant; fair use in narrative filmmaking should be evaluated by the use in question, not characteristics of the genre………………………………………………………..3

        **2.**  We have provided ample evidence of narrative filmmakers making fair use................................................................................................................5

        **3.**  Filmmakers are suffering adverse effects as a result of the DMCA's anticircumvention provisions......................................................................6

    **B.  The exemption must include AACS on Blu-ray**……………………………..7

        **1.**  High definition footage is mandatory in the modern film market..............7

        **2.**  The Blu-ray exemption poses no threat to the market for Blu-ray discs.....9

        **3.**  The proposed alternatives are inadequate...................................................9

            **a.**  *Licensing is not fair use*……………………………………………10
            **b.**  *Filming the television with a camera or cell phone is not a viable alternative to granting the exemption*……………………………10

            **c.**  *Screen capture software is not a viable alternative to circumvention*..................................................................................11

    **C.  Any concerns about the scope of the exemption are best resolved by structuring the exemption to permit circumvention "for the purpose of fair use in filmmaking" along with the other requirements in the proposed language**..................................................................................................12

V.    **CONCLUSION**……………………………………………………………13

**APPENDIX**

## I.   COMMENTER INFORMATION

Commenters are: International Documentary Association, Kartemquin Films, Film Independent, Independent Filmmaker Project, National Alliance for Media Arts + Culture, Indie Caucus, Women in Film, Women in Film & Video, and the Philadelphia Independent Film and Video Association.  For information about the commenters, please see Appendix A: About the Commenters. To contact the commenters, please contact the submitter, UCI Intellectual Property, Arts, and Technology Clinic, at dmcafilm@law.uci.edu.

## II.   PROPOSED CLASS: CLASS 6—AUDIOVISUAL WORKS—FILMMAKING USES

The Filmmaker Commenters propose the following exemption:

> Audiovisual works that are lawfully made and acquired from DVDs protected by Content Scramble System, or, if the work is not reasonably available in sufficient audiovisual quality on DVD, then from Blu-Ray discs protected by Advanced Access Content System, or, if the work is not reasonably available in sufficient audiovisual quality on DVD or Blu-Ray, then from digitally transmitted video protected by encryption measures when the circumvention is accomplished solely in order to incorporate portions of motion pictures into new works for the purpose of fair use in filmmaking.

## III.  INTRODUCTION

The organizations submitting these comments represent over twenty thousand filmmakers, production companies and media arts organizations who are creators and copyright holders themselves.  We submit these comments knowing our own films will be subject to the proposed exemption.  And although copyright infringement is an issue for many of us, we do not see any risk of infringement or other harm that would come from this exemption.  Instead, we see it as the only way we can continue to make fair use in the way the courts and Congress intended.

The organizations that oppose this exemption have expressed the same concerns that were repeatedly voiced in past rulemakings.  But none of the harms about which they were concerned came to pass; they have not demonstrated, or even alleged, any effect on the DVD market attributable to the filmmakers' exemptions in the six years they have been in place. Nor have they demonstrated, or even alleged, that the exemption has led to infringement of any kind.  If these fears had materialized, these organizations would presumably be in a position to provide the Register with some evidence of harm.  More fundamentally, there is no reason—and zero evidence—to conclude that the fears which failed to materialize in previous rounds will appear at any time during the next three years.

On the other hand, we have provided ample evidence that if the proposed exemption is not granted, the Digital Millennium Copyright Act's ("DMCA") anticircumvention provisions will inhibit countless fair uses and ultimately will reduce the number and types of films that can be made.  The chilling effect on creativity caused by the DMCA poses a far greater—and far more concrete—threat to the health of the independent film industry than the opponents' unfounded and speculative harms.

The evidence favoring an exemption is not limited to our submissions. The record as a whole reflects widespread public support for the proposed exemption, ranging from comments by New Media Rights to the Free Software Foundation to more than 1,500 individual submissions.[1]

In this Reply Comment, we emphasize three important points that address opponents' primary concerns.

- Fair use is an important part of narrative filmmaking and is regularly employed responsibly and without controversy. Narrative films make criticism and commentary, educate, and explain—as they always have—and contrary to the opponents' assertions, it is irrelevant whether their primary purpose is entertainment or something else. We have provided a wealth of uncontroverted examples of narrative filmmakers making or seeking to make fair use.

- High definition is the *minimum* standard in modern filmmaking. Distributors and broadcasters require high definition or better, and the public demands it.  For this and other reasons, proposed alternatives to circumvention are utterly inadequate.

- We have drafted a narrow exemption that presents no credible risk of harm.  Any concerns about the scope of the exemption are best resolved by structuring the exemption to permit circumvention "for the purpose of fair use in filmmaking" along with the other requirements in the language we proposed.   When analyzing fair use, courts routinely assess the purpose of the use and the amount used, as the Copyright Act requires—so there is no need to restrict the class to "criticism and commentary" or "short portions." The courts are best equipped to distinguish valid fair use arguments from invalid ones, and the Librarian need not create a parallel, substantively different test here.

We therefore urge the Register to recommend that the Librarian of Congress grant the proposed exemption covering Class 6.

---

[1] See 2015 Comments, Proposed Class 6, Copyright Office, http://copyright.gov/1201/2015/comments-020615/ (last visited May 1, 2015).

## IV.  DISCUSSION

### A.   Fair use has long been an important part of narrative filmmaking and the exemption should not exclude these filmmakers.

The proposed exemption should not exclude narrative filmmakers because, like documentarians, narrative filmmakers regularly make commentary, criticism, and other forms of fair use. Opponents claim that narrative filmmaking's primary purpose is entertainment[2] and that we have not provided enough examples of fair use in narrative films.[3] Both assertions are wrong. Narrative filmmaking's purpose cannot be reduced to mere entertainment, and in any event, even if it could, the appropriate inquiry is whether the use in question is fair—not the overall purpose of a work, and certainly not the overall purpose of a genre as diverse as narrative film. We have provided ample evidence that narrative filmmakers are consistently and regularly making fair use, easily satisfying the statute's requirement that an exemption concern a likely noninfringing use.[4]

### 1.   The primary purpose of a genre is irrelevant; fair use in narrative filmmaking should be evaluated by the use in question, not characteristics of the genre.

Opponents suggest that narrative filmmaking exists only for the purpose of "entertainment," in an attempt to undermine the conclusion that narrative films make criticism or commentary.[5] But an inquiry into an entire genre's primary purpose is not the appropriate fair use analysis, if such a primary purpose can even be identified.[6] Instead, the fair use analysis should be applied to the particular use in question.  As the Supreme Court declared in *Campbell v. Acuff-Rose Music*, "The task is not to be simplified with bright-line rules, for the statute, like the doctrine, calls for case-by-case analysis."[7]

In any event, we respectfully suggest that something as varied as filmmaking cannot be reduced to one primary purpose. Narrative filmmaking is a rich and diverse art form that encompasses much more than mere entertainment. Narrative films criticize, comment, educate, parody, and contribute to public discourse, just as documentary films and literature do. Furthermore, at its best, narrative filmmaking offers the same thought-provoking insights into and criticisms of the world as the most critically acclaimed literature.

The power of film to provide criticism and commentary on the world has been recognized since the early days of cinema. In the 1930s, Margaret Farrand Thorpe wrote, "The movies can now

---

[2] Comment of The Advanced Access Content System Licensing Administrator LLC ("AACS LA") (hereinafter "AACS Comment"), Docket No. 2014-07 at 8.

[3] *Id.*

[4] 17 USC § 1201(a)(1)(C) (2014).

[5] Comment of The DVD Copy Control Association ("DVD CCA") (hereinafter "DVD CCA Comment"), Docket No. 2014-07 at 7.

[6] *See, e.g.*, *Wade Williams Distrib., Inc. v. Am. Broad. Co.*, No. 00 CIV. 5002(LMM), 2005 WL 774275 at 9 (S.D.N.Y. Apr. 5, 2005); *Hofheniz v. Discovery Comm'cns, Inc.*, No. 00 Civ. 3802, 2001 U.S. Dist. LEXIS 14752 at *13 (S.D.N.Y. 2001).

[7] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).

say they are accepted as moral mentors, as visual educators, as art. They have college catalogues to prove it. They may say they are history. There are museum catalogues to prove that."[8] More recently, modern cinema studies Professor Robert Kolker wrote, "[F]ilm is not only entertainment but is a part of industrial and political culture….All nations, our own included, understand the power of film and television to influence their people…Film may be a bargaining chip in foreign policy, the subject of the politician's wrath at home, and consequently the subject of study of many different kinds of academic courses in which its power and complexity are acknowledged and analyzed."[9] He continued to write, "Movies have emotional and moral designs on us. They ask us to respond with our feelings and think of the world in moral certainties....They even suggest ethical solutions to the problems of how we should act in the world."[10] Finally, for decades scholars have been studying how cinema has transformed our understanding of history.[11]

Popular cinema contains many examples of narrative films that provide criticism, commentary, and serve other purposes beyond mere entertainment. The 2014 drama *Selma* depicts one of Martin Luther King, Jr's greatest victories in the 1960s civil rights movement, criticizing the inhumanities and brutalities committed by the Alabama government and the Johnson administration's reluctance to act sooner to pass the Voting Rights Act. Contemporary critics and scholars have already begun to examine *Selma*'s cultural and educational impact. Jamelle Bouie, for example, argues that the film provides a lesson in advocacy strategies that can inform activists protesting police violence against African Americans.[12] In addition, Dr. Learotha Williams, a professor at Tennessee State University, has praised *Selma* for its value as a historical examination of the civil rights movement, calling it "an important film because for the first time audiences will be getting a more complete understanding of the movement, of an individual who was leading the movement, and of all the kinds of variables that went into what they were doing."[13]

The 2014 drama *American Sniper* comments on the physical and mental toll war takes on the human body and mind and educates viewers about the story of a sniper in the United States Navy SEAL program. *American Sniper* has inspired a lengthy and vigorous public debate about the origins of the Iraq war and its lasting effects on American society.[14] In addition, the film provides an important educational service by demonstrating the psychological damage the war has had on the minds of soldiers and the difficulties they face in readjusting to a normal life upon returning home.[15]

---

[8] Margaret Farrand Thorp, *America at the Movies* 223 (1939).

[9] Robert Kolker, *Film, Form, and Culture* xi-xii (1999).

[10] *Id.* at 60.

[11] Yosefa Loshitzky, "Introduction," in *Spielberg's Holocaust: Critical Perspectives on* Schindler's List 1 (1993).

[12] Jamelle Bouie, *Why Selma Matters Today*, Slate (Dec. 18, 2014, 11:48AM), http://www.slate.com/articles/news_and_politics/politics/2014/12/why_selma_matters_today_what_the_film_can_te ach_activists_against_police.html.

[13] Ronald Roach, *Scholars: 'Selma' Film Likely to Have Social Justice Impact*, Diverse Issues in Higher Education (Jan.18, 2015), http://diverseeducation.com/article/68744.

[14] Oliver Gettell, *'American Sniper' Debate Continues As Trial in Chris Kyle Death Nears*, L.A. Times (Feb. 4, 2015, 11:57 AM) http://www.latimes.com/entertainment/movies/moviesnow/la-et-mn-american-sniper-chris-kyle-debate-20150203-story.html.

[15] Dana Stevens, *The Battle Over American Sniper*, Slate (Jan. 21, 2015, 7:11 PM), http://www.slate.com/articles/arts/movies/2015/01/american_sniper_and_the_political_battle_over_chris_kyle.html.

These films, like thousands of others, serve much more diverse purposes than mere entertainment. They provide criticism, commentary, and information on important social and cultural issues and therefore are capable of making fair use.

We appreciate that the DVD CCA has implicitly acknowledged this point because it considers biopics to be documentary films[16] and by extension believes such films are covered by the current documentary film exemption (the renewal of which it does not oppose).[17]  Many makers of biopic films, of course, are being harmed by the anti-circumvention provisions and would therefore benefit from this exemption. Stories about real life figures by their very nature provide commentary and criticism on their subjects, and many contain transformative uses of existing copyrighted material. Of course, not all narrative films that take advantage of fair use are limited to biopics, as narrative films with varying levels of elements from real life may also provide criticism, commentary, and serve other transformative purposes.[18]

2.  <u>We have provided ample evidence of narrative filmmakers making fair use.</u>

We have provided ample evidence that narrative filmmakers make fair use in the real world. Opponents claim that we have provided "only a few" examples of real world filmmakers making fair use, but our initial comment provided a list of 46 examples of fair use in narrative filmmaking.[19] That list is but a representative sample of the types of fair use that are taking place and it is hardly exhaustive.

Opponents complain that these examples asserted fair use where no court ruling was made to that effect.[20] Of course, in virtually all the examples we submitted, the reason no court ruling was issued to that effect is simply that no litigation was pursued,[21] and the films we cited in the Appendix to our initial comment were able to obtain errors and omissions insurance, providing independent verification of these fair use claims and powerful evidence of an emerging industry practice.[22]  In any event, the requisite burden is "likely…non-infringing use."[23]

The narrative film *Cesar Chavez* provides an instructive example of fair use in narrative filmmaking.  The film tells the story of Cesar Chavez's leadership in organizing migrant farm workers.[24]  The film's commentary on the historical plight of migrant farm workers and the exploitation they faced at the hand of large agribusinesses goes significantly beyond mere entertainment.  The filmmakers used limited portions of archival footage that showed migrant

---

[16] DVD CCA Comment at 14-15.

[17] *Id.*

[18] We direct the Register's attention to the comments of New Media Rights regarding the possible confusion that can arise out of attempting to exempt only a narrow subset of filmmakers. Filmmakers can make fair use whether they are documentarian, narrative, or otherwise. The DVD CCA's comment illustrates the very real possibility for such confusion. *See* Comment of New Media Rights, Docket No. 2014-17 at 12.

[19] Comment of International Documentary Association *et al.*, Docket No. 2014-07 (hereinafter International Documentary Association Comment), Appendix C.

[20] AACS-LA Comment at 9.

[21] *Id.*

[22] *Id.*

[23] 17 U.S.C. § 1201(a)(1)(C) (2014).

[24] International Documentary Association Comment, Appendix G.

farm workers enduring difficult conditions as well as historical footage of strikes and protests led by Chavez and the United Farm Workers.

Each of these short clips was used as a form of criticism and commentary that illuminates points being made about landmark moments in the life and work of Chavez and presented a clear case of fair use under the four factor analysis set forth in the Copyright Act.[25]  First, *Cesar Chavez* explores the life of Chavez, a figure of legitimate public concern, and undeniably constitutes a combination of comment and criticism.[26]  Moreover, the purpose and character of the use are highly transformative.  The original purpose of the footage was to document the struggle of migrant farm workers and their inspired rise against the system.  Conversely, the purpose of the use in *Cesar Chavez* is to illuminate and interpret the experiences of Chavez through the lens of history by showing how the fictionalized portrayal of real events in the biopic relates to the actual reality of those events.  With regard to the second factor, any creativity inherent in the underlying works is combated by the public interest in receiving the newsworthy information conveyed by the film.[27] In any event, the second factor has never been the driving force in any fair use decision in the judicial history of the United States.[28] Third, in considering the amount and substantiality taken from the original work, the film uses roughly two minutes of footage sourced from several hours of various source materials, which represents a miniscule taking from the original source. Ultimately, only as much as needed to illustrate the point being made was used.  Fourth, the use of archival clips does not harm the potential for the owners' copyrighted works because the use of the clips here are too few, too short and too small in relation to the whole to undercut the market for the copyrighted works.[29] If anything, *Cesar Chavez* only increased market demand for the copyrighted works by reigniting interest of viewers who wanted to learn more about the farm workers' struggle and the United Farm Workers' response to it.

This is just one of the many examples of films we submitted that have made fair use without controversy.

3.   Filmmakers are suffering adverse effects as a result of the DMCA's anticircumvention provisions.

We demonstrated in our initial comment that many filmmakers who would make fair use are unable to do so because of the DMCA.[30] Without an exemption, access to footage is impossible in many cases. This burdens fair use and imposes a severe adverse effect on filmmakers.

It is important to note that the narrative filmmakers we discuss in our initial comment made fair use amidst a climate of fear and uncertainty created by the DMCA. Many of the proponents report feeling chilled from making fair use because they fear litigation and know about the

---

[25] 17 U.S.C. § 107 (2014).

[26] *Monster Commc'ns Inc., v. Turner Broad. Sys., Inc.* 935 F. Supp. 490 (S.D.N.Y. 1996).

[27] *Id.*

[28] Michael C. Donaldson, *Refuge from the Storm: A Fair Use Safe Harbor for Non-Fiction Works*, 59 J. of the Copyright Soc'y of the USA 477, 491 (2012).

[29] *Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127 (E.D.N.Y. 2001).

[30] International Documentary Association Comment at 7.

DMCA's prohibition on circumvention.[31] Many will not even consider projects that would require fair use because they believe they cannot legally obtain access to the material they need.[32] Others considered projects but declined to pursue them because of their inability to access footage they need.[33] Against this backdrop of fear and uncertainty—the exact kind of chilling effect on fair use that Congress set up this proceeding in order to alleviate[34]—we urge the Register to recognize that proponents have identified a clear noninfringing use, and that we have shown adverse effects that easily satisfy the burden outlined in the Register's Notice of Inquiry.

### B.    The exemption must include AACS on Blu-ray.

Footage on Blu-ray discs should be covered by the exemption. In an increasingly high-definition ("HD") world, low quality footage causes many unsolvable problems for filmmakers, distributors, and networks alike. Opponents argue that these problems are minimal, and that extending the exemption would lead to adverse consequences for the Blu-ray market.[35] But the alternatives they propose are utterly unworkable and would do nothing to alleviate the adverse effects that § 1201 is causing to filmmakers' ability to make fair use.  High definition footage is mandatory in the modern filmmaking and broadcasting world, and an inability to make footage in HD will continue to create adverse effects that will ripple out beyond filmmakers to distributors, broadcasters, and of course, the public. In any event, opponents have provided no evidence whatsoever that the exemption poses a threat of any kind to the market for Blu-ray discs.

#### 1.    High definition footage is mandatory in the modern film market.

High definition is mandatory in the modern film market. As an initial matter, we should note that Blu-ray is not the highest quality footage available. 4k and Ultra HD programs are four times the resolution of HD and are available to consumers now.[36] In fact, Blu-ray is rapidly becoming the *minimum* quality needed for distribution. PBS's Technical Operating Specifications clearly and prominently require HD or better.[37]

---

[31] International Documentary Association Comment, Appendix I.

[32] *E.g.*, Telephone Interview with Matt Latham, filmmaker (January 2015).

[33] International Documentary Association Comment at 10.

[34] H. Rep. No. 105-551 (II), at 25-26 (1998).

[35] AACS-LA Comment at 22.

[36] International Documentary Association Comment, Appendix B. For this reason, opponents' citation to *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) is misplaced; *Corley* was decided nearly fifteen years ago, when DVD itself was still a new technology and Blu-ray did not exist. In any event, *Corley* is has no relevance to this rulemaking because the dicta quoted by the opponents was written in the context of a facial *constitutional* challenge to the DMCA, and the court made clear that fair use was *not* at issue in that case. *Id*. at 458. The constitutionality of § 1201 is not the question here. Rather, Congress set up this rulemaking expressly because it anticipated harms to noninfringing uses including fair use.  H.Rep. No. 105-551 (II), at 25-26 (1998).

[37] PBS Technical Operating Specification at 3 (2014), http://www-tc.pbs.org/producing/media/producing/cms_page_media/1/TOS%20Pt%201%20Submission%20November%202014,%20v3.pdf; *see also* Appendix C.

Phone interviews we have conducted with both PBS itself and filmmakers who have submitted films to PBS confirm that these terms are not precatory but instead accurate descriptions of the network's policy.[38] Exceptions are granted rarely and primarily in the context of archival footage that was not created in high definition.[39] Even in these instances, the footage must still be extensively processed, at considerable expense to the filmmaker. PBS will reject projects that do not meet these stringent standards, even in the conceptual stage.[40]

In addition, PBS's primary vehicles for broadcasting documentary films, the *POV* and *Independent Lens* series, incorporate these policies and standards into their own delivery requirements.[41]  Both organizations emphasize the necessity for high definition footage and their inability to make exceptions except in rare circumstances.[42] Lois Vossen of *Independent Lens* states, "To create a hurdle for engaging viewers in which 'fair use' footage cannot meet our delivery requirements…would in our opinion have a significant negative impact on the likelihood that these important ideas reach the public."[43]

In an attempt to cast doubt on this clear directive from PBS, opponents cite to two paragraphs in PBS's editorial standards which state that PBS must "strike the best balance" between a myriad of factors in selecting which films to air.[44] These are editorial standards, not technical specifications. PBS is not talking about the technical requirements of the footage in this document, but rather the nature of the filmmakers' artistic choices in making the film.[45] For example, PBS defines "quality" in the editorial standards by declaring that "PBS content should be distinguished by professionalism, thoroughness, and a commitment to experimentation and innovation."[46] But the actual technical requirements are contained elsewhere, in a document titled "Technical Operating Specifications."[47] This document states in bold font on the first page after the table of contents, "**PBS accepts only HD programs submitted on two types of physical media or via file delivery.**"[48]

Other networks such as NBC and CNN have equally high standards for footage. These systems include both computer programs that analyze footage quality on a frame-by-frame basis, and "eyeball" tests by professional network staff that can flag footage problems that even the computer misses.[49] One such report from CNN is attached for reference at Appendix D.[50] It shows a frame-by-frame computer analysis of the Kartemquin-submitted documentary film *Life*

---

[38] Telephone interviews with PBS personnel (January-April 2015); International Documentary Association Comment, Appendices B, D, and I.

[39] *Id.*; *See also* Letter from Simon Kilmurry, Executive Producer, *American Documentary* (Apr. 26, 2015); Letter from Lois Vossen, Deputy Executive Producer, *Independent Lens* (Apr. 28, 2015), Appendix E.

[40] *Id.*

[41] *See* Letter from Simon Kilmurry, Executive Producer, *American Documentary* (Apr. 26, 2015); Letter from Lois Vossen, Deputy Executive Producer, *Independent Lens* (Apr. 28, 2015), Appendix E.

[42] *Id.*

[43] Letter from Lois Vossen, Deputy Executive Producer, *Independent Lens* (Apr. 28, 2015), Appendix E.

[44] AACS-LA Comment at 17-18.

[45] PBS Editorial Standards and Policies, http://www.pbs.org/about/editorial-standards (last visited Apr. 29, 2015).

[46] *Id.*

[47] PBS Technical Operating Specification at 3, Appendix C.

[48] *Id.*

[49] Cloud Nineteen Report, Commissioned by CNN, Appendix D.

[50] *Id.*

*Itself*, in which many individual standard definition clips were rejected.[51] This document demonstrates the degree of sophistication and care that modern networks use to maintain their technical standards for programming. Many of the shots rejected suffered from image framing errors which as we discuss below are also common to screen capture software.[52]

These standards are the reality that filmmakers face every day when submitting their films to broadcasters and distributors.  They are by no means speculative. They are set forth clearly in the networks' documentation; confirmed by interviews with representatives at the networks and our members' own experience; and cited in declarations and testimony from many filmmakers and archivists who regularly submit footage to these networks and must overcome these hurdles to get their movies shown.[53]

Without an exemption for AACS on Blu-ray discs, the DMCA will amount to a hefty tax on fair use and would accordingly produce severe adverse effects on filmmakers seeking to make fair use.

> 2.    The Blu-ray exemption poses no threat to the market for Blu-ray discs.

The part of the proposed exemption pertaining to AACS on Blu-ray poses no threat to the market for Blu-ray discs. AACS-LA's comment supports this conclusion with its own evidentiary submission. AACS-LA argues that DVD sales have seen "sustained success" that Blu-ray has not[54]—but for the last eight years, DVDs have been covered by a § 1201 exemption, while Blu-ray has not. In all that time, opponents have provided neither allegation nor evidence of infringement or harm caused by the DVD exemptions, and of course, they no longer oppose the current exemption.

If exemptions of this nature truly posed a threat to the market for a distribution format, that harm presumably would have materialized in the DVD market following the previous exemption. It has not, and there is no evidence that the speculative harms that failed to materialize for DVDs will manifest for Blu-ray if our proposed exemption is instituted.

Both the history of the last three DVD-related exemptions, and that of the Blu-ray and DVD formats generally, could not point more directly to a simple conclusion: there is no evidence that the §1201 exemptions undermine the market for DVD or Blu-ray or cause rightsholders cognizable harm in any way.

> 3.    The proposed alternatives are inadequate.

The proposed alternatives to circumvention—licensing, filming the television with a camera or cell phone, and screen capture software—will not remedy the adverse effects caused by the

---

[51] *Id.*
[52] Letter from Jim Morrissette, Appendix B.
[53] Comment of International Documentary Association, Appendix D and I.
[54] AACS-LA Comment at 22.

DMCA's anticircumvention provisions. First, as the Register advised in the previous rulemaking, licensing is not an alternative to fair use.[55] Second, filming the television with a camera or cell phone is unacceptable for modern filmmakers; tellingly, opponents did not even attempt to provide evidence to the contrary. Third, screen capture software is utterly unworkable, and the multimedia demonstrations opponents presented would all fail modern quality control standards.

       a.    *Licensing is not fair use.*

Opponents suggest licensing as an alternative to fair use. But licensing is not fair use, and in fact fair use exists in part to overcome the problems of licensing. The Register's previous conclusion is as sound today as it was three years ago: "clip licensing is not a reasonable alternative."[56]

The first problem is that licensing creates a censorship problem. Given that fair use is an important First Amendment safeguard,[57] then any viable alternative to fair use must also be compatible with the First Amendment's protections of free speech. Many documentary filmmakers we spoke with reported problems with licensing related to the content of the project in question.[58] Licenses are denied to silence speech for political reasons; they are denied to protect the financial interests of the company that owns the footage; and sometimes, they are arbitrarily denied with no reason given at all.[59] Fair use is designed in part to remedy just this problem.

Second, licensing is only available for those who can afford to pay the licensing fees. Many filmmakers cannot afford such fees, and therefore, licensing cannot adequately substitute for fair use without causing massive access problems. Fair use cannot be restricted to only those who can afford to pay for it.

Even if, as opponents suggest, ability to pay were not an issue, the question of private censorship still looms large. If a company denies a license to a piece of footage, and that footage is locked behind a technological protection measure ("TPM"), that footage, for filmmaker purposes, is effectively removed from public discourse. This harms rich and poor filmmakers alike and imposes a burden on the entire filmmaking community. Licensing is simply not an acceptable remedy for the adverse effects that § 1201 is creating.

       b.    *Filming the television with a camera or cell phone is not a viable alternative to granting the exemption.*

Opponents' comments suggest filmmakers use their cameras or cell phones to film the television as an alternative to ripping from Blu-ray. This suggestion is no more credible than when it was last rejected by the Register.[60] The fact that opponents did not even attempt to submit an example

---

[55] Recommendation of the Register of Copyrights, 2012 at 131.
[56] *Id.*
[57] *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).
[58] International Documentary Association Comment at 12-14.
[59] *Id.*
[60] Recommendation of the Register of Copyrights, 2012 at 131-32.

of this method for review suggests that they were unable to create any quality footage in this manner.

Even under ideal conditions, this method creates many defects including Moiré interference, a visual distortion effect created by the interaction of the camera image sensor and the pixels of the TV screen.[61] This interference cannot be eliminated except by de-focusing the camera, and renders the resulting image fuzzy and completely unsuitable for criticism and commentary, not to mention broadcast.[62] Further, synchronizing the frame rates of the camera with the screen is nearly impossible even for the most technically savvy, nor can audio effectively be captured without direct connection to the TV.[63] But the audio output of most current TVs, if one exists at all, is digital.[64] It must be converted to analog audio for connection to a video camera. This conversion introduces audio delay and thus causes loss of audio synchronization with picture.[65] The suggestion is simply not credible.

        c.    *Screen capture software is not a viable alternative to circumvention.*

Screen capture software is not a viable alternative to circumvention because it does not produce an image quality sufficient for modern filmmaking, as demonstrated by the low quality of the multimedia clips submitted by opponents. All of the proposed clips would be rejected by modern distributors and broadcasters. In addition, the clips do not allow the type of detailed criticism and commentary that many filmmakers need to undertake.

The *Matrix Reloaded* clip captured by WMCapture and submitted by opponents as the best example of this software is deficient for multiple reasons. First, it was apparently screen captured from a DVD, not a Blu-ray, and therefore does not demonstrate anything about the proposed software's technical ability to screen capture Blu-ray footage;[66] it is extremely unlikely that the program in question can handle playing and recording simultaneously 29.97 frames per second of 1080p footage. The software simply cannot keep up without dropping frames.

The software is highly unlikely to successfully capture Blu-ray footage—because it fails even to create a usable Standard Definition resolution file. The submitted clip was not HD and was actually lower quality than what can be created using the current DVD exemption.[67] It also presented two fatal flaws that would cause it to be rejected by modern broadcasters. First, its image size was 776x344, a non-standard size that would be automatically rejected.[68]  Second, the clip featured numerous dropped frames and repeated frames.[69]

---

[61] Letter from Jim Morrissette, Appendix B.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] Analysis of Opponents' Screen Capture Exhibits, Appendix F.
[67] Letter from Jim Morrissette, Appendix B.
[68] *Id.* Interestingly, 776x344 is actually worse quality than standard definition (640x480), meaning this clip fails even to meet Standard Definition-quality standards. *Id.*
[69] *Id.*

Networks already require that DVD footage accessed using the current exemption must be up-converted and processed to meet their standards[70]—an expensive and time-consuming process that is generally available only as a last resort when the material was never produced in HD. Given that the screen captured clip is much worse quality than DVD footage that would be accessed using the current exemption, the software that captured this clip is in no way a substitute for a Blu-ray exemption and would not even pass muster as a substitute for DVD footage.

The other clips presented by opponents feature even more severe quality problems. The *Portlandia* clip had severe interlacing artifacts (the jagged edges seen whenever there is significant motion) and was presented in the wrong resolution (1680x1050, instead of the required 1920x1080).[71] The *Family Guy* clip also showed double image frames and repeated frames.[72] Either image quality error would result in rejection of the clips under modern broadcast and distribution standards.[73]  For virtually all filmmakers, these images would be impossible to fix.

Opponents offered a chart of additional screen capture programs besides WMCapture that could be used to capture footage.[74] None of these would be usable under the current exemption, which only permits "screen capture technology that is reasonably represented and offered to the public as enabling the reproduction of motion picture content after such content has been lawfully decrypted."[75] None of the programs suggested by opponents make such a representation. We also note with concern that one of the recommended products, Camstudio, is a well-known source of malware.[76]

The proposed alternatives are not adequate substitutes for Blu-ray quality footage and we urge the Register to reject them as alternatives to circumvention.

> **C.   Any concerns about the scope of the exemption are best resolved by structuring the exemption to permit circumvention "for the purpose of fair use in filmmaking" along with the other requirements in the proposed language.**

We note that opponents have expressed concerns about the scope of the exemption.  Apart from the question of whether these concerns have any merit, the wording of our proposed exemption eliminates them.   Our proposed exemption simply covers "the purpose of fair use in filmmaking" rather than creating a parallel set of requirements. To frame the exemption to include only short clips and only criticism and commentary would be unsuitable because it

---

[70] *See supra* Section B.1.
[71] Analysis of Opponents' Screen Capture Exhibits, Appendix F.
[72] *Id.*
[73] *See, e.g.,* PBS Technical Operating Specifications, Appendix C; Independent Lens Producers Handbook; Letters from POV and Independent Lens, Appendix E.
[74] AACS LA Comment at 20.
[75] Federal Register Notice Containing Librarian's Determination and Final Rule, 37 C.F.R. Section 201 (2012).
[76] *See* CamStudio – Screen Recorder, Sourceforge, sourceforge.net/projects/camstudio/reviews (last visited Apr. 29, 2015).

would create a parallel set of legal requirements distinct from those governing fair use. This then would require two separate tests to determine whether a particular use is legal, creating a result in which some fair uses could be illegal under the DMCA, while at the same time uses that might not constitute fair use might still be DMCA-compliant.[77] There is no benefit to this discrepancy, because even in areas of copyright law with no DMCA protections, courts have had no difficulty rejecting invalid fair use claims.[78] Under our proposed exemption, unlike opponents' proposed limitations on it, filmmakers who make an infringing use will be liable under both traditional copyright law and the DMCA.

Opponents raise concerns regarding two parts of the exemption: clip length and purposes beyond criticism and commentary. Under the proposed exemption, neither pose a problem. First, while the majority of fair use in filmmaking involves relatively short clips, the amount and substantiality of the portion taken is only one of the fair use factors, and a bright line test that confines the exemption to short clips would be without basis in either the Supreme Court's instructions on fair use or the statutory definition.[79] Courts have had no difficulty in responding to the length issue and in fact consider length automatically as part of the statutory fair use analysis.[80]

Second, filmmakers engage in many different kinds of transformative fair use. News reporting, teaching, scholarship, research, and many other uses have long been regarded as transformative purposes, and there is no legal or policy-based justification to deny an exemption for all these fair uses. Limiting the exemption to criticism and commentary would effectively be creating a two-tiered fair use structure, in which criticism and commentary can be made, while news reporting, educational use, and other fair uses remain burdened.  This division of fair use into two categories is arbitrary and not based in law.

An exemption that maps to fair use analysis will clarify the law, take care of questions about scope, and avoid imposing two distinct legal tests for fair use where one will suffice.

## V.    Conclusion

For the reasons set forth above, we respectfully urge the Register to recommend that the Librarian promulgate the proposed exemption.

---

[77] For example, a clip that is "short" but still longer than necessary to achieve its transformative purpose would actually fail the traditional fair use test and meet the opponent's proposed exemption test.

[78] For example, opponents cite to *Iowa State University v. American Broadcasting Co.*, 621 F. 2d 57 (2nd Cir. 1980), *Castle Rock Entertainment v. Carol Publishing*, 150 F.3d 132 (2nd Cir. 1998), and *Warner Bros. Entertainment, Inc. and J.K. Rowling v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008). In these cases, courts were easily able to reject invalid fair use claims and find liability, even though none of these cases involved content protected by TPMs.

[79] *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577-78 (1994); 17 U.S.C. § 107 (2014).

[80] 17 U.S.C. § 107 (2014).

Appendix A:
About the Commenters

About the Commenters:

**The International Documentary Association** (IDA) is a non-profit 501(c)(3) organization that promotes nonfiction filmmaking, and is dedicated to increasing public awareness for the documentary genre. At IDA, we believe that documentary storytelling expands our understanding of shared human experience, fostering an informed, compassionate, and connected world, and we exist to serve the needs of those who create this art form. Our major program areas are: Advocacy, Filmmaker Services, Education, and Public Programs and Events. IDA also has a long history of protecting documentary filmmaking as a vital art form, and we continue to seek ways to ensure that the artists, activists and journalists who make documentaries receive the resources that they deserve. For over 30 years, IDA has worked to support the documentary art form.

In 1966, **Kartemquin Educational Films** began making documentaries that examine and critique society through the stories of real people. Their documentaries, such as *The Interrupters*, *Hoop Dreams* and *The New Americans*, are among the most acclaimed of all time, leaving a lasting impact on millions of viewers. In 2014 they are having their busiest year ever, with multiple film releases and television broadcasts including *The Trials of Muhammad Ali, The Homestretch, American Arab, Almost There,* and *Life Itself*, about the film critic Roger Ebert, among others. Kartemquin Films is a home for independent media makers who seek to create social change through film. With a noted tradition of nurturing emerging talent and acting as a leading voice for independent media, Kartemquin is building on almost 50 years of being Chicago's documentary powerhouse. Kartemquin is a 501(c) 3 non-profit organization.

**Film Independent** is a non-profit arts organization and our mission is to champion the cause of Independent film and support a community of artists who embody diversity, innovation and a uniqueness of vision. We help independent filmmakers tell their stories, build an audience for their projects and diversify the voices in the film industry, supporting filmmakers at every experience level with a community in which their works can be appreciated and sustained. With over 200 annual screenings and events, Film Independent provides access to a network of like-minded artists who are driving creativity in the film industry. Our free Filmmaker Labs for selected writers, directors, producers and documentary filmmakers and year-round educational programs serve as a bridge from film school to the real world of filmmaking – one with no defined career ladder. Project Involve is Film Independent's signature program dedicated to fostering the careers of talented emerging filmmakers from communities traditionally underrepresented in the film industry. We also produce the weekly Film Independent at LACMA film series, the Los Angeles Film Festival in June and the annual awards programs for the finest independent films of the year—the Film Independent Spirit Awards.

**The Independent Filmmaker Project** (IFP) champions the future of storytelling by connecting artists with essential resources at all stages of development and distribution. The organization fosters a vibrant and sustainable independent storytelling community through its year-round programs, which include Independent Film Week, Filmmaker Magazine, the Gotham Independent Film Awards, and the Made in NY Media Center by IFP, a new incubator space developed with the Mayor's Office of Media and Entertainment. IFP represents a growing network of 10,000 storytellers around the world

and plays a key role in developing 350 new feature and documentary works each year. During its 35-year history, IFP has supported over 8,000 projects and offered resources to more than 20,000 filmmakers, including Debra Granik, Miranda July, Michael Moore, Dee Rees, and Benh Zeitlin. More info at www.ifp.org.

**The National Alliance for Media Arts and Culture** ("NAMAC") consists of 225 organizations that serve over 335,000 artists and media professionals nationwide. Members include community-based media production centers and facilities, university based programs, museums, media presenters and exhibitors, film festivals, distributors, film archives, youth media programs, community access television, and digital arts and online groups. NAMAC's mission is to foster and fortify the culture and business of the independent media arts. NAMAC believes that all Americans deserve access to create, participate in, and experience art. NAMAC co-authored the Documentary Filmmakers' Statement of Best Practices in Fair Use and has long been an advocate for orphan works reform.

**Indie Caucus** is a national, independent group of filmmakers who believe in the public mission of public media.  It is dedicated to strengthening our collective voice both within and outside of the public media system. As a group we keep tabs on events related to indies and public media, and can quickly activate the national community when a crisis arises.  We aim to be a voice that represents independent filmmakers to our broadcast, programming and funding partners in public media. Members of the Indie Caucus Steering Committee are independent producers who meet regularly, who can intervene behind the scenes, and who are pledged to activate their networks when a large outcry and action is needed.

**Women In Film** (WIF) recognizes the importance of developing pathways and opportunities to encourage current and future generations of women to explore and pursue careers in all fields of the entertainment industry. WIF actively supports women in the entertainment industry in four key ways: (1) assists independent filmmakers who have demonstrated advanced and innovative skills; (2) funds programs which provide scholarships and internships; (3) contributes financially and creatively to the production of PSAs which spotlight issues important to women and (4) creates events and seminars which are educational and creatively enlightening.

**Woman in Film & Video** (WIFV) of Washington, DC is dedicated to advancing the professional development and achievement of women working in all areas of film, television, video, multimedia, and related disciplines. WIFV supports women in the industry by promoting equal opportunities, encouraging professional development, serving as an information network, and educating the public about women's creative and technical achievements. WIFV, a 501(c)(3) non-profit community benefit organization founded in 1979, is the premier professional resource for people who want successful media careers in the DC-metro region. Our resources, connections, and advocates support a vibrant, creative media community.

**Philadelphia Independent Film and Video Association** (PIFVA) seeks to facilitate the creation of diverse and independent film and media art by consulting and connecting industry members seeking to produce, promote, and exhibit their work across the Greater Philadelphia region and beyond.

Appendix B:
Letter from Jim Morrissette



1901 WEST WELLINGTON CHICAGO ILLINOIS 60657
TELEPHONE 773 472-4366 FACSIMILE 773 472-3348
www.kartemquin.com

May 1, 2015

In this statement I provide further information about the quality control process, and the technical specifications that filmmakers must meet when delivering their films to broadcasters.

The context for this information is that high definition is mandatory in the modern film market. Blu-ray is not the highest quality footage available and is instead typically the minimum acceptable standard. 4k and Ultra HD programs are four times the resolution of HD. These are already available, as are 4K cameras, monitors and televisions.

Explanation of CNN Broadcast Quality Control Report

Broadcasters and Distributors perform a technical quality control (QC) procedure for programs that will be broadcast or distributed to theaters. This process analyzes every frame for video defects that do not meet their stringent technical requirements. PBS and NBC Universal also have similar comprehensive QC analysis protocol.

The Cloud Nineteen lab report for Kartemquin's documentary film "Life Itself", which was commissioned by CNN, gave us a FAILING grade. All clips graded 3 in the report were grounds for rejection.

Most of these clips were standard definition archival footage that showed many of the problems (which also are often associated with video screen capture): thick black lines around the image, dropped frames, interlace artifacts, and so on. Many of these clips proved to be unfixable, even after extensive and costly processing, and had to be removed from the movie simply because they failed quality control.

Discussion of Proposed Alternative to Circumvention: Filming the Television with a Camera or Cell Phone

Filming the television with a camera or cell phone creates numerous problems with the picture.  It creates Moire interference, a visual distortion effect created by the interaction of the camera image sensor and the pixels of the TV screen. This interference cannot be eliminated except by de-focusing the camera, and renders

1

the resulting image fuzzy and completely unsuitable for broadcast.  It also makes it much difficult to provide detailed criticism or commentary.

Other problems include:

- Synchronizing frame rates of the camera with the TV is nearly impossible, even for the most technically sophisticated.
- Audio cannot be captured without direct connection to the TV. Audio output of most modern TVs is digital and must be converted to analog for a connection to a video camera. This created audio delay and loss of synchronization.

Discussion of Proposed Alternative to Circumvention: Screen Capture Exhibits submitted by AACS-LA and DVCCCA (See annotated stills at Appendix F.)

The "Matrix Reloaded" clip was presented in lower than HD quality. A better image can be captured using the circumvention allowed by the exemption currently in place. The image size is 776x344, a non-standard size that would be automatically rejected by broadcasters. It also is worse quality than standard definition. It features numerous dropped frames and repeated frames. These are fatal flaws that would result in rejection by any modern broadcaster.

The "Portlandia" clip had severe interlacing artifacts and was presented in the wrong resolution (1680x1050 instead of the required 1920x1080). These are also fatal flaws.

The "Family Guy" clip suffered from severe 3-2 pulldown errors and exhibited double image and repeated frames. These are also fatal flaws.

These screen captured exhibits would be impossible to fix for virtually all modern filmmakers. They are not suitable for broadcast.


Jim Morrissette
Technical Director
Kartemquin Films

2

Appendix C:
PBS Technical Operating Specification, pg. 3

# 1. Scope and Purpose

1.1 This Technical Operating Specification, TOS, provides standards for producing programs of a consistently high technical quality for delivery to PBS stations. These standards apply to High Definition (HD) programs delivered by tape, disk or file.

1.2 Organizations submitting programs to PBS must have an understanding of the technical specifications set forth in this document and proficiency at using professional digital measurement equipment.

1.3 Evaluate the program to meet these specifications prior to submission. Program submissions not meeting these specifications may be rejected — requiring corrective action and delay in processing.[1]

**PBS accepts only HD programs submitted on two types of physical media or via file delivery (see 7.X File Submission).**

**Physical Media**
- HDCAM videotape format.

- XDCAM 422 50 Mb/s Disks

**Digital Media**
- XDCAM 422 50mb, DNxHD 145, 220 or 220x OP1a file

Appendix D:
Cloud Nineteen Report,
Commissioned by CNN



# CLOUD NINETEEN
## DVD•MOTION•SOUND•EDIT

**FAIL**

### QUALITY CONTROL REPORT

| | | | |
|---|---|---|---|
| **TITLE:** | **LIFE ITSELF** | **VIDEO ELEMENT:** | PRO RES HQ |
| | *TEXTED VERSION FEATURE* | | |
| **CLIENT:** | Magnolia Pictures | **TYPE OF QC:** | SOURCE ASSET QC |
| **DATE:** | 5/12/14 | **SOURCE:** | HDSR MASTER |
| **VERSION:** | 1.78 FULL FRAME | **FILE SIZE:** | 151.48 GB |
| **STANDARD:** | 1080psf | **PO#** | |
| **TIMECODE:** | 23.98 NDFTC | **OPERATOR:** | Wendy Wiencek |

| | | | |
|---|---|---|---|
| **FEATURE: LifeItself_Feat_hdsr_178_SS2315_2.mov** | | **REC DATE:** | 5/12/14 |
| **TEXTLESS: N/A** | | **REC DATE:** | |

| **LINE COUNT** | **21-560** | **BARCODE #** | **SS2315-2** | **LOGOS:** | **HEAD/TAIL** |
|---|---|---|---|---|---|
| **HORIZ WIDTH** | **11 µs** | **TXTLS MATERIAL:** | **N/A** | **SUBTITLES:** | **NO** |

| **PARTS** | **COLOR SPACE** | | **PROG START** | **PROG END** | **LENGTH** |
|---|---|---|---|---|---|
| **FEATURE** | **4:2:2 HQ** | | **01:00:01:00** | **03:00:24:00** | **2:00:23:00** |

| **CHANNEL** | **AUDIO CONFIG** | **CHANNEL** | **AUDIO CONFIG** | **CHANNEL** | **AUDIO CONFIG** |
|---|---|---|---|---|---|
| **CHANNEL 01:** | **LEFT 5.1** | **CHANNEL 07:** | **LEFT TOTAL 2.0** | **CHANNEL 13:** | **N/A** |
| **CHANNEL 02:** | **RIGHT 5.1** | **CHANNEL 08:** | **RIGHT TOTAL 2.0** | **CHANNEL 14:** | **N/A** |
| **CHANNEL 03:** | **CENTER 5.1** | **CHANNEL 09:** | **M&E LT 2.0** | **CHANNEL 15:** | **N/A** |
| **CHANNEL 04:** | **LFE 5.1** | **CHANNEL 10:** | **M&E RT 2.0** | **CHANNEL 16:** | **N/A** |
| **CHANNEL 05:** | **LEFT SURR.  5.1** | **CHANNEL 11:** | **N/A** | | |
| **CHANNEL 06:** | **RIGHT SURR. 5.1** | **CHANNEL 12:** | **N/A** | | |

### GENERAL COMMENTS

Texted version documentary - too much text to note every instance. Recommend a full textless version of feature for international delivery. Video: LOTS of thick lines & Framing errors.  Some windowboxed old legacy 4X3 (VHS) material has been FYI'd as creative intent (CLIENT ADVISE). Only shots that may pose a problem for iTunes acceptance have been noted.  Luminance levels wthin legal limits.  Legacy footage is mostly old SD 4X3 material, many generations down, with lots of inherent age-related issues, examples noted. One recorded-in digital hit could be fixed (CLIENT ADVISE). Audio: Peaks to +16, no clipping detected. Overall quality and sync throughout are excellent.  Audio is PASS.

### FINAL RESULTS - PASS/FAIL:

| **iTunes/VOD:** | **V FAIL A PASS** | **DVD/BluRay:** | **V FAIL A PASS** | **BROADCAST:** | **V FAIL A PASS** |
|---|---|---|---|---|---|

### FINAL RESULTS REMARKS:

**FAIL - MANY FRAMING ERRORS & THICK BLACK LINES, 1 LARGE RECORDED-IN DIGITAL VIDEO HIT (RECOMMEND FIXING); CLIENT ADVISE: WINDOWBOXED 4X3 FOOTAGE INTENTIONAL?**

| From | To | KIND | DESCRIPTION | RATE |
|---|---|---|---|---|
| 01:00:00:00 | 01:00:01:00 | VIDEO | File start - black | *FYI* |
| 01:00:01:00 | 01:00:06:00 | VIDEO | Program start - Logo: magnolia pictures (MOS) | *FYI* |
| 01:00:07:00 | 01:00:18:00 | TEXT | Over black: Main titles (fade in & out) | *FYI* |
| 01:00:19:02 | -- | VIDEO | Picture fade in | *FYI* |
| 01:01:56:20 | 01:02:07:21 | TEXT | Feature title over action: Life ITSELF (cut to cut) | *FYI* |
| 01:02:07:22 | 01:02:15:12 | TEXT | Over action: Main titles continue (1 shot) | *FYI* |
| 01:00:49:07 | 01:01:00:12 | VIDEO | FRAMING: Thick line, top (first active line 24) | 3 |
| 01:02:31:19 | 01:02:45:20 | TEXT | Over action: DECEMBER 2012 (cut to cut) | *FYI* |
| 01:02:45:21 | -- | VIDEO | T.C. Sync point -  MS man in hospital bed, giving thumbs up | *FYI* |
| 01:05:08:19 | 01:05:12:04 | TEXT | Over action: From Roger's Memoir, *Life Itself* (fade in & out mid-scene) | *FYI* |
| 01:09:07:13 | 01:09:14:09 | VIDEO | FRAMING: Thick line, top | 3 |
| 01:10:36:13 | 01:11:30:04 | VIDEO | FRAMING: Thick line, top | 3 |
| 01:12:01:18 | SCENE | VIDEO | Example: Old legacy SD Source footage contains analog video dropouts, horizontal banding, creases, poor resolution, 4X3 side mattes, etc (RECURS THROUGHOUT) | *FYI* |
| 01:24:50:04 | SHOT | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 28/553) | 3 |
| 01:24:50:04 | SHOT | VIDEO | Example: Old legacy 4X3 SD Source footage contains analog video dropouts, horizontal chroma banding, creases, poor resolution, etc (RECURS THROUGHOUT) | *FYI* |
| 01:28:31:08 | SHOT | VIDEO | Example: Aliasing on window blinds (source) intermittent throughout | *FYI* |
| 01:31:15:12 | 01:31:43:02 | VIDEO | 1.66 SIDE MATTED MOVIE CLIP (LEAVE SIDE MATTES ALONE) - FIX Thick Line, top | 3 |
| 01:32:06:11 | SHOT | VIDEO | White camera dot on Scorcese's L shoulder (MC) flicker in & out through shot | 3 |
| 01:32:47:08 | SHOT | VIDEO | FRAMING ERRORS - L&R Plus head interchange along bottome edge | 3 |
| 01:32:48:19 | 01:32:55:08 | VIDEO | Extremely damaged 8mm 4X3 Side Matte time lapse film (source) | *FYI* |
| 01:32:48:19 | 01:32:55:08 | VIDEO | Thick line top | 3 |
| 01:34:06:11 | 01:35:16:17 | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 28/553) | 3 |
| 01:35:39:22 | 01:35:43:08 | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 27/554) | 3 |
| 01:35:43:09 | -- | VIDEO | FYI - this side matted shot is NOT Window boxed like previous shot | *FYI* |
| 01:38:19:18 | 01:38:35:21 | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 28/553) | 3 |
| 01:38:37:22 | 01:39:20:00 | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 28/553) | 3 |
| 01:39:21:09 | 01:39:29:14 | VIDEO | FRAMING - Thick line R side | 3 |
| 01:39:29:15 | 01:39:46:03 | VIDEO | Old legacy 4X3 SD footage - intentionally window boxed? MATTES ALL 4 SIDES - PLEASE CONFIRM IF INTENTIONAL! (line count 28/553) | 3 |

| | | | | |
|---|---|---|---|---|
| 01:39:55:13 | 01:40:16:00 | VIDEO | FRAMING - Thick lines Top & Bottom | 3 |
| 01:39:59:00 | 01:40:16:00 | VIDEO | Example: Old legacy 4X3 SD Source footage contains conversion artifacts, line interlacing, breakup, analog video dropouts, horizontal chroma banding, creases, poor resolution, etc (RECURS THROUGHOUT) | FYI |
| 01:41:06:07 | 01:44:12:22 | VIDEO | Example: Old legacy 4X3 SD footage has conversion artifacts, heavy line interlacing, poor resolution, etc. | FYI |
| 01:44:11:19 | -- | VIDEO | Dur 1 fr - Large recorded-in digital video hit along R edge of picture (SHOULD FIX) | 3 |
| 01:42:38:10 | 01:42:41:21 | VIDEO | FRAMING - Thick line Top | 3 |
| 01:42:57:20 | 01:44:12:22 | VIDEO | FRAMING - Thick lines Top & Bottom | 3 |
| 01:45:55:21 | 01:45:59:08 | VIDEO | FRAMING - Thick lines Top & Bottom | 3 |
| 01:46:47:13 | 01:46:50:14 | VIDEO | FRAMING - Thick lines Top & Bottom | 3 |
| 01:46:55:00 | 01:47:02:19 | VIDEO | Example: Old legacy 4X3 SD Source footage contains analog edge ringing, mixed fields at cuts, analog video dropouts, image lag, poor resolution, etc (RECURS THROUGHOUT) | FYI |
| 01:47:27:22 | 01:47:41:09 | VIDEO | FRAMING - Thick lines Top & Bottom | 3 |
| 01:48:20:06 | 01:48:32:06 | VIDEO | FRAMING - Thick line Top | 3 |
| 01:50:22:17 | SHOT | VIDEO | Vertical noise lines (digital blow up from digital camera) (source) | 2+ |
| 01:50:25:21 | SHOT | VIDEO | White camera dot ML through shot | 3 |
| 01:50:35:15 | SHOT | VIDEO | Vertical noise lines (digital blow up from digital camera) (source) Recurs on all like shots through section | 2+ |
| 01:50:38:12 | 01:52:32:06 | VIDEO | White camera dot ML through shot, Recurs through all like shots through section | 3 |
| 01:50:49:02 | 01:51:15:07 | VIDEO | FRAMING - Thick line Top | 3 |
| 01:56:27:11 | 01:56:51:23 | VIDEO | Lens vignettes (dark, not black) UL, LR  (may not be fixable) | 3 |
| 01:56:51:23 | 01:57:59:19 | VIDEO | FRAMING - Thick line Top | 3 |
| 01:59:13:04 | 01:59:21:14 | VIDEO | FRAMING ERRORS - L&R SIDES, PLUS Thick lines Top & Bottom | 3 |
| 02:00:38:15 | 02:00:43:21 | VIDEO | FRAMING ERRORS - ALL 4 SIDES | 3 |
| 02:03:55:05 | 02:04:11:06 | VIDEO | FRAMING - Thick line Top | 3 |
| 02:06:42:17 | SHOT | VIDEO | FRAMING ERRORS - L&R Sides | 3 |
| 02:08:02:12 | 02:09:42:03 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:14:06:19 | 02:14:53:18 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:16:01:16 | 02:16:28:15 | VIDEO | FRAMING ERRORS - L&R SIDES, Plus image appears "Squeezed" | 3 |
| 02:16:28:16 | 02:17:00:00 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:16:28:16 | 02:17:00:00 | VIDEO | Example: Old legacy 4X3 SD Source footage contains analog edge ringing, mixed fields at cuts, analog video dropouts, image lag, noise, poor resolution, etc (RECURS THROUGHOUT) | FYI |
| 02:17:07:15 | 02:17:11:03 | VIDEO | FRAMING ERRORS - Top & Bottom | 3 |
| 02:17:14:20 | 02:17:33:15 | VIDEO | FRAMING ERRORS - Top & Bottom | 3 |
| 02:17:44:14 | 02:18:17:08 | VIDEO | FRAMING ERRORS - Top & Bottom | 3 |
| 02:19:14:18 | 02:20:33:17 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:21:53:12 | 02:22:14:11 | VIDEO | FRAMING - Thick line Top | 3 |
| 02:26:21:03 | 02:26:25:14 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:26:30:14 | 02:26:49:09 | VIDEO | FYI - Intentionally Windowboxed section | FYI |
| 02:35:38:19 | SHOT | VIDEO | Example: Old legacy 4X3 SD Source footage contains analog video dropouts, horizontal chroma banding, noise, recorded-in hum, creases, poor resolution, etc (RECURS THROUGHOUT) | FYI |

| | | | | |
|---|---|---|---|---|
| 02:38:25:06 | 02:39:43:21 | VIDEO | Example: Old legacy 16X9 SD Source footage contains line interlacing, reduced resolution, etc. | *FYI* |
| 02:38:25:06 | 02:39:43:21 | VIDEO | FRAMING: Slight thick line R edge | 3 |
| 02:49:22:09 | 02:49:29:22 | VIDEO | FRAMING - Thick line/Sm Framing error - Top | 3 |
| 02:49:43:06 | 02:50:13:22 | VIDEO | Lens vignette shadows L&R edges, LL & LR corners (Most likely NOT FIXABLE) | *FYI* |
| 02:54:35:19 | 02:54:39:17 | VIDEO | White camera dot on her hat/face through shot ML | 3 |
| 02:56:15:23 | -- | VIDEO | T.C. Sync point - Last cut before end credits: CU painting of Roger Ebert hanging on a wall | *FYI* |
| 02:56:24:00 | -- | VIDEO | Picture fade out | *FYI* |
| 02:56:26:09 | 03:00:04:21 | TEXT | Over black: End credits (fade in & out) | *FYI* |
| 03:00:05:20 | 03:00:24:00 | AUDIO/VIDEO | Logos: CINETIC, Kat Lei Productions, CNN FILMS, FILM RITES, KARTEMQUIN FILMS w/feature audio | *FYI* |
| 03:00:24:00 | -- | AUDIO/VIDEO | End of program | *FYI* |
| 03:00:25:06 | -- | VIDEO | End of file | *FYI* |
| | | | | |

Appendix E:
Letters from POV and Independent Lens



April 26, 2015

To Whom It May Concern:

American Documentary is writing this letter to provide information that may be useful to the Register of Copyrights in the ongoing proceeding concerning Section 1201 of the Digital Millennium Copyright Act.

20 Jay Street
Suite 940
Brooklyn, NY 11201

P: 212-989-8121
F: 212-989-8230
www.pov.org

POV
A Project of
American
Documentary
www.amdoc.org

POV, produced by American Documentary, is PBS's award-winning showcase for independent documentary films. For the past twenty eight years, POV has presented the work of a diverse range of filmmakers including, Marshall Curry, Freida Lee Mock, Lourdes Portillo, Alan Berliner and Jennifer Fox. As a series broadcast on PBS's national schedule POV reaches 98% of the US television market presenting 14-16 films each year.

American Documentary also produces America ReFramed, a documentary film series presenting 26 films each year on the WORLD Channel.

All programs presented by POV must meet PBS's Technical Operating Specifications ("TOS") and as a result we require all filmmakers we work with to deliver their projects on HDCAM 1080i, 59.94 drop frame. The complete PBS TOS can been reviewed at http://www-tc.pbs.org/capt/Producing/TOS-2012-Pt1-Submission.pdf.

Material that is of a lower visual quality can be accepted only in very rare circumstances and is generally restricted to archival footage that is often decades old and was never produced at a high quality.  In addition such archival footage must be extensively processed, a very costly, often time-consuming endeavor that comes entirely at the filmmakers' expense.

The overall visual quality of a film is essential to our audiences. If a film were to be broadcast entirely in HD except for certain non-archival footage, the result would be a jarring and disruptive viewing experience for the audience whose expectations are that POV will present only films of the highest visual and artistic qualities.  It is for this reason that we must insist on strict technical specifications such as these.

Thank you for your consideration.

Sincerely,

Simon Kilmurry
Executive Producer

AMERICAN DOCUMENTARY, INC./KCET/WGBH/WNET



April 28, 2015

To Whom It May Concern:

The Independent Television Service (ITVS) is writing this letter to provide information that may be useful to the Register of Copyrights in the ongoing proceeding concerning Section 1201 of the Digital Millennium Copyright Act.

Independent Television Service (ITVS) funds, presents, and promotes award-winning documentaries on public television and online, and new media projects on the web. It also produces the Emmy and Peabody Award-winning weekly series *Independent Lens* that broadcasts on Monday nights at 10:00pm on PBS stations. *Independent Lens* is the primary programming through which documentary filmmakers can broadcast their films on PBS, along with POV. *Independent Lens* is the largest showcase for independent documentaries anywhere on American television, premiering 22 new films each season.

The visual quality of any film we broadcast is critical to our business, and as a result we require all filmmakers we work with to deliver their projects on HDCAM 1080i, 59.94 drop frame, as indicated in the *Independent Lens* Production and Delivery Handbook that we provide to every filmmaker with whom we work. In other words, all deliverables must be "High Definition" or better.

As required by PBS, an *Independent Lens* broadcast necessitates high quality footage that meets these minimum standards. Exceptions are rare, and are mostly confined to archival footage that is often decades old and was never produced at a high quality.

Even in these cases, the footage must be heavily processed to make it suitable for broadcast.  This is an expensive and often lengthy process.  For *Independent Lens* acquisitions, the filmmaker is responsible for meeting the standards set forth in the *Independent Lens* Delivery Handbook.

Concerns over footage quality are also a consideration when ITVS is evaluating projects for our Open Call funding initiative.



651 Brannan Street, Suite 410
San Francisco, Ca 94107
T. 415 356 8383
F. 415 356 8391
pbs.org/independentlens



Appendix F:
Analysis of Opponents' Screen Capture Exhibits





Only DVD Resolution screen Capture shown here. Far better results than this can be achieved by directly accessing DVD files.





Note interlace artifacts and image size is 1680x1050, NOT
required 1920x1080



Unacceptable 3-2 pulldown errors showing double image frames