## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| Matthew Green, Andrew Huang, and Alphamax, LLC, | |
| Plaintiffs, | Civil Case No.: 1:16-cv-01492-EGS |
| v. | Hon. Emmet G. Sullivan |
| U.S. Department of Justice, Loretta Lynch, Library of Congress, U.S. Copyright Office, and Maria Pallante, | Hearing Requested |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Brian M. Willen (D.C. BN 490471)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas 40th Floor
New York, NY 10019
Tel. (212) 999-5800


Stephen Gikow (CA SBN 302484)
Lauren Gallo White (CA SBN 309075)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Tel. (415) 947-2000

Corynne McSherry (CA SBN 221504)
Kit Walsh (CA SBN 303598)
Adam Schwartz (CA SBN 309491)
ELECTRONIC FRONTIER
  FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel. (415) 436-9333

*Counsel for Plaintiffs Matthew Green, Andrew Huang, and Alphamax, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Section 1201's Anti-Circumvention and Anti-Trafficking Provisions ................. 3

    B.    Plaintiff Matthew Green ......................................................................... 3

    C.    Plaintiffs Andrew "bunnie" Huang and Alphamax ................................. 5

    D.    Section 1201's Triennial Rulemaking Process ....................................... 6

    E.    The 2015 Triennial Rulemaking ........................................................... 7

    F.    The Librarian Denied Exemptions That Would Have Covered Plaintiffs' Proposed Activities ................................................................ 8

    G.    Plaintiffs' Challenge To Section 1201 and Its Rulemaking Procedure ................. 9

ARGUMENT .................................................................................................... 10

I.    PLAINTIFFS HAVE PROPERLY ALLEGED ARTICLE III STANDING ................. 10

    A.    Standing to Bring A Pre-Enforcement Challenge Based on The First Amendment Requires A Credible Threat of Prosecution .................... 10

    B.    Plaintiffs Have Alleged a Credible Threat of Prosecution .................... 12

        1.    Plaintiffs' Conduct Is "Affected With a Constitutional Interest" .............................................................................. 12

        2.    Plaintiffs Allege That Section 1201 Bars Their Intended Conduct ............................................................................... 14

        3.    Plaintiffs Allege a Substantial Threat of Future Enforcement .......................................................................... 15

    C.    Dr. Green Has Standing Based on The Denial of A License To Speak ................. 17

II.    PLAINTIFFS HAVE STATED A VIABLE FIRST AMENDMENT CLAIM ................. 18

    A.    Section 1201 Burdens First Amendment Rights .................................... 18

    B.    Plaintiffs Have Stated A Viable Claim That Section 1201 Is An Unconstitutional Speech-Licensing Regime ......................................... 24

        1.    Speech-Licensing Schemes Must Satisfy Strict Standards .................... 25

        2.    Section 1201 Is An Unconstitutional Speech Licensing Scheme .......................................................................... 25

        3.    The Government Makes No Attempt to Defend 1201's Speech-Licensing Regime Under the Proper Standard ............. 27

C.      Plaintiffs Have Stated Claims that Section 1201 Violates the First Amendment as Applied to Dr. Green, Dr. Huang, and Alphamax ...................... 29

    1.      Section 1201 Is Subject to Strict Scrutiny ................................................. 30

    2.      Section 1201 Cannot Survive Strict Scrutiny ........................................... 32

    3.      Even If The Anti-Trafficking And Anti-Circumvention Rules Were Not Content-Based, They Fail Intermediate Scrutiny ...................................................................................................... 34

D.      Section 1201 Is Unconstitutionally Overbroad ...................................................... 36

E.      *Corley* Does Not Defeat Plaintiffs' Claims In This Case .................................... 38

III.      PLAINTIFFS HAVE STATED A VIABLE APA CLAIM ............................................ 42

CONCLUSION ........................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page**

## CASES

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ..........................................................11

*321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal 2004) ...........................40, 41

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .......................................................................20

*Act Now to Stop War & End Racism Coalition v. District of Columbia*,
    589 F.3d 433 (D.C. Cir. 2009) ......................................................................................11, 15

*Act Now to Stop War & End Racism Coalition v. District of Columbia*,
    905 F. Supp. 2d 317 (D.D.C. 2012) ......................................................................................36

*Am. Fed'n of Gov't Emps. v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982) ......................................29

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ......................................22

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................................33

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ............................ 10-11, 17

*Balogh v. Lombardi*, 816 F.3d 536 (8th Cir. 2016) .................................................................16

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .........................................................................23, 33

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ..............................................................................20

*Bd. of Trustees v. Sullivan*, 773 F. Supp. 472 (D.D.C. 1991) .................................................19

*Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ....................................19

*Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) ....................................25

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010) ...............................28, 34, 35

*Bowsher v. Synar*, 478 U.S. 714 (1986) ..................................................................................44

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................................36

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................................45

*Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600 (D.C. Cir. 1995) ......................16

*The Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004) ............................................................................................41

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ...........................................................................36

*City of Los Angeles v. Patel,* 135 S. Ct. 2443 (2015) ...................................................38

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003)...........................................13

*Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013) ...........................11, 12

*Clark v. Library of Cong.*, 750 F.2d 89 (D.C. Cir. 1984) .............................................43

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985)...........................................................................................22

*Edenfield v. Fane*, 507 U.S. 761 (1993) ................................................................ 34-35

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)............................34, 35

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)..............................................................31, 39,41

*ELTRA Corp. v. Ringer*, 579 F.2d 294 (4th Cir. 1978)...................................42, 43, 45

*Ethnic Emps. of Library of Cong. v. Boorstin*,
    751 F.2d 1405 (D.C. Cir. 1985)..........................................................................43

*First Nat'l of Bos. v. Belotti*, 435 U.S. 765 (1978) .............................................20, 22

*Freedman v. Maryland*, 380 U.S. 51 (1965)...................................................25, 27, 28

*Frisby v. Schultz*, 487 U.S. 474 (1988).................................................................34, 35

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) .....................................................25, 28

*Golan v. Holder*, 132 S. Ct. 873 (2012).................................................................. passim

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)...........................................................29

*Griswold v. Connecticut*, 381 U.S. 479 (1965)...........................................................19

*Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) ...............................14

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...............................10, 15, 17

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)................................................................21

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*,
    338 F.3d 1024 (D.C. Cir. 2003) .........................................................................11

*INS v. St. Cyr*, 533 U.S. 289 (2001)..........................................................................45

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    684 F.3d 1332 (D.C. Cir. 2012).................................................................42, 43, 45

*Intertape Polymer Corp v. Nat'l Labor Relations Bd.*,
    801 F.3d 224 (4th Cir. 2015) ..............................................................................42

*Karn v. U.S. Dep't of State*, 925 F. Supp. 1 (D.D.C. 1996)....................................19

*Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136 (1980) ...............................43

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)........................................................................ 23-24

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988)..............................................25, 27, 28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ...........................................................42

*\*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ...................................................... passim

*MDY Indus., LLC, v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010)...................................41

*MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118 (2007)........................................................10

*Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise,
Inc.*, 501 U.S. 252 (1991)..............................................................................45

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)..................................................... 32-33

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983).............................................................................22

*Nat'l Ass'n of Broads. v. Librarian of Cong.*,
    146 F.3d 907 (D.C. Cir. 1998) ...........................................................43

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)........................................... passim

*Pennell v. San Jose*, 485 U.S. 1 (1988)...........................................................................11

*Peterson v. Transp. Workers Union of Am.*,
    75 F. Supp. 3d 131, 135 (D.D.C. 2014) ................................................4

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)....................................................38

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).................................................................30, 32

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).....................................................20

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) ...............................................................21

*Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980)..................................................36

*Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) .........................13

*Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ..................................................40

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969)..............................................................25

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ...........................................................40

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ....................................33

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ..................................................................20, 21

*Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928)....................................................45

*Stanley v. Georgia*, 394 U.S. 557 (1969) ....................................................................................24

*\*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) ............................................... passim

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)........................................................................19

*Temple v. Abercrombie*, 903 F. Supp. 2d 1024 (D. Haw. 2012)..................................................16

*Terveer v. Billington*, 34 F. Supp. 3d 100, 122 ..........................................................................43

*Tracfone Wireless, Inc. v. Billington*, No. 06-cv-22942,
ECF No. 8-1 (S.D. Fla. Feb. 5, 2007) ..................................................................................43

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)...............................................................34

*United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).............................11, 12, 13

*United States v. Crippen*, No. CR 09-703 PSG,
2010 WL 7198205 (C.D. Cal. Nov. 23, 2010)......................................................................15

*United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) ...................................15, 40

*United States v. O'Brien*, 391 U.S. 367 (1968) ..........................................................................34

*United States v. Reichert*, 747 F.3d 445 (6th Cir. 2014).........................................................14, 15

*United States v. Sharp*, No. 14-CR-229-TCB,
2015 WL 4641537 (N.D. Ga. Aug. 4, 2015) .......................................................................15

*United States v. Silvius*, 559 F. App'x 490 (6th Cir. 2014) ........................................................15

*United States v. Stevens*, 559 U.S. 460 (2010)........................................................................36, 37

*United States v. Wittich*, 54 F. Supp. 3d 613 (E.D. La. 2014) ....................................................15

*United States v. Xiang Li*, No. CRIM. 10-112-LPS-1,
2012 WL 5379102 (D. Del. Oct. 31, 2012) .........................................................................15

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001)........................................................................................... passim

*Virginia State Bd. of Pharmacy v.
Virginia Citizens Consumer Council Inc.*, 425 U.S. 748 (1976) ......................................24

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)............................................. passim

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................................................34

*Wright v. City of St. Petersburg*, No. 15-10315,
2016 U.S. App. LEXIS 14957 (11th Cir. Aug. 15, 2016) ..................................................28

*Zemel v. Rusk*, 381 U.S. 1 (1965) .............................................................................21

# STATUTES

2 U.S.C. § 136.............................................................................................................42

17 U.S.C. §§ 501 et seq...............................................................................................32

17 U.S.C. § 1201 et seq........................................................................................ passim

Administrative Procedures Act, 5 U.S.C. § 500 et seq. ....................................... passim

Freedom of Information Act, 5 U.S.C. § 552 et seq. ..................................................43

# RULES

Fed R. Civ. Proc. 12(b)(1) ...........................................................................................4

# MISCELLANEOUS

92 Cong. Rec. 2149 (1946)..........................................................................................42

144 Cong. Rec. E2136-02 (1998) ................................................................................24

144 Cong. Rec. H10615-01 (1998)..............................................................................24

144 Cong. Rec. H10621 (1998) ...............................................................................6, 24

144 Cong. Rec. H7074-03 (1998)................................................................................24

144 Cong. Rec. S4884-01 (1998) ................................................................................24

H.R. Rep. No. 105-551 pt. 2 (1998).....................................................................6, 24, 44

Neil Netanel, *First Amendment Constraints on Copyright After* Golan v. Holder,
   60 UCLA L. Rev. 1082, 1086 (2013) ................................................................31

Presidential Statement on Siging the Original Millennium Copyright Act, 34
   Weekly Comp. Pres. Doc. 2168 Pres. Doc. 2168 (Oct. 28, 1998)....................44

U.S. Dep't of Justice, Prosecuting Intellectual Property Crimes (4th ed. 2013) ...................15, 32

## INTRODUCTION

Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 ("Section 1201"), broadly prohibits "circumventing" measures used to control access to copyrighted works and "trafficking" in the "tools" that can be used to circumvent those controls. These prohibitions are backed by the threat of criminal and civil penalties, and they have been interpreted to apply even where the circumvention serves an entirely lawful purpose. The only way around the statute's blanket restrictions on speech is to apply to the Librarian of Congress for an exemption through a rigid speech-licensing process.

Plaintiffs Dr. Matthew Green and Dr. Andrew "bunnie" Huang—respected computer scientists who wish to engage in and publish important security research and to create and share tools that will foster political and creative expression—have challenged the Section 1201 regime on constitutional and statutory grounds. Plaintiffs' claims are backed by detailed factual assertions, and the Government has not and cannot provide a basis to avoid answering them.

As an initial matter, Plaintiffs have standing. They seek to engage in conduct that is prohibited by Section 1201, and they face a credible threat of being prosecuted for doing so. The Government's standing arguments misstate the legal standard for pre-enforcement challenges and ignore the well-pleaded allegations in the Complaint. In addition, Dr. Green has standing because he sought—and was refused—an exemption from Section 1201's prohibitions that would have specifically protected his research.

On the merits, Plaintiffs have pleaded that Section 1201 violates the First Amendment. Contrary to the Government's assertion, the statute directly restricts speech, including the creation of computer programs and the dissemination and publication of information about circumvention. It also prohibits Plaintiffs and others from engaging in activities that are

fundamental predicates to speech—translating information into a usable form, gathering and creating information, sharing the fruits of that knowledge with others, and expressing oneself via fair use. All of this activity is constitutionally protected, and the burdens imposed on it by Section 1201 violate the First Amendment in at least three ways.

*First*, by broadly forbidding all speech that depends upon circumvention—subject only to a narrow exemption process administered by the Librarian of Congress—Section 1201 erects a speech-licensing regime that lacks the protections required by the First Amendment. *Second*, as applied to Plaintiffs, Section 1201's content-based bans are subject to strict scrutiny, although the Government cannot meet its burden under either strict or intermediate scrutiny because there are ample less restrictive means to advance the purposes supposedly served by Section 1201. Nor can the Government rely on copyright law to avoid that scrutiny. To be compatible with the First Amendment, laws targeting infringement must respect copyright's traditional boundaries, which Section 1201 does not. *Third*, because the statute's sweeping prohibitions are substantially overbroad, and nearly two decades of experience with the law has made clear that it causes extraordinary collateral damage to speech and innovation, Section 1201 is facially invalid as well.

Finally, the Government cannot evade Plaintiffs' statutory challenge by arguing that the Section 1201 rulemaking process is immune from judicial review under the Administrative Procedures Act ("APA"). When the Library of Congress is engaged in substantive rulemaking under Section 1201, statutory text, legislative history, and case law confirm that it is an "agency" whose decisions are subject to the APA. Any other reading of the statute would give rise to serious constitutonal problems, allowing an agent of Congress to exercise core executive power. Because the APA applies in this case, Plaintiff are entitled to proceed with their claim that the results of the most recent rulemaking proceeding were arbitrary, capricious, and unconstitutional.

# BACKGROUND

### A.     Section 1201's Anti-Circumvention and Anti-Trafficking Provisions

Plaintiffs challenge two provisions of Section 1201: the anti-circumvention provision in Section 1201(a)(1) and the anti-trafficking provision in Section 1201(a)(2). The former prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected [by copyright]." 17 U.S.C. § 1201(a)(1). Such measures, often referred to as "technological protection measures" (TPMs), include encryption, username/password combinations, and physical memory restrictions that prevent a user from accessing stored information. Complaint, ECF No. 1 ("Compl.") ¶ 18. The anti-trafficking provision prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that … is primarily designed or produced for the purpose of" circumventing an access control TPM. 17 U.S.C. § 1201(a)(2)(A).

Violation of either provision gives rise to both a private right of action and, if the circumvention or trafficking is done for a commercial purpose, a risk of criminal prosecution punishable by up to $500,000 in fines and imprisonment up to 5 years. 17 U.S.C. § 1204(a). The Government has prosecuted alleged violations of Section 1201 on multiple occasions. Compl. ¶ 28. Moreover, even though the ostensible ultimate purpose of the law was to inhibit copyright infringement, proscutors are taught that they may pursue individuals under Section 1201 even where the circumvention or trafficking has no nexus with actual infringement. *Id.* ¶ 27.

### B.     Plaintiff Matthew Green

Dr. Matthew Green is an Assistant Professor of computer science and applied cryptography at the Johns Hopkins Information Security Institute. Compl. ¶¶ 5, 75. He studies the security of computer systems and teaches others how to do the same. *Id.* ¶ 75. This is crucial work, because computer systems have serious vulnerabilities that can be exploited by

wrongdoers. Declaration of Matthew Green ("Green Decl.") (ECF No. 16-2) ¶ 3.[1] Security researchers like Dr. Green identify those vulnerabilities so they may be fixed. *Id*.; Compl. ¶ 75.

To analyze the security of a given technology, Dr. Green or a member of his team will first lawfully purchase a copy of the system they wish to test. Green Decl. ¶ 5. Dr. Green then seeks to understand how the system works, and where it might be vulnerable, including flaws in TPMs intended to control access to the systems. Green Decl. ¶ 8; Compl. ¶¶ 18, 75-77. A malicious actor would try to bypass these security measures in order to maximize her ability to locate and exploit vulnerabilities. Green Decl. ¶ 8. To identify security flaws, Dr. Green must do the same. *Id*. Otherwise, he cannot determine with confidence whether devices are secure. Compl. ¶¶ 75-78; Green Decl. ¶¶ 8-9. When Dr. Green locates security vulnerabilities, he discusses them with his research team and, where possible, with the company responsible for fixing them and/or people affected by the vulnerability. Green Decl. ¶¶ 12-17.

Dr. Green is currently writing a book about his research. Compl. ¶ 75. To inform readers about the methods of security research, including how to identify vulnerabilities in computer systems, Dr. Green would like to include in the book examples of code capable of bypassing security measures. Compl. ¶ 75; Green Decl. ¶¶ 19-22. Like any scientific research, Dr. Green's findings are credible only to the extent that other scientists can replicate them, so his book must show fellow computer scientists how to do so. Green Decl. ¶ 20. Moreover, Dr. Green hopes that others will build upon his research and locate additional security flaws. *Id*. ¶ 21. Finally, Dr. Green hopes that the people who design computer systems will use his book to learn how to design better systems that do not contain the kinds of flaws that he discovered. *Id*. ¶ 22.

---

[1] "A court may … examine evidence outside the complaint to decide a Rule 12(b)(1) motion to dismiss." *Peterson v. Transp. Workers Union of Am.*, 75 F. Supp. 3d 131, 135 (D.D.C. 2014) (citation omitted).

Dr. Green would like to offer his book for sale via typical distribution channels, such as bookstores and online retailers, and to receive royalties from its sale. Compl. ¶ 75; Green Decl. ¶ 23. His marketing materials would highlight detailed information contained in the book about bypassing security measures, since that is part of its value as a tool for understanding cutting-edge security research. Compl. ¶ 75; Green Decl. ¶ 24. He fears that these activities could invite criminal prosecution under Section 1201. Compl. ¶ 87.

### C.     Plaintiffs Andrew "bunnie" Huang and Alphamax

Dr. Huang is an engineer with a Ph.D from the Massachusetts Institute of Technology. Compl. ¶ 88. He owns and runs several small businesses, including Plaintiff Alphamax, and he is a Research Affiliate of the MIT Media Lab. *Id.* Among his inventions are the "NeTV" devices, which allow people to edit high-definition digital video streams. *Id.* ¶ 89.

Dr. Huang, through Alphamax, seeks to create an improved version of the NeTV device called "NetTVCR." *Id.* ¶ 90. This upgrade would allow people to edit their high-definition digital videos—via "High-Definition Multimedia Interface" or "HDMI" signals[2]—and store that edited material in a way that can be used later. *Id.* The device would facilitate a wide-range of protected and non-infringing speech. For example, it would enable users to display a live presidential debate along with the text from a commentator's live blog, or display coverage from multiple sources at once. *Id.* ¶ 100. It would enable the creation of remix videos mashing up pieces of several different works, as well as materials for media literacy education, versions of videos that are more accessible to persons with visual impairment, and a variety of other forms of expression detailed in the Complaint. *Id.* NeTVCR would also allow people to recapture the functionality of a VCR: a person could save content for later viewing, move content to a different device, or

---

[2] HDMI is a digital video standard used to send video signals from devices like computers, DVD players, and video game consoles to televisions and computer monitors. Compl. ¶ 92.

convert it to a more useful format. *Id.* ¶ 91.

To produce, sell and use the NeTVCR upgrade, Dr. Huang and Alphamax must circumvent the TPM that restricts the viewing of HDMI signals. *Id.* ¶ 93. Known as High-Bandwidth Digital Content Protection ("HDCP") and created by Intel, this TPM relies on on a set of secret cryptographic keys that prevent a user from viewing HDCP-restricted media. *Id.* To receive one of these secret keys from Intel, manufacturers must promise to implement certain playback and copying restrictions that run directly contrary to Plaintiffs' goals. *Id.*[3] And because Dr. Huang and Alphamax seek to distribute NeTVCR commercially, Section 1201 puts them at risk of criminal prosecution.

### D.     Section 1201's Triennial Rulemaking Process

When Congress enacted Section 1201, it recognized that the statute's breadth could lead to adverse impacts on a range of legitimate and socially beneficial activity. H.R. Rep. No. 105-551 pt. 2, at 36 (1998). Rather than narrowing the law to address that problem, Congress included an unusual provision directing the U.S. Copyright Office and the Librarian of Congress ("the Rulemaking Defendants") to conduct a rulemaking process once every three years in order to determine "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under this title of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C); 144 Cong. Rec. H10621 (1998), at H10617. If so, the statute instructs the Librarian to grant an exemption for such uses, for a three year period. 17 U.S.C. § 1201(a)(1)(D). The exemption process applies only to the circumvention ban.

---

[3] The "master key," which allows users to bypass the HDCP restrictions without obtaining any other key, was anonymously uploaded to the Internet in 2010. Compl. ¶¶ 95-96. Intel has made it clear that it would bring a Section 1201 claim against anyone who uses the key to create an unauthorized device for HDCP playback. *Id.* ¶ 97.

The statute instructs the Librarian to consider several specific factors: (i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact of the anti-circumvention rule on criticism, comment, news reporting, teaching, scholarship, or research; and (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works. 17 U.S.C. § 1201(a)(1)(C). In addition, the Librarian may consider "such other factors as the Librarian considers appropriate." 17 U.S.C. § 1201(a)(1)(C)(v). The Librarian has used this catch-all provision to deny exemptions based on issues that have nothing to do with the DMCA's ostensible purpose of protecting the market for copyrighted works. For example, exemptions have been rejected based on potential impacts on automobile pollution and energy policy. Compl. ¶ 33(e); *see also* Declaration of Brian M. Willen (dated September 29, 2016) ("Willen Decl.") (ECF No. 16-3) Exhibit ("Ex.") 1 ("2015 Final Rule") at 65,954.

In addition, the Rulemaking Defendants have imposed a variety of other requirements on applicants seeking exemptions. Compl. ¶ 33. Those include: (1) putting the burden of proof on the party seeking an exemption; (2) requiring applicants to demonstrate the rule's widespread impact on noninfringing uses; (3) requiring evidence that people are already engaging in circumvention, even though that invites criminal and civil jeopardy; and (4) requiring applicants to show that there is *no* viable alternative means of engaging in the prohibited use, even if the alternative is far more onerous and expensive. *See id*. Granted exemptions lapse every three years with no presumption of renewal, and the Rulemaking Defendants have failed to renew several previously granted exemptions. Compl. ¶ 35; *see also* Willen Decl. Ex. 9 ("2012 Final Rule") at 65,264-66.

### E.      The 2015 Triennial Rulemaking

Despite the substantial burdens of the rulemaking process, thousands of members of the

public approached the Copyright Office in the last rulemaking cycle to explain how the ban on circumvention interferes with their noninfringing speech, and to seek or support exemptions from the ban. Compl. ¶¶ 36-37. In the most recent rulemaking, the requested exemptions included documentary and narrative filmmaking (*id*. ¶¶ 37-38); educational uses to teach media criticism and analysis (*id*. ¶ 39(a)); security research (*id*. ¶ 41(e)); conversion of media to accessible formats for the visually impaired (*id*. ¶ 41(f)); analysis of medical data on medical devices (*id*. ¶ 41(i)); "format shifting" and "space shifting" (converting lawfully-acquired media from one format or device to another) (*id*. ¶ 39(d-e)). The Rulemaking Defendants denied many of the requested exemptions (including for space- and format-shifting) and significantly limited others (including for security research). *Id*. ¶¶ 39-42.

**F.    The Librarian Denied Exemptions That Would Have Covered Plaintiffs' Proposed Activities**

Dr. Green participated in the 2015 Rulemaking, hoping to obtain an exemption to cover his security research. *Id.*¶ 78. He submitted a proposed exemption and explained that the research is otherwise lawful and noninfringing. *Id*. He then submitted detailed comments on a subsequent security research exemption proposal, explaining the need for an exemption that covered not only consumer devices, but also non-consumer devices such as industrial-grade firewall and virtual private network modules, hardware encryption devices, toll collection systems, and other devices excluded from the rulemaking exemption. *Id*. ¶ 77; Green Decl. ¶¶ 42-48. The Rulemaking Defendants recognized both that the ban on circumvention has an adverse effect on computer security research like Dr. Green's, and that this adverse effect was not cured by any of the potentially relevant statutory exemptions. Compl. ¶ 79.

Nonetheless, the final exemption for security research offers insufficient protection for Dr. Green. It is confined to circumvention on "a device or machine that is primarily designed for use

by individual consumers (including voting machines)," motorized land vehicles, and medical devices that are designed for "implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care." Compl. ¶ 67; Willen Decl. Ex. 1 (2015 Final Rule) at 65,956. And it includes further restrictions on how research may be conducted and how researchers may use or distribute the information they glean from their inquiries. Compl. ¶ 68; Willen Decl. Ex. 1 (2015 Final Rule) at 65,956.

The Rulemaking Defendants also denied a number of exemptions that would have allowed Dr. Huang, Alphamax, and their customers to use NeTVCR for various forms of expression. The relevant exemptions were consolidated into Proposed Classes 1-7 (pertaining to uses of audiovisual works) and Proposed Classes 8 and 10 (pertaining to space- and format-shifting). Compl. ¶¶ 48-56, 57-64. The Rulemaking Defendants denied an exemption for extracting clips of motion pictures for narrative films (as opposed to documentaries), relying entirely on speculation about the potential effects of such an exemption on licensing markets. *Id*. ¶ 51. The Rulemaking Defendants also denied an exemption for space- and format-shifting, concluding that these were not sufficiently "established" as noninfringing uses, and that other online distribution sources offered adequate alternatives to circumvention—without considering the cost, quality, or availability of these supposed alternatives. *Id*. ¶¶ 62-63.

### G.   Plaintiffs' Challenge To Section 1201 and Its Rulemaking Procedure

Section 1201 continues to frustrate Dr. Green's research and publication efforts, as well as Dr. Huang's and Alphamax's ability to develop, distribute, and use the NeTVCR. Plaintiffs allege that Section 1201 violates the First Amendment on its face and as applied to them. They further contend that the Rulemaking Defendants' refusal to grant appropriate exceptions from the circumvention ban violates the APA. On September 29, 2016, Dr. Green also filed a motion for a preliminary injunction seeking to enjoin the Government from prosecuting him under Section

1201 during this litigation. ECF No. 16. The Government opposed the motion. *Id*. The Court

stayed resolution of Dr. Green's motion pending a ruling on the Government's Motion to

Dismiss. ECF Minute Order (Sept. 30, 2016).

## ARGUMENT

## I.   PLAINTIFFS HAVE PROPERLY ALLEGED ARTICLE III STANDING

The Government claims Plaintiffs lack standing because they have not alleged that they

are certain to be prosecuted for violating Section 1201. But the Government misstates the

standard. Supreme Court and D.C. Circuit authority simply require a "credible threat of

prosecution"—which is exactly what Plaintiffs have alleged.

### A.   Standing to Bring A Pre-Enforcement Challenge Based on The First Amendment Requires A Credible Threat of Prosecution

Where a plaintiff alleges injury stemming from the threatened enforcement of a law, "an

actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the

law." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014); *see also MedImmune,

Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-29 (2007). Instead, a plaintiff must offer well-pleaded

allegations establishing "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution

thereunder." *Driehaus*, 134 S. Ct. at 2342; *see, e.g.*, *Holder v. Humanitarian Law Project*, 561

U.S. 1, 15-16 (2010) (plaintiffs faced a "credible threat" of enforcement where they alleged that

their conduct was covered by the challenged statute, others had been prosecuted for violating the

law, and the Government declined to disavow prosecution); *Babbitt v. United Farm Workers

Nat'l Union*, 442 U.S. 289, 302 (1979) (plaintiff unions had standing where they alleged "some

reason in fearing prosecution for violation of the ban on specified forms of consumer publicity"

because the ban "on its face" applied to "any person" and "the State has not disavowed any

intention of invoking the criminal penalty provision.").[4]

These standards are applied with special solicitude in the First Amendment context, where an "actual and well-founded fear that the law will be enforced against [plaintiffs]" can give rise to self-censorship that can itself constitute injury. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *accord United States Telecom Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016) ("[T]he courts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First Amendment.") (citation omitted). As the D.C. Circuit has explained, "standing to challenge laws burdening expressive rights requires only 'a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" *Act Now to Stop War & End Racism Coalition v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (internal marks omitted). This burden is modest at the pleading stage, where the plaintiff's factual allegations must be taken as true. *See Pennell v. San Jose*, 485 U.S. 1, 7 (1988) (court must accept factual allegations as true and construe in favor of the complaining party in ruling on a motion to dismiss for lack of standing); *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003) (same).

Ignoring this authority, the Government asserts that Plaintiffs must allege that injury is "certainly impending" or "imminent." Gov't Br. at 15-16. That is not the correct standard, and the Government's own cases do not support it. The Government points to *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1147 (2013)), but that case *did not arise out of a pre-*

---

[4] "The Supreme Court has repeatedly found that plaintiffs have standing to bring pre-enforcement First Amendment challenges to criminal statutes, even when those statutes have never been enforced." *281 Care Comm. v. Arneson*, 638 F.3d 621, 628 (8th Cir. 2011) (citing cases); *see, e.g.*, *Babbit*, 442 U.S. at 302 (plaintiffs had standing notwithstanding that "the criminal penalty provision has not yet been applied and may never be applied").

*enforcement challenge to a criminal statute.* The standing question in *Clapper* was whether plaintiffs had been affected by the statute at all, not whether they faced a credible threat of being prosecuted for violating it. Moreover, the Supreme Court recognized in *Clapper* that standing can be "based on a 'substantial risk' that the harm will occur." *Id.* at 1150 n.5. And the Court has applied that test following *Clapper*. *See Driehaus*, 134 S. Ct. at 2341 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur") (quoting *Clapper*, 133 S. Ct. at 1150 n.5); *accord United States Telecom*, 825 F.3d at 740.

### B.   Plaintiffs Have Alleged a Credible Threat of Prosecution

The allegations in Plaintiffs' Complaint are more than sufficient to establish a credible threat of prosecution under Section 1201.

#### 1.   Plaintiffs' Conduct Is "Affected With a Constitutional Interest"

Plaintiffs have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Driehaus*, 134 S. Ct. at 2342-43. Dr. Green alleges that he wishes to engage in and publish security research techniques that require circumventing TPMs in various non-consumer devices to make sense of the software they contain. Compl. ¶¶ 77, 80, 85. Similarly, Dr. Huang and Alphamax have alleged that they wish to circumvent HDCP to improve access to HDMI content, allowing them and their customers to, *e.g.*, engage in new forms of political, educational, and cultural expression, save content for later viewing, move content between devices (space-shift), and convert content to different formats (format-shift). Compl. ¶¶ 90-93, 100-101. They have also alleged that they intend to develop, publish, and make commercially available software code for NeTVCR and devices pre-programmed with that code: a "technology . . . primarily designed" to circumvent access controls, with little-to-no other commercially significant uses. *Id.* ¶ 67; *id.* ¶ 100.

The Government argues that these activities are not protected by the First Amendment. Gov't Br. at 18-21. That is incorrect, but in any event it speaks to the merits of Plaintiffs' challenge, not to their standing to bring that challenge. "The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *see also City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("in reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims") (citations omitted). For example, the D.C. Circuit recently held that a broadband provider had standing to bring a First Amendment challenge notwithstanding the merits of its claim, which the Court ultimately rejected because it found the plaintiff was not engaged in constitutionally protected speech. *United States Telecom*, 825 F.3d at 740-44.

The same reasoning applies in this case. Although Plaintiffs clearly are engaged in constitutionally protected speech, to assert standing Plaintiffs need only allege that they wish to pursue activities "arguably affected with a constitutional interest." *Driehaus*, 134 S. Ct. at 2342-43. This is a lenient standard and, as explained below, it is clearly satisfied here. Plaintiffs' proposed course of conduct would directly contribute to public discourse, enhance the body of public knowledge, and faciliate creative expression. That conduct implicates the First Amendment, particularly its protections for necessary predicates to speech. *See* Section II.A *infra*.[5]

---

[5] Moreover, "in the First Amendment context, 'litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Am. Booksellers*, 484 U.S. at 392-93 (alteration omitted) (quoting *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984)). Dr. Huang and Alphamax have alleged that the First Amendment rights of their filmmaker customers are infringed by § 1201(a)(2)'s prohibition on the sale of equipment

2.   Plaintiffs Allege That Section 1201 Bars Their Intended Conduct

Plaintiffs' intended conduct is also "arguably . . . proscribed by [the] statute" they wish to challenge. *Driehaus*, 134 S. Ct. at 2344. On its face, Section 1201 applies to the activities that Plaintiffs contemplate. The Government does not argue otherwise, at least as to the anti-circumvention provision. Nor does the Government dispute that Huang and Alphamax's intended activity is covered by the anti-trafficking provision. *See* Gov't Br. at 20 n.8.

Instead, the Government claims that Dr. Green's book would not be proscribed by Section 1201(a)(2) because it is not a "'technology, product, service, device, component, or part thereof.'" Gov't Br. at 20 (quoting § 1201(a)(2)). But, as Dr. Green explained in his motion for a preliminary injunction, his book will include specific circumvention methods, including computer code "primarily designed or produced for the purpose" of circumvention, with no other "commercially significant purpose or use," and "marketed … for [such] use." ECF No. 16-1 at 22 (citing § 1201(a)(2)).[6] Such code plainly falls within Section 1201. *See, e.g.*, *United States v. Reichert*, 747 F.3d 445, 457 (6th Cir. 2014) ("Generally speaking, circumvention technology [regulated by § 1201] is computer code[.]"). Dr. Green thus has plausibly alleged that publishing his book would subject him to liability under the anti-trafficking provision's broad ambit. *See, e.g.*, *Am. Booksellers*, 484 U.S. at 392 (plaintiffs had standing where they risk criminal prosecution "if their interpretation of the statute is correct").

Contrary to the Government's suggestion (Gov't Br. at 15), Plaintiffs have also alleged an intent to "willfully" circumvent copyright access controls and traffic in the code used to

---

necessary for their free expression. Compl. ¶¶ 88-110. *See, e.g.*, *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 809 (D.C. Cir. 1987) (holding that a litigant has standing to assert third parties' First Amendment rights where those rights protect the third parties' customer/client relationship with the litigant).

[6] The Government correctly understood from the Complaint that Dr. Green's book would include circumvention code. Gov't Br. at 38-39; Compl. ¶ 75.

circumvent those controls for purposes of "commercial advantage or private financial gain"—Dr. Green to publish and sell an academic book on security research, and Dr. Huang and Alphamax to market and sell the NeTVCR. *See* 17 U.S.C. §§ 1201, 1204(a); Compl. ¶¶ 75-110. Article III requires no more. *See Act Now*, 589 F.3d at 435 (pre-enforcement standing "requires only a credible statement . . . of intent to commit violative acts").

### 3. Plaintiffs Allege a Substantial Threat of Future Enforcement

Finally, the threat of future enforcement is "substantial." *Driehaus*, 134 S. Ct. at 2341, 2345. As an initial matter, Plaintiffs allege that the Government has prosecuted alleged Section 1201 violations on multiple occasions in the eighteen years since its adoption. Compl. ¶ 28; *see also, e.g.*, *Reichert*, 747 F.3d at 448; *United States v. Silvius*, 559 F. App'x 490 (6th Cir. 2014); *United States v. Sharp*, No. 14-CR-229-TCB, 2015 WL 4641537 (N.D. Ga. Aug. 4, 2015); *United States v. Wittich*, 54 F. Supp. 3d 613 (E.D. La. 2014); *United States v. Xiang Li*, No. CRIM. 10-112-LPS-1, 2012 WL 5379102 (D. Del. Oct. 31, 2012); *United States v. Crippen*, No. CR 09-703 PSG, 2010 WL 7198205 (C.D. Cal. Nov. 23, 2010); *United States v. Elcom Ltd.,* 203 F. Supp. 2d 1111 (N.D. Cal. 2002). Plaintiffs are not required to allege greater detail about past prosecution. *Accord Holder*, 561 U.S. at 15-16. Indeed, the Government itself has taken steps that indicate Plaintiffs risk being prosecuted. DOJ recently promulgated an enforcement manual that explains how to successfully prosecute violations of Section 1201's anti-circumvention rule and anti-trafficking rules. *See* U.S. Dep't of Justice, Prosecuting Intellectual Property Crimes 233-79 (4th ed. 2013).[7] The manual takes the position that a Section 1201 violation need not be linked to actual infringement, and that fair use is no defense. *See, e.g., id*. at 242.

In addition to multiple past criminal prosecutions of Section 1201, Plaintiffs have also

_____

[7] https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/03/26/prosecuting_ip_crimes_manual_2013.pdf .

alleged that they have been chilled by the threat of private litigation. Compl. ¶¶ 81-83. Both the Supreme Court and the D.C. Circuit have acknowledged the further chilling effect of laws allowing private enforcement. *Driehaus*, 134 S. Ct. at 2345 ("The credibility of that threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency."); *Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600, 603 (D.C. Cir. 1995) ("[E]ven without a Commission enforcement decision, appellants are subject to litigation [by private parties] challenging the legality of their actions if contrary to the Commission's rule.").[8]

Moreover, even absent a history of criminal or private enforcement, allegations that a plaintiff has personally suffered as a result of the administrative actions taken in connection with the challenged law are strong evidence of a credible threat of prosecution. *See, e.g.*, *Parker*, 478 F.3d at 375-76 (plaintiff had standing to bring Second Amendment challenge to D.C. law prohibiting carrying a gun without a license where plaintiff had "applied for and been denied a registration certificate to own a handgun"). Here, Dr. Green applied for exemptions that would have allowed him to conduct security research on non-consumer-oriented devices and non-implanted medical devices. The Rulemaking Defendants denied that petition exercising their authority under Section 1201. Compl. ¶¶ 78-85. This administrative action shows that the Government has affirmatively considered whether to allow the expressive activity Green seeks to engage in, and has decided that the activity should not be permitted even for a limited three-year term. Dr. Huang has similarly suffered from the denial of a requested speech license under

---

[8] The Government's purportedly contrary authorities, which are from outside this Circuit, do not undermine this conclusion. Gov't Br. at 17 (citing *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016) (plaintiffs failed to allege a fairly traceable injury where they challenged a law lacking any criminal or administrative enforcement mechanism); *Temple v. Abercrombie*, 903 F. Supp. 2d 1024, 1034-35 (D. Haw. 2012) (same)).

Section 1201(a)(1). *Id.* ¶¶ 107-108. The Rulemaking Defendants rejected the circumvention exemptions that Dr. Huang and Alphamax seek to use. From those actions, it is reasonable to infer that the Government has a "particular interest" in prohibiting the expressive activities that Plaintiffs intend to engage in and will act to prohibit those activities. *Parker*, 478 F.3d at 375.

Finally, the Government has in no way disclaimed interest in bringing charges against Plaintiffs (indeed, it apparently plans to oppose Dr. Green's request for a preliminary injunction preventing him from being prosecuted under Section 1201 while this case is pending). ECF No. 16, at 1-2. The Government's own actions thus confirm Plaintiffs' pre-enforcement standing. *See, e.g.*, *Babbitt*, 442 U.S. at 302 ("[T]he State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices."); *Am. Booksellers*, 484 U.S. 393 (finding credible threat of prosecution where "State has not suggested that the newly enacted law will not be enforced"); *Holder*, 561 U.S. at 15-16 ("The Government has not argued . . . that plaintiffs will not be prosecuted if they do what they say they wish to do.").

Because Plaintiffs have alleged facts sufficient to show that their self-censorship is a reasonable response to a credible threat of prosecution, they have standing to bring this action.

## C.   Dr. Green Has Standing Based on The Denial of A License To Speak

While all Plaintiffs have standing based on the threat of prosecution, Dr. Green has an independent basis for establishing standing to challenge Section 1201's ban on circumvention. As described above, Dr. Green expressly asked for, and was denied, permission to speak in the most recent triennial rulemaking proceeding. *See* Compl. ¶¶ 78-85. The D.C. Circuit's decision in *Parker* is squarely on point. The court held that the plaintiff had Article III injury to challenge a D.C. law barring civilians from carrying a pistol without a license based simply on the fact that he had "applied for and was denied a registration certificate to own a handgun." 478 F.3d at 374-76. As the court explained: "We have consistently treated a license or permit denial pursuant to a

state or federal administrative scheme as an Article III injury." *Id*. at 376.

That is the situation here. Dr. Green's constitutional rights were restricted by a broad statute; he then sought a license that would have allowed him to engage in activity otherwise forbidden by the statute, but administrative officials rejected that request. The denial of Dr. Green's requested license inflicted an independent Article III injury that allows him to challenge the validity of the statute. *See id*. (explaining that "the formal process of application and denial, however routine, makes the injury to [Plaintiff's] alleged constitutional interest concrete and particular"). As in *Parker*, Dr. Green is not asserting that his injury is only a threatened prosecution for violating Section 1201, nor is he claiming only a general right to circumvent TPMs. He is asserting a right to an exemption, "the denial of which is his distinct injury." *Id*.

## II. PLAINTIFFS HAVE STATED A VIABLE FIRST AMENDMENT CLAIM

Plaintiffs' Complaint alleges, in detail, the various ways in which Section 1201 impermissibly burdens their First Amendment rights and those of the public at large. The Government argues that Section 1201 does not implicate protected speech at all, but that position disregards Plaintiffs' well-founded factual allegations and established First Amendment principles. And once that much is clear, the Government's remaining arguments fall away.

### A. Section 1201 Burdens First Amendment Rights

The Government's principal argument on the merits is that Section 1201 does not regulate speech or expressive conduct and thus does not implicate the First Amendment at all. *See, e.g.*, Gov't Br. at 37. The Government is wrong.

To see how acts of circumvention and trafficking implicate speech interests, the Court need look no further than the activities in which Plaintiffs themselves wish to engage. Plaintiffs seek to gather information, to engage in valuable academic research, to create new information, to build tools for speech, and to publish what they learn, using both words and computer code.

Compl. ¶¶ 3, 5, 75-78, 89-91, 100; *see also* Green Decl. ¶¶ 5, 8-9, 12-17, 19-22. All of these steps are protected links in a unified chain of expression that will ultimately reach a public audience that has a corresponding right to hear Plaintiffs' speech and to use their work to engage in new acts of speech and expression. That chain falls squarely within the First Amendment. *See Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read and freedom of inquiry, freedom of thought, and freedom to teach.") (citations omitted); *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) ("Freedom to reason and freedom for disputation on the basis of observation and experiment are the necessary conditions for the advancement of scientific knowledge.").

But Section 1201 stands in the way of Plaintiffs' activities—and those of many other people. In doing so, the statute restricts a wide variety of protected speech.

**Section 1201 burdens the right to create and use computer code.** Plaintiffs have created computer programs that are designed to circumvent access controls on certain copyrighted works. Compl. ¶¶ 132, 139. It is well settled, and the Government itself concedes, that "computer code, and computer programs constructed from code," are forms of speech. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446-50 (2d Cir. 2001) ("Computer programs are not exempted from the category of First Amendment speech simply because their instructions require use of a computer."); Gov't Br. at 38-39; *see also Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1436 (N.D. Cal. 1996); *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 9-10 (D.D.C. 1996). Thus, the creation and use of a computer program is protected by the First Amendment, just as is the creation and performance of a musical work, a film, or a scientific experiment. *Corley*, 273 F.3d at 447 (comparing computer code to musical scores); *Bd. of Trustees v. Sullivan*, 773 F. Supp.

472, 474 (D.D.C. 1991) (the "First Amendment protects scientific expression and debate just as it protects political and artistic expression"). Yet Section 1201 bars Plaintiffs from using the code they have created or disseminating it to others. That prohibition squarely implicates their First Amendment rights.

**Section 1201 burdens the right to gather information**. "[T]he First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l of Bos. v. Belotti*, 435 U.S. 765, 783 (1978). This principle is implicated here. Plaintiffs seek to gather factual information that they intend to share with the public. Dr. Green seeks to circumvent TPMs to identify and to understand security flaws in computer programs and then share that information to help make computer systems more secure. Dr. Huang seeks to circumvent TPMs in order to gather information about how to create a workable version of the NeTVCR, and to share his methods with his customers. Compl. ¶¶ 78-82, 93, 98-106.

The Supreme Court has recognized that the ability to gather information is a "necessary predicate" to the subsequent exercise of "rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see, e.g.*, *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (First Amendment right to record police officers because "[t]he right to publish . . . would be insecure, or largely ineffective" if the necessary antecedent acts of gathering information were "wholly unprotected."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (First Amendment right to monitor court proceedings).

The cases on which the Government relies (Gov't Br. 19-20) do not suggest otherwise.

*Zemel v. Rusk*, 381 U.S. 1 (1965), involved the right to travel to a particular foreign coutry (Cuba). But even in that very different context (which involved the possibility of "dangerous international incidents," *id* at 15), while the Court rejected an "unrestrained" right to gather information, it nonetheless affirmed that limits on "the flow of information" implicate the Constitution. *Id*. at 16-17. Likewise, *Houchins v. KQED, Inc.*, 438 U.S. 1, 10-11 (1978), a case about the right to access prisoners, is far afield here. It rejected a "First Amendment guarantee of a right of access to all sources of information within government control" (*id*. at 9) and a "claimed special privilege of access" to places closed to the general public (*id*. at 12). In contrast, this case involves the right to access information on Plaintiffs' *own property* and on works otherwise lawfully in their possession. *Id*. at 17 (Stewart, J., concurring) (recognizing the right "to gather information to be passed on to others" and to "use cameras and sound equipment" as important predicates to speech).

**Section 1201 burdens the right to create and share information**. Plaintiffs do not merely want to gather information; they also seek to create new information that they intend to share with others. By circumventing access controls on works in his lawful possession, Dr. Green seeks to shed new light on computer security vulnerabilities and the methods of investigating them. He then plans to share his insights, and the computer code that made them possible, with others for the benefit of public. Dr. Huang and Alphamax seek to create NeTVCR, a circumvention tool, so they and their customers can create fair use remixes of videos they lawfully possess. Compl. ¶¶ 75, 90-91, 98-106.

This too is protected speech. As the Supreme Court has explained, "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570 (citing *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (product labels);

and *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) (plurality opinion) (credit reports)). That Plaintiffs use technology like circumvention code to faciliate their information-creation efforts is no barrier to protection. The "process of creating" is as protected as "the product of these processes." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) ("[W]e have not drawn a hard line between the essays that John Peter Zenger published and the act of setting the type."). Indeed, it is well settled that the First Amendment protection for speech includes protection for the tools that enable speech. *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) (striking down a tax on ink used to publish newspapers); *First Nat'l Bank of Bos.*, 435 U.S. at 795 (striking down a limit on contributing money to a political campaign). Circumvention technology is just such a tool: not only may it constitute speech in and of itself (as discussed above), it is designed to facilitate the gathering and creation of information. It enables Plaintiffs to engage in protected First Amendment activities and to allow others to do so as well.

The Government compares the anti-circumvention rule to a ban on breaking into a locked room and stealing a book. Gov't Br. at 23. But that analogy overlooks one of the most basic problems with Section 1201: it applies to works that people like Plaintiffs have lawfully acquired. Indeed, one of the provision's central purposes and effects is to prevent people from *accessing their own property*. Thus, someone who buys an ebook or DVD would violate the DMCA by using circumvention to access the work's full contents. Section 1201 also prohibits transformation of information into a form to be used for subsequent speech. For example, the statute identifies "encryption"—the "scrambling" of information—as a technological protection measure that controls access to a work. *See* 17 U.S.C. §§ 1201(g)(1)(B), 1201(a)(3)(A). By prohibiting the use of decryption technology to unscramble information, Section 1201 proscribes

efforts to understand and make use of information in the works or items that a person already lawfully possesses. In that respect, Section 1201 is more like a ban on unlocking the contents of one's own library or using certain tools to read a book in that library printed in invisible ink.

**Section 1201 burdens the right to publish speech.** Beyond all this, Plaintiffs also seek to disseminate the technological information they have developed. Dr. Green wishes to publish an academic book that contains circumvention instructions, including code. Dr. Huang wishes to distribute his circumvention upgrade code, so his customers can reprogram the computer in their NeTV (which cannot circumvent) to NeTVCR (which can) and thereby engage in new acts of creativity, analysis, and cultural expression. Compl. ¶¶ 75, 110, 112-113. This kind of publication comes squarely within the First Amendment. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (protecting "the acts of 'disclosing' and 'publishing' information"). While the Government seems to concede this point for Dr. Green's book, it argues that Dr. Huang's NeTVCR is not protected because it is a device. Gov't Br. at 20-21, 39. But that makes no meaningful difference. What Dr. Huang and Alphamax seek to disseminate is their code, sometimes on its own, sometimes with a device containing a computer that can read and execute it as instructed by a customer. "[T]he fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Corley*, 273 F.3d at 447 ("A recipe is no less 'speech' because it calls for the use of an oven, and a musical score is no less 'speech' because it specifies performance on an electric guitar."). Code is no less speech because it is sold with a computer.

**Section 1201 burdens the right to receive information.** It is "well established that the Constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S.

23

753, 762 (1972). *See, e.g.*, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc.*, 425 U.S. 748, 757 (1976) (advertising); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (obscenity). Many people want to receive the information that Plaintiffs seek to offer. Security researchers, computer vendors, and consumers want to hear Green's speech about security flaws and circuvmention techniques. Consumers who lawfully possess videos want to hear Huang's speech about how to use circumvention to enable lawful fair use. Compl. ¶¶ 90-91, 100-101, 107. The rights of these audiences to receive information buttresses Plaintiffs' own First Amendment rights to gather and publish it.

For these reasons, the Court should reject the Government's expansive argument that Section 1201 does not implicate protected speech at all. Plaintiffs seek to engage in activity that falls within established First Amendment protections, and Section 1201 stands in the way of such activity. The statute thus is subject to traditional First Amendment review. As set forth below, Plaintiffs have properly alleged that Section 1201 cannot survive that review, whether generally or as applied to them. That is so for three independent reasons.

### B.   Plaintiffs Have Stated A Viable Claim That Section 1201 Is An Unconstitutional Speech-Licensing Regime

First, Section 1201 creates an unlawful speech-licensing regime. Congress recognized the threat that Section 1201 posed to lawful speech, H.R. Rep. No. 105-551 pt. 2, at 36 (1998), so it created a "fail-safe" to help reduce that risk. *See* 144 Cong. Rec. H10621 (1998), at H10617 (discussing the intent to ensure that "schools of thought in universities can still do research, and all of us can access information in a society that so prides itself on free speech and the free exchange of information.").[9] But the mechansim that Congress created—the triennial exemptions

---

[9] *See also, e.g.*, 144 Cong. Rec. H7074-03 (1998), at H7092; 144 Cong. Rec. E2136-02 (1998), at E2137; 144 Cong. Rec. H10615-01 (1998), at H10616; 144 Cong. Rec. S4884-01 (1998), at S4889

process administered by the Rulemaking Defendants—does not save the statute. To the contrary, that process is itself an unconstitutional burden on speech.

### 1.  Speech-Licensing Schemes Must Satisfy Strict Standards

Speech-licensing regimes are presumptively unconstitutional. *See Freedman v. Maryland*, 380 U.S. 51 (1965); *see, e.g.*, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) (ordinance requiring a permit to operate a business selling sexually explicit books and movies); *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) (regulation requiring a license to export encryption technology). As the Supreme Court has explained, a scheme making the "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS*, 493 U.S. at 226 (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). Such schemes create an unacceptably high risk that licensors will abuse their excessive discretion. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988).

Accordingly, a regulation "subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must include "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth*, 394 U.S. at 150-51; *accord Lakewood*, 486 U.S. at 770-72. In addition, any viable speech-licensing regimes must also employ procedural safeguards to limit the inherent dangers of a censorship system. Specifically, (1) the licensing decision must be prompt; (2) there must be prompt judicial review; and (3) when a censor denies a license, it must go to court to obtain a valid judicial order and, once there, must prove the gag is justified. *See Freedman*, 380 U.S. at 58-60.

### 2.  Section 1201 Is An Unconstitutional Speech Licensing Scheme

Plaintiffs have alleged more than enough facts to state a claim that Section 1201's

exemption process is an unconstitutional speech-licensing regime. Compl. ¶ 29. The statute begins with a blanket ban on a broad array of activities protected by the First Amendment. 17 U.S.C. § 1201(a)(1). Indeed, the Rulemaking Defendants themselves have acknowledged that the circumvention ban blocks many kinds of noninfringing speech and that the statute, as written, adversely affects legitimate activity. Compl. ¶¶ 41, 79. The only way that citizens can overcome that ban is to obtain the Government's permission before they are allowed to engage in activities. This is a textbook example of a speech-licensing regime.

That regime lacks the safeguards that the First Amendment requires. Compl. ¶¶ 29-42, 122-128. As an initial matter, the triennial rulemaking procedure lacks definite standards. The statute instructs that a class of copyrighted works is to be exempted from the ban on circumvention if "noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected." 17 U.S.C. § 1201(a)(1)(D). But it also provides that the Librarian of Congress "shall examine" several factors that speak to whether a use is infringing or is adversely affected by the ban, including "*such other factors as the Librarian considers appropriate.*" *Id.* § 1201(a)(1)(C)(i)-(v) (emphasis added). Based on this amorphous clause, the Rulemaking Defendants have denied and narrowed requested exemptions based on a variety of purported concerns that are wholly unrelated to copyright, such as environmental protection, potential risk of personal injury, and energy policy.[10] Likewise, they routinely use their discretion to favor some lawful speech over others.[11] Compl. ¶¶ 32-33. A licensing regime

---

[10] For example, in the 2015 Rulemaking, the Librarian delayed implementation of exemptions for security research and automobile repair because of their uncertain impact on, among other things, automobile pollution and energy policy. Compl. ¶ 33(e).

[11] For example, in the most recent rulemaking, the Rulemaking Defendants opted to prefer "documentary" film to "narrative" film, remixes of film over remixes of video games, multimedia e-books and classroom courses doing "close analysis" of film clips over other fair uses, and research on consumer devices over research on infrastructure. Compl. ¶¶ 36-42, 78-85.

creating such excessive discretion and is unconstitutional. *Lakewood*, 486 U.S. at 769-70 (could deny license as against "public interest").

The triennial rulemaking regime also lacks the required procedural protections. *See Freedman*, 380 U.S. at 58-60. The burden impermissibly falls on would-be speakers to vindicate their right to do so, and to carry that same burden every three years. Compl. ¶¶ 33(a), 35. A would-be speaker must wait up to three years to even ask for permission to speak, and then there are no deadlines requiring the Librarian to act in a timely fashion—in practice it takes between one and two years. *Id.* ¶¶ 29-35, 123; Willen Decl. Ex. 8 ("2010 Final Rule") at 43,826 (rulemaking commenced October 8, 2008; final rule published July 27, 2010). This is even more egregious than the licensing wait of four months that was unacceptable in *Freedman*. 380 U.S. at 55. Finally, the regime does not include a mechanism for swift judicial review. Compl. ¶ 124. (Indeed, the Government argues that APA review does not apply to the rulemaking. Gov't Br. at 42-44.) Any one of these many failings would render the regime unconstitutional, and even speech that is ultimately exempted through the rulemaking process is impermissibly burdened. *Freedman*, 380 U.S. at 58-59.

3. The Government Makes No Attempt to Defend 1201's Speech-Licensing Regime Under the Proper Standard

Implicitly recognizing that the exemption process cannot satisfy the *Freedman* factors, the Government argues that Section 1201 is not a speech-licensing regime at all. As discussed above, the Government's premise that the statute does not implicate Plaintiffs' speech is wrong. *See* Section II.A *supra*. But equally unavailing is the Government's argument that the Section 1201 rulemaking procedure is not a licensing regime because it does not issue exemptions on an individual basis, but rather considers exemption requests as to general classes of copyrighted works. Gov't Br. at 31-32. The Government offers no authority for this argument, and it does not

provide a valid basis for escaping *Freedman*. The Section 1201 rulemaking process determines what speech may take place, just like the licensing regime at issue in *Freedman*, and poses the same risks to freedom of speech. Indeed, far from saving the regime, the refusal to grant exemptions to particular individuals makes the exemptions process even more burdensome because it requires those who want a license to show not just that their own legitimate activities are burdened but also to produce evidence that a substantial number of *other people* are in the same position.

The Government's claim that a system that is content-neutral cannot be a prior restraint is similarly misplaced. Gov't Br. at 31, 34-36. First, the licensing regime created by Section 1201 is far from content-neutral: the Rulemaking Defendants exercise broad discretion in determining what forms of speech are to be permitted or forbidden, and they issue content-based exemptions every three years. *See* Section II.C.1 *infra*. Moreover, even content-neutral licensing schemes must include the *Freedman* safeguards. *See Lakewood*, 486 U.S. at 763-64; *FW/PBS*, 493 U.S. at 227 (plurality opinion) (city did not pass judgment on content of protected speech, but impermissibly had indefinite amount of time to issue license). In *Lakewood*, for example, the Supreme Court struck down a newsrack-permitting scheme that was neither facially content-based nor justified in terms of content. The court based its decision on the fact that licensing schemes create a heightened risk of discriminatory application even when facially neutral. *Lakewood*, 486 U.S. at 757-59.

The Government points to cases about "prior restraints" on the use of traditional public fora, including *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 516 (D.C. Cir. 2010), and *Wright v. City of St. Petersburg*, No. 15-10315, 2016 U.S. App. LEXIS 14957, at *15-17 (11th Cir. Aug. 15, 2016). *See* Gov't Br. at 31, 34. But regulations about traditional public fora, such

as public parks and sidewalks, are analyzed under a different rubric, often referred to as "time, place, and manner" analysis. This approach addresses "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). Section 1201's licensing regime is not a time, place, and manner regulation of a "particular place" administered by the government: it is a blanket ban on expressive activity, including on the ways that people may access their own property, which is allieviated only by an unduly rigid governmental licensing process.[12]

For all these reasons, Plaintiffs have alleged facts sufficient to show that the Section 1201 rulemaking is an unconstitutional licensing regime. Plaintiff have been directly harmed by that regime, as the exemptions that would have allowed them to speak were rejected or limited in ways that continue to restrict their activity. But even beyond Plaintiffs' individual experiences with the Section 1201 rulemaking process, that process—and the blanket circumvention ban to which it is integrally connected—cannot survive First Amendment scrutiny.[13]

## C.     Plaintiffs Have Stated Claims that Section 1201 Violates the First Amendment as Applied to Dr. Green, Dr. Huang, and Alphamax

As explained above, Plaintiffs' First Amendent rights are sigificantly inhibited by Section 1201's bans on circumvention and trafficking. Section 1201 prevents Dr. Green from both engaging in critical forms of research using his circumvention code and talking about that

---

[12] The Government's claim that the regulation cannot be a prior restraint because it is an exemption to a ban on speech is also inapposite. Gov't Br. at 31-34. *All* speech-licensing regimes exempt certain types of speech (at the government's choosing) while generally banning other, unlicensed speech—that is their very essence, and it does not render them permissible.

[13] To be clear, the rulemaking provision is not severable from the statute, because (a) the remaining portion of 1201(a)(1) would continue to be unconstitutional; (b) without the intended "fail-safe" mechanism for noninfringing speech, the ban would not function as Congress intended; and (c) Congress would not have enacted an absolute ban on circumvention without it. *See, e.g., Am. Fed'n of Gov't Emps. v. Pierce*, 697 F.2d 303, 307 (D.C. Cir. 1982) (general prohibition not severable from its fail-safe mechanism).

research, including publishing the relevant code. The law likewise prevents Dr. Huang and Alphamax from circumventing HDCP in order to remix HDMI videos and to distribute code and documentation for others to circumvent HDCP in the furtherance of lawful speech. *See* Background and Section II.A *supra*. These prohibitions violate the First Amendment.

     1.   <u>Section 1201 Is Subject to Strict Scrutiny</u>

Content-based speech restrictions are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-27, 2231 (2015). Both the circumvention and trafficking prohibitions in Section 1201 are content-based: they "defin[e] regulated speech" by "particular subject matter" and by "its function and purpose." *Id*. at 2227.

The anti-trafficking provision bans speech about the particular subject matter (or for the purpose) of circumventing TPMs, while allowing speech on every other subject matter and purpose. The provision's selective ambit "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (citation omitted). To determine whether Dr. Green's proposed book or Dr. Huang and Alphamax's NeTVCR code violate the anti-trafficking rule, one would have to examine their contents.

Liability under the circumvention ban likewise hinges on the content of the speech resulting from circumvention. Indeed, the statute on its face draws various content-based distinctions, exempting certain kinds of "reverse engineering" and "encryption research," (17 U.S.C. § 1201(f), (g)), but not others, and overtly regulating speech based on its form and purpose. Section 1201 also requires the Rulemaking Defendants, in determining which activities to exempt by regulation, to "examine" the ban's impact on "the availability for use of works for nonprofit archival, preservation, and educational purposes" and on "criticism, comment, news reporting, teaching, scholarship, or research." 17 U.S.C. § 1201(a)(1)(C)(ii) & (iii).

Unsurprisingly, therefore, the line between which instances of circumvention are unlawful and which are lawful is almost entirely content-based. Compl. ¶¶ 37-42; Willen Decl. Ex. 1 (2015 Final Rule) at 65,946 (Rulemaking Defendants will refine an exemption "by reference to the use or user"). Some examples include exemptions for use of video clips in "documentary" film but not "narrative" film; for ebooks offering close media critique but not others; for research on some devices but not others; and for educational uses at universities but not grade schools or adult education programs. Compl. ¶¶ 37-42. In short, the statute "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen*, 134 S. Ct. at 2531 (citation omitted).

The Government cannot shield Section 1201 from First Amendment scrutiny by appealing to its provenance as a copyright law. As the Supreme Court has made clear, laws that disturb the traditional contours of copyright must survive independent First Amendment scrutiny. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003); *Golan v. Holder*, 132 S. Ct. 873, 890 (2012); *see aso* Neil Netanel, *First Amendment Constraints on Copyright After* Golan v. Holder, 60 UCLA L. Rev. 1082, 1086 (2013) ("Following *Golan* and *Eldred*, neither Congress nor the courts may eviscerate copyright law's idea/expression dichotomy or fair use privilege without running afoul of the First Amendment."). Notwithstanding the Governments' claim (Gov't Br. at 26-27), Section 1201 does precisely that—the statute does not adequately accommodate fair use or the public's right to use non-copyrightable facts contained in copyrighted works. Instead, Section 1201 prevents Plaintiffs, and many others, from engaging in numerous lawful uses, from extracting excerpts from DVDs, to researching security vulnerabilities in everyday devices, to making books more accessible to the disabled, to building new and innovative tools to comment on affairs of the day. Compl. ¶¶ 39(a)-(f), 41(a)-(i), 42, 81-82, 108-110. Indeed, according to the

Department of Justice, enforcement of Section 1201 does not require any nexus to copyright infringement at all. Compl. ¶ 26 (citing U.S. Dep't of Justice, Prosecuting Intellectual Property Crimes, at 4-5).

Because it undermines copyright law's speech-protecting accommodations, Section 1201 is subject to ordinary First Amendment standards. Here, because the law is content-based, those standards require strict scrutiny.

2. Section 1201 Cannot Survive Strict Scrutiny

Under strict scrutiny, restrictions on speech can survive only upon a showing that they are "the least restrictive means of achieving a compelling state interest." *McCullen*, 134 S. Ct. at 2530; *see also Reed*, 135 S. Ct. at 2231 (strict scrutiny requires "the Government toprove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest" (quotations and citations omitted)). The Government cannot meet this standard here. The Government argues that the purpose of Section 1201 is to "ensur[e] adequate legal protections for copyrighted content" and "discourag[e] digital piracy." Gov't Br. at 25, 35. But the statute is not narrowly tailored to advance that purpose, and there are far less restrictive means to achieve these goals.

Most obviously, the ordinary enforcement of copyright law protects the copyrighted computer software and videos that Plaintiffs would be accessing without unduly restricting protected speech in the same way that Section 1201 does. Copyright law is a powerful tool: it includes civil liability (with statutory damages) and criminal penalties. 17 U.S.C. §§ 501, 504, 506. But it preserves the robust fair use rights that keep copyright law in balance with the First Amendment. *See Golan*, 132 S. Ct. at 890. And it "leaves breathing room for innovation and a vigorous commerce" by "absolv[ing] the equivocal conduct of selling an item with substantial lawful as well as unlawful uses." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932-33

(2005); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442, 456 (1984). The Government has not—and could not at this initial stage of the case—come close to meeting its burden of showing that these existing tools are not a less restrictive alternative way to advance the purposes supposedly furthered by Section 1201.

The Government argues merely that Plaintiffs' publication of circumvention technologies might pose some "risk" that an independent third party will choose to infringe copyright law using Plaintiffs' technologies. Gov't Br. at 41. It does not say how that might happen or make any effort to quantify that risk. In any event, if it ever materialized, that risk could be addressed by imposing copyright liability on those who might misuse Plaintiffs' technology to derogate the rights of copyright holders. It does not justify restricting Plaintiffs themseves from engaging in activity protected by the First Amendment. Indeed, it is well settled that the "prospect of crime . . . , by itself does not justify laws suppressing protected speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002). And "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30.

Indeed, the application of Section 1201 to Dr. Green's book and research *undermines* the Government's interest in "the progress of science and the useful arts" by depriving the public of Dr. Green's insights regarding how to conduct security research and design more secure systems. Likewise, the application of Section 1201 to noninfringing expressive activities using HDMI videos undermines the government's interest in cultural progress by diminishing the universe of new, fair use expression.

Plaintiffs have adequately alleged that Section 1201 cannot survive strict scrutiny.

3. <u>Even If The Anti-Trafficking And Anti-Circumvention Rules Were Not Content-Based, They Fail Intermediate Scrutiny</u>

Plaintiffs have alleged facts sufficient to show that Section 1201, as applied to them, cannot survive intermediate scrutiny either. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). A government regulation is only:

> sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id*. at 377; *see also, e.g., Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994).

Simply put, a burden on speech must be "narrowly tailored to serve a significant governmental interest." *McCullen*, 134 S. Ct. at 2534; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). This requirement ensures "a close fit between ends and means." *McCullen*, 134 S. Ct. at 2534. The burden on speech must be "no greater than is essential" to advance the government's interest. *Edwards v. District of Columbia*, 755 F.3d 996, 1001-02 (D.C. Cir. 2014) (quoting *O'Brien*, 391 U.S. at 377). The prohibitions must "target[] and eliminate[] no more than the exact source of the 'evil' [they] seek to remedy." *Boardley*, 615 F.3d at 522-23 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

The Government bears the burden of proving narrow tailoring. *Edwards*, 755 F.3d at 1003. To do so, it must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664 (plurality op.). It cannot rest on "mere speculation or conjecture"; instead, substantial evidence" is required. *Edwards*, 755 F.3d at 1003 (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-

71 (1993)). Because the anti-trafficking and anti-circumvention rules target far "more than the exact source of the 'evil' [the laws] seek to remedy," *Boardley*, 615 F.3d at 522-23 (quoting *Frisby*, 487 U.S. at 485), the Government cannot meet its burden here.

Nor can it show that Section 1201 burdens no more than necessary to deter copyright infringement. *Boardley*, 615 F.3d at 522-23 (quoting *Frisby*, 487 U.S. at 485). The Government merely asserts that Plaintiffs' publication of circumvention technology might make the anti-trafficking provision less effective and, therefore, could "interfer[e] with the online market for copyrighted works by deterring copyright owners from making works available online at all." Gov't Br. at 41. This claim is not supported by any factual allgations, and it defies logic. There is no online market for the software embedded in toll-collection systems, industrial-grade encryption modules, or the other subjects of Dr. Green's research. Indeed, software piracy is unlikely to be a problem when software is integrated with specific hardware—to benefit from a copy of the software, a person needs the corresponding device, something they cannot simply download. As for NeTVCR, many applications relate to video output of Blu-ray discs, video game discs, and other physical media played via an HDCP-enabled device, which would have no effect on copyright owners' decision to make works available online. *See, e.g.*, Compl. ¶ 100.

The Government further undermines its own argument by pointing to the permanent exemptions to the bans on circumvention and trafficking. *See* Gov't Br. at 29-30. Not only are these extremely narrow exemptions insufficient to accommodate fair use and protected speech, they demonstrate that Section 1201 is not narrowly tailored. "[A]n arbitrary exemption from or 'underinclusiveness of the scheme chosen by the government'" can show "the asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Edwards*, 755 F.3d at 1007. For example, a limit on posting signs on lamposts was not narrowly tailored

where the government could not justify treating signs for "events" more favorably than signs for "non-events." *Act Now to Stop War & End Racism Coalition v. District of Columbia*, 905 F. Supp. 2d 317, 332 (D.D.C. 2012); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (exceptions from speech limits "may diminish the credibility of the government's rationale for restricting speech in the first place"); *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (holding a limit on door-to-door solicitation was not narrowly drawn where it exempted similarly situated solicitors). The existence of these statutory exemptions, which enable a handful of noninfringing uses, undermines the argument that it is proper for the bans on circumvention and trafficking to sweep up all other noninfringing uses.

In short, Plaintiffs have stated a claim that the application of Section 1201 to their speech activities violates the First Amendment regardless of what level of scrutiny is applied.

### D.    Section 1201 Is Unconstitutionally Overbroad

Section 1201 is not just unconstitutional as applied to Plaintiffs' own activities. As set forth in the Complaint, the statute's sweeping prohibitions on circumvention and trafficking burden a wide range of legitimate First Amendment activity. Compl. ¶¶ 37-42, 48-75, 79-87, 100, 101, 107, 109, 110. This renders Section 1201 unconstitutionally overbroad. *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (striking down animal cruelty statute as overbroad).

The Government asserts that the overbreadth doctrine may only be applied to traditional forms of speech like picketing or demonstrating. Gov't Br. at 22. That is not the rule. *See e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (overbreadth applies "where conduct and not merely speech is involved"). For example, the Supreme Court has recently applied the doctrine to overturn a statute prohibiting "visual [and] auditory depiction[s]" of "conduct in which a living animal is intentionally harmed"—even though the statute exempted any depiction that had

"serious religious, political, scientific, educational, journalistic, historical, or artistic value." *Stevens*, 559 U.S. at 468, 477-87.

Plaintiffs also identify numerous examples of third-party speech impermissibly burdened by the challenged regulations, examples that the Government simply ignores. Gov't Br. at 24-25. While such specificity is not required—overbreadth is often established by examining *hypothetical* applications of a statute (*see Stevens*, 559 U.S. 460)[14]—the Complaint identifies numerous specific categories of impermissibly burdened speech. Those include: narrative films (Compl. ¶¶ 37-38); critical commentary on a large portion of a political debate, sporting event, or movie (*id.* ¶ 50); educational uses (*id.* ¶¶ 39(a-b), 41(d)); format- and space-shifting (*id.* ¶¶ 39(d-e), 57-64); analysis of medical data from medical devices (*id.* ¶ 41(i)); and at least six types of remix video expression particularly facilitated by NeTVCR (*id.* ¶ 100(a-f)). Plaintiffs likewise allege that the ban on trafficking impermissibly impedes these forms of speech, and the dissemination of knowledge and technologies for engaging in such speech. *Id.* ¶¶ 42, 100.

Continuing in the same vein, the Government incorrectly argues that other than their fair use claims "Plaintiffs fail to identify a single circumstance where the First Amendment would require an exception to" the challenged provisions. Gov't Br. at 30.[15] That simply is not so; Plaintiffs' Complaint is replete with examples. Compl. ¶¶ 39(a)-(f), 41(a)-(i). Nor can the Government support its conclusory statement that the "vast majority" of applications of Section

---

[14] By ignoring the traditional contours of direct and secondary copyright infringement, Section 1201 creates a broad hypothetical range of unconstitutional applications in addition to its actual burdens on real instances of protected activity. *See* Section II.C *supra*; Compl. ¶¶ 23, 42, 113, 116.

[15] The Government appears to suggest that fair use is not a right protected by the First Amendment. Gov't Br. at 26. But, as discussed above, the Supreme Court in *Golan* held that fair use embodies the First Amendment for purposes of copyright law. *Golan*, 132 S. Ct. at 890. Where fair use is burdened, therefore, the First Amendment is burdened. And if fair uses are impeded, as they are by Section 1201, that triggers First Amendment scrutiny.

1201 target infringing activity. Gov't Br. at 25-30. Some may, but the thousands of persons who asked the Rulemaking Defendants to issue exemptions in 2015 provide strong countervailing evidence of the widespread impact of the ban on circumvention on noninfringing speech. Compl. ¶¶ 36-41.

A law that outlaws "everything already illegal plus publishing newspapers" could not be defended against an overbreadth challenge by arguing that it is constitutional in *most* of its applications (on the basis that many things are illegal and can be prosecuted without implicating the First Amendment). Instead, a court must look at the actual effect of the challenged law. *See City of Los Angeles v. Patel,* 135 S. Ct. 2443, 2451 (2015); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894-95 (1992). Here, Section 1201's overbreadth must be evaluated by focusing on the speech that would have been lawful to create and disseminate prior to its enactment, but is now forbidden. Plaintiffs have plausibly alleged that the universe of speech burdened by the challenged provisions consists substantially of noninfringing speech that the First Amendment protects. Compl. ¶¶ 39(a)-(f), 41(a)-(i), 114.

The Government's motion to dismiss Plaintiffs' overbreadth claims should be denied.

### E.   *Corley* Does Not Defeat Plaintiffs' Claims In This Case

To avoid grappling with Section 1201's numerous defects, the Government repeatedly cites the Second Circuit's 2001 decision in *Corley.* That ruling, of course, is not binding here, but in any event, the Second Circuit's conclusions regarding Section 1201 and fair use are distinguishable in several important ways.

First, neither the parties nor the court in *Corley* considered whether and how Section 1201's exemption procedure operates as a speech-licensing regime. Indeed, when that case was filed, the triennial rulemaking regime had yet to be implemented, and Section 1201(a)(1)'s ban on acts of circumvention was not at issue. Here, however, the defects of the speech-licensing

regime are central to Plaintiffs' challenge. *See* Section II.B *supra*. And resolving that question in Plaintiffs' favor would foreclose one of the Government's principal arguments in defense of the law. Gov't Br. at 30 (arguing that the triennial rulemaking process provides a mechanism to address fair use considerations).

Second, *Corley* emphasized that the question whether the DMCA impairs fair uses was "far beyond the scope" of its ruling because "Appellants do not claim to be making fair use of any copyrighted materials and nothing in the injunction [at issue] prohibits them from making such a fair use." 273 F.3d at 458-59. Here, as set forth in the Complaint and above, Plaintiffs (and the public at large) are stymied in their ability both to make fair uses and to enable others to make fair uses. Unlike the plaintiffs in *Corley*, Plaintiffs here have presented concrete examples of how, despite the Government's contrary argument (Gov't Br. at 29), Section 1201(a) is not being interpreted to preserve fair use or free speech rights.

Third, *Corley* was decided without adequate guidance from the Supreme Court regarding the constitutional underpinnings of fair use. The *Corley* defendants argued that Section 1201's trafficking ban impermissibly burdens fair use. In rejecting that claim, the Second Circuit began by observing that the Supreme Court had not clearly stated that fair use is constitutionally required—a claim the Government mistakenly repeats here. Gov't Br. at 28-29 (citing *Corley*, 273 F.3d at 459). Two years after *Corley* was decided, however, the Supreme Court did just that. *See Eldred,* 537 U.S. at 221; *Golan* 132 S. Ct. at 890. Thus, the Supreme Court has superceded a core premise of *Corley's* understanding of the relationship between fair use and the First Amendment.

Fourth, *Corley* was simply incorrect in its conclusion that fair use does not encompass a right to copy "by an optimum method or in [an] identical format of the original." 273 F.3d at 459.

Fair use encompasses a right to copy as necessary to accomplish a transformative purpose; if an optimum method is necessary to accomplish that purpose, then it is protected by fair use. *See Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602-03 (9th Cir. 2000); *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992). Even the Rulemaking Defendants acknowledge that there are numerous categories of fair use video creations for which no alternative means of speech exist because they depend upon access to high-quality source material that is typically distributed subject to access controls. Compl. ¶¶ 39-41.

Finally, *Corley* rested in part on its conclusion that evidence of the impact of Section 1201 on fair use was "scanty." 273 F.3d at 459. Nearly two decades later, however, there is ample evidence of that impact. The Complaint identifies numerous forms of expression burdened by the challenged provisions that are incontrovertibly protected speech, from documentary and narrative films, to student education, to translation of e-books into an accessible format, to addition of commentary to videos, to Dr. Green's proposed book describing flaws in computer systems. Compl. ¶¶ 37-42, 48-75, 79-87, 100, 101, 107, 109, 110. The speech at issue does not infringe copyright—either because it is a fair use or because it relies only upon factual information in the copyrighted work—yet Section 1201 prevents it. *See id.* ¶¶ 23, 37-42, 50, 56, 62, 66, 74, 103-106. The Second Circuit did not have the benefit of these facts.

The Government also refers to two early district court cases, *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D Cal. 2002), and *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal 2004), but those cases suffer from similar defects. Like *Corley*, neither case considered Section 1201's onerous speech-licensing regime rulemaking procedure. *Elcom* followed *Corley* in concluding that is was unclear whether fair use was constitutionally required, and concluded that Section 1201 does not "eliminate" fair use but simply incidentally burdens it.

203 F. Supp. 2d 1131-33. That is not true here. Section 1201 prevents Plaintiffs from making fair uses of works they have lawfully acquired. Dr Green, for example, has no other way to complete his research; circumvention is essential to his ability to reproduce and comment on the original software. *Elcom* assumed that the lawful possessor of a work was always able to access it, *id.* at 1131, but that is not true for much of the software in modern-day devices, for which circumvention is required to even view the copyrighted work at all. *See* Green Decl. ¶¶ 5-9.

The district court in *321 Studios* had the benefit of *Eldred*'s guidance, but *Golan* had not yet been decided. Without the benefit of *Golan*, the court rested its analysis on *Eldred*'s initial conclusion that "copyright's built-in free speech safeguards" are generally adequate to address First Amendment concerns where a party wishes to use a copyrighted work. The court followed *Corley* to hold that Section 1201's restrictions on fair use are acceptable as long as fair use is still theoretically possible (even if it is not "as easy, as exact, or as digitally manipulable"). 307 F. Supp. 2d at 1102. As *Golan* clarified, though, the analysis must begin with a different question: whether Section 1201 interferes with traditional contours of copyright—like fair use—such that those contours cannot serve their essential accomodating role. 132 S. Ct. at 891-92.

Finally, subsequent circuit court decisions demonstrate that the relationship between Section 1201 and fair use is far from settled. Courts have split as to how Section 1201 interacts with copyright's traditional contours. The Federal Circuit requires a reasonable relationship between circumvention and copyright infringement. *The Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004). The Ninth Circuit does not, but has left the door open to a fair use defense. *MDY Indus., LLC, v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010). Meanwhile, the Sixth Circuit has narrowly construed access controls to avoid penalizing circumvention that had no connection to infringement, and one judge would have held that only

circumvention for the purpose of infringement is actionable. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004); *id.* at 552 (Merritt, J., concurring). Thus, *Corley*'s extreme approach and that of its district court progeny do not represent a consensus among the courts. This case offers an overdue opportunity to revisit the statute and resolve that confusion with new facts and new Supreme Court guidance.

## III.   PLAINTIFFS HAVE STATED A VIABLE APA CLAIM

The APA is a "bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated" by the Government. *Intertape Polymer Corp v. Nat'l Labor Relations Bd.*, 801 F.3d 224, 242 (4th Cir. 2015) (quoting 92 Cong. Rec. 2149 (1946) (Sen. McCarran)). Under the APA, courts must set aside "agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs allege in detail that the Rulemaking Defendants violated the APA in denying or limiting the exemptions from Section 1201's circumvention ban that would have covered their proposed activities. Compl. ¶¶ 36-74. Without addressing those claims on the merits, the Government argues that the APA does not apply to the Librarian's rulemaking determinations under Section 1201(a)(1)(C) because, in the Government's view, the Library of Congress is not an "agency" for purpose of the APA.

This argument fails. The APA defines "agency" as "each authority of the Government of the United States." 5 U.S.C. § 701(b)(1). The Library meets this definition: it is an authority that exercises the power on behalf of the United States Government. Its head, the Librarian of Congress, "is appointed by the President with advice and consent of the Senate, 2 U.S.C. § 136, and is subject to unrestricted removal by the President." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341 (D.C. Cir. 2012); *see also ELTRA Corp. v. Ringer*, 579 F.2d 294, 300 (4th Cir. 1978) ("the Librarian is an Officer of the United States").

42

Given that the Government does not claim that the Library is not an authority of the United States, its argument must rest on the idea that the Library is part of "the Congress," which is excluded from the definition of "agency." 5 U.S.C. § 701(b)(1)(A)). But that cannot be right in this context. Instead, the Library is a "hybrid character": "The Librarian performs certain functions which may be regarded as legislative (*i.e.*, Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative." *ELTRA*, 579 F.3d at 301. Thus, even if the Library is properly considered to be the Congress for certain purposes—such as when it regulates its own workplace[16]—it has a different character here. In granting exemptions from the anti-circumvention law, the Library is exercising substantive rulemaking authority. And, as the D.C. Circuit has held, when the Library "promulgate[s] copyright regulations," it "is undoubtedly a 'component of the Executive Branch.'" *Intercollegiate Broad.*, 684 F.3d at 1341-42. Indeed, the Library itself has recognized that it is not part of Congress in connection with its Section 1201 powers: "the Librarian and the Register conduct rulemaking proceedings as an independent agency. Congress exercises no appointment or removal authority over the Librarian or the Register and has no direct influence on the DMCA rulemaking process." *Tracfone Wireless, Inc. v. Billington*, No. 06-cv-22942, ECF No. 8-1, at 26-27 (S.D. Fla. Feb. 5, 2007). As such an agency, the Library's rulemaking decisions under

---

[16] *See* Gov't Br. 42-43 (citing *Ethnic Emps. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985); *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984); *Terveer v. Billington*, 34 F. Supp. 3d 100, 122 n.10 (D.D.C. 2014)). Nor can the Government rely on dicta in *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 145 (1980) suggesting that the Library of Congress is not an agency for purposes of FOIA. Whether the Library might be part of Congress in a capacity where it exercises no executive authority has no bearing on whether it is—or constitutionally could be—part of Congress purposes of the Section 1201 rulemaking. *Nat'l Ass'n of Broads. v. Librarian of Cong.*, 146 F.3d 907 (D.C. Cir. 1998), is even less helpful. That case held that the Librarian's royalty distribution decisions are not subject to APA review, but only because Congress repealed a law that had expressly provided APA review and replaced it with a different standard. *Id.* at 917-19. Nothing like that happened here.

Section 1201(a)(1)(C) are subject to APA review.

The DMCA's legislative history confirms that conclusion. The House Commerce Committee Report states expressly that the Section 1201 rulemaking proceeding must be "consistent with the requirements of the Administrative Procedures [sic] Act." H.R. Rep. No. 105-551, pt. 2, at 37. And in signing the law, President Clinton explained clearly that "the Copyright Office is, for constitutional purposes, an executive branch entity." Presidential Statement on Signing the Original Millennium Copyright Act, 34 Weekly Comp. Pres. Doc. 2168 at 1 (Oct. 28, 1998).

The Government argues that the APA's express application to the Register of Copyright (17 U.S.C. § 701(e)) means that it does *not* apply to the Library of Congress. Gov't Br. 43-44. But this only further undermines the Government's position. The Register (who heads the Copyright Office) is appointed and supervised directly by the Librarian of Congress. 17 U.S.C. § 701(a). And Section 1201 directs the two bodies to work in tandem in the rulemaking process: the Librarian makes its decisions "upon the recommendation of" the Register. 17 U.S.C. § 1201(a)(1)(C). This close relationship confirms that Congress intended the APA to apply to the outcome of Section 1201 rulemaking process.[17]

Finally, any other conclusion would raise grave constitutional questions. "The structure of the Constitution does not permit Congress to execute the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). But that is exactly what would happen under the Government's argument. The Library, acting as part of "the Congress," would be exercising substantive rulemaking power under a federal statute that imposes civil and criminal liability on those who violate it. That is a

---

[17] While the APA limits judicial review to "final agency action," 5 U.S.C. § 704, Plaintiffs bring their APA claims against both the Register and the Librarian, Compl. ¶¶ 14, 150-162, and the Government concedes that the Librarian's decisions are final, Gov't Br. at 44-45.

quintessentially executive function. *See Intercollegiate Broad.*, 684 F.3d at 1341-42 (explaining that the powers to "promulgate copyright regulations" and "to apply the statute to affected parties" are "ones generally associated in modern times with executive agencies rather than legislators"); *see also ELTRA*, 579 F.2d at 301 (concluding that "the operations of the Office of Copyright are executive" (citing *Buckley v. Valeo*, 424 U.S. 1 (1976))).

Under our system of separation of powers, executive powers such as these cannot be vested in the Congress. *See Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 269-77 (1991) ("If the power is executive, the Constitution does not permit an agent of Congress to exercise it."); *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928) ("[T]he legislature cannot engraft executive duties upon a legislative office."). And the Court must "construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001). There is an easy—and textually sound—way to do that: the Library should be understood as an "agency" for the purposes of the APA when it promulgates rules under Section 1201. Because judicial review of the Librarian's rulemaking determinations is available under the APA, the Government's motion to dismiss this claims fails.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to dismiss.

Dated: October 18, 2016

Respectfully submitted,

*/s/ Brian M. Willen*
Brian M. Willen

Corynne McSherry (CA SBN 221504)
Kit Walsh (CA SBN 303598)
Adam Schwartz (CA SBN 309491)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

Brian Willen (D.C. Bar No. 490471)
WILSON SONSINI
    GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas
40th Floor
New York, NY 10019
(212) 999-5800

Stephen Gikow (CA SBN 302484)
Lauren Gallo White (CA SBN 309075)
WILSON SONSINI
 GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000

*Counsel for PlaintiffsMatthew Green,
Andrew Huang, and Alphamax, LLC*