BRIAN M. WILLEN (D.C. BN 490471)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Tel. (212) 999-5800

LAUREN GALLO WHITE (CA SBN 309075)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Tel. (415) 947-2000

CORYNNE MCSHERRY (CA SBN 221504)
KIT WALSH (CA SBN 303598)
ADAM SCHWARTZ  (CA SBN 309491)
ELECTRONIC FRONTIER
  FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel. (415) 436-9333

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| Matthew Green, Andrew Huang, and Alphamax, LLC, <br><br> Plaintiff, <br><br> v. <br><br> U.S. Department Of Justice, William Barr, Library Of Congress, Carla Hayden, U.S. Copyright Office, and Karyn A. Temple, <br><br> Defendants. | Civil Case No. 16-cv-01492-EGS <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65(a)** <br><br> Judge:  Emmet G. Sullivan |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................2

    A.    Section 1201 Curtails Plaintiffs' Research, Communications, and Commercialization Efforts................................................ 2

    B.    Section 1201's Triennial Rulemaking Process ...................................... 3

    C.    Dr. Matthew Green ................................................................ 6

        1.    *To Perform His Important Security Research, Dr. Green Must Be Able to Circumvent Access Controls on the Works He Studies*.......................... 6

        2.    *For His Research to Be Effective, Dr. Green Must Be Able to Discuss How To Circumvent Access Controls and Publish His Results* ................ 7

    D.    Dr. Andrew "bunnie" Huang and Alphamax, LLC ................................ 9

        1.    *To Enable New Types of Noninfringing Video Transformations, Dr. Huang and Alphamax Must* Develop *Tools that Circumvent Technological Protection Measures to Access Encrypted Video Streams* ................................................................ 9

        2.    *To Commercialize New Types of Noninfringing Video Transformations, Dr. Huang and Alphamax Must* Distribute *Technology for Circumventing HDCP*...................................... 11

    E.    Dr. Huang's Unsuccessful Efforts to Secure an Exemption From the Circumvention Ban ........................................................... 13

    F.    Dr. Green's Temporary and Partial Exemption From the Circumvention Ban…………………………………………………………14

    G.    Procedural History ............................................................. 15

    H.    Statement of Requested Relief.............................................. 16

ARGUMENT ....................................................................................17

  I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.. 18

    A.    Section 1201's Anti-Trafficking Provision Violates The First Amendment As Applied to the Publication of Dr. Green's Book.................................. 19

B. Section 1201 Violates the First Amendment As Applied to Dr. Huang and Alphamax's Creation and Commercialization of NeTVCR ................................. 22

 1. *Section 1201's Anti-Circumvention Provision Prohibits the Development of NeTVCR Without Serving the Government's Interests* ... 22

 2. *The Triennial Rulemaking Process Demonstrates that Section 1201's Anti-Circumvention Provision Violates Dr. Huang and Alphamax's First Amendment Rights* ........................................................................... 25

 3. *Section 1201's Anti-Trafficking Provision Prohibits the Commercialization of NeTVCR Without Serving the Government's Interests* ................................................................................................... 26

C. Plaintiffs Are Likely to Prevail on All of Their Claims ........................................ 27

II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY WITHOUT PRELIMINARY THE RELIEF…………............................................................................... 28

III. THE BALANCE OF EQUITIES FAVORS AN INJUNCTION…………….................. 29

IV. THE PUBLIC INTEREST WOULD BE SERVED BY AN INJUNCTION……………. 31

CONCLUSION ........................................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)...............................................................................20

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982).................................................................................23

*Boardley v. U.S. Dep't of Interior*,
615 F.3d 508 (D.C. Cir. 2010).............................................................20, 22

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).................................................................................24

*Centro Tepeyac v. Montgomery Cty.*,
722 F.3d 184 (4th Cir. 2013) ..................................................................30

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004)................................................................17

*Citizens United v. Fed. Election Comm'n.*,
558 U.S. 310 (Fed. Cir. 2010).................................................................32

*Edenfield v. Fane*,
507 U.S. 761 (1993).................................................................................21

*Edwards v. Dist. of Columbia*,
755 F.3d 996 (D.C. Cir. 2014).................................................................19

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................2, 28

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978).............................................................................9, 23

*Frisby v. Schultz*,
487 U.S. 474 (1988)............................................................................20, 22

*FTC v. CCC Holdings Inc.*,
No. CV 08-2043 (RMC), 2009 WL 10631282 (D.D.C. Jan. 30, 2009)......................6

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)..............................................................28, 31

*Higher Soc'y of Ind. v. Tippecanoe Cty.*,
  858 F.3d 1113 (7th Cir. 2017) ..............................................................26

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)..............................................................................20

*Lee v. Weisman*,
  505 U.S. 577 (1992)..............................................................................32

*McCullen v. Coakley*,
  134 S. Ct. 2518 (2014)......................................................................20, 21

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)..............................................................................23

*Minney v. United States OPM*,
  130 F. Supp. 3d 225 (D.D.C. 2015) ......................................................32

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................................................31

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971)..............................................................................28

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016)..................................................28, 29, 30, 31

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
  699 F.3d 1 (1st Cir. 2012)......................................................................32

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..............................................................................24

*Stanley v. Georgia*,
  394 U.S. 557 (1969)..............................................................................20

*Tyndale House Publishers, Inc. v. Sebelius*,
  904 F. Supp. 2d 106 (D.D.C. 2012) ......................................................32

*United States v. O'Brien*,
  391 U.S. 367 (1968)..............................................................................19

*United States v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000)..............................................................................26

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d. Cir. 2001)..................................................................23

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)..................................................................................................20

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)..................................................................................................20

*\*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)...........................................................................................17, 28, 29, 31

## Statutes

17 U.S.C. § 107.....................................................................................................................23

17 U.S.C. § 501.....................................................................................................................27

17 U.S.C. § 1201....................................................................................................... *passim*

17 U.S.C. § 1203.....................................................................................................................3

17 U.S.C. § 1204..................................................................................................................3. 32

Administrative Procedure Act........................................................................................15, 27

Copyright Act.....................................................................................................................1, 17

## Other Authorities

77 Fed. Reg. 65,260 ..............................................................................................................4

83 Fed. Reg. 54,010 (Oct. 26, 2018)...................................................................................13

U.S. CONST. art. I, § 8, cl. 8................................................................................................30

## INTRODUCTION

Plaintiffs have stated a viable claim that Section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a) violates the First Amendment as applied to their intended conduct. Order on Mot. To Dismiss (ECF No. 25) ("MTD Order"). Plaintiffs look forward to proving up their claims as this litigation proceeds. In the meantime, however, the risk of criminal liability under Section 1201 has stymied Plaintiffs' ability to engage in protected research, development, and publication. Accordingly, Plaintiffs ask the Court to preliminarily enjoin the Government from enforcing Section 1201's anti-circumvention and anti-trafficking provisions against them.

Plaintiff Matthew Green seeks to publish a book on computer security research that would teach readers—using instructions written in English and in software languages—how to circumvent technological protections in order to discover and fix security flaws in computer systems. Plaintiffs Andrew "bunnie" Huang and Alphamax, LLC ("Alphamax") seek to research, develop, use, and publish software and hardware for transforming and manipulating videos that requires them to work around a video content protection measure called HDCP. This Court has held that these activities are protected by the First Amendment and impeded by Section 1201, which broadly prohibits anyone from "circumventing" measures used to control access to copyrighted works, 17 U.S.C. § 1201(a)(1), or "trafficking" in "technology" that can be used to circumvent those access controls, 17 U.S.C. § 1201(a)(2).

In light of this Court's prior ruling and the facts set out in the accompanying declarations, Plaintiffs are likely to succeed on the merits of their claim that the threat of enforcement of Section 1201 is interfering with their protected First Amendment rights to access and analyze information, to publish scholarly and creative writings and videos, and to publish instructions for

circumvention, including software instructions. Such interference "unquestionably constitutes irreparable injury" justifying an injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Further, the harms inflicted on Plaintiffs by allowing the threat of prosecution to block them from speaking outweigh any harm that the government might suffer if it were enjoined from enforcing the law against Plaintiffs. Finally, continuing to hold Section 1201 over Plaintiffs' heads is contrary to the public's interest in receiving the benefits of Dr. Green, Dr. Huang, and Alphamax's important work and in ensuring that individuals like them are free to engage in constitutionally protected activity.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Section 1201 Curtails Plaintiffs' Research, Communications, and Commercialization Efforts

In this case, Plaintiffs challenge two distinct but related provisions of the Section 1201 of the DMCA: (1) 17 U.S.C. § 1201(a)(1),[1] which prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected [by copyright];" and Section 1201(a)(2), which prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that … is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title" or "is marketed … for use in circumventing." 17 U.S.C. § 1201(a)(2)(A), (C).[2]

---

[1] The anti-circumvention provision provides in full: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

[2] The anti-trafficking rule provides in full: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

Violation of either the anti-circumvention or anti-trafficking provision gives rise to a private right of action. 17 U.S.C. § 1203. Moreover, if there is a commercial purpose, a violation of either provision is criminally punishable by up to $500,000 in fines and imprisonment up to five years. 17 U.S.C. § 1204(a). Both prohibitions threaten legitimate commercial applications, security research, and other fair uses that rely on bypassing security measures in order to gain access to copyrighted video streams or computer code.

### B.     Section 1201's Triennial Rulemaking Process

When Congress enacted Section 1201, it recognized that the statute's remarkable breadth could adversely impact a range of legitimate and socially beneficial activity. But, rather than narrowing the law to address that problem, Congress included an unusual provision directing the Librarian of Congress to conduct a rulemaking process every three years to determine "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under this title of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C)(B). The statute then instructs the Librarian to

> publish any class of copyrighted works for which the Librarian has determined . . . that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

---

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2).

*Id.* § 1201(a)(1)(D).[3]

Exemptions from the anti-circumvention provisions lapse every three years and must be requested again in order to be renewed.[4] Renewal is not guaranteed. Willen Decl., Ex. 4 (2018 Recommendation) at 18. In fact, Defendants Library of Congress, Carla Hayden, U.S. Copyright Office, and Karyn A. Temple (collectively "Rulemaking Defendants") have failed in the past to renew several previously granted exemptions, including an exemption to allow mobile phone owners to change carriers. Willen Decl., Ex. 1 ("Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies," 77 Fed. Reg. 65,260; 65,264-66 (Oct. 26, 2012) ("2012 Final Rule")). The public therefore cannot rely on the continued existence of an exemption to protect its activities beyond the initial three-year period.

Nonetheless, every three years, thousands of members of the public approach the Copyright Office to explain how the ban on circumvention interferes with their noninfringing speech, and to seek (or support) exemptions from the ban. In the most recent rulemaking, the requested exemptions included:

---

[3] This exemption process applies only to the circumvention ban. The Librarian of Congress has no authority to create any exemptions from the ban on trafficking.

[4] In the 2018 Rulemaking, the Librarian introduced for the first time a "Streamlined Renewal Process" for exemptions granted during the 2015 Rulemaking. Declaration of Brian M. Willen (dated September 19, 2019) ("Willen Decl."), Ex. 4 (U.S. Copyright Office, "Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights" ("2018 Recommendation")) at 17-19. That process is "based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Register to recommend adoption of the exemption in the prior rulemaking are expected to continue into the forthcoming triennial period." *Id.* at 18. However, "the fact that the Librarian previously adopted an exemption creates no presumption that readoption is appropriate." *Id.* Similarly, "[p]etitions seeking to expand upon a current exemption to include [new] activities" are not eligible for the Streamlined Process. *Id.* at 19.

- Documentary and narrative films. *See* Willen Decl., Ex. 4 (2018 Recommendation) at 38, 55-61.

- Gameplay "remixed" with audio and visual commentary. *Id.* at 128, 140-41.

- Short videos that "remix" content from other videos into a new work. *Id.* at 30.

- Repair of motorized land vehicles, including farm equipment. *Id.* at 25-26, 184-230.

- Multimedia ebooks discussing movies. *Id.* at 29, 62-66.

- Educational uses to teach media criticism and analysis. *Id*. at 27-28, 31-89.

- Security research. *Id*. at 26, 283-314.

- Conversion of media to accessible formats for the visually impaired. *Id*. at 22-23, 89-111.

- Restoration of lawfully acquired online video games where such games are no longer supported by the maker. *Id*. at 27, 255-83.

- Educational uses by museums, libraries, and nonprofits. *Id*. at 29, 31-89.

- "Format shifting" (converting lawfully-acquired media from one format to another). *Id*. at 7-8, 111-28.

- "Space shifting" (moving lawfully-acquired media from one device to another). *Id.*

In each case, the applicants elaborated on the scope and nature of the noninfringing speech that was burdened by Section 1201. To take just a few examples: The Joint Filmmakers pointed to non-documentary (or "narrative") films that rely upon fair use of clips from copyrighted works encumbered by access controls, and offered numerous accounts of filmmakers who censored themselves;[5] the Association of Transcribers and Speech-to-Text Providers showed that in the United States over 77,000 students with hearing disabilities and 60,000 students who are blind are impaired by technological protection measures in their ability

---

[5] Willen Decl., Ex. 5 (Comment of the Joint Filmmakers in 2018 Rulemaking) at 15-21, 27.

to access audiovisual educational materials;[6] and computer security researchers described how the anti-circumvention rule prevents them from pursuing "critical" vulnerability research on certain types of devices, including traffic control systems and drones.[7]

### C.    Dr. Matthew Green

#### 1.    *To Perform His Important Security Research, Dr. Green Must Be Able to Circumvent Access Controls on the Works He Studies*

Dr. Green is a professor at the Johns Hopkins Information Security Institute where he researches the security of computer systems. Declaration of Matthew Green, dated September 18, 2019 ("Green Decl.") ¶ 1.[8] His research aims to expose security flaws in computer systems so that they can be made more secure. *Id.* ¶ 2. Many computer systems used today have serious vulnerabilities. *Id.* ¶ 3. Wrongdoers commonly identify these vulnerabilities and then exploit them for their own malicious purposes—to defraud, to steal someone's identity, to stalk, or to invade people's privacy. *Id.* Independent security researchers, like Dr. Green, identify those vulnerabilities so they may be fixed. *Id.* To analyze the security of a given technology, Dr. Green or a member of his team will first purchase a copy of the system they wish to test. *Id.* ¶ 6. This might be software, or a device, or a set of devices. *Id.* Dr. Green then seeks to understand how the system works, and where it might be vulnerable. *Id.* ¶ 7.

To do this important work, Dr. Green must access the copyrighted code in those systems—which sometimes requires him to circumvent technical protections. A rigorous and

---

[6] Willen Decl., Ex. 6 (Comment of Association of Transcribers and Speech-to-Text Providers in 2018 Rulemaking) at 14.

[7] Willen Decl., Ex. 7 (Comment of Prof. Ed Felten and Prof. J. Alex Halderman in 2018 Rulemaking) at 19-21.

[8] Dr. Green's sworn declaration is admissible on a motion for preliminary injunction. *See, e.g.*, *FTC v. CCC Holdings Inc.*, No. CV 08-2043 (RMC), 2009 WL 10631282, at *1 (D.D.C. Jan. 30, 2009) (holding that the Federal Rules of Evidence do not apply to preliminary injunction hearings and that the Court may rely on the sworn declarations in the record).

effective audit of a computer system's security requires that Dr. Green analyze the software controlling the system. *Id.* ¶ 8. Often, secure computer systems prevent access to their software code through TPMs such as encryption, username/password combinations, or physical memory restrictions preventing a user from accessing certain stored information. *Id.* ¶ 9. An adversary seeking to extract information about the software code or about the system's user, or to install their own malicious software, would seek to bypass these measures in order to maximize their ability to locate and exploit vulnerabilities. *Id.* To identify security flaws, Dr. Green must do the same; indeed, finding and reporting on the vulnerability of these access controls is a critical part of auditing the security of the system. *Id.*

Thus, if he does not bypass access controls in a computer system, Dr. Green's research is significantly limited. *Id.* ¶ 10. While he may be able to discover some vulnerabilities, he cannot determine with confidence whether devices are secure against an adversary willing to circumvent access controls. *Id.* Often, they are not. *Id.*

So Dr. Green faces an impossible dilemma. While these academic pursuits would traditionally be understood to be fully protected by the fair use doctrine and the First Amendment, he still faces criminal and civil penalties under Section 1201(a).

### 2. For His Research to Be Effective, Dr. Green Must Be Able to Discuss How to Circumvent Access Controls and Publish His Results

When Dr. Green locates security vulnerabilities, he discusses them with his research team and, where possible, with the company responsible for fixing them, in sufficient detail for them to understand and confirm the vulnerability. *Id.* ¶ 11-12. He may also reach out to people affected by the vulnerability, particularly if malicious actors may already be exploiting it. *Id.* ¶¶ 13-17. For instance, when Dr. Green discovered a significant vulnerability in the Secure Sockets

Layer (SSL)—a cryptographic protocol that is widely used to protect sensitive information online—he contacted the Federal Bureau of Investigation (FBI), so that it could avoid using those systems until they were secured. *Id.* ¶ 17.

Dr. Green also discusses his work with peers, device manufacturers, students, and the general public. *Id*. ¶¶ 11, 12. He and other security researchers communicate not only through verbal descriptions of where vulnerabilities lie and how they may be exploited, but also via computer code languages that communicate the ideas being discussed with greater clarity and less ambiguity than the English language. *Id.* ¶ 12. Sharing the code also helps others verify the accuracy of instructions embodied in code, since it is possible to instruct a computer to follow the instructions in the code and see whether it reveals the vulnerability. *Id.*

To these same ends, Dr. Green is currently writing an academic book on computer system security research. He seeks to instruct readers in the methods of security research, including how to identify vulnerabilities in computer systems. *Id*. ¶ 20. He would like to include in the book examples of code capable of bypassing security measures. *Id.* ¶¶ 20-23. Dr. Green wishes to publish this information for several important reasons.

*First*, like any scientific research, Dr. Green's findings are credible only to the extent that other scientists can replicate them. *Id*. ¶ 21. So his book must show fellow computer scientists how to repeat the steps he took and circumvent the same security measures.

*Second*, like any scholar, Dr. Green hopes that others will build upon his work. *Id*. ¶ 22. When he finds a security flaw in a TPM or in its underlying software code, he knows that others might be able to find additional security flaws that he might have missed. Other scholars are less likely to find additional flaws if they must first re-discover the same flaws that Dr. Green already

found. So Dr. Green's book must show others how to circumvent the measures that he already circumvented.

*Third*, as an advocate of computer security, Dr. Green hopes that the people who design computer systems (both TPMs and their underlying software code) will use his book to learn how to design better systems that do not contain the kinds of flaws that he discovered. *Id.* ¶ 23. So, Dr. Green's book must show these computer system designers how he circumvented security measures. *Id.*

Dr. Green would like to offer his book for sale via typical distribution channels, such as bookstores and online retailers, and to receive royalties from its sale. *Id.* ¶ 24. He also wishes to highlight the detailed information contained in the book about bypassing security measures in order to market the book, since that will be part of what makes his book effective for teaching how to engage in cutting-edge security research. *Id.* ¶ 25. As the law now stands, Section 1201 puts Dr. Green at risk of criminal and civil penalties for doing so. The possibility of criminal or civil liability deters Dr. Green from sharing the results of his research, such as by publishing and selling his book. *Id.* ¶ 34.

### D.    Dr. Andrew "bunnie" Huang and Alphamax, LLC

#### 1.    *To Enable New Types of Noninfringing Video Transformations, Dr. Huang and Alphamax Must* **Develop** *Tools that Circumvent Technological Protection Measures to Access Encrypted Video Streams*

Dr. Huang is an electrical engineer and inventor who holds a Ph.D from the Massachusetts Institute of Technology. He owns several small businesses, including Alphamax, a Michigan corporation. Declaration of Andrew "bunnie" Huang, dated September 18, 2019 ("Huang Decl.") ¶ 1. Part of Dr. Huang's current research focuses on manipulating video streams. That work enables socially valuable expression in areas such as education, news, and

creativity by allowing people to blend, rescale, and transform videos. Several years ago, Dr. Huang invented a hardware device known as the NeTV2. *Id.* ¶ 3. The NeTV2 lets users replace pixels in a high definition digital video stream so that they can overlay an image or other graphic on top of a video. The device's full functionality and potential capabilities are severely limited, however, by the decision not to read any of the content of video streams protected by technological protection measures ("TPMs"). *Id.* ¶¶ 3, 4, 6-7, 9, 11-13, 17-25.

Many high definition digital video streams are encrypted with a TPM called High-bandwidth Digital Content Protection ("HDCP"). *Id.* ¶ 4-5. In 2001, a security researcher announced that HDCP could be circumvented, but did not describe how, citing fear of prosecution under the DMCA.[9] *Id.* ¶ 5. Dr. Huang has the same credible fear, which is the sole reason that he did not circumvent HDCP in the NeTV2 device. *Id.* ¶ 6. This, in turn, has dramatically restricted NeTV2's capabilities because it cannot access the pixels in high-definition digital videos. *Id.* Without the ability to access those videos, users cannot save transformative works, run software to interpret and modify the videos in question, or even rescale images or create smooth overlays.[10] *Id.* A device similar to NeTV2, but capable of circumventing HDCP, could have all of those features. *Id.* ¶¶ 11-12.

If not for the anti-circumvention and anti-trafficking provisions of Section 1201, Dr. Huang and Alphamax would create such a device, which Dr. Huang calls the "NeTVCR." *Id.* ¶ 12. Plaintiffs would also publish software that could be used by others to create such devices and

---

[9] The proof of concept was later borne out by the anonymous posting of a "master key" for HDCP in 2010. Huang Decl. ¶ 5.c.

[10] NeTV2 video overlays have sharp edges because NeTV2 can only add new pixels on top of the original video—it cannot adjust pixels from the original video, which would allow for smoother edges. Huang Decl. ¶¶ 6, 23. Similarly, NeTV2 cannot rescale video or create partially transparent overlays, as these require manipulating the original video stream. *Id.* These features are common and expected when creating professional, credible videos. *Id.*

reprogram the computer in the NeTV2 to enable the same transformations. *Id.* ¶¶ 12, 16. This software will be open source, meaning that it will be published in a "source code" format used to communicate ideas among programmers, so that others will read and understand it and propose new ideas to edit the code, as they have done for the NeTV2 source code. *Id.* NeTVCR would dramatically expand users' ability to create new, noninfringing speech. *Id.* ¶¶ 13-16. An individual might use NeTVCR to create a short movie of herself playing a video game, alongside commentary and remixes of other gamers' videos. *Id.* ¶¶ 13, 19. Media organizations might display news coverage of important events from multiple sources at the same time, bringing different perspectives to their viewers. *Id.* ¶ 13. NeTVCR would also allow software developers to train neural networks on portions of videos. *Id.* ¶ 23. The applications are broad and include improved software for tasks such as object recognition. *Id.* However, Dr. Huang has been unable to develop this technology because he needs to be able to circumvent HDCP in order to perfect his understanding of how the signals are transmitted and encoded and to experiment and debug in order to write the software instructions that will communicate how to achieve the desired transformations. *Id.* ¶¶ 16-18, 23.

> **2.** ***To Commercialize New Types of Noninfringing Video Transformations, Dr. Huang and Alphamax Must* Distribute *Technology for Circumventing HDCP***

Dr. Huang and Alphamax would like to expand the capabilities of NeTV2 by creating a new device called NeTVCR, which will contain the software instructions for access to encrypted high definition video streams. *Id.* ¶ 16. NeTVCR's capabilities could also be provided to existing NeTV2 owners by publishing a software update that includes NeTVCR functionality. *Id.* This software will be open source, meaning that it will be published in a "source code" format used to

communicate ideas among programmers, so that others will read and understand it and propose new ideas to edit the code, as they have done for the NeTV2 source code. *Id.*

NeTVCR, whether as a new device or an improved NeTV2, would expand the ability of customers to make fair and/or noninfringing use of video streams subject to HDCP. *Id.* ¶ 12. Dr. Huang and Alphamax would like to sell and distribute such a tool. *Id.* ¶ 25. In fact, Dr. Huang and Alphamax started a crowdfunding campaign in June 2018, and it raised over $87,000 from more than 200 customers who want to lawfully transform videos using the technology developed by Dr. Huang. *Id.* ¶ 8. But the possibility of criminal or civil enforcement of Section 1201 deterred Dr. Huang from developing or commercially distributing NeTVCR with the capacity to circumvent HDCP. Huang Decl. ¶ 11. The anti-circumvention and anti-trafficking measures of Section 1201 thus prevented significantly improved functionality that would improve users' ability to make noninfringing uses of legally modified HDCP video. *Id.*

In addition to self-expressive uses of NeTVCR, described above, publishing the computer instructions for bypassing HDCP controls will communicate information that allows other developers to learn from and build off of Alphamax's technology. *Id.* ¶ 16. And beyond creative and cultural expression, NeTVCR has numerous applications that will improve peoples' lives in areas such as education, news, and safety. *Id.* ¶ 13. For example, if NeTVCR could access encrypted video streams, developers could create a visual overlay that notifies homeowners when a door has opened or alerts elderly people when they need to take their medicine. *Id.* Educational technology will improve when people are able to create side-by-side comparisons of rescaled videos. *Id.* Dr. Huang would himself benefit from NeTVCR's noninfringing

applications: He would like to use NeTVCR to learn a new language, by including transliterations alongside videos. *Id.* ¶ 20.[11]

### E.    Dr. Huang's Unsuccessful Efforts to Secure an Exemption From the Circumvention Ban

Dr. Huang participated in the 2018 Rulemaking process, hoping to obtain an exemption to cover non-infringing uses of his new invention, NeTVCR. As required, he explained that the audiovisual device he wished to develop is otherwise lawful and noninfringing.[12] The Rulemaking Defendants recognized that some of Dr. Huang's proposed uses "may potentially be fair use." *See* Willen Decl., Ex. 3 ("Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies," 83 Fed. Reg. 54,010 (Oct. 26, 2018) ("2018 Final Rule")) at 54,027; Willen Decl., Ex. 4 (2018 Recommendation) at 132. They also recognized the "possibility that there may not be reasonable alternatives to each and every use listed by Huang." Willen Decl., Ex. 4 (2018 Recommendation) at 140.

Nonetheless, the Rulemaking Defendants denied the petition, concluding they needed a "fuller description" of these potentially fair uses in order to craft a sufficiently "narrow and focused" exemption. *See* Willen Decl., Ex. 4 (2018 Recommendation) at 132. The Rulemaking

---

[11] If some of the potential expression enabled by NeTVCR seems mundane, that is because Section 1201 is so broad that it prohibits ordinary, everyday expression that poses no threat of infringement.

[12]When deciding whether to grant an exemption, Section 1201(a)(1)(C) instructs the Librarian of Congress to examine four specific factors as well as "such other factors as the Librarian considers appropriate." *See* 17 U.S.C. § 1201(a)(1)(C)(v). This catch-all provision empowers the Librarian to deny exemptions based on all manner of issues that have nothing to do with fair use or indeed with the ostensible purpose of the DMCA: to protect copyrighted works. Indeed, the Librarian has imposed additional requirements on persons seeking exemptions, such as imposing the burden of proof (specifically the burden of production) on the party seeking an exemption. *See* Willen Decl., Ex. 4 (2018 Recommendation), at 12-13. Applicants are also required to demonstrate the rule's "actual" and "measurable" impact on noninfringing uses. *See id.* at 16-17.

Defendants did so even though the exemption that Dr. Huang sought would only apply to circumvention for non-infringing uses. Any circumvention with a nexus to copyright infringement would have remained punishable under Section 1201.

Because his efforts to develop a new audiovisual device continue to be stymied by Section 1201's broad bans on circumvention and trafficking, Dr. Huang needs relief from this Court to exercise his First Amendment rights. Complaint, ECF No. 1 ("Compl.").

**F.    Dr. Green's Temporary and Partial Exemption From the Circumvention Ban**

Unlike Dr. Huang and Alphamax, Dr. Green secured a limited exemption in the 2018 Rulemaking. The Final Rule allows him and others to conduct "good-faith security research," which it defines as "accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement." 2018 Final Rule at 54,026.

While this exemption will allow Dr. Green to circumvent TPMs in furtherance of his research—and Dr. Green is therefore not seeking to preliminarily enjoin the Government's enforcement of Section 1201(a)(1) against him—it will last only two more years, until 2021, and there is no guarantee that the exemption will be renewed. *See id.*; *see also* 17 U.S.C. § 1201(a)(1)(D). Dr. Green will therefore have to spend additional time and resources to attempt to maintain his freedom to engage in this useful and constitutionally-protected conduct after the

three-year term ends. In addition, the Rulemaking Process applies only to the anti-circumvention rule; it does not allow exemptions to Section 1201's separate ban on trafficking. *See* 17 U.S.C. § 1201(a)(1)(C). Section 1201 therefore continues to prohibit Dr. Green from publishing his book and sharing with the public the valuable information that he has studied. He therefore asks this Court to enjoin the Government from enforcing the anti-trafficking provision against him.

### G. Procedural History

Dr. Green first moved for a preliminary injunction on September 29, 2016, shortly after Plaintiffs filed this lawsuit. *See* ECF No. 16. This Court stayed briefing and resolution of that motion pending briefing and resolution of the Government's concurrently filed motion to dismiss. *See* Minute Order (September 30, 2016). On June 27, 2019, this Court issued an Order granting in part and denying in part the Government's motion. *See* Order on Mot. to Dismiss (ECF No. 25) ("MTD Order"). While the Court dismissed Plaintiffs' facial challenges to Section 1201 and Plaintiffs' claim for violation of the Administrative Procedure Act, the Court held that in light of Plaintiffs' intended course of conduct, Plaintiffs had stated a claim that the application of Section 1201 against them violated the First Amendment. In so holding, the Court recognized that Plaintiffs had standing to assert their claims based on a credible threat of prosecution under the statute. MTD Order at 15-21. In addition, the Court affirmed that "[c]ode is speech" and that using code to circumvent TPMs, and sharing that code with others, are forms of expression protected by the First Amendment. *Id.* at 27-28.

The Court further held that Section 1201's restrictions on Plaintiffs' speech were subject to intermediate scrutiny such that they must be narrowly tailored to promote the government's interest. *Id.* at 39, 46. Thus, to pass constitutional muster, the Government must show that it's application of Section 1201 against Plaintiffs furthers a substantial governmental interest that is

unrelated to the suppression of free expression and that Section 1201 does not burden substantially more speech than is necessary to further the government's interest. *Id.* at 46.

## H.     Statement of Requested Relief

All Plaintiffs respectfully request that the Court preliminarily enjoin the Government from enforcing the criminal prohibitions on circumvention and trafficking and enjoin the Rulemaking Defendants to grant exemptions that would allow Plaintiffs and others to engage in conduct protected by the First Amendment. In addition to a broad injunction against any criminal enforcement of the law and an exemption to permit any constitutionally protected activity, Dr. Green specifically requests that this Court enter a preliminary injunction that enjoins the Government, during the pendency of this case, from prosecuting him under Section 1201 for publishing information about how to circumvent TPMs in an academic book. Likewise, Dr. Huang and Alphamax specifically request that this Court enter a preliminary injunction preventing the Government, during the pendency of this case, from prosecuting them under Section 1201 for (1) circumventing HDCP for noninfringing purposes, including personal use to analyze and modify videos, as well as researching and developing product features for software and hardware that can modify high definition video streams; and (2) publishing software instructions and selling a physical product enabling users to create new noninfringing video content and make other noninfringing uses of videos subject to HDCP.

In the alternative, Plaintiffs ask the Court to narrowly construe the operative provisions of the statute, such that they do not apply to prohibit Plaintiffs from engaging in the lawful and valuable conduct discussed above, and to enjoin Defendants from enforcing the statute in a manner inconsistent with that construction. A narrower construction, protecting acts of circumvention and trafficking in service of noninfringing uses, would be in keeping with the

statute's provision that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1); *see Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1200-1203 (Fed. Cir. 2004) (construing Section 1201(a) to require a nexus to copyright infringement). The Federal Circuit in *Chamberlain* explained that "[a] provision that prohibited access without regard to the rest of the Copyright Act would clearly affect rights and limitations, if not remedies and defenses" and that it would be "absurd and disastrous" to conclude that Congress "enacted *by implication* a new, highly protective alternative regime for copyrighted works; contradicting other provisions of the same statute including § 1201(c)(1)." *Id.* at 1200-01.

Specifically, Plaintiffs ask the Court to construe the definition of "circumvent" included in Section 1201(a) such that a person may be considered to have the requisite "authority of the copyright owner" when their use of the copyrighted work at issue is non-infringing and therefore authorized by copyright law. In other words, the "authority of the copyright owner" element would be satisfied whenever the copyright owner would have no right to withhold that authority.

## ARGUMENT

Plaintiffs seek a preliminary injunction prohibiting the Government from enforcing Section 1201 against them while the case proceeds, allowing them to access information and engage in research and other important speech activities that are socially beneficial and constitutionally protected. As set forth below, this preliminary relief is appropriate because Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm in the absence of preliminary relief; and both the balance of equities and the public interest favors an injunction. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

In light of this Court's order denying in part the Government's motion to dismiss—and the evidence reflected in the declarations accompanying this motion—Plaintiffs are likely to succeed on the merits of their as-applied First Amendment claims.

In rejecting the Government's motion to dismiss those claims, the Court made clear that "[c]ode is speech" and that Section 1201 implicates Plaintiffs' First Amendment rights by restricting their ability to use code to further their academic and related commercial work. MTD Order at 26-27 (holding the DMCA and its triennial rulemaking process burden the use and dissemination of computer code, thereby implicating the First Amendment). More specifically, Plaintiffs seek to use that code to circumvent TPMs on copyrighted materials for the purpose of gathering information, engaging in valuable academic research, creating new information and expression, building tools for speech, and publishing what they learn. Green Decl. ¶ 20; Huang Decl. ¶¶ 13, 16. As this Court has already recognized, "the DMCA's prohibition on circumvention and trafficking appears to burden the[ir] accessing, sharing, publishing, and receiving of information," including "both the code that does the circumventing and the TPM-protected material to which the circumventing code enables access." MTD Order at 28.

Finding that Section 1201 triggers intermediate scrutiny (MTD Order at 39), the Court explained that the Government must show that Section 1201 does not, as applied to Plaintiffs, burden substantially more speech than is necessary to further the government's legitimate interests.[13] MTD Order at 49; *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968);

---

[13] While Plaintiffs accept the Court's conclusion about the level of constitutional scrutiny for purposes of this argument, Plaintiffs respectfully disagree with the Court's conclusion that Section 1201 does not warrant strict scrutiny (MTD Order at 39-45); and they preserve their

*Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001-02 (D.C. Cir. 2014) (holding the burden on speech must be "no greater than is essential" to advance the government's interest). While the parties agree that the DMCA is aimed at furthering the government's interest in preventing piracy, the statute as interpreted by the government directly targets access to information and publication of ideas as the means towards this objective. The Court held that Defendants failed to show that Section 1201's restrictions on Plaintiffs were no greater than necessary to further the government's interest. MTD Order at 46-50. Defendants could not carry their burden then, and they cannot do so now.

A.    **Section 1201's Anti-Trafficking Provision Violates the First Amendment as Applied to the Publication of Dr. Green's Book**

Dr. Green wishes to publish an academic book that contains circumvention instructions, including computer code. *See* Green Decl. ¶¶ 20-25. His book proposes to document the security flaws that his research has uncovered in various computer systems, including the TPMs that protect them, and to instruct others about how to locate and fix such flaws. *Id.* Dr. Green's publication is squarely protected by the First Amendment, as Defendants themselves conceded and the Court has previously found. *See* MTD Order at 26 (citing Defendant's Reply ISO MTD, ECF No. 19 at 12-16); *accord Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (protecting "the acts of 'disclosing' and 'publishing' information"). Beyond that, many computer researchers, computer vendors, and consumers want to hear Dr. Green's speech about security flaws and circumvention techniques. Green Decl. ¶ 16. It is "well established that the Constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

---

challenge to that holding. *See infra* Part I.C. For the same reasons that Section 1201 is not narrowly tailored to serve the Government's interest in preventing infringement, it also is not the "least restrictive means" to achieve that interest.

*See, e.g.*, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (advertising); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (obscenity). The rights of these audiences to receive information reinforce Dr. Green's First Amendment rights to gather and publish it.

But Section 1201's ban on trafficking, as interpreted by the government, bars Dr. Green from publishing his book and threatens him with potential criminal liability. That intrusion into Dr. Green's First Amendment rights triggers at least intermediate scrutiny. *See* MTD Order at 38-45. The Government must prove that the anti-trafficking provision, as applied to Dr. Green, does not burden substantially more speech than necessary to further the Government's purpose of preventing copyright infringement, MTD Order at 46-47, and that Section 1201 is "narrowly tailored" to serve that purpose. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In short, the Government must show that the anti-trafficking rule does not target "more than the exact source of the 'evil'" that the rule seeks to remedy. *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 522-23 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

The government cannot make that showing. Dr. Green's research focuses on the security of embedded software systems, such as those in toll-collection systems and industrial-grade encryption modules, as well as secure messaging systems and other technologies where TPMs exist primarily to protect the privacy of users rather than to prevent copyright infringement. Green Decl. ¶ 24. His explanations on how to bypass TPMs on these types of systems do not have generalized application to other TPMs applied to other copyrighted works and are unlikely to enable copyright infringement. *Id.* ¶ 24.

Indeed, the Government's interest in preventing online infringement offers little if any basis for preventing the publication of Dr. Green's book. There is no online market for many of the subjects of his research, such as software embedded in toll-collection systems and other kinds of hardware, because the software cannot fulfill its intended purpose without the physical hardware that it operates, and that hardware obviously cannot be downloaded by a would-be infringer. *Id.* ¶ 24; *see also* MTD Order at 48-49 (holding that the government failed to refute Plaintiffs' showing that "the risk of digital piracy" created by Dr. Green's intended publication "is minimal").

Nonetheless, Section 1201's blunt anti-trafficking ban prohibits Dr. Green from publishing a book on his research and forecloses valuable and non-infringing academic uses of his work by other computer scientists, scholars, and engineers. Green Decl. ¶¶ 22-24. As applied to Dr. Green, the anti-trafficking provision amounts to an impermissibly "[b]road prophylactic rule[]" (*Edenfield v. Fane*, 507 U.S. 761, 777 (1993)) that lacks anything like "a close fit between ends and means" (*McCullen*, 134 S. Ct. at 2534).[14]

Because the provision targets far "more than the *exact source* of the 'evil' [it] seek[s] to remedy" (*Boardley*, 615 F.3d at 522-23 (quoting *Frisby*, 487 U.S. at 485) (emphasis added)), as this Court has already held (MTD Order at 49), it fails the narrow tailoring requirement in this case. Dr. Green is therefore likely to succeed on the claim that Section 1201 violates his First Amendment rights.

---

[14]     Underscoring this problem, the Register of Copyrights is not permitted to grant exemptions from the trafficking ban that would allow Dr. Green to publish his book and research without risking criminal prosecution. *See* 17 U.S.C. § 1201(a)(1)(C), (D).

**B.     Section 1201 Violates the First Amendment as Applied to Dr. Huang and Alphamax's Creation and Commercialization of NeTVCR**

The same is true of Dr. Huang and Alphamax. In light of the Court's Order permitting their as-applied First Amendment claim to go forward, Dr. Huang and Alphamax are likely to succeed in showing that both the anti-circumvention and the anti-trafficking provisions of Section 1201 fail intermediate scrutiny as applied to their development and sale of NeTVCR. MTD Order at 46-51. Those provisions foreclose all of Dr. Huang and Alphamax's vital research, development, and commercialization of tools for expression through visual media—while only trivially serving the government's interest in preventing online piracy.

**1.     *Section 1201's Anti-Circumvention Provision Prohibits the Development of NeTVCR Without Serving the Government's Interests***

Dr. Huang and Alphamax wish to provide and take advantage of new opportunities to analyze videos and create new, video-based expression, by enabling themselves and others to access videos they lawfully possess. Compl. ¶¶ 78-82, 93, 98-106; Huang Decl. ¶¶ 20-25. To do so, they must circumvent HDCP, a TPM, in order to gather information about how to create a workable version of the NeTVCR, *id.* ¶¶ 18, 24, and to conduct related research on video manipulation, object recognition, and deep learning, as well as to create expression to help Dr. Huang and others learn new languages and learn how to express themselves using NeTVCR. Huang Decl. ¶¶13, 17-24. Once this is achieved, Dr. Huang and Alphamax seek to publish the NeTVCR software—which essentially consists of instructions that describe the math needed to decrypt HDCP—to be read, understood, commented on, and enacted by the many others who are interested in learning what they have to say. *Id.* ¶ 16.

As this Court has already held (MTD Order at 28), the First Amendment protects all aspects of Dr. Huang's development and research. The Supreme Court has recognized that the

ability to gather information is a "necessary predicate" to the subsequent exercise of "rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). The creation and use of a device and underlying computer program is protected by the First Amendment, no less than the creation and performance of a musical work, a film, or scientific experiment. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446-50 (2d. Cir. 2001). It is well established that the First Amendment protection for speech includes protection for the tools that enable speech, like the NeTVCR. *See, e.g.*, *Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) (striking down a tax on ink used to publish newspapers); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 795 (1978) (striking down a limit on contributing money to a political campaign). This Court has explained how these principles apply here:

> The course of conduct that plaintiffs intend to undertake—principally, using computer code to circumvent TPMs to access copyrighted materials and sharing that code with others, whether through books, articles, or otherwise, arguably implicates each of these various First Amendment rights, as the DMCA's prohibition on circumvention and trafficking appears to burden the accessing, sharing, publishing, and receiving of information, with "information" understood as both the code that does the circumventing and the TPM-protected material to which the circumventing code enables access.

MTD Order at 28 (citation omitted).

Yet Dr. Huang and Alphamax are prevented by Section 1201's anti-circumvention prohibition from engaging in this protected speech. That prohibition fails the requirement of narrow tailoring as applied to Plaintiffs' s development of NeTVCR and related HDCP circumvention research and expression. MTD Order 48-49. With respect to NeTVCR, Dr. Huang wishes to circumvent TPMs on videos that he possesses lawfully. Huang Decl. ¶ 17. He wishes to circumvent HDCP in order to develop a new technology that he (and others) will use to create fair use content. *Id.* ¶¶ 12-25. Dr. Huang's circumvention work does not involve any infringement of copyright. 17 U.S.C. § 107 ("the fair use of a copyrighted work … is not an

infringement of copyright"); *accord Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) ("the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works"). The Government cannot point to any way in which its interest in preventing infringement will be served by restricting Dr. Huang and Alphamax from engaging in private, singular, and otherwise entirely lawful acts of circumvention in order to create NeTVCR. Likewise, Dr. Huang's circumvention of HDCP for research purposes is clearly noninfringing and poses no credible threat to copyright holders. NeTVCR would indisputably have a wide range of noninfringing uses, which traditionally would mean that Dr. Huang and Alphamax would not be considered secondarily liable if third parties outside of their control decided to use their product in an infringing way. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

Section 1201 primarily deters First Amendment-protected activities while adding little to the government's ability to pursue copyright infringers. Infringers have ready access to the HDCP master key and the ability to circumvent, and copyright law already provides stiff penalties for infringers. Law-abiding actors like Plaintiffs, however, who conscientiously avoid infringement but need to circumvent access controls for lawful uses, are the ones who bear the brunt of Section 1201's deterrence.

Thus, Section 1201's anti-circumvention provision stands to snuff out the development of a valuable consumer technology that enables new forms of expression and to stifle video-related research, while doing little to serve the Government's interest in preventing copyright infringement. The statute fails intermediate scrutiny.

### 2. *The Triennial Rulemaking Process Demonstrates that Section 1201's Anti-Circumvention Provision Violates Dr. Huang and Alphamax's First Amendment Rights*

The Government cannot save Section 1201 by pointing to the triennial rulemaking process. The Librarian rejected Dr. Huang's petition for an exemption to develop NeTVCR and to conduct research by circumventing HDCP in 2018. Huang Decl. ¶¶ 26-28. In doing so, the Acting Register acknowledged that Dr. Huang proposed use cases for his requested exemption that "may potentially be fair uses." 2018 Final Rule at 54,027. Indeed, the scope of the requested exemption, *by definition*, only included noninfringing uses. By acknowledging the lawful conduct that would be enabled by his requested exemption, yet denying the exemption, the Registrar ensured that the threat of prosecution under Section 1201 would continue to chill Dr. Huang from engaging in lawful and constitutionally protected activity. The Registrar's ruling thus only underscores that Section 1201 is burdening more speech than necessary to deter copyright infringement.

The Acting Register justified its decision in part on the basis that Dr. Huang's was a case of "*de minimis* impact." 2018 Final Rule at 54,027. In fact, the threat of prosecution under Section 1201 is actively impeding the First Amendment rights not just of Dr. Huang and Alphamax, but of all the people they hope to teach and to serve with a commercially available NeTVCR. Huang Decl. ¶ 25. As noted above, more than 200 supporters and potential customers have invested more than $87,000 to help Dr. Huang bring a less capable device that does not circumvent, NeTV2, to market so that they can make noninfringing uses of videos to create forms of expression. These supporters would prefer a more effective device and inhibiting access to it is far from a trivial injury.

But even if Section 1201's prohibition on circumvention had only a limited impact on Dr. Huang, that would not save it here. *See, e.g.*, *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 826 (2000) ("We cannot be influenced, moreover, by the perception that the regulation in question is not a major one because the speech is not very important"); *accord Higher Soc'y of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) ("[E]ven short deprivations of First Amendment rights constitute irreparable harm."). To the contrary, the Acting Register's justification only compounds the injury by purporting to justify depriving Dr. Huang of his First Amendment rights because a government official mistakenly believes that those rights are unimportant.

### 3. Section 1201's Anti-Trafficking Provision Prohibits the Commercialization of NeTVCR Without Serving the Government's Interests

Dr. Huang and Alphamax's activities also implicate Section 1201's trafficking prohibition. Dr. Huang wishes to sell NeTVCR as a standalone product and to distribute software instructions for circumvention as an upgrade to the NeTV2 that would transform it into a NeTVCR. Compl. ¶¶ 88-90, 110, 112-113; Huang Decl. ¶ 16. And he wishes to share his general HDCP-circumvention research on video manipulation, object recognition, and deep learning with others. Huang Decl. ¶ 23. These activities embody both Plaintiffs' right to publish information and members of the public's right to obtain it—core First Amendment-protected activities. *See* MTD Order at 28. Moreover, Plaintiffs' work will help members of the public to use the NeTVCR to engage in new acts of creativity, analysis, and cultural expression, which would not otherwise be possible. Compl. ¶¶ 75, 110, 112, 113; Huang Decl. ¶¶ 12-25.

All of these activities, however, are foreclosed by the anti-trafficking provision—even though there is no question that they are protected by the First Amendment. *See* MTD Order at

28 ("The course of conduct that plaintiffs intend to undertake—principally, using computer code to circumvent TPMs to access copyrighted materials and sharing that code with others, whether through books, articles, or otherwise—arguably implicates each of these various First Amendment rights."). Applied in this way, Section 1201 burdens substantially more speech than is necessary to further the Government's anti-infringement interests. As for the sale and dissemination of NeTVCR, the product is aimed at consumers who already have *lawful* access to HDCP-protected digital videos and who will use the device to circumvent HDCP on those videos in order to create new fair use content and expression. Indeed, the NeTVCR is not necessary to would-be infringers, who can already use the publicly-available HDCP master key to engage in unlawful infringement. Huang Decl. ¶ 5. At any rate, actual copyright infringers can still be punished for violations of the copyright law, 17 U.S.C. § 501, and it is both unnecessary and unwarranted to prohibit Plaintiffs' speech activities in order to stop hypothetical third parties from potentially infringing.

In short, Plaintiffs' intention to distribute NeTVCR and to share video-related research will have no meaningful impact on piracy. Therefore, the Government will not be able to meet its burden of establishing that the anti-trafficking provision, as applied to Dr. Huang and Alphamax, is narrowly tailored to further its legitimate interests.

### C.      Plaintiffs Are Likely to Prevail on All of Their Claims

Beyond their as-applied First Amendment challenge to Section 1201's anti-circumvention and anti-trafficking provisions, which the Court allowed to proceed, Plaintiffs also brought other claims, including that Section 1201 is facially overbroad, an unconstitutional speech-licensing regime, and that the Rulemaking Defendants violated the Administrative Procedure Act. The Court granted the government's motion to dismiss those claims. While those

rulings are now law of the case, Plaintiffs through this motion seek a preliminary injunction on the dismissed claims as well. For the reasons set forth in Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF No. 18 at 18-33, 36-45, Plaintiffs are likely to ultimately prevail on the merits of those claims; those claims therefore serve as an additional basis for enjoining the government's enforcement of Section 1201.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY WITHOUT PRELIMINARY RELIEF

In addition to having demonstrated a clear likelihood of success on the merits of their First Amendment claims, Plaintiffs face clear and irreparable harm unless a preliminary injunction is granted. *Winter*, 555 U.S. at 20.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. at 373; *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). As a result, this prong is almost always satisfied in First Amendment cases if the plaintiff has shown a likelihood of success on the merits. *See Pursuing Am.'s Greatness*, 831 F.3d at 511 ("In First Amendment cases, the likelihood of success 'will often be the determinative factor in the preliminary injunction analysis.'"); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (citations omitted)).

So it is here. The First Amendment fully applies to Dr. Huang and Alphamax's research and development and to all Plaintiffs' publication and commercialization. Dr. Green's computer security book would advance the general state of knowledge in academic and professional fields,

while Dr. Huang and Alphamax's commercialization of NeTVCR would enable myriad new avenues of First Amendment-protected expression. These activities contribute to computer security and free speech for everyone. They touch on a matter of general public concern (the security of our software systems and the ability of people to express themselves freely). These research projects, including the contemplated circumvention efforts, are a necessary predicate to that speech. And these activities are classic noninfringing uses of copyrighted works that are protected by the fair use doctrine. *See* Green Decl. ¶¶ 5-18; Section I.A.1 *supra*.

Yet in the absence of a preliminary injunction,[15] Plaintiffs would have to wait until the conclusion of this lawsuit to learn whether they are free to engage in the research, development, publication, and commercialization needed to benefit the academic community, the computer industry, and the public. That is more than enough to show irreparable injury. *See, e.g.*, *Pursuing Am.'s Greatness*, 831 F.3d at 511 (finding irreparable injury where a law would have prevented the speaker from publishing the name of a candidate for public office).

## III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

Absent an injunction, Plaintiffs' harm far outweighs any harm the Government might suffer. *Winter*, 555 U.S. at 20. As explained above, Section 1201 deprives Plaintiffs of core First Amendment rights and threatens them with criminal liability if they circumvent TPMs in the course of conducting computer security research and development, publishing computer instructions for circumventing encrypted video streams, or speaking about how they did so. Without preliminary relief, Plaintiffs will continue to be deterred from publishing and commercializing their work. *See supra* pp. 6-7, 11-12. Without Dr. Green's book, computer

---

[15]    While a temporary exemption exists protecting much of Dr. Green's planned circumvention activities, the exemption does not extend to "trafficking" and therefore does not protect his planned publications and communications about his work. *See supra* n.3.

system operators and designers will be deprived of valuable information for identifying and correcting security flaws, and for making computer systems more secure for all. *Id.* And without Dr. Huang and Alphamax's new product, innovators, educators, and corporations will be deprived of valuable new forms of expression.

In contrast, the Government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (citation omitted); *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 (noting that "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").

If the Court grants preliminary relief, the Government will suffer no harm in its efforts to "promote the progress of science and the useful arts," U.S. CONST. art. I, § 8, cl. 8. The anti-circumvention and anti-trafficking rules restrict—instead of promote—that progress. And as applied here, they limit other security scholars from building on Plaintiffs' work and discovering additional security flaws, and they limit the ability of interested members of the public from engaging in productive noninfringing speech through the use of NeTVCR. *See supra* pp. 4-5. Nor will the Government suffer harm in its effort to discourage copyright infringement. As set forth above, circumvention and trafficking do no harm in and of themselves, nor is any showing of harm or infringement necessary to establish liability under the anti-circumvention and anti-trafficking rules. The Government has ample, and superior, alternative means of policing infringement, such as imposing liability for actual copyright infringement, which would be entirely unaffected by the preliminary injunction that Plaintiffs seek.

Section 1201 thus creates the worst of both worlds: it adds sharp legal teeth to technologies that often have no teeth of their own. TPMs are frequently very easily circumvented, Green Decl. ¶ 39, meaning that those willing to violate the law readily break computer security or commit copyright infringement. Meanwhile, conscientious actors like Plaintiffs are prohibited from beneficial, noninfringing speech because they care about staying on the right side of the law.

## IV.    THE PUBLIC INTEREST WOULD BE SERVED BY AN INJUNCTION

The final *Winter* factor—the public interest—also favors Plaintiffs for many of the same reasons that the third factor favors them. As the D.C. Circuit explained: "The [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 511 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party")). Whatever the Government's cited interest, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation and, without a preliminary injunction, [Plaintiffs are] unable to exercise those rights." *Pursuing Am.'s Greatness*, 831 F.3d at 511 (citing *Gordon*, 721 F.3d at 653). In short, "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.

That is especially true in this case. The Government cannot meaningfully rely on an asserted public interest in upholding copyright protections or promoting the progress of science because, as explained, Section 1201 is not narrowly tailored to those interests, and the Government has alternative methods to achieve its goals. *See supra* p. 31. Also, criminal liability under Section 1201 does not depend on any showing of copyright infringement. 17 U.S.C. §§

1201, 1204. In any event, any government interests here are outweighed by the public interest in the Government not violating First Amendment freedoms, "among the most precious rights guaranteed under the Constitution." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 130 (D.D.C. 2012) (citing *Lee v. Weisman*, 505 U.S. 577, 589 (1992)); *see also Minney v. United States OPM*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) ("Applying the law in a way that violates the Constitution is never in the public's interest.").

In addition, the Supreme Court has recognized that the suppression of speech "harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). Given the increasing pervasiveness of technological devices, and the increasing frequency of security breaches, members of the public have a strong interest in protecting their sensitive personal information. They also have a strong interest in new ways of engaging in protected speech. Dr. Green, Dr. Huang, and Alphamax's work is devoted to advancing these interests, and chilling their ability to conduct that work contributes to public vulnerability to destructive computer security flaws and prevents beneficial new fair uses of high definition video streams. In contrast, an injunction would permit Plaintiffs to conduct security research while this case proceeds, and to publish the results (including methodology), which would in turn enable the design of more secure computer systems and the correction of existing security vulnerabilities for the public good.

## CONCLUSION

For these reasons, Dr. Green, Dr. Huang, and Alphamax respectfully request that this Court enter a preliminary injunction preventing the Government, during the pendency of this case, from prosecuting them under Section 1201. In the alternative, Plaintiffs ask the Court to

narrowly construe the operative provisions of the statute such that they do not apply to prohibit Plaintiffs from engaging in the lawful and valuable conduct discussed above.


DATED: September 19, 2019

Respectfully submitted by:


*/s/ Brian M. Willen*
Brian M. Willen

Corynne McSherry (CA SBN 221504)
Kit Walsh (CA SBN 303598)
Adam Schwartz (CA SBN 309491)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

Brian Willen (D.C. Bar No. 490471)
WILSON SONSINI
GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas
40th Floor
New York, NY 10019
(212) 999-5800


Lauren Gallo White (CA SBN 309075)
WILSON SONSINI
GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000


*Counsel for Plaintiffs*