# In the United States District Court
# For the District of Columbia

| | |
|---|---|
| Matthew Green, Andrew Huang, and Alphamax, LLC, <br><br> Plaintiff, <br><br> v. <br><br> U.S. Department of Justice, William Barr, Library of Congress, Carla Hayden, U.S. Copyright Office, and Karyn A. Temple <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) Civil Case No. 16-cv-01492 <br> ) <br> ) Hon. Judge Emmet G. Sullivan <br> ) <br> ) <br> ) <br> ) <br> ) |

**Declaration of Andrew "bunnie" Huang In Support of Motion for Preliminary Injunction**

I, Andrew "bunnie" Huang, declare as follows:

**A. I am a technologist and small business owner.**

1. My name is Andrew "bunnie" Huang. I am an electrical engineer, inventor, and owner of several small businesses, including Alphamax, LLC. I have a Ph.D. from the Massachusetts Institute of Technology, and I am a Research Affiliate of the MIT Media Lab. I am a US citizen and Alphamax is a Michigan corporation. The inventory for Alphamax is kept primarily in the United States.

2. I have invented the following technologies, among others:

    a. The world's first fully-integrated nanophotonic-silicon chips, winning the Lewis Award for Best Paper at the International Solid-State Circuits Conference in 2007;

    b. Novena, an open hardware computing platform;

1

    c.   The Safecast Open Hardware Geiger Counter, in response to the earthquake that devastated Fukushima; and

    d.   Chumby, an early "Internet of Things" device enabling the consumption of Internet content on common household appliances.

**B. Section 1201 has limited my work with encrypted video streams.**

3.   I invented a device known as NeTV2, which allows for the replacement of pixels in high-definition digital video streams. The device can overwrite pixel data to be displayed on a monitor. For example, NeTV2 can be used to cover up part of the video with an image of one's choice.

4.   NeTV2 cannot, however, read out any of the pixel data from the original video stream if the video stream is subject to an access control measure known as High-bandwidth Digital Content Protection ("HDCP").

5.   HDCP has the following background:

    a.   HDCP was developed by Intel Corporation. HDCP relies on secret cryptographic keys to prevent viewing of HDCP-restricted media. To receive one of these secret keys from Intel, a manufacturer must promise to implement certain playback and copying restrictions.

    b. As early as 2001, a security researcher determined that HDCP could be circumvented, but they did not publish their work, citing fear of prosecution and civil litigation under Section 1201 of the DMCA.

    c. In 2010, a "master key" for HDCP was anonymously uploaded to the Internet. The master key is simply a grid of very long numbers that Intel chose to use as the secret element in its cryptographic system. By doing arithmetic with these numbers, it is possible to bypass HDCP restrictions without obtaining secret keys from Intel or agreeing to their terms restricting playback.

    d. Intel has stated that it believes researchers independently derived a master key via mathematical analysis, rather than it being leaked by someone entrusted to keep it confidential.

    e. Intel has also stated that it would pursue legal action against anyone who used the master key to create an unauthorized device for HDCP playback.

6. Thus, I designed NeTV2 not to circumvent HDCP. As a result, NeTV2 does not access or adjust the pixels in high-definition digital video streams subject to HDCP. NeTV2 can merely overwrite those pixels with new information, with no knowledge of what colors the original pixels were to display. This design dramatically restricts NeTV2's functionality. Each of the below examples would be possible if NeTV2 could circumvent access controls:

   a. Everything created with NeTV2 is transitory, because it lacks the capability to save video data. Thus, it does not enable anyone to create new works for their own later enjoyment or to publish to others.

   b. NeTV2 has only a limited ability to create image overlays. They have sharp and often distracting edges, because NeTV2 cannot blend those overlays with the underlying video to smooth the edges.

   c. NeTV2 can add a text ticker to the edge of the screen, but it cannot rescale the original video, meaning that part of it will be cut off.

   d. NeTV2 cannot create a partially-transparent overlay.

   e. NeTV2 cannot display two streams at once (side-by-side or picture-in-picture).

   f. NeTV2 cannot transform the colors of the original stream to make the video accessible to people with visual impairment.

7. NeTV2 allows its users to add their own pixel data to override the data from the video stream. But such users cannot do any of the things listed above that require access to the input video data.

8. Despite these limitations, via a Crowd Supply funding page located at https://www.crowdsupply.com/alphamax/netv2, I set out to raise $15,000 to support the NeTV2 technology. I ended up far exceeding this goal, raising over $87,000 from over

two hundred backers who wished to purchase NeTV2 hardware and software in order to lawfully manipulate and transform videos.

9. Consistent with this investor support, I frequently hear from customers and potential customers about features they desire that would require circumvention, features that would not infringe any copyright.

10. There are several versions of NeTV2, using different hardware. Earlier designs are known as NeTV. All earlier designs also operate as described herein.

11. NeTV2 does not read out any of the plaintext pixel data from the original HDCP-encrypted video stream, which creates the problems discussed above, because I and Alphamax are concerned that we could be prosecuted under Section 1201(a)(1) or (a)(2) if we used or sold a device with that functionality or published instructions for doing so, including software instructions.

**C. As part of my company Alphamax, I wish to develop better speech-enabling technology.**

12. But for Section 1201, as part of my company Alphamax, I would create an improved version of NeTV2, called NeTVCR. Unlike NeTV2, which does not circumvent HDCP and thus cannot access video streams, I would design NeTVCR so that it does circumvent HDCP and thus can access video streams. NeTVCR thus would enable me and my customers to make fair and other noninfringing uses of works that are subject to HDCP.

5

13. NeTVCR would enable many forms of socially valuable and noninfringing expression that NeTV2 does not, including:

   g. Political expression, *e.g.*, a single video that displays both a live presidential debate, and the text of a commentator's live blog, and avoids obscuring any part of the debate by rescaling the original video to fit alongside the commentary.

   h. Educational expression, *e.g.*, side-by-side comparison between two films or a compilation of clips for media literacy education or use by students for self-expression, as well as language teaching by displaying subtitles.

   i. News expression, *e.g.*, a single video that simultaneously displays the coverage of a live event by more than one news source.

   j. Safety expression, *e.g.*, a video that displays a live program, and also text or visual overlay that notifies a home owner that a door has opened or reminds an old or ill person that they need to take their medicine, rescaling the original image so that it is not obscured.

   k. Cultural expression, *e.g.*, a video gamer's post of a video of themselves playing a game, along with their own commentary about the game, or remixes of video game play and other videos.

   l. Commercial expression, *e.g.*, a video in a sports bar that displays games, and also targeted textual advertisements for local businesses of interest to sports viewers.

14. NeTVCR would also allow users to save and re-publish their creations, rather than viewing them only momentarily on a single display as with the NeTV2.

15. NeTVCR would also allow users to store high-definition digital video streams such as HDMI signals in a format of their choice. That is, as with older analog VCR devices, customers would be able to record programs for later viewing or for viewing on a different device, and convert them into a more portable format or a new format that can be understood and displayed by a wider range of devices. For example, a customer could optimize a video for their tablet and bring it with them to view while on a long flight or during their train commute.

16. But for Section 1201, I and Alphamax would publish software that can be used to upgrade NeTV2 devices to NeTVCR functionality and charge a fee for upgrade service or charge more for NeTVCR than for NeTV2. This upgrade is possible to achieve by publishing new software because the NeTV2 contains a general-purpose, reprogrammable computer. I and Alphamax publish the source code for NeTV2 and would do the same for NeTVCR. Source code is written in computer languages designed to facilitate the exchange of ideas among programmers. By publishing the source code, we communicate to others how the technology works and encourage them to discuss edits to improve the code, as they do for NeTV2 at https://github.com/AlphamaxMedia/, and at https://reddit.com/r/netv2/. Software is, after all, simply a set of instructions written in a language that can be understood by computers, as well as humans. In order to for software to achieve any function other than simply being read and understood by a

human recipient, a human must instruct a computer to follow the instructions communicated by the software. Similarly, decrypting something, such as video data, is simply math. A decryption program contains instructions detailing the mathematical steps required to achieve decryption and thereby compute the encrypted content.

**D. Section 1201 prevents me and others from publishing NeTVCR software and engaging in speech via NeTVCR that requires access to decrypted videos.**

17. Section 1201(a)(1), the anti-circumvention rule, prevents me, Alphamax, and others from accessing videos encumbered by HDCP. Gaining access to these video streams is a predicate step necessary to all of the non-infringing uses identified above. All of the expression identified above, which builds upon copyrighted videos encrypted with HDCP, is prevented by the anti-circumvention rule. The fear of prosecution and civil litigation deters me and Alphamax from engaging in and enabling this speech by building and using NeTVCR. All of the activities that I describe as ones I or Alphamax 'would like' to do are activities that I or Alphamax *would* do, using videos I lawfully possess, if not for Section 1201's prohibitions.

18. Developing and testing NeTVCR requires that I bypass HDCP access controls on copyrighted works. This is so because different source materials produce different errors and visual artifacts. At the moment, without circumventing, I and Alphamax are unable to determine if certain screen artifacts are due to source material, cabling, or signal processing added on the monitor side, and thus unable to fix them. Getting pixel-perfect access to source video frames feeding into the monitor is necessary to readily debug such issues and develop NeTVCR.

19. My customers would like to use NeTVCR for mixing, streaming, and recording video game feeds to the Internet. The HDMI output of the Playstation 3 video game console is encrypted with HDCP; it must be bypassed to make fair use of these output videos. These kinds of videos are ubiquitous for video game consoles that permit users to disable HDCP, demonstrating that a wide range of speech is being prevented for consoles, like the Playstation 3, that have mandatory HDCP on their output signals.

20. I am learning Chinese and I would like to circumvent using NeTVCR in order to run a program to automatically display the pinyin pronunciation of Chinese characters to aid in learning for myself and others.

21. I would like to circumvent using NeTVCR in order to make personal backup copies of media that I currently own in a format encumbered with access controls, such as Bluray discs and DVDs.

22. I would like to circumvent using NeTVCR in order to save for later viewing a program shown only at a particular time.

23. I and Alphamax would like to circumvent using NeTVCR in order to create fair use videos that demonstrate the device's capabilities and teach others how to use it. Because of massive demand from users of NeTV2, I would like to demonstrate 'alpha blending,' which enables transparency and smooth edges for overlays and makes the output look far

more credible, modern, and professional and eliminates distracting, jagged edges. Also because of widespread interest, I would like to demonstrate the ability to extract the lower portion of each video frame to train a machine learning system to recognize the symbols in the subtitles. This analysis is a stepping stone towards many other uses, including the real-time display of pinyin pronunciations or other annotations based on the information contained in the subtitles.

24. Sometimes the overlaid video colors appear colored with shades of pink and green. This happens because the video source has changed its color encoding scheme, but this change is a secret to NeTV2 because the color encoding scheme information is also encrypted by HDCP. Without the ability to circumvent, NeTV2 is effectively color blind, and instead users need to be trained to log into their NeTV2 devices and run commands to adjust the color encoding scheme. This is a great inconvenience to users and limits the audience for NeTV2 to fairly technical users. Users without that technical know-how will regularly find that their output has distorted colors, preventing them from expressing themselves as they intend to.

25. Section 1201(a)(2), the ban on trafficking in technology that can circumvent access controls, deters me and Alphamax from distributing NeTVCR. We would like to sell the NeTVCR software and devices pre-loaded with that software, but are deterred from doing so by the fear of prosecution or civil litigation. Because we are deterred from disseminating this tool, our customers never have the opportunity to engage in the speech identified above.

**E. In the 2017-2018 Triennial Rulemaking, the Librarian of Congress denied my petition for an exemption.**

26. I participated in the 2017-18 Triennial Rulemaking, seeking authorization to engage in circumvention of HDCP to make noninfringing uses of audiovisual works, for a variety of speech activities, including many examples given above.

27. The Librarian of Congress denied my petition. The Librarian's Final Rule did not include any reasoning, but summarized and incorporated by reference the reasoning of the Acting Register of Copyrights. The Librarian said that the Acting Register "concluded that the request was an individual case of *de minimis* impact as it was largely made upon a single request of an individual..."

28. If the Librarian of Congress had granted the exemption I requested, I would be free to engage in the many noninfringing speech activities described above without fear of Section 1201(a)(1).

I affirm under penalty of perjury that the foregoing facts are true.

_____          Sep 18, 2019
Andrew "bunnie" Huang                    _____
                                          Date