# EXHIBIT 5



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

## ITEM A.  COMMENTER INFORMATION

*This Comment has been submitted by the UCI Intellectual Property, Arts, and Technology Clinic and Donaldson + Callif, LLP on behalf of Film Independent, the International Documentary Association, Kartemquin Films, Independent Filmmaker Project, University of Film and Video Association, and The Alliance for Media Arts + Culture.*

**Commenters:**

**Film Independent** is an organization that helps filmmakers make their movies, build an audience for their projects, and diversify the film industry. Film Independent puts on over 250 annual screenings and events to unite like-minded artists. These events include the Film Independent Spirit Awards, which recognizes the finest achievements of American independent filmmakers and the LA Film Festival, which showcases select new works from emerging and established independent storytellers. Film Independent also offers an artist development program to foster the careers of talented filmmakers.

**International Documentary Association** is an organization that seeks to assist the growth and development of documentary films and the overall documentary culture. IDA provides educational programs and resources to documentary makers of various skill levels. IDA's grant programs help filmmakers attain the financing necessary to create documentary films. IDA also advocates for major issues that affect documentary filmmakers, including free speech and fair use.

**Kartemquin Films** is a not-for-profit media arts organization and collaborative center for documentary media makers who seek to foster a more engaged and empowered society. In 2016 Kartemquin celebrated 50 years of sparking democracy through documentary. A revered resource on issues of fair use, ethics, storytelling and civic discourse, Kartemquin is internationally recognized for crafting quality documentaries backed by innovative community engagement, and for its filmmaker development programs and media advocacy. The organization has won every major critical and journalistic prize, including multiple Emmy, Peabody, DuPont-Columbia and Robert F. Kennedy journalism awards, Independent Spirit, IDA, PGA and DGA awards, and an Oscar nomination.

**Independent Filmmaker Project** champions the future of storytelling by connecting artists with essential resources at all stages of development and distribution. IFP fosters a vibrant and sustainable independent storytelling community, represents a growing network of 10,000

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

storytellers around the world, and plays a key role in developing 350 new feature and documentary works each year. During its 35-year history, IFP has supported over 8,000 projects and offered resources to more than 20,000 filmmakers. IFP guides storytellers through the process of making and distributing their work through creative, technological and business support through year-round programming. Through its programming—which also includes seminars, conferences, and mentorships—IFP creates exciting opportunities for promising new voices from a diverse range of racial, ethnic, religious, ideological and sexual perspectives.

**University of Film and Video Association (UFVA)** aims to develop the potentialities of the motion picture and television media for purposes of instruction and communication throughout the world. UFVA works primarily in educational institutions with the goal of serving, encouraging, and assisting individuals who teach arts and sciences of motion picture and television production techniques, history, criticism and related subjects.

**The Alliance for Media Arts + Culture (AMAC)** consists of 225 organizations that serve over 335,000 artists and media professionals nationwide. Members include community-based media production centers and facilities, university based programs, museums, media presenters and exhibitors, film festivals, distributors, film archives, youth media programs, community access television, and digital arts and online groups. AMAC's mission is to foster and fortify the culture and business of the independent media arts. AMAC believes that all Americans deserve access to create, participate in, and experience art. AMAC co-authored the Documentary Filmmakers' Statement of Best Practices in Fair Use and has long been an advocate for orphan works reform.

**Representatives**

UCI Intellectual Property, Arts, and Technology Clinic

Jack I. Lerner, Director

Lauren Wertheimer and Shaia Araghi, Certified Law Students

UCI School of Law
401 East Peltason Drive
Irvine, CA 92697

(949) 824-7684

Michael C. Donaldson
Christopher Perez

Donaldson & Callif LLP

400 S Beverly Dr. # 400
Beverly Hills, CA 90212

(310) 277-8394

To contact the commenters, please email dmcafilm@law.uci.edu.

TABLE OF CONTENTS

ITEM A.  COMMENTER INFORMATION ........................................................................ 1

ITEM B.  PROPOSED CLASS ADDRESSED: Class 1—Audiovisual Works—Criticism and
Comment ......................................................................................................... 4

ITEM C.  OVERVIEW ............................................................................................... 4

ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION ........ 9

1. Content Scramble System ("CSS") on DVDs ......................................................... 9

2. Advanced Access Content System ("AACS") on Blu-ray Discs................................. 9

3. Encryption Measures on Digitally Transmitted Video ............................................. 9

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES ............................. 10

Statutory Factors .............................................................................................. 22

i.  Availability for use of copyrighted works ...................................................... 22
ii.  Availability of use of works for nonprofit archival, preservation, and educational
purposes ..................................................................................................... 24
iii. Impact that the prohibition on the circumvention of technological measures applied
to copyrighted works has on criticism, comment, news reporting, teaching,
scholarship, or research................................................................................ 25
iv. Effect of circumvention of TPMs on the market for, or value of, copyrighted
works ......................................................................................................... 25
Conclusion ....................................................................................................... 27

**ITEM B.  PROPOSED CLASS ADDRESSED:**

Class 1—Audiovisual Works—Criticism and Comment

Filmmaker commenters propose the following exemption:

> Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where circumvention is undertaken solely in order to make use of short portions of the motion pictures for the purpose of criticism or comment for use in filmmaking, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure.

As set forth in the Petition for Modification submitted September 13, 2017,[1] the proposed exemption is a modification of the exemption now in effect and codified at 37 CFR § 201.40(b)(1), and provisionally recommend for renewal.

**ITEM C.  OVERVIEW**

Scholars have tried. Filmmakers have tried. Even the International Documentary Association has tried. They all failed. No one has ever been able to craft a definition that draws a clear line between the films that are labeled documentary on one hand and films that are commonly referred to as feature films, fictional films, or scripted films on the other hand. This lexicographical failure does not hamper the marketing of films, nor the audiences who attend them, nor the robust community of filmmakers who identify themselves using this term. But when one is drawing a line between identical conduct by a group of people, in this case filmmakers, dividing conduct which is criminal from conduct which is not criminal, one must be extremely careful that the line is reliable, and does not frustrate any constitutionally based rights. Language that works well among a loose community or in the marketing department is simply insufficient for the task at hand in these triennial § 1201 rulemaking proceedings.

For a number of reasons, the commenters herein have come to you in the past with requests to decriminalize conduct for a select group that we have labeled as documentary filmmakers. The Register of Copyrights and the Librarian of Congress have used that label in granting our requests. But filmmakers who do not label themselves as documentary filmmakers are increasingly using or wanting to use fair use in their films—and they, too, are finding that the Digital Millennium Copyright Act's prohibition on circumvention is preventing them from doing so.

---

[1] *Film Independent and International Documentary Association's Petition for New Exemption Under 17 U.S.C. § 1201*, U.S. COPYRIGHT OFFICE, Sep. 14, 2017.

In short, the division has gone from problematic to unacceptable. We come to you today, in this brand-new proceeding, to request that you apply this exemption not just to the group we have called documentary filmmakers, but to all filmmakers.

The term "documentary" was first applied to film in 1926 in the *New York Sun* by John Grierson. His original definition of documentary— "the creative treatment of actuality"[2]—was made in reference to Robert Flaherty's *Nanook of the North*, which famously staged many scenes and employed actors in costumes to stage events and practices that Flaherty witnessed in real life while in the Arctic Circle—but which were no longer in common use.[3] Every scholar, every written history of documentary film, and every article on the subject cites *Nanook of the North* as the first documentary. Grierson's definition was instantly controversial, and he himself later declared, "documentary is a clumsy description, but let it stand."[4]

In the decades since Grierson proposed his definition, the struggle to define documentary filmmaking has reached legendary status. No fewer than 17 scholars and filmmakers (including Grierson himself) have proposed their own competing definitions:

> 1936: Documentary film is "the use of the film medium to interpret creatively and in social terms the life of the people as it exists in reality," and is the "intellectual ability" to draw out the "meaning *behind* the thing and the significance *underlying* the person."[5] – Paul Rotha

> 1946: "The documentary is the branch of film production which goes to the actual, and photographs it and edits it and shapes it. It attempts to give form and pattern to the complex of direct observation."[6] –John Grierson

> 1950: Documentary is "a dramatized presentation of man's relation to his institutional life."[7] –Raymond Spottiswoode

> 1950: "A documentary film, then, is basically a non-studio or non-theatrical film of any kind other than a cartoon or abstract film."[8] –Hugh Gray

> 1951: "The documentary film is an original art form. It has come to grips with facts-on its own original level. It covers the rational side of our lives, from the scientific experiment to the poetic landscape-study, but never moves away from the factual."[9] –Hans Richter

---

[2] John Grierson, *The First Principles of Documentary*, *in* GRIERSON ON DOCUMENTARY 147 (Forsythe Hardy ed., 1966).

[3] Ann S. Utterback, *The Voices of the Documentarist*, Journal of the University Film Association, Summer 1977, at 31, 34–35.

[4] John Grierson, *First Principles of Documentary (1932–1934)*, *in* NONFICTION FILM: THEORY AND CRITICISM 19 (Richard Meran Barsam ed., 1976).

[5] PAUL ROTHA, DOCUMENTARY FILM 132 (1936).

[6] John Grierson, *Postwar Patterns*, 1 HOLLYWOOD QUARTER 159 (1946).

[7] RAYMOND SPOTTISWOODE, A GRAMMAR OF THE FILM 284 (1950).

[8] Hugh Gray, *Robert Flaherty and the Naturalistic Documentary*, 5 Hollywood Quarterly 1, 45 (1950).

[9] Hans Richter, *Film as an Original Art Form*, 10 College Art Journal 157, 159 (1951).

1965: "The term documentary is used in its broadest sense to refer to films that possess truth and project reality, and are intended primarily for non-theatrical use."[10] –William J. Sloan

1973: A documentary film is a "film with a message." –Richard Meran Barsam

1973: A documentary is "the communication, not of imagined things, but of real things only,"[11] and "the presentation of actual facts in a way that makes them credible and telling to people at the time."[12] –William Stott

1980: "[T]he function of the documentary is to clarify choices, interpret history and promote human understanding."[13] –Alan Rosenthal

1985: Documentaries are films that give up control of the events being filmed.[14] –Robert C. Allen & Douglas Gomery

1990: A documentary "takes real people and real problems from the real world and deals with them."[15] –Trinh T. Minh-Ha

1995: "A documentary is any motion picture that is susceptible to the question 'Might it be lying?'"[16] –Dirk Eitzen

1997: "Documentary is purposive; it is intended to achieve something in addition to entertaining audiences and making money."[17] –William Rothman

1999: "[A] documentary […] tells something about the reality of our world - shows us the real world."[18] –Kees Bakker

2005: Documentary filmmaking is "the pursuit of truth."[19] –Regina Austin

---

[10] William J. Sloan, *The Documentary Film and the Negro: The Evolution of the Integration Film*, JOURNAL OF THE SOCIETY OF CINEMATOLOGISTS, January 1, 1965, at 66.

[11] RICHARD MERAN BARSAM, NONFICTION FILM: THEORY AND CRITICISM 4 (1976).

[12] WILLIAM STOTT, DOCUMENTARY EXPRESSION AND THIRTIES AMERICA xi, 73 (1976).

[13] ALAN ROSENTHAL, THE DOCUMENTARY CONSCIENCE: A CASEBOOK IN FILM MAKING 1 (1980).

[14] ROBERT C. ALLEN & DOUGLAS GOMERY, FILM HISTORY: THEORY & PRACTICE 216 (1985).

[15] Trinh T. Minh-Ha, *Documentary Is/Not a Name*, OCTOBER, Spring, 1990, at 76, 79.

[16] Dirk Eitzen, *When is a Documentary? Documentary as a Mode of Reception*, Cinema Journal, Vol. 35, No. 1, University of Texas Press on behalf of the Society for Cinema & Media Studies (1995).

[17] WILLIAM ROTHMAN, DOCUMENTARY FILM CLASSICS 4 (1997).

[18] KEES BAKKER, JORIS IVENS AND THE DOCUMENTARY CONTEXT (1999).

[19] Regina Austin, *The Next NewWave: Law-Genre Documentaries, Lawyering in Support of the Creative Process, and Visual Legal Advocacy*,16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 809 (2005-06)

2007: "A documentary film tells a story about real life, with claims to truthfulness."[20] – Pat Aufderheide

2008: A documentary is "a form of democratic and social pedagogy," and "an essentially transitional medium: it carries fragments of social reality from one place or one group or one time to another, and in transporting them, translates them from a local dialect to a lingua franca."[21] –Jonathan Kahana

2014: "[D]ocumentary films often purport to portray 'events, occurrences, or histories which are taken from real life, and which may be voiced or enacted wholly or in part, by the real-life participants in the event.'"[22] –Stephen Daly

For each of the definitions listed above, there are examples of films that were not labeled or marketed as documentaries, but fit one or more of these definitions. Consider *Dunkirk* (in which the allied invasion of Europe is graphically presented without dialogue, praised by experts for its accuracy), *Snowden* (Oliver Stone's biopic of Edward Snowden, accurate even in details of his hotel room as previously seen in the Oscar-winning documentary *Citizenfour*), *The Crown* (a TV series about Queen Elizabeth, with some unsupported conjectures but painfully accurate on episodes such as the Suez Canal crisis), and *Darkest Hour* (a historically accurate Winston Churchill biopic). Films about to come out include *The Post, The Greatest Showman, The Man with the Iron Heart,* and *Shock and Awe.* These films cover topics from the birth of show business, to the rise of the country's first female new publisher, to George Bush's planned invasion of Iraq in 2003, respectively.

The fact that documentary is one of the most confusing and perplexing genre classifications in film has not gone unnoticed. It has been called "the most familiar, but most abused and most understood term in the film lexicon."[23] Many have concluded that it is simply impossible to define documentary film in any consistent way. In 1990, Trinh Minh-Ha wrote,

> There is no such thing as documentary—whether the term designates a category of material, a genre, an approach, or a set of techniques. This assertion—as old and as fundamental as the antagonism between names and reality—needs

---

[20] PAT AUFDERHEIDE, DOCUMENTARY FILM: A VERY SHORT INTRODUCTION 2 (2007).

[21] JONATHAN KAHANA, INTELLIGENCE WORK: THE POLITICS OF AMERICAN DOCUMENTARY 1-2 (2008).

[22] Stephen Daly, REFRAIN FROM CRUDE BEHAVIOR: The Need for Journalism Standards in Documentary Filmmaking, 31 ENT. & SPORTS LAW. 1 (2014-15) (quoting Cynthia D. Bond, Documenting Law: Reality and Representation on Trial, 39 LINCOLN L. REV. 1 (2012)).

[23] BARSAM, *supra* note 23, at 1–3. See also Eitzen, *supra* note 16, at 81 (the definition of documentary film "remains a vexed and controversial issue, not just among film theorists but also among people who make and watch documentaries"); Annette Kuhn, *Documentary: The Camera I Observations on Documentary*, 19 SCREEN 71 (1978) (the many interpretations of documentary film have led to an "inevitable outcome of confusion: a collapsing of fiction and non-fiction resulting from attempts to describe documentary in terms of film language seen as a general cinematic sign system, for example, or a movement away from a questioning of naïve realism in the context of the documentary and onto the terrain of Truth.").

incessantly to be restated, despite the very visible existence of a documentary tradition."[24]

In fact, scholars and commentators have been pointing out for decades how much fiction and nonfiction overlap in filmmaking. As Carl Plantinga states in *What a Documentary Is, After All*, "[t]he question of how best to define the documentary film and video and to distinguish it from the fiction film continues to fascinate and baffle philosophers and film theorists. It is clear that the special nature of the film medium—and in particular its use of photographic images and sound recordings—has proven particularly difficult to conceptualize in relation to the fiction/nonfiction film distinction."[25] Michael Renov further states in *Theorizing Documentary*, "[I]n a number of ways, fictional and nonfictional forms are enmeshed in one another— particularly reading semiotics, narrativity, and questions of performance."[26] Documentaries "borrow heavily from the narrative forms of fiction, and the documentary filmmaker will often creatively select shots, mix sounds, and juxtapose scenes to tell an entertaining story."[27]

If generations of people who analyze and study film for a living cannot draw a clear line between documentary and non-documentary films, then certainly the Copyright Office—and further, the courts—cannot either. As we discuss in this Comment,[28] to do so raises serious constitutional concerns. The Supreme Court has instructed that a regulation cannot pass constitutional muster if persons "of common intelligence must necessarily guess the meaning and differ as to its application."[29] This is especially true when First Amendment freedoms are at risk,[30] and the Supreme Court has specifically held that laws regulating film must be especially precise.

In identifying only documentary films as exempt, the Librarian is leaving filmmakers unclear on which films fall under the exemption, causing the exemption to be unconstitutionally vague. Accordingly, we urge the Register not use "documentary filmmaking" in its recommended exemption, but rather simply to use the term "filmmaking." This solution would be much clearer because it points to an activity rather than a marketing genre or an arbitrary classification based on claims of "reality" or other inherently subjective descriptions.

In this Comment, we demonstrate that many films which may not traditionally be categorized as "documentary" regularly make fair use in the form of criticism and commentary. We further show that the creators of these films need high quality content in order to do so, and that such content is encrypted or otherwise protected by technological protection measures at every turn. As a result, many filmmakers are finding that their ability to make lawful criticism and commentary is being adversely effected by § 1201.

We also address the continuing undue burden imposed by the screen capture requirement in the current exemption. As was true at the time of the last rulemaking process, there exists no screen

---

[24] Minh-Ha, *supra* note 15, at 76.
[25] Carl Plantinga, *What a Documentary Is, After All*, 63 THE JOURNAL OF AESTHETICS AND ART CRITICISM, 105 (2005)
[26] MICHAEL RENOV, THEORIZING DOCUMENTARY 2 (1993)
[27] Daly, *supra* note 22.
[28] See *Supra at page* 25-26
[29] *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).
[30] *Scull v. Com. of Va. ex rel. Committee on Law Reform and Racial Activities*, 359 U.S. 344, 353 (1959).

capture programs that will render content in quality that is even close to meeting the stringent requirements that filmmakers face today. We therefore we request that the Register recommend this exemption be modified so as to remove this burden.

## ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION

The TPMs that are at issue in this proposal are the same as those at issue in the current exemption that the Register has provisionally recommended for renewal.[31] Filmmakers need to access motion picture material on (1) DVDs, (2) Blu-ray discs, and (3) digitally transmitted video to make criticism and commentary in their films.

### 1. Content Scramble System ("CSS") on DVDs

Like the current exemption, the modified exemption will permit circumvention, in certain circumstances, of CSS on DVDs.[32] CSS utilizes a mix of access and use controls to protect the content of DVDs from being copied by, distributed by, and viewed from unauthorized devices. The Register has previously concluded[33] that CSS qualifies as a TPM subject to the DMCA's anticircumvention provisions because it "effectively controls access" to content by requiring the "application of information"—namely, encryption keys—to gain access to the work.[34] Software that allows users to access content on DVDs has been available for well over a decade.

### 2. Advanced Access Content System ("AACS") on Blu-ray Discs

Like the current exemption, the modified exemption will permit circumvention, in certain circumstances, of AACS on Blu-ray discs. Like CSS, AACS is also a mixed access and use control, and has also been previously recognized by the Register[35] as a TPM subject to the DMCA because it "effectively controls access" to content by requiring the "application of information"—namely, encryption keys—to gain access to the work.[36] To the best of our knowledge, there exists software which allows users to access digital files on AACS-protected Blu-ray.

### 3. Encryption Measures on Digitally Transmitted Video

Like the current exemption, the modified exemption will permit circumvention, in certain circumstances, of TPMs on digitally transmitted video. Much like CSS and AACS, the protection measures found on digitally transmitted video seek to control access through encryption and other mechanisms, and thus qualify as a TPM within the meaning of § 1201(a)(3) by requiring the "application of information"—namely, encryption keys—in order to gain access to the

---

[31] Exemption to Permit Circumvention of Access Controls on Copyrighted Works, 82 Fed. Reg., 49,557 (Oct. 26, 2017).

[32] See 37 C.F.R. § 201.40 (2010).

[33] Register of Copyrights, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention at 216 (Oct. 8, 2015).

[34] 17 U.S.C § 1201(a)(3) (2016)

[35] Register of Copyrights, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention at 126 (Oct. 8, 2015).

[36] 17 U.S.C § 1201(a)(3) (2016)

work.[37] The Register reached the same conclusion in her 2015 recommendation, determining that a "significant number of platforms that offer digitally transmitted motion pictures, both for digital downloads and for streaming, constitute technological measures controlling access to those works under § 1201(a)(1)."[38] The same is true today.

In general, protection measures on digitally transmitted video operate by utilizing a combination of (i) client verification, which ensures that an authorized client is receiving the content; (ii) encryption, which ensures that the content is delivered securely only to authorized client; and (iii) access controls, which ensure that the client cannot export the content for redistribution. [39] For example, Netflix content streamed to a laptop through a web browser plug-in is protected by both encryption and other protocols.[40] The most popular of these are Microsoft Silverlight and Adobe Flash. A client requests media usage rights from a rights server online and downloads a DRM license or key so that he or she can play the content.[41] In addition, cable set-top boxes, DVR machines, Hulu, and Netflix are often protected by hardware encryption through High Definition Multimedia Interface ("HDMI") cable outputs as well as encryption and other protocols active within DVR and cable boxes. [42] The systems that use DRM protocols such as these are diverse and in a state of constant flux. It is clear, however, that virtually all of the digital systems in use today seek to control access through a combination of encryption and other mechanisms that easily qualify as TPMs within the meaning of § 1201(a)(3).

ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

**1.   The proposed class includes many works protected by copyright.**

The class as modified utilizes motion pictures as defined at 17 U.S.C. § 101, which are a defined category of authorship under §102(6). The overwhelming majority of motion pictures are protected by copyright and have not fallen into the public domain. In addition, a massive proportion are protected by TPMs and thus unavailable to a significant portion of filmmakers for criticism and commentary.

**2.   The use contemplated in this exemption—excerpting short portions of motion pictures for the purposes of criticism and commentary—is a quintessentially noninfringing use.**

All types of films have long relied on fair use and arguably could not function without it. Fair use in filmmaking has been recognized by the Register, Librarian, and in over 90 judicial opinions since the Copyright Act of 1978 went into effect. Criticism and commentary is an archetypical form of fair use, so much so that it was identified as such by Congress in § 107 of the copyright statute.[43] The Register has previously recognized that documentary filmmaking relies heavily on fair use and documentary filmmakers routinely exercise their rights under the

---

[37] Register of Copyrights, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at* 126 (Oct. 2012).
[38] *Id.* at 73.
[39] Memorandum from Alex Podobas, Appendix U.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] 17 U.S.C. § 107 (2016)

fair use doctrine safely and responsibly. The same is true for all filmmakers, not just those who market themselves as documentary filmmakers or consider themselves as a part of the documentary film community.

Since the beginning of film, all genres of filmmaking have conducted criticism and commentary of copyrighted works, using techniques such as parody, reference, pastiche, or simple commentary whether by narrators, interviewees, or invented characters. For example, "biopics," films "based on a true story," and other fact-based films present information and commentary meant to educate and analyze real events. In the film *Chavez*, the filmmakers exercised their right to fair use by utilizing news clips from the time period of Hugo Chavez to strengthen the historical integrity of the film.[44] In the 2015 film *Steve Jobs*, Universal Studios was unable to get permission to use the well-known "1984" Apple computer advertisement, which played a key role in the film.[45] The permission was denied because the Jobs family "hated" the direction that the film was taking.[46] As one of the filmmakers at Universal said at the time, "there is a need for responsible people to be able to say what they really want to say, and not to be prevented from doing that."[47] Leaving this clip out was not an option, so Universal Studios exercised its right to fair use and used the commercial.[48]

Many courts have, in fact, upheld fair use in fictional works,[49] and filmmaking is no exception. For example, in *Sofa Entertainment v. Dodger Productions*, Dodger used a short clip of the "Ed Sullivan Show" in the biographical musical "Jersey Boys."[50] The court held that the use of this clip fell squarely within Dodger's fair use rights because the use was clearly transformative.[51] After the case was decided, the play was made into a film.[52] Another example comes out of *Adjimi v DLT Entmt't Ltd.*, where the court concluded that a Broadway play parodying Three's Company was considered fair use. In addition, in *Jackson v. Warner Bros. Inc.,* the court granted

---

[44] *Comment of International Documentary Association, et. al., In the Matter of Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (2014) (Docket No. 2014-07).
[45] The Wrap, *How 'Steve Jobs' Used Apple's Super Bowl Ad without Permission,* (Oct. 13, 2015), http://m.startribune.com/variety/movies/332251172.html?section=/variety.
[46] *Id.*
[47] *Id.*
[48] *See* Appendix S, Lerner, Jack I., and Michael C. Donaldson. "Docket No. 2014-7 Exemptions to Prohibition Against Circumvention of Technological Measures Protecting Copyrighted Works Proposed Class 6 - Audiovisual Works – Derivative Uses – Filmmaking Uses." Received by Maria Pallante, 15 Oct. 2015; E-mail from Stephen Ruwe, Assistant Gen. Counsel, U.S. Copyright Office, to Jack Lerner, Assistant Clinical Professor of Law, Univ. of CA, Irvine School of Law, Michael Donaldson, Donaldson + Callif (Oct. 15, 2015, 01:01PM EST) (explaining that "the record for the current rulemaking on Exemptions to Prohibition Against Circumvention of Technological Measures Protecting Copyrighted Works has been closed for some time. As such, the information you provided will not be considered in the current rulemaking.").
[49] *See, e.g.*, *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1260 (11th Cir. 2001); *Campbell v. Acuff- Rose Music, Inc.,* 510 U.S. 569, 569-70 (1994). *Cf. MCA, Inc. v. Wilson*, 677 F.2d 180, 185 (2d Cir. 1981) (permissible parody should target the original, but may also reflect on life in general).
[50] S*OFA Entm't, Inc. v. Dodger Prods., Inc*., 709 F.3d 1273, 1276 (9th Cir. 2013).
[51] *id.*
[52] Jersey Boys Official Movie Site, Jersey Boys, http://www.jerseyboysmovie.com (last visited Dec. 17, 2017).

summary judgment in favor of defendant who claimed fair use when making a romantic comedy.[53] Many other examples exist.[54]

Today, more and more independent films that would not traditionally be considered documentary are making fair use. As Michael Donaldson explains in his letter attached hereto as Appendix A, this trend is the result of "mobility within the independent film community. Independent filmmakers work on a documentary one week and a narrative film the next week." Within the independent film community, "[t]his intermingling between these two types of work was inspiring filmmakers to take what they had learned to be their rights in making a documentary and use it when they worked on scripted films." Furthermore, films from genres outside documentary now routinely obtain fair use endorsements on media liability insurance.

The use of short portions of motion pictures for the purpose of making criticism or commentary is clearly a noninfringing use no matter how the film is categorized. The noninfringing nature of the use does not change just because of the film's marketing designation or genre classification. The mere fact that a film is marketed as a documentary does not make that film's criticism or commentary any less deserving of fair use protection—and there is no reason to think filmmakers would act more or less responsibly depending on how their film is categorized.

Indeed, application of the four statutory factors set forth in § 107 firmly supports the conclusion that the use of short portions of motion pictures for purposes of criticism and commentary is highly likely to be fair use no matter how one classifies the film.

### Factor 1: Purpose and character of work

For the first factor set forth in § 107, the court must look to the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes. As the Register has determined in numerous previous rulemakings,[55] while many films are commercial in nature, they still can—and do—make fair use for the purpose of criticism and commentary, among other uses.[56]

When applying the fair use factors to any given case, courts have consistently rejected bright line assessments as to a work's overall purpose, and rather, focused more so on whether the work in question was transformative. For example, in *Wade Williams Distribution, Inc. v. Am. Broad. Co., Inc.*, the court considered whether use of video clips in an entertaining morning talk show

---

[53] *Jackson v. Warner Bros. Inc.*, 993 F. Supp. 585, 592 (E.D. Mich. 1997).

[54] *Campbell*, 510 U.S. at 580; *Arrow Prods. v. The Weinstein Co.*, No. 13-Civ.-5488 (S.D.N.Y. 2014).

[55] Register of Copyrights, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at* 72 (Oct. 2015); Register of Copyrights, *Section 1201 Rulemaking: Fourth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at* 126 (Oct. 2012); Register of Copyrights, *Section 1201 Rulemaking: Third Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at* 126 (Oct. 2010).

[56] *Wade Williams Distrib., Inc. v. Am. Broad. Co.*, No. 00 CIV. 5002(LMM), 2005 WL 774275 at *9 (S.D.N.Y. Apr. 5, 2005); *Hofheinz v. Discovery Comm'cns, Inc.*, No. 00 Civ. 3802, 2001 U.S. Dist. LEXIS 14752 at *13 (S.D.N.Y. 2001).

constituted fair use.[57] The court rejected the argument that "there can be no fair use when copyrighted excerpts are used for entertainment," and held, "what is most persuasive in this case is that...use of the films was clearly transformative." [58] Similarly, the court in *Hofheinz v. Discovery Communications, Inc.* held that "[§] 107 does not explicitly distinguish between entertaining and serious, plausible and implausible, or weighty or frivolous commentaries."[59] The focus in these cases, and the overwhelming majority of fair use decisions, is on the specific use in question, not general characteristics of the genre. The case law makes clear that there is no need for a distinction between genres; rather, courts decide on a case by case basis based on the specific use at issue.

Many fair use decisions involving filmmaking rely heavily on the fact that the use of the underlying work is transformative. Parody is another example of transformative work where the courts uphold fair use in entertainment and commercial works.[60]  Films often use parody and although the work created may be commercial in nature and for the purpose of entertainment, courts have deemed it fair use. [61] In the seminal case on fair use in parody, *Campbell v Acuff–Rose*, the United States Supreme Court rejected the idea that a work is presumptively unfair just because it is commercial in nature.[62] In addition to recognizing the legitimacy of fair use in works with a commercial nature, the Court also recognized that a work created at least in part for the purpose of entertaining can still constitute fair use. Additionally, in *Bourne v. Twentieth Century Fox Film Corp.*, the court concluded that a parody of the song "When You Wish Upon a Star" in the show *Family Guy* was also fair use. [63] Lastly, in *Brownmark Films, LLC v. Comedy Partners*, the Seventh Circuit upheld fair use where the television show *South Park* created a parody of a viral internet video. [64]

There should be no question that many films not traditionally classified as documentary make fair use. This statutory factor weighs heavily in favor of modifying the current exemption to include all filmmakers, not just those classified as "documentary filmmakers."

### Factor 2: The Nature of the Copyrighted Work

The second element requires an analysis of the nature of the copyrighted work. Although motion pictures are often highly creative, the use of motion pictures contemplated by the current exemption and proposed modification—short portions for criticism and commentary—is still highly transformative.  This fact strongly outweighs any concern regarding the nature of the copyrighted work.[65] In fact, in the 2012 and 2015 Rulemakings, the Register noted that the second factor is not especially relevant when determining whether a use is fair. [66]

---

[57] *Wade Williams*, No. 00 CIV. 5002(LMM), 2005 WL 774275 at *9.
[58] *Id.*
[59] *Hofheinz,* No. 00 Civ. 3802, 2001 U.S. Dist. LEXIS 14752 at *13.
[60] *Campbell,* 510 U.S. at 565.
[61] *Id.*
[62] *Id.* at 570
[63] *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d 499, 511 (S.D.N.Y. 2009).
[64] *Brownmark Films, LLC v. Comedy Partners*, 82 F.3d 687 (7th Cir. 2012).
[65] Michael Donaldson, *Refuge from the Storm: A fair Use Safe Harbor for Non-Fiction Film,* 481 (Dec. 18, 2012
[66] *See* 2015 Recommendation at 74; *See* 2012 Recommendation at 128.

In fact, the Second Circuit has said the second factor "may be of limited usefulness where the creative work of art is being used for a transformative purpose."[67]

Further, the second factor is not dispositive in the fair use analysis, and in fact, if one were to take out this factor from any given analysis, the outcome would almost always remain the same. Courts uniformly spend little time on this factor when discussing their reasoning in fair use cases, and there are endless examples of cases in which courts uphold fair use even when the works being used are highly creative and imaginative.[68] Judge Leval recognized as much in *Authors Guild v, Google, Inc*. when he emphasized that the second factor has rarely played a significant role in the determination of a fair use dispute.[69] In that case, the Second Circuit decided that the use in question was fair use not because of the nature of the work, but because the secondary use is transformative.[70]

It cannot be disputed that films of every kind make criticism and commentary in the form of parody, symbolism, allusion, and many other transformative ways. And where transformative use exists, the second factor should be given relatively little weight.

### Factor 3: Amount Used

The third element requires an analysis at the amount and substantiality of the portion used in relation to the copyrighted work as a whole. This element need not be discussed in detail because the proposed modification still permits use of short portions. Further, fair use resources for filmmakers and counseling to filmmakers encourage use of only a reasonable amount of content. Counsel for Commenters use the following approach as recommended in Michael Donaldson's article *Refuge from the Storm: A Fair Use Safe Harbor for Non-Fiction Film*: ask "whether the amount of material used by the filmmaker [is] limited to no more than that which is reasonably in service of the point he or she is trying to make."[71] In our experience, this works well for all kinds of filmmakers. The same is true for the guidelines set out in the widely-accepted *Statement of Best Practices in Fair Use for Documentary Filmmakers*, which provides that "the use [should] [be] no more extensive than is necessary to make the point for which the material has been selected."[72]

In fact, the "short portions" limitation in this exemption is actually more restrictive than traditional fair use, which on occasion might allow more than a short portion to be used (such as with a scene-by scene analysis, running commentary, mashup, or remix). On occasion, fair use even allows for an entire work to be used.[73]

---

[67] *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 612 (2d Cir. 2006).
[68] *Amsinck v. Columbia Pictures Indus., Inc*., 862 F. Supp. 1044, 1047 (S.D.N.Y. 1994).
[69] *Authors Guild v. Google, Inc.,* 804 F.3d 202, 220 (2nd Cir. 2015).
[70] *Id.*; *See Also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990).
[71] Michael Donaldson, *Refuge from the Storm: A fair Use Safe Harbor for Non-Fiction Film,* 482 Dec. 18, 2012.
[72] Association of Independent Video and Filmmakers, et al., *Documentary Filmmakers' Statement of Best Practices in Fair Use*, CENTER FOR MEDIA & SOCIAL IMPACT (CMSI) (Nov. 18, 2005), http://www.cmsimpact.org/sites/default/files/fair_use_final.pdf.
[73] *Bill Graham*, 448 F.3d at 612.

Nothing about the classification of the film being made changes the analysis of this element. Application of this factor favors fair use and it should also favor a finding that the use at issue here is non-infringing for purposes of § 1201, regardless of genre.

### Factor 4: Market

Application of the fourth element depends on the effect of the use upon the potential market for or value of the copyrighted work. The Supreme Court has held that rightsholders do not have the right to the market for transformative uses of their works.[74] This is because, among other reasons, rightsholders of underlying works likely do not want criticisms of their original work, and therefore would have no motive to develop such market. In other words, transformative uses do not affect a legitimate market and thus the proposed modification will have no effect on any clearance market.

Additionally, with respect to documentary filmmaking, the Register has previously concluded that "use of a motion picture clip for purposes of documentary commentary or criticism is unlikely to interfere with the primary or derivative markets for the underlying work."[75] There is no reason that this would be any different in a non-documentary context. Given that there is no right to a license to work made pursuant to fair use, there can be no market-based objection to an exemption that merely permits that fair use to go forward.[76]

As in the previous rulemaking, we are not aware of any evidence, or even a single allegation, that the filmmakers' exemption has resulted in any harm to the market for copyrighted motion pictures. Again, this makes intuitive sense, as filmmakers are rightsholders themselves, are already inclined to follow established best practices in fair use, and thus are very unlikely to use the exemption in a way that harms the market.

### 3. Filmmakers are being adversely affected in their ability to make fair use of short portions of motion pictures for the purpose of criticism and commentary.

#### a. Content Scramble System on Digital Video Discs

Since 2010, exemptions applicable to documentary filmmaking have been in effect. This exemption has helped many filmmakers, and there has been neither evidence nor any allegation that this exemption has harmed rightsholders in any way. There is no reason this would change if the "documentary" limitation were removed. All filmmakers regularly need access to footage on DVDs and without an exemption to DVDs, many non-infringing uses simply cannot be made.

Many filmmakers whose projects would not traditionally be classified as documentary seek to make fair use but have been stymied by § 1201's anticircumvention provisions. Filmmakers Steve Boettcher and Mike Trinklein relate that they have refrained from making fair use for fear

---

[74] *Campbell*, 510 U.S. at 591.

[75] *See* 2015 Recommendation.

[76] (Barring increased infringing uses--of which there have been no increase nor allegations of one in the future).

of violating § 1201: [77]

> Given the significant amount of drama in the film [we are working on], we decided early on that our storytelling toolbox could not include fair use of materials from DVD or Blu-ray, because the exemption did not cover accessing that material for use in a drama. Already, we were hindered in our ability to tell these stories. So, there is already a chilling effect in that a drama-heavy documentary might be seen as a drama outright, and thus under a different set of rules.
>
> Further, [we] urge the Copyright Office to consider the 2012 Ben Affleck movie *Argo*, which chronicled the freeing of the US hostages in Tehran. The film meticulously followed the facts of the rescue—and served as an important history lesson for those who saw it. One key to the story was Ted Koppel's nightly reports on ABC about the continuing saga in 1979-80. That key element of the story could not have been acquired from a DVD—and used via fair use—because the exemption does not cover "drama."

An anonymous filmmaker provided the following statement regarding the DMCA:

> I'm an award-winning producer whose films have played at major festivals around the world and have had wide theatrical releases through major distributors. I have previously relied on fair use in non-documentary films. Going forward, I plan to make a hybrid documentary/narrative feature about a very famous film duo. This film is mostly going to require the use of third party content that is protected by access controls. The only way that I can get access to the high-quality clips that I need to make the film is to have the ability to circumvent the access controls. Without this, my project doesn't work.

Robert Grant explained the following impediments that § 1201 poses for his current project: [78]

> My most recent project, *Fake Blood*, uses an "outside the box" concept to examine the filmmaker's responsibility in portraying violent imagery on screen and how audiences react to those images. *Fake Blood* is most accurately described as a documentary-thriller and blends nonfiction and fictional elements to tell the story. Through narration and various interviews, *Fake Blood* makes reference to my past horror films and well-known films that use violent imagery to tell their stories. To accurately convey the points being made, it was necessary to show brief clips of each film under the protection of the fair use doctrine.
>
> *Fake Blood* is an independent film that was made with a limited budget. Only through the film being labeled as a documentary was I able to take advantage of fair use due to the encrypted materials I needed to access. Without being able to use these clips under fair use, the clips would not have been used at all and *Fake Blood* would not have been completed, which I think would be a shame with such

---

[77] Letter from Boettcher/Trinklein Productions, Appendix C.
[78] Letter from Rob Grant, Appendix P.

16

an important topic. As these examples illustrate, the current exemption has had a profound impact on filmmaking.

In light of this evidence, it is clear that fair use in filmmaking will be adversely affected if filmmakers do not have the ability to legally circumvent CSS on DVDs.

### b. Advanced Access Content System on Blu-ray

Blu-ray remains commonplace and since the last rulemaking, continues to further supplant DVDs as an important source of motion picture material. As was true in 2015, this bonus footage can often only be found on a Blu-ray, which makes it even more necessary for this exemption to be expanded to include all filmmakers that need to access this unique footage. [79] Further, many filmmakers need access to HD/the high-quality content found on Blu-ray to complete the story they are attempting to portray in their filmmaking.

Roberto Miller, at Pure Grain Productions, has faced great difficulty with his current project because of § 1201's anticircumvention provisions: [80]

> I am developing a narrative feature film with Liz Holdship about a professor who, in the midst of a divided world, leads a team of international scientists on a unique experiment to facilitate a sense of unity in humans. To truthfully illustrate a politically, economically, and racially "divided world" that audiences can readily relate to, our main characters will witness clips of contemporary news casts and broadcast shows from major world networks such as CNN, Fox News, BBC, ABC news, PBS, etc. Some of our characters will see (or recall in their minds) clips from films that illustrate a "divided world," and the fight against it, such as *Mr. Smith Goes to Washington*, which is digitally encrypted in 4K on a Blu-ray disk. Access to this digital content is the only way we can demonstrate the "divided world" which is essential to our film going forward.

This use is virtually identical to use in a film styled as a "documentary" in which the clips are analyzed and explored to explain and illuminate the world around us. Filmmaker Gail Prensky faces a similar problem:

> I am a filmmaker and produce various videos that capture factual accounts. Currently, I am working on a project entitled The Jüdische Kulturbund Project, which explores the dilemmas that Jewish artists faced in Germany back in the 1930s and early 1940s and contemporary artists confront around the world today. I would categorize my project as both documentary and fiction because the project produces factual narratives such as live public presentations, but I am also developing a script for dramatic feature film and a multimedia play. Because so much of this project requires clips of the featured artists' performances to comment on and illustrate the struggles they face, I would need to rip from sources like DVDs and Blu Ray. Access to media like DVDs and Blu Ray would help tell the artists' story. I couldn't

---

[79] Letter from Jim Morrissette, Kartemquin Films (Dec. 4, 2017), Appendix B.
[80] Letter from Roberto Miller, Pure Grain Productions, Appendix K.

afford to produce this material otherwise because much of the material is not available online. I am unsure of whether my project would fall under the exemption because it is a combination of documentary and narrative, and my fear of a lawsuit once my project is publicly viewed and distributed stops me from ripping from these sources**.**

Filmmaker Rachel Ward discusses how the roadblocks caused by the DMCA affected her creative process:[81]

An example of [this issue] is a web series we sold to Universal called TESLA & TWAIN, which was a fictional exploration of the real historical friendship between the great writer Mark Twain and the genius inventor Nikola Tesla. We wanted to use a four second clip from Back to the Future as an analogous comedic touchstone. Due to the lack of an exemption for non-documentary films, we chose not to use a clip from the film even though we certainly thought it would quality as fair use. Licensing the material was not an option because it would have been too expensive. We ended up creating an audio sound-alike instead. Universal never released the series.

As seen in the above examples from filmmakers, narrative filmmakers will continue to be adversely affected in their ability to make fair use if they are prohibited from legally accessing Blu-ray footage.

### c. Encryption measures on digitally transmitted video

Digitally transmitted video has become the predominant distribution mechanism for motion pictures today. In the past few years, there has been a proliferation of digital streaming video services. In fact, some projections estimate that digital video and audio streaming may generate as much as 89% of web traffic by the end of 2018.[82] Further, people are spending one hour and 39 minutes a day consuming media on their phones this year, versus an hour and two minutes last year — a 60 percent jump.[83] In addition, revenue from sales and rentals of movies and TV shows totaled $12 billion in 2016, according to data released by trade organization Digital Entertainment Group. [84]

Similar to CSS and AACS, the protection measures found on digitally transmitted video seek to control access through encryption and other mechanisms, and thus qualify as a TPM within the

---

[81] Letter from Rachel Ward, Appendix N.
[82] *Digital Media: Rise of On Demand Content*, *supra note* 12, at 6.
[83] John Koblin, *How Much Do We Love TV? Let Us Count the Ways*, N.Y. Times (June 30, 2016), https://www.nytimes.com/2016/07/01/business/media/nielsen-survey-media-viewing.html
[84] Ryan Faughnder, *Home Video Sales Shrank Again in 2016 as Americans Switched to Streaming*, L.A. Times (Jan. 6, 2017), http://www.latimes.com/business/hollywood/la-fi-ct-home-video-decline-20170106-story.html

meaning of Section 1201(a)(3) by requiring the "application of information"—namely, encryption keys—in order to gain access to the work.[85]

Most digitally transmitted video, including widely used services such as Netflix, Hulu, HBO-GO, YouTube, cable and DVR, and systems that use HDMI, are protected by TPMs, which prevent filmmakers from being able to make fair use of materials that are not unavailable in other formats. Specifically, these streaming services are often the sole authorized providers of various forms of materials, whether feature-length motion pictures, television series, or advertisements. Because these unique materials are increasingly less available on any form of DVD or Blu-ray, filmmakers will be adversely affected in their ability to make fair use if they cannot access there is no circumvention to the various encryption measures on digitally transmitted video.

For example, filmmaker Matthew Miller is working on a project that would be severely compromised without the use of footage available through digitally transmitted video:[86]

> We would like to push the boundaries of our parody even further and when appropriate and only in short, transformative uses, use footage actually ripped from physical or digital media. In an upcoming episode we are planning a parody of The X Files and would benefit greatly from being able to incorporate some of the footage from their opening animations and juxtapose that with our own footage.

Filmmaker Alfred Spellman faces a similar problem with his next project:[87]

> Our first narrative feature film, which we plan to shoot in 2018, contemplates a present-day relationship between several historical figures. We hope to use the Fair Use Doctrine to establish the historical nature of the relationship as well as depict pop culture events that occurred over the course of the relationship. Many of the events we hope to portray are contained in films and other programs where the high-quality clips we need are only available on Blu-ray and digital online sources. Without the fair use doctrine, it would be impossible to give the appropriate context to the historical figures and the world they inhabited.

Additionally, many filmmakers have the need to use footage from news sites, which today are primarily or exclusively found on digitally transmitted formats. Filmmaker Tim Pedegana faces an issue with developing an upcoming project due to the DMCA: [88]

> I am currently working on a narrative feature film about a young man who, in the days following 9/11, travels from Mexico to New York City to find his father, an undocumented worker at the World Trade Center's famous Windows on the World restaurant. To truthfully illustrate the aftermath of 9/11 and the vast amount of people who were missing loved ones, we hope to use archival news clips from major world networks on screen as the main character travels across a continent to

---

[85] 17 U.S.C. § 1201(a)(1)(3).
[86] Letter from Mathew Miller, Appendix G.
[87] Letter from Alfred Spellman, Appendix Q.
[88] Letter from Tim Pedegana, Appendix I.

find his father among the rubble. These news clips are necessary to illustrate and support the magnitude of the main character's experience and contextualize his fictional experience with one that many real families went through in September of 2001…[a]ccess to this digital content is the only way we can illustrate the real-life impact of 9/11, which is essential to our film going forward.

Filmmaker Lianne Halfon faces a similar problem:[89]

Our company is currently developing a film based on the flooding of the Colorado River and a speed run down the river through the Grand Canyon.  The film is based on a non-fiction book, The Emerald Mile, by Kevin Fedarko. As part of our film, we would like to use news footage that documented the "El Nino" conditions during the weeks before the crisis at the damn. Having access to high quality versions of the news footage to use pursuant to fair use would allow us to tell the story more accurately.

Filmmaker Joshua Louis faces problems regarding access to news clips as well:[90]

I just completed my second feature film, *Devils Tree: Rooted Evil* and am currently starting pre-production on two other feature films. *Devils Tree* is inspired by events that have been reported on in real life about a tree in Florida where many horrible acts have occurred.  It is a fictional story about a journalist who decides to write a story about the haunted tree.  This film incorporated news clips and material that were used under fair use.  This project would have benefited from the DMCA exemption, as I easily would have obtained quality content without being confined by the DMCA and access controls.

My two new films will reference real events, and I would like to use local and national news clips in the films. One is a horror film which discusses paranormal activity in hospitals. Being able to use news clips that are directly on point, i.e. which show paranormal events in real hospitals, will greatly benefit my film.  The other film I am producing is a mob film, in which I'd like to incorporate news dealing with various criminal activity, including news clips of organized crime busts. The DMCA exemption would certainly help me create these films without the fear of being in violation of copyright law, and without the need to expend time and resources to use material that would otherwise fall within the exemption.

As seen in the above examples, in order to make fair use, filmmakers need access to various forms of digitally transmitted video in order to make their film. As a result, fair use in filmmaking will be adversely affected if narrative filmmakers are unable to legally circumvent encryption measures that are found on numerous types of digitally transmitted video.

---

[89] Letter from Lianne Halfon, Appendix F.
[90] Letter from Joshua Louis, Appendix L.

The need for filmmakers to have access to high quality content from Blu-ray and online forms of video has never been more necessary than it is now. 4K production and distribution has become a dominating force in the video content industry, as over 70% of movie theaters in the US now use digital projection in 4K.[91] Independent filmmakers need the ability to access high-quality content to meet the requirements of distributors.

### i. Alternatives to Circumvention

We know of no alternatives to circumvention that would be feasible options for filmmakers who want to make fair use in the form of criticism and commentary in their films.

Screen capture has never been feasible for filmmaking. Commenters presented substantial evidence in 2008-2009, 2011-2012, and 2014-2015 that screen capture is not a workable option for filmmakers. That is still the case today. The documentary and independent film communities comprise thousands of filmmakers, and none that we know of have ever found screen capture to be a viable alternative to circumvention where filmmakers need content for fair use and seek to have their film broadcast or distributed.

As was the case in previous rulemakings, all screen capture software programs of which we are aware create dropped frames and loss of audio sync, among other defects.[92] Although some screen capture software programs claim to be able to capture high-resolution video, it is not clear that these programs do so without circumventing TPMs, and in any event, they are not suitable for independent filmmakers. While they may be appropriate for video game play, they do not render acceptable images for high-quality filmmaking, as they require significant system resources, which is time-consuming and also leads to a significant loss in footage quality.[93] In addition, they require a high-end PC rig and special graphics hardware,[94] a problem for filmmakers given that film editors and producers almost universally use Mac systems. Such high-end systems are not financially feasible for many filmmakers. In short, it is simply not realistic to ask filmmakers to explore screen capture options given the high-quality footage and rigorous broadcast and distribution standards they must meet. [95]

Nor is licensing a reasonable alternative for filmmakers who seek to make fair use. Aside from the lengthy time it takes to license a clip and exorbitant licensing fees, many rightsholders, including all the major film studios, insist on thorough non-disparagement clauses in all clip licenses.  In Appendix T, we have included eight examples of such clauses used in standard licenses from a range of prominent studios.

---

[91] Letter from Jim Morrissette, Kartemquin Films 1 (December 4, 2017), Appendix B.
[92] *Id.* at 3-4.
[93] *Id.*
[94] *Id.*
[95] *Id.*

## Statutory Factors

In conducting the rulemaking, the Register must examine the following statutory factors listed in § 1201(a)(1)(C): (i) the availability of copyrighted works; (ii) the availability for use of works for nonprofit archival, presentation, and educational purposes; (iii) the impact that the prohibition on the circumvention of Technological Protection Measures applied to copyrighted work has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effects of circumvention of technological protection measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.[96] An analysis of each of these statutory factors supports the granting of this proposed exemption.

### i. Availability for use of copyrighted works

§ 1201's prohibition on circumvention has severely reduced the availability of copyrighted works on which filmmakers may comment.

#### a. Whether the Availability of the Work in Protected Formats Enhances and/or Inhibits Public Use of Particular Works

As we demonstrate above in Part E, Adverse Effects on Noninfringing Uses, § 1201 prohibits filmmakers from making fair use of works in a range of formats. The vast majority of works available today, especially the most popular works which are the subject of greater debate and analysis, are TPM protected. This inhibits the public's use of particular works.

In any event, the proposed modification would not harm public availability of the original work on DVD, Blu-ray, or digitally transmitted video. The Register has already considered this question in the documentary context for DVDs, Blu-ray, and digitally transmitted video, and determined that an exemption for certain non-infringing uses will not end their digital distribution.  There is no reason that this analysis would change for films not categorized as "documentary."

#### b. Whether the work protected is available in other formats and whether those formats are protected by access controls

No formats exist as viable alternatives to DVD, Blu-ray, and digitally transmitted video. The standards for quality are rising, and VHS quality, or even 720p resolution, is insufficient to meet the needs of filmmakers today.

Each format in the proposed exemption is protected by TPMs that filmmakers fear are covered by §1201. With respect to Blu-ray, certain important material is only included on one particular format, which makes it even more necessary that filmmakers have the ability to access all three formats. When filmmakers need a certain piece of footage, such as bonus materials from a film, there is no alternative source for this material other than Blu-ray, and the main issue is there is no

---

[96] 17 U.S.C.A. § 1201 (2016).

alternative that is not protected by TPMs.

### c. If alternative formats are available, whether such formats are sufficient to accommodate non-infringing uses

Some content is only available on a single format. As a result, no one format can satisfy the non-infringing uses of filmmakers. While some older films may only be available through DVD, newer ones may only be available online, and others only on Blu-ray.

### d. Whether the format is part of a "use-facilitating" business model that offers the public access to work in a variety of new ways and whether the proposed exemption would prejudice this model

There is no evidence that any filmmaker-related exemption has prejudiced a "use-facilitating business model" in any way. There has been no effect on sales, no link to privacy, no effect on a legitimate licensing market, and certainly no effect on public perception of the business model other than to make it seem less untenable.

TPMs on DVDs, Blu-ray, and digital transmissions are use-limiting by nature. TPMs restrict the ability of the public to access material for a range of non-infringing, including criticism and commentary. These types of films need a fair use exemption.

For example, *These Amazing Shadows* is a documentary film depicting the power of movies as a major cultural force. This film consisted of mainly clips of underlying works. By watching this film, the audience learned of underlying works and thus there was actually an increase in the market value of the original films.[97]

When the fair use material that is necessary to create such works becomes inaccessible due to TPMs, the works themselves are not created, and audiences lose their ability to engage with both the fair use works and the original works in the method and manner that they would like.

A well-known example of the impact of rightsholders and their power over the ability of filmmakers to access content and make fair use is found in the story of the film "Wanderlust," which chronicles the genre of American road films. In the creation of this film, producer Alicia Sams ran into numerous issues with rightsholders and was even quoted to pay $450,000 to gain access to the clips that she wanted to use for the film. Rightsholders often only have the interest of protecting corporate assets, and the prohibitively expensive costs for using short clips are not feasible for some filmmakers. Such practices go on to this day, through the use of non-disparagement clauses in contracts that an artist must sign when using content.[98] These clauses often prohibit filmmakers from criticizing or parodying the underlying work.[99]

---

[97] *See* 2015 Comment at Appendix E, Letter from Paul Mariano and Kurt Norton, Gravitas Docufilms.
[98] *See* Non-disparagement clauses, Appendix T.
[99] *Id.*

**ii. Availability of use of works for nonprofit archival, preservation, and educational purposes**

The proposed modification would greatly improve access to motion picture materials for these purposes. Films not traditionally classified as "documentary" often serve educational purposes and serve an increasingly important role in educational and social commentary. These films serve as teaching tools in the classroom because of their portrayal of important historical and contemporary events, such as the feature film *Selma*, which chronicles Martin Luther King, Jr.'s march from Selma to Montgomery for voting rights in 1965.[100]

There are countless other examples of films used to educate at every level. For example, *My Cousin Vinny* is often shown by law professors to students in evidence classes.[101] Another example is the mini-series *Roots,* which is used in high school history classes to teach about slavery.[102] This same is true for *the Dead Poets Society* in English class, *The Diary of Anne Frank* or *Johnny Tremaine* in history class, *Lorenzo's Oil* in science class, and many others.[103] Films serve a critical role in education, and the proposed exemption would greatly expand access to motion picture materials for these purposes.

Outside the classroom, films often serve as a conversation topic for the audience and can lead to conversations about sensitive topics that, without the film to spark the discussion, would never be discussed by the general public. For example, racism and race relations are very uncomfortable for Americans to talk about. But numerous films including *12 Years A Slave*, *Remember the Titans*, *Do the Right Thing* and *Django Unchained* have spurred discussions about these movies that lead to a more general discussion about race relations. Popular culture is one of the key ways that we express ourselves and is one of the primary ways we engage in civil discourse in modern America.

Further, films often educate the public on important moments in history that would otherwise remain relatively obscure. Millions of Americans who watched the film *Dunkirk* learned more about the German invasion onto the French beaches of Dunkirk than they would have ever known otherwise. This is the same for the *Schindler's List* and the Holocaust, *Lincoln* and the end of the Civil War, *The Imitation Game* and the cracking of the Nazi codes during World War II, and many more. Films such as these teach about their respective subjects in a way that books cannot.

The proposed modification would greatly expand access to motion picture materials for these purposes.

---

[100] *See generally Teach with Movies, http://www.teachwithmovies.org/ (*last visited 12/10/2017*).*

[101] CBS Los Angeles, *25 Years Later, 'My Cousin Vinny' Keeps Laughs and Legal Lessons Coming*, (Mar. 13, 2017, 5:31PM),http://losangeles.cbslocal.com/2017/03/13/25-years-later-my-cousin-vinny-keeps-laughs-and-legal-lessons-coming/.

[102] Teach With Movies, *Roots Volume I*, http://www.teachwithmovies.org/guides/roots-vol-i.html (last updated July 21, 2011).

[103] *See generally Teach with Movies, http://www.teachwithmovies.org/ (*last visited 12/10/2017*).*

**iii. Impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research**

Countless films present poignant commentary on important social issues, including many acclaimed pictures from 2017 including *Hidden Figures*, *Loving*, and *Hacksaw Ridge*. Though none of these are generally thought of as documentaries, each depict the stories of real individuals who played pivotal roles in space exploration, the reversal of anti-miscegenation laws, and the Battle of Okinawa, respectively.[104] A significant proportion of these can and do make fair use, including *Steve Jobs*.[105] And many require access to TPM-protected material to do so.[106] The DMCA's prohibition on circumvention severely restricts filmmakers' right to conduct criticism and commentary, among many other uses including education. The proper solution to this problem is a modification of the current exemption to include all filmmakers.

**iv. Effect of circumvention of TPMs on the market for, or value of, copyrighted works**

The Supreme Court has instructed rightsholders have no claim on the derivative market for criticism of their works because rightsholders are unlikely to desire an additional work criticizing the original work, and have no incentive to develop such markets.[107] In addition, the Register has previously concluded that transformative uses will likely not affect the relevant markets for the original work.[108]

We are unaware of any allegations that the filmmakers' exemption has harmed the market for copyrighted motion pictures in any way.[109] As creators and rightsholders themselves, the filmmakers who will be eligible for the modified exemption already have a propensity to follow the established best practices in fair use, and routinely do so. There is no reason to think that this group would begin to use the exemption in a way that would cause harm to existing markets.[110]

**v. Such other factors as the Librarian considers appropriate.**

    **i. Without the proposed modification removing the "documentary" limitation, the exemption will be unconstitutionally vague.**

As we discuss above, the definition of documentary film is notoriously difficult to define. Since the origins of the medium and through to the present, scholars and filmmakers have endlessly discussed and debated the definition—without resolution. We strongly urge the Register to consider the constitutional problems inherent in the difficulty of this definition.

---

[104] *Nominees – The 89th Academy Award Nominations for the 2017 Oscars*, THE OSCARS Oscar.go.com/nominees (last visited Dec. 4, 2017).
[105] See Supra at page 9.
[106] *See supra* Part 3(c).
[107] *Campbell,* 510 U.S. at 564.
[108] Register of Copyrights, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at* 72 (Oct. 2015).
[109] *See supra* Part E (4).
[110] *Id.*

A statute is unconstitutional when "[the] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess the meaning and differ as to its application. . ."[111] The void for vagueness doctrine is especially demanding when First Amendment freedoms are at risk. The Supreme Court has held that "[c]ertainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law."[112] Additionally, the Court has held that "where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.[113]

Where filmmaking is concerned, the Court has repeatedly instructed that a government edict must be especially clear, because "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments"[114] In *Interstate Circuit, Inc. v. City of Dallas*, the Supreme Court directed that "[…] one who wishes to convey his ideas through [a] medium, […] must consider whether what he proposes to film, and how he proposes to film it, is within the terms of classification schemes such as this."[115] Therefore, "[i]f he is unable to determine what the ordinance means, he runs the risk of being foreclosed, in practical effect, from a significant portion of the movie-going public,"[116] and is not afforded his First Amendment freedom. That is exactly what the term "documentary filmmaking" does here.

Further, because this statute is so vague, countless films may or may not be able to fit into the category it creates. These films can be considered "hybrid" films and do not fit nicely in any particular category of film. They are films that make use of fiction and nonfiction elements and can resemble a documentary and narrative at the same time. For example, the film *The Story of the Weeping Camel* was nominated for awards in over 7 film festivals in multiple categories, including "best documentary", "best foreign film" and "best feature film." There are countless films like this one that can fit into multiple categories. For example, films like *Kate Plays Christine, Notes on Blindness*, and *All the Sleepless Nights* all make claims to truth while still using actors and a script.

As another example, the Cinema Eye Awards, which have grown into a well-respected award show, has given out the "Heterodox Award" for the last 8 years. This award is specifically designed to recognize and celebrate films that blur the line between narrative fiction and documentary film.

---

[111] *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).
[112] *Scull v. Com. of Va. ex rel. Committee on Law Reform and Racial Activities*, 359 U.S. 344, 353 (1959).
[113] *Smith v. Goguen*, 415 U.S. 566, 573 (1974).
[114] *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) (holding "sacrilegious" to be unconstitutionally vague in a New York statute regulating films); *Gelling v. State of Tex.*, 343 U.S. 960 (1952) (holding "of such character as to be prejudicial to the best interest of the people of said City" unconstitutionally vague in Texas statute regulating films); *Superior Films, Inc. v. Dep't. of Educ. Of State of Ohio, Div. of Film Censorship*, 346 U.S. 587 (1954) (holding "moral educational or amusing and harmless unconstitutionally vague in Ohio statute regulating films); *Rabe v. Washington*, 405 U.S. 313 (1972)(reversing conviction for showing movie with sexually frank themes at a drive-in theater because the Washington obscenity statute was impermissibly vague).
[115] *Id.* at 683.
[116] *Id.*

Given this vagueness, the creators of many films are left in the dark as to whether this exemption applies to them or not. Because the exemption tries to draw artificial line that is not able to actually be drawn, this unclearness creates a huge risk that filmmakers might not always be willing to take. An exemption that uses the term "filmmaking" would be much clearer because it would point to an activity rather than a genre that should be viewed as a marketing category or an arbitrary classification based on claims of "reality" or other inherently subjective descriptions.

Relatedly, we note that there is pending litigation about the constitutionality of § 1201 generally, and of this proceeding in particular. This litigation raises the possibility that the triennial review amounts to an unconstitutional speech licensing regime and a prior restraint in violation of the First Amendment. We note that the content-based distinctions in the existing exemption between "documentary" and "non-documentary" create additional constitutional tension that may not survive strict scrutiny. Given the fraught procedural context of this review, which requires speakers to seek permission in advance of engaging in First Amendment-protected fair use, we urge the Register to avoid these constitutional concerns by eliminating the content-based distinctions presently included in the exemption, thereby ensuring that filmmakers can make fair use regardless of the precise content of their output.

**4. § 1201's prohibition on circumventing access controls is the cause of the adverse effects.**

We have shown that filmmakers, who are not traditionally classified as documentary filmmakers, need to make fair use of short portions of motion pictures for the purpose of criticism or commentary. Further, we have made clear that the use in question is a quintessentially noninfringing use. In order to exercise their right to make fair use, filmmakers need access to high quality content from DVDs, Blu-rays, and digitally transmitted video. However, the vast majority of high quality content is protected by TPMs, and there is no other source from which the filmmakers could access this content, nor are there viable alternatives to circumvention. Filmmakers are therefore adversely affected in that they are often forced to self-censor and are thus unable to make criticism and commentary as they see fit. In fact, a filmmaker may even have to abandon his or her project all together due to the prohibition on circumventing TPMs. These adverse effects are clearly caused by § 1201's prohibition on circumventing access controls.

**Conclusion**

The exemption currently in effect, codified at 37 C.F.R. 201.40(b)(1), and provisionally recommended for renewal, should be modified to include all filmmakers. Filmmakers make a broad impact on the viewing public in numerous ways, including in an educational setting and in the world outside the classroom. Films have the ability to create an impetus for widespread and needed change in modern society, and the ability to make fair use of TPM-protected materials is frequently a necessary component in making criticism and commentary. Alternatives to circumvention, including screen capture, are insufficient for the needs of filmmakers and their distributors, and are inaccessible because of the high level of technical skill that these tools

require.[117]

For these reasons, we respectfully urge the Register to modify the current exemption to:

      (1) remove the "documentary" limitation; and

      (2) remove reference to screen capture technologies.

---

[117] Letter from Jim Morrissette, Kartemquin Films (December 4, 2017), Appendix B.

**APPENDICES**

APPENDIX A: LETTER FROM MICHAEL C. DONALDSON

APPENDIX B: LETTER FROM JIM MORRISSETTE

APPENDIX C: LETTER FROM BOETTCHER/TRINKLEIN PRODUCTIONS

APPENDIX D: LETTER FROM JAMES CARMAN

APPENDIX E: LETTER FROM JON KATZMAN

APPENDIX F: LETTER FROM LIANNE HALFON

APPENDIX G: LETTER FROM MATTHEW MILLER

APPENDIX H: LETTER FROM MICHAEL MAILER

APPENDIX I: LETTER FROM TIM PEDEGANA

APPENDIX J: LETTER FROM ZACK ANDREWS

APPENDIX K: LETTER FROM ROBERTO MILLER

APPENDIX L: LETTER FROM JOSHUA LOUIS

APPENDIX M: LETTER FROM MARC DELORME

APPENDIX N: LETTER FROM RACHEL WARD

APPENDIX O: LETTER FROM MEGAN GRIFFITHS, MATTHEW BRADY, AND ALISA
TAGER

APPENDIX P: LETTER FROM ROB GRANT

APPENDIX Q: LETTER FROM ALFRED SPELLMAN

APPENDIX R: LETTER FROM BRENDA GOODMAN

APPENDIX S: LETTER FROM JACK LERNER AND MICHAEL C. DONALDSON TO
MARIA PALLANTE, REGISTER OF COPYRIGHTS; ARTICLE WRITTEN BY "THE
WRAP" ABOUT THE FILM *STEVE JOBS*.

29

APPENDIX T: NON-DISPARAGEMENT CLAUSES

APPENDIX U: LETTER FROM ALEX PODOBAS

APPENDIX V: EDUCATIONAL EVENTS FOR FILMMAKERS ABOUT FAIR USE

Appendix A

Letter from Michael C. Donaldson

# DONALDSON ✚ CALLIF

December 18th, 2017

U.S. Copyright Office
101 Independence Avenue S.E.
Washington, D.C. 20559-6000

To the Register of Copyrights:

Since the beginning of cinema, narrative films have made use of copyrighted material pursuant to the fair use doctrine. During the period when production was dominated by major studios, the practice became to license anything and everything for fear of legal consequences. Fair use cases were based on situations such as a mistake as to whom to license from (in *Amsinck*, the baby crib mobile manufacturer was paid, but the artist for the creative works dangling above the crib was not), oversight (the poster on the Roc set in *Ringgold*) or understandable oversights (the Mike Tyson's tattoo in Hangover 2). All of the fair use cases arose in studio films (as opposed to independent films), and the vast majority of them were shot on sound stages dressed by the production company.

During the triennial hearing of 2012 I only had one scripted film in the office that used fair use that implicated the DMCA. I pointed out that I had information about a few narrative films that were beginning to exercise their rights under the fair use doctrine and predicted that this was the beginning of a major trend. The basis for that prediction was the mobility within the independent film community. Independent filmmakers work on a documentary one week and a narrative film the next week. This intermingling between these two types of work was inspiring filmmakers to take what they had learned to be their rights in making a documentary, and use it when they worked on scripted films.

In the next round of Section 1201 Hearings we submitted a 10-page chart containing 37 scripted films which our office cleared and 11 films we did not work on but were the subject of published court opinions. Each of the films we worked on obtained Errors and Omissions (E&O) insurance coverage for their fair use materials. Out of the eighteen fact-based films, only one had had a fair use claim, and it resulted in a court opinion finding fair use. Of the twelve totally fictional works in both natural and set dressed settings, only one that had a claim ("What Women Want" in 2000) that also resulted in a finding of fair use. Today we submit a chart that contains all the cases we could find that involved scripted films. Interestingly, all challenges of infringement, save one, were found to be fair use, where that exception had been relied upon. We will keep looking for more cases involving scripted films.

---

MICHAEL DONALDSON | LISA CALLIF | DEAN CHELEY | CHRISTOPHER PEREZ | MARISA KAPUST | KATHRYN ALIMOHAMMADI | EREZ ROSENBERG | KATE SERFOSS

400 South Beverly Drive, Suite 400,
Beverly Hills, California, 90212
Office 310-277-8394 Fax 310-277-4870

New York Affiliate:
Gray Krauss Stratford Sandler Des Rochers LLP
New York, NY www.gksd-law.com 212-996-6700

We had intended to attach a second chart composed of scripted films we worked on that utilized fair use. The chart included a total of 91 films that came through our office alone. We thought it was important to see the growth of fair usage among independent filmmakers who are making films not classified as documentaries. We opted not to include the chart due to the concerns of some clients about the legal implications of having accessed certain high quality audio visual materials.

Several filmmakers have expressed to me personally that they would like to use material pursuant to fair use in fictional films, but are nervous and have figured out other, albeit less effective, ways to tell their stories. Each one expressed a preference for being able to use real footage and had concerns about access to source material. Each one represents a situation in which the DCMA has acted as censor to the storyteller. The purposes of the Copyright Law have been frustrated by anti-circumvention provisions when telling stories that explore and comment on our life and times. Creative voices need all the tools possible to make their important stories clear and continuing.

Sincerely,

Michael C Donaldson

Michael C. Donaldson

Encl:  Chart

Appendix B

Letter from Jim Morrissette



Jim Morrissette
Technical Director
Kartemquin Films
1901 W. Wellington
Chicago, IL 60657


November 27, 2017


To whom it may concern:

I would like to thank the Copyright Office for the opportunity to speak in support of our proposed renewal of the exemption allowing us to circumvent CSS encryption on DVDs, AACS on Blu-ray discs, and the various encryption and authentication protocols on Digital Video Transmissions (DVTs). DVTs include internet streaming, internet downloads, TV Pay-Per View, and recordings from Digital Video Recording (DVR) devices connected to cable or satellite dishes.

As the Technical Director at Kartemquin Films in Chicago, I feel more strongly than ever that the proposed exemption renewal is necessary for all filmmakers, allowing digital access to "fair use" and public domain works for inclusion in their films.

**Distribution of Independent Films Expanded Since 2015**

Expanded independent film distribution into movie theaters for film festivals and theatrical release over the last few years requires higher resolution video sources than DVD can provide. Many independent filmmakers are showing their work as theatrical releases first, and then later on broadcast TV, cable, and streaming distribution.

Over 70% of all movie theaters in the US now use digital projection in 4K resolution (40963840x2160 pixels). The digital theater projectors use DCP (Digital Cinema Pac) formatted files on hard disc that must be at least 1920x1080 pixels, raising the bar for image resolution over anything a standard definition DVD (720x480 pixels) can adequately deliver.

A DVD file can be "up-converted" to 1920x1080 pixels by creating additional "fake" pixels to fill in-between the real pixels using expensive video hardware boxes like the $2000 Teranex. The process of creating a DCP for theatrical screening requires additional conversion of EVERY frame of the video into individual still frames (1,440 per minute). During this process the "fake" frames behave differently than the actual frames from the DVD and create another level of image degradation beyond just the up-conversion to HD. DCP files also require conversion of the video from RGB color space to XYZ color space to adhere to the strict DCP specifications. Interpolated video frames from DVD up-conversion to HD get degraded in the conversion to XYZ color space as well. If the video being converted to DCP format has HD 1080x1920 actual real frames, the video image quality remains high despite this conversion to multiple still frames and XYZ color space.

As we predicted in 2015, 4K video content has become mainstream in 2017. Many documentary filmmakers, including Kartemquin Films, are now producing programs in Ultra High Definition (UHD) 4K (3840x2160) format. In fact, Netflix now requires all original content programs to be produced in 4K. Up-conversion of DVD content from 720 pixels (horizontally) to 3840 pixels (horizontally) is unacceptable visually on a 4K UHD TV, much less on an 80 foot wide theater screen.

In the last 3 years, 4K production and distribution has become a reality for Independent Filmmakers. Professional video cameras that shoot 4K are available for under $2000, and even current iPhones shoot 4K UHD at cinematic frame rates. All professional editing software programs now support 4K, and 4K content is widely available. Netflix, iTunes, and Amazon are streaming movies and original content in 4K. Apple TV, Chromcast, and Roku 4K UHD streaming boxes are available to provide 4K content. 4K UHD Blu-ray players are available for as little as $200 and plenty of 4K UHD Blu-ray titles are available to play on them.

4K UHD TVs are selling well online and at local retailers such as Best Buy and Target. "Futuresource" forecasts that throughout 2017, 35% of global TV sales will be 4K UHD units.

As a result, independent filmmakers will be at a distinct disadvantage if they cannot acquire at least HD (1080) content to include in their 4K productions. Thus the urgent need for an exemption that allows filmmakers to access HD and UHD content on Blu-ray discs and from online sources such as Netflix



Above is a chart to scale showing just how small a DVD image is compared to HD and 4K.

Image resolution is measured by the number of individual pixels that make up the video picture vertically and horizontally. DVD image resolution of 720x480 pixels is represented by the small purple box in the upper left of the chart. The green area is full HD Blu-ray image resolution of 1920x1080 pixels, and the orange area represents 4K Ultra High Definition (UHD) with 3840x2160 pixels.

The total number of pixels per video frame for each format is as follows:

DVD:       345,600

Blu-ray:   2,073,600 or 6 times more than DVD

4K UHD:  8,294,400 or 4 times more than Blu-ray and 24 times more than DVD

**Computer screen capture software programs continue to suffer from serious defects, including dropped frames and loss of audio sync.**

No suitable screen capture software exists that would allow independent filmmakers to obtain the type of high quality material needed to pass muster with distributors and broadcasters.

Our research, and the experience of our community suggest that the same problems we

articulated in the 2014-2015 proceeding exist today.[1]

These include:

- Dropped Frames, stuttering
- Loss of Audio Sync
- Non-standard  frame resolution
- Overly compressed video files

In the last few years, some screen capture programs have emerged that claim to handle HD video.  However, these only work on very powerful computers that require immense system resources (CPU, GPU, RAM and the like). They are PC only, and most filmmakers and editors use Mac systems. Moreover, **s**creen capture of streaming video requires a lot of system resources. Important factors for recording include: high end graphics processor; CPU clock speed; and use of solid state system and data drives. Some screen capture progrms require "codecs," small computer programs computer program that encode and decode digital data streams. These codecs cannot be used directly in the editing process and must be converted and re-encoded to an edit-ready file codec, which is time consuming and causes significant quality loss.  In addition, PC graphics cards that claim to be able to capture high-resolution video game play directly in the graphics card itself cannot capture any HDCP 2.0 or 2.2 protected discs (such as a Blu-ray) playing on a PC, or any protected video streams like Netflix.

In short, there are no screen capture alternatives that are of sufficient quality for the feature films that independent filmmakers create.

**Scan Conversion:**

Shooting video of an HDTV screen with an HD capable cell phone camera or HD camcorder was unacceptable for broadcast or theatrical display in 2015, and it is even less suitable now.  Aliasing issues, poor audio, color balance shifts, and camera auto-exposure flickering remain. Moiré rainbow banding and aliasing often occurs when shooting a flat screen monitor or TV with an HD video camera, and is not possible to fix these defects in post production.

**Updated Broadcast Technical Requirements Remain High**

Public Broadcasting Service (PBS) technical specs, last updated in 2016, specifically state: "The image must be free of compression artifacts (such as macroblocking and mosquito noise), aliasing (such as the artifacts associated with scan conversion), frame dropouts, and other artifacts association with conversion and encoding." TOS 3.3.1

---

[1] See Letter from Jim Morrissette (Feb. 4, 2015), attached as Appendix B to *Comment of International Documentary Association, et. al., In the Matter of Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (2014) (Docket No. 2014-07).

These kinds of artifacts, associated with up-converting DVD material to HD, and all other proposed alternatives to circumvention, are difficult and costly to fix, and often cannot be brought up to the PBS standards.

In short, there are no workable screen capture alternatives that are of sufficient quality for the feature films that independent filmmakers create.

**Filmmakers Need Access to Content Only Available on Blu-ray**

Blu-ray versions of films often contain additional material not available on the DVD version of the film. These can include director's commentaries, deleted scenes, behind the scenes footage, etc. that is not available anywhere else. They also offer the film in its original aspect ratio.

Here is an example of the "extras" available on the Blu-ray version of the movie "Arrival"" vs the DVD version of the same film.



| Arrival Special Features DVDBlurayFeatures.com | 2-Disc 4K Ultra HD Blu-ray Combo | 1-Disc Blu-ray Edition | 1-Disc DVD Edition |
|---|---|---|---|
| 4K Ultra HD Blu-ray – *Arrival* | Y | N | N |
| Blu-ray – *Arrival* | Y | Y | N |
| DVD – *Arrival* | N | N | Y |
| Digital Copy – *Arrival* | Digital HD / Ultraviolet | Digital HD / Ultraviolet | N |
| Xenolinguistics: Understanding Arrival | Y | Y | N |
| Acoustic Signatures: The Sound Design | Y | Y | N |
| Eternal Recurrence: The Score | Y | Y | N |
| Nonlinear Thinking: The Editorial Process | Y | Y | N |
| Principles of Time, Memory & Language | Y | Y | N |

In conclusion, over the last three years, filmmakers' need for access to a minimum of HD 1080 quality for fair use video clips has increased greatly. Theatrical distribution of documentaries in

5

digital DCP format and the expansion of UHD 4K video streaming by Netflix and Amazon into homes are two major recent developments that have contributed to this increased need to make HD quality video accessible to filmmakers.

The 4K resolution requirements of theatrical DCP presentation and Netflix submission, broadcast network requirements, and the move to 4K UHD distribution for home viewing, is why an exemption that covers DVD, Blu-ray, and digitally transmitted video remains crucial.

Appendix C

Letter from Boettcher/Trinklein Productions



To Whom It May Concern:

We at Boettcher/Trinklein Productions have been producing films for over twenty-five years. We have written and produced many award-winning programs, including the long-running PBS series *Pioneers of Television*. Most recently, we produced two television programs on the lives and careers of Robin Williams and Mary Tyler Moore as well as the film *A Return to Grace: Luther's Life and Legacy* about Martin Luther.

We are in writing in support of expanding the current DMCA exemption to include non-documentary projects because it will very likely affect our work in the next three years and beyond.

Our experience is that the sharp lines between documentary and drama are not sharp at all. If a documentary uses dramatic storytelling (complete with actors, sets, costumes, and makeup) could it be classified as a drama? If so, then we're hindered in our ability to tell these stories. Case in point is our 2-hour film on Martin Luther for PBS, which aired nationally on Sept 12, 2017. It could be classified as a documentary, because it's a factual story and we used narration and on-camera interviews with experts. At the same time, much of the film plays out like a drama: entire scenes with actors speaking dialogue in period costumes on authentic sets. Given the significant amount of drama in the film, we decided early on that our storytelling toolbox could not include fair use of materials from DVD or Blu-ray, because the exemption did not cover accessing that material for use in a drama. So there is already a chilling effect in that a drama-heavy documentary might be seen as a drama outright, and thus under a different set of rules.

This goes to the larger point: the distinction between drama and documentary is an artificial one. The films we call "documentaries" have used dramatic storytelling techniques from the very beginning (The first theatrical doc *Nanook of the North* is a great case in point). Similarly, dramas often try to recount factual stories. Consider the 2012 Ben Affleck movie *Argo* which chronicled the freeing of the US hostages in Tehran. The film meticulously followed the facts of the rescue; and served as an important history lesson for those who saw it. One key to the story was Ted Koppel's nightly reports on ABC about the continuing saga in 1979-80. That key element of the story could not have been acquired from a DVD--and used via fair use--because the exemption does not cover "drama."

Ultimately, we feel that our work is restricted by the fact that the DMCA exemption does not currently extend to non-documentary projects, and we fully stand behind the effort to expand the exemption to include the uses we anticipate making in the future.

Sincerely,

*Michael Trinklein*     *Steve Boettcher*

Steve Boettcher / Mike Trinklein
Boettcher/Trinklein Television

Appendix D

Letter from James Carman

## James Carman's DMCA Exemption Letter

My name is James Carman.  I am an accomplished New York based filmmaker who also works as a photographer and cinematographer.  I run his own production company called Time Traveler Productions. My feature length documentary, **The Hidden Hand; Alien Contact and the Government Cover-up**, has won 5 awards and is distributed internationally. It was on both Amazon Prime's and Netflix's best selling documentary list for 3 weeks.

I have shot many feature films that have been shown in festivals and film theaters around the globe (Sundance, Cannes, Berlin, and Toronto film festivals.) Recently five films I shot were shown at the **MoMA** retrospective of Bruce La Bruce. My short films were screened at the Berlin and Locarno Film Festivals. I am a member of the Producer's Guild and am currently directing a TV series, **Superconscious**, which explores people with special gifts and abilities. He is also producing a feature film about radical thinking called **HyperParanØid**.

**HyperParanØid** is a science fiction low budget film that takes place in a prison setting. It deals with arguing "thought leaders" who are confined together. It would be helpful to fill out the story with fair use imagery from off set. This would compliment the isolation the inmates feel in their jail cell and let the audience know the state of what the future has become.

Footage of space, whether from space agencies or science fiction films, would be instrumental in portraying this age, along with images of environmental degradation, overcrowding and pollution. This footage would come mainly from documentaries and feature films. In some instances, it might be necessary to rip from DVDs or Blu-rays. For this reason, it would be critical if **HyperparanØid** could implement footage sourced externally from the primary production shoot. Being as this is a low budget film, this possibility would enable the film to portray its message in its true scope.

We completely support the proposed expansion of the DMCA exemption to narrative filmmakers. If you have any questions, please feel free to ask.

Sincerely,
James Carman

Appendix E

Letter from Jon Katzman

To Whom It May Concern:

I have been producing Hollywood films for over twenty years.  I also teach a producing class for Columbia College on their campus at Raleigh Studios in Hollywood.

I heard about the attempt to get an exemption from the DMCA for narrative filmmakers and thought I would share a few projects that would be affected by the result.

We are in development on a project about the real life Dr. Seuss and his wife.  It would be a game changer is they could show Dr. Seuss movies like *The Grinch* in a way that met the standards for fair use.  With the exemption, I'm confident that it would already have been made and our writer would be on to her next script.  It would make the difference between her becoming a professional screenwriter versus keeping her day job as a therapist.  As for me, it's one less project that I can easily bring to market.

Our movie script about the last chapter in Jack London's life would benefit greatly from showing footage from *Call of the Wild* or *White Fang* in the opening scene when one of our characters is reading one of Jack's books and the scene morphs into what is now a fictional scene on the Klondike.  It took us years to figure out that we should adapt London's semi-autobiographical book *The Little Lady of the Big House* and plug in the real Jack London, his real life wife, and his real best friend for the characters that were created in the book.  If we had the ability to use a real Jack London book and movie clip, I think we would have saved years of development by coming to the conclusion that Jack London and not his literary alter-ego Jack Forrest should be the lead character.

Could I have used some real Michael Jackson music on my bio-pic *The Man in the Mirror: The Michael Jackson Story*?  That's a question that I often ask.  That would have made it a much more viable project.  In terms of footage, we did license about three seconds of Michael showing his baby from his hotel window to the crowd in Germany.  If we had known more about fair use I would have made a lot of changes, including using bits of "Thriller" and "Billie Jean." Wow - would have been amazing.

I also have a few scripts that, with the exemption, would have almost certainly been made already.  One, on the making of *The Fresh-Prince of Bel-Air* would benefit greatly from fair use access to the original series. Another, with the original author of *Goodfellas*, Nick Pileggi, about *Goodfellas* mobster Henry Hill who was later involved in the Boston College point shaving scam would have already been completed if we had fair use access to the original *Goodfellas* movies. Lastly, we have a script about the events that led to the first Super Bowl.  Without fair use or the exemption, we would have to recreate the first Super Bowl, which is a near financial impossibility for this independent project.  With the exemption, it might have already been made.

Thank you for considering an expansion of the DMCA exemption to allow filmmakers like me to make fair use.

Sincerely,

Jon Katzman

Appendix F

Letter from Lianne Halfon

To Whom It May Concern:

I am a producer at Mr. Mudd.  I have been producing films for over twenty-five years, and my previous credits include *Juno*, *The Perks of Being a Wallflower*, and *Demolition*.

Our company is currently developing a film based on the flooding of the Colorado River and a speed run down the river through the Grand Canyon.  The film is based on a non-fiction book, *The Emerald Mile*, by Kevin Fedarko.  As part of our film, we would like to use news footage that documented the "El Nino" conditions during the weeks before the crisis at the damn. Having access to high quality versions of the news footage to use pursuant to fair use would allow us to tell the story more accurately.

Our company also developed a limited series dramatizing the story of John Hinckley, Jr. and his assassination attempt on Ronald Reagan.  The story is told from the point of view of his family, and of the lawyers who were trying to save his life by arguing an insanity plea.   Hinckley's delusions were based on the film *Taxi Driver* by Martin Scorsese.  Due to the involvement of *Taxi Driver* in John Hinckley, Jr.'s life, we would like to use scenes from the film to effectively communicate Hinckley's obsession with the character of Travis Bickle.  In fact the film was played in its entirety at the conclusion of Hinckley's trial and was hugely effective in his defense.  His story would be incomplete without the presence of *Taxi Driver*.

The exclusion of non-documentary projects has limited my ability to tell stories. As a result, I fully support the expansion of the DMCA exemption.


Sincerely,

Lianne Halfon

Appendix G

Letter from Matthew Miller

# ZAPRUDER FILMS

107 SHAW STREET, TORONO, M6J 2W4  |  ☎ 647 292-4407
mm@zapruderfilms.com  |  www.zapruderfilms.com

December 4, 2017

To Whom It May Concern:

I am the Executive Producer of a television show called *nirvanna the band the show* which is made for VICE Studios and distributed by VICE internationally.  The show is a pop-culture mash up using parody and references to underscore the insane narrative of the episode.  It is steeped in nostalgia of a certain pre-internet era (mostly mid-late 1990s) and nary a minute of screen time goes by without some kind of pop culture reference or homage.

Structurally the show often takes on the shape and form of the thing it is parodying.  For example in a recent episode Matt, one of the two main characters, is watching the 1993 classic *Mrs. Doubtfire*.  When he realizes the absurdity of the film's premise (Robin Williams in disguise to hang out with his kids who he's not allowed to be around), it births Matt's idea for a plan of action (Matt dresses in a disguise to hang out with his best friend Jay who has told Matt he didn't want to spend time with him that night).  As the episode progresses plot points from *Mrs. Doubtfire* help to influence the storyline of our own show, culminating in a climactic scene at a restaurant where Matt is switching between his true identity and his disguise (just as Robin Williams does in Mrs. Doubtfire), before he runs out of rope and the truth comes out.

We would like to push the boundaries of our parody even further and when appropriate and only in short, transformative uses, use footage actually ripped from physical or digital media.  In an upcoming episode we are planning a parody of The X Files and would benefit greatly from being able to incorporate some of the footage from their opening animations and juxtapose that with our own footage.

Beyond *nirvanna the band the show*, we are developing a feature film called *Kill Hitler*.  In this time travel movie our main character is sent back in time to Kill Hitler in 1939, before WWII breaks out.  There is a scene in the film where our protagonist attends a CIA style mission briefing.  The briefing will contain projected film footage of Hitler.  It would be very helpful to us if we could rip existing footage of Hitler, edit it together and then print it back to 16 mm film and essentially use it as a prop within the briefing scene.

I am happy to further discuss this with you and provide any additional information that may be requires in this matter.

Sincerely,

Matthew Miller
President, Zapruder Films Inc.

Appendix H

Letter from Michael Mailer



December 4, 2017


To Whom It May Concern:

I am an American film producer and director who has produced over thirty films, including *Blood and Bone* (2009), *The Ledge* (2011) and *Empire* (2002).  In the course of making these films, I have learned a lot about the fair use doctrine as it relates to the use of third party content in films.

I'm writing this letter in support of an exemption to the DMCA for all films, not just documentaries. I am currently developing a narrative feature film that I believe will necessitate the usage of archive news footage in a way that, based on my past experience, should fall within the protection of fair use. My budget for this film is modest and if I am not able to take advantage of a DMCA fair use exemption that applies to narrative filmmakers, I will have to divert resources from other priorities, causing the project to suffer. In a worst-case scenario, I could see a lack of fair use exemption derailing a project entirely.

I believe the DMCA is an important piece of legislation. But it needs to be modified so that it is helpful to creators of all types of films, not just documentarians. Please consider expanding the scope of fair use exemptions under the DMCA to narrative films.


Sincerely,


Michael Mailer
Producer/Director

43 Clark Street, Brooklyn, NY 11201
(212) 966-9494  ✦  michael@michaelmailerfilms.com
www.MichaelMailerFilms.com

Appendix I

Letter from Tim Pedegana

To Whom It May Concern:

I am a post-production supervisor based in Los Angeles. I have worked on an array of award-winning narrative films based on true stories, including *The Imitation Game*, *Into the Wild*, and the soon to be released Rob Reiner film, *Shock and Awe*.

I am currently working on a narrative feature film about a young man who, in the days following 9/11, travels from Mexico to New York City to find his father, an undocumented worker at the World Trade Center's famous Windows on the World restaurant.

To truthfully illustrate the aftermath of 9/11 and the vast amount of people who were missing loved ones, we hope to use archival news clips from major world networks on screen as the main character travels across a continent to find his father among the rubble. These news clips are necessary to illustrate and support the magnitude of the main character's experience and contextualize his fictional experience with one that many real families went through in September of 2001.

We plan to work with reputable clearance attorneys to ensure that our use of clips will fall within the protection of the fair use doctrine.  In order to take advantage of fair use, however, we will need access to clips which are almost always encrypted.  Access to this digital content is the only way we can illustrate the real-life impact of 9/11, which is essential to our film going forward.

Sincerely,

Tim Pedegana

Appendix J

Letter from Zack Andrews

To Whom It May Concern:

My name is Zack Andrews.  I am a writer and producer, best known for *The House October Built* franchise.  *The House October Built* was released in 2014, and its sequel was released this year.

In making the first movie, we hadn't started working with clearance attorneys, so I was unaware of how fair use was helpful in the making of a film.  We were shooting a scene where five friends are watching something in the background in an RV before they go inside a haunted house.  Thematically speaking and as a clue to the film, we wanted to use an old episode of SCOOBY-DOO as to what would be on in the background (that our characters were watching in the RV).  We contacted Warner Bros. and were told that they license episodes out starting at $12,000.  With our budget, that was not smart for something so trivial.  But to this day, my director brings it up because he really wanted that to be on in the background.  Had I known about fair use, I think there is a possibility that we could have made his day.

We also were able to make fair use of a popular song thanks to our new awareness and relationship with Donaldson + Callif in our sequel.  While that didn't implicate the DMCA, we're going to continue to take advantage of fair use in our narrative films, and some of that material will probably be behind access controls.  If we don't have the exemption to be able to get to that material, then I don't know if we can use it.

Fair use has been helpful for us as filmmakers both in wanting certain elements on screen and to be protected if they accidentally end up on screen and I support D+C for their continued efforts to make this possible.


Sincerely,


Zack Andrews

Appendix K

Letter from Roberto Miller



**Pure Grain Digital Productions**

To Whom It May Concern:

I am a filmmaker based in San Francisco. My recent award-winning feature film, *Mandorla*, is currently in distribution worldwide. I have been the director of Pure Grain Digital Productions for 20 years, which made the first all-digital film, *Mail Bonding* (American Cinematographer, April 1995).  I have also made commercials for Silicon Valley companies such as Apple and HP, and am currently focused on developing my next feature film project.

I am developing a narrative feature film with Liz Holdship about a professor who, in the midst of a divided world, leads a team of international scientists on a unique experiment to facilitate a sense of unity in humans.

To truthfully illustrate a politically, economically, and racially "divided world" that audiences can readily relate to, our main characters will witness clips of contemporary news casts and broadcast shows from major world networks such as CNN, Fox News, BBC, ABC news, PBS, etc. Some of our characters will see (or recall in their minds) clips from films that illustrate a "divided world," and the fight against it, such as *Mr. Smith Goes to Washington*, which is digitally encrypted in 4K on a Blu-ray disk:

https://www.amazon.com/Washington-4K-Mastered-UltraViolet-Included-Digibook/dp/B00N5708NE

We plan to work with reputable clearance attorneys to ensure that our use of clips will fall within the protection of the fair use doctrine.  In order to take advantage of fair use, however, we will need access to clips which, as I mentioned above, are almost always encrypted.  Access to this digital content is the only way we can illustrate the "divided world" which is essential to our film going forward.

Sincerely,

Roberto Miller
Pure Grain Digital Productions

Appendix L

Letter from Joshua Louis

To Whom It May Concern:

I've been involved in the film industry as a director, producer and writer since 2008. I worked on numerous independent film projects until 2010, and started to work on narrative films in 2011. I heard about the attempt to get an exemption from the DMCA for narrative filmmakers and thought I would share a few projects that would be affected by the result.

I just completed my second feature film, *Devils Tree: Rooted Evil* and am currently starting pre-production on two other feature films. *Devils Tree* is inspired by events that have been reported on in real life about a tree in Florida where many horrible acts have occurred. It is a fictional story about a journalist who decides to write a story about the haunted tree. This film incorporated news clippings and material that were used under fair use. This project would have benefited from the DMCA exemption, as I easily would have obtained quality content without being confined by the DMCA and access controls.

My two new films will reference real events, and I would like to use local and national news clips in the films. One is a horror film which discusses paranormal activity in hospitals. Being able to use news clips that are directly on point, i.e. which show paranormal events in real hospitals, will greatly benefit my film. The other film I am producing is a mob film, in which I'd like to incorporate news dealing with various criminal activity, including news clips of organized crime busts. The DMCA exemption would certainly help me create these films without the fear of being in violation of copyright law, and without the need to expend time and resources to use material that would otherwise fall within the exemption.

Expansion of the DMCA exemption to narrative filmmakers would be a vital change that would help filmmakers like me to create content without being limited by cost constraints. This in turn will allow filmmakers to convey their messages wholly.

Thank you for considering an expansion of the DMCA exemption to allow filmmakers like me to make fair use.

Sincerely,

Joshua Louis

Appendix M

Letter from Marc Delorme

To Whom It May Concern:

My name is Marc Delorme. I am a documentary filmmaker based in Hawaii. I have been involved in filmmaking for over thirty-five years (NYU-Film Grad/Class of 1982.)

Most of my work has been educational in nature and has focused primarily on social and environmental issues in Hawaii. While I may not be very well known as a filmmaker, I continue to direct and produce independent films.

As someone involved in creating original media I am quite aware of the need for copyright protection. At the same time, I am also aware of the need for copyright law exceptions or exemptions. I believe that the issue of the exemption from the DMCA is a complicated one that needs to be revisited and updated legally to include narrative filmmakers.

The nature of documentary filmmaking is changing. The film that I am currently working on will include fair-use footage but will utilize a non-traditional approach
to documentary storytelling. In order to reach a greater audience, my film will have a more "dramatic" feel. Will someone perceive my film to be dramatic in nature as opposed to being a documentary? Will I then no longer be covered by the DMCA exemption?

My next film will drive this issue even further as I plan to incorporate a documentary within a standard dramatic film. The line between documentary and narrative films will be blurred even more in this case. I am choosing this approach once again in order to reach a larger audience. How will I be protected then as a filmmaker?

Removing the exemption's limitation to "documentary" would eliminate my concern of being in violation of copyright law.

In looking at the matter of fair use footage, I think it is important to consider the educational, historical and cultural dimensions to this issue. The fair use footage that I plan to utilize will not affect the market value of the underlying works as referred to in the new narrative while the new narrative will provide greater educational value.

In other words, allowing filmmakers to apply fair use clips to their storytelling not only affects the individual work, but also enriches the American cultural heritage as a whole.

As an American independent filmmaker I urge you to consider this issue.

Sincerely,

Marc Delorme

Appendix N

Letter from Rachel Ward



December 14, 2017

To Whom It May Concern:

My name is Rachel Ward and I have been a producer on seven feature films, two digital series, and over a dozen commercials. Of the feature films I've worked on, two were documentaries and five were fiction films. Each of these films has been financed through private equity and produced entirely independently of the studio system. As an independent producer, I work with limited resources and much of the content I create is produced upon speculation of distribution. Which is to say, when we make the films we are unsure where they will end up – in theaters, on television, online - ideally all of these platforms, but one never knows. Securing licenses to all the branded content, logos, music, or other copyrighted material is a big part of delivering an acceptable product to a distributor. It is a process that takes months and is frequently cost prohibitive to include even the smallest non-original element. With this regard, I find myself omitting any clips, news footage, or visual material from the finished film, regardless of the context it provides to the story or the cultural reference or impact it may have.

An example of this is a web series we sold to Universal called TESLA & TWAIN, which was a fictional exploration of the real historical friendship between the great writer Mark Twain and the genius inventor Nikola Tesla. We wanted to use a four second clip from Back to the Future as an analogous comedic touchstone. Due to the lack of an exemption for non-documentary films, we chose not to use a clip from the film even though we certainly thought it would quality as fair use. Licensing the material was not an option because it would have been too expensive. We ended up creating an audio sound-alike instead. Universal never released the series.

The expansion of a DMCA exemption to unquestionably include fiction films would be an important resource that many producers like myself would greatly appreciate.

Sincerely,

Rachel Ward

2801 Ocean Park Blvd. Suite 374
Santa Monica, CA 90405 USA
310.664.1954 – Office  /  310.388.0536 – eFax

Appendix O

Letter from Megan Griffiths, Matthew Brady, and Alisa Tager

To Whom It May Concern:

We are collectively writing to support the effort to expand the DMCA exemption to non-documentary filmmakers based on our experience with our recent film *The Night Stalker*. *The Night Stalker* is a thriller that is based on the true story of serial killer Richard Ramirez, played by Lou Diamond Phillips. Here is a little bit about us:

Megan Griffiths wrote and directed *The Night Stalker*. She also directed two episodes of the Duplass Brothers' HBO anthology series *Room 104*. Her film *Lucky Them* starring Toni Collette, Thomas Haden Church and Johnny Depp premiered at the Toronto International Film Festival and was distributed by IFC Films. Megan's film *Eden*, based on the true story of a young woman captured into the world of human trafficking, was a breakout at SXSW in 2012, winning the Emergent Narrative Director Award and the Audience Award for Narrative Feature. Her feature *The Off Hours* premiered at the 2011 Sundance Film Festival.

Matthew Brady is the founder and owner of MRB Productions. In addition to *The Night Stalker*, MRB Productions is currently producing a feature film entitled *A Little Something for Your Birthday*, starring Sharon Stone, Tony Goldwyn and Ellen Burstyn. They are also producing the documentary *In Utero*. MRB Productions also produces films and programs for commercial and corporate clients and has also produced many hours of television for networks such as ESPN, the Hallmark Channel and Comedy Central.

Alisa Tager has been producing films for over twenty years. In addition to producing *The Night Stalker*, she is known for the films *Seven Years in Tibet*, *Enemy at the Gates* and *Serenity*. Alisa's most recent project is *Cocaine Godmother*, a biopic of the infamous drug lord Griselda Blanco played by Catherine Zeta-Jones. Like *The Night Stalker*, news and documentary footage is used in *Cocaine Godmother* in order to bring authenticity to the story.

Together, our experience on *The Night Stalker* makes a compelling case for the need for an exemption for non-documentary filmmakers. Known to many as the "Night Stalker," Richard Ramirez was an unusually cruel and prolific serial killer who murdered fourteen people and terrorized Los Angeles in the summer of 1985. Though Ramirez was convicted of these atrocities and remained on death row for nearly thirty years, he was always suspected of committing additional crimes. This thriller tells the story of Kit, an attorney who travels to San Quentin on an impossible mission to clear the name of a death row inmate in Texas-- someone she believes has been wrongly accused of murders actually perpetrated by Ramirez. Kit herself lived in Los Angeles during the fear-tinged summer where Ramirez terrified its citizens, and confronting him again dredges up old and frightening memories of her own past. As the days count down to the innocent Texas man's execution, Kit confronts Ramirez about his unspeakable crimes in search of an elusive confession, plunging into intense psychological depths in her quest for the truth.

The actual events surrounding the 1985 murders are integral to the story and the dynamic between the two characters. We used flashbacks throughout the film in order to show what happened from both characters' perspectives and how it affected them. In order to depict this in a realistic way, actual news footage is used. This footage was not encrypted, but other footage that could have been useful for our film – and which would fall within fair use – was protected by access controls.

There is no question that the absence of a DMCA exemption for non-documentary films is limiting for filmmakers like us. We need this exemption in order to make films that are based on a true story. We have the right to fair use, but if we can't get past access controls, we're severely limited in the material we can actually use.


Sincerely,


Megan Griffiths          Matthew Brady          Alisa Tager

Appendix P

Letter from Rob Grant

To Whom It May Concern:

My name is Rob Grant.  I have been involved in filmmaking for over a decade, focusing mostly on the horror genre.

My most recent project, *Fake Blood*, uses an "outside the box" concept to examine the filmmaker's responsibility in portraying violent imagery on screen and how audiences react to those images.  *Fake Blood* is most accurately described as a documentary-thriller and blends nonfiction and fictional elements to tell the story.  Through narration and various interviews, *Fake Blood* makes reference to my past horror films and well-known films that use violent imagery to tell their stories.  To accurately convey the points being made, it was necessary to show brief clips of each film under the protection of the fair use doctrine.

*Fake Blood* is an independent film that was made with a limited budget.  Only through the film being labeled as a documentary was I able to take advantage of fair use due to the encrypted materials I needed to access.  Without being able to use these clips under fair use, the clips would not have been used at all and *Fake Blood* would not have been completed, which I think would be a shame with such an important topic.

If we regard film in general as a potential for change or influence, and by that I mean both documentary and non-documentary films, then a filmmaker should be able to use fair use just as freely in projects that may not be defined as documentaries if it is reasonably making a point or idea more clear.  I can imagine many circumstances where news clips, YouTube videos, and DVD clips are needed to help build a realistic world in non-documentary films, thus making the films' messages more powerful and believable.

For these reasons, the DMCA exemption should be expanded to non-documentary films.

Sincerely,

Rob Grant

Appendix Q

Letter from Alfred Spellman

To Whom It May Concern:

I have been a film and television producer for 17 years, producing documentary features and miniseries.  I have made extensive use of the fair use doctrine in all of our documentaries.

Our first narrative feature film, which we plan to shoot in 2018, contemplates a present-day relationship between several historical figures. We hope to use the Fair Use Doctrine to establish the historical nature of the relationship as well as depict pop culture events that occurred over the course of the relationship. Many of the events we hope to portray are contained in films and other programs where the high-quality clips we need are only available on Blu-ray and digital online sources. Without the fair use doctrine, it would be impossible to give the appropriate context to the historical figures and the world they inhabited.

Being able to rely on fair use is crucial for all filmmakers.  Without the exemption, our narrative feature film will be severely hampered in that I will not have the assurance that I can rely on fair use, which is crucial to our project.

Thank you for your consideration of an expansion of the DMCA exemption.


Sincerely,


Alfred Spellman
Rakontur

Appendix R

Letter from Brenda Goodman

# USC School of Cinematic Arts

**Film & Television Production**

*Brenda Goodman*

To Whom It May Concern:

My name is Brenda Goodman.  I have been producing films for over thirty years, and I am also a Professor of the Practice of Cinematic Arts at the USC School of Cinematic Arts.  I've produced films that are traditionally considered to be documentaries as well as films that most people would think of as narrative films.

Most recently, I produced the film *Sex(Ed) the Movie*, a documentary that explores the humor, shock and vulnerability people face when learning about sex, through the lens of the often hilarious, only sometimes informative, sex-ed films from 1910 to the present day.  I also produced the film the narrative film *Sophie and the Rising Sun*, which was selected to premiere at the Sundance Film Festival in 2016.  *Sophie* tells the fictional story of two interracial lovers swept up in the tides of history in South Carolina in 1941.  While most of the plot of the film is fictional, the film very much relies on critical moments in history to help viewers understand the historical context in which this love story exists.  The true historical context not only helps make the love story stronger, but also informs us of our American history on a very emotional level.  You may say that because *Sophie* relies so much on the true historical background and that this love story, at its core, most likely occurred many times over to similar individuals in similar circumstances, the film has documentary elements.

I continue to produce films that rely heavily on an accurate historical background.  I am currently in development on a script about a young singer from Mexico.  She comes to the United States illegally to escape a cartel and is targeted by ICE for playing at an immigration rally.  We will want to use news footage but have been reducing it in the script as we feel we either will not get it for all the markets we need or we will not be able to afford it.  Even though we think we might be able to rely on fair use for this material because the use will be very transformative, we've looked into the licensing route in part because we don't have the protection of a DMCA exemption.

The modification of a DMCA exemption to unquestionably include films like the one above would help me tremendously.  Without it, I'm simply not going to use the footage I was planning to use.

Sincerely yours:

Brenda Goodman



Appendix S

Letter from Jack Lerner and Michael C. Donaldson to Maria Pallante, Register of

Copyrights; Article written by "The Wrap" about the film Steve Jobs

Jack I. Lerner  
UCI Intellectual Property, Arts, and  
Technology Clinic  
UC Irvine School of Law  
401 E. Peltason Dr.  
Irvine, CA 92697  

Michael C. Donaldson  
Donaldson + Callif LLP  
400 S. Beverly Dr. Ste. 400  
Beverly Hills, CA 90212  

October 15, 2015  

Maria Pallante, Register of Copyrights  
c/o Jacqueline C. Charlesworth, Associate Register of Copyrights  
United States Copyright Office  
101 Independence Ave. S.E.  
Washington, D.C. 20559  

Re:   Docket No. 2014-7  
      Exemptions to Prohibition Against Circumvention of Technological  
      Measures Protecting Copyrighted Works  
      Proposed Class 6 - *Audiovisual works – derivative uses – filmmaking uses*  

Dear Ms. Pallante,

     We write to call your attention to recent news stories attached to this letter reporting the importance of fair use in the upcoming Universal Pictures narrative film *Steve Jobs*. We believe these reports underscore the hollowness of arguments made in this proceeding that question the need for fair use in narrative filmmaking.[1] As these stories demonstrate, even large studios must rely on fair use in narrative films and such use enjoys the strong support of executives at the highest levels.

     Of course, the iconic Apple commercial at issue here is widely available on the internet, but for more obscure material, often the only source of usable footage is protected by technological protection measures. In such situations, copyright law and the Digital Millennium Copyright Act operate as a form of private censorship allowing a rightsholder to suppress speech it opposes—as almost happened here.

     We deeply appreciate your consideration of this matter. We hope this new information will be helpful to you as you make your final recommendations in this rulemaking.

     Very truly yours,

Jack I. Lerner  
UCI Intellectual Property,  
Arts, and Technology Clinic  

Michael C. Donaldson  
Donaldson + Callif, LLP  

CC:  David Mao, Robert Newlen, Nicole Marcou (Library of Congress); Stacy Cheney (National Telecommunications and Information Administration); Stephen Metalitz, Art Neill, David Jonathan Taylor, Bruce Turnbull, Matthew Williams (counsel for commenters on proposed Class 6)

---

[1] *See* Comment of the AACS-LA, Section 5.I.B. (March 27, 2015), http://copyright.gov/1201/2015/comments-032715/class%206/AACS_LA_class06_1201_2014.pdf; Comment of the DVD CCA, Section 5.I.B. (March 27, 2015), http://copyright.gov/1201/2015/comments-032715/class%206/DVDCCA_class06_1201_2014.pdf, and Comment of the Joint Creators, Item 5 (March 27, 2015), http://copyright.gov/1201/2015/comments-032715/class%206/Joint_Creators_and_Copyright_Owners_class06_1201_2014.pdf.



## How 'Steve Jobs' Steamrolled Objections of Apple Founder's Family

**AWARDS** | By **Steve Pond** on October 12, 2015 @ 3:02 pm        Follow @stevepond



**Jobs' family refused director Danny Boyle's request to use the iconic '1984' Apple ad but the director found a way to use it anyway**

"**Steve Jobs**" has received raves from critics, awards voters and early audiences in Los Angeles and New York, but the late tech icon's family has been putting roadblocks in the way of **Danny Boyle**'s movie from the start.

In fact, Boyle revealed to TheWrap that the filmmakers and Universal Studios' lawyers had to invoke the fair use exception to U.S. copyright law in order to use Apple's famous "1984" Super Bowl commercial. The rights to the commercial were initially denied them by the family, which hated **Walter Isaacson**'s biography of Jobs on which **Aaron Sorkin** partly based his screenplay.

The commercial, which was directed by **Ridley Scott**, was only aired twice — once late at night on Dec. 31, 1983 to qualify for advertising awards, and then more notably during the 1984 Super Bowl.

**Also Read: Critics Love 'Steve Jobs': 10 Reviews Promising Michael Fassbender Drama Is Worth Price of Admission**

Often considered the greatest television commercial ever made, the ad was inspired by the George Orwell novel "1984" and features a young woman throwing a hammer through a huge screen on which a Big Brother-type figure addresses a crowd of faceless, obedient workers.

The commercial plays a key role in "**Steve Jobs**." It is screened before Jobs introduces the first Macintosh computer to a rapt audience at a product launch in 1984, and it is also a source of heated arguments between Jobs, played by **Michael Fassbender**, and Apple CEO John Sculley (**Jeff Daniels**) in the film.

In an interview with TheWrap, **Ridley Scott** said that the "**Steve Jobs**" filmmakers originally approached him asking for permission to use the groundbreaking commercial. "I said, 'I will do everything I can to get it,'" he said.

The director said he went to Chiat-Day, the advertising agency for which he had created the commercial. "Chiat contacted me and said Steve's family had said no, because they weren't happy about the direction the film had taken."

Boyle picked up the story from there in a separate interview, confirming to TheWrap that the filmmakers never received permission to use the footage. "We got it under fair use," he said, citing the exception to copyright law that allows artists to use part of a copyrighted work without payment or permission.

**Also Read: Trevor Noah Addresses Apple Backlash With 'Steve Jobs' Screenwriter Aaron Sorkin**

The fair use doctrine takes into account "the purpose and character of the use," the nature of the copyrighted work, the amount of the work used in relation to the entire work, and the effect of the use on the potential market or value of the original work.

Universal's legal department, Boyle said, carefully considered whether the use of the "1984" ad could qualify under fair use. "Universal have been exemplary in their confidence, and willing to take some risks

to support the filmmaking," the director said, and then chuckled. "I'm sure it helps that they've had such a stellar year, so they're not as nervous about stuff."



Boyle singled out Universal Pictures chairman **Donna Langley** and president **Jimmy Horowitz**, who formerly worked in the studio's legal affairs department, for supporting his right to use the advertisement. In his film, much of "1984" is glimpsed from behind as it plays on a huge screen at the Apple product launch.

"You could have had other circumstances where people would have said it was too risky," Boyle said. "But in the American system, freedom of speech is very big part of culture. And we know lawyers are very powerful, but they can stand with you as well and protect you sometimes. There is a need for responsible people to be able to say what they really want to say, and not to be prevented from doing that."

**See video: New 'Steve Jobs' Trailer Emphasizes Drama of Creating 'Most Tectonic Shift to Status Quo... Ever' (Video)**

Boyle said he did have to change some other copyrighted material, particularly news footage from ABC, which denied permission to use it. And he expected to receive criticism from those close to Jobs — which he has, from current Apple CEO Tim Cook and others who felt that the person depicted on screen

is not the Jobs they knew.

Others familiar with Jobs, including Apple co-founder Steve Wozniak and longtime Apple and NeXT PR agent **Andrea Cunningham**, have said that despite the fact that Sorkin purposely fictionalized parts of the story, the daring and unconventional film accurately captures the real guy. Both Wozniak and Cunningham are depicted in the movie, played by **Seth Rogen** and **Sarah Snook**, repsectively.

"It's so difficult dealing with real people's lives, and it's why you have to have an important story if you're going to do it," said Boyle, who spoke to TheWrap the day after an official Academy screening that drew a capacity crowd of enthusiastic voters to the 1,000-seat Samuel Goldwyn Theater in Beverly Hills.

**Also Read: 33 Best Picture Challengers in First Oscar Outlook: 'The Martian,' 'Steve Jobs,' 'Bridge of Spies'**

"And when you're dealing with people who just recently passed away, you are always going to be dealing with grief or with personal sensitivity," Boyle said. "The thing that is different about this is that Jobs was a huge public figure.

"And I'm afraid, however unpopular this may be with his friends and family, he is a major figure in our lives, and it's incumbent upon us all to look at his work and his legacy."

## MOVIES

# How 'Steve Jobs' used Apple's Super Bowl ad without permission



Michael Fassbender plays the title role in "Steve Jobs." — Francois Duhamel, TNS

By **THE WRAP**
October 13, 2015 - 6:08 PM

"Steve Jobs" has received raves from critics, awards voters and early audiences in Los Angeles and New York, but the late tech icon's family has been putting roadblocks in the way of Danny Boyle's movie from the start.

In fact, Boyle revealed to TheWrap that the filmmakers and Universal Studios' lawyers had to invoke the fair use exception to U.S. copyright law in order to use Apple's famous "1984" Super Bowl commercial. The rights to the commercial were initially denied them by the family, which hated Walter Isaacson's biography of Jobs on which Aaron Sorkin partly based his screenplay.

The commercial, which was directed by Ridley Scott, was only aired twice — once late at night on Dec. 31, 1983 to qualify for advertising awards, and then more notably during the 1984 Super Bowl.

**Also Read:** Critics Love 'Steve Jobs': 10 Reviews Promising Michael Fassbender Drama Is Worth Price of Admission

Often considered the greatest television commercial ever made, the ad was inspired by the George Orwell novel "1984" and features a young woman throwing a hammer through a huge screen on which a Big Brother-type figure addresses a crowd of faceless, obedient workers.

The commercial plays a key role in "Steve Jobs." It is screened before Jobs introduces the first Macintosh computer to a rapt audience at a product launch in 1984, and it is also a source of heated arguments between Jobs, played by Michael Fassbender, and Apple CEO John Sculley (Jeff Daniels) in the film.

In an interview with TheWrap, Ridley Scott said that the "Steve Jobs" filmmakers originally approached him asking for permission to use the groundbreaking commercial. "I said, 'I will do everything I can to get it,'" he said.

The director said he went to Chiat-Day, the advertising agency for which he had created the commercial. "Chiat contacted me and said Steve's family had said no, because they weren't happy about the direction the film had taken."

Boyle picked up the story from there in a separate interview, confirming to TheWrap that the filmmakers never received permission to use the footage. "We got it under fair use," he said, citing the exception to copyright law that allows artists to use part of a copyrighted work without payment or permission.

**Also Read:** Trevor Noah Addresses Apple Backlash With 'Steve Jobs' Screenwriter Aaron Sorkin

The fair use doctrine takes into account "the purpose and character of the use," the nature of the copyrighted work, the amount of the work used in relation to the entire work, and the effect of the use on the potential market or value of the original work.

Universal's legal department, Boyle said, carefully considered whether the use of the "1984" ad could qualify under fair use. "Universal have been exemplary in their confidence, and willing to take some risks to support the filmmaking," the director said, and then chuckled. "I'm sure it helps that they've had such a stellar year, so they're not as nervous about stuff."



Boyle singled out Universal Pictures chairman Donna Langley and president Jimmy Horowitz, who formerly worked in the studio's legal affairs department, for supporting his right to use the advertisement. In his film, much of "1984" is glimpsed from behind as it plays on a huge screen at the Apple product launch.

"You could have had other circumstances where people would have said it was too risky," Boyle said. "But in the American system, freedom of speech is very big part of culture. And we know lawyers are very powerful, but they can stand with you as well and protect you sometimes. There is a need for responsible people to be able to say what they really want to say, and not to be prevented from doing that."

**See video:** New 'Steve Jobs' Trailer Emphasizes Drama of Creating 'Most Tectonic Shift to Status Quo... Ever' (Video)

Boyle said he did have to change some other copyrighted material, particularly news footage from ABC, which denied permission to use it. And he expected to receive criticism from those close to Jobs — which he has, from current Apple CEO Tim Cook and others who felt that the person depicted on screen is not the Jobs they knew.

Others familiar with Jobs, including Apple co-founder Steve Wozniak and longtime Apple and NeXT PR agent Andrea Cunningham, have said that despite the fact that Sorkin purposely fictionalized parts of the story, the daring and unconventional film accurately captures the real guy. Both Wozniak and Cunningham are depicted in the movie, played by Seth Rogen and

Sarah Snook, repsectively.

"It's so difficult dealing with real people's lives, and it's why you have to have an important story if you're going to do it," said Boyle, who spoke to TheWrap the day after an official Academy screening that drew a capacity crowd of enthusiastic voters to the 1,000-seat Samuel Goldwyn Theater in Beverly Hills.

**Also Read:** 33 Best Picture Challengers in First Oscar Outlook: 'The Martian,' 'Steve Jobs,' 'Bridge of Spies'

"And when you're dealing with people who just recently passed away, you are always going to be dealing with grief or with personal sensitivity," Boyle said. "The thing that is different about this is that Jobs was a huge public figure.

"And I'm afraid, however unpopular this may be with his friends and family, he is a major figure in our lives, and it's incumbent upon us all to look at his work and his legacy."

Read original story Inside How 'Steve Jobs' Used Apple's Super Bowl Ad Without Permission At TheWrap

Comments

Appendix T

Non-Disparagement Clauses

## MASTER USE, SYNCHRONIZATION AND PERFORMANCE RIGHTS LICENSE

This agreement ("Agreement"), dated and effective as of ▮▮▮▮▮▮▮ is hereby acknowledged and entered into by and between EntertainmentOne ("Licensor"), with offices at 200 Varick Street, New York, NY 10014, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Producer"), located at ▮▮▮▮▮▮▮▮. As used herein, the term "Producer" shall include all of Producer's licensees, assignees and designees.

1) **COMPOSITIONS**: The musical compositions covered by this Agreement are those compositions which are set forth on Schedule A (the "Composition(s)"), attached hereto and incorporated herein by this reference.

2) **MASTERS**: The master recordings covered by this Agreement are those masters which are set forth on Schedule B (the "Master(s)"), attached hereto and incorporated herein by this reference.

3) **MUSIC VIDEOS**: The music videos covered by this Agreement are those music videos which are set forth on Schedule C (the "Music Video(s)"), attached hereto and incorporated herein by this reference.

4) **ARCHIVAL VIDEO**S: The archival videos covered by this Agreement are those archival videos which are set forth and identified on Schedule D (the "Archival Video(s)"), attached hereto and incorporated herein by this reference.

5) **CONTENT**: The content to and of which Licensor hereby grants Producer access to high-resolution versions, is set forth and identified on Schedule E (the "Content"), attached hereto and incorporated herein by this reference.

6) **PICTURE**: As used herein, the "Picture" shall mean the motion picture documentary series tentatively entitled "The Defiant Ones" and any portion thereof (including clips), together with all trailers, featurettes, advertisements, "behind the scenes" and "making of" footage, director's cut and other versions and promotional material for the Picture.

7) **NUMBER AND TYPE OF USES**: Licensor hereby agrees and understands that Producer may use the Compositions, Masters, Music Videos, Archival Videos, and Content (individually and collectively referred to hereinafter as the "Licensed Properties") in any manner and for such number of uses as Producer may elect, provided such use is in connection with the Picture. Said use of the Licensed Properties includes, but is not limited to, the right to rerecord, reproduce and/or perform excerpts from the Licensed Properties and/or the entirety of any Licensed Properties, as a vocal use, instrumental use, visual/foreground use, background use, use as part of a music video or other audio-visual work or any other use and manner, in the soundtrack of and in timed relation to Picture. Producer may use the Licensed Properties in whole or in part, edited or otherwise modified in Producer's sole discretion.

8) **TERRITORY**: The territory covered by this Agreement is the universe ("Territory").

9) **PERPETUAL TERM**: All rights granted herein shall commence on the date hereof and shall endure perpetually, including, without limitation, for the periods of all copyrights in each country of the Territory in and to the Licensed Properties and any and all renewals or extensions thereof in each country of the Territory and thereafter in perpetuity ("License Term").

10) **GRANT OF RIGHTS**: Licensor hereby grants Producer the non-exclusive, irrevocable, and perpetual rights, license, privilege, and authority during the License Term to record, reproduce, dub, synchronize, edit, adapt, arrange, re-arrange and use, in each country of the Territory (and to import the recordings of

the Licensed Properties into any country throughout the Territory), the aforesaid type and use of the Licensed Properties in synchronization or in timed-relation with the Picture, and to make copies of such Licensed Properties in the Picture, and to exhibit, distribute, perform (publicly and otherwise), broadcast, market and otherwise exploit the Licensed Properties in the Picture (including, for the avoidance of doubt, all in-context and out-of-context trailers, featurettes, advertisements and promotional material therefor) perpetually throughout each country in the Territory in all media now known or hereafter devised and in any and all languages and any manners and format now known or hereafter devised, excluding only theatrical.

11) **FEE**: As full and complete consideration for the rights granted herein, Licensor shall be paid a one-time, flat fee of ███████████████ ("License Fee") upon full execution of this Agreement. For the avoidance of doubt, the License Fee constitutes a buyout and no further sums shall be due, including without limitation for use on DVDs, electronic deliveries and other sales and exploitations of the Picture in any and all media whether now or hereafter known. The foregoing notwithstanding, this license does not include the name and likeness rights for any of the artists or personalities included in the video clip. Producer shall negotiate and pay for those rights, only if and when necessary as determined by Producer, separately from this agreement.

12) **CREDIT**: Provided Licensor is not in material breach of any provision of this Agreement, Licensor shall receive credits on screen in the end crawl of the particular episode(s) of the Picture in which the Masters, Compositions, Archival Videos, and/or Music Videos are used in substantially the following form: "Under Exclusive License from Entertainment One U.S LP.". All other aspects of such credits shall be in Producer's sole and absolute discretion. No causal or inadvertent failure by Producer or any failure by a third party to comply with the provision of this Section 12 shall constitute a breach of this Agreement.

13) **DELIVERY**: Licensor shall deliver the Masters, Music Videos, Archival Videos and Content to Producer in time for preparation and dubbing and editing, on such dates as Producer shall require and in such form as Producer shall require. Timely delivery is of the essence in this Agreement.

14) **REPRESENTATIONS AND WARRANTIES**: Licensor acknowledges, warrants, represents and agrees that:

   a) It has the full right, power, and authority to enter into this Agreement, and to grant all rights granted herein; it has not made and will not make any grant or assignment which will or might conflict with or impair the complete enjoyment of the rights granted to Producer in this Agreement;

   b) Licensor owns or controls the percentage of copyright interest and rights to the respective Compositions, Masters, Music Videos, Archival Videos throughout the Territory as specifically set forth in the respective schedules attached hereto and all required third-party consents have been received by Licensor and Producer has secured the consent of the estate of Tupac Shakur required for Licensor to license the rights granted herein in and to the Compositions, Masters, Music Videos, Archival Videos to another party;

   c) Licensor is under no court or administrative order, disability, restriction or prohibition, whether contractual or otherwise, with respect to Licensor's right to execute this Agreement, to grant the rights herein granted and to perform each and every term and provision hereof;

   d) Neither the Licensed Properties nor any part or parts thereof, violate or infringe or will violate or infringe upon any common law statutory or other right of any person, firm, corporation, entity, partnership or labor organization including without limitation contractual rights, property rights, copyrights and rights of privacy or unfair competition;

   e) Licensor's agreements with all third parties who render services in connection with any or all of the Compositions, Masters, Music Videos, Archival Videos shall provide that third parties will

look solely to Licensor for any payment in connection with any of the Licensed Properties in the Picture and that Producer shall have no responsibility whatsoever with respect thereof;

f) Licensor shall be responsible for any payments due to any record companies, artists, producers, unions (e.g. re-use fees/new use fees, etc.) or other third parties, with the exception of the estate of Tupac Shakur, who may be due any compensation in connection with the grant of this license and the rights hereunder.

g) Producer shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise, or exploitation of rights by Producer pursuant to this Agreement except as specifically provided in this Agreement; and

h) Licensor makes no representation or warranty with respect to the rights in and to the Content granted to Producer hereunder.

15) **NO OBLIGATION TO USE:** Producer shall not be obligated to use the Licensed Properties, nor any part thereof, in the Picture.

16) **REMEDIES:** No failure by Producer to perform any of its obligations hereunder shall constitute a breach hereof, unless Licensor gives Producer written notice of such non-performance and Producer fails to cure within sixty (60) business days of receipt of such notice. Licensor's rights and remedies in the event of a breach or alleged breach of this Agreement by Licensee shall be limited to an action at law for damages, if any, and in no event shall Licensor or any of its affiliates, subsidiaries, parent entities, agents, principals, members, employees, independent contractors, licensees, successors, assigns or creditors be entitled to injunctive or other equitable relief against the Picture, any advertising or promotion thereof, or Producer, its licensees, successors or assignees.

17) **INDEMNIFICATION:** Licensor hereby agrees to indemnify Producer, Producer's successors, distributors, sub-distributors, assigns, and the respective officers, directors, agents, and employees of each of the foregoing, from and against any damages, liabilities, costs and expenses (including reasonable outside attorneys' fees), arising out of or connected with any claims and damages arising from the breach of any term, provision, representation or warranty of Licensor made in this Agreement. Producer shall indemnify and defend Licensor from and against any and all claims and damages arising from the production, distribution, exhibition or exploitation of the Picture, or any element thereof, to the extent such claim or damage does not arise out of a breach by Licensor hereunder.

18) **SEVERABILITY:** In the event that any terms or provision of this Agreement shall be held invalid by a court of competent jurisdiction or governmental agency of competent jurisdiction: (i) the provision of this Agreement so affected shall be limited only to the extent necessary to permit compliance with the minimum legal requirement; (ii) no other provisions of this Agreement shall be affected thereby; and (iii) all such other provisions shall continue in full force and effect. The parties shall negotiate in good faith to replace any invalid, illegal or unenforceable provision with a valid provision, the effect of which comes as close as possible to that of such invalid, illegal or unenforceable provision.

19) **WAIVERS:** No waiver of any term or condition of this Agreement shall be construed as a waiver of any other term or condition hereof. The descriptive headings of the paragraphs of this Agreement are for convenience only and do not constitute a part of this Agreement. The parties agree that ambiguities contained in this Agreement (if any) are not to be construed against the drafter of this Agreement.

20) **ARBITRATION:** Any dispute relating to this agreement shall be settled pursuant to binding arbitration under the rule of the independent Film and Television alliance ("IFTA") before a sole arbitrator in New York, NY and the prevailing party thereof shall be entitled to collect reasonable outside attorneys' fees and costs.

21) **ASSIGNMENT**:  Producer shall have the right to assign this Agreement to any person, corporation, and/or entity for the purpose of distributing, exploiting, exhibiting, and/or marketing the Picture, or the ownership therein. Licensor shall not assign rights without Producer's prior written consent and any attempted assignment without such consent shall be void and shall transfer no rights to the purported assignee.

22) **NOTICES**: Any notice under this Agreement shall be written and delivered by hand, by a recognized courier service such as Federal Express, or by facsimile or e-mail with confirmation of receipt and prepaid first class (air mail if posted to another country) post to the party at its address above and shall be deemed to have been served immediately if hand delivered, faxed or e-mailed during business hours (or otherwise when the next business day starts).  Courtesy copies of all notices shall be sent to the following:

*If to Producer:*



*If to Licensor:*

23) **COUNTERPARTS**: This Agreement may be signed in counterparts and facsimile or scanned copies of the Agreement shall be considered originals for all purposes.

24) **FURTHER ASSURANCES**: The parties hereto agree to sign such other documents, do and perform and cause to be done and performed such further and other acts consistent herewith as may be necessary or desirable in order to give full effect to this Agreement.

25) **ADDITIONAL DOCUMENTS**:  Licensor agrees to execute, deliver and/or file any and all further and reasonable instruments consistent herewith, which Producer may reasonably deem necessary to carry out the purposes of this Agreement.

26) **GOVERNING LAW**: This Agreement will be governed by the laws of the State of New York.

27) **ENTIRE AGREEMENT**: This Agreement constitutes the entire agreement between the parties hereto with respect to all of the matters herein and its execution has not been induced by, nor do any of the parties hereto rely upon or regard as material, any representations or writing whatsoever not incorporated herein and made a part hereof and supersedes all prior agreements and understandings, whether oral or written, between the parties relating to the subject matter hereof. Any amendments, additions to or changes in this Agreement shall be valid only if set forth in writing and signed by the parties. If a provision of this Agreement is held invalid under any applicable law, such invalidity will not affect any other provision of this Agreement that can be given effect without the invalid provision.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year written above.



**LICENSOR**

SCHEDULE A



**SCHEDULE B**



**SCHEDULE C**



**SCHEDULE D**
**ARCHIVAL VIDEOS**



**SCHEDULE E**
**CONTENT**



---

### *N O N - E X C L U S I V E   C L I P S   &   S T I L L S   L I C E N S E*

**DATED:** ███████                    **CONTRACT #:** ███████

**LICENSOR:**   Miramax, LLC
2450 Colorado Ave., Ste. 100E
Santa Monica, CA 90404
Attn: ████████████

**LICENSEE:**   ████████████████

**Licensed Clip(s) and still(s):** Twenty-Three (23) outtake interview Clips from ████████████████ ████████ see Exhibit A)

**Underlying Motion Picture:** ████████████████ ("MOTION PICTURE")

**Licensing Program:** ████████████ ("PROGRAM")

**Permitted Use of LICENSED MATERIAL:** The LICENSED MATERIAL will be featured within the PROGRAM. The MOTION PICTURE is viewed in a positive light and the LICENSED MATERIAL will retain its original integrity.

I.   Number of Clip(s) and still(s): Twenty-Three (23) Clips (See Exhibit A)
II.  Duration of Clip(s): Not to exceed Sixty (60) seconds in the aggregate
III. Term: US & Canada: ████████ in Perpetuity; World excluding US & Canada: ████████ ████████
IV.  Territory: Worldwide
V.   Distribution Media: All media, whether now known or hereafter devised, excluding only theatrical. In-context promotional rights expressly reserved

**License Fee (US$):**
**Total:**                        ████████

Payment must be made prior to using content.  Payment shall be made via credit card, wire, or check to
Visual Icon Inc.  See Exhibit "B" for payment instructions

Miramax, LLC ("LICENSOR") hereby grants to ▉▉▉▉▉▉▉▉▉▉▉▉ ("LICENSEE") this non-exclusive and non-transferable license (except as otherwise provided below) ("License") to use (but neither materially alter nor modify (e.g., color correction is acceptable)) the LICENSED MATERIAL only in the PROGRAM described above, and only for the purposes and manner otherwise set forth herein. This License is fully conditioned upon payment of the above License Fee and upon LICENSEE's execution of this License. For good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged, LICENSOR and LICENSEE agree as follows:

1)      LICENSEE will not make any reproduction of or from the LICENSED MATERIAL whatsoever in whole or in part, except for use in connection with the PROGRAM, and as herein described.

2)      LICENSEE will include a credit notice in the PROGRAM in which the LICENSED MATERIAL appears, in the form of "Courtesy of Miramax." LICENSEE's inadvertent failure to accord such credit shall not be deemed a breach hereof.

3)      LICENSEE shall not use the LICENSED MATERIAL for any purpose in connection with the advertising and publicizing of the PROGRAM in which the LICENSED MATERIAL is used, without the prior express written consent of LICENSOR.

4)      LICENSEE represents, warrants and agrees that it will obtain and be solely responsible for all other required authorizations, consents and releases in connection with the proposed use of the LICENSED MATERIAL, and pay all re-use fees necessary (if any) for the use of the LICENSED MATERIAL hereunder (including, but not limited to, consents from all unions and guilds to the extent required under applicable collective bargaining agreements, or otherwise required by law). LICENSOR represents and warrants that it has the full right and authority to enter into this License and to grant the rights herein granted. LICENSOR further represents and warrants that LICENSEE's permitted use of the LICENSED MATERIAL will not infringe upon the copyright of any third party. The provisions of this Paragraph 4 shall survive the expiration or earlier termination of this license.

5)      LICENSEE hereby indemnifies, defends and holds harmless Licensor, and its affiliates, agents, employees, representatives, associates, parent and subsidiary corporations, and each of them, from and against any and all loss, cost, damages, liability and expense, including reasonable outside attorneys' fees, arising out of any claim whatsoever which may be brought based upon LICENSEE's use of the LICENSED MATERIAL. LICENSOR hereby indemnifies, defends and holds harmless Licensor, and its affiliates, agents, employees, representatives, associates, parent and subsidiary companies, and each of them, from and against any and all, cost, damages, liability and expense including reasonable outside attorneys' fees, arising out of any claim whatsoever which may be brought due to a breach by LICENSOR of any term, representation, or warranty (or any combination of the foregoing) in this LICENSE. In the event of a breach or default of any term under this License by LICENSEE, LICENSOR shall provide written notice to LICENSEE of such breach or default and LICENSEE shall have thirty (30) days following its actual receipt of such written notice to cure or remedy the breach or default.

6)      LICENSEE shall pay all direct, verifiable, out-of-pocket, third-party laboratory costs and other direct, verifiable, out-of-pocket, third-party costs that may be involved in obtaining the LICENSED MATERIAL.

7)      This License shall be governed by the laws of the State of California. Any action to enforce its terms shall be commenced within the State of California and within a court of competent jurisdiction in Los Angeles County, California.

8)      This License shall be deemed null and void unless fully executed by both parties.

9)      LICENSEE will make available to LICENSOR a digital file of the program for the sole purpose of verification of the use of the LICENSED MATERIAL, which may not be shared by LICENSOR and shall be promptly destroyed by LICENSOR following such verification.

10)     The PROGRAM shall not be derogatory to or critical of LICENSOR, or any officer, director, agent, employee, affiliate, parent or subsidiary of LICENSOR or of any MATERIAL owned, produced or distributed by LICENSOR.  The LICENSED MATERIAL will not be used in a manner derogatory to or critical of the MOTION PICTURE from which the LICENSED MATERIAL was/were taken or the persons involved in the production or distribution of the MOTION PICTURE from which the LICENSED MATERIAL was taken.

11)     This License may not be amended, modified or supplemented (whether by amendment, side letter, schedule, exhibit, addendum or otherwise) except by the written agreement of both parties.  This License is complete and embraces the entire understanding between the parties, all prior understandings, either oral or written, having been merged herein.

    12) LICENSEE shall have the right to assign this License and the rights granted hereunder for the purposes of exhibiting, distributing, advertising, promoting, and otherwise exploiting the PROGRAM.

AGREED AND ACCEPTED:

Miramax, LLC:

_____

Its:_____

As Of:_____

Exhibit A



Exhibit B

Payment must be made in advance of receiving content.



# ◉CBS TELEVISION DISTRIBUTION

## LICENSE AGREEMENT

This is an Agreement dated as of ███████ between CBS TELEVISION DISTRIBUTION, a division of CBS STUDIOS, INC. ("CBS") and ██ ██████████████████████████████ ("Licensee"), for and on behalf of ███████ "Copyright Holder"), c/o ██ ██████ ████████ ██ █████ wherein Licensee seeks to obtain and CBS hereby grants certain non-exclusive rights to use footage as more specifically set forth below. Licensee and CBS agree that the use of the footage will be subject to the terms and conditions set forth herein and the Standard Terms and Conditions which are attached hereto and incorporated herein by reference (the "Agreement").

**FOOTAGE:** ███████████████████████████████████████

**TYPE OF USE/**
**USE OF FOOTAGE:** The Footage will be incorporated into a ████████ entitled ████████████████ (the "Program").

**MEDIA:** All media.

**INITIAL BROADCAST/**
**RELEASE DATE:** ██████████

**TERM:** ██████████ through perpetuity.

**RUNS:** Unlimited.

**TERRITORY:** Worldwide.

**LICENSE FEE:** USD ████████ per 30 seconds aggregate use per episode (footage is cut or used more than once within the program for an aggregate running time of up to 30 seconds). Payment must be made before master Footage is ordered and released. Total footage running time may not exceed four (4) minutes in length.

**FOOTAGE FEE:** USD ██████ per episode. Payment must be made before screening or master Footage is ordered and released and must be returned with a signed copy of the Agreement.

**ADMINISTRATIVE FEE:** USD ██████ per license.

**BANK FEES:** The payment of bank fees for wire transfers is Licensee's responsibility and may not be deducted from the fees owed to CBS.

**CANCELLATION FEE:** USD ██████ (if applicable).

**RESTRICTION:** All music and third-party materials that may be included in the footage must be cleared separately.

**CREDIT:** A credit must be accorded as follows:

███████████████████████████

**NO CREDIT PENALTY FEE:** ██████████ (if the above-referenced credit is not accorded).

If any fees are due as referenced hereinabove, no invoice will be issued. This Agreement shall serve as your formal invoice and payment needs to be received by CBS with a signed copy. By signing in the space provided below, Licensee warrants and represents that they have the right and authority on behalf of the Copyright Holder of the Program to enter into this agreement thereby agreeing to all of the terms and conditions contained above and in the attached Standard Terms and Conditions. If there is any inconsistency between the provisions above and any provisions in the Standard Terms and Conditions, the provisions above shall prevail.

CBS TELEVISION DISTRIBUTION,
a division of CBS STUDIOS, INC. ("CBS")

By:_____



**STANDARD TERMS AND CONDITIONS**

1.  GRANT OF LIMITED LICENSE:  Upon receipt by CBS of this Agreement, signed by Licensee and counter-signed by CBS, CBS hereby grants to Licensee, without any representations or warranties of any kind, expressed or implied, as to the extent of any rights to the contemplated use, a non-exclusive and non-transferable license to use the Footage pursuant to the terms hereof.  The Footage shall be used in and as part of one Program only that is exhibited or broadcast in whole in the Media, in the Territory and for the Term, and will not be used for any other purposes whatsoever.  Use of the Footage in any other version of the Program, in whole or in part is expressly prohibited.  Licensee will not make any reproduction of or from the Footage whatsoever in whole or in part, except for use in and as part of the Program.  Licensee warrants that the Footage shall not be loaned, assigned, disposed of, transferred to, licensed by, or sold to any other person, firm, corporation or entity.  Licensee further warrants and represents that upon completion of production of the Program, all right, title and interest in and to the Program shall be assigned to Copyright Holder and that Copyright Holder shall abide by all of the terms and conditions of this Agreement; in any event, Licensee shall remain primarily liable and responsible for all of the obligations to which it agrees hereunder.  Unless otherwise set forth herein, Licensee may not use the Footage in connection with the main or end titles of the Program, nor shall the Footage be used in any manner such that it appears that artists appearing in the Footage have rendered services for the Program or Licensee.  If Licensee has not signed and returned this Agreement to CBS within thirty (30) calendar days of the date of this Agreement, then CBS may, in its sole discretion, terminate the Agreement and deem it void *ab initio*.  If Licensee has not signed and returned this Agreement to CBS within thirty (30) calendar days of the date of this Agreement but used, exhibited or broadcast the Footage, Licensee's use of the Footage constitutes acceptance of the terms of this Agreement, and Licensee is obligated to abide by the terms and conditions set forth herein or be in breach.

2.  LICENSE FEE:  Licensee shall pay the license fee before master Footage is released.  If Footage is not used within the Program, CBS will refund the license fee less the cancellation fee, as defined in Paragraph 4, to Licensee upon fulfillment of all requirements specified in Paragraph 13 of this Agreement.

3.  FOOTAGE FEE:  Licensee will pay all costs ("footage fee"), before screening Footage is released, arising in connection with the license granted hereunder and with making the Footage available to Licensee including, without limitation, researching, screening, processing, laboratory, transfer and shipping charges attributable to the manufacture of any pre-print material and positive prints or tape of the Footage, the return of materials and the costs involved in replacing any lost or damaged elements.

4.  CANCELLATION FEE:  If CBS provides master Footage to Licensee and the Footage is not used with the Program, Licensee will pay a cancellation fee for the Footage.

5.  CREDIT:  Licensee agrees that there shall be included in any use of the Footage a credit as specified and provided herein.

6.  NO CREDIT PENALTY FEE:  If credit is not accorded in the Program as required herein, Licensee shall pay a no credit penalty fee in lieu of providing credit.  The no credit penalty fee is due regardless of whether Licensee's failure to provide credit was inadvertent or intentional.

7.  MEDIA DEFINITIONS:  "All Media":  All forms of program delivery via any form of media now known or hereafter devised.

8.  RELEASES:  Licensee shall not have the right to use the Footage without first obtaining all required written authorizations, releases, consents, clearances and licenses, and make all required payments, in form and substance satisfactory to CBS, as may be necessary with respect to the use of the Footage including, without limitation, the releases set forth below, and shall and furnish CBS with copies of all such releases upon request. Notwithstanding the foregoing, as long as all required written authorizations, releases, consents, clearances and licenses have been obtained, any and all required payments that may be due in relationship thereto may be made after delivery of the Program to the broadcaster but must be made before initial broadcast of the Program.

   (a)  Written releases from all individuals appearing recognizably in the Footage, including, but not limited to:
      (i)   those the results and proceeds of whose services are utilized in the Footage; and
      (ii)  stunt persons appearing in any stunt identifiable in the Footage.
   (b)  Written releases from any unions or guilds to the extent required under applicable collective bargaining agreements in connection with the use of the Footage, as well as consents from and payments to unions and guilds, including, if applicable and without limitation, the American Federation of Television and Radio Artists, the Screen Actors Guild, the Writers Guild of America and the Directors Guild of America.
   (c)  If any music is included in the Footage, consents must be obtained from those performing music in the Footage (including musicians), if any, and master use, synchronization and performing licenses must be obtained from the copyright proprietors of the applicable master recording(s) and composition(s) and such other persons, firms or associations, societies or corporations as may own or control the performing rights thereto.

9.  EDITING, DUBBING AND COLORIZING:  Licensee shall not edit, dub, colorize or otherwise alter the Footage, except to edit for time.

10.  NATURE OF PROGRAM:  The Program shall not be in any way derogatory to or critical of the entertainment industry, CBS, or any officer, director, agent, representative, employee, affiliate, parent or subsidiary of CBS or of any program or motion picture produced or distributed by CBS and none of the Footage will be used in a manner which would be derogatory to or critical of the program from which the Footage was taken or to the persons involved with the production of the program from which the Footage was taken.

11. ADVERTISING: Licensee shall not use the Footage or the name of CBS for any purposes in connection with the advertising, publicizing or any other promotion of the Program.

12. RETURN OF MATERIALS/ELEMENTS: If the Footage was provided to Licensee by e-mail, FTP, or any other Internet based form of delivering downloadable footage, Licensee must destroy the Footage upon initial broadcast of the Program.

13. VERIFICATION: Upon broadcast of the Program or sooner, Licensee shall provide to CBS, at Licensee's expense, a viewing copy of the Program for the purpose of verifying the Footage used, the title and credit accorded, and the copyright registered. Such copy should be sent as a downloadable file to: CTD Clip Licensing Group via e-mail at ctdcliplicensinggroup@cbs.com.

14. AGREEMENTS, NOTICES AND PAYMENTS:

**Agreements and Notices to CBS:**    CBS Television Distribution
Attn: CTD Clip Licensing Group

**Payments to CBS:**



15. COPYRIGHT: Licensee represents and warrants that the end of show copyright to Licensee's program shall be registered as © **2017 SOML, LLC**, that Licensee shall be the copyright proprietor of the Program, that it shall be registered for copyright protection in accordance with the requirements of the Universal Copyright Convention, and that all formalities shall be complied with in all countries where the Program will be exploited. Licensee further represents, warrants and agrees that the incorporation of the Footage into the Program shall in no way affect the continued and separate copyright in the Footage and the program from which the Footage was taken, and that said copyright will not merge with the copyright of Licensee's Program.

16. PROGRAM SECURITY: Licensee shall make every effort to provide adequate security of the Program that contains the Footage to prevent theft, pirating, unauthorized exhibition, duplication or copying of the Program. Should Licensee become aware of any infraction of security, Licensee shall make every effort to remedy such infraction and shall immediately notify CBS of the efforts being made. CBS reserves the right to remedy any infraction of security of the Footage.

17. RIGHTS: CBS hereby reserves all its rights in the Footage and the program from which it came. CBS shall at all times, anywhere in the world and whether or not in conflict or competition with Licensee, have the right to use or authorize others to use the Footage in any way CBS may desire.

18. INDEMNITY: Licensee will indemnify, defend and hold CBS and its parents, affiliates, subsidiaries, agents, independent contractors, representatives, associates, and the officers, directors, and employees of each and all of them, harmless from and against any and all losses, costs, damages, judgments, liabilities and expenses, including, without limitation, attorneys' fees and costs and any payments that may be due any music publisher, musician, writer, director, actor, union, guild or other party arising out of any claim whatsoever, whether or not groundless, which may, whenever and wherever, arise or be brought or based directly or indirectly by reason of Licensee's use of the Footage.

19. GOVERNING LAW: This Agreement and all matters or issues collateral thereto shall be governed by the federal laws of the United States and the laws of the State of California applicable to agreements entered into and to be performed entirely within the state, and Licensee further agrees to be subject to the jurisdiction thereof.

20. REMEDIES: Licensee further acknowledges that a breach by Licensee of any of its representations, warranties or agreements hereunder will cause CBS irreparable damage, which cannot be readily remedied in damages by an action at law and may, in addition thereto, constitute an infringement of CBS's copyright and trademark, thereby entitling CBS to equitable remedies, costs and attorneys' fees. Notwithstanding the foregoing, in the event Licensee provides CBS with a downloadable viewing copy of the Program, as specified in Paragraph 13 hereinabove, no less than thirty (30) days prior to initial broadcast of the Program, time being of the essence, on a one-time-only basis, Licensee shall be afforded 15 consecutive days to cure the problem after being given written notice of an issue.

21. WAIVER: A waiver by either Licensee or CBS of any of the terms and conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.

22. ENTIRE AGREEMENT: This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior licenses, whether oral or written, pertaining thereto. No modification, amendment, or waiver of this Agreement or any of the terms or provisions hereof shall be binding upon CBS or Licensee unless confirmed by a written instrument signed by Licensee and by a duly authorized officer of CBS.

## FILM FOOTAGE PROGRAM LICENSE AGREEMENT

No. 56580-1

Agreement dated as of ██████████ between Twentieth Television, a division of Twentieth Century Fox Film Corporation (**"Fox"**), and ████████████████ (**"Licensee"**) to obtain certain rights to use the film/tape footage (**"Footage"**) as set forth below. Licensee and Fox agree that the use of the Footage will be controlled by the terms set forth on this page and the attached Standard Terms and Conditions.

A. <u>FOOTAGE</u>: The Footage shall consist of six clips totaling :29 seconds from the television program entitled ████████

B. <u>PICTURE</u> : The Footage shall only be used as background playback on a television set in connection with the motion picture currently entitled ████████ (**"Picture"**). Neither the Footage, nor the Picture, may be included in whole or any part containing the Footage, in any other program, production or product. The use is limited to the scene outlined in Exhibit "A" attached hereto.

C. <u>MEDIA</u> : The **"Media"** is All Media Exhibition.

D. <u>TERRITORY</u> : The **"Territory"** is Worldwide.

E. <u>TERM</u> : The **"Term"** shall be in perpetuity, to the extent Fox now or hereafter owns or controls all copyrights in and to the Footage throughout the Territory, and any renewals or extensions thereof.

F. <u>LICENSE FEE</u>: Licensee shall pay Fox the non-refundable sum of ████████ (**"License Fee"**) based on the rate of $██████ per minute, or portion of a minute, per episode in connection with the Picture as herein provided.

G. <u>CREDIT/COPYRIGHT NOTICE</u> : Licensee shall accord Fox credit in the Picture in the following form: "Footage From ██████ Courtesy of Twentieth Television. All rights reserved. "

By signing in the spaces provided below, the parties have agreed to all of the terms and conditions contained above and in the attached Standard Terms and Conditions.

Twentieth Television, a division of Twentieth Century Fox Film Corporation

("Fox")

By _____

ELIZABETH D. MASTERTON
SENIOR VICE PRESIDENT
LEGAL AFFAIRS

P.O. Box 900
Beverly Hills, California 90213

# STANDARD TERMS AND CONDITIONS

1) GRANT OF LIMITED LICENSE: Upon receipt by Fox of this Agreement, signed by Licensee, Licensee is granted by Fox, without any representations or warranties of any kind, expressed or implied, a non-exclusive and non-transferable license to use the Footage pursuant to the terms hereof. The Footage shall only be used in and as part of the Picture, for exhibition in the Media, in the Territory, and for the Term. The Footage will not be used for any other purposes whatsoever. Licensee will not make any reproduction of or from the Footage whatsoever in whole or in part, except for use in and as part of the Picture. Unless otherwise set forth herein, Licensee may not use the Footage in connection with the main or end titles of the Picture nor shall the Footage be used in any manner such that it appears that artists appearing in the Footage have rendered services for the Picture or Licensee.

2) LICENSE FEE: If Licensee has not signed and returned this Agreement along with the License Fee to Fox within sixty days after Licensee's receipt of this Agreement, then this Agreement shall automatically terminate in its entirety and be deemed void ab initio and Licensee shall be in breach of its obligations herein.

3) RELEASES: Licensee shall not have the right to use the Footage without obtaining all required individual authorizations, releases, consents, clearances and licenses ("Releases") as may be necessary with respect to the use of the Footage including, without limitation, the Releases set forth below:

   a) Written releases from all individuals appearing recognizably in the scene(s) contained in the Footage and from all stunt persons appearing in any stunt identifiable in the scene(s) contained in the Footage.

   b) Written releases from any unions or guilds to the extent required under applicable collective bargaining agreements in connection with the use of the Footage.

   c) If any music is included in the Footage, master use, synchronization and performing licenses must be obtained from the copyright proprietors of the applicable master recording(s) and composition(s) and such other persons, firms or associations, societies or corporations as may own or control the performing rights thereto.

   Licensee shall pay any fees and other payments required in connection with the Releases and furnish Fox with copies of all such Releases upon request.

4) COSTS: Licensee will pay all costs arising in connection with the license granted hereunder including screening, processing, laboratory, transfer and shipping charges

attributable to the manufacture of any pre-print material and positive prints or tape of the Footage, the return of materials and the costs involved in replacing any lost or damaged materials delivered to Licensee.

5) EDITING, DUBBING AND COLORIZING: Licensee shall not edit, dub, colorize or otherwise alter the Footage, except to edit for time.

6) NATURE OF PICTURE: This License is conditioned on the Picture not being derogatory to or critical of the entertainment industry or of Fox, or any officer, director, agent, employee, affiliate, parent or subsidiary of Fox or any motion picture/television program produced or distributed by Fox and the Footage will not be used in a manner which would be derogatory to or critical of the motion picture/television program from which the Footage was taken or to the persons involved with the making of the motion picture/television program from which the Footage was taken. If Licensee violates this provision, this Agreement shall automatically terminate in its entirety and be deemed void ab initio and Licensee shall be in breach of its obligations herein.

7) RETURN OF MATERIALS: Upon the completion of production of the Picture, Licensee shall promptly return all preprint material and positive prints or tape of the Footage to such location as Fox shall designate.

8) ADVERTISING: Licensee shall not use the Footage or the name of Fox for any purposes in connection with the advertising, publicizing or any other promotion of the Picture.

9) COPYRIGHT: Licensee represents, warrants and agrees that the incorporation of the Footage into the Picture shall in no way affect Fox's continued and separate copyright ownership in the Footage and the motion picture/television program from which the Footage was taken and that the copyright ownership of Fox will not merge with the Picture nor deprive Fox of its copyright ownership. Licensee further represents, warrants and agrees that Licensee shall be the copyright proprietor of the Picture, that the Picture shall bear a copyright notice thereon and that if the Picture is exploited in the United States, it shall be registered for copyright in the United States Copyright Office and the Picture shall be registered for copyright protection, and all formalities shall be complied with, in all other countries where the Picture will be exploited.

10) CONDITIONS OF USE: The consent of Fox is conditioned upon Licensee's compliance with the provisions of the Universal Copyright Convention and of the laws of the United States to protect the copyrighted Footage. Licensee shall not have the right to use the Footage unless it complies with said laws.

11) INDEMNITY: Licensee will indemnify, defend and hold Fox and its officers, directors, agents, employees, representatives, associates, affiliates and subsidiary corporations, and each and all of them harmless from and against any and all loss, costs, damage, liability and expense, including reasonable attorneys' fees, arising out of any claim whatsoever, whether or not groundless, which may arise, directly or indirectly, by reason of Licensee's use of the Footage or any breach of this Agreement.

12) GOVERNING LAW: This Agreement and all matters or issues material thereto shall be governed by the laws of the State of California applicable to contracts performed entirely therein.

13) REMEDIES: Licensee further acknowledges that a breach by Licensee of any of its representations, warranties or agreements hereunder will cause Fox irreparable damage, which cannot be readily remedied in damages in an action at law and may, in addition thereto, constitute an infringement of Fox's copyright, thereby entitling Fox to equitable remedies, costs and attorneys' fees.

14) TERMINATION: Without prejudice to any right or remedy available to Fox, this Agreement shall be terminable at the election of Fox in the event of breach of any term or condition hereof and in the event of any such termination, no further use of the Footage shall be made by Licensee.

15) DEFINITIONS: The following terms shall have the meanings as set forth below:

   a) **"All Media Exhibition"**: The exhibition of a Motion Picture using any form of Motion Picture copy by Home Video Exhibition, Non-Theatrical Exhibition, Television Exhibition, Theatrical Exhibition and Internet Exhibition.

   b) **"Home Video Exhibition"**: The non-public exhibition of a Motion Picture by means of an audio/visual device for viewing in a private residence.

   c) **"Motion Picture"**: Pictures of every kind and character whatsoever, whether produced by means of any photographic, electrical, electronic, mechanical or other processes or devices now known, and their accompanying devices and processes whereby pictures, images, visual and aural representations are recorded or otherwise preserved for projection, reproduction, exhibition, or transmission by any means or media now known in such manner as to appear to be in motion or sequence, including computer generated pictures and graphics other than video games.

   d) **"Non-Theatrical Exhibition"**: The exhibition of a Motion Picture using any form of Motion Picture copy in any manner now known by any medium or process now known, other than Theatrical Exhibition, Television Exhibition, or Home Video Exhibition.

   e) **"Television Exhibition"**: The exhibition of a Motion Picture using any form of Motion Picture copy for transmission by any means now known (including over-the-air, cable, wire, fiber, master antenna, satellite, microwave, closed circuit, multi-point distribution services or direct broadcast systems) for viewing the Motion Picture on the screen of a television receiver or comparable device now known (including high definition television), other than Home Video, Non-Theatrical or Theatrical Exhibition, without regard as to how ultimately received by the viewer.

   i) **"Basic Origination Television Exhibition"**: Television Exhibition (other than Free Television Exhibition or Pay Television Exhibition) such as basic cable, whereby the transmission of programming over one or more channels is available to the viewer on the basis of the payment of an access, carriage or equipment fee for the privilege of unimpaired reception of the transmission for viewing, without regard as to how ultimately received by the viewer.

   ii) **"Free Television Exhibition"**: Television Exhibition (other than Basic Origination Television Exhibition or Pay Television Exhibition) whereby programming originates from over-the-air, terrestrial television broadcast stations without regard as to how ultimately received by the viewer.

   iii) **"Pay Television Exhibition"**: Television Exhibition (other than Basic Origination Television Exhibition or Free Television Exhibition) whereby the transmission of programming is available to the viewer on the basis of a premium subscription charge or fee (as distinguished from an access, carriage or equipment fee) for the privilege of unimpaired reception of the transmission for viewing, whether such transmission is on a pay-per-view, pay-per-show, pay-per-channel (such as HBO) or pay-per-time basis, without regard as to how ultimately received by the viewer.

   f) **"Theatrical Exhibition"**: The exhibition of a Motion Picture using any form of Motion Picture copy by any process now known in walk-in or drive-in theaters open to the general public on a regularly scheduled basis where a fee is charged for admission to view the Motion Picture.

   g) **"Internet Exhibition"**: The "Internet Exhibition," as such is commonly understood, or similar or successor technology(ies), whether now known or hereafter devised.

16) ENTIRE AGREEMENT: This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior licenses, whether oral or written, pertaining thereto. No modification, amendment, or waiver of this Agreement or any of the terms or provisions hereof shall be binding upon Fox or Licensee unless confirmed by a written instrument signed by Licensee and by a duly authorized officer of Fox.

**NBCUniversal**
**Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

**Meg Nakahara**
**Account Manager**
**(212) 664-2236**
**meg.nakahara@nbcuni.com**

## LICENSE AGREEMENT
(███████████████)

This license agreement ("Agreement") is entered into between **NBC News Archives LLC**, A Division of NBCUniversal Media, LLC, and its parent, subsidiary and affiliated companies (**"NBC"**) and ████████████████████ (**"Licensee"**) located at ████████████████████████████, regarding the use of █████████ content ("Content") in a production ("Production") titled:

████████████

### 1. Footage

The Content which is the subject of this Agreement:

_____

### 2. Ownership and Reservation of Rights

As between the parties to this Agreement, **Licensee** acknowledges that **NBC** is the sole owner of the Content, including all copyright and other exclusive rights in it. This Agreement does not transfer any ownership rights or copyrights in the Content to **Licensee**, all of which shall remain **NBC**'s property.  **NBC** shall at all times throughout the universe have the right to use and authorize others to use the Content or any portion thereof in any manner.

### 3. Third Party Clearances

The Content may contain listed restrictions, including, without limitation, restrictions as to time, manner, industry and territory of use, and required pre-approval by a depicted person or their representative. The absence of such a listed restriction is not a guarantee that there are no limitations on use or required consents.  **Licensee**, not **NBC**, shall be solely responsible for obtaining all third party required consents, clearances and releases, and for making all payments of any associated costs and expenses directly to third party that are necessary to use the Content, including, but not limited to: consents from those who appear recognizably in the Content; moral rights or the equivalent; rights from third parties for use of their material in the Content including but not limited to products, logos, storefronts, mastheads, works of fine art, footage and photos; consent from those whose services are used in conjunction with the Content; as well as consents from or payments to any applicable  unions, guilds, leagues or professional organizations.  If music is in the Content, it is the responsibility of **Licensee** to obtain applicable licenses, such as synchronization, master and performing rights licenses.

### 4. Rights Granted

**NBC** grants **Licensee** a non-exclusive license to use the Content solely in the Production in the following media, territory and term:

**Rights Package:** All Media Worldwide including in-context Promotion (Excluding Advertising & Theatrical) In Perpetuity

### 5. Limitations of Use

The use of any **NBC** still photographs, graphics, logos, trademarks, talent (voice-over or image) or use of the Content for promotional, advertising or marketing purposes is **strictly prohibited** without prior written permission from **NBC**,

NBCUniversal:2265328v2



**NBCUniversal**
**Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

**Meg Nakahara**
**Account Manager**
**(212) 664-2236**
**meg.nakahara@nbcuni.com**

**LICENSE AGREEMENT**
(▓▓▓▓▓▓▓▓▓▓▓▓▓▓)

except as noted in paragraph 1 [Footage].  Other than a credit as noted in paragraph 11 below, **NBC** cannot be identified as the provider of the Content without prior written permission from **NBC**, except as noted in paragraph 1.  Provided, however, that if **NBC**'s "bug" or other watermark appears in the Content, the "bug" or watermark must not be altered and must be visible in the Content unless **NBC** approves otherwise in writing or paragraph 1.  Other than for use as part of the Production, **Licensee** may not make any reproductions or use of the Content.  **Licensee** represents and warrants that the use of the Content and the Production will not defame or constitute trade disparagement of **NBC**, its officers, directors, agents, employees, affiliates, parents or its subsidiaries or of any production from which the Content is taken or which is produced or distributed by **NBC** or any of the foregoing entities.

6. **Fees and Expenses**

The license fees for the use of the Content for the rights granted above and outstanding services are listed below.

| Service | Notes | Qty | Unit Price | Total Price |
|---|---|---|---|---|
| Service Description | Notes | Qty | Unit Price | Total Price |

| | Total Amount: _____ |
|---|---|

The license fee is **non-refundable** and is based on the final Content ordered. All fees and expenses are due and payable within thirty (30) days of receipt of invoice. **Licensee** shall forward an executed pdf copy of this Agreement to **Meg Nakahara - meg.nakahara@nbcuni.com** at NBC News Archives LLC. This Agreement is not valid unless the Agreement is fully executed and **Licensee** has paid all fees.   **Licensee** is responsible for the payment of all applicable sales and use taxes, customs and duties.  **Licensee** shall pay all research, shipping, material and transfer costs in connection with this Agreement, even if the Content is provided but not used.

7. **Protection of Content; File Deletion or Return of Content**

**Licensee** agrees to provide adequate security to prevent theft, pirating, and unauthorized exhibition, duplication or copying of the Content**. Licensee** shall give prompt notice to **NBC** of any such unauthorized activity, and shall take all steps necessary to stop such unauthorized activity. Without limiting the foregoing, if use of Content is permitted on the Internet, or any other online or interactive media**, Licensee** shall take commercially reasonable, technically feasible steps to impede digital theft and ensure that the Content remains in the linear production for which it was licensed and cannot be searched by shot and downloaded in broadcast or substantially comparable quality. Upon the earlier of the completion of the Production, the expiration or earlier termination of this Agreement, **Licensee** shall promptly delete the Content from its computers or other electronic storage systems and shall ensure that **Licensee**'s subcontractors do likewise. If the Content is not provided in a digital form, the Content and any copies of it must be returned to **NBC** at **Licensee**'s expense. Under no circumstances may **Licensee** retain Content supplied by **NBC** other than that portion of the Content that is incorporated into the Production.

8. **Disclaimer of Warranty or Representation; Limitation on Recovery**

Except as otherwise specifically stated in paragraph 2 above, **NBC** makes no warranty or representation, express or implied, of any kind with respect to the Content or its use, including but not limited to disclaiming all warranties of merchantability and fitness for a particular purpose.  **Licensee** acknowledges that due to technological limitations, the

2



**NBCUniversal**
**Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

Meg Nakahara
Account Manager
(212) 664-2236
meg.nakahara@nbcuni.com

**LICENSE AGREEMENT**
( ██████████ )

Content may not be of broadcast quality. **Licensee** acknowledges that its damages in the event of **NBC**'s breach of this Agreement shall be limited to recovery of the fees actually paid by **Licensee** to **NBC** as set forth in this Agreement. **NBC**'s liability under any theory shall not exceed the return of the amount of fees actually paid by **Licensee**, and under no circumstances will **NBC** be liable for any special, indirect, consequential or incidental damages or lost profits or any other damages.

**9.  Indemnification**

**Licensee** agrees to indemnify, defend and hold harmless **NBC** (and its current and future parent and subsidiary companies, affiliated entities, successors and assigns and their respective officers, directors, agents and employees) from any actions, claims, liabilities, damages, loss or costs (including attorneys' fees) of any kind or nature whatsoever which may arise out of **Licensee's** use of the Content or **Licensee's** breach of this Agreement.  This indemnity shall survive the termination of this Agreement.

**10.  Sub-license**

**Licensee** may assign its rights under this Agreement solely in connection with the distribution of the Production. However, under no circumstance may such assignee sub-license or archive any Content except to the extent and in the form that such Content is contained in the Production.

**11.  Credit and Copyright Notice**

**Licensee** will give **NBC** an appropriate credit ("NBCUniversal Archives") in the end credits of the Production at least as prominent in size and placement as that accorded any other supplier of content used in the Production. In the case of still images for editorial uses, **Licensee** shall include a copyright notice and credit adjacent to each image. In the case of footage posted on line for editorial uses, **Licensee** shall include a copyright notice and credit adjacent to each link where the footage is posted. **Licensee** represents and warrants that its use of the Content in the Production will not affect **NBC**'s continued and separate copyrights in and ownership of the Content or the programs from which it is taken. **Licensee** will affix an appropriate **Licensee** copyright notice in the Production.

**12.  Termination; Withdrawal**

In addition to any other remedies, **NBC** may terminate this Agreement and revoke any rights granted if **Licensee** materially breaches any term of the Agreement. Upon termination, cancellation or expiration of this Agreement, neither **Licensee** nor any other person or entity covered by the license granted in this Agreement will have any right to make any use of the Content. Such termination will not suspend, alleviate or otherwise impact **Licensee**'s payment obligations under this Agreement.  Upon notice from **NBC** that the Content may be subject to a claim for which **NBC** may be liable, **NBC** may require **Licensee** immediately to stop using the Content. **NBC** will use best commercially feasible efforts to provide comparable Content, as determined by **NBC** in its reasonable judgment, for no additional charge, subject to the terms and conditions of this Agreement.

**13. Confirmation of Use**

At **NBC's** request, a copy of the Production shall be provided to **NBC** for the purpose of verifying that **Licensee** has complied with the terms and conditions of this Agreement.



### NBCUniversal
### Archives

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

**Meg Nakahara**
**Account Manager**
**(212) 664-2236**
**meg.nakahara@nbcuni.com**

### LICENSE AGREEMENT

(█████████████)

**14.  Miscellaneous**

The parties to this Agreement are independent contractors with respect to each other, and nothing in this Agreement shall create any association, partnership, joint venture or agency relationship between the parties. The illegality, invalidity or unenforceability of any specific provision shall in no way affect the remainder of this Agreement. No modifications of this Agreement will be effective unless set forth in writing signed by both parties. A waiver by either party of any of the terms and conditions of this Agreement shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  This Agreement shall be construed under the laws of the State of New York. The parties irrevocably consent that the state and federal courts located in the County of New York in the State of New York shall have exclusive jurisdiction. This paragraph shall survive the termination or the expiration of this Agreement. This is the entire agreement and it supersedes all prior oral or written understandings and communications concerning the Content.

**ACCEPTED AND AGREED:**

**NBC News Archives LLC,**
**A Division of NBCUniversal, LLC**                       ████████████████████

Signature: _____          Signature: _____

Print: _____          Print: _____

Title: _____          Title: _____

Date: _____          Date: _____

Email: _____          Email: _____

**4**

NBCUniversal:2265328v2

AGREEMENT dated as of ████████ by and between PARAMOUNT PICTURES CORPORATION ("PPC"), located at 5555 Melrose Avenue, Hollywood, CA 90038 and ████████ ("Producer"), located at ████████ ████████

RE: ████████

Producer has requested the use of thirty three seconds of film clips from the above-referenced Property (the "Material") as background video playback within the upcoming feature film entitled ████████ the "Picture"). Producer agrees that the Material shall not be shown on more than 80% of the screen in the Picture at any time. Producer agrees that the usage of the Material in the Picture and the context in which it is used shall conform specifically to the usage set forth, and there shall not be any direct or indirect use of or reference to the Property elsewhere in the Picture or otherwise.

This will confirm that PPC has no objection to Producer's non-exclusive use of the Material as aforesaid and PPC agrees to make the Material available to Producer subject to the following terms and conditions:

1.      The Material, as incorporated in the Picture, may be exhibited in all media, worldwide in perpetuity.  Producer has no right to exhibit or otherwise use, or to cause, authorize or permit others to exhibit or otherwise use the Material except as set forth in this Agreement.  Without limiting the foregoing, the Material may not be used in any advertising and promotion of the Picture.  Producer shall have no right to edit or to otherwise alter the Material.

2.      Producer shall pay all laboratory and other costs that may be involved in making the Material available to Producer and in editing and printing the same.

3.      It is expressly understood and agreed that PPC's waiver of objection hereunder to Producer's use of the Material is given only insofar as PPC is concerned and that PPC makes no warranty or representation whatsoever with respect to the nature or extent of its rights, if any, in and to the Material.  Producer shall be solely responsible for obtaining any and all further clearances, releases, consents and authorizations that are ████████ required from all other persons or entities and for all payments with respect thereto, including, but not limited to, the consent from any and all performer(s), appearing in the Material, and from all unions and guilds having jurisdiction over the Property, to the extent required under the applicable collective bargaining agreements.

4.      In addition to payment of costs referred to in Paragraphs 2 and 3 above, and in consideration of PPC's waiver of objection ████████ hereunder, Producer shall pay to PPC a non-refundable, non-returnable total fee of Fifteen Thousand Dollars ████████ (exclusive of the fee pursuant to Paragraph 2).  **Payment shall be due upon Producer's signing of this Agreement.**  Please make check payable to Paramount Pictures Corporation, Attn: ████████ of the following: ████████

████████

████████

6.      Without limiting Producer's obligations under Paragraph 3 above, Producer shall indemnify, hold harmless, and defend PPC, its parent, affiliated and subsidiary companies, and its and their officers, directors, agents and employees ("Indemnitees") from and against any and all liabilities, claims, causes of action, suits, losses, damages, fines, judgments, settlements and expenses (including any and all attorney's fees and court costs) which may be suffered, made or incurred by any of such Indemnitees arising directly or indirectly out of the use of the Material by Producer and any breach of any warranties, representations and agreements made by Producer herein.

7.      Producer represents and warrants that nothing contained in the context in which the Material is used will be in any way derogatory to the Property, any person connected with the production of the Property or depicted therein or to the literary or dramatic material upon which it is based.

8.      PPC reserves all of its rights in and to the Property and the Material.  The Picture shall bear the copyright notice required under U.S. copyright law, and any copyright in such Picture to the extent of Material used therein shall be held in trust for PPC and/or the copyright proprietor of the Property if any other than PPC.

9.      It is understood and agreed that Producer's use of the Material shall in no event be deemed to constitute the placement of commercial time by PPC.

10.     Producer agrees that the following visual notice will be given in the end credits of the Picture:

12.     The right to use the Material as granted herein shall not be assigned or sublicensed, in whole or in part, by Producer, except to authorized distributors of the Picture.

13.     This Agreement cannot be amended, modified or altered without the written consent of PPC.  Please note that Producer is not authorized to use the Material excepting upon the conditions stated above.

14.     This Agreement shall be construed and interpreted pursuant to the laws of the State of California, and the parties hereto submit and consent to the exclusive jurisdiction of the courts of the State of California, including Federal Courts located therein, in any action brought to enforce (or otherwise relating to) this Agreement.

15.     This Agreement (including any exhibits and schedules which are attached hereto and made a part hereof by this reference), when signed by the parties, shall constitute the entire understanding of the parties with respect to the subject matter, superseding all prior and contemporaneous promises, agreements, and understandings, whether written or oral, pertaining thereto and cannot be modified except by a written instrument signed by the parties hereto, nor may it be amended or rescinded, other than as provided by its terms, except by a writing duly executed by an authorized officer of the party to be charged.

Please signify acceptance of the above terms and conditions by signing in the space provided below.

AGREED TO AND ACCEPTED:

PARAMOUNT PICTURES CORPORATION


Sign: _____ Date: _____          Sign: _____ Date:_____
Print: _____                           Print: _____
Title: _____                           Title: _____

As of ████████

SONY PICTURES STUDIOS, INC.
10202 West Washington Boulevard
Culver City, California 90232

Re:   Film Clip Set Forth on Schedule "A" Attached Hereto - ████████ ██ █
      ████    ████████    ██   █████   █ ████████

Dear Sir/Madame:

We have advised you that we are about to produce a documentary entitled
"████████" ("PROGRAM") and that we desire to include therein excerpts ("FOOTAGE")
from the films ("PICTURES") more fully described on, and for the specific use as set forth in
Schedule "A" attached hereto and incorporated herein by this reference.

The license fee, if any, specified in Schedule "A", shall be due and payable
immediately upon the execution of this Agreement, is non-refundable, and Sony Pictures
Studios, Inc. receipt of the fee shall be a condition precedent to the effectiveness of the
Agreement and you consent to our use of the FOOTAGE upon and subject to the following
terms and conditions:

1.      You grant to us without warranty or representation of any kind a non-exclusive
and non-transferable license to include the FOOTAGE in the PROGRAM and to exhibit,
market and exploit the same as part of (but not separate from) the PROGRAM and for no
other use or purpose, provided that we shall have the right to assign the Program to our
broadcast licensees.

2.      We will not have the right to, and we expressly agree that we will not at any time
license or authorize any person to use, exploit, distribute, exhibit, broadcast, or rebroadcast
any of the FOOTAGE or any portion thereof (a) except as a part of the PROGRAM, or (b) in
any manner not herein specifically authorized by you.  Further, we agree that we have no right
to edit or otherwise alter the FOOTAGE, the music contained therein, or any portion thereof.

3.      We will not use your name, logo or trademark for any purpose without your
written consent first had and obtained.

4.      We acknowledge that the use of the FOOTAGE, portions thereof, or any music
and any master recordings thereof also require additional consents or licenses. Accordingly,
we undertake that as a condition for the use of any of the FOOTAGE or portion thereof, we
will at our sole cost and expense, obtain all consents and licenses and other permissions which
may be required from such persons, publishers, guilds or unions whose consents, licenses or
permissions are so required. We acknowledge that you make no warranty or representation as
to your right to authorize us to use any likenesses or performances contained in the
FOOTAGE.  If by reason of use by us of the FOOTAGE, or any portion thereof, any person
including any person whose likeness or performance is reproduced (or any guild or union or
other person acting on his or her behalf) shall make any claim, including, without limitation,

1



any claim for the payment of money for any reason, the satisfaction and discharge of any such claim shall be our sole responsibility and we shall take such actions as may be necessary or appropriate in the defense of such claim and shall pay any amount required to be paid on account thereof.  If the FOOTAGE contains copyrighted material licensed from a third party, (including but not limited to film clips, still photographs, posters, music, etc. embodied in the film clip being licensed) or music and master recordings controlled by you, it shall be our sole responsibility to secure all additional consents, licenses and permissions as may be necessary for the use of such material.

5.      We will, at our own cost and expense, indemnify and defend you, and your officers, employees, successors and assigns for and hold you and such parties harmless from and against any and all suits, claims, losses, costs and damages (including reasonable attorneys' fees) resulting from or arising out of any breach by us of any of the provisions hereof, or any claim or suit made or brought against you or any of said parties, based directly or indirectly, upon any use of the FOOTAGE by us.

6.      The PROGRAM shall not be derogatory to the film industry or to you or to any motion picture photoplay produced or distributed by you and the FOOTAGE will not be used in a manner that would be derogatory to the PICTURES or to the person(s) appearing or depicted therein or the literary material upon which the PICTURES were based.

7.      We will protect the FOOTAGE by including on the PROGRAM the appropriate copyright notice or notices under the Universal Copyright Convention and by taking all other steps necessary or appropriate to protect your rights in the FOOTAGE and to prevent the FOOTAGE from falling into the public domain, it being understood that we will hold in trust for you our copyright in the PROGRAM, to the extent of the use therein of the FOOTAGE.  If the foregoing appropriate copyright notice is not included on the PROGRAM, at your request we shall add the statement in substantially the form "Contains excerpts from motion pictures held under copyright and licensed by Columbia Pictures Industries, Inc."

8.      Without prejudice to any other right or remedy which may be available to you, including, without limitation, your right to enjoin the use of the FOOTAGE in the PROGRAM, this license shall be immediately terminable and voidable at your election if we breach any term hereof.

9.      We shall pay all laboratory and other out-of-pocket costs that may be involved in obtaining the FOOTAGE.

10.     We will make available to you a copy of the Program for the purpose of verification of licensed material.

11.     We are under no obligation to use the FOOTAGE in the PROGRAM.  If we elect not to use the FOOTAGE in the PROGRAM, all license fees as well as all laboratory and shipping charges remain due in full.  There is no kill fee or refund.

12.     Other than as may be required by any applicable law, government order or regulation, or by order or decree of any court of competent jurisdiction, neither party shall divulge or announce, or in any manner disclose to any third party, any confidential information or matters revealed to the other party pursuant hereto, or any of the specific terms and

2



conditions of the Agreement, and both parties shall do all such things as are reasonably necessary to prevent any such information becoming known to any party other than the parties involved with the transaction.

      13.     The substantive laws (as distinguished from the choice of law rules) of the State of California and the United States of America applicable to contracts made and to be performed entirely in California shall govern (i) the validity and interpretation of this Agreement, (ii) the performance by the parties of their respective obligations (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this agreement or its cancellation or termination.

      14.     This agreement shall be construed and enforced in accordance with the laws of the state of California without regard to the choice of law principles thereof. The parties agree that any and all disputes or controversies of any nature between them arising at any time shall be determined by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") before a single neutral arbitrator ("Arbitrator"). The Arbitrator shall be an attorney or retired judge with at least ten (10) years experience in the entertainment industry and shall be mutually agreed upon by the parties. If the parties are unable to agree on an Arbitrator, the Arbitrator shall be appointed by the AAA. The fees of the Arbitrator shall be borne equally by the parties, provided that the Arbitrator may require that such fees be borne in such other manner as Arbitrator determines is required in order for this arbitration clause to be enforceable under applicable law. The parties shall be entitled to conduct discovery in accordance with Section 1283.05 of the California Code of Civil Procedure, provided that (a) the Arbitrator must authorize such discovery in advance based on findings that the material sought is relevant to the issues in dispute and that the nature and scope of such discovery is reasonable under the circumstances, and (b) discovery shall be limited to depositions and production of documents unless the Arbitrator finds that another method of discovery (e.g., interrogatories) is the most reasonable and cost efficient method of obtaining the information sought. There shall be a record of the proceedings at the Arbitration hearing and the Arbitrator shall issue a Statement of Decision setting forth the factual and legal basis for the Arbitrator's decision. If neither party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the Arbitrator's decision shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to the California Superior Court, which may be made ex parte, for confirmation and enforcement of the award. If either party gives written notice requesting an appeal within ten (10) business days after the issuance of the Statement of Decision, the award of the Arbitrator shall be appealed to three (3) neutral Arbitrators (the "Appellate Arbitrators"), each of whom shall have the same qualifications and be selected through the same procedure as the Arbitrator. The appealing party shall file its appellate brief within thirty (30) days after its written notice requesting the appeal and the other party shall file its brief within thirty (30) days thereafter. The Appellate Arbitrators shall thereupon review the decision of the Arbitrator applying the same standards of review and all of the same presumptions as if the Appellate Arbitrators were a California Court of Appeals reviewing a judgment of the California Superior Court, except that the Appellate Arbitrators shall in all cases issue a final award and shall not remand the matter to the Arbitrator. The decision of the Appellate Arbitrators shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to the California Superior Court, which may be made ex parte, for confirmation and enforcement of the award. The party appealing the



decision of the Arbitrator shall pay all costs and expenses of the appeal, including the fees of the Appellate Arbitrators and the reasonable outside attorneys' fees of the opposing party, unless the decision of the Arbitrator is reversed, in which event the expenses of the appeal shall be borne as determined by the Appellate Arbitrators. The Arbitrator shall have the power to enter temporary restraining order, preliminary and permanent injunctions. Prior to the appointment to the Arbitrator or for remedies beyond the jurisdiction of an Arbitrator, at any time, either party may seek *pendent-lite* relief in a court of competent jurisdiction in Los Angeles County, California without thereby waiving its right to arbitration of the dispute or controversy under this section. All arbitration proceedings (including proceedings before the Appellate Arbitrators) shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award. The provision for this paragraph shall supersede any inconsistent provision of any prior agreement between the parties. Nothing in this paragraph shall prevent either party from seeking interlocutory and/or injunctive relief from a court of competent jurisdiction pursuant to other provision of the Agreement.

The parties hereby waive the right to jury trial with respect to all claims and issues arising out of or relating to this agreement whether sounding in contract or tort, and including any claim for fraudulent inducement thereof.

AGREED AND ACCEPTED:                    Very truly yours,

████████████

████████████████████████

(AUTHORIZED SIGNATURE

Its: ___ ████████ █ ████████

SONY PICTURES STUDIOS, INC.

By: _____
       ████ ████████
       Vice President, Content Licensing

4

## S C H E D U L E  "A"

**FOOTAGE:** ████████████████████████████████

████████████████████████████████

████████████████████████████████

**USE OF FOOTAGE:** For inclusion in a ██████████████████.

**RIGHTS:** All media, worldwide, in perpetuity.

For use in connection with the Program only.  No separate use for advertising or promotion.

**FEE:** ████████████████████

**CREDIT REQUIRED:** ████████████████████

████████



# NBCUniversal
## Archives

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

Scott Norman
**Sales and Rights Manager**
**(212) 413-5989**
scott.norman@nbcuni.com

**LICENSE AGREEMENT**
(█████████████)

This license agreement ("Agreement") is entered into between **NBC News Archives LLC**, A Division of NBCUniversal Media, LLC, and its parent, subsidiary and affiliated companies **("NBC")** and ████████████████ **("Licensee")** located at ██████████████████████████████, regarding the use of **NBC NEWS** content ("Content") in a production ("Production") titled:

████████████████████

## 1. Footage

The Content which is the subject of this Agreement:

████████████ ██████████████
███████████ █████████ ██████████
███████████ ████████████ ████████████████
███████████████ ██████████ ████████

████████████ ██████████████ ████████████████████
███████ █████████

## 2. Ownership and Reservation of Rights

As between the parties to this Agreement, **Licensee** acknowledges that **NBC** is the sole owner of the Content, including all copyright and other exclusive rights in it. This Agreement does not transfer any ownership rights or copyrights in the Content to **Licensee**, all of which shall remain **NBC**'s property.  **NBC** shall at all times throughout the universe have the right to use and authorize others to use the Content or any portion thereof in any manner.

## 3. Third Party Clearances

The Content may contain listed restrictions, including, without limitation, restrictions as to time, manner, industry and territory of use, and required pre-approval by a depicted person or their representative. The absence of such a listed restriction is not a guarantee that there are no limitations on use or required consents.  **Licensee**, not **NBC**, shall be solely responsible for obtaining all third party required consents, clearances and releases, and for making all payments of any associated costs and expenses directly to third party that are necessary to use the Content, including, but not limited to: consents from those who appear recognizably in the Content; moral rights or the equivalent; rights from third parties for use of their material in the Content including but not limited to products, logos, storefronts, mastheads, works of fine art, footage and photos; consent from those whose services are used in conjunction with the Content; as well as consents from or payments to any applicable  unions, guilds, leagues or professional organizations.  If music is in the Content, it is the responsibility of **Licensee** to obtain applicable licenses, such as synchronization, master and performing rights licenses.

████████████████


**NBCUniversal Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

Scott Norman
**Sales and Rights Manager**
**(212) 413-5989**
scott.norman@nbcuni.com

### LICENSE AGREEMENT

( ▮▮▮▮▮▮▮▮▮▮▮▮ )

**4. Rights Granted**

**NBC** grants **Licensee** a non-exclusive license to use the Content solely in the Production in the following media, territory and term:

**Rights Package:** All Media, (excluding Theatrical Distribution and advertising), Worldwide, in perpetuity, includes Film Festival showings.
**Expires On:** in perpetuity

**5. Limitations of Use**

The use of any **NBC** still photographs, graphics, logos, trademarks, talent (voice-over or image) or use of the Content for promotional, advertising or marketing purposes is **strictly prohibited** without prior written permission from **NBC**, except as noted in paragraph 1 [Footage]. Other than a credit as noted in paragraph 11 below, **NBC** cannot be identified as the provider of the Content without prior written permission from **NBC**, except as noted in paragraph 1. Provided, however, that if **NBC**'s "bug" or other watermark appears in the Content, the "bug" or watermark must not be altered and must be visible in the Content unless **NBC** approves otherwise in writing or paragraph 1. Other than for use as part of the Production, **Licensee** may not make any reproductions or use of the Content. **Licensee** represents and warrants that the use of the Content and the Production will not defame or constitute trade disparagement of **NBC**, its officers, directors, agents, employees, affiliates, parents or its subsidiaries or of any production from which the Content is taken or which is produced or distributed by **NBC** or any of the foregoing entities.

**6. Fees and Expenses**

The license fees for the use of the Content for the rights granted above and outstanding services are listed below.

| Service | Notes | Qty | Unit Price | Total Price |
|---------|-------|-----|-----------|-------------|
| ▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮ | | ▮▮▮▮▮ | |
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮ | ▮▮▮▮▮ | ▮▮▮▮ |
| ▮▮▮ | | | | |



The license fee is **non-refundable** and is based on the final Content ordered. All fees and expenses are due and payable within thirty (30) days of receipt of invoice. **Licensee** shall forward an executed pdf copy of this Agreement to **Scott Norman - scott.norman@nbcuni.com** at NBC News Archives LLC. This Agreement is not valid unless the Agreement is fully executed and **Licensee** has paid all fees. **Licensee** is responsible for the payment of all applicable sales and use taxes, customs and duties. **Licensee** shall pay all research, shipping, material and transfer costs in connection with this Agreement, even if the Content is provided but not used.

**NBCUniversal**

**Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

Scott Norman
**Sales and Rights Manager**
**(212) 413-5989**
scott.norman@nbcuni.com

<u>**LICENSE AGREEMENT**</u>



### 7.  <u>Protection of Content; File Deletion or Return of Content</u>

**Licensee** agrees to use commercially reasonable efforts to provide adequate security to prevent theft, pirating, and copying of the Content. **Licensee** shall give prompt notice to **NBC** of any such unauthorized activity, and shall take all steps necessary to stop such unauthorized activity. Without limiting the foregoing, if use of Content is permitted on the Internet, or any other online or interactive media, **Licensee** shall take commercially reasonable, technically feasible steps to impede digital theft and ensure that the Content remains in the linear production for which it was licensed and cannot be searched by shot and downloaded in broadcast or substantially comparable quality. Upon the earlier of the completion of the Production, the expiration or earlier termination of this Agreement, **Licensee** shall promptly delete the Content from its computers or other electronic storage systems and shall ensure that **Licensee**'s subcontractors do likewise. If the Content is not provided in a digital form, the Content and any copies of it must be returned to **NBC** at **Licensee**'s expense. Under no circumstances may **Licensee** retain Content supplied by **NBC** other than that portion of the Content that is incorporated into the Production.

### 8.  <u>Disclaimer of Warranty or Representation; Limitation on Recovery</u>

Except as otherwise specifically stated in paragraph 2 above, **NBC** makes no warranty or representation, express or implied, of any kind with respect to the Content or its use, including but not limited to disclaiming all warranties of merchantability and fitness for a particular purpose.  **Licensee** acknowledges that due to technological limitations, the Content may not be of broadcast quality.  **Licensee** acknowledges that its damages in the event of **NBC**'s breach of this Agreement shall be limited to recovery of the fees actually paid by **Licensee** to **NBC** as set forth in this Agreement. **NBC**'s liability under any theory shall not exceed the return of the amount of fees actually paid by **Licensee**, and under no circumstances will **NBC** be liable for any special, indirect, consequential or incidental damages or lost profits or any other damages.

### 9.  <u>Indemnification</u>

**Licensee** agrees to indemnify, defend and hold harmless **NBC** (and its current and future parent and subsidiary companies, affiliated entities, successors and assigns and their respective officers, directors, agents and employees) from any actions, claims, liabilities, damages, loss or costs (including attorneys' fees) of any kind or nature whatsoever which may arise out of **Licensee's** use of the Content or **Licensee's** breach of this Agreement.  This indemnity shall survive the termination of this Agreement.

### 10.  <u>Sub-license</u>

**Licensee** may assign its rights under this Agreement solely in connection with the distribution of the Production. However, under no circumstance may such assignee sub-license or archive any Content except to the extent and in the form that such Content is contained in the Production.

### 11.  <u>Credit and Copyright Notice</u>

**NBCUniversal**
**Archives**

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

Scott Norman
**Sales and Rights Manager**
**(212) 413-5989**
**scott.norman@nbcuni.com**

### LICENSE AGREEMENT



**Licensee** will give **NBC** an appropriate credit ("NBCUniversal Archives") in the end credits of the Production at least as prominent in size and placement as that accorded any other supplier of content used in the Production. In the case of still images for editorial uses, **Licensee** shall include a copyright notice and credit adjacent to each image. In the case of footage posted on line for editorial uses, **Licensee** shall include a copyright notice and credit adjacent to each link where the footage is posted. **Licensee** represents and warrants that its use of the Content in the Production will not affect **NBC**'s continued and separate copyrights in and ownership of the Content or the programs from which it is taken. **Licensee** will affix an appropriate **Licensee** copyright notice in the Production.

### 12. Confirmation of Use

At **NBC's** request, a copy of the Production shall be provided to **NBC** for the purpose of verifying that **Licensee** has complied with the terms and conditions of this Agreement.

### 13.  Miscellaneous

The parties to this Agreement are independent contractors with respect to each other, and nothing in this Agreement shall create any association, partnership, joint venture or agency relationship between the parties. The illegality, invalidity or unenforceability of any specific provision shall in no way affect the remainder of this Agreement. No modifications of this Agreement will be effective unless set forth in writing signed by both parties. A waiver by either party of any of the terms and conditions of this Agreement shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.  This Agreement shall be construed under the laws of the State of New York. The parties irrevocably consent that the state and federal courts located in the County of New York in the State of New York shall have exclusive jurisdiction. This paragraph shall survive the termination or the expiration of this Agreement. This is the entire agreement and it supersedes all prior oral or written understandings and communications concerning the Content.

### 14. INJUNCTIVE RELIEF
If Licensee breaches its obligations hereunder, the damage, if any, caused NBC shall not be irreparable or sufficient to entitle the undersigned to injunctive or other equitable relief.  Consequently, NBC's rights and remedies shall be limited to the right, if any, to obtain damages at law and NBC shall not have any right in such event to terminate or rescind this agreement or any of the rights granted to Licensee hereunder or to enjoin or restrain the development, production, advertising, promotion, distribution, exhibition or exploitation of the Production and/or any of Licensee's rights hereunder.

# NBCUniversal
## Archives

30 Rockefeller Plaza
Room 1221/39B73
New York, NY 10112
T: (212) 664-3797
www.nbcuniversalarchives.com

**Scott Norman**
**Sales and Rights Manager**
**(212) 413-5989**
**scott.norman@nbcuni.com**

## LICENSE AGREEMENT
(███████████████)

**ACCEPTED AND AGREED:**

**NBC News Archives LLC,**
**A Division of NBCUniversal, LLC**                    ████████████████████

| Signature: | _____ | Signature: | _____ |
|---|---|---|---|
| Print: | _____ | Print: | _____ |
| Title: | _____ | Title: | _____ |
| Date: | _____ | Date: | _____ |
| Email: | _____ | Email: | _____ |

5

# ABCNEWS *VideoSource*
## License Agreement & Basic Provisions

| | | No. ███ |
|---|---|---|
| **Licensee:** | ████████████████ | |
| **Address:** | | |
| **Attention:** | | |

**2. Grant of Rights:** ABCNEWS *VideoSource* (the Licensor) hereby grants to Licensee the limited, non-exclusive and non-transferable license to show footage (the Footage) from its library (description of footage): various clips of approved ABC News talent ████████████████

| | |
|---|---|
| **3. Program Licensed Use:** | ███████████ |
| **4. Territory:** | Worldwide |
| **5. Licensed Media:** | All media (excluding Theatrical) and in context ad and promotion (for b-roll only) |
| **6. Term:** | Perpetuity |
| **7. License Fee Per Second:** | ████████████████ |
| **8. Minimum License Fee:** | |
| **9. Seconds Ordered:** | |

**10. Standard Terms:** The Standard Terms and Conditions attached hereto constitute part of this Agreement and are hereby incorporated by reference. To the extent there is any inconsistency between the Basic Provisions and the Standard Terms and Conditions, the Basic Provisions shall govern.

**11. Additional Terms:** It is understood that this fee arrangement is non-precedential.

## AGREED AND ACCEPTED:

For Licensee:

Signature: _____

Date:

For ABCNEWS *VideoSource*

███████████

Signature: ___ ████████████████

Date: ████████████████

**ABCNEWS** *VideoSource*
STANDARD TERMS AND CONDITIONS

1. Grant of License: Upon receipt by Licensor of this Agreement, signed by Licensee, Licensee is granted by Licensor, a non-exclusive, non-transferable license to use the Footage pursuant to the terms of this Agreement.

2. Limited Use: The Footage may not be used in connection with the exploitation, advertising, publicity or promotion of the production unless otherwise agreed to in advance in writing by Licensor. Licensee further agrees that the Footage will not be used in any manner which is detrimental or disparaging to Licensor.

3. Territory: Any contemplated use of the Footage outside of the Territory will require a supplementary license from Licensor.

4. Credit: When and if credits are run in Licensee's production, Licensee shall give Licensor an on-screen visual credit ("Footage Courtesy of ABCNEWS VIDEOSOURCE"), displayed in the end titles of the production in a similar manner and duration as other credits which are run. Other than the foregoing, **ABC will not be identified in any way as the footage supplier without ABC's express written permission.**

5. Additional Consents: It is specifically understood by Licensee that by entering into this agreement, Licensor has not represented, and does not represent, that Licensor is granting Licensee any right whatsoever other than a license to use the Footage as set forth in the Agreement. Licensee shall obtain, at Licensee's own expense, requisite consents and releases from any individual performers, or other persons who appear recognizably in the Footage, and any necessary consents and releases from the Writers Guild of America ("WGA"), American Federation of Television and Radio Artists ("AFTRA"), Directors Guild of America ("DGA"), American Federation of Musicians ("AFM"), and any other guild or union which might have jurisdiction over the exploitation of the Footage as well as any other entities such as, but not limited to, production companies, distributors, sports clubs, or associations whose permission or release may be required. If any music is included in the Footage, licenses must be obtained for the use of any master recordings or musical copyrights contained in the Footage, including music publishing, and/or synchronization licenses and/or performance rights. It is agreed that Licensee shall be solely responsible to the performers, music rights holders, unions and guilds for the payments of any fees, expenses, costs, penalties, residuals or any other sums which may become due under their respective rules and regulations from Licensee's exploitation of the Footage. Moreover, Licensee agrees to make timely payment, at Licensee's own expense, of any and all fees, expenses, costs, penalties, residuals or any other sums which may be required.

6. Narration/Voice-over: No Footage may be used which contains narration or voice-over without the express specific written permission of Licensor.

7. Security: Licensee shall provide adequate security to prevent theft, pirating, and unauthorized exhibition, duplication or copying of the Footage. Licensee shall give prompt notice to Licensor of any such unauthorized activity.

8. Payment: Licensee will be invoiced for all payments due under this agreement. NO USE MAY BE MADE OF THE FOOTAGE UNTIL A FULLY EXECUTED COPY OF THIS AGREEMENT IS RECEIVED BY LICENSOR AND ALL PAYMENTS DUE ARE MADE TO LICENSOR. All payments are made exclusive of any applicable taxes described under paragraph 9 below.

9.  <u>Taxes</u>: Licensee agrees to pay all foreign taxes (including, but not limited to, any withholding taxes), sales, use, property and similar taxes properly imposed in connection with this Agreement. Licensee shall be responsible for filing any tax returns or reports and making any remittances to the appropriate governmental authorities with respect to these taxes. Any interest or penalties arising from the failure to file such returns or reports or to make such remittances on a timely basis shall be the sole responsibility of Licensee.

10. <u>Viewing Copy/Footage Transfer Costs</u>: Licensee shall pay all shipping, material and transfer costs in connection with this Agreement. It is understood that these costs will be payable even if the footage is provided but not used. Title to the dubs shall pass to the Licensee upon the Licensor making the product available for delivery.

11. <u>Payment of Licensee Fee</u>: Licensee will be charged the License Fee for all clean Footage ordered at the per second rate set forth in the Basic Provisions.

12. <u>Minimum License Fee</u>: In the event footage is provided but not used, Licensee will be responsible for the Minimum License Fee set forth in the Basic Provisions.

13. <u>Return of Footage</u>: It is mandatory that all Licensor supplied dubs, transfers and Footage materials be returned to Licensor at Licensee's expense immediately after use. In addition, Licensee shall furnish Licensor a digital watermarked file of the Program if so requested by Licensor.

14. <u>No Assignment:</u> Neither the Footage nor any of the rights or obligations hereunder may be assigned, sublicensed, sold or transferred by Licensee to any other entity, person, firm or corporation, other than as required by the Licensee for the production and distribution of the Program.

15. <u>Indemnification</u>: Licensee agrees to defend, indemnify and hold Licensor and their respective parent and subsidiary companies, predecessors, successors and assigns and the respective officers, directors, agents and employees of each, harmless from and against any and all liability, losses, actions, claims, demands or damages (including, without limitation, reasonable outside attorney's fees and punitive damages) (collectively, "Losses") of any kind, including but not limited to, any based on libel, slander, or rights of privacy or  publicity, or of any nature whatsoever which may arise out of Licensee's use of the Footage or breach  of this Agreement; and, in this regard, Licensor agrees to give Licensee prompt notice of any claim or  proceeding and an opportunity to defend with counsel of Licensee's choice and at Licensee's own  expense, and Licensor further agrees that Licensor will not settle or compromise any claim without  Licensee's consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, the indemnification obligations set forth in this paragraph shall not apply solely to the extent that Losses arise out of Licensor's breach of this Agreement and of its representations and warranties herein.

16. <u>Warranties</u>: Licensor warrants its authority to enter into this Agreement in that, subject to and without in any way limiting Licensee's obligations as set forth in Section 5 above, Licensor either owns the Footage or has a license to control the exhibition and distribution rights thereto. Licensee agrees that Licensee's damages hereunder, in the event of Licensor's breach, shall be limited to recovery of the fees actually paid by Licensee to Licensor as set forth herein. <u>Subject to Licensee's strict compliance with the terms of this Agreement and the scope of the license set forth herein, Licensor's rights shall be limited to an action at law for damages, and Licensor shall not be entitled to restrain or enjoin the distribution of the Program.</u>

17. <u>Complete Agreement</u>: This Agreement shall be interpreted under New York law and all disputes hereunder shall be brought in a Court in the State of New York. This Agreement constitutes the complete and full understanding of the parties relating to the subject matter herein contained. All prior agreements and understandings, if any, between the parties are merged in this Agreement, which alone fully and completely expresses the parties agreement. This Agreement cannot be modified except in writing expressly agreed to by both parties.

Appendix U

Memorandum from Alex Podobas

**TECHNOLOGICAL PROTECTION MEASURES IN DIGITAL CONTENT DISTRIBUTION SYSTEMS**

**MEMORANDUM OF ALEX PODOBAS**

**DECEMBER 18, 2017**

<u>Biography</u>

Alex M. Podobas is a Senior Cybersecurity Analyst/Penetration Tester at US ProTech, Inc. He specializes in analyzing web applications and networks for security vulnerabilities, developing applications to parse "Big Data" sets to analyze anomalous security events, and reviewing web applications, databases, and other cloud-related technologies for compliance with federal and state data privacy statutes. Mr. Podobas has a Juris Doctor from the University of California, Irvine School of Law and an undergraduate degree from the University of California-Los Angeles

This memorandum presents Mr. Podobas's analysis alone and does not represent in any way the opinions of the US ProTech, Inc. or any other organization or person.

<u>Introduction</u>

The number of software tools and services specifically built to deliver media content online has risen as the Internet has increasingly become a distribution system for video streaming. Encryption measures are routinely integrated into online distribution platforms to protect digital video files during storage and transmission. This memorandum discusses several of the most prominent encryption measures in use today.

<u>WebM</u>

**Definition**

WebM constitutes a set of open-source, royalty free software technologies used to support playback of audio-visual media files primarily in web-based context. Per its open-source project website: "WebM defines the file container structure, video and audio formats. WebM files consist of video streams compressed with the VP8 or VP9 video codecs and audio streams compressed with the Vorbis or Opus audio codecs."[1]  WebM technology is deployed on

---

[1] *See* https://www.webmproject.org/about/.

thousands of websites worldwide. Its most prominent use case includes generic YouTube, which makes WebM the default transcoding scheme for video uploads.[2]

WebM utilizes encryption and decryption of media files through the AES (Advanced Encryption Standard), a FIPS (Federal Information Processing Standard)-compliant cryptographic algorithm defined at 66 FR 63369.[3] AES operates as a "symmetric block cipher," using a fixed-length bit and a single key used to encrypt (encipher) and decrypt (decipher) AES-protected data.[4]

## DVR Systems

DVR stands for "Digital Video Recorder." The purpose of such systems is to digitally save copies of video content onto storage devices such as USB sticks, external hard drives, or hard drives internal to the DVR itself. DVR systems are a general descriptor for the functionality they provide, and are not a brand identity or trademark associated with one particular vendor.

**Encryption on DVR Systems using HDCP**

DVR systems routinely include encryption.

   **(1) HDCP:**  Some DVR Systems utilize a technology named "High-bandwidth Digital Content Protection" ("HDCP"). This encryption technology protects the transmission between what device reads the content from a media source and what that device is connected to in order to display the media source. Thus, the purpose of HDCP is to regulate which displays are authorized to transmit the audio and/or video content of HDCP-protected files at the "last stage" of the transmission: the connection between a device and the display, and whether the display can ultimately render the audio and visual aspects of HDCP-protected content.[5]

   (2) **HDCP Components.** HDCP-protected systems typically include four components: *source* (such as a set-up box like a DVR or a DVD or Blu-Ray player); *sink* (the display that receives content and renders it on a display for viewing); *repeaters* (such as audio

---

[2] *See* https://youtube.googleblog.com/2011/04/mmm-mmm-good-youtube-videos-now-served.html.

[3] *See* https://www.federalregister.gov/documents/2001/12/06/01-30232/announcing-approval-of-federal-information-processing-standard-fips-197-advanced-encryption-standard.

[4] The raw source code of WebM's encryption mechanism may be found at https://github.com/webmproject/webm-tools/blob/master/webm_crypt/webm_crypt.cc and the yet un-finalized standards specification for AES support in WebM may be found at https://www.webmproject.org/docs/webm-encryption/.

[5] S*ee https://www.digital-cp.com/sites/default/files/resources/HDCP_deciphered_070808.pdf at 1.*

amplifiers or video splitters); and *digital interfaces* (physical input/output ports that are connected by a cable). HDCP protects the digital interface communication channel, and includes:[6]

> • Digital Visual Interface (DVI)
> • DisplayPort, GVIF (Gigabit Video Interface)
> • DLI (Digital Light Interface)
> • UDI (Unified Display Interface)

HDCP utilizes encryption to verify that a device is authorized to perform certain content using authentication, authorization, and encryption. HDCP uses these principles in three distinct steps. In the explanation below, imagine a scenario in which an HDCP-protected Blu-Ray disc is inserted into a Blu-Ray player and asked to play a particular movie on a particular screen. The components of this example, for the sake of clarity, shall be:

- **Source:** a Blu-Ray DVD

- **Transmitter 1:** A device (Blu-Ray Player) that is asked to render the audio-visual content of a media source

- **Connector 1:** an HDMI cable connected on one end to Transmitter 1 and on the other end to Receiver 1.

- **Receiver 1**: A high-definition television set authorized to play HDTV content

**HDCP Encryption Step 1 (Authentication):**

Prior to sending any content from Source to Receiver 1, Transmitter 1 instantiates an authentication process with Receiver 1. The purpose of this authentication process is to confirm that Receive 1 is authorized to receive data from Transmitter 1. Two sets of data are used to identify that a certain transmitter or receiver is actually that transmitter or receiver.

(1) Device Private Keys

   a. Transmitter 1 and Receiver 1 (like all HDCP transmitters and receivers) include "Device Private Keys." These keys are unique to the transmitter or receiver that holds these keys, meaning that no other transmitter or receiver holds an identical set of Device Private Keys. Each Device Private key is a 56-bit key, and each

---

[6] S*ee* https://www.digital-cp.com/sites/default/files/resources/HDCP_deciphered_070808.pdf at 3.

3

transmitter or receiver holds 40 Device Private Keys which are each 56-bit length-keys. These are never shared with other HDCP transmitters or receivers.

(2) Key Selection Vector

    a.  In addition to the Device Private Key, Receiver 1 and Transmitter 1 (like any receiver and transmitter) each contain a Key Selection Vector unique to the device that holds a Key Selection Vector. Each Key Selection Vector is  a 20-bit binary value and is used like a public key in public-private key exchange authentication mechanisms to verify the identity of a particular device.

**Step 1, Part A:**

The first part of HDCP authentication is initiated by Transmitter 1, which occurs when Transmitter 1 sends (1) its Key Selection Vector (again, a key akin to a public key) to Receiver 1 and (2) a second unique value that Transmitter 1 generates. This secondary value is based on a proprietary algorithm licensed by the

**Step 1, Part B:**

The second part of HDCP authentication is when Receiver 1 parses Transmitter 1's communication and then returns (1) its own key Selection Vector back to Transmitter 1 along with (2) a unique value that identifies Receiver 1 as a repeater (see "**HDCP Overview Definitions** " above for the definition of a receiver).

**Step 1, Part C:**

If this exchange of data between Transmitter 1 and Receiver 1 is successful, then a secret value, shared only between Receiver 1 and Transmitter 1, is generated. This shared secret is generated from a proprietary algorithm licensed by Digital Content Protection LLP, and the shared secret's creation involves two steps: (1) Transmitter 1 using its Device Private Key (not shared with Receiver 1) and Receiver 1's Key Selection Vector and (2) Receiver 1 using its Device Private Key (not shared with Transmitter 1) and Transmitter 1's Key Selection Vector

The overall purpose of this key-based exchange serves the purpose of confirming to Transmitter 1 that Receiver 1 is actually Receiver 1, and separately confirming to Receiver 1 that Transmitter 1 is really Transmitter 1.

**Step 1, Part D:**

If Receiver 1 and Transmitter 1 have completed Part A, Part B, and Part C of Step 1 and ultimately verified to one another that each device matches the identity of what it purports to represent, then content may be transmitted from the Source by Transmitter 1 to Receiver 1. This transmission stream is encrypted using the key-based exchange authentication process described in Step 1. The encryption process uses two technical avenues to create an encrypted stream of content from Source and transmitted between Transmitter 1 and Receiver 1.

**HDCP Encryption Step 2 (conditional)**

Step 2 is a conditional step, meaning that it may or may not occur depending on whether or not Receiver 1 is a repeater. Suppose that instead of being a high-definition television (as the original example above instructs), Receiver 1 is a video-splitting device that enables the Source's contents to play on multiple television screens.  If Receiver 1 is a repeater, then an intermediary step is performed: checking how many downstream Key Selection Vectors are present. This quantity is important because, as Digital Content Protection, LLC notes: "HDCP sources, repeaters and sinks may connect together in a tree-shaped topology with up to seven levels and 127 devices. This enables many different combinations of devices. Encrypted HDCP content flows through this topology over HDCP-protected interfaces."[7]

**HDCP Encryption Step 3 (Periodic Checks) (conditional**

Step 3 does not involve the initial authentication and authorization steps, but instead involves subsequent authentication and authorization. Specifically, every 128 frames of video or at least once every two seconds (but not necessarily once per second), a certain process occurs that has two purposes:

(1) Receiver 1 sends a communication back to Transmitter 1 to verify that Transmitter 1 is *still* Transmitter 1, which simultaneously confirms to Transmitter 1 that Receiver 1 is still Receiver 1.

(2) Receiver 1 and Transmitter 1 communicate to verify that the encrypted stream of content from Source to Transmitter 1 to Receiver 1 is synchronized.

---

[7] *See* https://www.digital-cp.com/sites/default/files/resources/HDCP_deciphered_070808.pdf at 4.

5

## HTML 5 Encryption

Netflix, a major on-demand media provider, detailed its recent support for HTML 5 streaming video in a March 2017 Medium post.[8] The company wrote, "we have launched HTML5 video on Chrome OS, Chrome, Internet Explorer, Safari, Opera, Firefox, and Edge on all supported operating systems." In the same post, Netflix further described that "[our] adoption of HTML5 has resulted in us contributing to a number of related industry standards," including MPEG-DASH, WebCrypto, and Encrypted Media Extensions. In a Comment submitted as part of the 2014-2015 § 1201 Anticircumvention Rulemaking, HTML5's encryption mechanism was discussed at the time of writing (late 2014).[9]  This memorandum expands upon that submission by discussing new or updated types of online media protection mechanisms.

## WebCrypto API

WebCrypto is a "JavaScript API for performing a wide array of basic cryptographic operations in web applications,"[10] including hashing, generating and verifying signatures, data encryption and decryption, derivation of shared secrets, and importing and exporting cryptographic keys.[11]

Web applications are, of course, the means by which streaming video content is delivered to end customers. Netflix, Hulu, HBO Now, and YouTube are both web applications (as accessible from a web browser), but also operate through mobile OS-specific platforms like iOS and Android.

The WebCrypto API has two features that make it relevant in the context of digital rights management:

(1) **Encryption without exposure of cryptographic keys:** The ability to utilize private keys without making the contents of the key available to JavaScript. Otherwise, the risk is such that cryptographic content that should never be made available to the general public, like a private key, could operate in the web browser's DOM tree and therefore potentially be exposed. Accessing the DOM tree is typically accomplished by right clicking on a web page and then selecting "Inspect Element" or "View Source" (or some variation thereof).

(2) **Data integrity protection:** Online video streaming services often cache static content to execute faster load times. The Web Crypto API can encrypt the contents such as to

---

[8] https://medium.com/netflix-techblog/update-on-html5-video-for-netflix-fbb57e7d7ca0
[9] Comment of Authors Alliance et al., Docket No. 2014-07 (filed Feb. 6, 2015).
[10] https://www.w3.org/TR/WebCryptoAPI/; https://developer.mozilla.org/en-US/docs/Web/API/Web_Crypto_API
[11] https://webkit.org/blog/7790/update-on-web-cryptography/

prevent the inappropriate taking of the protected media content or separately to confirm that it has not been tampered with (data integrity protection).

**MPEG-DASH**

The "MPEG" in "MPEG-DASH" is an acronym for the Moving Picture Expert Group ("a working group of ISO/IEC with the mission to develop standards for coded representation of digital audio and video and related data.")[12] and the "DASH" in "MPEG-DASH" stands for "Dynamic Active Streaming over HTTP."[13] MPEG-DASH is supported by a veritable consortium of technology companies, including:

Google, Adobe, Akamai, Cisco, Comcast, Dolby, Ericsson, Microsoft, Netflix, Qualcomm, Samsung, Experi, Arris, Brightcode, Verizon (Digital Media Services), technicolor, Nexstreaming, and more.[14]

MPEG-DASH supports the ability to apply different encryption protection schemes to different parts of a media file. For example, a movie can have different licensees available for the audio and video components of the movie file within the ContentProtection element.[15]

**Encrypted Media Extensions (EME)**

As specified by the W3C, EME is a proposed standard that "extends HTMLMediaElement [HTML51] providing APIs to control playback of encrypted content."[16] The full technical standard is available at https://www.w3.org/TR/encrypted-media/#introduction.

Like MPEG-DASH, EME permits licensors and other parties that have an interest in DRM diverse control over how, and by what mechanism, media content is encrypted. Implementations may "select content protection mechanisms, control license/key exchange, and execute custom license management algorithms."[17]

---

[12] https://mpeg.chiariglione.org/.
[13] The ISO/IEC standard ISO/IEC 23009-1:2014(E) is available in PDF format at http://standards.iso.org/ittf/PubliclyAvailableStandards/c065274_ISO_IEC_23009-1_2014.zip and serves as the technical resource for this brief description.
[14] http://dashif.org/members/.
[15] ISO/IEC 23009-1:2014(E), pg. 75 (5.8.41: Content Protection).
[16] https://www.w3.org/TR/encrypted-media/.
[17] *Id.*

## Widevine

Widevine is a DRM solution produced by Google. Per its "Supported Platforms," Widevine is deployed on a variety of living room media players, the main mobile OS platforms (Android and iOS), significant desktop operating systems (MacOS, Windows, Linux, and Chrome OS), and a variety of chipset vendors.[18] Widevine includes support for several media encryption technologies discussed in this writing (MPEG-DASH, CENC, and EME).[19]

---

[18] http://www.widevine.com/supported_platforms.html.
[19] https://storage.googleapis.com/wvdocs/Widevine_DRM_Getting_Started.pdf;
https://storage.googleapis.com/wvdocs/Widevine_DRM_Encryption_API.pdf.

Appendix V

Educational Events for Filmmakers About Fair Use

## <u>EDUCATIONAL EVENTS TO INFORM FILMMAKERS ABOUT FAIR USE</u>

Various organizations and institutions have held panels, discussions, and lectures in order to inform filmmakers about fair use of copyrighted materials.

*2018*

1. **<u>March 2018</u>**: Lisa Callif will be speaking at a one-hour CLE session as part of the SXSW 2018 Film program.

2. **<u>March 2018</u>**: Michael Donaldson will be giving a workshop at SXSW.

3. **<u>2/28/2018</u>**: Michael Donaldson will be a guest speaker at Harvard Law School.

*2017*

4. **<u>November 2017</u>**: Lisa Callif gave a master class on fair use at the International Documentary Association master class.

5. **<u>11/6/2017</u>**: Chris Perez gave a guest lecture for the Intellectual Property and Technology Law Clinic at USC Gould School of Law.

6. **<u>October 2017</u>**: Lisa Callif moderated a documentary case study panel at Film Independent Forum.

7. **<u>October 2017</u>**: Lisa Callif hosted a fair use lecture for client Dirty Robber.

8. **<u>October 2017</u>**: Lisa Callif gave a guest lecture at UCLA extension class for fair use in music.

9. **<u>August 2017</u>**: Lisa Callif participated in Fair use master class during Minas Gerais Audiovisual Expo - MAX 2017 in Brazil by sending in a video on fair use.

10. **<u>7/26 & 7/27/2017</u>**: Chris Perez gave a lecture titled Clearance & Copyright Lecture at UCLA.

11. **<u>7/24 & 7/25/2017</u>**: Dean Cheley gave a guest lecture titled Legal Issues for Independent Projects at UCLA.

12. **<u>7/7/2017</u>**: Chris Perez gave a lecture for a production class at Columbia College / Semester in LA.

13. **<u>July 2017</u>**: Jack Lerner presented on fair use at the "Your Preproduction Legal Checklist: How to Save Time, Money and Needless Suffering and Learn from People Who Didn't," University Film & Video Association Annual Conference.

14. **4/28/2017**: Dean Cheley gave a guest lecture titled Fair Dealing vs. Fair Use Entertainment & Media Law Symposium 2017 in Toronto.

15. **4/12/2017**: Chris Perez was a guest speaker for the Film Independent Documentary Lab at Film Independent.

16. **February 2017**: Lisa Callif participated in a fair use Q&A at California State University, Long Beach.

17. **February 2017**: Jack Lerner presented on fair use at the YouTube Creators' Summit in Santa Monica, CA.

18. **2/23 & 2/24/2017**: Dean Cheley gave a guest lecture titled Clearance and Copyright at UCLA.

19. **2/8 & 2/9/2017**: Dean Cheley gave a guest lecture titled Legal Issues for Independent Projects at UCLA.

20. **2/6 & 2/7/2017**: Chris Perez gave a Clearance & Copyright lecture at UCLA.

21. **2/2/2017**: Chris Perez gave a lecture for a production class at Columbia College / Semester in LA.

22. **2017**: Michael Donaldson was a guest lecturer at Harvard Law School.

23. **2017**: Jack Lerner presented on fair use at Whittier Law School.

24. **2017**: Jack Lerner gave a guest lecture titled Online Media and the Law at the USC Annenberg School of Journalism.

25. **2017**: Jack Lerner gave a guest lecture on fair use at the UCI Humanities Research Institute.

*2016*

26. **November 2016**: Lisa Callif was a speaker at Emoji Film event at Emojicon.

27. **11/16/2016**: Dean Cheley gave a guest lecture titled Basics of Copyright, Fair Use and Personal Rights for Dealmaking in Entertainment Industry Course at USC Gould Law School.

28. **10/17/2016**: Chris Perez gave a guest lecture for the Intellectual Property and Technology Law Clinic at USC Gould School of Law.

29. **9/28/2016**: Dean Cheley gave a guest lecture titled Fair Use in Narrative Films in the Media Arts & Culture Department at Occidental College.

30. **8/14/2016**: Chris Perez gave a Fair Use, Rights & Clearances Master Class MFA Social Documentary Film SVA.

31. **8/3 & 8/4/2016**: Dean Cheley gave a guest lecture titled Legal Issues for Independent Projects at UCLA.

32. **8/1 & 8/2/2016**: Chris Perez gave a Clearance & Copyright lecture at UCLA.

33. **7/14 & 7/15/2016**: Michael Donaldson was a guest speaker at UCLA Summer Program in Producing in Los Angeles, CA.

34. **4/12/2016**: Chris Perez was a panelist at the Intellectual Property and Fair Use in Nutshell Panel for USC Talent Week.

35. **4/4/2016**: Chris Perez was a guest lecturer for Studio Producing for Film and TV at Columbia College / Semester in LA.

36. **3/28/2016**: Chris Perez gave a guest lecture for the Intellectual Property and Technology Law Clinic at USC Gould School of Law.

37. **2/23 & 2/25/2016**: Chris Perez gave a Clearance & Copyright lecture at UCLA.

38. **2016**: Michael Donaldson spoke in Havana, Cuba about fair use's applications in Cuba at the University of Havana Law School.

39. **2016**: Michael Donaldson gave a two week-long workshop in Zimbabwe for the American Film Showcase program of the United States Department of State.

40. **2016**: Jack Lerner presented on fair use for the Hispanic Bar Association of Orange County.

41. **2016**: Jack Lerner presented on fair use at Books in Browsers in San Francisco, CA.

42. **2016**: Jack Lerner presented at the filmmaker workshop, "Fair Use: You Be The Judge" at Getting Real conference (International Documentary Association) in Los Angeles CA.

43. **2016**: Jack Lerner gave a guest lecture titled Online Media and the Law at the USC Annenberg School of Journalism.

*2015*

44. **10/15/2015**: Jack Lerner presented on "Fair Use & Friction: Fan Art, Remix, Appropriation & the Law," California Lawyers for the Arts in Long Beach, CA.

45. **7/9/2015**: Chris Perez gave a guest lecture at Studio Producing for Film and TV at Columbia College / Semester in LA.

46. **5/31/2015**: Chris Perez gave the following lecture: Produced by Session: Based on a True Story at The Studios at Paramount.

47. **5/28 & 5/29/2015**: Michael Donaldson was a guest speaker at Moscow Film School in Moscow, Russia.

48. **5/16-5/27/2015**: Michael Donaldson was a guest speaker at American Film Showcase (AFS) in Kiev, Ukraine.

49. **2/19/2015**: Chris Perez gave a guest lecture at Studio Producing for Film and TV at Columbia College / Semester in LA.

50. **2/16 & 2/17/2015**: Michael Donaldson was a guest speaker at UCLA Winter Program in producing in Los Angeles, CA.

51. **2/10/2015**: Michael Donaldson was a guest speaker at Loyola Law Chicago in Chicago, IL.

52. **2/3/2015**: Chris Perez was a guest lecturer at CalArts Graduate Seminar.

53. **1/13/2015**: Chris Perez gave a Production & Clearance lecture at USC SCA.

54. **2015**: Michael Donaldson was a guest speaker at University of Southern California Law School.

55. **2015**: Michael Donaldson gave a two week-long workshop in the Ukraine for the American Film Showcase program of the United States Department of State.

56. **2015**: Jack Lerner presented on fair use at the Brooks Institute in Ventura, CA

57. **2015**: Jack Lerner presented on fair use for the Orange County Bar Association.

58. **2015**: Jack Lerner gave a guest lecture titled Online Media and the Law at the USC Annenberg School of Journalism.

*2014*

59. **November 2014**: Lisa Callif was a guest speaker at CLEAR Association's legal seminar.

60. **11/10/2014**: Dean Cheley gave a guest lecture at the Fair Use and Other Legal Issues for Documentary Filmmakers at New York Film Academy in Los Angeles.

61. **October 2014**: Lisa Callif was a panel guest at The Association of Media & Entertainment Counsel's event "Understanding Fair Use in Reality TV and Unscripted Programming."

62. **10/24/2014**: Chris Perez gave a Clearance & Copyright lecture at UC Irvine.

63. **2/24-2/25/2014**: Michael Donaldson was a guest speaker at UCLA Spring Program in Producing in Los Angeles, CA.

64. **2/5/2014**: Michael Donaldson was a guest speaker at University of Miami Cinema & Interactive Media Department, Miami, FL.

65. **2014**: Michael Donaldson was a guest speaker at University of California at Los Angeles Law School.

*2013*

66. **12/11/2013**: Michael Donaldson was a guest speaker at Hiscox Insurance Co., Whose Permission Do I Need: Fair Use Trademarks, and More in Los Angeles, CA.

67. **9/26/2013**: Michael Donaldson was a guest speaker at New York University, Whose Permission Do I Need: Fair Use, Trademarks, and More in New York, NY.

68. **7/15 & 7/16/2013**: Michael Donaldson was a guest speaker at UCLA Summer Program in Producing in Los Angeles, CA.

*2012*

69. **7/25-7/26/2012**: Michael Donaldson was a guest speaker at UCLA Summer Program in Producing in Los Angeles, CA.

*2011*

70. **10/24/2011**: Michael Donaldson was a guest speaker at Columbia College Chicago, Lecture on Copyright, Clearance and Fair Use in Chicago, IL.

71. **7/25-7/28/2011**: Michael Donaldson was a guest speaker at UCLA Summer Program in Producing in Los Angeles, CA.

72. **7/20/2011**: Michael Donaldson was a guest speaker at Columbia College Chicago, "Semester in LA," in Los Angeles, CA.

73. **3/23/2011**: Michael Donaldson was a guest speaker at Columbia College Chicago, "Semester in LA," in Los Angeles, CA.

74. **1/13/2011**: Michael Donaldson was a guest lecturer at Chapman University via Skye for their production legal clinic.

*2008*

75. **2008**: Michael Donaldson was a guest speaker at University of California at Berkeley Law School.

76. **2008**: Michael Donaldson was a guest speaker at Stanford Law School.

*Miscellaneous*

77. Jack Lerner co-wrote "Everything is a Remix: Fair Use," an educational YouTube video, available at https://www.youtube.com/watch?v=vTLQ4h4yKSk.