EXHIBIT 6



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

### Item A: Commenter Information

*Commenters:*

**Association of Transcribers and Speech-to-Text Providers (ATSP)**

The Association of Transcribers and Speech-to-Text Providers (ATSP) is a non-profit organization devoted to advancing the delivery of real-time speech-to-text services to deaf or hard-of-hearing people. ATSP's purpose is to promote excellence and integrity in the delivery of real-time speech-to-text services, by establishing a national standard of quality for transcribers, educating the public about real-time speech-to-text accommodations, strengthening networks between providers and stakeholders, and advocating for equal access to effective communication.

**Association of Research Libraries (ARL)**

The Association of Research Libraries (ARL) is a non-profit organization of 123 research libraries at comprehensive, research institutions in the US and Canada that share similar research missions, aspirations, and achievements. ARL aims to influence the changing environment of scholarly communication and the public policies that affect research libraries and the diverse communities they serve.

**American Library Association (ALA)**

The American Library Association (ALA) is a nonprofit professional organization of more than 60,000 librarians dedicated to providing leadership for the development, promotion and improvement of library and information services and the profession of librarianship in order to enhance learning and ensure access to information for all.

**American Library Association Video Round Table (VRT)**

The American Library Association Video Round Table was founded in 1988 as the ALA Video Interest Group to provide "a unified voice for video advocacy in the areas of legislation, professional guidelines for collections today, such as those related to streaming and digital media, and other issues" for ALA members with an interest in and/or responsibility for video collections. VRT became an official ALA round table two years later in 1990. It eclipsed 500 members for the first time in 2011.

**Association of College and Research Libraries (ACRL)**

The Association of College and Research Libraries (ACRL) is the higher education association for librarians. Representing more than 11,000 academic and research librarians and interested individuals, ACRL develops programs, products and services to help academic and research librarians learn, innovate and lead within the academic community. Founded in 1940, ACRL is committed to advancing learning and transforming scholarship.

**Association on Higher Education And Disability (AHEAD)**

The Association on Higher Education And Disability (AHEAD) is a professional membership association of over 3,200 members who are dedicated to advancing equity and inclusion for people with disabilities within postsecondary education. AHEAD is actively involved in all facets of promoting full and equal participation by individuals with disabilities in higher education; and supporting the systems, institutions, professions, and professionals who attend to the fulfillment of this important mission.

*Representatives:*

**Samuelson-Glushko Technology Law & Policy Clinic (TLPC)**
Colorado Law
Blake E. Reid, Director
Sophia Galleher, Angel Antkers, and Susan Miller, Student Attorneys
*Counsel to ATSP*
blake.reid@colorado.edu
303-492-0548
Robert & Laura Hill Clinical Suite, 404 UCB Boulder, CO 80309-0404

**Association of Research Libraries (ARL)**
Krista Cox, Director of Public Policy Initiatives
krista@arl.org
202-296-2296 x156
21 Dupont Circle, N.W., Suite 800, Washington, DC 20036

**Library Copyright Alliance**
Jonathan Band, policybandwidth
*Counsel to ARL, ALA, and ACRL*
jband@policybandwidth.com
202-296-5675
21 Dupont Circle NW, Suite 800, Washington, DC 20036

**American Library Association Video Round Table (VRT)**
Andrew Horbal, Head of Learning Commons
ahorbal@umd.edu
301-405-9227
1101 McKeldin Library, 7649 Library Ln., University of Maryland, College Park, MD 20742

**Association on Higher Education And Disability (AHEAD)**
Stephan J. Smith, Executive Director
stephan@ahead.org
704.947.7779
8015 West Kenton Circle, Suite 230
Huntersville, NC 28078

# Table of Contents

**Item A: Commenter Information** ..................................................................................i

**Item B: Proposed Class Addressed: Class 2: Audiovisual Works—Accessibility** .........1

**Item C: Overview** ........................................................................................3

**Item D: Technological Protection Measures and Methods of Circumvention** ...........5

**Item E: Asserted Adverse Effects on Noninfringing Uses** ...........................................7

1.  Statutory provisions impose legal obligations on disability services professionals to make video content accessible for students with disabilities ..........................................................8

2.  Making video content accessible is an uncontroversially non-infringing fair use..............9

    a.  The purpose and character of making motion pictures accessible weighs in favor of fair use. ......................................................................................10

    b.  The nature of motion pictures is heterogeneous and not dispositive. .......................11

    c.  The amount and substantiality of the portion used in converting motion pictures to accessible formats weighs in favor of fair use. ...............................................11

    d.  The effect of converting motion pictures to accessible formats on the potential market or value weighs in favor of fair use. ...................................................11

3.  Section 1201(a)(1)(C)'s five statutory factors weigh in favor of granting an exemption.13

    a.  Making motion pictures accessible is essential for educational purposes, and prohibiting the circumvention of technological protection measures negatively impacts teaching, scholarship, and research. ................................................14

    b.  The effect of circumvention of technological measures on the market for or value of copyrighted works favors granting the exemption....................................15

    c.  Other factors weigh in favor of granting the exemption. ...........................................16

**Documentary Evidence: Appendix A— Testimonials from Disability Service Professionals** ..........................................................................................17

**Item B: Proposed Class Addressed: Class 2: Audiovisual Works—Accessibility**

This comment supports our proposed exemption, which would permit "disability services offices, organizations that support people with disabilities, libraries, and other units at educational institutions that are responsible for fulfilling those institutions' legal and ethical obligations to make works accessible to people with disabilities" to circumvent technological protection measures (TPMs) for motion pictures (including television shows and videos), "where circumvention is undertaken for the purpose of making a motion picture accessible to people with disabilities, including through the provision of closed and open captions and audio description."[1] Our petition submitted to the Copyright Office as part of the 2018 triennial rulemaking proceeding explains:

> (1) "The types of copyrighted works that need to be accessed" are motion pictures (including television shows and videos) as defined in 17 U.S.C. § 101;

> (2) "[T]he physical media or devices on which the works are stored or the services through which the works are accessed" may include but are not limited to optical media, video cassettes with access control measures, and streaming services;

> (3) "[T]he purposes for which the works need to be accessed" include making the works accessible to people with disabilities through the provision of accessibility features including closed and open captions and audio description;

> (4) "[T]he types of users who want access" include disability services offices, organizations that support people with disabilities, libraries, and other units at educational institutions that are responsible for fulfilling those institutions' legal and ethical obligations to make works accessible to people with disabilities; and

> (5) "[T]he barriers that currently exist or which are likely to exist in the near future preventing these users from obtaining access to the relevant copyrighted works" include technological protection measures that impede the use of common tools for adding accessibility features to the works without first circumventing the measures, thereby raising

---

[1] Association of Transcribers and Speech-to-text Providers ("ATSP"), Association of Research Libraries ("ARL"), American Library Association ("ALA") & Association of College and Research Libraries ("ACRL") Class 2 Petition at 3 ("Class 2 Petition"), https://www.regulations.gov/document?D=COLC-2017-0007-0067; Copyright Office, 2017 Notice of Proposed Rulemaking, 82 Fed. Reg. 49,550, 49,560 (Oct. 27, 2017) ("2017 NPRM"), https://www.gpo.gov/fdsys/pkg/FR-2017-10-26/pdf/2017-23038.pdf.

concerns about liability under Section 1201 of the Digital
Millennium Copyright Act (DMCA).[2]

This exemption aims to help disability services professionals in educational institutions more freely engage in an exemplary, uncontroversial fair use that is not only recognized by both Congress and the courts but required under disability law: adapting copyrighted works into formats that are accessible for people with sensory disabilities.[3] This exemption is necessary so that when disability services professionals must circumvent technological protection measures to fulfill their legal and ethical obligations to make digital works accessible for students with disabilities under the Americans with Disabilities Act, the Rehabilitation Act of 1976, and other disability laws, they can do so without uncertainty about the intersection of their activities and Section 1201 of the Digital Millennium Copyright Act.

This exemption will complement the Copyright Office's well-established precedent of exempting accessibility activities from Section 1201 in the triennial review. Specifically, the Copyright Office has recognized that there is "a need to ensure that access controls do not prevent" people with disabilities from accessing copyrighted works.[4] As the Office has explained, exemptions that make copyrighted content more accessible to people with disabilities represent "a quintessential case for an exemption to the prohibition on circumvention."[5]

Indeed, exemptions for converting content into an accessible format are so uncontroversial that in the 2015 triennial rulemaking proceeding there was no opposition to the petition to renew the 2012 ebook accessibility exemption, which allowed people with disabilities to circumvent protection measures on electronically distributed literary works for

---

[2] Class 2 Petition at 3.

[3] *See e.g.* H.R. Rep. No. 94-1476, at 73 (1976); S. Rep. No. 94-473, at 73 (1975) (expressly stating that converting works into "forms needed for the use of" people with disabilities is a "special instance illustrating the application of fair use"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014) (concluding that the fair-use doctrine permits converting "works in formats accessible to those with disabilities").

[4] Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights (Oct. 8, 2015), ("2015 Recommendation") https://www.copyright.gov/1201/2015/registers-recommendation.pdf.

[5] 2015 Recommendation at 135; *see also* 2015 Final Rule, 80 Fed. Reg. 65,944, 65,950 (Oct. 28, 2015) ("2015 Final Rule"), https://www.gpo.gov/fdsys/pkg/FR-2015-10-28/pdf/2015-27212.pdf; 2012 Final Rule, 77 Fed. Reg. 65,260, 65,262-63 (Oct. 26, 2012) ("2012 Final Rule"), https://www.gpo.gov/fdsys/pkg/FR-2012-10-26/pdf/2012-26308.pdf; 2010 Final Rule, 75 Fed. Reg. 43,825, 43,837 ("2010 Final Rule") (Jul 27, 2010), https://www.gpo.gov/fdsys/pkg/FR-2010-07-27/pdf/2010-18339.pdf; 2006 Final Rule, 71 Fed. Reg. 68,472, 68,475 (Nov. 27, 2006) ("2006 Final Rule"), https://www.gpo.gov/fdsys/pkg/FR-2006-11-27/pdf/E6-20029.pdf.

purposes of accessibility.[6] The Librarian of Congress noted that even the Association of American Publishers, which represented book publishers as key copyright stakeholders, filed comments indicating support for the exemption because there is currently no market solution that is sufficient to make literary works in an accessible format.[7]

In addition, the Office's 2017 Policy Study recommended that Congress adopt a permanent exemption that would "enable blind or visually impaired persons to utilize assistive technologies" because "an assistive technologies exemption has been adopted as a temporary exemption in the past five triennial rulemakings." [8] The Register acknowledged that "repeated participation in the rulemaking process has become especially burdensome and time-consuming for the blind and print-disabled community."[9]

Against that backdrop, the nature and purpose of the proposed exemption is wholly consistent with that of prior accessibility exemptions: it seeks to advance an environment that facilitates making works more accessible for people with disabilities. To that end, this exemption serves the most fundamental purpose of these rulemaking proceedings—to provide a "'fail-safe' mechanism" to ensure that Section 1201 does not "diminish the public's access to copyrighted works for lawful uses, including activities protected by the fair use doctrine" and to protect "users of a copyrighted work . . . if such persons are, or are likely to be, adversely affected by virtue of the prohibition in their ability to make noninfringing uses of such works."[10]

### Item C: Overview

Disability services offices around the country receive daily requests from faculty, student services offices, and other student organizations to convert motion pictures into a format that is accessible for students with disabilities, generally through the provision of closed captions or audio description.[11] Under the Americans with Disabilities Act (ADA), the Individuals with Disabilities Education Act (IDEA), and Section 504 of the Rehabilitation Act of 1973 (Section 504), professionals who receive these requests are legally and ethically obligated to fulfill them.[12]

Today, nearly 48 million Americans are deaf or hard of hearing, and approximately 77,000 students with hearing disabilities require support from disability services offices.[13]  In

---

[6] 2015 Final Rule, 88 Fed. Reg. at 65,950; 2015 Recommendation at 132.

[7] 2015 Final Rule, 88 Fed. Reg. at 65,950; 2015 Recommendation at 132.

[8] U.S. Copyright Office, A Report of the Register of Copyrights 84 (Jun. 2017) ("2017 Report") https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

[9] *Id.* at 84.

[10] *Id.*

[11] *Testimonial from Disability Service Professional, West Virginia University*, Appendix A.

[12] Americans with Disabilities Act, 42 U.S.C. §§ 12101-12103; Rehabilitation Act, 29 U.S.C. § 701; Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1491.

[13] Nat'l Instit. on Deafness and Other Commc'n Disorders (NIH), *Quick Statistics About Hearing* (Dec. 15, 2016) https://www.nidcd.nih.gov/health/statistics/quick-statistics-

addition, nearly 24 million Americans are blind, visually impaired, or print disabled, and over 60,000 students with visual disabilities require assistance from disability services offices.[14]

Disability services professionals have a legal, ethical, and moral responsibility to ensure all students have an equal opportunity to participate in the educational environment. As Congress stated in IDEA, "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society."[15]

To that end, this comment seeks an exemption that would permit disability services offices, organizations that support people with disabilities, libraries, and other units at educational institutions to circumvent technological protection measures for motion pictures (including television shows and videos). These entities would undertake circumvention for the purpose of making a motion picture accessible to people with disabilities, including through the provision of closed and open captions and audio description.

Section 1201's prohibition on the circumvention of TPMs leaves these professionals with uncertainty about whether circumventing TPMs to fulfill their legal obligations by engaging in a plainly noninfringing fair use may nevertheless incur legal risk under the DMCA.[16] One disability services professional explains that "this is a moral issue that I should not have to face when it comes to making educational material accessible" while another calls it an "ethical and logistical nightmare."[17] While the ADA, IDEA, and other laws arguably override the DMCA's prohibition on circumvention in this context, granting the proposed exemption would eliminate any uncertainty.

This comment demonstrates why the proposed exemption is necessary. First, it outlines the TPMs that disability services professionals must circumvent in order to add captions and audio description to videos. Second, it explains why making motion pictures accessible does not infringe copyright. Third, it explains why section 1201(a)(1)(C)'s five statutory factors

---

hearing; Hearing Loss Ass'n of Am., *Basic Facts About Hearing Loss* http://www.hearingloss.org/content/basic-facts-about-hearing-loss (providing the statistic that approximately 48 million people in the United States are hearing impaired); Nat'l Ctr. for Educ. Statistics, *Fast Facts*, https://nces.ed.gov/fastfacts/display.asp?id=64 (last visited Dec. 17, 2017) (providing the statistic that approximately 77,000 hearing impaired students are served by disability services offices).

[14] American Foundation for the Blind (AFB), *Statistical Snapshots from the American Foundation for the Blind* (2017), http://www.afb.org/info/blindness-statistics/2 (providing the statistic that there are 23.7 Americans with vision impairments; National Federation of the Blind (NFB), *Statistical Facts about Blindness in the United States*, https://nfb.org/blindness-statistics (last visited Dec. 17, 2017) (providing the statistic that there are approximately 62,000 blind students in the United States).

[15] 20 U.S.C. § 1400.

[16] 17 U.S.C. §§ 1203-04.

[17] *Testimonial from Disability Specialist, University of Illinois*, Appendix A; *Disability Service Professional, Kent State University*, Appendix A.

counsel toward granting the proposed exemption by highlighting the chilling effects Section 1201 has on the efforts of disability services professionals to make educational materials accessible. Finally, it presents evidentiary support to underscore the adverse effects that the prohibitions against circumvention have against both disability services professionals and the student communities that they serve.

### Item D: Technological Protection Measures and Methods of Circumvention

As the record in past triennial reviews has demonstrated, most copyrighted motion pictures are encumbered with some form of access control measures.[18] Those measures may require disability services professionals to circumvent them before converting works into an accessible format through the provision of closed and open captions and audio description.[19] This section describes the TPMs that content creators and distributors use to control the access to motion pictures, both for videos delivered via fixed media and online streaming services.

**Video Delivered via Fixed Media.** One common source of video that disability services professionals must make accessible are Digital Versatile Discs (DVDs) provided by students and faculty members for use in educational contexts. Nearly all DVDs use Content Scramble System (CSS) to restrict access to the motion pictures they contain.[20] CSS controls access to videos by requiring an appropriately configured player or computer drive to decrypt and play back the content, and prevents the content from being copied.

Other fixed media such as Blu-ray discs and HD DVDs are similarly protected by Advanced Access Content System (AACS), which allow vendors to revoke compromised keys and distribute new keys.[21] For the purpose of this exemption, AACS is essentially a more technologically advanced variant of CSS; it is likewise designed to prevent unauthorized users from accessing or copying content.[22] Encrypted works protected by CSS or AACS are automatically decrypted whenever a person who possesses a motion picture disc places it in an authorized player.[23]

Manufacturers that produce DVD, Blu-ray, and HD DVD players are given licensed keys that decrypt the digital right management (DRM) and allow access to the copyrighted content.[24] The data about these keys is hidden from consumers and the process of decryption is unseen by the user of the player.[25] As with past exemptions, there remain myriad ways to circumvent the DRMs that protect the content on optical media, and the

---

[18] 2015 Recommendation at 29.

[19] 2017 NPRM; 80 Fed. Reg. at 49,560.

[20] 2015 Recommendation at 29.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

method used will depend largely on the sophistication of the person circumventing the TPMs for fair-use purposes.

**Video Delivered via Online Streaming Services.** Online streaming services use a variety of constantly evolving DRM technologies to control access to online content.[26] Some services, such as Vimeo's online video sharing platform, do not use encryption or other access controls.[27] Most services, however, including Netflix, Hulu, and Google TV, protect streamed content through encryption and other protocols such as Microsoft Silverlight, Adobe Flash, or Apple's proprietary FairPlay scheme.[28]

The DRM schemes controlling videos delivered via online streaming services are more sophisticated than simple protection schemes such as standard encryption; they generally utilize four components: digital rights to manage, encryption, license management, and a DRM-enabled client.[29] Because different internet protocol (IP)-delivered video distributors use different DRM technologies, it is impossible to give a single, coherent account of the mechanisms at issue; however, the streaming-related DRM marketplace is dominated by a few main services—Adobe Primetime, Apple FairPlay Streaming, Google Widevine, DivX, Intertrust Marlin, Microsoft PlayReady, and Veramatrix VCAS.[30] Although these core DRM services work with a number of content distribution and technology service providers, each DRM vendor provides its platform in a different manner—some directly and some with a network of third party value-added resellers.

This dynamic has left the DRM market for online streaming services in a "in a state of flux."[31] For example, the various DRM strategies that leading IP-delivered video services such as Netflix, Hulu, and Google, have implemented have changed several times.[32] In addition, the departure of incumbent distributors of DRM technologies from the marketplace further compounds the uncertainties surrounding DRM technologies. For example, Adobe recently announced that it will phase out Flash, the once-ubiquitous plugin

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] What is DRM? Streaming Media, http://www.streamingmedia.com/Articles/Editorial/What-Is-.../What-Is-DRM-112279.aspx (Jul 12, 2016).

[30] *Id.*

[31] 2015 Recommendation at 29.

[32] Press Release, *Microsoft, Netflix Taps Microsoft PlayReady as Its Primary DRM Technology for Netflix Ready Devices and Applications* (May 25, 2010), *available at* http://www.microsoft.com/Presspass/press/2010/may10/05-25PlayReadyNetflixPR.mspx; Mike Isaac, Netflix App Released for Android Phones, Sorta, Wired: Epicenter Blog (May 12, 2011), https://www.wired.com/2011/05/netflix-android-phone/ (last visited Dec 5, 2017).;Mike Isaac, Hulu Plus Hits Android, One Handful of Devices at a Time, Wired (Jun. 23, 2011), https://www.wired.com/2011/06/hulu-plus-android/.

that underpinned video distribution systems such as YouTube, by the end of 2020.[33] Although Adobe and other video distribution vendors have committed to adopting the Hypertext Markup Language 5 (HTML5) standard of the World Wide Web Consortium (W3C) for future distribution of video, it is unclear how that standard will implement DRM for the distribution of video.[34] A technical discussion among developers during the development of that platform made clear that DRM would be a requisite for many video distributors to deliver video but showcased widespread disagreement among developers about whether and how to incorporate DRM into the standard. And Flash, Silverlight, and HTML5 are only a few of the technologies that will be used to distribute video with DRM over the next three years; leading media playback software such as Apple's Quicktime and Microsoft's Windows Media Player both apparently support their own forms of DRM.

Regardless of the specific type of DRM employed, it is likely that a substantial portion of online streaming services will continue to use DRM technologies that prevent disability services offices from converting works into a format that is accessible for students who are deaf, hard of hearing, blind, or visually impaired. To that end, exemptions involving online streaming services should not be limited to a certain subset of technologies to avoid becoming "obsolete long before the exemption expire[s]."[35] As with past exemptions, there remain myriad ways to circumvent the DRMs that protect the content on online streaming services, and the method used will depend largely on the sophistication of the person circumventing the TPMs for fair-use purposes.

### Item E: Asserted Adverse Effects on Noninfringing Uses

In educational settings, the use of videos that are distributed by copyright holders without captions, video (audio) description, or both, is frequent. Disability services offices receive numerous requests—often, hundreds per semester—from faculty, student services offices, and other campus organizations, to reconfigure videos into formats that are accessible to students with disabilities, generally through the provision of captions or audio description.[36] Disability services professionals are obliged under disability law to fulfill these requests, and in doing so engage in an uncontroversial non-infringing use.[37] Unfortunately, the DMCA has created a chilling effect that leaves some disability services professionals anxious that they may face liability for circumventing the access controls to add captions and video descriptions onto motion pictures encumbered with DRM.[38]

---

[33] Frederic Lardinois, Get ready to finally say goodbye to Flash — in 2020, TechCrunch (Jul 25, 2017), https://techcrunch.com/2017/07/25/get-ready-to-say-goodbye-to-flash-in-2020/

[34] Peter Bright, HTML5 DRM finally makes it as an official W3C Recommendation, ArsTechnica (Sept. 18 2017), https://arstechnica.com/gadgets/2017/09/drm-for-html5-published-as-a-w3c-recommendation-after-58-4-approval/.

[35] 2015 Recommendation at 29.

[36] *Testimonial from Disability Service Professional, West Virginia University*, Appendix A.

[37] *Id.*

[38] *See generally* Appendix A.

1.  **Statutory provisions impose legal obligations on disability services professionals to make video content accessible for students with disabilities**

Nearly all educational institutions are subject to one or more of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, or IDEA.[39] Under these and other disability laws, disability services offices in educational institutions have a legal obligation to foster a learning environment that accommodates students with disabilities. As Congress has articulated:

> Disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.[40]

Disability services professionals play a key role in promoting and protecting the rights of students with disabilities to learn in an environment that accommodates their needs.

Through the Rehabilitation Act, IDEA, and the ADA, the federal government has repeatedly established its commitment to providing students with disabilities with educational opportunities that are equal to those of non-disabled students. In 1973, Congress passed Section 504 of the Rehabilitation Act of 1973, a law that prohibits discrimination on the basis of physical or mental disability and specifies that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . .[41]

In 1990, President George H.W. Bush signed IDEA into law. At its core, IDEA is designed to ensure that all students, notwithstanding their disabilities, are educated in an environment that is appropriate for their unique needs.[42] Under IDEA, students with disabilities must be provided with an education in the least restrictive environment, which should place students with disabilities in a "typical educational environment" that is comparable to that of non-disabled students.[43]

Title II of the ADA likewise requires public universities and other covered entities to take appropriate steps to ensure that communications with people with disabilities are as

---

[39] 42 U.S.C. §§ 12101-12103; 29 U.S.C. § 701; 20 U.S.C. §§ 1400-1491.

[40] 20 U.S.C. § 1400.

[41] 29 U.S.C. § 794.

[42] 20 U.S.C. § 1400.

[43] *Id.*

effective as communications with others to afford individuals with disabilities an equal opportunity to participate in, and enjoy the benefits of their services programs, or activities. It also requires covered entities, such as educational institutions, to furnish appropriate auxiliary aids and services where necessary to achieve effective communication.[44] Under Title II of the ADA, public universities and other covered entities must afford individuals with disabilities an equal opportunity to benefit from the services provided, which includes adding captions and audio description to videos to make the content in those videos accessible.[45]

## 2. Making video content accessible is an uncontroversially non-infringing fair use.

Congress's mandate to make video content accessible in educational contexts dovetails neatly with its recognition that doing so is a non-infringing fair use. Indeed, the legislative history of the 1976 Copyright Act makes clear that converting works into formats that are accessible to people with sensory disabilities is a quintessential example of fair use.[46] The House Committee Reports explicitly states:

> Another special instance illustrating the application of the fair use doctrine pertains to making copies or phonorecords of works in special forms for blind persons. These special forms . . . are not usually made by the publishers for commercial distribution . . . the making of a single copy or phonorecord as a free service for a blind person would properly be considered a fair use under section 107.[47]

The courts have affirmed Congress's "commitment to ameliorating the hardships faced by" people with sensory disabilities.[48] In *Sony v. Universal City Studios*, the Supreme Court stated that "[m]aking a copy of a copyrighted work for the convenience of people with sensory disabilities is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying."[49]

In *Authors Guild, Inc. v. HathiTrust*, the Second Circuit likewise affirmed that conversion of inaccessible copyrighted works into accessible digital formats for use by people who are blind, visually impaired, or print disabled is a fair use. As the *HathiTrust* court held, "the

---

[44] 42 U.S.C. §§ 12101-12103; 29 U.S.C. § 701; 20 U.S.C. §§ 1400-1491.

[45] Dep't of Justice, The United States' Findings and Conclusions Based on its Investigation Under Title II of the Americans with Disabilities Act of the University of California at Berkeley, DJ No. 204-11-309 (Aug. 30, 2016), https://news.berkeley.edu/wp-content/uploads/2016/09/2016-08-30-UC-Berkeley-LOF.pdf.

[46] H.R. Rep. No. 94-1476, at 73 (1976); S. Rep. No. 94-473, at 73 (1975).

[47] *Id.*

[48] *HathiTrust*, 755 F.3d at 102.

[49] 464 U.S. 417, 455 (1984)

doctrine of fair use allows [the] provi[sion of] full digital access to copyrighted works to [the] print-disabled." Copyright jurisprudence has established that making digital works accessible to the print-disabled is noninfringing fair use on grounds that are equally applicable to making motion pictures accessible to people who are blind, visually impaired, deaf or hard of hearing, through the provision of closed captions and audio description.

Making works accessible to people with sensory disabilities is so uncontroversially a fair use that an in-depth analysis is unnecessary. However, consideration of the four fair-use factors in Section 107 conclusively demonstrates the fairness of use.

### a. The purpose and character of making motion pictures accessible weighs in favor of fair use.

The first factor of fair use analysis focuses on the purpose and character of the use.[50] The first factor requires the use to "serve broader public purposes."[51] Converting an inaccessible copyrighted motion pictures into an accessible format clearly serves a broad public benefit and results in direct, tangible benefit for many students who are blind, visually impaired, deaf, or hard of hearing. Providing access for people who are blind, visually impaired, or print disabled serves "a valid purpose under factor one."[52]

The Supreme Court made clear that making copyrighted works accessible to people who are blind, visually impaired, deaf, or hard of hearing is a fair use under the first factor in *Sony*, noting that "[m]aking a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying."[53] The *HathiTrust* court also pointed out that the legislative history referred to by the Supreme Court provides clear "guidance support[ing] a finding of fair use in the unique circumstances presented by print-disabled readers."[54]

Finally, Congress's continuing "commitment to ameliorating the hardships" faced by people with sensory disabilities supports a finding of fair use under the first factor.[55] In the Americans with Disabilities Act, Congress declared the goal of "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."[56] Congress reaffirmed this commitment with the Chafee Amendment, which "illustrates Congress's intent that copyright law make appropriate accommodations for the blind, visually impaired, or print disabled."[57]

---

[50] 17 U.S.C. § 107(1).

[51] *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993).

[52] *HathiTrust*, 755 F.3d at 102.

[53] *Sony*, 464 U.S. at 455 n.40 (1984); *see also HathiTrust*, 755 F.3d at 102.

[54] *HathiTrust*, 755 F.3d at 102.

[55] *Id.*

[56] 42 U.S.C. § 12101(7).

[57] 17 U.S.C. § 121.

**b. The nature of motion pictures is heterogeneous and not dispositive.**

The second fair-use factor asks courts to examine the nature of the copyrighted work.[58] The proposed exemption would cover access to motion pictures, which come in many formats and genres. As the *HathiTrust* court stated, "[t]his does not preclude a finding of fair use, however, given [the] analysis of the other factors"[59]

**c. The amount and substantiality of the portion used in converting motion pictures to accessible formats weighs in favor of fair use.**

The third fair-use factor asks courts to consider "whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the copying's purpose."[60] At its core, this inquiry asks whether "no more was taken than necessary."[61]

Disability services offices use only what is necessary to convert motion pictures into an accessible format. Converting a motion picture into an accessible format requires only a partial replication of the original copyrighted work. Adding captions and audio description to a video utilizes only the aural and visual components of that video, respectively.

If a disability services professional receives a request to add captions to a video, he or she will have to transcribe the audio of that video to add the captions to the video.[62] In that scenario, however, the transcriber will not need to use the visual portion of the video for the purpose of making it accessible. Likewise, if a professional must add audio description to a video, he or she will only transcribe the visual portion of the video and not the audio. Because disability services offices only need to utilize the aural and visual components of the copyrighted work, the third factor weighs in favor of finding fair use.

**d. The effect of converting motion pictures to accessible formats on the potential market or value weighs in favor of fair use.**

Making motion pictures accessible to students with disabilities does not negatively affect the market or value of copyrighted works. The House Report on the 1976 Copyright Act noted that accessible versions, "such as copies in Braille and phonorecords of oral readings (talking books), are not usually made by the publishers for commercial distribution."[63]

Although progress is being made, the market failures that Congress recognized more than forty years ago continue to persist. As the *HathiTrust* court noted, "[i]t is undisputed that the present-day market for books accessible to the handicapped is so insignificant that 'it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind." The

---

[58] *HathiTrust*, 755 F.3d at 102.

[59] *Id.*

[60] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 570 (1994).

[61] *Id.* at 589.

[62] *Testimonial from Disability Service Professional, West Virginia University*, Appendix A.

[63] H.R. Rep. No. 94-1476, at 73 (1976); S. Rep. No. 94-473, at 80 (1975).

industry's failure to provide accessible e-books signaled to the court that preserving the ability to convert books into accessible versions that can be consumed and enjoyed by people who are blind, visually impaired, or print disabled weighed the fourth factor conclusively in favor of fair use.[64]

In addition, in the 2015 rulemaking, the Association of American Publishers (AAP), the trade association representing the publishers as the key copyright stakeholders, expressly stated that it did not object to the renewal of the petition to grant an exemption for assistive technologies in ebooks.[65] AAP specifically noted that "market conditions . . . do not yet offer inherent accessibility across such platforms or in the commercially-available versions of such works for consumers with print disabilities"[66]

Likewise, the prevalence of inaccessible works similarly persists in the video industry. For example, disability advocacy groups recently sued Hulu, one of the largest online video streaming services in the country, because it has failed to provide audio description for its videos.[67] Hulu is just the most recent content distributor to face such allegations; others, such as Netflix and American Multi-Cinema (AMC), have been involved in similar lawsuits.[68] This lawsuit underscores the market's failure to distribute films in an accessible format.

Even more problematic, however, is the failure of copyright owners to retroactively make motion pictures accessible or give permission to disability services offices to make those works accessible, even when contacted directly.[69] One disability service professional lamented the "many cases where the publisher has denied our request to caption videos, or not responded at all."[70]

Instances where videos are not captioned or described are pervasive. Disability services offices receive hundreds of requests every year to add captions or audio description to videos—one disability service professional estimated receiving approximately 200 requests per semester while another reported receiving 1,700 requests to caption videos since 2012.[71]

---

[64] *HathiTrust*, 755 F.3d at 102.

[65] Ass'n of Am. Publishers, *Short Comment Regarding a Proposed Section 1201 Exemption*, https://www.copyright.gov/1201/2015/comments-020615/InitialComments_ShortForm_AAP_Class09.pdf

[66] *Id.*

[67] Alana D. Richer, *Hulu sued for not offering audio service for blind customers*, L.A. Times (Nov. 23, 2017) http://beta.latimes.com/sns-bc-us--hulu-blind-lawsuit-20171121-story.html.

[68] Elisa Edelberg, *Audio Description Lawsuits: Netflix, Hamilton, UC Berkeley, and AMC Theatres*, 3PlayMedia.com (April 5, 2017), http://www.3playmedia.com/2017/04/05/audio-description-lawsuits/.

[69] *Testimonial from Disability Specialist, University of Illinois*, Appendix A.

[70] *Id.*

[71] *Testimonial from Disability Service Professional, West Virginia University*, Appendix A (estimating that the disability services office receives about 200 requests to add captions or audio description to videos per semester); *Testimonial from Disability Specialist*, University of Illinois,

This indifference towards disability services offices underscores the market's failure to incentivize copyright holders to retroactively make their works accessible for people with disabilities. Because the market conditions do not support retroactively converting works into an accessible format, converting motion pictures to accessible formats has little effect on the potential market for converting works. The fourth fair use factor weighs in favor of fair use.

### 3. Section 1201(a)(1)(C)'s five statutory factors weigh in favor of granting an exemption

Under Section 1201, the Librarian of Congress additionally considers five factors in considering whether to grant an exemption:

i.   The availability for use of copyrighted works;

ii.  The availability for use of works for nonprofit archival, preservation, and educational purposes;

iii.  The impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

iv.  The effect of circumvention of technological measures on the market for or value of copyrighted works;

v.   Such other factors as the Librarian considers appropriate.

In the 2015 triennial rulemaking, the Register found, and the Librarian agreed, that "all five factors strongly favor . . . an exemption to facilitate assistive technologies."[72] The Register expressly reaffirmed the position it established in the 2012 proceedings that an exception to promote accessibility "is not merely a matter of convenience, but is instead intended to enable individuals who are blind or visually impaired to have meaningful access to the same content that individuals without such impairments are able to perceive."[73]

Making motion pictures accessible is wholly consistent with the precedent established in past proceedings. Each of the five statutory factors weigh in favor of the proposed exemption.

---

Appendix A (reporting that the disability services office has received 1,700 requests to add captions or audio description to videos since 2012).

[72] 2015 Recommendation at 135.

[73] Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at 22 (Oct. 12, 2012) ("2012 Recommendation")

a. **Making motion pictures accessible is essential for educational purposes, and prohibiting the circumvention of technological protection measures negatively impacts teaching, scholarship, and research.**

This analysis combines the first, second, and third statutory factors because, for the purpose of this comment, the prohibitions on circumvention have a similar impact under each factor:

i. Without an explicit exemption, disability services professionals are inhibited from making works available for students with disabilities;

ii. The prohibitions on circumventions restrict the availability of works for educational purposes; and

iii. The prohibitions have a negative impact on teaching and scholarship.

Specifically, this exemption would provide to students who are blind, visually impaired, deaf, or hard of hearing access to information that is otherwise unavailable to them. Students with disabilities face particular difficulties finding and using accessible class materials in a meaningful way and within acceptable time periods.[74]

This difficulty, which the ADA and other disability laws attempt to overcome, is exacerbated by TPMs and uncertainty about the ability to circumvent them. For example, one disability services professional noted that the inclusion of TPMs poses "video access nightmares" for professionals and students alike.[75] The ability to circumvent TPMs on academic materials would ensure that students who are blind, visually impaired, deaf, or hard of hearing are afforded equal access to the materials used in the educational environment.

A prohibition on circumvention of TPMs in motion pictures not only impacts disability services professionals but also the students they serve. Today, over 77,000 students require support from disability services offices for hearing related disabilities while over 60,000 students are blind and require assistance from disability services offices.[76] Currently, these students are limited in their ability to fully participate in the educational environment, especially when instructors rely on audiovisual content to supplement their course material. If the proposed exemption is not granted, those Americans will remain limited in their ability to access educational materials with TPMs.

In a recent settlement agreement with the U.S. Department of Justice and Department of Education, one academic institution agreed to "purchase only digital content and devices

---

[74] *Testimonial from Anonymous Assistive Technology Specialist,* Appendix A.

[75] *Testimonial from Anonymous Disability Service Professional*, Appendix A.

[76] Nat'l Ctr. for Educ. Statistics, Fast Facts, https://nces.ed.gov/fastfacts/display.asp?id=64 (last visited Dec. 17, 2017) (providing the statistic that approximately 77,000 hearing impaired students are served by disability services offices); NFB, Statistical Facts about Blindness in the United States, https://nfb.org/blindness-statistics (last visited Dec. 17, 2017) (providing the statistic that there are approximately 62,000 blind students in the United States).

that were fully accessible or else provide reasonable modifications for this type of technology."[77] The settlement agreement defined "reasonable accommodation or modification" as the changes are necessary "so that a student can acquire the same information, engage in the same interactions, and enjoy the same services as sighted students with substantially equivalent ease of use."[78]

In practice, these types of settlements require covered entities to convert content into accessible formats. Many universities, libraries, and other educational institutions employ faculty members specifically for the purpose of making materials accessible for students who are blind, visually impaired, or dead or heard of hearing. Often, accessibility requires the circumvention of TPMs that interfere with accessibility technology.

   b.   **The effect of circumvention of technological measures on the market for or value of copyrighted works favors granting the exemption.**

Granting this exemption would have a negligible effect on the market value for motion pictures, while denying the exemption may have a negative impact on the market circulation of those works, particularly in universities. In 2010, the Department of Justice and the Department of Education, after entering into a series of settlement agreements with colleges and universities, issued a joint statement to colleges to express their concerns over those institutions use of inaccessible materials. The letters expressly admonished universities stating:

> Requiring use of an emerging technology in a classroom environment when the technology is inaccessible to an entire population of individuals with disabilities—individuals with visual disabilities—is discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) unless those individuals are provided accommodations or modifications that permit them to receive all the educational benefits provided by the technology in an equally effective and equally integrated manner.[79]

This letter, among other factors, has compelled universities to move towards prioritizing content that either adheres to universal design standards—which requires products to be "usable by all people, to the greatest extent possible, without the need for adaptation or specialized design"—or can easily be converted into an accessible format.[80] If the Copyright Office denies this petition it will likely create an environment where universities are loath to

---

[77] Joint Letter, Dep't. of Justice and Dep't. of Educ., at 2 (Jun 20, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.pdf.
[78] *Id.*
[79] *Id.* at 1.
[80] The Center for Universal Design, NC State University https://projects.ncsu.edu/ncsu/design/cud/about_ud/about_ud.htm (last visited Dec. 13, 2017).

use content that they cannot easily convert into an accessible format. Therefore, the fifth statutory factor weighs in favor of granting the petition.

### c.   Other factors weigh in favor of granting the exemption.

Under the fifth statutory factor, the Librarian should consider other appropriate factors. Importantly here, we request that the Librarian consider that non-circumventing alternatives are an inadequate solution to make works accessible. Non-circumventing alternatives are not only burdensome on disability services offices; they are considered inadequate accommodation for students with disabilities. In many cases, when the DRM on online media players or online streaming services prevents access to videos, disability services professionals can only provide students with a transcript of those videos.[81] These transcripts often must be supplemented with real-time interpreting or a transcriber summary.[82]

Though this process is indeed cumbersome for the disability services offices, the more serious issue is that this method to deliver videos to students is widely considered by disability services professionals to be an inadequate form of accommodation for students with disabilities.

\*       \*       \*

That TPMs are inhibiting students with disabilities from participating in educational environments on equal terms is unacceptable. As this rulemaking proceeding has established, making works accessible "is not merely a matter of convenience, but is instead intended to enable individuals . . . have meaningful access to the same content that individuals without such impairments are able to perceive."[83]

Respectfully submitted,

/s/

Blake E. Reid
Sophia Galleher
Angel Antkers
Susan Miller

---

[81] *Testimonial from Disability Service Professional, West Virginia University*, Appendix A.
[82] *Id.*
[83] 2012 Recommendation at 22.

**Documentary Evidence: Appendix A—**
**Testimonials from Disability Service Professionals**

This appendix includes testimonials from disability services professionals around the country who receive daily requests from faculty, student services offices, and other student organizations to convert motion pictures into a format that is accessible for students with disabilities, generally through the provision of closed captions and audio description. These testimonials underscore the chilling effects that the DMCA's anti-circumvention measures have had on the work of disability services professionals, and how they have adversely affected their ability to make works accessible to people with disabilities. Affiliations have been provided for identifying purposes only and withheld in some cases to protect the privacy of the submitters.

**Testimonial from Disability Service Professional, West Virginia University**

We probably receive about 200 videos a semester for captioning. These captioning requests generally fall into two categories relevant to this petition: (1) Accommodations and (2) Quality Matters.

*Accommodations:* captioning requests for videos in classes where students who are Deaf or Hard of Hearing have been approved for accessible media through our office as a legal accommodation. Instructors may not decline this request. We are obligated to provide a captioned version for students who are deaf or hard of hearing.

In certain cases, media players will block accessible videos from being streamed. The result is that we can only provide the student with a transcript, which is not technically considered an effective accommodation. We supplement this transcript to the best of our ability with real-time Interpreting or a Transcriber Summary. The process to caption videos takes upwards of 7 hours for each hour of video captioned (often more). We do not authorize instructors to use YouTube autocaptions in their classes unless they have been approved by us in advance as an effective accommodation.

*Quality Matters:* captioning requests for videos in classes (mostly online) where students who are deaf or hard of hearing have not yet enrolled. (This is a proactive measure undertaken by instructors.) In this case, we are not legally obligated to provide captions for these videos, but we support this as a Universal Design standard and a proactive move toward accessibility. If the instructor does not own the rights to the media, then we decline to create captions to avoid copyright issues.

While our office does not download, upload, or convert YouTube clips or other online videos in our process, it would often be much easier and less time consuming if we could. It would also result in a permanent alternative to the poor captioning offered automatically through YouTube.

**Testimonial from Disability Specialist, University of Illinois**

Since 2012, our office has received 1,700 requests to add captions or audio description to videos. We have many instances where we have to contact copyright holders for permission to caption videos. In general it is a time consuming process and very confusing as it is hard to determine who is the actual copyright holder in many of the cases where we

17

have old videos or a documentary where the publishing company has gone under. Also, I'm never certain if someone gives me copyright permission for some of the smaller publisher, if they are actually the holder of copyright.

We have also run into many cases where the publisher has denied our request to caption videos, or not responded at all, and then the professors insist that they are going to show the material whether I can caption the material or not. I have two options in these situations: I can deny service to our students or I can face legal uncertainty under copyright law. This is a moral issue that I should not have to face when it comes to making educational material accessible for all students, not just the ones who are deaf/hard of hearing.

**Testimonial from Anonymous Assistive Technology Specialist**

This petition is indeed very needed within the disability services. I am responsible for captioning videos for students that have a disability we are accommodating through our disability service office, so I am very aware of the video access nightmares. What I relay to you is only my experience trying to fulfil our department's legal mandates.

The DMCA has put me in a position where, for our office to meet its legal responsibilities to provide accessible media, I would essentially have to become a "video hacker," especially when professors assign these videos with no advance warning, and I have only days to make them captioned and available to our students so they have access the same time as other students. This often has left zero time to try to find out who the video creator is and ask permission to download and caption (essentially modify) their video.

To have LEGAL and EASY access to videos that federal law requires we make accessible would be AWESOME! Ideally, the video CREATORS themselves should make their own videos accessible; I know that is still a ways off, but I can hope.

**Testimonial from Anonymous Student Accessibility Services Professional**

I'm a sign language interpreter but also caption videos for our deaf and hard of hearing students. One of the challenges I have encountered is not getting a response from the publisher when I request permission to caption the video. Since this is an educational setting, I was informed that videos can be captioned if they are for educational purposes without having the risk to face copyright infringement charges. If this exemption would go through, it would allow us to simply provide our students with captioned videos without delay.

**Disability Services Professional, Kent State University**

If a student registered with our office is approved for the closed captioning accommodation, instructors cannot show videos without captioning or listen to audio without an accompanying transcript. We cannot deny students access to captioned materials. This might mean having a conversation with faculty that is something along the lines of "you can't show this video in class and I'm sorry if you've built your curriculum around a theme from the video(s), or, I realize you believe this is the only video about the theme, but it can't be made accessible, therefore it can't be used and you will need to find an alternative." Please note students registered with a disability office can drop, change, add classes similar to any other student and we have to hustle to make content accessible quickly.

Alternative methods are cumbersome and the programs don't always work. Glitches occur delaying the process even more so. The captioning process is long and tedious, and with the moral burden, effective workflows and policies aren't adequately made. Decisions have to be made with video storage, who owns it, who else can use the asset once it's made accessible and who will oversee the process- all an ethical and logistical nightmare. These conversations occur across campuses, not just in a disability office and require multiple departments to work together.