**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                          |     |                                        |
| ---------------------------------------- | --- | -------------------------------------- |
| MATTHEW GREEN ET AL.,                    | )   |                                        |
|                                          | )   |                                        |
| Plaintiffs,                              | )   | Civil Action No. 1:16-cv-1492-EGS      |
|                                          | )   |                                        |
| v.                                       | )   | Judge: Emmet G. Sullivan               |
|                                          | )   |                                        |
| U.S. DEPARTMENT OF JUSTICE ET AL.,       | )   |                                        |
|                                          | )   |                                        |
| Defendants.                              | )   |                                        |

**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 3

    I.    STATUTORY BACKGROUND ........................................................... 3

    II.   REGULATORY BACKGROUND ...................................................... 6

    III.  PROCEDURAL HISTORY .............................................................. 7

          A.   Initial Proceedings ................................................................ 7

          B.   The Court's Opinion of June 27, 2019 ................................... 8

          C.   Subsequent Proceedings and the Instant Motion ...................... 9

ARGUMENT ................................................................................................ 10

    I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF
         THEIR AS-APPLIED FIRST AMENDMENT CLAIMS ................................... 12

          A.   Plaintiffs' Proposed "Narrow Construction" of § 1201(a) Is Not
              Tenable ................................................................................ 12

          B.   Section 1201(a) Does Not Violate the First Amendment As Applied
              To Huang ............................................................................. 13

              1.  Huang Has No First Amendment Interest In Creating or Using a
                   Device Embedded With Decryption Code Copied From Another
                   Source. ............................................................................. 13

              2.  To the Extent Huang's Proposed Circumvention and Trafficking
                   Implicate the First Amendment, § 1201(a)(1)(A) and (a)(2) Satisfy
                   Intermediate Scrutiny As Applied To Him. ...................... 19

                  a.  The Court has recognized the government's substantial
                     interest unrelated to the suppression of free expression. ....... 20

                  b.  Ample evidence demonstrates that the provisions are
                     narrowly tailored. ................................................... 20

          i.    The evidence shows that the DMCA's provisions were necessary at the time of their enactment. ................... 21

          ii.    The evidence shows that the DMCA's provisions are also necessary as applied to Huang's proposed circumvention and trafficking. ................................... 26

   C.    Section 1201(a)(2) Does Not Violate the First Amendment As Applied To Green ................................................................................ 33

      1.   An Academic Publication About Security Research Would Not Ordinarily Be Prohibited Under § 1201(a)(2) ................................... 33

      2.   To the Extent Green's Book Is Subject To § 1201(a)(2), the Provision's Application To Green Satisfies Intermediate Scrutiny ................................................................................. 36

II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM WARRANTING EMERGENCY RELIEF ......................................................... 40

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN THE GOVERNMENT'S FAVOR AND AGAINST AN EMERGENCY INJUNCTION ................................................................................................ 42

IV.   PLAINTIFFS' REQUESTED INJUNCTION EXTENDS FAR BEYOND ANY RELIEF APPROPRIATE FOR THEIR AS-APPLIED CLAIMS ............. 43

CONCLUSION ................................................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*321 Studios v. Metro Goldwyn Mayer Studios, Inc*.,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ........................................................ 16, 21, 22, 33

*AFGE v. Dist. of Columbia*, No. 05-472, 2005 WL 1017877 (D.D.C. May 2, 2005) ................ 21

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank*, 840 F. Supp. 2d 327 (D.D.C. 2012) ............ 40

*Allied Veterans of World, Inc v. Seminole Cty*., 783 F. Supp. 2d 1197 (M.D. Fla. 2011) .......... 14

*Am. Meat Inst. v. U.S. Dep't of Agric*., 968 F. Supp. 2d 38 (D.D.C. 2013),
    *aff'd after reh'g en banc*, 760 F.3d 18 (D.C. Cir. 2014) ................................................. 42

*Am. Soc'y for Testing & Materials, et al. v. Pub. Resource.Org, Inc*.,
    896 F.3d 437 (D.C. Cir. 2018) .................................................................................. 30-31

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313 (3d Cir. 2015) ........ 21

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ....................................................... 31

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) .................................................. 31

*BellSouth Corp. v. FCC*, 144 F.3d 58 (D.C. Cir. 1998) ............................................................. 37

*Cable/Home Commc'n Corp. v. Network Prods., Inc,* 902 F.2d 829 (11th Cir. 1990) .............. 16

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................................. 44

*Campbell v. Acuff-Rose Music, Inc*., 510 US 569 (1994) ........................................................... 16

*Capitol Records, LLC v. ReDigi Inc*., 910 F.3d 649, 663 (2d Cir. 2018),
    *cert denied*, 139 S. Ct. 2760 (2019) .............................................................................. 33

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ........................ 16

*Chamberlain Grp., Inc. v. Skylink Techs., Inc*., 381 F.3d 1178 (Fed. Cir. 2004) ....................... 13

*Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290 (D.C. Cir. 2006) ..................... 40

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ..................... 11

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ............................................................... 10-11, 21

*Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ..................... 14, 15

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) ........................................................ 27

*Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ........................ 14

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) ............................................ 31

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ................................................................. 11

*\*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ....................................................................................... 16

*English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................... 11

*FDIC v. Meyer*, 510 U.S. 471 (1994) ........................................................................................... 45

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) ....................................................................... 17

*Fox News Network, LLC v. TvEyes, Inc.,* 883 F.3d 169 (2d. Cir. 2018) ...................................... 31

*Golan v. Holder*, 132 S. Ct. 873 (2012) ........................................................................................ 16

*\*Green v. DOJ*, 392 F. Supp. 3d 68 (D.D.C. 2019) ............................................................ *passim*

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ..................................... 31

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) (plurality) ............................................................... 17

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58 (D.D.C. 2013) ....... 10, 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) .......................................................... 36

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ....................................................... 44

*Manhattan Cmty. Access Corp. (MCAC) v. Halleck*, 139 S. Ct. 2921 (2019) ............................ 18

*MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928 (9th Cir. 2010),
    *as amended on denial of reh'g* (Feb. 17, 2011) ....................................................... 12, 13

*Newdow v. Bush,* 355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................. 40

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65 (2d Cir. 1999) ................ 31

*Nken v. Holder,* 556 U.S. 418 (2009) ............................................................................................ 11

*Norton v. SUWA*, 542 U.S. 55 (2004) .......................................................................................... 45

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ............... 41

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ........................................................17-18

*Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016) ................................................... 11

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ................................................................... 44

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) ......................... 20, 21, 29, 32, 37, 40

*\*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................................................................ 4, 16, 20

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ............................................ 22

*United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ................................... 44

*United States v. O'Brien*, 391 U.S. 367 (1968) ........................................................ 20

*\*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001)................................. *passim*

*Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211 (S.D.N.Y. 2000) ....................... 43

*Universal City Studios Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000) ............ 22-25, 29

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .................................................... 21

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    468 U.S. 1323 (1984) (Rehnquist, J., in chambers) ......................................................... 42

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................ 10, 42

*Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ............................................... 40

*\*Zemel v. Rusk*, 381 U.S. 1 (1965) ........................................................................... 17

## **Statutes**

Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998) .... 24

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ................................................ 7, 8

17 U.S.C. § 102 ........................................................................................................... 45

17 U.S.C. § 106 ............................................................................................................. 16, 19

17 U.S.C. § 106A ............................................................................................................... 16

17 U.S.C. § 107 .................................................................................................................. 16

Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 ...................................... *passim*

17 U.S.C. § 1203 ................................................................................................................. 6

17 U.S.C. § 1204 ................................................................................................................. 6

44 U.S.C. § 1507 ............................................................................................................... 27


**Legislative Materials**

144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties),
     1998 WL 785674 (Cong. Rec.) ....................................................................... 3

H.R. Rep. No. 105-551(I) (1998) .................................................................... 4, 22, 23

H.R. Rep. No. 105-551(II) (1998) ................................................................. 5, 12, 22

S. Rep. No. 105-190 (1998) ..................................................... 3, 4, 20, 21, 22, 23, 24

*Chapter 12 of Title 17, Hearing Before the Subcomm. on Courts, Intellectual Property and the
     Internet of the H. Comm. on the Judiciary ("Chapter 12 Hearing")*, 113th Cong., 2d Sess.
     (Sept. 17, 2014), *available at* https://judiciary.house.gov/hearing/hearing-chapter-12-of-
     title-17/ .................................................................................................... 26

WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997),
     1997 WL 447232 .................................................................................... 3, 23

WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act:
Hearing on H.R. 2281 and H.R. 2280 Before the Subcomm. on Courts and Intellectual Property of
the House Comm. on the Judiciary, 105th Cong. (1997) ......................................... 22

NII Copyright Protection Act of 1995: Hearings on H.R. 2441 Before the Subcomm. on Courts
and Intellectual Property of the House Comm. on the Judiciary, 104th Cong. (1996) ............... 22

NII Copyright Protection Act of 1995: Joint Hearing on H.R. 2441 and S. 1284 Before the
Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary and the Senate
Comm. on the Judiciary, 104th Cong. (1995) ................................................... 22

**Administrative Materials**

37 C.F.R. § 201.40 ......................................................................................................... 7

65 Fed. Reg. 64556-01 (2000 Final Rule) ...................................................................... 6

68 Fed. Reg. 62011-01 (2003 Final Rule) ...................................................................... 6

71 Fed. Reg. 68472-01 (2006 Final Rule) ...................................................................... 6

75 Fed. Reg. 43825-01 (2010 Final Rule) ...................................................................... 6

77 Fed. Reg. 65260-01 (2012 Final Rule) ...................................................................... 6

80 Fed. Reg. 65944 (2015 Final Rule) ........................................................................... 6

82 Fed. Reg. 29805, 29807 (2017 request for petitions) ............................................... 5

83 Fed. Reg. 54010 (2018 Final Rule) ............................................................... 6, 7, 27, 33

U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights
(June 2017) ("USCO Report"), *available at*
https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ...................... 6, 26

**Secondary Sources**

Dean S. Marks & Bruce H. Turnbull, *Technical Protection Measures: The Intersection of
Technology, Law and Commercial Licenses*, 46 J. Copyright Soc'y U.S.A. 563
(1999) ................................................................................................................... 22, 23

## INTRODUCTION

Plaintiffs seek an emergency injunction so that they can proceed to distribute products that would allow widespread piracy of digital audiovisual content, disturbing markets that have arisen and flourished under the protection of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, in which copyrighted works have been disseminated through innovative business models such as high-definition digital cable and streaming services. The Court should deny Plaintiffs' request because they are unlikely to succeed in their as-applied First Amendment challenges—the only claims that remain in this case—against Defendants the U.S. Department of Justice and William P. Barr in his official capacity as Attorney General ("DOJ Defendants").[1] Applying the intermediate scrutiny framework that this Court already adopted, the anti-circumvention and anti-trafficking provisions of § 1201(a) do not burden substantially more of Plaintiffs' speech than necessary to further the government's legitimate interests in preventing piracy of copyrighted works and facilitating their dissemination in the digital marketplace.

In regard to Plaintiffs Andrew Huang and his company Alphamax (collectively, "Huang"), their proposed creation, use, and distribution of a NeTVCR device that allows circumvention of HDCP—the technological protection measure ("TPM") that safeguards copyrighted content, whether it comes from a computer, streaming device, cable box, or video game console, as it travels over an HDMI cable to a monitor—does not involve any act of communication that could be considered protected speech. Instead, the device applies preexisting code to a machine to break past lawful access barriers to capture a form of a digital copyrighted work—one that can be

---

[1] All claims against defendants the Library of Congress, Carla Hayden in her official capacity as Librarian of Congress, the U.S. Copyright Office, and Karyn A. Temple in her official capacity as Register of Copyrights ("LOC Defendants") were dismissed by the Court's Order of June 27, 2019 [ECF 24] (dismissing Counts I, II, VI, and VII). *See* Compl. ¶¶ 111–62 (identifying Counts II, VI, and VII as the only claims asserted against the LOC Defendants).

permanently saved and freely disseminated at the user's will—that the owner never agreed to make available. Any subsequent alleged "fair use" of the captured content cannot turn that initial act of unlawful access into "speech." Moreover, any incidental burden on speech is insufficient to overturn the DMCA's provisions when the NeTVCR would indisputably allow piracy on an unprecedented scale, and the evidence shows that numerous alternatives exist to make the fair uses that Huang identifies. Huang is thus unlikely to succeed in his as-applied First Amendment claim.

As for Plaintiff Matthew Green ("Green"), Green concedes that he is already able to conduct good faith security research without an injunction because the DMCA exempts good faith security research from the anti-circumvention prohibition in § 1201(a)(1)(A), and the Librarian of Congress ("Librarian") has already granted Green further exemptions through the DMCA's triennial rulemaking process. Green thus seeks to enjoin only the anti-trafficking prohibition in § 1201(a)(2), but his allegations are insufficient to conclude that the academic book that he describes is barred by that provision in the first place. Of course, to the extent Green seeks to claim that he would include in his book code that could decrypt a version of HDCP, and that he would market his book's inclusion of such code to the general public in a way that would essentially invite piracy, the same analysis applicable to Huang would apply. Either way, Green's as-applied First Amendment claim is unlikely to succeed.

The other factors also weigh against a preliminary injunction. Plaintiffs rely on their asserted First Amendment violations to show irreparable harm and hardship and to argue the public interest is on their side. Their arguments fall in the face of their likely failure to prevail on the merits. In comparison, the government's substantial interest in supporting the digital content marketplace would be gravely harmed due to the potentially staggering impact on such markets from Plaintiffs' requested relief. After all, once Plaintiffs are allowed to distribute circumvention

products, the damage will be done. There would be no way to reverse the impact should the Court ultimately reject Plaintiffs' claims, piracy will be permitted, and harm to the digital marketplace for copyrighted works will be permanent. The Court therefore should deny Plaintiffs' motion.

## BACKGROUND

### I.     STATUTORY BACKGROUND

The general background of the DMCA is set forth in the Court's prior opinion, *Green v. DOJ*, 392 F. Supp. 3d 68, 77–79 (D.D.C. 2019). Defendants further address the necessity of the legislation in the intermediate scrutiny analysis below. In brief, the DMCA, among other things, implements an international treaty, the World Intellectual Property Organization ("WIPO") Copyright Treaty, which requires contracting states to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights. *See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997), 1997 WL 447232, at *13; S. Rep. No. 105-190, at 2.[2]  Like the WIPO treaty, the DMCA's purpose is to provide the necessary legal protections that would allow content owners the freedom to disseminate their work in the new digital formats that were quickly developing without the risk that they would thereby lose all benefits conferred by their copyright ownership through digital piracy, which has the potential to allow unauthorized access to and distribution of copyrighted works on a massive scale. *See* S. Rep. No. 105-190, at 2, 8 (1998) (recognizing that "the law must adapt to make digital networks safe places to disseminate and exploit copyrighted materials" and that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive

---

[2] The United States signed the WIPO Copyright Treaty on April 2, 1997, and the Senate ratified it on October 21, 1998. 144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties), 1998 WL 785674 (Cong. Rec.).

piracy"); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001) (discussing DMCA's background); *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1119 (N.D. Cal. 2002) (same). Thus, Congress intended the DMCA to provide this protection and thereby to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works." S. Rep. No. 105-190, at 2.

The DMCA sets forth three prohibitions, codified at 17 U.S.C. § 1201, that address the concern with digital piracy. Only the first two, both in § 1201(a), are at issue here. First, the DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act. 17 U.S.C. § 1201(a)(1)(A). Second, the DMCA prohibits the manufacture of or trafficking in products or technology (or parts thereof) primarily designed to circumvent such access controls. *See id.* § 1201(a)(2). Third, in a separate provision that Plaintiffs do not challenge in this case, the DMCA prohibits the manufacture of or trafficking in products or technology designed to circumvent measures that protect a copyright owner's rights under the Copyright Act, sometimes referred to as copy controls. *See id.* § 1201(b).[3] Thus, the prohibitions at issue here, in § 1201(a), address circumvention of TPMs that block *access* to a copyrighted work—such as TPMs that prevent people from viewing an article on an Internet website unless they have a password or pay a fee. *See id.* § 1201(a)(3)(A) (explaining that to "circumvent a

---

[3] Notably, § 1201 does *not* forbid the act of circumventing copy controls. If such circumvention occurred, any subsequent copying activity would be assessed as a potential copyright infringement, *see* 17 U.S.C. § 501, and the traditional defenses to infringement liability, including the fair use defense, *see id.* § 107, would be available if they applied. S. Rep. No. 105-190, at 12 (explaining that "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)" because "[t]he copyright law has long forbidden copyright infringements, so no new prohibition was necessary"); H.R. Rep. No. 105-551(I), at 18 (1998) ("Paragraph (a)(1) does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of [TPMs]. . . . In a fact situation where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable.").

technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner").

The DMCA sets forth several permanent exemptions to its prohibitions. The statute permits circumvention of an access control on a copyrighted work, or in certain limited circumstances, the sharing of circumvention technology, in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer, computer system, or computer network. *See* 17 U.S.C. § 1201(d)–(j).

The DMCA also directs the Librarian of Congress to make a determination every three years, through a rulemaking proceeding conducted by the Copyright Office and upon the recommendation of the Register of Copyrights, regarding categories of copyrighted materials that should be exempted for the next three-year period from the anti-circumvention prohibition in § 1201(a)(1)(A). *See id.* § 1201(a)(1)(C). This triennial rulemaking is intended to serve as a "'fail-safe' mechanism" to account for possible changes in the online marketplace after the DMCA's enactment. *See* H.R. Rep. No. 105-551(II), at 35–37 (1998) (explaining that rulemaking would provide a method to "monitor developments in the marketplace for copyrighted materials," so that the prohibition on circumvention of access controls in § 1201(a)(1)(A) could "be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials").

The Government may bring criminal charges against those who violate the DMCA's anti-

circumvention and anti-trafficking provisions pursuant to 17 U.S.C. § 1204. Persons injured by violations of these provisions may also seek civil remedies pursuant to 17 U.S.C. § 1203.

## II.    REGULATORY BACKGROUND

Thus far, the Librarian has issued seven Final Rules pursuant to the recommendation of the Register of Copyrights, following the DMCA's triennial rulemaking procedure. *See* 65 Fed. Reg. 64556-01 (2000 Final Rule); 68 Fed. Reg. 62011-01 (2003 Final Rule); 71 Fed. Reg. 68472-01 (2006 Final Rule); 75 Fed. Reg. 43825-01 (2010 Final Rule); 77 Fed. Reg. 65260-01 (2012 Final Rule); 80 Fed. Reg. 65944-01 (2015 Final Rule); 83 Fed. Reg. 54010 (2018 Final Rule).[4]  In the Sixth Triennial Rulemaking, an exemption was adopted allowing circumvention of access controls protecting computer programs for good faith security research on devices or machines primarily designed for consumer use, motorized land vehicles, or medical devices designed for implantation. 80 Fed. Reg. at 65956.

Prior to the most recent Seventh Triennial Rulemaking, the Copyright Office adopted a new, streamlined procedure for those "seeking readoption of a current exemption" to "petition for renewal," rather than submitting an entirely new proposal. 82 Fed. Reg. 29805, 29807 (2017 request for petitions).[5]  Renewal requests were submitted in connection with the security research exemption granted in 2015. 83 Fed. Reg. at 54014. In addition, Green and two other parties sought expansions of the prior exemption, among other things to remove its device limitation. *Id.* at

---

[4]  Materials relevant to the rulemaking process, including the Register's recommendations as well as all exemption proposals and comments submitted during the rulemaking process, are available on the Copyright Office website at https://www.copyright.gov/1201/. The materials relevant to the Seventh Triennial Rulemaking are at https://www.copyright.gov/1201/2018/.

[5]  This streamlined process was adopted pursuant to the Copyright Office's recommendation, as set forth in a congressionally-requested comprehensive policy study of Section 1201. U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights (June 2017) ("USCO Report"), *available at* https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

54025–26; Green Pet'n (Class 10). The Librarian adopted the Acting Register's recommendation that the 2015 exemption for security research be renewed, and that the exemption be expanded to remove any device limitation. *Id.* at 54026, 54030; 37 C.F.R. § 201.40(b)(11).

Huang also submitted an exemption petition in the Seventh Triennial Rulemaking, seeking an exemption that would allow circumvention "to make noninfringing uses of audiovisual works" protected by HDCP. 83 Fed. Reg. at 54027. Many parties opposed Huang's petition, "noting that HDCP is the industry standard for protecting audiovisual works in transit to a display device." *See id.* These parties identified "a significant online infringement risk" if the exemption were granted, in light of HDCP's role as "a critically important component of the secure ecosystem through which content is delivered for home entertainment." *Id.* Opponents also noted that Huang's petition was exceptionally broad in seeking an exemption for "all noninfringing uses"; at the same time, opponents also "set forth a large number of concrete examples of potential alternatives" that would allow noninfringing uses without circumvention of HDCP. *Id.* The Librarian adopted the Acting Register's recommendation that Huang's requested exemption be denied. *Id.* at 54027–28.

## III.   PROCEDURAL HISTORY

### A.   Initial Proceedings

Plaintiffs filed their Complaint on July 21, 2016, claiming that the DMCA violated the First Amendment on overbreadth grounds (Count I), as an impermissible prior restraint (Count II), and as applied to them (Counts III, IV, V), and, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, that the LOC Defendants improperly denied exemptions that would have allowed Plaintiffs' proposed circumvention and trafficking (Counts VI, VII). [ECF 1.] Defendants moved to dismiss on September 29, 2016. [ECF 15.] On the same day, Green filed a motion for preliminary injunction, seeking to enjoin his prosecution under either the anti-circumvention or

anti-trafficking provisions of § 1201(a). [ECF 16.] The Court stayed Green's motion pending resolution of Defendants' motion to dismiss. Minute Order of Sept. 30, 2016.

### B.     The Court's Opinion of June 27, 2019

The Court issued an opinion and order on June 27, 2019. [ECF 24, 25.] *Green v. DOJ*, 392 F. Supp. 3d 68 (D.D.C. 2019). The Court first held that Plaintiffs' allegations were sufficient, at the pleading stage, for standing purposes. *Id.* at 84. Although acknowledging Defendants' arguments "that plaintiffs' proposed activities of circumvention and trafficking do not amount to the speech or expressive conduct that implicates First Amendment rights," the Court indicated that consideration of that "important question" was "premature" at the motion to dismiss stage. *Id.*

Although the Court did not dismiss Plaintiffs' claims based on a lack of standing, it proceeded to dismiss the majority of their claims for failure to state a claim upon which relief can be granted. In particular, the Court dismissed Plaintiffs' overbreadth and prior restraint claims. *Id.* at 88–90. The Court also dismissed Plaintiffs' APA claims against the LOC Defendants because the final rule resulting from the DMCA's triennial rulemaking process is issued by the Librarian, and the Library of Congress is not an "agency" subject to the APA. *Id.* at 100.

In regard to the only remaining claims—Plaintiffs' as-applied challenges to the DMCA— the Court narrowed the issues in dispute. The Court held that any restrictions on speech imposed by the DMCA's anti-circumvention and anti-trafficking provisions would be subject to intermediate, rather than strict, scrutiny. *Id.* at 91. In so holding, the Court followed the Second Circuit's decision in *Corley*, which "cogently explained" that "code capable of circumventing TPMs is purely functional (*i.e.*, non-speech) when it communicates a decryption message through a computer," and that "the functional, non-speech aspect of code" is also implicated by the anti-trafficking provision. *See id.* (citing *Corley*, 273 F.3d at 451–52, 454). Because the DMCA "targets

only the non-speech component" of the Plaintiffs' intended "use of code to circumvent TPMs and the dissemination of that code to others," and any burden on "the speech component—the code's ability to communicate to a human"—is incidental, any speech restriction qualifies as content neutral. *See id.* at 91–92.

The Court also recognized that the first two prongs of intermediate scrutiny are satisfied. *See id.* at 94. In particular, the Court recognized that the DMCA was enacted due to "substantial fears of 'massive piracy' of copyrighted works in the digital environment." *Id.* (quoting S. Rep. No. 105-190 at 8). Thus, the government has a substantial interest in "preventing trafficking in devices and technologies that would undermine the access controls that protect copyrighted works." *Id.* Moreover, that interest is "unrelated to the suppression of free expression." *Id.* (quoting *Corley*, 273 F.3d at 454).

However, the Court declined to dismiss Plaintiffs' as-applied claims. The Court indicated that the Government had failed to respond to certain arguments advanced by Plaintiffs. *Id.* at 95. The Court also concluded that the Government had not yet met its burden "to demonstrate that the provisions do not burden substantially more speech than is necessary to further the government's legitimate interest," because "none of the facts supporting the asserted risks identified by the government are in the record in this case." *Id.* at 95, 96 (citation omitted).

In sum, the Court dismissed all claims against the LOC Defendants. With respect to the DOJ Defendants, the Court dismissed all but Plaintiffs' as-applied First Amendment claims, held that those claims are subject to intermediate, not strict, scrutiny, and held that the first two prongs of intermediate scrutiny are satisfied.

### C.    Subsequent Proceedings and the Instant Motion

Following the Court's Order on Defendants' motion to dismiss, Plaintiffs indicated an

intent to renew their motion for preliminary injunction. [ECF 27]. In response to the Court's proposal that the parties engage in expedited discovery and combine preliminary injunction and summary judgment proceedings, the parties attempted to reach agreement on a joint statement of stipulated facts but were unable to do so. [ECF 29.] After Plaintiffs indicated their intent to appeal any adverse decision on their motion for preliminary injunction, the Court issued a briefing schedule, and Plaintiffs filed their renewed Motion for Preliminary Injunction ("Motion" or "Pl. Mot.")—this time seeking emergency relief on behalf of Huang as well as Green—on September 19, 2019. [ECF 30.]

Plaintiffs' Motion asks the Court to enjoin the DOJ Defendants from criminal enforcement of the DMCA's anti-circumvention and anti-trafficking provisions in 17 U.S.C. § 1201(a)(1)(A) and (a)(2) and to compel the Librarian to grant exemptions that would allow Plaintiffs "and others to engage in conduct protected by the First Amendment." Pl. Mot. at 3–4. Plaintiffs base this request for emergency relief on (1) Huang's as-applied challenges to the DMCA's anti-circumvention and anti-trafficking provisions in § 1201(a) and (2) Green's as-applied challenge to the anti-trafficking provision, as well as all dismissed claims. Citing the security research exemption granted in the Seventh Triennial Rulemaking, Green does not seek a preliminary injunction with respect to the DMCA's anti-circumvention provision. Pl. Mem. [ECF 30-1] at 14.

## ARGUMENT

"The standard for issuance of the extraordinary and drastic remedy of . . . a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013). A preliminary injunction is "never awarded as of right," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258

(D.C. Cir. 2004). A party moving for a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75–76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Courts have applied an even higher standard when "a plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (i.e., a mandatory injunction)." *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018). The injunction sought by Plaintiffs here is particularly disfavored because it would not only change the status quo by allowing them to proceed with projects that are currently barred by the DMCA, but it could in fact amount to "essentially the full relief" they seek on the merits. *See Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969)). Plaintiffs seem to contemplate that, should a preliminary injunction issue, Huang would proceed to distribute his NeTVCRs, and Green would proceed to publish his book. Such relief would essentially moot Plaintiffs' claims since, even if Defendants were ultimately to prevail, the Court could not recall all NeTVCRs that had been distributed in reliance on the preliminary injunction, nor copies of Green's book that had been sold.

As an initial matter, Plaintiffs' attempt to seek a preliminary injunction in connection with claims that have already been dismissed, Pl. Mem. at 27–28, should be rejected out of hand. Plaintiffs apparently assert this argument in an attempt to include those dismissed claims in any appeal from the Court's ruling on the instant Motion—a questionable tactic at best. However, even

11

if it were appropriate to seek a preliminary injunction with respect to claims that are no longer part of this lawsuit, this Court has already determined, when dismissing those claims, that they are unlikely to succeed on the merits. *Green*, 392 F. Supp. 3d at 88 (dismissing overbreadth claim), 90 (dismissing prior restraint claim), 99 (dismissing APA claims against LOC Defendants). For the same reasons stated by the Court in that decision, as well as those set forth in Defendants' prior briefing, the Court should deny Plaintiffs' Motion for Preliminary Injunction with respect to those claims. Moreover, because Plaintiffs have not carried their burden on any of the four factors, even with respect to claims that the Court did not dismiss, their Motion should be denied in its entirety.

## I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR AS-APPLIED FIRST AMENDMENT CLAIMS

### A. Plaintiffs' Proposed "Narrow Construction" of § 1201(a) Is Not Tenable

In a background section that is not even included in, let alone justified by, Plaintiffs' "Argument," Plaintiffs suggest in passing that the Court should "construe" § 1201(a) such that all circumvention and trafficking of access controls "in service of noninfringing uses" is allowed. *See* Pl. Mem. at 16–17. As Plaintiffs apparently realize, the plain language of § 1201(a) precludes such a reading. Indeed, the same argument has been raised and rejected in other cases. *Corley*, 273 F.3d at 443–44 & n.13; *MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 950 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011). As recognized in *Corley*, § 1201(a) contains no general exemption for all noninfringing uses because Congress "eschew[ed] the quick fix" that Plaintiffs propose. *Corley*, 273 F.3d at 443 n.13. Instead, in addition to the specific exemptions listed in the statute, Congress designed the triennial rulemaking process to allow for exemptions from the anti-circumvention process "when it becomes evident that in practice, the statute is adversely affecting certain kinds of fair use." *Id.* (citing H.R. Rep. No. 105-551(II), at 36). Plaintiffs' proposed interpretation would render the triennial rulemaking process, as well as the

express statutory exemptions, meaningless and is therefore untenable. *See MDY Indus., LLC*, 629 F.3d at 950 (rejecting "infringement nexus requirement," as proposed by the Federal Circuit in *Chamberlain Grp., Inc. v. Skylink Techs., Inc*., 381 F.3d 1178 (Fed. Cir. 2004), the case upon which Plaintiffs rely, because it would require the court to "disregard the plain language of the statute"). As such, Plaintiffs' "narrow construction" is instead a request to altogether invalidate the scheme mandated by Congress and should therefore be rejected.

**B.      Section 1201(a) Does Not Violate the First Amendment As Applied To Huang**

**1.      Huang Has No First Amendment Interest In Creating or Using a Device Embedded With Decryption Code Copied From Another Source.**

Turning to Plaintiffs' First Amendment claims, Huang is unlikely to succeed in his as-applied challenge. Huang bases his claim on his desired creation, use, and distribution of a device (which he calls NeTVCR) containing a "master key" that would allow users to circumvent HDCP, a TPM that protects digital video content as it travels through an HDMI cable from a device, such as a computer, DVD player, streaming video player, or video game console, to a monitor or television. Compl. ¶¶ 92–93, 95. Importantly, no court has ever held that the design or use of a device to circumvent an access control qualifies for First Amendment protection.[6]   In *Corley*, the Second Circuit addressed the defendants' violation of the DMCA's anti-trafficking provision by posting decryption code online and by linking to other webpages that contained the code. *Corley*, 273 F.3d at 453. The court concluded that "computer code . . . *can* merit First Amendment

---

[6] Plaintiffs incorrectly state that this Court already held that "using code to circumvent TPMs" is "protected by the First Amendment." Pl. Mem. at 15. Although the Court in its prior opinion considered the possibility "arguable," it did not resolve the question. *Green*, 392 F. Supp. 3d at 86. Nor have Defendants conceded that the use of Huang's NeTVCR device qualifies as speech. Defendants acknowledged, in connection with Green's stated intent to include decryption code in his book, that other courts have concluded code is speech. Def. MTD Reply [ECF 19] at 10 n.6. As discussed herein, they did so when considering the transmission of code to other people.

protection," but it also acknowledged that code did not always merit such protection. *Id.* at 449 (emphasis added). In particular, the court distinguished the case before it, where code was being used to "communicate . . . to another programmer," from an earlier decision, in *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000), where the court concluded that an automated computer program giving commands to users "in an entirely mechanical way, as though it were an audible command to a machine to start or stop," where the only purpose of language "was to induce action," did not implicate the First Amendment. *See Corley*, 273 F.3d at 448–49. Thus, when *Corley* held that "computer code conveying information" to others—as it does when posted or linked to online—was "'speech' within the meaning of the First Amendment," it did not overturn the earlier holding in *Vartuli* that computer code that did *not* communicate to others, but served a solely functional purpose, was not First Amendment speech. *See id.* at 449–50.[7]

This distinction is consistent with the fact that, outside the context of computer code, the use of language for purely functional purposes when operating a machine has never been deemed "speech" within the meaning of the First Amendment. A burglar who uses a numerical combination that has been decoded or stolen in order to open a locked safe has never been able to raise a First Amendment defense on the basis that the numbers he used qualified as speech—even though numbers are a form of language and can be used to communicate. Similarly, if someone used voice commands to break into a system protected by voice recognition software, or if someone used a stolen or guessed password to withdraw someone else's money from an ATM

---

[7] Other courts have applied *Corley* and *Vartuli* to distinguish between a situation where code is used to communicate with other people, *e.g.*, *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691–92 (W.D. Tex. 2015) (treating software as speech when the plaintiffs sought to distribute it as "open source," "to be used by others as a baseline to be built upon, altered and otherwise utilized"), and one where it only interacts with a computer, *e.g.*, *Allied Veterans of World, Inc v. Seminole Cty.*, 783 F. Supp. 2d 1197, 1202–03 (M.D. Fla. 2011) (holding software does not qualify as speech when it only communicates to a computer).

machine or transfer money out of someone else's online bank account, no First Amendment defense would be available, even though the tool used to gain unlawful access in all these instances—words used as commands or passwords—is a form of language. The situation should not be different when the language at issue is decryption software—which, after all, is nothing but a more complex form of a combination lock's numerical code.

Huang's proposed conduct in circumventing HDCP resembles that in *Vartuli* rather than *Corley*. Similar to using a stolen password to transfer money out of someone else's account, Huang proposes to copy and embed decryption code that he obtained elsewhere in a device that he would then use, and sell to others, to circumvent HDCP and thereby obtain access to video content traveling across a HDMI cable. Far from engaging in a form of communication with another person, this conduct simply entails allowing a preexisting automated script within the NeTVCR device to operate on another device "in an entirely mechanical way," *Vartuli*, 228 F.3d at 111. As in *Vartuli*, no First Amendment interest is conceivably implicated. *See id.*

Huang asserts a First Amendment connection in two ways, but neither suggests that Huang's intended circumvention activity qualifies as speech. First, Huang asserts that, similar to the defendants in *Corley*, he seeks to distribute or publish software—presumably containing the HDCP decryption code—that would allow others to "upgrade" devices he has already designed, called NeTV and NeTV2, which do not circumvent HDCP. Compl. ¶ 110; Huang Decl. ¶ 16. However, any dissemination of such software would not implicate § 1201(a)(1)(A), the DMCA's anti-circumvention provision, but only § 1201(a)(2), the anti-trafficking provision.[8]

_____

[8] Aside from the "upgrade" software, Huang's proposed trafficking activity—his sale of the NeTVCR device—would not qualify as speech for the same reasons explained with respect to his own use of the NeTVCR, namely, the sale of the device to others so that the embedded decryption code could operate on HDCP-protected content passing through their HDMI cables would not involve communication with another person. Moreover, any marketing of such a device would

Huang also heavily relies on the notion that his or others' subsequent use of video content that was accessed through the circumvention technology in the NeTVCR may be "fair use." *E.g.*, Compl. ¶¶ 100, 107. However, that possibility is irrelevant to the question of whether the NeTVCR's circumvention of HDCP itself implicates the First Amendment. The Supreme Court has recognized that the provision of the Copyright Act addressing fair use, 17 U.S.C. § 107, codifies an "affirmative defense" to a claim of copyright infringement under 17 U.S.C. §§ 106 or 106A. *Campbell v. Acuff-Rose Music, Inc.*, 510 US 569, 576, 590 (1994). However, § 107 provides no defense to the acts of circumvention and trafficking proscribed in § 1201(a). There is thus no statutory basis to apply a right of "fair use" when it comes to the act of circumventing access controls such as HDCP. And the Supreme Court has never recognized a free-standing First Amendment right to "fair use" independent of § 107; rather, in *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003), and *Golan v. Holder*, 132 S. Ct. 873, 890 (2012), the Court emphasized that it would not second-guess the balance that Congress struck in that provision. *E.g.*, *Eldred*, 537 U.S. at 221 (where "Congress has not altered the traditional contours of copyright protection, further First Amendment scrutiny is unnecessary").[9]

---

constitute commercial speech proposing illegal activity (others' use of the NeTVCR to circumvent HDCP), which is not protected under the First Amendment. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–64 (1980) ("The government may ban . . . commercial speech related to illegal activity."); *cf. 321 Studios v. Metro Goldwyn Mayer Studios Inc.,* 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) (rejecting First Amendment interest in marketing DVD copying software because "the CSS circumvention portion of the [plaintiff's] software is illegal"); *Cable/Home Commc'n Corp. v. Network Prods., Inc.,* 902 F.2d 829, 850 (11th Cir. 1990) (holding promotion and sale of devices that would allow unauthorized access to subscription television content was not protected by First Amendment).

[9] A statutory restriction on copying for fair use purposes might arguably implicate First Amendment concerns. Significantly, however, the DMCA omits any such restriction. *See* 17 U.S.C. § 1201(b) (prohibiting trafficking in products that circumvent copy controls but omitting any restriction on circumvention itself); *Elcom Ltd.*, 203 F. Supp. 2d at 1125 (recognizing, in connection with § 1201(b), that "while it is not unlawful to circumvent [copy controls] for the purpose of engaging in fair use, it is unlawful to traffic in tools that allow fair use circumvention.

The Court here need not address any constitutional dimension of fair use because, properly understood, § 1201(a) does not restrict fair use of copyrighted material. Rather, § 1201(a) only targets "the *circumvention* of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the *use* of those materials after circumvention has occurred." *Corley*, 273 F.3d at 443. Thus, even if the fair *use* of copyrighted material implicates First Amendment interests, there remains no basis to recognize a First Amendment right to circumvent a privately-developed access control technology, HDCP, in order to *access* a particular format of the protected content that can be manipulated, without the copyright owner's authorization. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 10–11 (1978) (plurality) (finding no constitutional violation in the denial of access to a jail for the purpose of investigating jail conditions); *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965) ("The right to speak and publish" did not confer a right to passport validation for travel with Cuba for the purpose of "gather[ing] information.").[10]

The distinction between use and access was addressed in *Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) (Bates, J.), where the court considered the plaintiffs' asserted First Amendment

---

That is part of the sacrifice Congress was willing to make in order to protect against unlawful piracy and promote the development of electronic commerce and the availability of copyrighted material on the Internet."). Instead, the DMCA expressly states that its prohibitions have no impact on the availability of a fair use defense to copyright infringement. 17 U.S.C. § 1201(c)(1). And in regard to access controls, Congress went beyond anything constitutionally required by establishing the triennial rulemaking process as a "fail-safe" to ensure any impact of § 1201(a)(1) on the "availability for use of copyrighted works" would be minimized. *See* 17 U.S.C. § 1201(a)(1)(C)(i).

[10] The Court's prior opinion suggested *Zemel*'s holding was put under strain by *First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978). That case struck down a state prohibition on corporate spending on issue advocacy, observing that the prohibition amounted to a government limitation on "the stock of information from which members of the public may draw." *See id.* at 767, 783. However, the businesses seeking to express their views in that case were not bypassing other businesses' lawfully imposed barriers to do so. Here, moreover, as discussed in detail below, far from limiting the "stock of information" available to the public, the DMCA has helped to create an environment where a plethora of audiovisual content is available on a wide variety of digital platforms.

interests in using private companies' website content in a manner that violated the companies' terms of service, but did not involve circumventing technological access controls. The court posited that the Internet, as a whole, operated as a public forum, and that the plaintiffs therefore had a First Amendment interest in using websites that were publicly available, despite any contractual "terms of service" that the websites sought to impose. *Id.* at 11–12, 17–18 ("plaintiffs neither want a special privilege of access nor seek to force websites to give them otherwise unobtainable information"). However, even under such a theory, the court recognized that "code-based restrictions, which 'carve[] out a virtual private space within the website or service that requires proper authentication to gain access,' remove those protected portions of a site from the public forum." *Id.* at 13. Thus, "breaching a site's security to evade a code-based restriction . . . remains unprotected by the First Amendment." *Id.* This is so even where the breach was intended to gather information that would facilitate speech. The court analogized such a breach to someone breaking into a locked food truck while it is parked overnight on the National Mall in order to find information about and "broadcast to the world the truck's substandard ingredients," concluding that "the First Amendment . . . does not protect those who circumvent barriers that demarcate private areas, even if those private areas are surrounded by an otherwise public forum." *Id.* at 14.[11]

Here, the act of circumventing HDCP is equivalent to breaching a secure area of a website. Indeed, such a secure area can consist not only of wholly inaccessible content, but also of limited-access content, where, for example, a visitor to a newspaper's website can read some articles but

---

[11] The *Sandvig* court's "public forum" analysis preceded the Supreme Court's decision in *Manhattan Cmty. Access Corp. (MCAC) v. Halleck*, 139 S. Ct. 2921 (2019), which underscores that private entities hosting private websites are not "public forums" subject to First Amendment scrutiny. The Government continues to dispute liability in *Sandvig* based on this issue and others. For purposes of the present case, however, the relevant point is that, as the *Sandvig* court correctly recognized, technological barriers on access are fully consistent with the First Amendment.

not others, or can read an article but cannot e-mail or download it, or can read articles only during a limited subscription time period. Such restrictions are imposed by the website's technological access controls, which implement a content owner's business decision regarding what aspects of the owner's control over its content to make available to others.[12] Even assuming that a fair use of the article, such as quoting portions of it for purposes of comment or criticism, is protected by the First Amendment, a desire to make such fair use of the article does not imbue the act of breaching the newspaper's access controls with First Amendment protection. Similarly here, the fact that someone may wish to make fair use of content that has been transmitted through an HDMI cable does not confer a First Amendment right to circumvent HDCP.

2.     **To the Extent Huang's Proposed Circumvention and Trafficking Implicate the First Amendment, § 1201(a)(1)(A) and (a)(2) Satisfy Intermediate Scrutiny As Applied To Him.**

Because Huang's proposed circumvention of HDCP, and trafficking in a NeTVCR device (with the possible exception of noncommercial communication of upgrade software), do not implicate the First Amendment, the Court can conclude that Huang is unlikely to succeed in his as-applied claims without analyzing the DMCA's provisions under intermediate scrutiny. However, should the Court reach the issue, the anti-circumvention and anti-trafficking provisions of § 1201(a) both satisfy intermediate scrutiny as applied to Huang. Under that analysis, the provisions "will be upheld so long as they further a substantial governmental interest; the interest furthered is unrelated to the suppression of free expression; and the provisions do not burden substantially more speech than is necessary to further the government's interest." *Green*, 392 F. Supp. 3d at 94; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). Where, as here, "speech

---

[12] The exclusive bundle of rights provided by copyright includes the rights of copying, distribution, display, public performance, and preparation of derivative works. 17 U.S.C. § 106.

and non-speech elements are combined in a single course of conduct, a sufficiently important government interest in regulating the non-speech element can justify incidental intrusions on First Amendment freedoms." *Elcom*, 203 F. Supp. 2d at 1127–28 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)).

      **a.**      **The Court has recognized the government's substantial interest unrelated to the suppression of free expression**.

As this Court concluded, and Plaintiffs do not dispute, the first two prongs of the intermediate scrutiny analysis are satisfied: The anti-circumvention and anti-trafficking provisions further substantial government interests, and those interests are unrelated to the suppression of free expression. *Green*, 392 F. Supp. 3d at 94. The DMCA was enacted due to "substantial fears of 'massive piracy' of copyrighted works in the digital environment." *Id.* (quoting S. Rep. No. 105-190, at 8). Thus, the government has a substantial interest in "preventing trafficking in devices and technologies that would undermine the access controls that protect copyrighted works." *Id.* Congress intended that the DMCA's anti-circumvention and anti-trafficking provisions would provide the necessary legal protection to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works," which would result in content owners' willingness to "make available via the Internet . . . movies, music, software, and literary works." S. Rep. No. 105-190, at 2.

      **b.**      **Ample evidence demonstrates that the provisions are narrowly tailored.**

The third prong of intermediate scrutiny is also satisfied. A regulation is deemed narrowly tailored for purposes of intermediate scrutiny if it "does not burden substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 665. In order to establish "necessity" in this context, the government bears the burden to show that the

government's interest "would be achieved less effectively absent the regulation." *Id.* at 662. Pursuant to the Court's prior opinion, Defendants plan to meet this burden at the summary judgment stage. However, even the evidence currently available suffices to demonstrate that Plaintiffs are unlikely to succeed on the merits, and that their Motion for Preliminary Injunction therefore should be rejected.[13] As detailed below, the government's interest in protecting copyrighted works from massive piracy in the digital age while encouraging new markets where content owners will disseminate their work in innovative ways would undoubtedly be achieved less effectively absent the DMCA's anti-circumvention and anti-trafficking provisions.

> ### i.     The evidence shows that the DMCA's provisions were necessary at the time of their enactment.

In evaluating whether a regulation is "narrowly tailored" under intermediate scrutiny, the Court "must 'accord substantial deference to the predictive judgments of Congress,' since '[a]s an institution . . . Congress is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon an issue as complex and dynamic as that presented here.'" *321 Studios*, 307 F. Supp. 2d at 1101 (quoting *Turner*, 512 U.S. at 624). By the time the DMCA was enacted, the evidence was overwhelming that the legal protections provided by the DMCA's anti-circumvention and anti-trafficking provisions were necessary in order to launch and protect the digital marketplace for copyrighted works and address the risk of "massive piracy" in the digital

---

[13] At this stage, the Court may also "rely on the sworn declarations in the record and other credible evidence in the record even though such evidence might not meet all of the formal requirements for admissibility at a trial." *AFGE v. Dist. of Columbia*, No. 05-472, 2005 WL 1017877, at *4 (D.D.C. May 2, 2005); *see Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981) (decision on a preliminary injunction may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Cobell,* 391 F.3d at 261 (same); *see also Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 325 (3d Cir. 2015) ("There is no rule in the preliminary injunction context akin to the strict rules governing the form of affidavits that may be considered in summary judgment proceedings.").

age. S. Rep. No. 105-190, at 2–8 (describing years-long effort, involving task forces, working groups, and extensive hearings, to address the challenges of digital technology, resulting in DMCA).[14] At that time, DVDs had only recently been developed. *See Universal City Studios Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 309 (S.D.N.Y. 2000).[15] This new technology would allow movie studios and others to commercially distribute films and other copyrighted video content in a higher quality format than had previously existed. *Id.* But at the same time, it "brought with it a new problem—increased risk of piracy by virtue of the fact that digital files, unlike the material on video cassettes, can be copied without degradation from generation to generation." *Id.*; *see also* Marks, *supra*, at 563 (identifying the "serious challenge" faced by content owners trying to protect their copyrighted work "in a world where: (i) duplication is easy and inexpensive, (ii) every copy made (whether from the original or another copy) is perfect, and (iii) distribution to users around the world can be accomplished virtually cost-free and immediately over the Internet").

---

[14] *See also, e.g.,* WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary, 105th Cong. (1997); NII Copyright Protection Act of 1995: Hearings on H.R. 2441 Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary, 104th Cong. (1996); NII Copyright Protection Act of 1995: Joint Hearing on H.R. 2441 and S. 1284 Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary and the Senate Comm. on the Judiciary, 104th Cong. (1995); H.R. Rep. No. 105-551(I) & (II) (1998).

[15] Significantly, *Reimerdes* was filed and decided soon after the DMCA's enactment and involved a digital technology that was of great concern at the time. Dean S. Marks & Bruce H. Turnbull, *Technical Protection Measures: The Intersection of Technology, Law and Commercial Licenses*, 46 J. Copyright Soc'y U.S.A. 563, 575 n.7, 578–79 (1999). The court's findings in that case regarding the nature of DVDs and their utility to the motion picture industry as a means of distributing films in digital format, the DeCSS decryption code, and the discussions that took place leading up to the DMCA's enactment at this point are either generally known or historical in nature, and thus "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Ev. 201(b). The Court therefore can take judicial notice of those factual findings in this case. *See Reimerdes*, 111 F. Supp. 2d at 305 & n.4 (taking judicial notice of facts set forth in *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999), regarding how computers operate); *see also 321 Studios,* 307 F. Supp. 2d at 1089 (providing facts about DVDs and CSS).

In 1996, a TPM known as CSS was adopted to protect content on DVDs. *Reimerdes*, 111 F. Supp. 2d at 309. However, both content owners and lawmakers concluded, following extensive discussion in international fora including the Global Business Dialogue on Electronic Commerce (GBDe) and WIPO conferences as well as in Congressional hearings during this period, TPMs alone are insufficient. *E.g.*, Marks, *supra*, at 567–69; S. Rep. No. 105-190, at 8. Indeed, the risk of piracy was so great that content owners were unwilling to engage in wide-scale dissemination of their work in this format absent legal protections in place to prohibit TPM circumvention. Declaration of C. Brendan S. Traw ("Traw Decl.," attached hereto[16]) ¶¶ 3, 8 ("[M]embers of the motion picture industry made it clear they would not disseminate their valuable copyrighted movie content in the DVD format without adequate protection against infringing serial copying," and because "an experienced and well-resourced hacker could ultimately defeat any protection system, . . . legal protections were needed to pick up where technology left off"); S. Rep. No. 105-190, at 2, 8 (recognizing that, "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy," and that the law therefore "must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials"); Marks, *supra*, at 578–80 (describing film studios' reluctance to release content on DVDs, early discussions to address this problem, and recognition that both "technical and legal protections" were needed).

The WIPO Copyright Treaty, adopted after a December 1996 international diplomatic

---

[16] The Traw Declaration and the Declaration of Stephen P. Balogh ("Balogh Decl.", also attached hereto), were provided by proposed amici curiae Intel Corporation and Digital Content Protection L.L.C. *See* ECF 31. Because the proposed amici asked for leave to submit their brief by a date after Defendants' filing deadline, and their motion has not yet been granted, Defendants have attached the declarations as part of the record in this case so that they can be cited herein.

conference, required signatories to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights." *Reimerdes*, 111 F. Supp. 2d at 315–16. The treaty was signed by the United States in April 1997, WIPO Copyright Treaty, *supra*, and the DMCA was enacted in 1998, Pub. L. No. 105-304, Title I, § 103(a) 112 Stat. 2863. As Congress recognized, the DMCA would provide necessary legal protection and thus "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works," which would result in content owners' willingness to "make available via the Internet . . . movies, music, software, and literary works." S. Rep. No. 105-190, at 2; *accord* H.R. Rep. No. 105-551(I), at 9–10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet."). Movie studies began distributing films on DVDs, encrypted with CSS, at around the same time. *Reimerdes*, 111 F. Supp. 2d at 310.

The events that ultimately led to the Second Circuit's decision in *Reimerdes*/*Corley* dramatically illustrate the reality of the risks and the necessity of the DMCA's protections. By 1999, just as content owners and Congress had foreseen, DeCSS, a software program allowing the circumvention of CSS encryption on computers running the Windows operating system, had been developed and posted online. *Reimerdes*, 111 F. Supp. 2d at 311. Although the individual who first developed DeCSS claimed he had only wanted to "make a DVD player that would operate on a computer running the Linux operating system," it was undisputed that, once DeCSS was posted online, it could be used to decrypt any CSS-encrypted DVD on Windows, and users could then access the entire content of the DVD for any use they wished, including sharing the content with others who had no legal right to access it. *Id.* The defendants in the case had created a web site

offering DeCSS for download, and providing links to mirror sites. *Id.* at 312.[17]  The district court

found that the effect of making DeCSS publicly available "is reasonably plain," and that DeCSS

was "a free, effective and fast means of decrypting [the plaintiff content owners'] DVDs and

copying them to computer hard drives," which "compromised [the] plaintiffs' system of copyright

protection for DVDs, requiring them either to tolerate increased piracy or to expend resources to

develop and implement a replacement system unless the availability of DeCSS is terminated." *Id.*

at 315. The court concluded that the plaintiffs had been "gravely injured," *id.*, and that "broad

dissemination of DeCSS threatens ultimately to injury or destroy [the] plaintiffs' ability to

distribute their copyrighted products on DVDs and, for that matter, undermine their ability to sell

their products to the home video market in other forms," *id.* at 334. Thus, the court estimated that

"[t]he potential damages probably are incalculable." *Id.*

The *Corley* case thus exemplifies the DMCA's necessity, making clear that the risks posed

by decryption technology are real, and that the government's interests would be harmed absent the

DMCA's prohibitions. The court concluded that the DMCA's anti-trafficking provision satisfied

intermediate scrutiny, and particularly the narrow tailoring prong, because the "incidental restraint

on protected expression" was not "broader than is necessary to accomplish Congress' goals of

preventing infringement and promoting the availability of content in digital form." *Id.* at 330. The

court then enjoined the defendants from posting DeCSS on their website, and from posting

hyperlinks that would allow DeCSS to be downloaded. *Id.* at 343–44. On appeal, the Second

Circuit affirmed that both injunctions satisfied intermediate scrutiny. *Corley*, 273 F.3d at 455–57.

---

[17]  In fact, the computer code appeared at the end of an online article that the defendant Corley had
written about DeCSS, as a journalist, for a magazine targeted at hackers. *Corley*, 273 F.3d at 439.
Corley claimed that the code was an essential part of the article because "people want to see
specifically what it is that we are referring to." *See id.*

In more recent hearings, members of Congress as well as witnesses have pointed out that the balance struck by the DMCA has served its purpose in allowing markets in new technologies, such as mobile apps, streaming services, video games, and ebook lending libraries, to thrive. Chapter 12 of Title 17, Hearing Before the Subcomm. On Courts, Intellectual Property, and the Internet of the House Comm. on the Judiciary, 113th Cong., 2d Sess. (Sept. 17, 2014).[18]  A report issued by the Copyright Office, following a comprehensive study including public input, also concluded that the DMCA has largely been successful.[19]

ii.     **The evidence shows that the DMCA's provisions are also necessary as applied to Huang's proposed circumvention and trafficking.**

Huang's proposed circumvention and trafficking activity strikes at the heart of today's

---

[18] *See id.* at 2 (Rep. Nadler) ("The DMCA has . . . . . . encourage[d] the creation of new digital works and has allowed authors a way to protect against copyright infringement while also . . . le[a]d[ing] to a long period of innovation and benefits for consumers."); *id.* at 4 (Rep. Conyers) ("Chapter 12 . . . . strengthens our copyright system by cultivating innovative business models that encourage the lawful dissemination of copyrighted works to the public."); *id.* at 20–21 (Jonathan Zuck, President, the App Association) (pointing to "near constant innovation in content consumption, delivery and creation," in new streaming services as well as apps, as evidence that the DMCA, through its protection of TPMs, "has created an environment in which these things are possible"); *id.* at 28 (Christian Genetski, Entertainment Software Ass'n) ("The evolution of the video game industry over the last 15+ years reflects a DMCA success story . . . ."); *id.* at 69–75 (Sandra Aistars, CEO, Copyright Alliance) (independent artists benefit from DMCA's legal protections in conjunction with TPMs to "experiment with new business models" to engage with and reach new audiences for their work); *id.* at 126 (Ass'n of American Publishers) ("eBook subscription services and library lending programs" are another example of how "meaningful protection of TPMs incentivizes creators to embrace digital technology to increase consumer choice in accessing copyrighted works"). As explained by Mr. Genetski, "the DMCA plays a critical role" because "people understand that it is unlawful to hack these TPMs," and although TPMs "inevitably" fail on their own, the law acts "as a backstop." *Id.* at 81. Moreover, free trade agreements with other countries currently in effect are tied to the DMCA. *See id.* at 77 (Genetski).

[19] *See generally* USCO Report, *supra*. For example, in regard to the DMCA's goal to prevent piracy, the report concluded that the anti-trafficking provision has helped to "prevent[] circumvention tools from becoming available in legitimate outlets such as Best Buy or Amazon," thus "prevent[ing] such tools from acquiring . . . legitimacy in the public mind" and "prevent[ing] the development of mainstream business models based around the production and sale of circumvention tools." *Id.* at 51, 56.

digital audiovisual content marketplace. In 2017, as part of the Seventh Triennial Rulemaking, Huang submitted a petition regarding HDCP for the first time. Unlike typical petitions seeking exemptions from § 1201(a)(1)(A) for a specific noninfringing use, Huang's petition focused on the access control that he seeks to circumvent: He sought an exemption in order to circumvent HDCP for the general purpose of "mak[ing] noninfringing uses of audiovisual works that" are transmitted over HDMI connections and are protected by HDCP. Huang Pet'n, at 2. As described in the Complaint and Huang's declaration, his proposed circumvention of HDCP would be carried out using his NeTVCR device, and he proposes to publish software for and market that device for widespread dissemination. Compl. ¶¶ 90–93, 102, 107; Huang Decl. ¶¶ 16–23. Significant evidence was provided in the course of the Rulemaking showing that Huang's proposed circumvention, if allowed, would pose enormous risks to digital content marketplaces.[20]

HDCP "is the industry standard for protecting audiovisual works in transit to a display device." 83 Fed. Reg. at 54027; *cf.* Traw Decl. ¶¶ 11–13. HDCP is critically important to a vast array of content distribution methods that currently support robust markets in digital content, services, and technology. Joint Creators II Class 4 Opp'n at 15–16[21]; ESA Class 4 Opp'n at 2–5; DCP Class 4 Opp'n at 3. As the standard access control for all copyrighted audiovisual content passing over HDMI cables, HDCP protects content offered through cable and satellite subscription

---

[20] Publicly-available records of administrative proceedings are admissible. F.R.E. 803(8)(C). The Court can also take judicial notice of such material. *See CREW v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (public records can be judicially noticed); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed.").

[21] Proposed exemptions are grouped according to the USCO's designation. USCO designated Huang's proposed exemption as Class 4. 83 Fed. Reg. at 54027. The USCO also separately designated as Class 3 a requested exemption that would allow circumvention of TPMs for the purpose of "space-shifting" (transferring a work "from one storage medium to another, such as from a DVD to a computer hard drive"). *Id.* at 54026. The comments in opposition to the proposed exemptions at issue in the Seventh Triennial Rulemaking are organized by Class and available at https://www.copyright.gov/1201/2018/comments-021218/.

and on-demand television services such as Comcast, Verizon Fios, and DIRECT TV; online streaming services such as Hulu, Netflix, and Amazon Prime Video; network mobile apps, such as HBO NOW; digital rental retailers, such as iTunes, Google Play, and Vudu; and video game consoles sold by Microsoft, Sony, and Nintendo. Balogh Decl. ¶ 4; Joint Creators II Class 4 Opp'n at 6–9; ESA Class 4 Opp'n, at 3–4; *see also* Joint Creators II Class 3 Opp'n at 6–11 (further discussing evolving options in the digital audiovisual content marketplace). Content on DVDs that is protected by CSS—the access control at issue in *Corley*—as well as content on Blu-ray discs protected by the Advance Access Content System ("AACS") and Ultra HD discs protected by AACS2, can also be transmitted from DVD and Blu-ray players and laptops to other devices, such as monitors or televisions, through HDMI cables. Joint Creators II Class 4 Opp'n at 9–10. Thus, HDCP "serves as the last link in the chain of protection" for this content. *Id.* at 10; *see also* DVD CCA & AACS Class 4 Opp'n at 2–3.

As a device designed to circumvent HDCP, Huang's NeTVCR would enable unrestricted access to all the content described above, for any purpose, including piracy and other infringements of copyright. The fact that the device would include recording and format-conversion functionality, Huang Decl. ¶¶ 14–15, would certainly facilitate the ability to engage in piracy. Although Huang claims that he intends to make only noninfringing uses of content accessed through NeTVCR, and he intends his customers to do the same, "Huang does not dispute that [his proposed circumvention] could permit virtually anything displayable on a modern television screen to be recorded in the clear and made available online[.]" Register's Recommendation, at 143; *see also* DCP Class 4 Opp'n, at 11 ("[T]he end result of circumventing HDCP would be an in-the-clear copy of entire works originally protected from infringing distribution. As history teaches, once a copy is available in the clear, massive online infringement is inevitable and the

28

negative effect on the market for the work will be substantial."); Balogh Decl. ¶ 5 ("If publication of hacking material for HDCP or products like a NeTVCR (as proposed here) are permitted, the effect would be to eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement."); *accord* Traw Decl. ¶ 14.

There can be no doubt that the government's substantial interests "would be achieved less effectively" if the provisions of § 1201(a) did not apply to Huang's proposed conduct. *See Turner*, 512 U.S. at 662. The situation here is directly parallel to that in *Corley*, where the DeCSS code posted online would similarly allow such piracy and threaten developing markets in DVD content, in a manner that the trial court deemed "incalculable," *Reimerdes*, 111 F. Supp. 2d at 335, but the risk to the "global digital on-line marketplace for copyrighted works," S. Rep. No. 105-190, at 2, posed by Huang's proposed circumvention and trafficking is exponentially greater, in light of the growth in the digital content marketplace that has already occurred, at least in part in reliance on the DMCA's legal protections, and the large number of platforms that would be affected. *See* Register's Recommendation at 143 ("[O]pponents raise a serious concern that the exemption, if granted, could potentially compromise a distribution system for audiovisual content that has matured seemingly in part due to the protections offered by section 1201."); Balogh Decl. ¶ 5 (citing issuance of "tens of billions of HDCP encryption and decryption keys").

In the Seventh Triennial Rulemaking, opponents of Huang's proposed exemption described the negative impact it would have on existing markets. For example, "video-on-demand business models based on charging lower prices for time-limited access to movies are undermined when end users can create complete digital copies of transmitted works to add them to their permanent digital libraries while paying only for temporary access. . . . This would harm consumers, who benefit from having lower-priced options available in the marketplace." Joint

Creators II Class 4 Opp'n at 5–6; *see also* ESA Class 4 Opp'n at 9. The Register summarized the concerns expressed by creators and distributors of audiovisual works that "widespread circumvention could flatten market distinctions between live and scheduled broadcasts, subscription and ad-based streams, and rentals and purchases because all could be captured, copied, and circulated." Register's Recommendation at 143 (concluding that "[b]ased upon the record, the proposed activities may well have a negative effect on the market for or value of copyrighted works").

Plaintiffs' argument that the government's interests are sufficiently protected by pre-DMCA copyright law because "actual copyright infringers can still be punished," Pl. Mem. at 24, 27, misses the mark. As described in detail above, the DMCA was enacted to address specific challenges that arose from the nature of digital content and the Internet, and its necessity is amply demonstrated by the proceedings in *Corley*, as well as by the growth of the digital marketplace that Congress hoped to foster.

While the government's substantial interests would be harmed absent the DMCA's application to Huang, the burden on protected speech here is low. Even if Huang could identify a protected speech interest in his proposed acts of circumvention and trafficking, the interest is minimal, deriving solely from his application of preexisting decryption code to circumvent HDCP. And although Huang also seeks to rely on his and his potential customers' interest in making fair use of content protected by HDCP, that reliance is misplaced.

As an initial matter, Huang's factual assertions do not establish that his proposed uses, much less those of future customers not yet identified, qualify as fair use. Because fair use is an equitable doctrine, "'no generally applicable definition is possible, and each case raising the question must be decided on its own facts.'" *Am. Soc'y for Testing & Materials, et al. v. Pub.*

*Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)). As the Second Circuit found when addressing the defendants' similar arguments in *Corley*, Huang provides no evidence regarding the DMCA's actual impact on "prospective fair users" other than himself. *See Corley*, 273 F.3d at 459. Moreover, the Register, considering the same descriptions in Huang's petition, was unable to determine that Huang's own proposed uses would be noninfringing. Register's Recommendation at 132–37. To the contrary, many of his proposed uses appear likely to be infringing. For example, making translations or subtitling has been described by one circuit as a "[p]aradigmatic example[] of [a] derivative work[]" that "do[es] not involve the kind of transformative purpose that favors a fair use finding." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015) (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014)); *cf. Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72–73 (2d Cir. 1999). Additionally, courts have been markedly skeptical of whether space- and format-shifting are fair uses. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 862 (9th Cir. 2017) ("reported decisions unanimously reject the view that space-shifting is fair use"); *Fox News Network, LLC v. TvEyes, Inc.*, 883 F.3d 169, 177–81 (2d. Cir. 2018); *Corley*, 273 F.3d at 459. And such uses have been routinely denied their own circumvention exemption. 2018 Recommendation at 136–37; *see also id.* at 111–28 (discussing proposed space-shifting exemption request).

Aside from such questions, as discussed above, there is no First Amendment right to circumvent HDCP in order to make fair use of the underlying content. Moreover, as the court in *Corley* recognized, fair use itself "has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original." *Corley*, 273 F.3d at 459. Thus, "[a] film critic making fair use of a movie by quoting selected lines

of dialogue has no constitutionally valid claim that the review (in print or on television) would be technologically superior if the reviewer had not been prevented from using a movie camera in the theater, nor has an art student a valid constitutional claim to fair use of a painting by photographing it in a museum." *Id.* To the extent Huang's proposed uses are noninfringing, a variety of options are available to him and others, to make such uses without circumventing HDCP or using a NeTVCR sold by Huang. Throughout the Seventh Triennial Rulemaking, as well as in the Balogh Declaration, industry commenters have provided substantial evidence of numerous circumvention alternatives, including Huang's own NeTV device. *See, e.g.*, Joint Creators II Class 4 Opp'n at 4, 6–10, 13–15; ESA Class 4 Opp'n at 3–7; DCP Class 4 Opp'n at 4–9 & ex. A; Balogh Decl. ¶ 6 & ex.A. As the Acting Register concluded:

> Opponents set forth a number of concrete examples of potential alternatives to circumvention that Huang fails to meaningfully challenge.  For example, Huang fails to explain why using an existing laptop, smartphone, or tablet while watching TV, or even having multiple windows open on a computer, is an inadequate alternative to picture-in-picture, split screen, and certain rescale uses.  While Huang argues that his NeTV device cannot create transparent overlays, he fails to explain why the opaque overlays that the NeTV *does* generate are inadequate for many of the described uses, such as smart home and home assistant messages, reminders, and alerts.  Huang also fails to describe why current DVRs on the market, along with the myriad download, rental, streaming, on-demand, disc-to-digital, locker, and remote access options offered by copyright owners . . . are inadequate for his needs.

2018 Recommendation at 140. Nor is Huang burdened in continuing his research. *See* Pl. Mem. at 11. Nothing prevents him from bypassing HDCP on the numerous and widely available public domain audiovisual works that are not protected by the statute. *See* 17 U.S.C. § 1201(a)(1)(A) (pertaining to "work[s] protected under this title"). Section 1201(a) therefore "does not burden substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 665.

Plaintiffs point to Huang's assertion that he wishes to circumvent HDCP "on videos that

he possesses lawfully," and that the NeTVCR is "aimed at consumers who already have *lawful* access to HDCP-protected digital videos." Pl. Mem. at 23, 27. But as just described, the business models followed in the existing digital content marketplace presuppose that a user's "lawful" access or possession will not confer total, permanent access. *Cf. 321 Studios*, 307 F. Supp. 2d at 1096 ("This Court agrees with the Corley court that the purchase of a DVD does not give to the purchaser the authority of the copyright holder to decrypt CSS."). At least in part because of the DMCA, copyright owners now offer consumers different options to access content with varying terms and pricing. For example, movies are generally offered both for permanent purchase and short-term rental, with the latter costing less than the former. If everyone who obtains lawful access to a short-term rental could then circumvent HDCP to record and keep the film forever, the market for permanent purchases would collapse, along with the current variety of consumer choices that § 1201 helped foster. Similarly, if those who purchase copies, whether short-term or permanent, could make and disseminate "in the clear" copies to everyone, all current digital content markets, premised on the right of copyright owners to control distribution, would suffer. *Cf. Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 663 (2d Cir. 2018) (recognizing "substantial harm" that is inflicted "on the value of . . . copyrights through . . . direct competition in the rights holders' legitimate market, offering consumers a substitute for purchasing from the rights holders"), *cert denied*, 139 S. Ct. 2760 (2019). Application of § 1201(a) to Huang therefore satisfies intermediate scrutiny, and Huang is not likely to succeed on the merits of his as-applied challenge.

**C.    Section 1201(a)(2) Does Not Violate the First Amendment As Applied To Green**

**1.    An Academic Publication About Security Research Would Not Ordinarily Be Prohibited Under § 1201(a)(2)**

Plaintiff Green also cannot establish a likelihood of success in his as-applied First

Amendment challenge to the DMCA's anti-trafficking provision in § 1201(a)(2). As Green concedes, in light of the permanent exemption for security research in § 1201(j) as well as exemptions granted in the Seventh Triennial Rulemaking, 83 Fed. Reg. at 54014, 54025–26, he is able to conduct security research without violating the DMCA's anti-circumvention provision in § 1201(a)(1)(A). However, Green claims he is affected by the anti-trafficking prohibition in § 1201(a)(2) because he "wishes to publish an academic book that contains circumvention instructions, including computer code." Pl. Mem. at 19 (citing Green Decl. ¶¶ 20–25).

An academic book or article about security research would not ordinarily be prohibited under § 1201(a)(2). In order to fall under the ambit of the anti-trafficking prohibition, a publication would have to satisfy one of the three criteria set forth in § 1201(a)(2)(A)–(C). Specifically, the publication would have to be considered a "product . . . that (A) is primarily designed or produced for the purpose of circumventing a [TPM] that effectively controls access to a [copyrighted work]"; (B) "has only limited commercially significant purpose or use other than to circumvent" such a TPM; or (C) "is marketed . . . for use in circumventing" such a TPM. 17 U.S.C. § 1201(a)(2). Academic publications typically are not primarily produced for the purpose of circumventing TPMs, so as to fall under § 1201(a)(2)(A); instead, they are produced for academic purposes, such as instruction or contributing to a field of research. In addition, to the extent an academic publication has a commercially significant purpose or use, it is generally not to enable circumvention of a TPM, so as to fall under § 1201(a)(2)(B), nor are academic publications typically marketed as circumvention tools, such that they would fall under § 1201(a)(2)(C). Indeed, as an Associate Professor at Johns Hopkins University, Green has published numerous papers and articles, none of which apparently subjected him to liability under § 1201(a)(2).[22]

_____

[22] The Court can take judicial notice of Green's faculty page on the Johns Hopkins University

It is far from clear, based on Green's description of his proposed book, that its sale would qualify as "trafficking" under § 1201(a)(2). Inquiry into whether an activity falls within § 1201(a)(2) is fact-specific, yet the Complaint's sparse descriptions of Green's planned book are devoid of any factual assertions that would bring the book within the ambit of the anti-trafficking provision. *See* Compl. ¶¶ 75 (merely asserting that Green "would like to include detailed information regarding how to circumvent security systems in his book, and expects to earn royalties on the book's sale"), 112 (asserting Green "seeks to publish a book that would educate readers about how to circumvent access controls on copyrightable software").

Green's declaration similarly fails to allege that his book is primarily intended to be used to circumvent the TPMs that the code excerpts would relate to, or that it would be marketed or considered commercially significant for that purpose. Instead, Green alleges that he wishes "to include examples of code . . . for readers to learn from" and to "demonstrate vulnerabilities in various protocols" so that readers could improve their own security researching skills, or learn how to design computer systems without the same flaws that he has previously identified. Green Decl. ¶¶ 20, 23. He also claims he wishes his readers to "repeat [his] steps and circumvent the same security measures" he has circumvented during his security research, so that other scholars can check and "build upon" his work, and that he wishes to "highlight" the book's "detailed information" when marketing it because those details would be "part of what makes it an effective book for teaching a person how to engage in cutting-edge security research." *Id.* ¶¶ 21–22, 25. However, these allegations do not suggest that the primary purpose of his book is to enable

---

website, available at https://isi.jhu.edu/~mgreen/, which lists his academic papers and publications. Many of them appear to be focused on security research. *E.g.*, Dancing on the Lip of the Volcano: Chosen Ciphertext Attacks on Apple iMessage; Forward Secure Asynchronous Messaging from Puncturable Encryption; Security Analysis of a Cryptographically-Enabled RFID Device.

circumvention or that it would be marketed "for use" in circumvention. Green's claimed broader academic purpose, and his identification of the book as a textbook that would presumably be marketed for educational purposes—the very attributes that he uses to justify his opposition to the DMCA—challenge the notion that his book would fall within § 1201(a)(2).[23]

The situation here appears to be distinct from that in *Corley*, where one of the defendants had published an article on a website affiliated with a hackers' magazine and attached a copy of the DeCSS code to the article. *Corley*, 273 F.3d at 438. In that factual scenario, the posted article with DeCSS code clearly qualified as a product designed to circumvent CSS. The obvious consumer demand for such a product, which would allow people to access and disseminate movies and other DVD content free of charge, further supports the notion that its posting was intended to meet that demand by allowing circumvention of CSS. Here, in contrast, Green, by his own description, is an academic engaged in good faith security research, whose book would be for educational and research purposes.

### 2. To the Extent Green's Book Is Subject To § 1201(a)(2), the Provision's Application To Green Satisfies Intermediate Scrutiny

To be sure, to the extent Green would include in his book code that would allow circumvention of a version of HDCP, and to the extent he were to market the book so as to reach a non-academic audience and to draw attention to its potential use for circumvention purposes,

---

[23] The Court previously held that Green had adequately established standing at the pleading stage because he had "sufficiently alleged that [his] proposed course of conduct is arguably proscribed by the DMCA." *Green*, 392 F. Supp. 3d at 82. Beyond the pleading stage, however, Green's burden to establish standing increases. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (at summary judgment, a plaintiff "can no longer rest on . . . mere allegations, but must set forth . . . specific facts" establishing standing (internal quotation omitted)). If Green's proposed book will not fall within any of the categories set forth in § 1201(a)(2)(A)–(C), the book's publication would not be proscribed by § 1201(a)(2), and Green would lack standing to challenge the anti-trafficking provision.

Green Decl. ¶¶ 20, 25, Green's conduct would more closely resemble that in *Corley*, and may give rise to questioning his assertions about good faith security research and the academic purpose of his book. *See* DOJ Comments (June 28, 2018) (security research "for the purpose of discovering security holes in software in order to exploit them for illicit financial gain rather than to improve security generally" would not be considered in "good faith" and thus could result in criminal or civil liability).[24]   Conceivably, in such a case, Green's book might meet one of the required criteria in § 1201(a)(2)(A)–(C), and if so, then distribution of the book would violate § 1201(a)(2). In such a scenario, the provision would satisfy intermediate scrutiny as applied to him.

In such a case, the DMCA's anti-trafficking prohibition would be sufficiently narrowly tailored for the same reasons explained with respect to Huang. As described above in the context of Huang's NeTVCR device, failing to apply the DMCA to the distribution of a book containing decryption code that would allow readers to circumvent HDCP, or other decryption codes likely to be used by readers primarily for the purpose of circumventing TPMs protecting access to copyrighted works, would undermine the government's substantial interests in preventing piracy and facilitating the growth of marketplaces that require protection of underlying copyrighted content in order to flourish. The same evidence discussed above therefore demonstrates that the government's interest here "would be achieved less effectively absent the regulation." *Turner*, 512 U.S. at 662.[25]   Indeed, although intermediate scrutiny does not require that the government use the

---

[24] These comments were submitted during the Seventh Triennial Rulemaking and are available at https://www.copyright.gov/1201/2018/USCO-letters/.

[25] Green asserts that for "many types of devices," there is no "separate market" for the TPM-protected software that his "circumvention instructions" would allow users to access. Green Decl. ¶ 24. However, as described above, consumer interest in circumvention may be driven by the underlying product that the TPM is protecting, and Green offers no basis to conclude that device-enabling software is somehow immune from piracy. Nor does he address the market harm to copyrighted security software that would arise if a circumvention tool were widely available. Moreover, to the extent Green seeks to disseminate instructions to decrypt HDCP 2.0, *see* Green

least restrictive means to achieve its interest, *BellSouth Corp. v. FCC*, 144 F.3d 58, 70 (D.C. Cir. 1998), here Plaintiffs have not identified *any* other means that would be less restrictive of speech but equally effective in preventing piracy and protecting digital markets. For example, Plaintiffs "have not suggested, much less shown, any technique" that would prevent the use of code published in Green's book for circumvention purposes, or that would prevent someone from taking the code published in Green's book and posting it online. *Cf. Corley*, 273 F.3d at 454.

In addition, as with Huang, the burden imposed on Green's speech is minimal because the First Amendment interests that he identifies can be satisfied in other ways that would not violate § 1201(a)(2). The DMCA's anti-trafficking provision does not prohibit the publication of all academic textbooks on security research. Rather, it would apply to Green's proposed book only if the book qualifies as a "product" that meets one of the criteria set forth in § 1201(a)(2)(A)–(C). Even assuming Green's book would qualify as such a product if it includes functional decryption code that would permit circumvention of a TPM like HDCP, the DMCA would not prohibit publishing a nearly-identical book that omitted those excerpts. Green fails to identify any burden that omitting such excerpts of functional computer code would impose on his own First Amendment interests.

Plaintiffs' attempt to explain why Green's book needs to include functional decryption code excerpts largely relies on the asserted interests of others in receiving this information. *See* Pl. Mem. at 19–20; Green Decl. ¶¶ 21–23. However, Green fails to identify a genuine interest in making publicly available a decryption code excerpt specifically designed to circumvent a TPM. For example, Green claims that specific code excerpts are helpful to those learning how to conduct

---

Decl. ¶ 20, his activities would implicate the countless audiovisual works protected by that technology, for which there clearly is a robust market. *See* Balogh Decl. ¶¶ 4–5.

security research. However, the book could contain examples of code without including an extensive fully functional excerpt of code designed to circumvent HDCP or another similar TPM.[26]

Green also argues that publishing the code would allow others to check his work, essentially as a quality control measure, Green Decl. ¶ 21. However, Green fails to explain why such a goal requires him to publish decryption code in a book, available to the general public. Elsewhere in his declaration, Green explains that he already "communicate[s] confidentially" with other professors and researchers, who presumably could serve as peer reviewers in evaluating the accuracy of his results. Green Decl. ¶ 13. Moreover, publishing fully functional decryption code in a book would seem a particularly questionable way to seek verification from other security researchers, given that, by Green's own description and according to other security researchers' testimony during the triennial rulemaking process, standard procedure for good faith security research requires consideration of responsible approaches to disclosure, such as making a limited "coordinated disclosure" of vulnerabilities to the product owner prior to any general public disclosure.[27]

Green's further assertion that other researchers need to see Green's decryption code in order to identify "additional security flaws that [Green] might have missed," *id.* ¶ 22, again does

---

[26] Papers and publications listed on Green's faculty page do appear to contain code. However, given Green's assertion that the DMCA prevents him from publishing any work that would be prohibited under § 1201(a)(2), either those excerpts do not allow circumvention or the publications do not satisfy any of the criteria set forth in § 1201(a)(2)(A)–(C). Either way, they demonstrate that Green is able to publish articles about security research that contain code without violating § 1201(a)(2).

[27] *See* Green Decl. ¶ 13; *see also, e.g.*, U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding, Recommendation of the Register of Copyrights 258 (noting Green's argument that harm to copyright owner would be avoided through coordinated disclosure with company), 276 (noting researchers' argument that "good-faith security researchers already follow various best-practice disclosure guidelines and standards"), 277 & n.1873 (noting petition by academic security researchers to incorporate disclosure standards promulgated by the International Organization for Standardization into exemption), https://www.copyright.gov/1201/2015/ .

not explain why the information must be conveyed in a generally available book, rather than confidentially to others working on research in the same area, nor does Green provide any evidence that awareness of certain flaws in a TPM actually facilitates the identification of other flaws. It is also unclear why publication of decryption code is necessary for those who design computer systems to learn how to design TPMs "that do not contain the kinds of flaws that [Green has] discovered," *id.* ¶ 23; Green instead could simply describe the flaw, and could even describe how he circumvented it, without including functional code specifically designed to circumvent the TPM, or again he could communicate confidentially with designers. Application of § 1201(a)(2) to Green therefore "does not burden substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 665. Green thus is unlikely to succeed in his as-applied First Amendment challenge to § 1201(a)(2).

## II.  PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM WARRANTING EMERGENCY RELIEF

Aside from the merits, Plaintiff cannot clear this Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, "unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush,* 355 F. Supp. 2d 265, 292 (D.D.C. 2005).

Here, Plaintiffs' delay in seeking emergency relief "weighs against a finding of irreparable harm." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank*, 840 F. Supp. 2d 327, 338–39 (D.D.C. 2012). Plaintiffs initially waited over two months from the time they filed their Complaint, on July 21, 2016, to seek a preliminary injunction, and at that time sought the injunction only on behalf of Green. ECF 16 (filed Sept. 29, 2016). Although the Court stayed consideration of the injunction

sought on behalf of Green, it did not prohibit Huang from seeking a preliminary injunction at any point, if circumstances warranted. *See* Minute Order of Sept. 30, 2016. Yet Huang waited over three years from the time this case was filed before seeking any form of emergency relief. ECF 30 (filed Sept. 19, 2019). Plaintiffs fail to identify any change in circumstances that justified their initial delay, let alone any change that would suddenly give rise to a need for emergency relief on Huang's part three years later.

Plaintiffs' assertion of irreparable harm relies entirely on the notion that a First Amendment violation is a *per se* irreparable harm. Pl. Mem. at 28. But Plaintiffs have not shown they are likely to succeed on their as-applied First Amendment claims and thus cannot demonstrate irreparable harm on that basis.

Nor have Plaintiffs demonstrated irreparable harm independent of the presumed harm of a First Amendment violation. Plaintiffs generally argue that there will be a delay in the publication of Green's book, and the distribution of Huang's NeTVCR device. Pl. Mem. at 28–29. However, Plaintiffs do not explain why such harm would be irreparable. Unlike *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016), the only case cited by Plaintiffs, where the plaintiff was facing the prospect of losing the chance to include candidates' names on its website or in its social media postings during the current election cycle, *see id.* at 511, Plaintiffs identify no deadline or opportunity that might be missed absent preliminary emergency relief. Moreover, to the extent Plaintiffs intend to get Green's book published, and Huang's NeTVCR distributed, before this case is fully adjudicated, based solely on a preliminary injunction, that is all the more reason to deny Plaintiffs' Motion, as Plaintiffs do not explain how those actions could be reversed should Defendants ultimately prevail, particularly once the book and NeTVCR are in the hands of third parties beyond the Court's jurisdiction.

41

III.  **THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN THE GOVERNMENT'S FAVOR AND AGAINST AN EMERGENCY INJUNCTION**

Along the same lines, the balance of equities and the public interest do not favor an emergency injunction under the circumstances here. "In exercising their sound discretion" when deciding a motion for preliminary injunction, "courts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. at 24 (internal quotation and citations omitted). With respect to these factors, Plaintiffs simply repeat their argument that First Amendment violations are harmful per se and assert that the Government would face no harm if its enforcement of the DMCA is enjoined because, they contend, the DMCA is unnecessary. Again, because Plaintiffs have not established a likelihood of success in their as-applied First Amendment challenges, these arguments fail. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 82–83 (D.D.C. 2013) (holding public interest factor weighed against injunction when plaintiffs were unlikely to succeed on the merits), *aff'd after reh'g en banc*, 760 F.3d 18 (D.C. Cir. 2014).

Moreover, both the government and the public have a strong interest in the enforcement of laws passed by Congress and signed by the President. "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors,* 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). Here, in addition, the equities and public interest favor preventing dissemination of products— Huang's NeTVCR and Green's book (assuming its publication would qualify as trafficking under § 1201(a)(2))—that would lead to massive piracy and disturb the digital marketplaces that have flourished since the DMCA's enactment. Significantly, in *Corley*, the court entered a preliminary injunction *against* the parties violating the DMCA's anti-trafficking provision, given the

immeasurable harm that would result from the continued online posting of DeCSS on the Internet. *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 215, 227 (S.D.N.Y. 2000). These factors therefore weigh against an injunction.

## IV.    PLAINTIFFS' REQUESTED INJUNCTION EXTENDS FAR BEYOND ANY RELIEF APPROPRIATE FOR THEIR AS-APPLIED CLAIMS

Aside from Plaintiffs' failure to meet their burden to justify their request for emergency relief, the relief that Plaintiffs seek in their Motion and Proposed Order extends far beyond what could be justified by their as-applied claims. As discussed above, the only claims properly at issue for purposes of Plaintiffs' Motion for Preliminary Injunction, following this Court's prior decision on Defendants' motion to dismiss, are Huang's as-applied claim with respect to § 1201(a)(1)(A) and (a)(2) and Green's as-applied claim with respect to § 1201(a)(2). Those three claims are asserted only against the DOJ Defendants. Yet Plaintiffs ask the Court not only to enjoin the DOJ Defendants from enforcing the DMCA's criminal penalties for the as-applied claims at issue against them, but also to enjoin the DOJ Defendants from enforcing the DMCA's criminal penalties altogether, and to compel the Librarian—against whom no claims are at issue in Plaintiffs' Motion, or in this case generally, following the Court's dismissal of all claims against the LOC Defendants—to grant an unbounded exemption to § 1201(a)(1)(A) that would allow not only Plaintiffs but anyone "to engage in conduct protected by the First Amendment." *See* Pl. Mot. [ECF 30] at 3–4; Pl. Proposed Order [ECF 30-12] at 1. Both expansions of Plaintiffs' requested relief beyond the as-applied claims at issue should be rejected even if the Court were to otherwise hold in Plaintiffs' favor.[28]

---

[28] Plaintiffs may intend their request for relief beyond anything that could conceivably be appropriate with respect to their as-applied claims to relate to their request for a preliminary injunction on claims that have already been dismissed. However, Plaintiffs have not specified that that is the case, and their requested relief would be inappropriate even if their dismissed claims

First, the Court should not issue a broad injunction that would prohibit the DMCA's enforcement generally, rather than only against Plaintiffs. Traditional equitable principles require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2427–28 (2018) (Thomas, J., concurring) (recognizing that the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'"). In the First Amendment context as well, the Supreme Court has similarly recognized that "we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 477–78 (1995). Indeed, injunctions that reach beyond the plaintiff before the Court "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring). Such relief would be particularly inappropriate at the preliminary injunction stage, before the merits of the case have been fully presented to the Court.

Second, it would be wildly inappropriate for the Court to impose requirements on the Librarian based on Plaintiffs' as-applied claims against the DOJ Defendants. The Court has already recognized that the APA does not waive sovereign immunity for claims against the Librarian because the Librarian is not an "agency" under the APA. *See Green*, 392 F. Supp. 3d at 97, 100. Moreover, the Court has dismissed all claims, including all constitutional claims, against the Librarian. *See* Order [ECF 24], at 1 (dismissing Counts II, VI, and VII); *Green*, 392 F. Supp. 3d

---

remained in the case. Thus, Plaintiffs' requested relief should be rejected in any event.

at 96 n.7 (noting Plaintiffs' concession "that the Librarian's denial of exemptions did not violate the First Amendment"). Sovereign immunity therefore bars the Court from issuing any relief against the Librarian. *FDIC v. Meyer*, 510 U.S. 471, 483–84 (1994) (relief requires both waiver of sovereign immunity and avenue for relief under substantive law).

Moreover, Plaintiffs' requested "exemption" would bypass the established procedures that must be followed, and the factors that must be considered, in the triennial rulemaking process and would far exceed the permissible scope of any exemption that might properly be granted through that process. *See* 17 U.S.C. § 1201(a)(1)(C) (setting forth factors that must be considered to determine whether certain noninfringing uses of "a particular class of copyrighted works" should be exempted); 2018 Recommendation at 131–32 (explaining that an exempted "class" must be "a narrow and focused subset of the broad categories of works . . . identified in [17 U.S.C. §] 102" rather than, for example, "all audiovisual works" for "all noninfringing uses"). Such relief could not have been granted under the APA, even if Plaintiffs' APA claim had not been dismissed for lack of jurisdiction. *See Norton v. SUWA*, 542 U.S. 55, 64 (2004) (the APA "empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act" (internal quotation omitted)). Thus, even if the Court were to grant preliminary relief here (which it should not, for the reasons explained above), the Court should reject the broad injunction that Plaintiffs propose.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

October 24, 2019                                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
ERIC R. WOMACK
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC   20005
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*