**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Matthew Green, *et al.*,                          )
                                                  )
                Plaintiff,                        )
                                                  )
v.                                                )        Civil Action No. 16-cv-01492(EGS)
                                                  )
U.S. Department of Justice, *et al.*,             )
                                                  )
                Defendants.                       )

## DECLARATION OF C. BRENDAN S. TRAW

I, C. Brendan S. Traw, an adult and over the age of twenty-one (21) years, hereby declare

pursuant to 28 U.S.C. Section 1746 as follows:

1.        I am currently an Intel Corporation ("Intel") Senior Fellow. I have personal knowledge of

all of the following facts and, if called as a witness, could and would competently testify thereto. Intel is

a Member of the DVD Copy Control Association LLC ("DVD CCA") and the Advance Access Content

System Licensing Administrator LLC ("AACS LA"). Digital Content Protection LLC ("DCP") – the

Licensor of the High-bandwidth Digital Content Protection ("HDCP") system – is a wholly owned

subsidiary of Intel.

2.        From April 1995 to date, I have occupied various positions at Intel. These positions

included Chief Content Protection Architect, Digital Home Group CTO, and General Manager of

several software products.

3.        In the spring of 1996, the motion picture industry was considering whether to distribute

in the home video market their valuable motion picture content in a new digital format – the Digital

Versatile Disc ("DVD"). Many properties of this new format would benefit consumers, including better picture quality, familiar physical format, better sound, etc. Members of the motion picture industry expressed to me one major concern; protection of the intellectual property embedded in the DVDs. Copies of existing analog VHS format tapes would be degraded in comparison to the original, inhibiting serial copying . Unprotected digital content, however, permitted perfect copy after perfect copy, ad infinitum. Those members of the motion picture industry made it clear they would not disseminate their valuable copyrighted movie content in the DVD format without adequate protection against infringing serial copying.

4.      The motion picture and consumer electronics ("CE") industries presented a solution, which, for the Information Technology ("IT") industry, had at least two flaws; (1) it would not have provided much protection (the content would be in the clear on the DVD) and (2) personal computers would not have been permitted to play the DVDs. The IT industry alternatively proposed the use of encryption and the licensing of keys and algorithms that would permit playing, but not copying of the DVDs content on authorized devices including personal computers with licensed playback software.

5.      Interested parties formed the Copy Protection Technical Working Group ("CPTWG") to discuss the concepts of a system that would enable the motion picture industry to launch distribution of protected DVDs. Some 54 motion picture, CE, IT companies, trade associations, and others, participated in CPTWG. During the spring of 1996, CPTWG developed the basic concepts now embedded in virtually all digital content protection systems. The approach was consumer focused, i.e., the consumers should never notice the protection system unless they attempted to make unauthorized copies. Nor should the system add significant cost to the discs or devices. Thus, CPTWG proposed the conceptual system of content encryption with licensed keys to unlock the content for playback.

6.        Entities desiring to incorporate DVD playback on their devices would sign licenses requiring the protection of the keys and the content on those devices. Taking this broad-based, consensus driven input, Matsushita Electric Industry Co. Ltd. (now known as Panasonic Corporation) and Toshiba Corporation developed the DVD Content Scramble System. Their proposal was presented to a wide range of parties, who provided feedback on both the technical and legal regime. Toshiba authorized Panasonic to be the initial licensor of the technology. The two companies subsequently licensed their intellectual property in this system to DVD CCA which, in turn, sublicensed it to companies to permit the technology to be implemented in DVD players and in the embedding process for content to be distributed on DVDs. The licensing system enabled the issuance of specifications and keys that permitted creation and playback of protected DVDs.

7.        At the outset of these activities, television sets and computer monitors only displayed analog signals. Accordingly, DVD players decrypted the CSS encrypted digital content and converted the resulting data into analog form for the DVD players to output to televisions and monitors for consumer enjoyment. However, the industries recognized there were still two missing elements: legal protection against circumvention and a secure digital connection between playback devices and digital screens (either part of computer systems or the soon-to-be developed digital televisions) and other connected devices.

8.        CPTWG participants acknowledged an experienced and well-resourced hacker could ultimately defeat any protection system. The distribution of the "hack" ("cracking" material such as unlicensed keys and code to extract the content in the clear) was a significant threat. Moreover, sale of devices that incorporated the circumventing material to make in-the-clear copies would further allow mass distribution of unprotected infringing copies. Without a solution, such circumvention would inhibit the dissemination of creative content in digital form. In other words, the technology could provide an

initial barrier to unauthorized access and use of the content, but legal protections were needed to pick up where technology left off. The participants in CPTWG activities in 1996 were well aware that the countries of the world were negotiating what became the Copyright Treaty of the World Intellectual Property Organization, which was agreed to in December 1996. That Treaty was then implemented in the United States through the Digital Millennium Copyright Act of 1998. This added legal regime was essential to the overall system that was developed by those participating in the CPTWG and, hence, those participants also supported the legal structure ultimately embodied in the DMCA.

9.    As noted above, the advent of displays with digital inputs for both computers and televisions meant that there needed to be a secure way to stream the content in digital form from the security of the DVD's CSS encryption to these new display products. Accordingly, the CPTWG embarked on its second task – examining and outlining the requirements for security mechanisms to be applied to content as it passed from one digital device to other digital devices, ultimately to the digital displays. The content companies made the logical point that it would do no good to distribute DVDs with CSS protections if those protections were immediately lost when the DVD player transmitted the content to the next device without applying some equivalent form of protection against unauthorized access and use.

10.    The CPTWG's Digital Transmission Discussion Group ("DTDG") took note of standards that other groups had developed, or were in the process of developing, that optimized the transmission of digital video content but also noted that those other groups were not incorporating a security system to protect the transmitted content from unauthorized interception and use. The DTDG focused its efforts on defining the requirements for, and encouraging the development of, solutions for protecting compressed digital content being exchanged between devices within the home via emerging serial busses like IEEE 1394.

- 4 -

11.    Within a couple of years, additional digital interfaces began to emerge for decompressed digital content.[1] The primary difference between the two systems was that the decompressed content, due to its very large size, was optimal for the final connection to the display, enabling the television and other display makers to avoid having to incorporate the decompression technology in their devices. Two decompressed transmission standards were developed – one of which was the Digital Video Interface (DVI) that focused primarily on computer application. Intel was a major participant in the development of DVI. For the stand-alone televisions, another standard – the High-Definition Multimedia Interface ("HDMI") - became the preferred technology. The size of the data comprising the content in decompressed form made it unwieldy for consumer products to do anything other than display it for consumer enjoyment. In the late 1990s and early 2000s, there was no feasible way for a consumer device to make a copy of such a large data set for later playback. Hence, the content protection system developed for the decompressed environment assumed that no copying of the content would be allowed – that the transmission would be purely for display purposes. It was in that context that Intel developed HDCP to protect decompressed content flowing between licensed devices via DVI and eventually for HDMI and other display interface standards. At a high level, like many other content protection systems, HDCP uses the encryption/licensing system to ensure protection of video content flow, as noted above primarily for the purpose of sending the content from a receiver or player to a digital screen. Most content protection systems, such as CSS for DVD content and, later on, the Advanced Access Content System ("AACS") for Blu-ray disc ("BD") content, limit permitted outputs, in order not to lose the protections their systems provide for the content as it is distributed on DVDs and BDs. Those and most other video content protection systems specify HDCP as a permitted output. Since the normal

---

[1] I use the term "decompressed" to describe digital content that has, at one point, been compressed but that is ultimately transmitted or delivered in uncompressed form (e.g., to the digital display). Nearly all digital content is compressed at some point in transit from the original source to sink.

expectation was that DVDs and BDs would be playable on a wide array of player products, there would be no need for a consumer to make additional copies. This, combined with the data size point made above, dictated that HDCP would be a "no copies allowed" system. The movie companies found that compatible with their needs, and player makers (for both computer and set-top environments) felt that this would present an excellent system for consumer enjoyment of movie and other video content. For this and other reasons noted below, the result is that HDCP has become the de facto transmission protection standard for content delivery from a receiver or player product to display products (including all televisions sold in the United States).

12. The other situation – transmission of compressed video data – was addressed through other transmission standards and associated content protection technologies resulting from the DTDG work. Because the data remains compressed, it is much easier to create consumer devices that could make copies of the data for later playback and other uses from the copy. The initial contemplation was that a home network could include a set-top receiver of cable or satellite television programming that could be connected through a secure transmission cable (and later through wireless transmission) to a DVD or Blu-ray recorder that would make a copy of the content onto recordable discs to enable the time-shifting (i.e., viewing a copy of a television program at a later time than its original transmission). In fact, this system did develop and is still the widely deployed system for time-shifting that of television broadcast content in Japan. In the United States, however, the cable and satellite companies found it to be convenient to incorporate large hard disc drives in their own set-top-box ("STB") receiving devices, and the market for external consumer copying devices did not broadly develop here.

13. The effect has been that the consumer marketplace for home copying has become one where consumers use the hard drive in the STBs supplied by their cable or satellite providers to make copies of television programming for time-shifting purposes. Those STBs are then linked to display

- 6 -

products by HDMI connections.  HDCP protects the decompressed content as it is transmitted over those HDMI connections to displays for view-only enjoyment by consumers. Accordingly, HDCP has become ubiquitous in the United States and is incorporated in every STB, DVD player, BD player, and other streaming device systems of which I am aware.

14.    Accordingly, the content protection ecosystem consists of the distribution of protected content, playback on licensed devices, and protected transmission over the last few feet for the consumer to enjoy on their display. Since ultimately all content is transmitted across that last HDCP-protected path, permitting HDCP circumvention devices or the cracking material to be freely available would effectively eviscerate virtually every video content protection system.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of October, 2019.

C. Brendan S. Traw

- 7 -