# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW GREEN, ANDREW HUANG, AND ALPHAMAX, LLC,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF JUSTICE, WILLIAM BARR, LIBRARY OF CONGRESS, CARLA HAYDEN, U.S. COPYRIGHT OFFICE, AND KARYN A. TEMPLE,

        Defendants.

Civil Case No. 16-cv-01492-EGS

**[PROPOSED] BRIEF OF *AMICI CURIAE* ASSOCIATION OF AMERICAN PUBLISHERS, INC., ENTERTAINMENT SOFTWARE ASSOCIATION, MOTION PICTURE ASSOCIATION, INC., AND RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. IN SUPPORT OF THE GOVERNMENT**

J. Matthew Williams (DC Bar No. 501860)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, 7th Floor
Washington, DC 20036
(202) 355-7900
mxw@msk.com

Robert H. Rotstein (*Pro Hac Vice* Motion Pending)
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-2000
rxr@msk.com

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

**Page**

I.    INTERESTS OF *AMICI CURIAE* .................................................................................. 1

II.   SUMMARY OF ARGUMENT ......................................................................................... 3

III.  ARGUMENT ...................................................................................................................... 5

    A.    Plaintiffs Are Unlikely to Prevail on the Merits Because the DMCA Would Be Less Effective Without Section 1201(a)'s Prohibitions. .................................... 6

    B.    Plaintiffs' Dissemination of Circumvention Tools Would Result in the Same Harms that Congress Sought to Prevent by Passing the DMCA. ......................... 13
        1.    Dr. Huang and Alphamax ......................................................................... 14
        2.    Professor Green .......................................................................................... 18

IV.   CONCLUSION ................................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ...........................................................14, 17

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004) ..................................................................................7

*CoxCom, Inc. v. Chaffee*,
  536 F.3d 101 (1st Cir. 2008) ....................................................................................15

*DirecTV, Inc. v. Ferguson*,
  328 F. Supp. 2d 904 (N.D. In. 2004) .......................................................................15

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...............................................................................7, 16

*Echostar Satellite, LLC v. Viewtech, Inc.*,
  543 F. Supp. 2d 1201 (S.D. Cal. 2008) ....................................................................15

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ....................................................................................................6

*Green v. DOJ*,
  392 F. Supp. 3d 68 (D.D.C. 2019) .............................................................................5

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ....................................................................................................1

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) ..........................................................................6, 7, 14

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*,
  421 F.3d 1307 (Fed. Cir. 2005) ..................................................................................7

*United States v. Elcom Ltd.*,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002) ...................................................................14

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) .........................................................................17, 18, 19

*Universal City Studios, Inc. v. Reimerdes*,
  111 F. Supp. 2d 294 (S.D.N.Y. 2000) ............................................................. passim

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ......................................................................................5

*Warner Bros. Entm't, Inc. v. WTV Sys.,*
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) .....................................................6

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)..........................................................................................3

### STATUTES

17 U.S.C.
   § 106.............................................................................................................7
   § 1201................................................................................................. passim
   § 1201(a) ............................................................................................ passim
   § 1201(a)(1)(C) ........................................................................................9, 18
   § 1201(a)(1)(E) ...........................................................................................19
   § 1201(a)(2) ......................................................................................7, 14, 18
   § 1201(e) .....................................................................................................18
   § 1201(g) .....................................................................................................18
   § 1201(j)......................................................................................................18

Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998)...........................1

### OTHER AUTHORITIES

37 C.F.R. § 201.40(b)(11).................................................................................18

Association of American Publishers, *Advancing Digital Platforms to Support
   Student Success* .........................................................................................13

*Chapter 12 of Title 17, Hearing before the Subcomm. on Courts, Intellectual
   Property and the Internet of the H. Comm. On the Judiciary*, 113th Cong., 2d
   Sess. (Sept. 17, 2014).............................................................................11, 12

Entertainment Software Association, 2019 ESSENTIAL FACTS ABOUT THE
   COMPUTER AND VIDEO GAME INDUSTRY ................................................13

H.R. REP. NO. 105-551, pt. 2 (1998)................................................................14

INFORMATION INFRASTRUCTURE TASK FORCE, INTELLECTUAL PROPERTY AND THE
   NATIONAL INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING
   GROUP ON INTELLECTUAL PROPERTY RIGHTS (1995)................................8

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>**Page(s)**</u>

Joshua P. Friedlander, Recording Industry Association of America, MID-YEAR
2019 RIAA MUSIC REVENUES REPORT ........................................................... 13

*Library of Congress U.S. Copyright Office DMCA Section 1201(a)(1) Hearing*
*(May 18-19, 2000)* ................................................................................. 6, 9

*Library of Congress U.S. Copyright Office Public Roundtable on Section 1201*
*(May 19, 2016)* ............................................................................................ 12

*Library of Congress U.S. Copyright Office Public Roundtable on Section 1201*
*(May 25, 2016)* ............................................................................................ 12

*Library of Congress U.S. Copyright Office Rulemaking Hearing* (May 2, 2003) ........................ 10

*Library of Congress U.S. Copyright Office Section 1201 Roundtable* (Apr. 12,
2018).* ..................................................................................................... 11

*Library of Congress U.S. Copyright Office Section 1201 Rulemaking Hearing*
*before the Copyright Office Panel* (May 17, 2012) ....................................... 10

*Library of Congress U.S. Copyright Office Sixth Triennial Rulemaking Hearings*
*(May 20, 2015)* ............................................................................................ 11

Motion Picture Association of America, 2018 THEATRICAL HOME
ENTERTAINMENT MARKET ENVIRONMENT (THEME) REPORT (March 2019) ......................... 13

S. REP. NO. 105-190 (1998) ............................................................................. 6, 7

STAFF OF THE H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION
ANALYSIS OF H.R. 2281 AS PASSED BY THE U.S. H. OF REP. ON AUGUST 4,
1998 (Comm. Print 1998) ............................................................................ 8

STEPHEN E. SIWEK, COPYRIGHT INDUSTRIES IN THE U.S. ECONOMY: THE 2018
REPORT (2018) ............................................................................................ 3

U.S. CHAMBER OF COMMERCE, IMPACTS OF DIGITAL PIRACY ON THE U.S.
ECONOMY (June 2019) .............................................................................. 3, 14

U.S. COPYRIGHT OFFICE, REPORT OF THE REGISTER OF COPYRIGHTS ON SECTION
12 OF TITLE 17 (2017) .......................................................................... 7, 12, 17

U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL
PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

CIRCUMVENTION: RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (Oct. 2015) ..................................................................................................................16

U.S. COPYRIGHT OFFICE, SEVENTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION: RECOMMENDATION OF THE ACTING REGISTER OF COPYRIGHTS (Oct. 20018) ...........................................................18

*WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 105th Cong., 1st Sess. (Sept. 16 and 17, 1997)..................................................................8

World Intellectual Property Organization Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997) ..................................................................7

## I.   __INTERESTS OF__ *AMICI CURIAE*

The Association of American Publishers, Inc. ("AAP"), the Entertainment Software Association ("ESA"), the Motion Picture Association, Inc. ("MPA"), and the Recording Industry Association of America, Inc. ("RIAA") are trade associations whose members create and distribute some of the highest-value copyrighted works in the marketplace. *Amici* were founded to protect their members' copyright interests *and* First Amendment rights. They submit this brief because granting Plaintiffs' motion for a preliminary injunction would eviscerate critical safeguards created by Section 1201(a) (17 U.S.C. § 1201(a)) of the Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998), and thus undermine copyright's role as the "engine of free expression." *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 330 (S.D.N.Y. 2000), *quoting Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

AAP represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. As essential participants in local markets and the global economy, AAP's members invest in and inspire the exchange of ideas, transforming the world we live in one word at a time.

ESA is the U.S. trade association serving companies that manufacture video game equipment and create software for game consoles, handheld devices, personal computers, and the internet. The association has an unmatched track record in protecting the industry's First

Amendment rights and helping its members to reimagine entertainment for billions of players around the world.[1]

MPA is the voice of the global film and television industry – a community of storytellers at the nexus of innovation, imagination, and creativity.  In the United States and around the world, the film and television industry drives the creative economy.  MPA's members are: Walt Disney Studios Motion Pictures, Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, and Warner Bros. Entertainment Inc.

RIAA is the trade organization that supports and promotes the creative and financial vitality of the American recording industry.  Its members comprise the most vibrant record industry in the world, investing in great artists to help them reach their potential and connect to their fans.  In support of this mission, the RIAA works to protect the intellectual property and First Amendment rights of artists and music labels.

Section 1201(a)'s prohibitions against circumvention of access controls and trafficking in circumvention tools foster *Amici's* members' creative expression.  Because these prohibitions help prevent devastating piracy and unauthorized access to copyrighted works, they are vital both to producers of expressive content like *Amici's* members and to consumers of expressive content. Technological protection measures also enable copyright owners to design innovative business models that benefit consumers by enabling lower-cost access to a more diverse variety of offerings, including subscription-based access to high quality digital entertainment content, on-demand viewing, cloud-based storage and sharing, and secure, authenticated videogame play.

---

[1] A complete list of ESA's member companies is available at: http://www.theesa.com/about-esa/members/.

Indeed, *Amici's* members' businesses directly depend upon the types of technological protection measures that Section 1201(a) protects.[2]

## II.   SUMMARY OF ARGUMENT

The Government's memorandum of law in opposition to the Plaintiffs' motion explains why the factors set forth in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), weigh against the issuance of an injunction.  In this brief, *Amici* provide a first-hand account of the critical importance of Section 1201(a) to their dissemination of creative content.

Even before Congress enacted Section 1201 as part of the DMCA, copyright owners, including *Amici*, made it clear to policymakers that while advances in digital technology presented great opportunities for creative expression, these advances also posed tremendous threats to the vitality of the creative industries.  With the emergence of the internet as a medium of transmission, copyright owners recognized its potential for offering consumers myriad new ways of enjoying high quality digital content.  At the same time, the copyright owners knew that these new business models must rely on technological measures to prevent unscrupulous hackers from accessing and pirating copyrighted works in the same high-quality, digital form.  Copyright owners also understood that a lawful market for tools designed to circumvent and defeat these anti-piracy measures could render the technological protection systems useless.  Copyright owners therefore sought legal protection against the manufacture and distribution of such tools.

---

[2] A recent study concluded that the core copyright industries contribute $1.3 trillion annually to the U.S. economy.  STEPHEN E. SIWEK, COPYRIGHT INDUSTRIES IN THE U.S. ECONOMY: THE 2018 REPORT 3 (2018), https://iipa.org/files/uploads/2018/12/2018CpyrtRptFull.pdf.  However, another study concluded that global online piracy of motion pictures alone costs the U.S. economy at least $29.2 billion in lost revenue each year.  U.S. CHAMBER OF COMMERCE, IMPACTS OF DIGITAL PIRACY ON THE U.S. ECONOMY ii (June 2019), https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf.

In enacting Section 1201 as part of the DMCA, Congress sought, in a careful and nuanced way that took into account the viewpoints of many constituencies, to foster complementary objectives: the development of emerging digital business models for the lawful dissemination of content; the promotion of First Amendment values through increased access to content; and the protection of intellectual property rights.  To achieve these goals, Congress chose, with limited exceptions, to make unlawful the acts of circumventing access controls and trafficking in circumvention tools.  Congress had no alternative that would have prevented piracy as effectively yet that would have, at the same time, encouraged copyright owners to avail themselves of digital platforms, including the internet.  For this reason, Section 1201(a) satisfies intermediate scrutiny, and Plaintiffs are unlikely to succeed on the merits.

Moreover, issuing an injunction at this stage of the case would not serve the public interest.  A preliminary injunction would not just preserve the status quo but would instead result, before the merits of the case are finally adjudicated, in the immediate release of destructive circumvention tools that could never be "put back into the bottle."  For this additional reason, *Amici* strongly believe that preliminary injunctive relief is particularly inappropriate in this case.

Dr. Andrew "Bunnie" Huang and his company, Alphamax, LLC, want to sell a device that would enable anyone to transform encrypted, high definition and ultra-high definition content, pay-per-view transmissions, subscription-based transmissions, and time-limited rentals into unprotected, in-the-clear, permanent copies of copyrighted audiovisual works (including works such as music videos containing recorded music) that could be distributed online and reproduced *ad infinitum*.  The sale of this device would contravene Congress's purposes and would be economically devastating to copyright owners.

Professor Matthew Green is currently covered by statutory exceptions that permit some of his conduct; and by a regulatory exemption that permits an even broader range of "security research." Yet, Professor Green, like Dr. Huang, seeks an extraordinarily broad injunction. He apparently plans to distribute circumvention tools concerning an undefined universe of devices, vehicles, programs, and systems. But he does not explain how he could stop bad actors from misusing these methods to harm copyright owners and the public. While *Amici* support good faith security research, they cannot support a misapplication of the First Amendment that would allow the unrestrained circulation of digital skeleton keys that could harm the very individuals and industries that rely most on free speech for their livelihoods and success.

As set forth more fully below, *Amici* respectfully submit that the motion for preliminary injunctive relief should be denied.

## III.    ARGUMENT

This Court previously held that intermediate scrutiny applies in this case, and that Section 1201(a) furthers an "unquestionably substantial" interest that is unrelated to the suppression of free expression. *Green v. DOJ*, 392 F. Supp. 3d 68, 94 (D.D.C. 2019), *quoting Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 454 (2d Cir. 2001). Accordingly, the remaining merits-related issue to be resolved preliminarily on the pending motion is whether the DMCA is narrowly tailored to serve the unquestionably legitimate government (and public) interest in preventing copyright infringement, and unauthorized access to copyright-protected works. *Reimerdes*, 111 F. Supp. 2d at 329-330. "[T]o satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Id.* Instead, "the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.*, *quoting Ward v. Rock Against Racism,* 491 U.S. 781, 799 (1989). Both at the time of the passage of the

DMCA and today, policymakers have had substantial evidence to support the need for Section 1201(a). Plaintiffs' proposed conduct would render that statute less effective, and Plaintiffs offer no credible argument to the contrary. Thus, not only are Plaintiffs unlikely to prevail on the merits, but the public interest weighs in favor of the Government,[3] such that Plaintiffs are not entitled to injunctive relief.

### A.    Plaintiffs Are Unlikely to Prevail on the Merits Because the DMCA Would Be Less Effective Without Section 1201(a)'s Prohibitions.

Plaintiffs contend that Section 1201(a) is unnecessary because "[t]he Government has ample, and superior, alternative means of policing infringement, such as imposing liability for actual copyright infringement, which would be entirely unaffected by the preliminary injunction that Plaintiffs seek." ECF 30-1 at 30. But after a lengthy legislative process, Congress concluded the opposite. *See* S. REP. NO. 105-190, at 8 (1998) ("[C]opyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."); *see also Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003) ("[I]t is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives.").

In enacting the DMCA, Congress "extend[ed] a new form of protection, *i.e.*, the right to prevent circumvention of access controls, broadly to works protected under Title 17, *i.e.*, copyrighted works." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 945 (9th Cir. 2010). In other words, as multiple courts have held, a violation of Section 1201(a)(1) or

---

[3] "[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1015 (C.D. Cal. 2011), *citing Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).

1201(a)(2) need not result in a separate violation of the exclusive rights of reproduction,

adaptation, distribution, public performance, or public display provided by Section 106 of the

Copyright Act (17 U.S.C. § 106).  *See, e.g., Disney Enters., Inc. v. VidAngel, Inc.,* 869 F.3d 848,

863-65 (9th Cir. 2017), *citing Corley*, 273 F.3d at 433; *see also* U.S. COPYRIGHT OFFICE, REPORT

OF THE REGISTER OF COPYRIGHTS ON SECTION 12 OF TITLE 17, at 43 (2017) ("Section 1201

Study") ("In adopting section 1201(a), Congress intended to provide copyright owners with a

new and independent right to prohibit the circumvention of TPMs used to prevent unauthorized

access to their works."); S. REP. NO. 105-190, at 12 ("[I]f unauthorized access to a copyrighted

work is effectively prevented through use of a password, it would be a violation of this section to

defeat or bypass the password and to make the means to do so").[4]

Congress created this "new and independent right," and a prohibition against tools

designed to thwart it, for very good reasons.  The United States had just joined the World

Intellectual Property Organization ("WIPO") Copyright Treaty, Apr. 12, 1997, S. Treaty Doc.

No. 105-17, Art. 11 (1997), which required parties to "provide adequate legal protection and

effective legal remedies against the circumvention of effective technological measures that are

---

[4] Plaintiffs ask the Court (ECF 30-1 at 16-17) to interpret Section 1201(a) to be redundant of 17 U.S.C. § 106, such that anyone who does not violate the latter, also does not violate the former. Plaintiffs contend their "narrower construction" of the statute was adopted in *Chamberlain Grp., Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1200-1203 (Fed. Cir. 2004).  It was not.  In that case, which involved garage door openers with no claim of any connection to possible copyright infringement, the Federal Circuit merely concluded that a defendant must make infringement *possible* in order to violate Section 1201(a)(2).  *Chamberlain*, 381 F.3d at 1198-1202.  In other words, a plaintiff in the Federal Circuit must show a "nexus between *any possible infringement* and the use of the circumvention devices."  *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1319 (Fed. Cir. 2005) (emphasis added).  In addition to being incorrect (*see MDY Indus.*, 629, F.3d at 945), the *Chamberlain* standard does not help Plaintiffs, who admit that the technologies they intend to circulate could enable infringement.

used by authors in connection with the exercise of their rights."[5]  When Congress held hearings regarding implementation of the treaty, copyright owners strongly supported legislation creating a right against unauthorized access and protecting against trafficking in circumvention devices. They also emphasized the role that such legislation would play in helping to launch new business models for disseminating creative expression.  *See, e.g.*, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 105th Cong., 1st Sess., at 79 (Sept. 16 and 17, 1997) (statement of Jack Valenti, MPAA) ("The same technology that will smooth the way for legitimate delivery of video on demand over digital networks will also prime the pump for copyright pirates."); *id.* at 204 (statement of Allan Adler, AAP) ("Without adequate safeguards for copyright, the promise of the Internet simply won't be fulfilled.").  So, when Congress passed Section 1201(a), it had substantial evidence that statutory prohibitions against unauthorized access and circumvention tools were an essential supplement to traditional copyright law to protect copyright owners in a way that would incentivize online speech and prevent piracy.  *See* STAFF OF THE H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE U.S. H. OF REP. ON AUGUST 4, 1998, at 6 (Comm. Print 1998) ("These technological measures … that this bill protects can be deployed, not only to prevent piracy and other harmful unauthorized

---

[5] Before the negotiation of the WIPO Copyright Treaty, the U.S. Commerce Department published a "white paper," which supported prohibitions against undermining technological protection measures used by copyright owners.  *See generally* INFORMATION INFRASTRUCTURE TASK FORCE, INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS 230 (1995) ("[T]echnological protection likely will not be effective unless the law also provides some protection for the technological processes and systems used to prevent or restrict unauthorized uses of copyrighted works.").

uses of copyrighted materials, but also to support new ways of disseminating copyrighted materials to users … These technological measures may make more works more widely available …").

After Congress enacted the DMCA, the Copyright Office and the Librarian of Congress, through the triennial rulemaking process codified in Section 1201(a)(1)(C), have continued to hear from copyright owners regarding (i) ongoing risks presented by digital piracy and (ii) the ways in which Section 1201(a) has facilitated the launch of successful business models that have increased the availability of means of access to creative content.[6] While there are far more relevant pieces of testimony and written comments than can be included in this brief, the following examples illustrate the concerns and success stories expressed by copyright owners:

> "[A]n underlying assumption of many of the remarks made in the course of this inquiry is that technological protection measures will be used to 'take' works away from users or to deny access. I strongly believe that this assumption is fundamentally flawed. Technological protection measures actually facilitate the making of works available to consumers. DVD is a concrete example. My company would not have released its motion pictures on the DVD format if DVD did not incorporate technical protection measures." May 19, 2000 statement of Dean Marks, Warner Bros.[7]

> "[D]igital technology creates a need for the use of technological measures to protect copyrighted works plus a need for effective legal protection against circumvention. That of course is what the DMCA gave us in 1998. We have seen an explosive growth in the DVD market and a significant decrease in prices to consumers for purchasing copies of movies as well as for purchasing the players to watch them on. We have seen a myriad of new and exciting offerings []

---

[6] *Amici* have submitted evidence to the Copyright Office during every triennial rulemaking proceeding concerning all of the innovative business models and digital products that have been facilitated by Section 1201(a), and about the ongoing threat posed by digital piracy.

[7] *Library of Congress U.S. Copyright Office DMCA Section 1201(a)(1) Hearing*, written statement of Dean Marks, at 2 (May 18-19, 2000), https://www.copyright.gov/1201/hearings/2000/dean_marks.pdf.

beginning to emerge for digital content."  May 2, 2003 statement of Shira Perlmutter, Time Warner[8]

"Video game consoles are platforms for the creation, distribution, and consumption of copyrighted works, and they rely on the TPMs at issue … to prevent infringement of those works. …  It's precisely because strong copyright protections are critical to the investment and creation of copyrighted works that Congress made clear that exemptions to 1201's anti-circumvention provision should not only be disfavored but should only be made in the most exceptional of circumstances."  May 17, 2012 statement of Christian Genetski, ESA[9]

"So the trend is toward broader availability and more interactive availability. This trend is supported by the availability of access controls and the legal protection thereof.  It is also supported by the ability to charge consumers for access to content because it costs money to create content and to roll out new methods of distribution.  Access control technologies are an integral part of our efforts to offer consumers the widest possible choice of platforms and terms at a corresponding range of price points to enjoy our movies and TV programs."  May 17, 2012 statement of Dan Mackechnie, 20th Century Fox Home Entertainment[10]

"[A] key to support [for] all of these varying business models is that they have access controls ... We require all of our licensees to complete a technical questionnaire and negotiate with them about what DRMs will enable the business models they want to support and the devices to which they want to deliver content.  But we think that if we didn't have access controls to support the flexible uses of our content, that there might be that same kind of mass piracy we've seen with unprotected music."  May 17, 2012 statement of Clarissa Weirick, Warner Bros Home Entertainment Group[11]

"[W]ith any distributor we work with, copy protection and encryption is critical. So as we go into the digital marketplace … as we negotiate with distributors and licensees on the Internet and with cable providers, we pay a considerable amount

---

[8] *Library of Congress U.S. Copyright Office Rulemaking Hearing*, at 50 (May 2, 2003), https://cdn.loc.gov/copyright/1201/2003/hearings/transcript-may2.pdf.

[9] *Library of Congress U.S. Copyright Office Section 1201 Rulemaking Hearing before the Copyright Office Panel*, at 18 (May 17, 2012), https://www.copyright.gov/1201/2012/hearings/transcripts/hearing-05-17-2012.pdf.

[10] *Id.* at 72.

[11] *Id.* at 165.

of attention to copy protection and the encryption services to protect our media."
May 20, 2015 statement of Simon Swart, Fox Home Entertainment[12]

"So the deals historically that I was involved with when I was previously with
Sony Music, for example, we did a lot of due diligence and we specified very
precisely what kind of security measures we intended to have in place for
sometimes called end-to-end or link, or whatever term you want to use, to protect
the music."  April 12, 2018 statement of David Hughes, RIAA[13]

Over the years, Congress has gathered additional evidence of the continued need for, and

the success of, Section 1201(a).  *See, e.g., Chapter 12 of Title 17, Hearing before the Subcomm.*

*on Courts, Intellectual Property and the Internet of the H. Comm. On the Judiciary*, 113th Cong.,

2d Sess., at 2 (Sept. 17, 2014) (statement of Rep. Jerrold Nadler) (Section 1201 "has worked to

encourage the creation of new digital works and has allowed authors a way to protect against

copyright infringement while also helping to promote the development of new and innovative

business models."); *id.* (statement of Rep. Thomas Marino) ("The digital economy has enabled

wide distribution of movies, music, eBooks and other digital content.  Chapter 12 seems to have

a lot to do with the economic growth ..."); *id.* at 35-36 (written statement of Christian Genetski,

ESA) ("Since the DMCA was enacted in 1998, ESA's members have continually deployed

TPMs in pursuit of both of the DMCA's mutually-reinforcing objectives. …  [T]here is no

question that TPMs have played a pivotal role in reducing piracy, particularly on home console

platforms.").[14]

---

[12] *Library of Congress U.S. Copyright Office Sixth Triennial Rulemaking Hearings,* at 81 (May 20, 2015), https://cdn.loc.gov/copyright/1201/2015/hearing-transcripts/1201-Rulemaking-Public-Roundtable-05-20-2015.pdf.

[13] *Library of Congress U.S. Copyright Office Section 1201 Roundtable*, at 102 (Apr. 12, 2018), https://www.copyright.gov/1201/2018/hearing-transcripts/1201-Rulemaking-Public-Roundtable-04-12-2018.pdf.

[14] The hearing transcript is available at: https://docs.house.gov/meetings/JU/JU03/20140917/102670/HHRG-113-JU03-Transcript-20140917.pdf.

In addition, in 2017 Congress requested and received a report from the Register of Copyrights concerning how Section 1201 functioned in the marketplace. The report confirmed that Section 1201 was successful in spurring the dissemination of creative works, and that copyright owners continued to express the need for Section 1201(a). *See* Section 1201 Study, *supra*, at i ("Since the enactment of section 1201, the use of technological measures has been useful in expanding consumer choice and the avenues for dissemination of creative works …"). The report also concluded that the circulation of circumvention tools in the legitimate marketplace would result in increased harm to copyright owners and the public. *Id.* at 56 ("[T]he Office agrees with the commenters who argued that it would be impossible to control the downstream uses of any circumvention tools once distributed, even if they were produced with the intent that they be used only to assist authorized circumvention.").[15]

Section 1201(a) has helped the entertainment industry, the publishing industry, and the software industry transform their businesses in ways that have expanded the output of creative expression and have made that expression more widely accessible to consumers. Members of

---

[15] *Amici*, and their members, submitted comments and testimony during the Section 1201 Study process. *See, e.g.*, *Library of Congress U.S. Copyright Office Public Roundtable on Section 1201*, at 22-23 (May 19, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-2016.pdf (statement of Troy Dow, Walt Disney Co.) ("I can tell you that the availability of these legal tools has been directly relevant to the decisions to get into these markets … [T]he DMCA has been a factor in the willingness to engage in all of those things. And so, I think it, from our perspective, has been both necessary and successful."); *Library of Congress U.S. Copyright Office Public Roundtable on Section 1201*, at 35 (May 25, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf (statement of Ben Golant, ESA) ("I think that the statute has allowed members to be creative in ways to protect its content through DRM measures and then having 1201 on top of that gives them a modicum of assurance that they can go forward to create more and new things. In fact the entire system … leads not only to the creation of innovative products but also goodwill among our consumers."); *id.* at 15 (statement of Susan Chertkof, RIAA) ("It's been well publicized in the music industry that the industry is shifting from an ownership model to an access model and that access is really kind of where all the growth is.").

AAP, ESA, MPA, and RIAA continuously innovate to meet the demands of their customers and to provide choices to keep audiences growing and diversifying.[16]  They are committed to continuing that innovation.  They welcome and embrace the wide variety of new forms of distribution that offer compelling content in the manner that consumers want to enjoy it.  For example, subscription-based, digital access to movies, television content, books, magazines, music, or videogames, as well as inexpensive, time-limited access to downloads of such works, would not be a viable business model without legal protection for access controls.  In designing their diverse offerings, authors and creative businesses need the assurance that the marketplace is protected from widespread availability of hacking tools that render useless the limitations on digital access that make these offerings possible.  As representatives of member companies that invest billions of dollars in creating and disseminating copyrighted content, *Amici* oppose Plaintiffs' requested injunction because it would undermine the Government's objectives of preventing piracy and encouraging copyright owners to embrace digital business models.

> **B.    Plaintiffs' Dissemination of Circumvention Tools Would Result in the Same Harms that Congress Sought to Prevent by Passing the DMCA.**

In every other case in which litigants have raised First Amendment arguments against Section 1201, and in which courts have applied intermediate scrutiny, those litigants have lost because it was clear that the DMCA would work less effectively to achieve Congress's goals if

---

[16] *See generally* Entertainment Software Association, 2019 ESSENTIAL FACTS ABOUT THE COMPUTER AND VIDEO GAME INDUSTRY,  https://www.theesa.com/wp-content/uploads/2019/05/ESA_Essential_facts_2019_final.pdf; Motion Picture Association of America, 2018 THEATRICAL HOME ENTERTAINMENT MARKET ENVIRONMENT (THEME) REPORT (March 2019), https://www.motionpictures.org/research-docs/2018-theatrical-home-entertainment-market-environment-theme-report/; Association of American Publishers, *Advancing Digital Platforms to Support Student Success*, https://publishers.org/our-markets/higher-education; Joshua P. Friedlander, Recording Industry Association of America, MID-YEAR 2019 RIAA MUSIC REVENUES REPORT, http://www.riaa.com/wp-content/uploads/2019/09/Mid-Year-2019-RIAA-Music-Revenues-Report.pdf.

the statute allowed for the circulation of the circumvention technologies at issue.  *See Reimerdes*, 111 F. Supp. at 329-330 (DVD decryption program), *aff'd Corley*, 273 F.3d at 454-55; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1089 (N.D. Cal. 2004) (same); *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1131 (N.D. Cal. 2002) (software program that allowed removal of use restrictions from files formatted for the Adobe eBook Reader).  The Plaintiffs in this case are no different, and the outcome of the case should be the same as precedents upholding Section 1201.

### 1.    Dr. Huang and Alphamax

Section 1201(a)(2) "is aimed fundamentally at outlawing so-called 'black boxes' that are expressly intended to facilitate circumvention of technological protection measures for purposes of gaining access to a work[.]"  H.R. Rep. No. 105-551, pt. 2, at 29 (1998).  "Congress was particularly concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses."  *MDY Indus.*, 629 F.3d at 947.  As discussed above, copyright owners have done so.  *See, e.g.*, Impact of Digital Piracy on the U.S. Economy, *supra*, at ii ("As of 2018, there are more video streaming subscribers than paid-TV subscribers worldwide, accessing over 500 licensed online video portals.  As a result of this rapid expansion and exploding consumer demand, the industry is producing original content at an unprecedented rate ...").  But consumer devices that undermine technological protections render such business models unattractive, and the legalization of such devices would deter future creativity and innovation.  *Id.* (noting massive piracy of digital video content).

Unauthorized access to such programming could, like traditional cable piracy, involve gaining decrypted access to a scrambled pay-per-view channel to view a boxing match.  Indeed,

many of the lawsuits filed under Section 1201(a) have related to "cable piracy," *i.e.*, gaining

access to cable or satellite television signals without paying for a subscription.  *See, e.g.,*

*CoxCom, Inc. v. Chaffee*, 536 F.3d 101 (1st Cir. 2008); *Echostar Satellite, LLC v. Viewtech, Inc.*,

543 F. Supp. 2d 1201 (S.D. Cal. 2008); *DirecTV, Inc. v. Ferguson*, 328 F. Supp. 2d 904 (N.D. In.

2004).  Unauthorized access could also involve hacking password protection on an online

streaming service like Hulu, or a magazine subscription service like Apple News +, or a

videogame subscription service, in order to see that service's entire catalogue of videogames and

other media options.  Or, unauthorized access might allow a pirate to pay Amazon $3.99 for a

temporary download of a movie (today's equivalent of the old brick-and-mortar video store

rental) and bypass access controls to gain a decrypted copy of the movie, which the pirate could

permanently add to a collection—a permanent copy for which Amazon might have charged

$19.99.  Or, unauthorized access could involve subscribing to an online streaming service, like

Netflix or Spotify, for one month, downloading copies of shows, movies, or sound recordings

that are supposed to be available only to subscribers, and then bypassing access controls to retain

access to the copies after canceling the subscription.

Alphamax's NeTVCR would enable the equivalent of such unlawful activities.  After the

device strips the HDCP encryption used to protect content transmitted through an HDMI cable,

anything viewable on a television screen can be copied in perfect digital quality and added to a

permanent collection of movies, television shows, and music videos, regardless of the terms and

conditions of access.  Huang's declaration is replete with hypothetical – and sometimes very

obscure – uses of the NeTVCR that he contends should qualify as fair uses of copyrighted

material.[17]  But he eventually concedes that he wants to enable what is frequently referred to as "back-up copying," "space shifting," and "format shifting," ECF 30-3 ¶¶ 15, 21-22, terms that are double-speak for creating unauthorized reproductions of full-length, unprotected motion pictures without paying the copyright owners for the copies.  No court has held that such copying constitutes fair use, and several have held the opposite.  *See VidAngel, Inc.*, 869 F.3d at 862 ("The reported decisions unanimously reject the view that space-shifting is fair use under § 107.").[18]

Even assuming for the sake of argument that such unrestrained personal copying were fair use, which it is not, Alphamax and Dr. Huang cannot explain how Congress could have crafted Section 1201 to enable use of that technology while at the same time (i) preventing unrestrained piracy and (ii) encouraging copyright owners to make their works widely available in digital formats.  Huang's declaration does not claim that the NeTVCR will enable *only* individual consumers who have paid for permanent downloads of motion pictures or for Blu-ray discs to create one, or two, or even three copies each.  Instead, he admits that anyone with the

---

[17] A review of the 2018 triennial rulemaking record demonstrates that almost all of the conduct Dr. Huang identifies, other than copying full length movies and shows in an unencrypted format, is already possible using lawful devices currently available in the marketplace.  Split-screen televisions, digital-video-recorders, and videogame consoles that allow for recording game play are all commonplace.  The opposition record pertaining to Dr. Huang's proposed exemption is available on the Copyright Office's website (*see* "Class 4: Audiovisual works – HDCP/HDMI"), https://www.copyright.gov/1201/2018/comments-021218/.  The hearing testimony concerning the proposal is also available on the website (*see* pages 116-184), https://www.copyright.gov/1201/2018/hearing-transcripts/1201-Rulemaking-Public-Roundtable-04-24-2018.pdf.

[18] The Register of Copyrights and Librarian of Congress have considered numerous petitions, during the Section 1201(a) triennial rulemaking processes, arguing that space shifting or format shifting qualify as established fair uses.  The Register and Librarian have consistently rejected these arguments and denied such petitions.  *See, e.g.*, U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION: RECOMMENDATION OF THE REGISTER OF COPYRIGHTS 107-126 (Oct. 2015).

NeTVCR could copy anything she wants, without restriction.  ECF 30-3 at 12.  Accordingly, the NeTVCR is no different from the decryption programs at issue in *Reimerdes*, *Corley*, and *321 Studios* -- except that the NeTVCR would enable the reproduction of *far more* content than any of the technologies at issue in those cases.  Those cases were about gaining unauthorized access to, and creating or distributing copies of, content on DVDs that consumers had purchased, rented, or borrowed.  But the NeTVCR would enable unauthorized access to, and copying of, all content viewable by a consumer, whether acquired through a DVD, a Blu-ray disc, a cable set-top-box on-demand rental, a Netflix or Hulu or YouTube Premium subscription, or a videogame console (which make access to motion pictures, videogames and music videos available via proprietary platforms).  It would thwart all of the other technological measures used on these products and services by enabling decryption at the very last step of the process of delivering protected transmissions to consumers.

Dr. Huang insists that "the NeTVCR is not necessary to would-be infringers, who can already use the publicly-available master key to engage in unlawful infringement."  ECF 30-1 at 27.  This assertion, in addition to being factually suspect, ignores the value of preventing the sale of hacking devices through legitimate channels.  While illicit technologies may always be available somewhere, dramatically more harm would result from their presence on the shelves of BestBuy, Target and Wal-Mart.

In summary, there is simply no way that Congress could have crafted Section 1201 to allow for the distribution of the NeTVCR without undermining the statute's legitimate and substantial goals.  *See* Section 1201 Study, *supra*, at 56 ("[P]erhaps the primary value of the anti-trafficking provisions has been to prevent the development of mainstream business models based around the production and sale of circumvention tools.  Permitting the distribution of such tools

could significantly erode that important benefit.").  Accordingly, Section 1201(a) is constitutional.  *See Corley*, 273 F.3d at 454-55 ("Although the prohibition on posting prevents the Appellants from conveying to others the speech component of DeCSS, the Appellants have not suggested, much less shown, any technique for barring them from making this instantaneous worldwide distribution of a decryption code that makes a lesser restriction on the code's speech component.").

> ### 2.    *Professor Green*

*Amici* support good faith security research conducted by independent researchers, including academics like Professor Green.  However, his arguments fail to address a central question: how could Congress have drafted Section 1201 to achieve its legitimate interests in preventing piracy and encouraging the dissemination of copyrighted works while also allowing good faith researchers to broadly circulate hacking tools?

Congress actually *did* address this issue by crafting exceptions to Section 1201(a) to allow aspects of security research.  *See* 17 U.S.C. §§ 1201(e), (j), (g).  It also empowered the Librarian of Congress to create, when justified, regulatory exemptions to the prohibition on the act of circumventing access controls.  17 U.S.C. § 1201(a)(1)(C).  Professor Green and likeminded advocates have petitioned for expanded security research exemptions, and the Librarian has granted the requests.[19]  37 C.F.R. § 201.40(b)(11).  However, Congress did *not* empower the Librarian to create exemptions to the *anti-trafficking* prohibitions of Section

---

[19] During the 2018 triennial rulemaking proceeding, *Amici* did not oppose renewal of the existing security research exemption, but did advocate, with others, for maintaining parameters that protect copyright owners and the public.  *See* U.S. COPYRIGHT OFFICE, SEVENTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION: RECOMMENDATION OF THE ACTING REGISTER OF COPYRIGHTS 283-313 (Oct. 20018).

1201(a)(2), *see* 17 U.S.C. § 1201(a)(1)(E), precisely because the threat posed by circumvention devices and services to the success of the digital marketplace of ideas is too great.

Congress crafted a nuanced statute to include regulatory proceedings to accommodate, where it could, fair use concerns and other concerns to the degree possible without resulting in a less effective statute.  But the choice between allowing circumvention tools to fall into the hands of bad actors and enacting a prohibition against that risk was stark, and remains so today.  As Professor Green admits, "[i]t is not possible to eliminate the risk of misuse while also informing potential victims of the risk created by the vulnerability."  ECF 30-2 ¶ 40.  For this very reason, Professor Green claims he could not successfully utilize existing statutory exceptions to Section 1201(a)'s prohibitions because he might (even inadvertently, he claims) violate their limitations against researchers facilitating lawbreaking, violations of privacy, infringement, and breaches of security.  ECF 30-2 ¶¶ 40, 43.  There is no legislative approach that would allow Professor Green to widely circulate hacking tools without harming copyright owners and the public.  Analogously, some of the users of the defendants' publication in *Corley* were purportedly interested in identifying security vulnerabilities.  273 F.3d at 435, 439.  But that fact neither justified their circulation of unlawful decryption code nor gave such conduct First Amendment protection against enforcement of the statute.  *Id.* at 454-55.

Professor Green's filings focus primarily on toll-collection systems, industrial-grade encryption modules, secure messaging systems, and other technologies where access controls exist, he says, primarily to protect the privacy of users rather than to prevent copyright infringement.  ECF 30-1 at 20.  But his proposed injunction order, ECF 30-12, is *not* limited to such software and systems; instead, it prohibits enforcement of Section 1201(a) against him for any purpose (and actually appears to prevent enforcement of Section 1201(a) against *anyon*e for

19

any purpose). *Amici* would oppose any injunction here, but the breadth of what is requested certainly threatens the industries *Amici* represent, because access controls are vitally important to publishers of literary works and entertainment software, record labels, movie studios, and millions of artists, craftspeople, technology providers, and others with whom they do business.

Indeed, while Professor Green asserts an interest in protecting the public from security vulnerabilities, he fails to explain how his dissemination of code that enables hacking to exploit such vulnerabilities will prevent the exact harm against which he claims to be fighting.  Whether bad actors identify vulnerabilities themselves or instead learn about them from Professor Green, such "[w]rongdoers commonly identify these vulnerabilities and then exploit them for their own malicious purposes—to defraud, to steal someone's identity, to stalk, or to invade people's privacy."  ECF 30-1 at 6.  As the Southern District of New York has noted, "[t]here are far too many who, given any opportunity, will bypass those security measures, some for the sheer joy of doing it, some for innocuous reasons, and others for more malevolent purposes."  *Reimerdes*, 111 F. Supp. 2d at 331.  Whatever Professor Green's motives, his work could unintentionally cause substantial harm to copyright owners and empower malicious hackers.  Again, the statute satisfies intermediate scrutiny.  *Id.*

## IV.   <u>CONCLUSION</u>

Section 1201(a) promotes the important government interest of avoiding copyright infringement on a massive, worldwide scale, while also enabling new business models that benefit consumers.  There is no means as effective as Section 1201(a) to accomplish Congress's purposes.  The DMCA's history and the explosion of lawful digital content in today's marketplace confirm that Section 1201(a) actually promotes free expression.  *Amici* respectfully submit that the Court should deny Plaintiffs' motion.

DATED: October 31, 2019

Respectfully submitted:

<u>/s/ J. Matthew Williams</u>
J. Matthew Williams (DC Bar No. 501860)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, 7th Floor
Washington, DC 20036
(202) 355-7900
mxw@msk.com

Robert H. Rotstein (*Pro Hac Vice* Motion Pending)
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-2000
rxr@msk.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on counsel of record for the parties electronically through the court's Case Management/Electronic Case Filing system.


DATED: October 31, 2019

Respectfully submitted:


<u>/s/ J. Matthew Williams</u>
J. Matthew Williams (DC Bar No. 501860)
MITCHELL SILBERBERG & KNUPP LLP
1818 N Street NW, 7th Floor
Washington, DC 20036
(202) 355-7900
mxw@msk.com

*Attorneys for Amici Curiae*