# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Matthew Green, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-01492(EGS) |
| | ) | |
| U.S. Department of Justice, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED]
## AMICUS BRIEF OF CONTENT PROTECTION ORGANIZATIONS
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICI CURIAE* ................................................................. 1

INTRODUCTION ................................................................................... 3

BACKGROUND ...................................................................................... 5

    I.      The Evolution of Digital Content Protection for Copyrighted Video.....................5

    II.     The Necessity of DMCA Protection .....................................................11

    III.    The Triennial Exemption Process ........................................................12

    IV.   Reasonable Expectation of DMCA Enforcement ................................15

LEGAL STANDARD .............................................................................. 16

ARGUMENT ......................................................................................... 16

    I.      Plaintiffs are Unlikely to Succeed on the Merits ................................18

    II.     The Balance of the Equities and the Public Interest Weigh Heavily Against an Injunction ................................................................22

CONCLUSION ....................................................................................... 25

INDEX OF EXHIBITS ........................................................................... 26

CERTIFICATE OF SERVICE ................................................................. 27

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004).................................................................................................................15

*Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68 (D.D.C. 2019) .............................13, 15, 18, 19

*In re Napster, Inc. Copyright Litig.,* 191 F. Supp. 2d 1087 (N.D. Cal. 2002)................................6

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007).................................................................................................................23

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................................22

*Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 WL 2617091 (N.D. Cal. June 26, 2019) ...............................................................................22

*United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) ..........................................15

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001)......................................16, 21

*Winter v. Natural Resources Def. Council*, 555 U.S. 7 (2008)...............................................16, 22

*WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275 (2d Cir. 2012) .............................................................22, 24

**Statutes and Constitutional Provisions**

17 U.S.C. § 1201.............................................................................................................12

**Rules**

Fed R. App. P. 29.............................................................................................................1

**Other Authorities**

37 CFR 201.40................................................................................................................21

David Blackburn, et. al, *Impacts of Digital Video Piracy on the U.S. Economy*, NERA ECONOMIC CONSULTING (June 2019).........................................................17

Mark A. Lemley & R. Anthony Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation,* 56 Stan. L. Rev. 1345, 1374 (2004) .......................................6

Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding
    to Determine Exemptions to the Prohibition on Circumvention,
    Recommendation of the Acting Register of Copyrights (2018) .............................................14

Warren Cohen, *Special Report: Copy-Protected CDs*, Rolling Stone (June 7,
    2002) ...........................................................................................................................us policy6

## INTEREST OF *AMICI CURIAE*

*Amici*[1] are the creators, licensors, and administrators of Technological Protection Measures ("TPMs") that protect digital audio-visual content[2] when stored on physical media like DVDs and when transmitted from a "source device" like a DVD player or computer to a screen or other "sink device." These TPMs include the Content Scramble System ("CSS") used to protect content on DVDs from unauthorized use or copying, the Advanced Access Content System ("AACS") used to encrypt content on Blu-ray Discs and also to protect against unauthorized copying or redistribution, and the High-Bandwidth Digital Content Protection system ("HDCP") used to encrypt content for transit over the High-Definition Multimedia Interface ("HDMI").

In general terms, *Amici's* interest in the outcome of Plaintiffs' motion for preliminary injunction[3] is the same as the general interests of the American public, digital content creators, and content owners: maintaining a system of legal, simple, and seamless dissemination of copyrighted digital video content across a variety of devices and media. As set forth herein, this protected digital content ecosystem has been one of the most successful systems for the dissemination of creative content in history. Content creators would not use a digital video content distribution system unless it afforded both technological and legal protection against massive infringement. In

---

[1] In compliance with LCvR 7(o)(5) and Fed R. App. P. 29(a)(4)(E), *Amici* state as follows: *Amici* and their counsel are solely responsible for the content of this Amicus Brief. Counsel for Defendants, Kathryn L. Wyer, has been provided preliminary copies of this Brief, but has played no role in its drafting. No party to this case has contributed money that was intended to fund preparing or submitting this brief, nor has any party's counsel. No person—other than *Amici*—contributed money that was intended to fund preparing or submitting this brief.

[2] Audio-visual content is commonly referred to as "video" content.

[3] Plaintiffs nominally limit their requested relief to an injunction against the *government* enforcing the DMCA anti-circumvention and anti-trafficking provisions against them; however, their arguments may apply with equal force to private enforcement of the DMCA. If the provisions of the DMCA are unconstitutional as applied to Plaintiffs' conduct, they cannot be enforced by private actors. *Amici* thus have an interest in defending the DMCA and preserving their ability to enforce its provisions.

one stroke, Plaintiffs would eviscerate that system, which, for decades, has seamlessly served the needs of consumers, content creators, and device manufacturers.

*Amici* DCP, DVD CCA, and AACS LA, as the licensors of the TPMs that enable digital content dissemination ("*Amici licensors*"), have a heightened interest in insuring that these TPMs can continue to provide protection against unauthorized copying and redistribution of copyrighted content. *Amici licensors* exist to promote the digital content ecosystems supported by their technologies, which would be called into question by the issuance of a preliminary injunction here, and derive their revenue from the licensing of TPM encryption keys[4] and associated technology to digital device manufacturers. *Amici licensors* use this revenue to continuously improve the ability of the digital content ecosystem to protect valuable copyrighted content while stored on a DVD, Blu-ray Disc, or other electronic media, and while it is transmitted to a screen.[5] *See e.g.,* Pak Decl. ¶ 8. *Amici licensors'* ability to provide this protection and derive revenue therefrom would be put

---

[4] Encryption keys are used to prepare content in an encrypted form prior to storage, distribution, or transmission. Decryption keys are used by playback devices to convert encrypted content into unencrypted content that can be interpreted by a screen or other device. For the purpose of this brief, both encryption and decryption keys will be referred to as "encryption keys."

[5] *Amicus* DCP licenses HDCP to over 800 leading digital device manufacturers and digital content owners worldwide, including major motion picture studios. Decl. of Stephen P. Balogh ¶ 5 ("Balogh Decl.") (attached as Exhibit A). DCP licenses HDCP to digital device manufacturers pursuant to the HDCP License Agreement ("Adopter Agreement"). Licensees under the Adopter Agreement ensure digital devices they manufacture comply with the HDCP specification (including content protection rules) and the terms of the Adopter Agreement, and are interoperable with other products over HDCP-protected interfaces. DCP receives annual administrative fees and licensing fees from digital device manufacturers under the Adopter Agreement and annual administrative fees from Digital Content owners under the Content Participant Agreement. Further information about HDCP licenses can be found at www.digital-cp.com/licensing. *Amicus* DVD CCA licenses CSS to an additional 114 licensees. Decl. of Jacob Pak ¶ 5 ("Pak Decl.") (attached as Exhibit B). *Amicus* AACS LA licenses AACS1 or AACS2 to more than 1000 companies. Decl. of John P. Brizek ¶ 7 ("Brizek Decl.") (attached as Exhibit C). AACS LA has issued more than 267 million encryption keys for individual devices, and protects more than 100,000 motion picture and television titles on Blu-ray discs. *Id.*

at risk by the code that Green intends to make publicly available in his book and the NeTVCR device that Huang seeks to commercialize. If the Court were to grant Plaintiffs' motion, *Amici's* TPMs would be less valuable to their licensees, jeopardizing not only the content protected by the TPMs and the secure distribution ecosystem that enables widespread dissemination of that content, but also the licensing revenue received by *Amici licensors.* Ultimately, the relief requested by Plaintiffs would discourage content owners from using *Amici licensor'* distribution systems for their content and deprive consumers of the ability to use those systems to enjoy video content.

## **INTRODUCTION**

Plaintiffs' request for a preliminary injunction against enforcement of the Digital Millennium Copyright Act's ("DMCA") anti-circumvention and anti-trafficking provisions implicates far more than just the interests of Green and Huang. Granting such an injunction would result in indelible and irreversible harm to *Amici*, to the creators of copyrighted content, and ultimately to the American public.

Over the last two decades, the digital content ecosystem has evolved around the foundational assumption that the DMCA's anti-circumvention and anti-trafficking provisions can and will be enforced to protect copyrighted content from unauthorized copying and redistribution. This assumption has been affirmed by a plethora of judicial opinions holding that enforcement of the DMCA's provisions does not violate the First Amendment. The DMCA's relatively hands-off approach has allowed the Information Technology (IT) industry—in conjunction with the motion picture industry and consumer electronics industry—to develop standardized methods for encrypting, decrypting, and transmitting copyrighted content. These methods are employed across

billions of devices and protect many millions of copyrighted works.[6] This standardized approach has resulted in a digital content ecosystem that seamlessly delivers content to consumers without concern for the compatibility of devices or storage media, and simultaneously protects digital content in a way that is invisible to authorized users.

While TPM standardization has redounded to the overwhelming benefit of the American consumer, standardized protection would leave digital content vulnerable to massive infringement were it not for the DMCA's anti-circumvention and anti-trafficking provisions. The commercialization of a single device capable of circumventing a standardized TPM, or the broad dissemination of the code to do so, would result in nearly all digital content being subject to unauthorized access, copying, and redistribution. The DMCA prevents this by placing civil and criminal liability on those who circumvent TPMs or who traffic in circumvention devices. Green and Huang seek an injunction allowing them to profit by trafficking in tools that circumvent the single most important TPM—HDCP—which protects nearly all digital video content, regardless of source, as it is transmitted to a screen.[7] If HDCP is circumvented, all other TPMs become meaningless and all protected digital video content is left susceptible to unauthorized copying and redistribution. Once this content is broadly available "in-the-clear" (i.e., free of any protection), through mainstream channels, there is no way to reverse the damage to *Amici licensors*, content creators, or consumers.

---

[6] *See* Balogh Decl. ¶ 5 ("DCP has over 800 active HDCP licenses to device manufacturers. [It is estimated that DCP has] issued tens of billions of HDCP encryption and decryption keys."); *see also* Brizek Decl. ¶ 7.

[7] Green also seeks to publish code that can circumvent the TPMs that protect digital content at its source, like CSS for DVDs and AACS for Blu-ray discs. These TPMs, though not standardized across all digital media, still protect nearly all underlying digital video content. By circumventing CSS, for example, an individual could gain access to in-the-clear copies of all content stored on any DVD. *See* Pak Decl. ¶ 15.

The harmful and irreversible results of allowing Green to traffic in circumventing code or Huang to traffic in his NeTVCR justify denying Plaintiffs' request for a preliminary injunction. Plaintiffs have failed to show that the DMCA's anti-circumvention and anti-trafficking provisions burden substantially more speech than necessary to achieve the government's legitimate interest in preventing copyright infringement. In fact, the vast majority of the proposed non-infringing uses of the NeTVCR are already made available to consumers by existing devices or could be provided by the NeTVCR after the purchase of an HDCP license from *Amicus* DCP. Thus, Plaintiffs are not likely to succeed on the merits of their First Amendment claim. Further, the granting of a preliminary injunction would do serious and permanent harm to *Amici licensors*, to content creators, and to the American public by undermining the digital content ecosystem and making it difficult to securely distribute valuable digital content to consumers. In comparison, the denial of a preliminary injunction can result only in transitory injury to Plaintiffs by delaying the publication of Green's book and the commercialization of the NeTVCR. There is simply no comparison between these harms, either in scope or reparability. For these reasons, as well as those described in more detail below, *Amici* request that the Court deny Plaintiffs' Motion.

## BACKGROUND

### I.  The Evolution of Digital Content Protection for Copyrighted Video.

Protecting copyrighted video content has not always required extensive use of technology. Before the advent of commercially-available media that could store digital content, concerns about the copying of copyrighted videos were limited. While it was technically possible to copy analog content from storage media like VHS tapes, the resultant duplicate was a degraded version of the original. Decl. of C. Brendan Traw ¶ 3 ("Traw Decl.") (attached as Exhibit D). Serial copying would compound this degradation. *Id.* As a result, in the analog era, video content could be broadly

distributed with more limited concern that unauthorized copies would proliferate. Moreover, because the Internet was not yet fully developed, analog copies had to be delivered physically.

The advent of the digital era at the end of the 20th century changed this. Digital formats have numerous advantages to consumers over analog, including: better picture and sound quality, the ability to incorporate sophisticated navigation tools, menus and interactive features, and smaller physical storage units. *Id.* However, content stored in unprotected digital format can be copied without degradation *ad infinitum*, raising serious concerns about the protection of copyrighted video content. *Id.* In the spring of 1996, when the motion picture industry was considering whether to distribute its valuable content to home consumers in a new digital format— the Digital Versatile Disc ("DVD")—its primary concern was that the new format would leave the content unprotected from repetitive unauthorized copying and redistribution. *Id.*[8] The motion picture industry made it clear that it would not distribute its content in digital format without adequate protection against infringing duplication and redistribution. *Id.*

---

[8] This concern was more than hypothetical. In observing the transition from audiocassette tapes to Compact Discs ("CDs"), the creators of video content had seen how unauthorized copies of copyrighted content could proliferate after a switch to an easily-duplicated format. *See* Mark A. Lemley & R. Anthony Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation,* 56 Stan. L. Rev. 1345, 1374 (2004) ("The economics of digital copyright have also rendered traditional solutions to counterfeiting obsolete. The wide dissemination of copies made by end users over the Internet means that content owners can no longer ignore end-user copies and focus on professional counterfeiters. In order to stop large-scale infringement online, copyright owners must stop the end-user copies as well."). For the music industry, the transition from analog to digital media resulted in more than a decade of expensive, repetitive litigation against "file-sharing" sites and individual infringers. *See generally id.; see, e.g.*, *In re Napster, Inc. Copyright Litig.,* 191 F. Supp. 2d 1087 (N.D. Cal. 2002). Record labels publicly stated that the unauthorized copying of CDs contributed to $4.2 billion in lost revenues and that the uploading of copied content to online "file-sharing" sites cost billions more. *See* Warren Cohen, *Special Report: Copy-Protected CDs*, Rolling Stone, (June 7, 2002), https://www.rollingstone.com/music/music-news/special-report-copy-protected-cds-245618/.

To bridge the gap between consumer desire for higher-quality digital content and the content creators' desire to maintain protection of their valuable intellectual property, interested parties formed the Copy Protection Technical Working Group ("CPTWG"). *Id.* ¶ 5. This group comprised 54 members of the motion picture, consumer electronics, and IT industries as well as several trade groups. *Id.* The CPTWG developed the conceptual framework for the current digital content ecosystem. *Id.* In this system, digital content would be stored on physical media—like DVDs—in an encrypted form that could not be decrypted without an encryption key. *Id.* ¶¶ 5, 6. These encryption keys and associated technology would be licensed to the manufacturers of video playback devices. *Id.* Pursuant to the licenses, those manufacturers would agree to protect the keys and the content on those devices and to use the associated technology only for compliant devices. *Id.*; *see also* note 5, *supra*. When a DVD was inserted into an authorized playback device, that device would use the encryption key to decrypt the digital content and prepare it for transmission to a screen or other device.[9]

For video content distributed in digital form using physical media such as the DVD, the content creators insisted on sufficient protection to deter ordinary non-technical consumers from easily making copies and to ensure that products sold to consumers would not, in their "as sold" form, circumvent technological protections. Traw Decl. ¶ 3; Pak Decl. ¶ 5. As noted above, for DVD, the Content Scramble System was developed and deployed in time to launch the DVD business in 1996 in Japan and in 1997 in the United States. Traw Decl. ¶¶ 5-6. The technology provided was limited by two factors—the processing power then available for consumer products

---

[9] Originally developed by Matsushita Electric Industry Co. Ltd. (now known as Panasonic Corporation) and Toshiba Corporation, the standardized encryption technology for content stored on DVDs became known as the Content Scramble System ("CSS"). Traw Decl. ¶ 6; Pak Decl. ¶ 3. *Amicus* DVD CCA now licenses this technology. *Id.*

and the U.S. Government's export control rules that permitted general export of encryption technology and systems only up to key lengths of 40 bits. Because the resulting encryption system was relatively weak, defeating that system was correspondingly easier. That made reliance on legal protections against circumvention all the more important.

As picture quality advances took place, first to high definition ("HD") and most recently to Ultra High Definition ("Ultra HD"), the industries looked to enhance the ability of the physical media to deliver HD and then Ultra HD formats for viewing in consumers' homes. Brizek Decl. ¶¶ 4, 15. Advances in technical capability—reducing or even eliminating the processing power constraints noted above—and changes in U.S. export control rules enabled the industries to enhance the technical capabilities of the content protection regimes.

While the CPTWG continues to meet periodically, its role as a forum for discussion of state-of-the-art technologies has been diminished over time. With the model of technological protection backed by licensing strongly reinforced by legal protections of the DMCA firmly established in the early 2000s, the need for the on-going forum was reduced. Therefore, when companies wanted to move physical media delivery of video content to HD quality, several companies simply formed a consortium and pushed forward with the technological development. Accordingly, AACS LA was formed by eight companies for the purpose of devising such an enhanced regime for HD content brought to consumers on Blu-ray Discs. *Id.* ¶ 2. The technology used the U.S. Government standard algorithm, the Advanced Encryption Standard ("AES"). It employed 128-bit keys and imposed stronger standards for the protection of the keys and associated technologies (called "robustness standards"). Most recently, AACS LA developed a further enhanced system, called AACS2, for use with Ultra HD content delivered on Ultra HD Blu-ray Discs. *Id.* ¶ 14.

AACS LA also required that products using AACS2 must be capable of some form of field updating, so if a hack revealed a vulnerability in a particular product, that vulnerability could be fixed using a firmware upgrade. *Id.* ¶ 4. Neither CSS nor AACS technologies required the field upgrade capability. *Id.* Since many consumer electronics products were never connected to the Internet, pushing firmware upgrades to those products was impractical. With Internet access now virtually ubiquitous, requiring the upgrade capability makes more sense. *Id.* However, DVD and HD Blu-ray products lack the capacity to be upgraded.

Initially, video content did not need protection during transmission between playback device and screen. Traw Decl. ¶¶ 7, 9. Televisions and computer monitors were only capable of accepting and displaying analog signals and, as noted above, those signals provided some inherent protection against repetitive duplication. *Id.* ¶¶ 3, 7. However, CPTWG participants recognized that as DVDs began to replace VHS cassettes, analog screens would be replaced by digital screens and content would be transmitted between playback device and screen in digital format. *Id.* ¶ 7. It would do no good to distribute DVDs with CSS protections if those protections were immediately lost when the DVD player transmitted the content in digital format to the next device without applying some protection against unauthorized access and use. *Id.* ¶ 9; *see* Pak Decl. ¶ 7. Around this time, digital television interfaces began to use a single, uniform transmission standard: HDMI. Traw Decl. ¶ 11. Digital computer video interfaces also settled on a single transmission standard, the Digital Video Interface ("DVI"). *Id. Amicus* Intel Corporation developed HDCP to protect content flowing between devices via either HDMI or DVI. *Id.* HDCP is now the standard link protection between all playback devices utilizing HDMI or DVI—including set-top cable and satellite boxes; streaming devices like Apple TV, Roku, and Amazon Fire boxes; DVD and Blu-

ray players; computers; Digital Video Recorders ("DVRs"); and game consoles—and digital screens.[10] *Id* ¶¶ 11, 12; Balogh Decl. ¶ 4; Brizek Decl. ¶ 9; *see* Pak Decl. ¶ 7.

Like many other TPMs, HDCP uses an encryption/licensing system to ensure protection of video content transmissions. Balogh Decl. ¶ 4. However, HDCP is distinct from TPMs like CSS and AACS—which apply to a single storage media—in that HDCP protects content across a wide array of sources. *Id.* ¶¶ 4, 5; *see* Pak Decl. ¶ 7 (describing HDCP as "the universally applied digital output protection"); *see also* Brizek Decl. ¶ 9. HDCP is agnostic to the content of the digital transmissions it protects, meaning that it does not know whether it is transmitting a video game, motion picture, or music video. Manufacturers of playback devices license HDCP to encrypt digital content for transmission across HDMI and manufacturers of digital screens license HDCP to decrypt that content after transmission for final display to the consumer. Balogh Decl. ¶¶ 4, 5. Nearly all consumer devices in the U.S. market that permit HDMI output of copyrighted digital video content only do so after applying HDCP. *Id.* ¶ 5; Brizek Decl. ¶ 9. *Amicus* DCP is the licensor of HDCP keys and has over 800 active licenses with device manufacturers. Balogh Decl. ¶¶ 4, 5. DCP estimates that tens of billions of devices have been issued HDCP encryption keys. *Id.* ¶ 5. HDCP is thus essential to the chain of protection for digital video content, protecting the final stage of delivering nearly all such content to consumers. *Id.*; Pak. Decl. ¶ 15; Brizek Decl. ¶ 18.

---

[10] All hard-wire digital transmissions to televisions in the United States are protected by HDCP. *See* Traw Decl. ¶ 11.



Without the protection provided by HDCP, the valuable copyrighted digital content transmitted over billions of HDMI connections every day would be subject to unauthorized access, copying, and redistribution. Balogh Decl. ¶ 5; *see* Pak Decl. ¶¶ 7, 15; Brizek Decl. ¶ 19. The effect would be to eviscerate virtually every digital video content delivery protection system, exposing valuable copyrighted video content to massive infringement. Balogh Decl. ¶ 5; *see also* Pak Decl. ¶¶ 14, 15; Brizek Decl. ¶¶ 18, 19.

## II.    The Necessity of DMCA Protection.

From the origin of the CPTWG, participants recognized that the ability of TPMs to protect valuable copyrighted digital content would be limited and would have to be supplemented by legal protections. Traw Decl. ¶ 8. Though the members of the IT industry could provide a robust protection system against most unauthorized access, a well-resourced hacker with sufficient time could ultimately defeat any TPM. *Id.* Isolated incidents of hacking are unavoidable in any content delivery system. However, the possibility for broad distribution of the "hack" ("cracking" material

such as unlicensed keys and code to extract the content in-the-clear) and the sale of devices that could allow anyone to utilize the hack were a significant threat to the viability of the CPTWG's proposed digital video delivery system. *Id.* Without an adequate solution, such circumvention and trafficking would inhibit the dissemination of digital video content. *Id.*

In 1996, when the CPTWG first began meeting, its participants were aware that the countries of the world were negotiating what became the Copyright Treaty of the World Intellectual Property Organization in December 1996. *Id.* That Treaty was then implemented in the United States through the DMCA. *Id.* Two provisions of the DMCA, the anti-circumvention provision (codified at 17 U.S.C. § 1201(A)(1)(a)) and the anti-trafficking provision (codified at 17 U.S.C. § 1201(a)(2)) filled the enforcement gap that existed in the CPTWG's planned digital ecosystem.[11] These provisions picked up where the technical capabilities of TPMs left off. They prohibited individuals from circumventing the TPMs that protected copyrighted video content and from manufacturing or trafficking in devices designed to do so. *See* 17 U.S.C. § 1201. This added legal regime was supported by CPTWG participants as essential to the development of a stable and secure content delivery ecosystem. Traw Decl. ¶ 8. The protection provided by the DMCA is also critical to the continued health of that ecosystem.

## III.    The Triennial Exemption Process.

The DMCA also includes a rulemaking process designed to preserve the ability to make non-infringing use of content that would otherwise not be available if there were not exceptions to the broad prohibition against the circumvention of TPMs. As this Court has recognized, "Congress sought to balance its efforts to curtail digital piracy with users' rights of fair use by putting in place

---

[11] There are also anti-trafficking provisions applicable to circumvention of TPMs that protect against unauthorized uses of copyrighted content. See 17 U.S.C. §1201(b). Those provisions are not at issue in this case.

a triennial rulemaking process to exempt certain non-infringing uses of certain classes of copyrighted works from the anti-circumvention provision for three-year periods." *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 78 (D.D.C. 2019). *Amici* have participated in every triennial rulemaking proceeding where their interests were at stake since the process began in 2000. *See* Pak Decl. ¶ 9; Brizek Decl. ¶ 12.

In the latest triennial, *Amicus* DCP submitted a comment in opposition to an exemption petition that would have allowed Huang's proposed NeTVCR to circumvent HDCP. *See* Balogh Decl. ¶ 6, Ex A. Huang alleged then, as he does now, that his device was aimed at permitting certain types of fair use of copyrighted content that could not be accomplished without circumventing HDCP. *Id.* DCP's opposition attached more than 100 pages of exhibits demonstrating that each of Huang's proposed noninfringing uses could be accomplished by devices that already existed in the marketplace without the need to circumvent HDCP. *Id.* In denying Huang's proposed exemption, the Register of Copyrights' recommendation to the Librarian of Congress stated, "opponents set forth a large number of concrete examples of potential alternatives to circumvention that the petitioner failed to meaningfully challenge." Decl. of Brian M. Willen Ex. 3, at 19, ECF No. 30-7. The only use facilitated by Huang's NeTVCR that was not capable of being provided by other legal products was producing unprotected copies of digital content for infringing uses. Balogh Decl. ¶ 6.

In his declaration attached to Plaintiffs' Motion, Huang again includes a laundry list of functions that he says he would like to enable with his NeTVCR. Like those functions included in Huang's unsuccessful exemption petition, many of these functions can be enabled by existing devices without circumvention. Still more of Huang's proposed functions have been determined

in prior triennials (and, in some cases, repeatedly over several triennials) to enable only infringing use of the copyright of content protected by TPMs.

With respect to the functions that have non-circumventing alternatives that were identified in the triennial proceeding, *Amici* have already submitted many pages of evidence—mostly in the form of product advertisements—demonstrating that these functions are currently available in the marketplace.[12] By way of example, Huang proposes to use his product to enable viewing at a later time. *See* Huang Decl. ¶ 22, ECF No. 30-3. That capability is widely available through many devices, including set-top-boxes provided by cable and satellite providers and third-party devices such as TiVo. *See* Balogh Decl. Ex. A. There is no shortage of ways in which such "time shifting" can be accomplished without circumventing HDCP. *Id.* In addition, of course, since CSS and AACS technologies are applied to physical media, that media can be played and replayed any time the consumer desires, with no need for circumvention at all.

Further, many of the functions proposed by Huang were rejected in the most recent triennial proceeding because they represented infringing uses of copyrighted content. Most strikingly, the NeTVCR's proposed capacity to copy digital video data for use on another device, *see* Huang Decl. ¶ 15, a practice known as "space-shifting," has been repeatedly rejected in the proceedings on the ground that the Register of Copyrights could not find that the activity was "more likely than not" noninfringing. *See* Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights 113 (2018) ("2018 Rulemaking") ("The Register has declined to recommend an exemption for such uses in the past four rulemakings because the proponents

---

[12] *Amici* need not recount each non-circumventing alternative here and instead draws the Court's attention to the summary attached as an exhibit to the Declaration of Steve Balogh. *See* Balogh Decl. Ex. A.

have failed to establish a legal or factual record sufficient to establish that the space-shifting and/or format-shifting of audiovisual works, e-books, and other copyrighted works constitutes a noninfringing use.") (citing the Recommendation of the 2015 Triennial Proceeding). Further, the copying of copyrighted digital video data for "personal back-up" purposes, *see* Huang Decl. ¶ 21, has also been repeatedly rejected in the proceedings on similar grounds. *See* 2018 Rulemaking at 113 ("When considering space- or format-shifting for the transfer of copyrighted works to different devices or the creation of back-up copies, the Register has consistently found insufficient legal authority to support the claim that these activities are likely to constitute fair uses under current law.").

## IV.     Reasonable Expectation of DMCA Enforcement.

For over twenty years, the DMCA has been consistently enforced to prohibit exactly the type of conduct that Green and Huang now seek to engage in. This enforcement represents a consensus between Congress, federal regulators, the Department of Justice, and the courts and has provided the stable foundation upon which *Amici* and others have built the digital content ecosystem. Courts across the country have consistently upheld the DMCA against First Amendment challenges like this one. In its Memorandum Opinion on Defendants' Motion to Dismiss, this Court cites many of these opinions for the proposition that the DMCA's provisions are content-neutral and only subject to intermediate scrutiny. *See Green* at 91-93 (citing *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001); *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004);  *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002). In each of these cases, the Court held that the enforcement of the DMCA did not violate the First Amendment. *Id.*

The importance of this case law goes well beyond the standards it provides. From *Corley* onward, the motion picture industry, consumer electronics industry, and IT industry have relied on repeated judicial assertions that the DMCA's anti-circumvention and anti-trafficking provisions could be constitutionally enforced against those who seek to publish circumventing code or market circumventing devices. *See Corley*, 273 F.3d at 452-59. The digital content ecosystem has flourished—and billions of copies of valuable digital content have been distributed—under the assumption that DMCA enforcement will continue, and thus provide legal protection that can pick up where technological protection leaves off. Without the consistent enforcement of the DMCA, both at the regulatory and judicial levels, and both by private and government actors, the ecosystem will collapse.

## LEGAL STANDARD

The legal standards governing Plaintiffs' Motion for Preliminary Injunction are well-established both in the case law and in the parties' briefs and do not bear lengthy repetition here. The Court's analysis of Plaintiffs' Motion is guided by the four *Winter* factors: (i) the likelihood of success of Plaintiffs' claims on the merits; (ii) irreparable harm in the absence of preliminary relief; (iii) the balance of the equities between the parties that would result from the issuance or denial of the injunction; and (iv) whether an injunction will be in the public interest. *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 20 (2008).

## ARGUMENT

Should the Court grant Plaintiffs' request for a preliminary injunction and allow Green and Huang to legally distribute their circumventing instructions and devices, there will be *no viable mechanism* through which digital video content can be delivered to consumers on the massive scale it is today without the risk of substantial infringing activities. Once this infringement occurs,

it is impossible to reverse, particularly if it is facilitated by a commercial product like Huang's NeTVCR. The civil and criminal liabilities imposed by the DMCA form a bulwark of protection for copyrighted digital video content that cannot be replaced by technological measures or industry adjustment. Losing this protection, even just temporarily and even just for a single device, would expose billions of dollars of investment-backed copyrighted content to unauthorized access, copying, and redistribution.[13]

The profound negative impact of allowing Plaintiffs to commercialize instructions and devices that facilitate copyright infringement strongly countenances against granting a preliminary injunction in this case. As the government's interest in preventing the infringement of valuable digital video content can only be served by a robust prohibition against the commercialization of a device that circumvents HDCP, the DMCA's anti-circumvention and anti-trafficking provisions do not burden substantially more speech than necessary to further the government's legitimate interest. Thus, Plaintiffs claims are unlikely to succeed on the merits. Further, the potential temporary benefit to Plaintiffs in publishing the code to circumvent HDCP (and potentially other protection systems such as AACS) and commercializing the NeTVCR during the pendency of this case pales in comparison to the permanent injury to *Amici* and to content creators. Both of the latter would see their decades long investment in the digital content ecosystem devalued due to the

---

[13] As of 2019, the Global Innovation Policy Center at the U.S. Chamber of Commerce estimated that piracy of digital content resulted in 29.2 billion in lost revenue each year. *See* David Blackburn, et. al, *Impacts of Digital Video Piracy on the U.S. Economy*, NERA ECONOMIC CONSULTING (June 2019), https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf. This loss could only be compounded by the availability of a commercial device that can circumvent digital TPMs distributed under color of a court injunction through legitimate retail channels. *See* Pak Decl. ¶¶ 10-14 (recounting efforts by *Amicus* DVD CCA to prevent the commercialization of products containing unauthorized CSS decryption code and the effect of the release of decryption code on the development of commercially available devices that make the unauthorized code accessible to average consumers).

circumvention of TPMs and the loss of protection for valuable copyrighted video content. Thus, the balance of the equities weighs strongly against the Plaintiffs. Finally, as courts have repeatedly held, the public has a strong interest in the enforcement of copyright protections, including the DMCA. Thus, an injunction would not serve the public interest. For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## I.     Plaintiffs are Unlikely to Succeed on the Merits.

In its ruling on Defendants' Motion to Dismiss, the Court provided the framework for considering Plaintiffs' likelihood of success on the merits. Only Plaintiffs' First Amendment challenge to the anti-circumvention and anti-trafficking provisions of the DMCA *as applied* to their particular proposed conduct survived the Motion to Dismiss. *Green v. U.S. Dep't of Justice,* 392 F. Supp. 3d 68 (D.D.C. 2019). These claims are subject to intermediate scrutiny, "which only requires the government to prove that the restriction serves a substantial governmental interest; that the interest served is unrelated to the suppression of free expression; and that the restriction does not burden substantially more speech than is necessary to further the government's legitimate interest." *Id.* at 91-93.

The Court has narrowed the analysis in this case to only the third prong: whether the DMCA—as applied to Green's publication of the code to circumvent HDCP (and potential other content protection systems such as AACS) and Huang's NeTVCR—burdens substantially more speech than necessary to further the government's legitimate interest in "preventing trafficking in devices and technologies that would undermine the access controls that protect copyrighted works." *Id.* at 94. In refusing to dismiss Plaintiffs' as-applied challenge, the Court identified two areas where additional factual testimony was required to support Defendants' position: (1) whether the anti-trafficking provisions of the DMCA "would be substantially less effective if individuals

and companies such as [p]laintiffs were allowed to disseminate decryption technologies, even if they intended the dissemination to serve a limited purpose;" and, (2) whether Plaintiff's proposed conduct "would undermine the effectiveness of access controls, thus interfering with the online market for copyrighted works by deterring copyright owners from making works available online at all." *Id.* at 95.[14] The evidence presented by *Amici* is determinative as to each of the Court's two inquiries.

As to the first, *Amici* have shown that the protections afforded by the anti-trafficking provisions of the DMCA would be eviscerated by the commercial distribution of Huang's NeTVCR or the publication of Green's circumventing code. Both Huang's device and Green's code would enable easy and widespread circumvention of the protection that HDCP affords to digital transmissions over HDMI. Plaintiffs' "intent" is irrelevant. Once the code and/or devices are allowed to be lawfully distributed to the public, there is no longer an effective means of providing technological protection against infringement. Moreover, individual infringement enforcement actions would come at a tremendous cost—in terms both of economic and judicial resources—and likely be ineffective. The entire digital content ecosystem relies on the standardized protection provided by HDCP for the last step in the process of providing digital video content to consumers. If this protection is lost, all protected digital video content becomes susceptible to widespread infringing copying. As history teaches, once copyrighted content is available in-the-clear, massive online infringement is inevitable and the negative effect on the market for the work is substantial. *See* note 8, *supra.* By targeting the common link in all digital video TPMs, Huang's device, and others like it, pose the greatest threat to the system of digital

---

[14] The Court *did not determine* that Plaintiffs were likely to succeed on these points, only that the government, at the motion to dismiss stage, could not place facts in the record to contest Plaintiffs' allegations. *Id.* at 96.

content ecosystem since its creation more than two decades ago. *Amici* have not only demonstrated that the anti-trafficking provision of the DMCA would be less effective if the Court permitted the sale of Huang's device and Green's hacking code, *Amici* have shown that all other TPMs protecting copyrighted digital video would be superfluous once HDCP is circumvented.

The above analysis also partially answers the Court's second inquiry: whether Plaintiffs' proposed conduct would undermine the effectiveness of the access controls that protect copyrighted content.[15] Plaintiffs' hacking code and circumventing device are specifically intended to circumvent HDCP, the TPM that protects nearly all digital video content as it is transmitted to a screen. Regardless of how content is encrypted at its source or at the screen, circumventing HDCP would allow potential infringers to gain easy access to in-the-clear copies of copyrighted content, rendering moot any prior measures to protect it. Given the existing architecture of the digital content ecosystem, neither *Amici* nor any other members of the IT industry would be able to protect against the resulting explosion of infringing activity. There is simply no consistent technological defense to the type of circumvention that Plaintiffs' actions would facilitate. The only defense is the legal protections provided by the DMCA.

Finally, *Amici* have provided evidence demonstrating that the DMCA's anti-circumvention and anti-trafficking provisions do not burden substantially more speech than necessary to further the government's legitimate interest in preventing copyright infringement. Even a cursory review of the devices currently available to American consumers demonstrates that those devices already enable certain functions Huang proposed for his NeTVCR (e.g., time shifting enabled by TiVo and

---

[15] The Court also inquires into whether the undermining of access codes would result in content creators restricting the availability of their content. *Amici* state no position as to this element of the Court's inquiry, and instead defer to the *amicus curiae* brief filed on behalf of the content creators.

many cable set top boxes). Further, exemptions currently permitted under the DMCA's triennial review process already permit end users to engage in many of the types of fair uses proposed by Huang.[16] Finally, to legally market the NeTVCR, Huang would simply have to license the encryption keys to HDCP, CSS, and AACS from *Amici* and agree—like all other licensees—not to facilitate copyright infringement. *See* Pak Decl. ¶ 7. Huang has refused to do so, likely because facilitating infringing uses of valuable copyrighted digital content is the true purpose of the NeTVCR—as well as its only distinguishing feature in the marketplace. Huang's refusal to avail himself of existing, well-trod avenues for engaging in *protected* speech belies any contention that such speech is unduly burdened by the enforcement of the DMCA. Neither a consumers' ability to engage in productive, non-infringing uses of copyrighted materials nor Huang's ability to commercialize a device that facilitates legal use of copyrighted digital video content are burdened by the current legislative and regulatory scheme.

---

[16] Though consumers may not have access to a perfect copy of digital content for all of their non-infringing uses, the law does not require that such a copy be provided in order to avoid offending the First Amendment. *See Corley*, 273 F.3d 429, 459 ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original."). The triennial exemption process provides a legal mechanism through which end users of copyrighted digital video content can petition to make fair use of that content, even if it is protected by a TPM. Many of Huang's proposed functions for his NeTVCR are already permitted to end users by existing exemptions. For example, an exemption already permits end users to circumvent TPMs for the creation of non-commercial videos, documentaries, or parodies for the purpose of criticism and comment. *See* 37 CFR 201.40(b)(1)(i). Other exemptions permit end users to circumvent TPMs for a range of educational uses. *See* 37 CFR 201.40(b)(1)(ii). Still other exemptions have been granted that allow disability service offices and educators to create content that is accessible to those with visual or auditory impairments. *See* 37 CFR 201.40(b)(2)(i). Though users may not have access to a perfect, digital copy of the work from which to base their fair uses, existing methods are more than sufficient to support fair use. In fact, *Corley* makes clear that fair use is adequately facilitated even if end users must capture the video content "by pointing a camera, a camcorder, or a microphone at a monitor as it displays the DVD movie." 273 F.3d at 459.

In total, *Amici* have shown that the consistent enforcement of the DMCA's anti-circumvention and anti-trafficking provisions, as applied to HDCP, CSS, and AACS, is necessary for the survival of the digital content ecosystem and does not unduly burden protected speech. This evidence fills the gaps identified by the Court in the government's motion to dismiss briefing and demonstrates that Plaintiffs are not likely to succeed on the merits of their as-applied First Amendment challenge.

## II.    The Balance of the Equities and the Public Interest Weigh Heavily Against an Injunction.

The public's interests in maintaining legal, simple, seamless, and secure access to digital video content, and in preventing copyright infringement are best served by denying Plaintiffs' Motion. The third and fourth *Winter* factors are whether the balance of the equities weighs in favor of Plaintiffs and whether the public interest favors a preliminary injunction. Where the government is the party against whom an injunction is sought, these factors collapse into a single public interest inquiry. *Nken v. Holder*, 556 U.S. 418, 465 (2009) ("[T]he traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party.").

The public has a strong interest in the enforcement of the DMCA's anti-circumvention and anti-trafficking provisions. *See Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019). This interest is not simply based on the general principle that individuals should be encouraged to follow the law, but on the specific economic and cultural balance that is struck by the DMCA and other copyright laws. "Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012). Courts have

consistently held that the public interest in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works. *See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1222 (C.D. Cal. 2007).

Here, the public interest is best served by permitting the enforcement of the DMCA's anti-circumvention and anti-trafficking provisions during the pendency of this lawsuit. At worst, if the Court denies Plaintiffs' request for a preliminary injunction and ultimately rules for them on the merits, publication by Green of the hacking code would have been unnecessarily paused during the pendency of this case[17] and Huang's commercialization of his NeTVCR would have been similarly delayed. Any harm to the public that resulted from these events would be small or nonexistent. In comparison, the harm to the public if the Court grants the preliminary injunction and then rules against the Plaintiff on the merits would be monumental and irreversible. Once Green's circumventing code is published, it cannot be withdrawn from the public sphere. The same is true for Huang's NeTVCR. The result of an improvident grant of a preliminary injunction would be unnecessarily exposing billions of dollars' worth of digital video content to unauthorized access, copying, and redistribution. Any copy made of this content would be in-the-clear—unprotected by any TPM. These copies could then be duplicated and distributed *ad infinitum*, removing the need for any additional circumvention in the future. *See* Pak Decl. at ¶ 15; Traw Decl. ¶ 3.

---

[17] Plaintiffs contend that a delay in the publication of HDCP, CSS, and AACS hacking codes would prevent security research and allow vulnerabilities in those protection systems to persist. This contention collapses under scrutiny. For the *vast* majority of consumer electronic devices like televisions, DVD players, and Blu-ray players, TPM protection is embedded in the device and cannot be updated with a security patch. The publication of Green's hacking code *could not* result in the improvement of the TPMs on these devices. Instead, the publication of hacking code would simply make the devices' TPMs worthless and expose all existing digital content to infringement.

This Court is not the first to confront this issue. In *WPIX, Inc. v. ivi Inc.*, the Southern District of New York considered a similar set of facts and came to the conclusion that the public interest weighed heavily in favor of maintaining strong copyright protections during the pendency of a lawsuit. *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012). There, the court was asked to issue a preliminary injunction to prevent a company—ivi—from operating a service that captured over-the-air broadcasts and made them accessible to the public without the consent of the copyright owner. *Id.* at 598. In granting the preliminary injunction, the court held:

> If plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming. In contrast, ivi simply provides an additional way, among many others, for consumers to view the copyrighted programming created by plaintiffs. Significantly, however, plaintiffs currently retain control over how and where this material gets distributed, including Internet retransmissions, through negotiated licenses and other mechanisms.

*Id.* at 621. As in *WPIX*, allowing Plaintiffs to traffic in circumventing code and devices during the pendency of this lawsuit would do permanent damage to the public's interest. Denying Plaintiffs' request would, at worst, do temporary damage to Plaintiffs themselves and no damage to the public interest.

Moreover, granting a preliminary injunction would undermine the very foundation of the modern digital content ecosystem. In doing so, it would limit the public's ability to receive copyrighted digital video content in high quality digital formats. As explained above, this ecosystem is premised on the assumption that the DMCA's provisions will be consistently enforced. For years, the protection afforded by these provisions against the infringement of digital content has been consistently upheld and has contributed to the most successful content distribution system since the invention of the printing press. From its origin at the dawn of the 21st

century, the system has promoted video content consumption everywhere inside the home and outside the home, even on airplanes. Absent predictable enforcement of the DMCA, content creators have little incentive to trust their content to the protection of standardized TPMs like HDCP, CSS, and AACS and the digital content ecosystem in its current form is put in extreme jeopardy. The failure of this ecosystem would not only be harmful to the content creators, device manufactures, and IT industry, it would be incredibly damaging to the American public's ability to access and consume video content.

## CONCLUSION

For the foregoing reasons, *Amici Curiae* Digital Content Protection, L.L.C. ("DCP"), Intel Corporation ("Intel"), Advanced Access Content System Licensing Administrator, LLC ("AACS LA"), and DVD Copy Control Association ("DVD CCA") respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction and for such other and further relief as the Court deems just and proper.

DATED: October 31, 2019

Respectfully submitted:

/s/    James M. Burger
James M. Burger (DC Bar No. 151720)
THOMPSON COBURN LLP
1909 K Street, NW Suite 600
Washington, DC 20006
(202) 585-6909
jburger@thompsoncoburn.com
*Attorneys for Intel Corporation and*
*Digital Content Protection, L.L.C.*

/s/    David Jonathan Taylor
David Jonathan Taylor (DC Bar No. 483431)
RIGHT SIZE LAW PLLC
621 G Street, SE
Washington, DC 20003
(202) 546-1536
david.taylor@rightsizelaw.com
*Attorneys for DVD Copy Control Association,*
*Inc. and Advanced Access Content System*
*Licensing Administrator LLC*

## INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | **Declaration of Stephen P. Balogh (DCP)** |
| **Exhibit B** | **Declaration of Jacob Pak (DVD CCA)** |
| **Exhibit C** | **Declaration of John P. Brizek (AACS LA)** |
| **Exhibit D** | **Declaration of Brendan S. Traw (Intel)** |

**CERTIFICATE OF SERVICE**

I certify that on October 31, 2019, I caused a true and correct copy of the foregoing to be filed with the Court using the Court's Electronic Case Files System ("ECF"). The document is available for review and downloading via the ECF system and will be served upon all counsel of record by operation of the ECF system.


*/s/ James M. Burger*
James M. Burger