# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Matthew Green, *et al.*,  )
                          )
    Plaintiff,        )
                          )
v.                        )  Civil Action No. 16-cv-01492(EGS)
                          )
U.S. Department of Justice, *et al.*,  )
                          )
    Defendants.       )

**DECLARATION OF JACOB PAK, PRESIDENT,
THE DVD COPY CONTROL ASSOCIATION IN SUPPORT OF
THE AMICUS BRIEF OF CONTENT PROTECTION ORGANIZATIONS
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.   INTRODUCTION TO DVD CCA**

1.    I am Jacob Pak, the President of DVD Copy Control Association ("DVD CCA"). I offer this declaration to provide background on DVD CCA and its operations and particularly, how the proposed publication of Dr. Matthew Green's research of circumvention tools targeting HDCP and the proposed distribution of the NeTVCR would adversely affect the content protection provided by the Content Scramble System ("CSS") licensed by DVD CCA.

    A.    **Background**

2.    The DVD CCA is a not-for-profit Delaware corporation with its principal office in Morgan Hill, California. It licenses CSS for use in connection with audio-visual content prerecorded onto DVD discs in order to protect against unauthorized access to or use of such content.

1

3.  In 1999, Matsushita Electric Industrial Co., Ltd. ("MEI," the company now known as Panasonic Corporation) established DVD CCA. At that time, MEI and Toshiba Corporation licensed DVD CCA to sublicense the technology that MEI and Toshiba had developed known as CSS. Shortly after its establishment, DVD CCA was converted into a business association recognized by the Internal Revenue Service as qualifying for treatment under Section 501(c)(6) of the Internal Revenue Code.

B. **Licensing**

4.  DVD CCA licenses CSS and associated encryption keys to the owners of audio visual content and the related authoring and disc replicating companies; producers of encryption engines, hardware and software decryptors; and manufacturers of DVD players and DVD-ROM drives.

5.  The availability of CSS was essential to inducing content owners to release their valuable content in digital form on DVD, thereby allowing consumers to enjoy movies and other audiovisual content in much higher resolution than previously available on analog VHS tapes. The availability of CSS laid the groundwork for the launch of what became the fastest growing consumer electronics format in history. Although now twenty years old, the DVD format remains a very popular form of distribution for audiovisual content. DVD CCA has 114 active licensees and expects to continue operations for the foreseeable future.

1. **Technology**

    (a) *Content Scrambling System*

6.  CSS is an encryption-based technology. The technology permits a content owner to encrypt the content in a manner that requires the use of a licensed decryption product to view the content.

### *(b)   Relationship to HDCP*

7.   In order for a product to be licensed to decrypt content, the terms of the CSS license require the product manufacturer (licensee) to equip the product in a manner that adheres to certain rules ("compliance rules") specifically designed to protect copyrighted content from unauthorized access and use. Under the compliance rules, a manufacturer must apply another authorized digital output protection technology to any digital outputs (since the content is decrypted within the DVD player and then exists in a "clear" unprotected form that would enable the types of uses that are designed to be protected against). In the United States, the universally applied digital output protection is HDCP, since digital televisions sold in the United States all (or nearly all) have HDMI inputs and HDCP decryption capabilities. The use of HDCP protection, in accordance with the CSS compliance rules, serves to protect that decrypted content as it is transmitted digitally to a monitor. If HDCP were not applied, then content could be captured in the signal as it is passed to the monitor. For example, the cable to the monitor or TV could be attached to an HDMI video capture device as easily as the cable could be attached to the monitor. An HDMI video capture device can be as simple as a hand-sized box capable of copying the contents of the HDMI signal to an SD-card or USB memory device. The application of HDCP to the video signal output from the manufacturer's CSS-compliant product prevents the HDMI video capture device from recording the content signal in a useable form.

### C.   **Enforcement**

8.   DVD CCA works with copyright owners in preventing circumvention devices from getting a foothold in the marketplace. DVD CCA regularly contacts licensees that have failed to comply with the compliance rules in one way or another and has consistently worked with the licensees to modify their products in order to come into compliance. In the rare cases

3

where licensees have not responded quickly to bring their products into compliance, litigation has upheld the requirements in the compliance rules in DVD CCA's license agreements. *See Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913 (N.D. Ca. 2009); *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 97 Cal. Rptr. 3d 856 (2009). For "rogue" or unlicensed products that come into the marketplace, DVD CCA is aware that the content companies have utilized the DMCA to block these products from being available in standard retail outlets. This enforcement approach has (i) prevented circumventing products from being declared "legal", (ii) kept circumvention products and tools out of legitimate consumer distribution channels, (iii) left circumvention products and tools to be distributed only on unknown and seemingly untrustworthy websites, and (iv) most importantly, fostered a marketplace for hundreds of millions of consumers to enjoy viewing copyrighted works on licensed, compliant DVD players for now more than two decades.

### D. Rulemaking Proceeding

9. DVD CCA has participated in the triennial rulemaking since its inception in 2000. In the earliest proceedings, DVD CCA was at the center of the rulemaking process, defending the technology from multiple parties requesting exemptions to circumvent CSS for various allegedly noninfringing purposes. Over the past few proceedings, the rulemaking has resulted in narrowly tailored exemptions permitting the circumvention of CSS on DVDs for such purposes as permitting educators to use short clips of movies from DVDs in their classroom, permitting documentary filmmakers to incorporate short clips of movies from DVDs in their works; and (iii) facilitating the inclusion of audio or visual captions for works distributed on DVDs without these features benefiting people, who are visually or hearing impaired. Broad-based exemptions, such as making "back-up" copies of DVDs or making copies to enable the movies to be viewed from

alternative platforms (smart phones, pad-type products, and the like), have been uniformly opposed by DVD CCA and rejected by the Librarian of Congress, on the grounds that such exemptions are not necessary for "fair use" of the content.

## II.    Marketplace for Dr. Green's Research

10. As illustrated by the dispute in the seminal case, *Universal City Studios, Inc. v. Corley*, 273 F. 3d 429 (2nd Cit. 2001), which concerned the publication of decryption code for its licensed technology, CSS, DVD CCA has traveled down the road of publication of decryption code and its effects. In spite of court orders, the *Corley* defendants and other activists ensured that DeCSS, as the unauthorized decryption code came to be known, was widely distributed.

11. As the cat was already out of the bag, various actors attempted to launch commercial products that incorporated DeCSS or its underpinnings into the functionality of commercial products. Typically, these circumventing products were dressed up as enabling consumers to make "backup copies for their personal use." DVD CCA and copyright owners spent millions of dollars to shut down those purveyors of products believed to pose the biggest threat to the digital marketplace, in particular keeping these products from being sold in normal retail channels of distribution.

12. Even though DeCSS was widely available, the general public did not adopt DeCSS. DVDs were marketed well with bonus features, readily available among retailers and were offered at reasonable prices for both purchase and rental. Thus, consumers saw no reason to learn how to hack a DVD using some risky website when legitimate DVDs offered consumers a favorable value proposition.

13. DVD CCA's experience with DeCSS and related activities demonstrates that there is a marketplace for Dr. Green's research if he, as has been proposed, among other things,

publishes source code to decrypt HDCP. Publication of the decryption code for HDCP would most certainly lead to some number of actors trafficking in future circumvention products that incorporate Dr. Green's know-how as publication of DeCSS did.

14. The risk of inducing purveyors of circumvention products to target HDCP is far too high due to the crucial role that HDCP plays. Content delivery can be viewed as a chain of events which begins at a source and ends with the content displayed on a peripheral such as a television or monitor. Once the content is output as a signal to a display peripheral, then there is nothing more than HDCP protecting the content in the signal. In fact, CSS and any other technological protection measure employed earlier in the chain is meaningless if the HDCP is circumvented.

### III. The Effects of NeTVCR Activities Would be Significant and Not Isolated to HDCP Itself Devices

15. To suggest that the market for copyrighted works distributed in physical media such as DVDs is independent of the online market for copyrighted works represents a gross misunderstanding of the digital content ecosystem. As previously discussed, HDCP protects the video signal sent from the playback device (DVD player) to an output peripheral such as a television. At that point the video signal is protected solely by HDCP as the CSS employed to the protect the content on the DVD has been decrypted at playback. Consequently, if circumvention of the HDCP occurs, then the video output signal is completely "in the clear" (i.e., there is no longer any copy protection of the copyrighted work), and a copy of the copyrighted work can be readily produced from this signal transmitting "in the clear" content. Although originating from physical media, this one "in the clear" copy can be redistributed readily and endlessly over networks with improved broadband speeds.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: Oct 30, 2019

_____
Jacob Pak, President
DVD Copy Control Association