BRIAN M. WILLEN (D.C. BN 490471)
JOHN RAFAEL PEREZ (NY RN
5522164)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Tel. (212) 999-5800

CORYNNE MCSHERRY (CA SBN
221504)
KIT WALSH (CA SBN 303598)
ADAM SCHWARTZ (CA SBN 309491)
ELECTRONIC FRONTIER
  FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel. (415) 436-9333

LAUREN GALLO WHITE (CA SBN
309075)
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Tel. (415) 947-2000

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| Matthew Green, Andrew Huang, and Alphamax, LLC, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| U.S. Department Of Justice, William Barr, Library Of Congress, Carla Hayden, U.S. Copyright Office, and Karyn A. Temple, | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Civil Case No. 16-cv-01492-EGS

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65(a)**

Judge:  Emmet G. Sullivan

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I.   SECTION 1201 SHOULD BE CONSTRUED ACCORDING TO CONGRESS'S INTENT TO PRESERVE THE RIGHT TO CIRCUMVENT TO MAKE FAIR USES.................................................................................................. 1

II.   THE COURT CAN PROPERLY ENJOIN ENFORCEMENT OF SECTION 1201(a) ................................................................................................................. 5

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR AS-APPLIED CLAIMS........................................................................................ 5

    A.   Plaintiffs Seek To Vindicate Strong And Varied First Amendment Interests. ...................................................................................................... 5

        1.   The First Amendment Protects The Expressive Use Of Computer Code ................................................................................ 6

        2.   Plaintiffs Have A First Amendment Right To Engage In Non-Infringing Uses…………….…………………………………8

    B.   The Government's Interest In Assuaging The Fears Of Copyright Owners Does Not Justify Its Ban On Plaintiffs' Protected Expression .... 12

        1.   The Government Offers No Evidence to Support Its Purported Substantial Interest In Criminalizing Circumvention And Related Trafficking ...................................................................... 13

        2.   Section 1201(a) Burdens Substantially More Speech Than Is Necessary To Serve The Government's Interest In Preventing Copyright Infringement ............................................................... 16

        3.   *Corley* Does Not Defeat Plaintiffs' Claims ................................. 19

IV.   PLAINTIFFS CONTINUE TO SUFFER IRREPARABLE HARM.................... 22

V.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR FIRST AMENDMENT RIGHTS OVER IMAGINED ECONOMIC LOSS....... 24

CONCLUSION................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boardley v. U.S. Dep't of Interior,*
615 F.3d 508 (D.C. Cir. 2010)..........................................................................17

*A&M Records, Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) .........................................................................15

*Action for Children's Television v. F.C.C.,*
58 F.3d 654 (D.C. Cir. 1995)...........................................................................13

*Ark. Educ. TV Comm'n v. Forbes,*
523 U.S. 666 (1998)..........................................................................................12

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002)..........................................................................................16

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ..............................................................................9

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014)...............................................................................10

*Bartnicki v. Vopper,*
532 U.S. 514 (2001)..........................................................................................16

*Bifulco v. United States,*
447 U.S. 381 (1980)............................................................................................4

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
447 U.S. 557 (1980)............................................................................................9

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.,*
381 F.3d 1178 (Fed. Cir. 2004)....................................................................3, 22

*City of Cincinnati v. Discovery Network,*
507 U.S. 410 (1993)..........................................................................................17

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994)............................................................................................18

*Commodity Futures Trading Comm'n v. Vartuli,*
228 F.3d 94 (2d Cir. 2000)................................................................................6

*Doe v. Harris,*
    2013 U.S. Dist. LEXIS 5428 (N.D. Cal. Jan. 11, 2013) ........................................16

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988)..............................................................................................4

*Edwards v. District of Columbia,*
    755 F.3d 996 (D.C. Cir. 2014) ......................................................................17, 18

*Eldred v. Ashcroft,*
    537 U.S. 186 (2003)................................................................................4, 19, 22

*Elrod v. Burns,*
    427 U.S. 347 (1976)............................................................................................23

*Force v. Facebook,*
    934 F.3d 53 (2d Cir. 2019)...................................................................................7

*Fox Broad. Co. v. Dish Network, LLC,*
    723 F.3d 1067 (9th Cir. 2013),
    *amended and reh'g en banc denied,* 747 F.3d 1060 (9th Cir. 2014) ......................11

*Golan v. Holder,*
    565 U.S. 302 (2012)............................................................................................19

*Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) ...........................................................................23

*Home Box Office, Inc. v. F.C.C.,*
    567 F.2d 9 (D.C. Cir. 1977) ........................................................................14, 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.,*
    515 U.S. 557 (1995)............................................................................................12

*IMS Health Inc. v. Sorrell,*
    630 F.3d 263 (2d Cir. 2010)................................................................................15

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ...............................................................................7

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2002) ...................................................................9, 10, 20

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,*
    964 F.2d 965 (9th Cir. 1992) ..............................................................................10

*Lexmark Int'l v. Static Control Components, Inc.,*
    387 F.3d 522 (6th Cir. 2004) .......................................................................... 3, 22

*McCullen v. Coakely*,
573 U.S. 464 (2014)....................................................................................................17

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010) ..................................................................................4, 22

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971).....................................................................................................23

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999)..........................................................................................11

*Packingham v. N. Carolina*,
137 S. Ct. 1730 (2017).................................................................................................16

*Pagan v. Fruchey*,
492 F.3d 766 (6th Cir. 2007) ......................................................................................14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .................................................................................9, 10

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
180 F.3d 1072 (9th Cir. 1999) .....................................................................................11

*Sandvig v. Sessions*,
315 F. Supp. 3d 1 (D.D.C. 2018)...................................................................................8

*Sega Enter. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ...........................................................................9, 20, 24

*Showtime Entm't, LLC v. Town of Mendon*,
769 F.3d 61 (1st Cir. 2014)..........................................................................................13

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) .............................................................................9, 10, 20, 24

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).....................................................................................................11

*Turner Broad. Sys. v. F.C.C.*,
512 U.S. 622 (1994).........................................................................................13, 14, 16

*United States v. Elcom Ltd.*,
203 F. Supp. 2d 1111 (N.D. Cal 2002) ..........................................................................8

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001).................................................................................. *passim*

*Vill. of Schaumburg v. Citizens for a Better Env't,*
    444 U.S. 620 (1980) ..........................................................................................18

**Statutes**

17 U.S.C. § 107(3) ..........................................................................................20

17 U.S.C. § 501 ..............................................................................................15

17 U.S.C. § 1201 (Digital Millennium Copyright Act) ...................................... *passim*

**Other Authorities**

144 Cong. Rec. E2136-02 (1998) .........................................................................2

144 Cong. Rec. H10615-01 (1998) ........................................................................1

H.R. Rep. No. 105-551, pt. 1 (1998) .....................................................................1

H.R. Rep. No. 105-551, pt. 2 (1998) .....................................................................2

S. Rep. No. 105-190 (1998) ................................................................................2

U.S. Const. art. I, § 8, cl. 8 .............................................................................22

Jessica Litman, *Digital Copyright* 57–63 (2001) ...................................................14

Lee Tien, *Publishing Software as a Speech Act,* 15 Berk. Tech. L.J. 629, 633
    (2000) ..........................................................................................................7

Pamela Samuelson, *Intellectual Property and the Digital Economy: Why the Anti-
Circumvention Regulations Need to Be Revised*, 14 Berkeley Tech. L.J. 519,
    530 (1999) ..................................................................................................14

Stephen M. McJohn, *Eldred's Aftermath: Tradition, the Copyright Clause, and
the Constitutionalization of Fair Use*, 10 Mich. Telecomm. & Tech. L. Rev.
    95, 100 (2003) ...........................................................................................19

## INTRODUCTION

In attempting to justify Section 1201(a)'s sweeping encroachment on Plaintiffs' constitutional rights, the government's opposition falls far short of its burden of satisfying intermediate scrutiny. It begins by mischaracterizing Congress's intent: Contrary to the government's claims, Congress never intended Section 1201(a) to penalize fair use and free expression—to the contrary, Plaintiffs' proposed uses are the type of expression Congress has often sought to promote and defend. The government then attempts to justify impeding this expression by manufacturing a crisis that is unsupported by any actual evidence and by insisting that Section 1201(a) is the only solution. But speculation does not overcome intermediate scrutiny, nor can it forestall injunctive relief. Because the government's position threatens to directly limit the ability of Dr. Green and Dr. Huang to engage in protected speech, a preliminary injunction is warranted.

## I.   SECTION 1201 SHOULD BE CONSTRUED ACCORDING TO CONGRESS'S INTENT TO PRESERVE THE RIGHT TO CIRCUMVENT TO MAKE FAIR USES.

The government claims that Plaintiffs seek to "altogether invalidate the scheme mandated by Congress." Opp'n at 13. To the contrary, Plaintiffs seek to fulfill it. In enacting Section 1201, Congress intended to create a regime that would permit those who had lawful access to a work to circumvent access controls for the limited purpose of making fair uses of the work.

This intent was made explicit in both the legislative history and the statutory text. The House Report issued in connection with Section 1201 explains that "an individual would not be able to circumvent in order to gain unauthorized access to a work, but would be able to do so in order to make fair use of a work which he or she has acquired lawfully." H.R. Rep. No. 105-551, pt. 1, at 18 (1998); *see also* 144 Cong. Rec. H10615-01 (1998) at H10616 ("It is very clear to us

that we need to have the protection of the fair use provisions which had previously been in the law. This we have done."); 144 Cong. Rec. H10615-01 (1998) at H10616 (bill "respect[s] the right of people to fair use in accessing information").

The Senate agreed, stating that the ban on circumvention was not to apply once a person "has obtained authorized access . . . even if such actions involve circumvention of other types of technological protection measures." S. Rep. No. 105-190, at 28 (1998); *see* 144 Cong. Rec. S11887-01 (1998) at S11887 (Kohl states "In my opinion, this bill achieves a fair balance by taking steps to effectively deter piracy, while still allowing fair use of protected materials.").

Congress also intended to preserve the traditional limit on secondary liability that protects the dissemination of technology with substantial non-infringing uses. 144 Cong. Rec. S4884-01 (1998) at S4890 (Ashcroft states "neither section 1201(a)(2) nor section 1201(b) should be read as outlawing any device with substantial non-infringing uses"). It anticipated and *rejected* the idea of a "pay-per-use society" where lawful possession would not enable subsequent fair uses, 144 Cong. Rec. E2136-02 (1998) at E2137—an idea the government attempts to revive. Opp'n at 19. When Congress considered unauthorized access to a copyrighted work, it cited instead examples such as a scrambled cable channel, where the primary concern was that people might access content without paying for a copy or for a subscription. H.R. Rep. No. 105-551, pt. 2, at 37.

Congress finally intended to preserve the freedom of a person who has lawfully acquired a copyrighted work to circumvent access controls to make a fair use of the work. Congress codified the limited reach of the anti-circumvention provision in 17 U.S.C. § 1201(c), which specified that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title" and preserved the limitations on secondary copyright infringement and "the rights of free speech or the press."

If anything, it is the government that wishes to thwart Congress's intent by reserving the right to prosecute a lawful possessor of a work for circumventing in order to make a non-infringing use, or for disseminating technology for such circumvention even when the technology has substantial non-infringing uses. This expansive interpretation of the statute also brings Section 1201(a) directly into conflict with the First Amendment. In particular, Dr. Huang's NeTVCR would not enable anyone to access a work that they were not already authorized to access on their personal devices. Likewise, Dr. Green conducts his research on copies of works that he has lawfully acquired.

To be sure, the language of Section 1201 is far from precise. This has led appellate courts considering this issue to divergent readings, from the infringement nexus of the Federal Circuit, *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202–03 (Fed. Cir. 2004), to the extremely restrictive view of the Second Circuit that Defendants have adopted in enforcing the law, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443–44 (2d Cir. 2001). In the Sixth Circuit, a concurring judge agreed in essence with the Federal Circuit that "Congress . . . sought to reach those who circumvented protective measures 'for the purpose' of pirating works protected by the copyright statute." *Lexmark Int'l v. Static Control Components, Inc.*, 387 F.3d 522, 552 (6th Cir. 2004) (Merritt, *J.*, concurring).[1] The dissenting Judge Feikens would have held that any finding of fair use would prevent a successful Section 1201 claim. *See id*. at 562 (Feikins, *J.*,

---

[1] Judge Merritt reasoned that because Section 1201 is only meant to prohibit piracy, the court should consider the purpose of the circumvention technology before enforcing Section 1201's anti-circumvention ban: "Unless a plaintiff can show that a defendant circumvented protective measures for such a purpose, its claim should not be allowed to go forward." *See id.* at 552 (Merritt, *J.*, concurring). Judge Merritt further held that construing the law to prohibit otherwise lawful circumvention, intended to make fair or non-infringing uses of a protected work, would thwart Congress's purpose under the Copyright Act of promoting science and useful arts. *Id.* at 553 ("Lexmark's reading of the extent of these rights, however, would clearly stifle rather than promote progress.").

dissenting). Meanwhile the Ninth Circuit held that a *prima facie* showing of a 1201(a) violation did not require showing a nexus to infringement, but left open the possibility of a fair use defense. *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 950 n.12 (9th Cir. 2010).

The Supreme Court's pathmarking decision in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), clarified that fair use protections (along with other traditional contours of copyright law) are essential in keeping copyright law's restrictions on speech compatible with the First Amendment. In light of that principle, and taking account of Congress's intent in passing Section 1201, the Court should adopt the construction of Section 1201 that preserves the freedom to engage in non-infringing uses and avoids creating constitutional infirmities, particularly given that the statute provides for criminal penalties. *See Bifulco v. United States*, 447 U.S. 381, 387 (1980) (applying the rule of lenity to interpret criminal prohibitions in favor of the accused); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.")

Section 1201(a) should be interpreted as Congress intended, and as the First Amendment requires, so that it is not prohibited 'circumvention' to bypass technological protection measures (TPMs) in a work that a person lawfully possesses, when done in furtherance of a non-infringing use.[2]

---

[2] This construction also partially cures the infirmities of the Triennial Rulemaking, since it would no longer be strictly necessary to seek a rulemaking exemption in order to avoid legal jeopardy for non-infringing circumvention. Instead, the rulemaking would be a way for would-be fair users to establish their rights as to categories of copyrighted works without the expense of litigation and the risk of massive statutory damages for copyright infringement if they were mistaken about the fair use status of their activities.

## II.   THE COURT CAN PROPERLY ENJOIN ENFORCEMENT OF SECTION 1201(a).

Plaintiffs simply seek to vindicate their traditional freedom of inquiry and speech without the threat of prosecution hanging over them.[3] Allowing that is far from the "final victory" alleged by the government. *See* Opp'n at 2–3. The government admits that TPMs are readily broken, meaning that the law is the only obstacle to accessing and using copyrighted works encumbered by TPMs. Opp'n at 26 n.18 ("TPMs 'inevitably' fail on their own, the law acts 'as a backstop.'"). Would-be infringers are already violating copyright or other laws, and it is unlikely that they will be deterred by the additional penalty for circumvention. A fair user trying to stay on the right side of the law, on the other hand, bears the brunt of Section 1201(a)'s onerous restrictions. Therefore, an injunction allowing circumvention and publication of technology describing circumvention techniques would not let the genie out of the bottle because the know-how behind those techniques is not exclusive to Plaintiffs.

## III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR AS-APPLIED CLAIMS.

### A.  Plaintiffs Seek To Vindicate Strong And Varied First Amendment Interests.

While authoring and communicating code most definitely is speech protected by the First Amendment, MTD Order at 26–27, it is not the only form of speech implicated by Section 1201(a) and at issue in this case, MTD Order at 28. As Plaintiffs have repeatedly explained—and Defendants have not rebutted—the First Amendment protects accessing information and creating non-infringing works using that information. The non-infringing works Plaintiffs wish to create (and to enable others to create) are not merely works of software, but remix videos, publications

---

[3] Plaintiffs brought this action seeking relief for both their own rights and the rights of others, and do not waive any rights to the full relief requested. To be clear, in light of this Court's prior ruling, the scope of the preliminary injunction sought on the basis of Plaintiffs' as-applied First Amendment claims is an injunction barring enforcement of Section 1201(a)(1) against Dr. Huang and Alphamax and barring enforcement of Section 1201(a)(2) against all Plaintiffs.

discussing the non-copyrightable elements of a copyrighted work, educational overlays, and more. Yet Section 1201(a), as construed by the government, bars Plaintiffs and others from a range of expression and First-Amendment-protected access that goes beyond code and includes obvious examples of protected speech like authoring books and making movies. The government is wrong to consider such speech to be acceptable losses in their effort to maximize the profits of copyright owners (including the *amici* who have predictably appeared in this case to side with the government).

    1. <u>The First Amendment Protects The Expressive Use Of Computer Code.</u>

  The government seeks to narrow the types of speech protected under the First Amendment by asserting that Plaintiffs' innovative expression does not serve a communicative purpose. In doing so, it relies heavily on an out-of-circuit case, *Commodity Futures Trading Commission v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000), for the proposition that communication between computers is less deserving of First Amendment protection than the communication to another human programmer. Opp'n at 13–15. As an initial matter, the facts and posture of that case markedly differ from this one. There, the CFTC sought to enjoin defendants from selling a computer program that claimed to provide profitable trading opportunities in the market for currency futures. 228 F.3d at 97–98. The court held that requiring defendants to register as a commodity trading advisor did not amount to a prior restraint given that the software was being marketed as an automatic trading program. *Id.* at 111. In contrast, the court held "publishing [the software] alone—*i.e.*, not as an automatic trading system" *would* constitute protected speech. *Id.* at 112.[4] That holding correctly recognized that the act of publishing software instructions—

---

  [4] The Court also went out of its way to expressly caveat its holding that the marketed use of defendants' software was not protected speech:

whether in a textbook like Dr. Green's or in a device or software upgrade like Dr. Huang's—should otherwise be protected by the First Amendment.

But even assuming *Vartuli*'s characterization of an automated software program had any bearing on Plaintiffs' desire to disseminate code for others to use, expand upon, and implement to engage in creative expression, the government's claim that "computer code that [does] *not* communicate to others . . . was not First Amendment speech," Opp'n at 14 (emphasis added)—is incorrect. Code, like English, is a language, and it is capable of being understood by humans and machines alike. Surely the government would not suggest that English speech loses its protection if it is communicated to a machine that is capable of understanding English in addition to Java and C++. *See* Lee Tien, *Publishing Software as a Speech Act*, 15 Berk. Tech. L.J. 629, 633 (2000). There is no reason to treat code any differently where, as here, it is intended to be used for innovation and creative expression. Indeed, courts increasingly have recognized that communications by computers are equally if not more expressive than humans. *See, e.g.*, *Junger v. Daley*, 209 F.3d 481, 484–485 (6th Cir. 2000) ("[C]omputer source code, though unintelligible to many, is the preferred method of communication among computer programmers. Because computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First Amendment."); *Force v. Facebook*, 934

---

Statements in the form of orders or instructions are strikingly common: Commands by military officers to their subordinates, by restaurant patrons to their waiters, by doctors to their patients, by political or religious leaders to their devoted followers. We do not think and do not mean to suggest by our holding today that such communications "can claim . . . talismanic immunity from constitutional limitations." The uses of language are subtle, complex and infinitely variable. *Any assertion that a statement like or unlike the 'buy' and 'sell' instructions issued by a Recurrence-loaded computer is not fully protected by the Constitution should be subjected to careful and particularized analysis to insure that no speech entitled to First Amendment protection fails to receive it.*

*Id.* at 112 (citations omitted) (emphasis added).

F.3d 53, 82–83 (2d Cir. 2019) (Katzmann, *J.*, dissenting) (discussing the communicative power of Facebook's "friend suggestions": "Facebook's algorithms thus allegedly provide the user with a message . . . that they would like these people, groups, or events."); *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1126 (N.D. Cal. 2002) ("Object code is merely one additional translation of speech into a new, and different, language").

> 2.   Plaintiffs Have A First Amendment Right To Engage In Non-Infringing Uses.

Beyond these mischaracterizations of the First Amendment's scope, the government errs in characterizing Plaintiffs' desired conduct. The government's repeated analogies to supposed break-ins, Opp'n 14–15, 17–19, are particularly inapt. Unlike a burglar or a car thief, Plaintiffs do not seek to acquire access to copyrighted works that they do not already lawfully possess. Section 1201(a) operates more like a dealership who sells you a car, then tells you you're a criminal if you repaint it or write a book about what's under the hood, or a bookseller who sells you a book and sues you if you annotate the pages.

That said, as discussed above, *supra* Part I, Section 1201(a)'s use of the term "unauthorized access" should be construed such that the anti-circumvention prohibition does not apply when a person already lawfully possesses the work.[5] This would limit the Section's application to scenarios like those envisioned by the government, where a person "breaks in" to access a work they do not possess. As the government seeks to apply the law, however, the sweep of Section 1201(a) is far broader than its supposed justification, and improperly prohibits Plaintiffs from

---

[5]   For the same reason, the government's reliance on *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 14 (D.D.C. 2018), is also misguided. Plaintiffs' proposed expression does not involve obtaining access to "private areas," but rather involves the circumvention of access controls that limit access to content Plaintiffs already lawfully possess.

exercising their First-Amendment-protected rights of free expression and analyzing information in their possession.

Plaintiffs are also protected by the First Amendment when they market their publications and technology for use in circumvention. Contrary to the government's assertion, this marketing is not categorically "commercial speech proposing illegal activity." Opp'n at 16 n.8. First, numerous categories of circumvention are protected by statutory and rulemaking exemptions. Second, according to the government's own case, "commercial speech" is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). That definition does not apply where, as here, publications are marketed for use in exercising freedoms of expression. *Id.*

**Dr. Green Wishes To Engage In Non-Infringing Uses.** The government does not allege that Dr. Green's circumvention activities would infringe copyright, and indeed they would not. A robust body of case law—including cases dealing specifically with research into functional aspects of software—recognizes that using copyrighted works to enable or increase public access to information is a legitimate and important purpose that supports a finding of fair use. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (image search functions); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2002) (same); *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (book search functions).

In *Sega Enterprises Ltd. v. Accolade, Inc.*, the Ninth Circuit explained that research into the functional aspects of Sega's video game software was a legitimate purpose, even for a competitor seeking to develop competing games. *See* 977 F.2d 1510, 1522–23 (9th Cir. 1992) (holding that using copyrighted material to study functional requirements was fair use). The court later reaffirmed this reasoning in *Sony Computer Entertainment, Inc. v. Connectix*, explaining that

it was legitimate for Connectix to copy Sony's Playstation BIOS in order to understand its functional parameters and allow it to create a competing means of playing games designed for the Playstation console. *See* 203 F.3d 596, 608 (9th Cir. 2000). Like the functional research of Accolade and Connectix, security and safety research has a legitimate purpose that falls well within the scope of fair use. These same cases explain that the nature of device software lends towards fair use, and that use of the entire work is generally fair when done for analysis, as with security research. *Id.* at 603, 605; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) ("For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use."); *Kelly*, 336 F.3d at 820–21 (same); *Perfect 10*, 508 F.3d at 1167.

*Alphamax And Dr. Huang's Wish To Engage In Non-infringing Uses.* The government correctly concedes that Section 1201(a), as it construes it, bars Dr. Huang and Alphamax from engaging in a wide range of fair uses. But the government incorrectly contends that Dr. Huang's proposed pinyin pronunciation aid and space- and format-shifting are not fair uses.

As an initial matter, real-time translation and instantaneous display would not create a derivative work nor implicate any exclusive right of the copyright owner. *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992) ("A derivative work must incorporate a protected work in some concrete or permanent 'form.'"). Even if it did, it would be a core fair use for Dr. Huang to develop his system to display pinyin pronunciations for educational purposes—to aid others in learning languages. Dr. Huang's system is only useful for someone who has already acquired the original work. Further, his system acts as an aid in understanding the original work and learning languages through it, not as a method for acquiring a market substitute.

The key case cited by the government in fact supports a finding of fair use: *Authors' Guild v. HathiTrust* held that it was a fair use for libraries to create complete translations of works for their print-disabled patrons. 755 F.3d 87, 95–96 (2d Cir. 2014). That activity has far more potential to impact the market for the original works than Dr. Huang teaching himself a language. Dr. Huang's proposed fair use also bears no resemblance to selling unauthorized translations as direct substitutes for original works, the use at issue in *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 72–73 (2d Cir. 1999).

As for time-, format-, and space-shifting, these too have a long pedigree of fair use protection. *E.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984); *Fox Broad. Co. v. Dish Network, LLC,* 723 F.3d 1067 (9th Cir. 2013), *amended and reh'g en banc denied*, 747 F.3d 1060 (9th Cir. 2014); *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072 (9th Cir. 1999). In *Sony*, the Supreme Court identified various time-, space-, and format-shifting uses that were likely fair: "a teacher who copies for the sake of broadening his personal understanding of his specialty . . . a legislator who copies for the sake of broadening her understanding of what her constituents are watching . . . a constituent who copies a news program to help make a decision on how to vote . . . [i]n a hospital setting, using a VTR to enable a patient to see programs he would otherwise miss . . . [thereby] contributing to the psychological well-being of the patient." *Sony*, 464 U.S. at 455 n.40.

Such educational, political, and medical uses of time-, space-, and format-shifting often depend upon circumvention, including circumvention of HDCP. Dr. Huang would like to time-, format-, and space-shift media that he owns into a format that will be reliably supported years from now. He is at elevated risk for early onset Alzheimer's disease and understands that watching familiar media is soothing to those suffering from the condition. He wishes to engage in this

format-shifting and archiving now in case he loses the mental ability to do so in the future. 2018 Triennial Rulemaking, Class 4 Reply Comment of Bunnie Huang, at 5.

Finally, Dr. Huang's speech is no less protected simply because he seeks to use "preexisting" code. Opp'n at 1, 30. As the Supreme Court has explained, the First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995); *see also Ark. Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (holding that "compilation of the speech of third parties" constitute "communicative acts" protected by the First Amendment).

Plaintiffs wish to engage in innovative, socially beneficial, expressive activity that is protected by the First Amendment. MTD Order at 26–28, 46–51. The government's efforts to discount Plaintiffs' proposed conduct should be rejected.

## B. The Government's Interest In Assuaging The Fears Of Copyright Owners Does Not Justify Its Ban On Plaintiffs' Protected Expression.

Contrary to the government's claim, Plaintiffs have never conceded that the government's purported interest is substantial and unrelated to the suppression of free expression. Plaintiffs have argued throughout these proceedings that Section 1201(a) does not merely relate to the suppression of free speech, but strikes to its very heart, interfering with their constitutional rights to create, gather, share, publish, and receive information. *See supra* Part III.A; Pls.' Opp'n to Mot. to Dismiss at 18–24; MTD Order at 28. But, even beyond that, the government has failed to put forth evidence of a substantial government interest underlying Section 1201(a) or that Section 1201(a) is appropriately tailored to promote that interest. The government's failure to do so confirms that Plaintiffs are likely to succeed on the merits of their claim.

1.      The Government Offers No Evidence to Support Its Purported Substantial
        Interest In Criminalizing Circumvention And Related Trafficking.

"When the Government defends a regulation on speech as a means to … prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994) (internal quotation marks omitted). Instead, the government is required to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* "[A] governmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial." *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 75 (1st Cir. 2014). Moreover, "the deference afforded to legislative findings does not 'foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law.'" *Action for Children's Television v. F.C.C.*, 58 F.3d 654, 680 (D.C. Cir. 1995).

In *Turner*, the appellants challenged the "must-carry" provisions of a law that required cable operators to devote a portion of their channels to local stations. The government's stated interest in that case was the overall economic health of local broadcasting. 512 U.S.at 662. The Supreme Court explained that just because "the Government's asserted interests are important in the abstract does not mean . . . that the [statute] will in fact advance those interests." *Id.* at 664. The government failed to support its claimed interest with actual evidence—such as evidence of actual bankruptcies, or financial difficulties suffered by local stations—and the statute therefore failed to pass intermediate scrutiny. *Id.* at 667–68.

The same result should obtain here, where the government's effort to satisfy intermediate scrutiny rests on even more generalized claims of harm than those proffered in *Turner*. In place of evidence, the government offers speculation and conjecture—specifically, private parties' supposed fears that TPMs and traditional copyright and other laws will be insufficient to deter

13

unidentified third parties (not Plaintiffs themselves) from engaging in piracy. *See, e.g.*, Opp'n at 20, 23 (citing S. Rep. No. 105–190, at 2, 8). Such "fears" are not sufficient, on their own, to establish the substantial interest needed to meet intermediate scrutiny or that the restriction imposed by Section 1201(a) alleviates the relevant harms in a direct and material way. *Turner*, 512 U.S. at 644, 667.

The government and its *amici* essentially manufacture a wide-scale crisis where there is none—a tactic that flies in the face of the requirement of "evidence to establish that a speech regulation addresses actual harms *with some basis in fact*." *Pagan v. Fruchey*, 492 F.3d 766, 773–74 (6th Cir. 2007) (emphasis added) (declining to adopt a "standard of 'obviousness' or 'common sense,' under which [a court] uphold[s] a speech regulation in the absence of evidence of concrete harm"); *see also Turner*, 512 U.S. at 664; *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 50 (D.C. Cir. 1977) (holding the Commission's rules violated the First Amendment because the Commission "has not put itself in a position to know whether the alleged . . . phenomenon is a real or merely a fanciful threat.").[6]

---

[6]     The government claims to rely on the WIPO Copyright Treaty's commitment to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures," Opp'n at 24, but it overlooks the fact that the WIPO Treaty itself contemplates the preservation of fair use and does not support criminalizing the otherwise lawful use and publication of computer code. In fact, the Treaty explicitly contemplates that signatories need not forbid activities authorized under local copyright law. WIPO Copyright Treaty, art. 11 (1996). U.S. law already met this standard prior to enacting Section 1201 by providing penalties for infringement. Pamela Samuelson, *Intellectual Property and the Digital Economy: Why the Anti-Circumvention Regulations Need to Be Revised*, 14 Berkeley Tech. L.J. 519, 530 (1999). The Treaty, then, is certainly consistent with a narrowly-tailored version of Section 1201(a) that preserves fair use and only penalizes circumvention when there is a nexus to copyright infringement. Indeed, after being unable to advance their agenda in Congress, copyright lobbyists successfully persuaded U.S. negotiators to push for its inclusion in the WIPO Copyright Treaty, and then used that as leverage to pass the statute—a process often referred to as "policy laundering." *See* Jessica Litman, *Digital Copyright* 57–63, 103-111 (2001).

The government is unable to proffer that evidence not only because it does not exist, but because the theory of harm defies reason. Existing copyright laws—unchallenged here—already prohibit and deter copyright infringement in the digital space, through civil and criminal penalties. Anyone using circumvention tools to distribute unauthorized non-transformative copies of copyrighted works is likely already liable as a direct infringer, *see* 17 U.S.C. § 501, and secondary liability exists for bad actors who knowingly or intentionally provide such tools to facilitate infringing uses, *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019–23 (9th Cir. 2001). In fact, for over ten years it has been the norm for digital music sold in mainstream stores like iTunes and Amazon Music to come without TPMs at all, demonstrating that the government's imagined fears are unfounded. *E.g. iTunes Store and DRM-Free Music: What You Need to Know*, MacWorld, *available at* https://www.macworld.com/article/1138000/drm-faq.html (Jan. 7, 2009). Nonetheless, the government asks this Court to infer that some unidentified bad actors who aren't already deterred by other penalties would use Plaintiffs' code to pirate content to such an extent that the sales of digital rightsholders would actually be affected in a meaningful way.

In an attempt to mask the thinness of its argument, the government simply insists that "the DMCA was enacted to address specific challenges that arose from the nature of digital content and the Internet." Opp'n at 30. Vague assertions do not establish a "record that convincingly shows a problem to exist and that relates the proffered solution to the statutory mandate." *Home Box Office*, 567 F.2d at 50. If anything, the government's inability to present anything more than generalized and unsubstantiated predictions underscores that Section 1201(a) contributes little to actual protections against copyright infringement, instead serving primarily to reassure and further the financial interests of digital media rightsholders at the expense of the speech interests of the public. *See, e.g.*, *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010) (rejecting a proposed

government interest in medical privacy given the absence of studies or data to substantiate that commercial use of data would actually undermine the prescribing process or the doctor-patient relationship).

And even assuming that the speech activity Plaintiffs seek to engage in might *theoretically* help unnamed others infringe (something the government has not shown here), it would not change the result. As the Supreme Court has repeatedly explained, the "prospect of crime . . . , by itself does not justify laws suppressing protected speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002). "[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001). The government simply "may not suppress lawful speech as the means to suppress unlawful speech." *Packingham v. N. Carolina,* 137 S. Ct. 1730,1738 (2017) (citing *Ashcroft*, 535 U. S. at 255); *see also, e.g.*, *Doe v. Harris*, 2013 U.S. Dist. LEXIS 5428 at *35–36 (N.D. Cal. Jan. 11, 2013) (holding that the government cannot restrict speech because it *may* lead to unlawful acts when government failed to demonstrate that its restriction significantly deterred the unlawful acts in question).

2.   <u>Section 1201(a) Burdens Substantially More Speech Than Is Necessary To Serve The Government's Interest In Preventing Copyright Infringement.</u>

Having failed to meet the first prong of the intermediate scrutiny test, the government goes on to misread the second prong altogether, claiming that it can satisfy intermediate scrutiny simply by showing that enjoining enforcement of Section 1201(a) would make the government's effort to deter piracy "less effective." Opp'n at 20–21 (citing *Turner*, 512 U.S. at 662). That is not correct: in *Turner* itself, the Supreme Court explains that narrow tailoring requires the government to show "that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" 512 U.S. at 662; *see also* Opp'n at 8–9 (*citing* MTD Order).

As both the Supreme Court and the D.C. Circuit have further explained, this narrow tailoring requirement ensures "a close fit between ends and means." *McCullen v. Coakely*, 573 U.S. 464, 486 (2014). The burden on speech must be "*no greater than is essential*" to advance the government's interest. *Edwards v. District of Columbia*, 755 F.3d 996, 1001–02 (D.C. Cir. 2014) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)) (emphasis added). The prohibitions must "target[] and eliminate[] *no more than the exact source of the 'evil' [they] seek to remedy.*" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 522-23 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)) (emphasis added).

The government does not even attempt to show that Section 1201(a) burdens no more speech than necessary to serve its interest in deterring piracy. *Edwards*, 755 F.3d at 1001–02 (citation omitted); *Boardley*, 615 F.3d at 522–23.[7] Nor could it: both the statute itself and the record in this case make clear that less burdensome alternatives exist.

*First*, as discussed above, *supra* Part I, the DMCA should be read to require a nexus to actual copyright infringement. Such a reading would give legal teeth to TPMs that protect copyrighted works while allowing individuals to circumvent TPMs in works they have lawfully acquired, in ways that advance fair use and the public interest. Indeed, the government itself suggests that the statute plausibly may be construed so as not to prohibit publication of the book that Dr. Green wishes to publish. Opp'n at 33–36. To the extent, however, that the Court declines to construe the statute to protect non-infringing uses, such a construction still presents a significantly narrower alternative to the government's expansive view of Section 1201(a)—a

---

[7]     Not only that, the government goes so far as to suggest that it is *Plaintiffs* who must identify less restrictive means of preventing piracy. *See* Opp'n at 38; *see also* Opp'n at 37 n.25 (arguing that Dr. Green bears the burden to show that "device-enabling software is somehow immune from piracy" and to address some unidentified "market harm"). This is not the law. The government bears the burden of proving that a law is narrowly tailored. *See, e.g. City of Cincinnati v. Discovery Network*, 507 U.S. 410, 416 (1993).

narrower construction that would still advance whatever interest the government has in limiting the circumvention of TPMs.

*Second*, as discussed above, traditional copyright law already prohibits infringement and provides rightsholders with strong protections against the piracy they fear would result from allowing individuals to circumvent TPMs. While the government alludes to rightsholders' anxieties about making available digital copies of works, it does not actually explain whether their fears are justified, or whether the implementation of TPMs combined with the enforcement of preexisting copyright laws would have been insufficient to protect them from infringement. Indeed, although there is no dispute that the circumvention code DeCSS was made publicly available, *see* Opp'n at 24, there is no evidence that its dissemination actually led to rampant infringement, much less that the work that Plaintiffs seek to create would have such a result.

*Third*, the statutory and rulemaking exemptions show that the law is not narrowly tailored. As the D.C. Circuit recently explained, "an arbitrary exemption from or 'under-inclusiveness of the scheme chosen by the government'" can show "the asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Edwards*, 755 F.3d at 1007; *see also, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994) (explaining that exceptions from speech limits "may diminish the credibility of the government's rationale for restricting speech in the first place"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (holding a limit on door-to-door solicitation was not narrowly drawn where it exempted similarly situated solicitors). If the government were correct in insisting that any deviations from the prohibitions of Section 1201(a) would let the infringement genie out of the bottle, then these exemptions would already have accomplished it. And yet, the government has not even suggested that any infringement has occurred as a result of any of the statutory or rulemaking exemptions.

3.      *Corley* Does Not Defeat Plaintiffs' Claims

As it did in its motion to dismiss the complaint, the government continues to rely primarily on the Second Circuit's 2001 decision in *Corley* to argue that Plaintiffs' as-applied claims are not likely to succeed. But *Corley* is distinguishable from the case at hand. Further, nearly two decades of subsequent law and practice suggest *Corley* was wrongly decided.

*First*, *Corley* refrained from deciding whether and how Section 1201 impairs fair use because the issue was "far beyond the scope" of the issues alleged by the appellants. 273 F.3d at 458–59. The appellants in *Corley* did "not claim to be making fair use of any copyrighted materials, and nothing in the injunction [at issue] prohibit[ed] them from making such fair use." *Id*. Here, in contrast, Plaintiffs have presented concrete examples of how the current interpretation of Section 1201(a) prevents them and their customers from making fair and other non-infringing uses of copyrighted works. *See, e.g.*, Green Decl. ¶¶ 20–34; Huang Decl. ¶¶ 12–24.

*Second*, the government fails to address the Supreme Court's subsequent holding that fair use is constitutionally guaranteed. *See Eldred*, 537 U.S. at 219–20. The court in *Corley* stated "the Supreme Court has never held that fair use is constitutionally required," and the government mistakenly repeats that assertion in its opposition. *Corley*, 273 F.3d at 458; Opp'n at 16, 39. The Supreme Court has since corrected that proposition. *See Eldred*, 537 U.S. at 221. *Eldred* held that fair use is a "traditional First Amendment safeguard" within copyright law. *Id.* at 220; *see also Golan v. Holder*, 565 U.S. 302, 328 (2012); *see also* Stephen M. McJohn, *Eldred's Aftermath: Tradition, the Copyright Clause, and the Constitutionalization of Fair Use*, 10 Mich. Telecomm. & Tech. L. Rev. 95, 100 (2003). While *Eldred* involved a situation where "Congress has not altered the traditional contours of copyright protection," *id*. at 221, the opposite is true in this case. *Eldred* stands for the proposition that where, as here, Congress *has* altered the traditional contours of

copyright protection (according to the government's own interpretation) by prohibiting Plaintiffs' expressive conduct without regard for fair use, the First Amendment is squarely in play.

*Third*, the government relies on *Corley* to argue that fair use does not encompass a right to copy "by the optimum method or in [an] identical format of the original." 273 F.3d at 459. This is also wrong. While the fair use analysis considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), that is one factor of many. Where, as here, Plaintiffs wish to copy the entirety of a work, or to copy by an "optimum method" or in an identical format, in order to engage in a fair and non-infringing use, that copying does not render the use infringing. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("It was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site."). For fair use to accomplish the "ultimate aim [of the Copyright Act], to stimulate artistic creativity for the general public good," it must encompass a right to copy as much and as optimally as necessary to accomplish the intended transformative purpose. *See id.*; *see also Connectix*, 203 F.3d at 602–03 (9th Cir. 2000) (disassembly and repeated copying of entire copyrighted work does not preclude fair use finding); *Accolade*, 977 F.2d at 1520–28 (same) (citation omitted).

Here, Plaintiffs' intended fair uses are perfectly aligned with the Copyright Act's "ultimate aim." Dr. Green wants to publish a book that will document the security flaws that his research has uncovered. He wants that book to include the software code he uses to circumvent TPMs, to educate his readers and enable them to test and further improve upon that code. *See* Green Decl. ¶ 20. The government suggests that Dr. Green can simply publish a "nearly-identical book that omitted those excerpts," Opp'n at 38, but that would defeat the intended purpose of the book, *see* Green Decl. ¶¶ 21–23. Similarly, Dr. Huang wants to design NeTVCR to circumvent HDCP and

thereby enable fair use expressions, such as displaying a live program with visual overlay of safety notifications. *See* Huang Decl. ¶¶ 12–13. The government again suggests inferior and expensive alternatives such as watching for alerts on a separate device, rather than the much more effective overlay that NeTVCR would allow. *See* Opp'n at 32 (citing 2018 Recommendation at 140).

In both cases, the government's "alternatives" impede the efficacy of the transformative purpose. Security researchers will be unable to improve upon the vulnerabilities that Dr. Green has identified if they are unable to read and apply those vulnerabilities. Filmmakers similarly will be unable to generate the types of political, educational, and cultural expression that Dr. Huang's NeTVCR would enable, *see* Huang Decl. ¶ 13, if they are unable to access and copy underlying audiovisual works. If an optimum method is necessary to accomplish a given purpose, then it is protected by fair use. *See Sony*, 203 F.3d at 602–03.

*Fourth*, *Corley* relied in part on the fact that evidence of the impact of Section 1201 on fair use was "scanty." 273 F.3d at 459. Today there is ample evidence of the impact of Section 1201 on fair use.[8] Several examples are provided by the government itself, in the Copyright Office's Section 1201 Report, released in June 2017. Numerous aggrieved commenters were not permitted "to fix obsolete, damaged, or malfunctioning TPMs" for purposes of repair or modification to improve such devices. Section 1201 Report at 88. The Copyright Office found that an exemption was necessary for the repairs but not for modifications to improve, though both constitute fair use.

---

[8]     The Complaint identifies numerous forms of expression burdened by the challenged provisions that are incontrovertibly protected speech, from documentary and narrative films, to student education, to translation of e-books into an accessible format, to addition of commentary to videos, to Dr. Green's proposed book describing flaws in computer systems. Compl. ¶¶ 37–42, 48–74, 79–87, 100, 101, 107, 109, 110. The speech at issue does not infringe copyright—either because it is a fair use or because it relies only upon factual information in the copyrighted work—yet Section 1201 forbids it. *See id.* ¶¶ 23, 37–42, 50, 56, 62, 66, 74, 103–06. The Second Circuit did not have the benefit of these facts.

*Finally*, subsequent circuit court decisions provide alternative interpretations of the relationship between Section 1201 and fair use that do not impair free speech. As discussed above, *supra* Part I, the Federal Circuit calls for a nexus requirement—requiring a reasonable relationship between circumvention and copyright infringement, *Chamberlain*, 381 F.3d 1178; the Ninth Circuit held that Section 1201 liability does not depend on a nexus to copyright infringement but nonetheless left the door open to a fair use defense, *MDY Indus.*, 629 F.3d 928; and the Sixth Circuit avoided the question, holding that an authentication sequence did not constitute an access control protected by Section 1201, *see Lexmark*, 387 F.3d at 547.

Among these decisions, the Second Circuit's decision in *Corley* is an outlier in its illogical interpretation of the relationship of fair use and Section 1201 (perhaps in part because it alone predates *Eldred*). It simply fails to consider the overarching purpose of copyright law to "promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, and fails to recognize that fair use is a fundamental and constitutionally-protected safeguard against copyright's prohibitions. *See Eldred*, 537 U.S. at 220.

In short, the government's heavy reliance on a markedly distinguishable, 18-year-old, out-of-Circuit case is misplaced. Plaintiffs' claims provide the Court with the opportunity to reinforce the traditional constitutional safeguards that Section 1201(a) places in peril.

## IV.    PLAINTIFFS CONTINUE TO SUFFER IRREPARABLE HARM.

Like its merits arguments, the government's response to Plaintiffs' claim of irreparable harm relies primarily on its suspicion that unidentified third parties might misuse Plaintiffs' expression. Opp'n at 40–41. It further suggests—contravening a long line of Supreme Court and D.C. Circuit cases—that the government's interference with Plaintiffs' First Amendment rights alone is insufficient to show irreparable injury absent some external "deadline or opportunity." Opp'n at 41. As Plaintiffs explained in their opening brief, Pl. Mem. at 28, that is not the rule.

Interference with an individual's First Amendment right to expression constitutes *per se* irreparable injury. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

In addition, Plaintiffs have explained that the audience for Plaintiffs' proposed expression has grown and that the need for relief is greater now, more than three years after Plaintiffs filed this case, and now that the Court has lifted its stays of Dr. Green's prior motion for preliminary relief, Minute Entry 29, and of all proceedings in the case, Minute Entry 27. With respect to Dr. Huang's NeTVCR in particular, there is a real and present demand. *See* Huang Decl., ¶¶ 8–9. Dr. Green also routinely must refrain from publishing important information about security vulnerabilities; two examples arising during the pendency of this litigation include a potentially dangerous vulnerability in medical devices and a serious flaw in encrypted communication technology. *See* Green Decl., ¶¶ 32–33.

Elsewhere, the government also suggests that Plaintiffs' proposed course of conduct is less deserving of First Amendment protection because there might be "circumvention alternatives." *See* Opp'n at 32–33; 39–40. With respect to Dr. Huang, the government relies on the suggestions of those who *opposed* Dr. Huang's requested rulemaking exemptions at the Seventh Triennial Rulemaking. Opp'n at 32. With respect to Dr. Green, in addition to the proposal that he should publish a book that does not include and encourage others to use and test circumvention code, Opp'n at 40, the government also suggests that he should use "confidential" or "limited" communications, Opp'n at 39.

These are woefully inadequate alternatives that do not alleviate the irreparable injury that Plaintiffs would suffer. Plaintiffs' proposed conduct is not infringing and is not intended to support

infringement by others. To the contrary, Plaintiffs wish to use and share computer code in order to make fair and non-infringing uses of copyrighted works. As explained above, for fair use "to stimulate artistic creativity for the general public good," it must encompass a right to copy as necessary to accomplish the intended transformative purpose. S*ee Connectix*, 203 F.3d at 602–03; *Accolade*, 977 F.2d at 1520–28. The government's effort to eradicate that right by confining Plaintiffs to inadequate alternative ways of speaking only underscores the irreparable speech-related injury they would suffer in the absence of a preliminary injunction.

## V.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR FIRST AMENDMENT RIGHTS OVER IMAGINED ECONOMIC LOSS.

In the government's only attempt to salvage its arguments as to the equities and public interest, it returns to fear-mongering, repeating its unsubstantiated position that copyright protections would disintegrate were Plaintiffs allowed to exercise their First Amendment rights. The contention is doubly misguided. *First*, as discussed above, the government has pointed to no evidence that Plaintiffs' desired expression would actually "disturb the digital marketplace," Opp'n at 42, and its speculation is both implausible as a matter of fact and insufficient as a matter of law. *Second*, if the government's argument is that the spirit of the copyright act must be upheld, then the government's position does more harm than good. Plaintiffs' desired activities are paradigmatic fair uses, which would contribute substantially to the development of the arts and sciences. The government proclaims to champion intellectual property protections but does so in this case by undermining the very purpose behind such protections—to promote innovation, discovery, and progress. That is not in the public interest.

## CONCLUSION

For these reasons, this Court should enter a preliminary injunction preventing the government from prosecuting Plaintiffs under Section 1201(a). In the alternative, it should

narrowly construe the operative provisions of the statute such that they do not apply to prohibit

Plaintiffs from engaging in their lawful and constitutionally-guaranteed rights to free expression.


DATED: November 14, 2019

Respectfully submitted by:


 /s/ Brian M. Willen
Brian M. Willen

CORYNNE MCSHERRY (CA SBN
221504)
KIT WALSH (CA SBN 303598)
ADAM SCHWARTZ (CA SBN 309491)
ELECTRONIC FRONTIER
 FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

BRIAN M. WILLEN (D.C. BN 490471)
JOHN RAFAEL PEREZ (NY RN 5522164)
WILSON SONSINI
 GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
(212) 999-5800


LAUREN GALLO WHITE (CA SBN 309075)
WILSON SONSINI
 GOODRICH & ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000

*Counsel for Plaintiffs*