# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Matthew Green, *et al.*,                     )
                                             )
                  Plaintiff,                 )
                                             )
v.                                           )          Civil Action No. 16-cv-01492(EGS)
                                             )
U.S. Department of Justice, *et al.*,        )
                                             )
                  Defendants.                )

### DECLARATION OF STEPHEN P. BALOGH

I, Stephen P. Balogh, an adult and over the age of twenty-one (21) years, hereby declare

pursuant to 28 U.S.C. Section 1746 as follows:

1.      I have personal knowledge of all of the following facts and, if called as a witness,

could and would competently testify thereto.

2.  I am currently President of Digital Content Protection L.L.C. ("DCP") – the Licensor of

the High-bandwidth Digital Content Protection ("HDCP") system. DCP is a wholly

owned subsidiary of Intel Corporation ("Intel").

3.      From April 16th, 1990 to date, I have occupied various positions at Intel. These

positions included Technical Policy Specialist, Technical Marketing Engineer, and Engineering

Support.

4.      HDCP protects high-value digital audiovisual content over digital display

interfaces including the High-Definition Multimedia Interface ("HDMI") connection. HDMI

delivers content between the encrypted source of that audiovisual content and the digital display

or another connected licensed device. Such encrypted sources could be a DVD or Blu-ray player, an Internet Streaming video device (e.g., Netflix or Amazon Prime Video via a Roku or AppleTV set-top box), or a cable set-top box. Each of those sources decrypts the audiovisual content, where such content may be protected by an upstream content protection system, and passes the content to the HDCP function in the device, which re-encrypts the content, confirms the destination (called a "sink"), then streams the encrypted video over the HDMI connection. If the sink is a screen, it securely decrypts and displays the video.

5.      Almost without exception, encrypted delivery systems that encrypt video content require device manufacturers to license material (such as keys) to decrypt the content. Those licenses limit the output for transmission to other devices to "protected" outputs using approved protection systems. For the HDMI connection, almost universally those delivery systems permit the output only if it uses HDCP. Currently, all known (to DCP LLC) video delivery systems permit HDCP. DCP has over 800 active HDCP licenses to device manufacturers. I estimate that we have issued tens of billions of HDCP encryption and decryption keys. If publication of hacking material for HDCP or products like a NeTVCR (as proposed here) are permitted, the effect would be to eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement.

6.      It is claimed that encryption, specifically HDCP, prevents manipulating the protected video in many ways. In the Librarian of Congress' The Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies Final Rule, the Librarian stated:[1] "opponents set forth a large number of concrete examples of potential

---

[1] Plaintiff's Exhibit 3 at 19.

alternatives to circumvention that the petitioner failed to meaningfully challenge." In fact, DCP set forth 108 pages of examples that covered all of the so-called missing functionality in the market as of February 2018. A summary of those functions, also submitted in that proceed is attached as Exhibit A. The function not permitted is producing unprotected copies, which can readily be further copied and distributed across the Internet causing massive infringement.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of October, 2019.

_DocuSigned by:_

_Stephen Balogh_

—————————————————

2A1A3818CDCA4D9...

Stephen P. Balogh

Exhibit A:

Evidence of Currently Available Functionality

DCP Opposing Comment                Exhibit A           Proposed Class 4: Audiovisual Works

Among other things, the viability of Mr. Huang's petition hinges on the absence of alternative technologies that can provide the functionalities described in Huang's examples without circumventing HDCP. As the list below demonstrates, the vast majority of Huang's example uses are already possible through the use of non-circumventing technologies.[1]

Though Huang may propose additional example uses that are not specifically enabled by the products below,[2] this Exhibit demonstrates that current manufacturers and providers are capable of incorporating added functionality into their products without the need to circumvent HDCP. To the extent there may be some uses that are currently not provided for (for example, those posited in Huang's "Commercial expression" category) it is because there is no consumer demand for these services, not because HDCP prevents any such use.

**Picture-in-Picture Display:**

Huang claims, without circumventing HDCP, it would not be possible to watch a live political debate alongside the text of a commentator's live blog, or to rescale two movies for side-by-side viewing, or to simultaneously display the coverage of a live event by more than one news source. However, these functions can already be accomplished in multiple ways. First, a user could employ separate devices to provide much the same experience; for example, a live political debate could be displayed on a television while a viewer simultaneously read a blog on a phone, tablet, or computer. Second, if a consumer wished to view two separate programs on the same screen, current smart TVs make this possible. *See, e.g.*:

1.   **VIZIO TV:** *Picture in Picture / PIP / POP*, VIZIO Support, https://support.vizio.com/s/article/Picture-in-Picture-PIP-POP?language=en_US (last visited February 12, 2018) (describing how to use the picture-in-picture function on a VIZIO smart TV) (attached herein as Exhibit A-1);

2.   **Sony TV:** *Displaying Picture-in-Picture (PIP)*, Bravia i-Manual, http://docs.esupport.sony.com/imanual/NA/EN/hx750/c_pippap_uc_pip.html (last visited February 12, 2018) (describing how to use the picture-in-picture function on a Sony smart TV) (attached herein as Exhibit A-2);

3.   **Samsung TV:** *How to View Picture in Picture (PIP) in Samsung SUHD 4K Curved Smart TV JS9000?*, Samsung Support (December 29, 2017), http://www.samsung.com/in/support/skp/faq/1092297 (describing how to use the picture-in-picture function on a Sony smart TV) (attached herein as Exhibit A-3).

---

[1] This list is by no means exhaustive. The following are just a few examples found in a simple Internet search.

[2] As evident from this pleading, there is little to no evidence supporting Huang's Comment. Huang should not be permitted to introduce "missing" evidence in the third round, reply comments. The NPRM states: "Reply comments should not raise new issues, but should instead be limited to addressing arguments and evidence presented by others." NPRM at, 49558.

DCP Opposing Comment                    Exhibit A          Proposed Class 4: Audiovisual Works

Huang further claims that circumvention of HDCP is necessary to allow educators to draw notes over the top of an image or video. The technology to enable this use already exists and does not require circumvention. For example, both the Microsoft Surface Hub interactive whiteboard and the SMART series of whiteboards allow users to "add notes to, and write on, virtually everything you can show on the board."

4.   **SMART Board:**  *SMART Board 7000 series: write*, SMART Boards, https://education.smarttech.com/products/7000-series (last visited February 12, 2017) (attached herein as Exhibit A-4);

5.   **Surface Hub:** *View reports in Presentation mode on Surface Hub and Windows 10 Power BI*, Microsoft: Power BI (October 13, 2017), https://docs.microsoft.com/en-us/power-bi/mobile-windows-10-app-presentation-mode (attached herein as Exhibit A-5).

**Integration of TV and Security Systems:**

In the "Safety expression" category Huang suggests circumventing HDCP would be necessary to "rescale a display so that text or visual overlay can appear alongside it to notify a home owner that a door is open." This functionality is presently provided by several MVPD services, as well as by security companies like ADT.

6.   **Xfinity Home Security:** *Xfinity Home Features*, Xfinity.com, https://www.xfinity.com/learn/home-security/features (last visited February 12, 2018) (attached herein as Exhibit A-6);

7.   **Samsung Smart TV:** Julie Jacobson, *ADT Pulse Adds Samsung Smart TV App, AirPlay, Home Health*, CEPro: Security (Jan. 21, 2013), https://www.cepro.com/article/adt_pulse_adds_samsung_smart_tv_home_automation_app_airplay_home_health/ describing a partnership between ADT and Samsung to provide a Samsung Smart TV App that would integrate with an ADT security system) (attached herein as Exhibit A-7);

8.   **Verizon (service no longer offered):** Verizon offered a similar service from 2011-2014, demonstrating that implementation of such a service is not prevented by HDCP. *See Verizon drops Home Monitoring and Control Service*, Fierce Cable (Feb. 10, 2014) https://www.fiercecable.com/cable/verizon-drops-home-monitoring-and-control-service (attached herein as Exhibit A-8).

Further, the ability of MVPDs to provide caller ID services that integrate with video services demonstrates that providers are capable of rescaling content and overlaying it with real-time information about other devices in one's home—and, importantly, can do so without circumventing HDCP. Should there be an increase in consumer demand for security systems that integrate with smart TVs or MVPD services, the market has demonstrated that it is technologically capable of providing these services.

9.   **Xfinity:** *Turn Caller ID On or Off on a Non-X1 TV Box*, XFINITY support, https://www.xfinity.com/support/articles/settings-for-the-universal-caller-id-to-tv-app (last visited February 12, 2018) (attached herein as Exhibit A-9);

DCP Opposing Comment                    Exhibit A          Proposed Class 4: Audiovisual Works

10.     **U-verse:** *Activate Caller ID for Phone and U-verse TV*, AT&T e support,
        https://www.att.com/esupport/article.html#!/u-verse-voice/KM1040428 (last visited
        February 12, 2018) (attached herein as Exhibit A-10);

11.     **Spectrum:** *Caller ID on TV*, Spectrum, Get Help and Support,
        https://www.spectrum.net/support/tv/caller-id-tv/?domain-redirect=true (last visited
        February 12, 2018) (attached herein as Exhibit A-11);

12.     **Verizon:** *Caller ID for Fios TV*, Verizon support,
        https://www.verizon.com/support/residential/tv/programs-features/callerid (last visited
        February 12, 2018) (attached herein as Exhibit A-12).

## Recording and Streaming of Video Games

        In perhaps his most puzzling claim, Huang states that HDCP prevents users from
"recording a video gamer's gameplay and remix[ing] it with audio and visual commentary about
their game performance." A quick search of any Internet video site would demonstrate this is not
true. In fact all major gaming devices and computer operating systems now have the built-in
ability to record gameplay or stream it live online.

13.     **Recording on Windows 10:** *Record Game Clips with Game DVR on Windows 10*, Xbox
        Support, https://support.xbox.com/en-US/xbox-on-windows/social/record-game-clips-
        game-dvr-windows-10 (last visited February 12, 2018) (describing how to record
        gameplay on a computer running Windows 10) (attached herein as Exhibit A-13);

14.     **Streaming on Windows 10 and Xbox:** *Broadcast Your Game With Mixer on Windows
        10*, Xbox Support, https://support.xbox.com/en-US/games/game-setup/broadcast-game-
        with-mixer-windows-10 (last visited February 12, 2018) (describing how to livestream
        gameplay from a device running Windows 10) (attached herein as Exhibit A-14);

15.     **Recording on iOS:** *How to Use QuickTime Player*, Apple Support (June 3, 2016),
        https://support.apple.com/en-us/HT201066 (describing how to record the screen on a
        device running iOS) (attached herein as Exhibit A-15);

16.     **Recording on iOS Mobile:** *How to Record the Screen on Your iPhone, iPad, or iPod
        Touch*, Apple Support (Nov. 17 2017), https://support.apple.com/en-us/HT207935
        (attached herein as Exhibit A-16);

17.     **Recording on Xbox:** *Capturing Game Clips and Screenshots*, Xbox Support,
        https://support.xbox.com/en-US/xbox-one/console/capture-game-clips-and-screenshots
        (last visited February 12, 2018) (describing how to record gameplay on an Xbox gaming
        system) (attached herein as Exhibit A-17);

18.     **Streaming on PlayStation 4:** *How to Broadcast on YouTube Using Your PlayStation 4*,
        Playstation.com (October 3, 2017), https://www.playstation.com/en-gb/get-help/help-
        library/apps---features/playstation-apps---features/how-to-broadcast-using-youtube/
        (attached herein as Exhibit A-18);

DCP Opposing Comment                    Exhibit A          Proposed Class 4: Audiovisual Works

19.     **Recording on PlayStation 4:** *Uploading a Video Clip*, PlayStation 4 User's Guide
        http://manuals.playstation.net/document/en/ps4/share/videoclip.html (last visited
        February 12, 2018) (describing how to record and upload gameplay from a PlayStation 4)
        (attached herein as Exhibit A-19).


## VCR Functionality:

        Finally, Huang argues that "circumvention of HDCP is necessary to recapture the
functionality of VCR machines that once allowed for time, format, and space shifting of
ephemeral signals." Yet again, Huang is behind the times. Numerous Digital Video Recording
devices ("DVRs") that do not circumvent HDCP are currently available to users and far exceed
the capabilities of traditional VCRs. For example, the latest iteration of the TiVo DVR allows
users to pause, rewind, fast-forward, replay, or slow down  live TV, to transfer a signal from one
device to another, to record content (if allowed by the source TPM), to rescale a picture and
overlay it with an info banner, and to configure personalize menus to better navigate through
content. MVPDs like Dish Network, Comcast, and AT&T provide DVRs with similar time-
shifting and space-shifting capabilities. Additionally, many of these devices come with advanced
voice control and enhanced closed captioning for users with visual or auditory impairments.

20.     **TiVo Time Shifting:** *See Let the Fun Begin*, TiVo Roamio Welcome Center,
        https://www.tivo.com/quick-links/welcome-center-roamio/let-the-fun-begin (last visited
        February 12, 2018) (describing the time-shifting capability of the TiVo Roamio)
        (attached herein as Exhibit A-20);

21.     **TiVo Space Shifting:** *Beyond the basics of your TiVo Roamio DVR*, TiVo Roamio
        Welcome Center, https://www.tivo.com/quick-links/welcome-center-roamio/beyond-the-
        basics (last visited February 12, 2018) (describing the space-shifting capability of the
        TiVo Roamio) (attached herein as Exhibit A-21);

22.     **TiVo Recording:** *TiVo Roamio OTA 1TB DVR*, Tivo.com,
        https://www.tivo.com/shop/ota-detail (last visited February 12, 2018) (describing the
        recording capability of the TiVo Roamio OTA) (attached herein as Exhibit A-22);

23.     **Dish Network (The Hopper) Time and Space Shifting:** *The Hopper. The People's
        Choice*, Dish.com, https://www.dish.com/equipment/dvrs/hopper/ (last visited February
        12, 2018) (attached herein as Exhibit A-23);

24.     **Xfinity (X1 DVR) Time and Space Shifting + Accessibility:** *Xfinity X1 Features*,
        Xfinity.com, https://www.xfinity.com/learn/digital-cable-tv/x1 (last visited February 12,
        2018) (attached herein as Exhibit A-24);

25.     **U-verse Time and Space Shifting:** *Using your DVR*, AT&T Welcome Center,
        https://www.att.com/u-verse-welcome/tv/dvr.html (last visited February 12, 2018)
        (attached herein as Exhibit A-25);

DCP Opposing Comment                    Exhibit A        Proposed Class 4: Audiovisual Works

26. **Cox (Contour 2 DVR) Time Shifting:** *Contour 2: DVR*, Cox.com,
    https://www.cox.com/residential/education-center/tv/dvr.html (last visited February 12,
    2018) (attached herein as Exhibit A-26).

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Matthew Green, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-01492(EGS) |
| | ) | |
| U.S. Department of Justice, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF JACOB PAK, PRESIDENT,
### THE DVD COPY CONTROL ASSOCIATION IN SUPPORT OF
### THE AMICUS BRIEF OF CONTENT PROTECTION ORGANIZATIONS
### IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.      INTRODUCTION TO DVD CCA

1.      I am Jacob Pak, the President of DVD Copy Control Association ("DVD CCA"). I offer this declaration to provide background on DVD CCA and its operations and particularly, how the proposed  publication of Dr. Matthew Green's research of circumvention tools targeting HDCP and the proposed distribution of the NeTVCR would adversely affect the content protection provided by the Content Scramble System ("CSS") licensed by DVD CCA.

### A.      Background

2.      The DVD CCA is a not-for-profit Delaware corporation with its principal office in Morgan Hill, California.  It licenses CSS for use in connection with audio-visual content prerecorded onto DVD discs in order to protect against unauthorized access to or use of such content.

1

3.      In 1999, Matsushita Electric Industrial Co., Ltd. ("MEI," the company now known as Panasonic Corporation) established DVD CCA.  At that time, MEI and Toshiba Corporation licensed DVD CCA to sublicense the technology that MEI and Toshiba had developed known as CSS.  Shortly after its establishment, DVD CCA was converted into a business association recognized by the Internal Revenue Service as qualifying for treatment under Section 501(c)(6) of the Internal Revenue Code.

B.      **Licensing**

4.      DVD CCA licenses CSS and associated encryption keys to the owners of audio visual content and the related authoring and disc replicating companies; producers of encryption engines, hardware and software decryptors; and manufacturers of DVD players and DVD-ROM drives.

5.      The availability of CSS was essential to inducing content owners to release their valuable content in digital form on DVD, thereby allowing consumers to enjoy movies and other audiovisual content in much higher resolution than previously available on analog VHS tapes. The availability of CSS laid the groundwork for the launch of what became the fastest growing consumer electronics format in history.  Although now twenty years old, the DVD format remains a very popular form of distribution for audiovisual content.  DVD CCA has 114 active licensees and expects to continue operations for the foreseeable future.

1.      **Technology**

(a)      *Content Scrambling System*

6.      CSS is an encryption-based technology.  The technology permits a content owner to encrypt the content in a manner that requires the use of a licensed decryption product to view the content.

2

(b)     *Relationship to HDCP*

7.      In order for a product to be licensed to decrypt content, the terms of the CSS license require the product manufacturer (licensee) to equip the product in a manner that adheres to certain rules ("compliance rules") specifically designed to protect copyrighted content from unauthorized access and use.  Under the compliance rules, a manufacturer must apply another authorized digital output protection technology to any digital outputs (since the content is decrypted within the DVD player and then exists in a "clear" unprotected form that would enable the types of uses that are designed to be protected against).  In the United States, the universally applied digital output protection is HDCP, since digital televisions sold in the United States all (or nearly all) have HDMI inputs and HDCP decryption capabilities.  The use of HDCP protection, in accordance with the CSS compliance rules, serves to protect that decrypted content as it is transmitted digitally to a monitor.  If HDCP were not applied, then content could be captured in the signal as it is passed to the monitor.  For example, the cable to the monitor or TV could be attached to an HDMI video capture device as easily as the cable could be attached to the monitor.  An HDMI video capture device can be as simple as a hand-sized box capable of copying the contents of the HDMI signal to an SD-card or USB memory device.  The application of HDCP to the video signal output from the manufacturer's CSS-compliant product prevents the HDMI video capture device from recording the content signal in a useable form.

C.      **Enforcement**

8.      DVD CCA works with copyright owners in preventing circumvention devices from getting a foothold in the marketplace.  DVD CCA regularly contacts licensees that have failed to comply with the compliance rules in one way or another and has consistently worked with the licensees to modify their products in order to come into compliance.  In the rare cases

3

where licensees have not responded quickly to bring their products into compliance, litigation has upheld the requirements in the compliance rules in DVD CCA's license agreements. *See Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913 (N.D. Ca. 2009); *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 97 Cal. Rptr. 3d 856 (2009). For "rogue" or unlicensed products that come into the marketplace, DVD CCA is aware that the content companies have utilized the DMCA to block these products from being available in standard retail outlets. This enforcement approach has (i) prevented circumventing products from being declared "legal", (ii) kept circumvention products and tools out of legitimate consumer distribution channels, (iii) left circumvention products and tools to be distributed only on unknown and seemingly untrustworthy websites, and (iv) most importantly, fostered a marketplace for hundreds of millions of consumers to enjoy viewing copyrighted works on licensed, compliant DVD players for now more than two decades.

D.     **Rulemaking Proceeding**

9.     DVD CCA has participated in the triennial rulemaking since its inception in 2000. In the earliest proceedings, DVD CCA was at the center of the rulemaking process, defending the technology from multiple parties requesting exemptions to circumvent CSS for various allegedly noninfringing purposes. Over the past few proceedings, the rulemaking has resulted in narrowly tailored exemptions permitting the circumvention of CSS on DVDs for such purposes as permitting educators to use short clips of movies from DVDs in their classroom, permitting documentary filmmakers to incorporate short clips of movies from DVDs in their works; and (iii) facilitating the inclusion of audio or visual captions for works distributed on DVDs without these features benefiting people, who are visually or hearing impaired. Broad-based exemptions, such as making "back-up" copies of DVDs or making copies to enable the movies to be viewed from

alternative platforms (smart phones, pad-type products, and the like), have been uniformly opposed by DVD CCA and rejected by the Librarian of Congress, on the grounds that such exemptions are not necessary for "fair use" of the content.

## II.     Marketplace for Dr. Green's Research

10.     As illustrated by the dispute in the seminal case, *Universal City Studios, Inc. v. Corley*, 273 F. 3d 429 (2nd Cit. 2001), which concerned the publication of decryption code for its licensed technology, CSS, DVD CCA has traveled down the road of publication of decryption code and its effects. In spite of court orders, the *Corley* defendants and other activists ensured that DeCSS, as the unauthorized decryption code came to be known, was widely distributed.

11.     As the cat was already out of the bag, various actors attempted to launch commercial products that incorporated DeCSS or its underpinnings into the functionality of commercial products. Typically, these circumventing products were dressed up as enabling consumers to make "backup copies for their personal use." DVD CCA and copyright owners spent millions of dollars to shut down those purveyors of products believed to pose the biggest threat to the digital marketplace, in particular keeping these products from being sold in normal retail channels of distribution.

12.     Even though DeCSS was widely available, the general public did not adopt DeCSS. DVDs were marketed well with bonus features, readily available among retailers and were offered at reasonable prices for both purchase and rental. Thus, consumers saw no reason to learn how to hack a DVD using some risky website when legitimate DVDs offered consumers a favorable value proposition.

13.     DVD CCA's experience with DeCSS and related activities demonstrates that there is a marketplace for Dr. Green's research if he, as has been proposed, among other things,

publishes source code to decrypt HDCP. Publication of the decryption code for HDCP would most certainly lead to some number of actors trafficking in future circumvention products that incorporate Dr. Green's know-how as publication of DeCSS did.

14.    The risk of inducing purveyors of circumvention products to target HDCP is far too high due to the crucial role that HDCP plays. Content delivery can be viewed as a chain of events which begins at a source and ends with the content displayed on a peripheral such as a television or monitor. Once the content is output as a signal to a display peripheral, then there is nothing more than HDCP protecting the content in the signal. In fact, CSS and any other technological protection measure employed earlier in the chain is meaningless if the HDCP is circumvented.

III.    **The Effects of NeTVCR Activities Would be Significant and Not Isolated to HDCP Itself Devices**

15.    To suggest that the market for copyrighted works distributed in physical media such as DVDs is independent of the online market for copyrighted works represents a gross misunderstanding of the digital content ecosystem. As previously discussed, HDCP protects the video signal sent from the playback device (DVD player) to an output peripheral such as a television. At that point the video signal is protected solely by HDCP as the CSS employed to the protect the content on the DVD has been decrypted at playback. Consequently, if circumvention of the HDCP occurs, then the video output signal is completely "in the clear" (i.e., there is no longer any copy protection of the copyrighted work), and a copy of the copyrighted work can be readily produced from this signal transmitting "in the clear" content. Although originating from physical media, this one "in the clear" copy can be redistributed readily and endlessly over networks with improved broadband speeds.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: _Oct 30, 2019_

Jacob Pak, President
DVD Copy Control Association

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Matthew Green, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-01492(EGS) |
| | ) | |
| U.S. Department of Justice, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JOHN P. BRIZEK,
TECHNICAL ADVISOR TO THE ADVANCED ACCESS CONTENT
SYSTEM LICENSING ADMINISTRATOR, LLC ("AACS LA") IN SUPPORT
OF THE AMICUS BRIEF OF CONTENT PROTECTION ORGANIZATIONS IN
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

I.      **INTRODUCTION TO AACS LA**

1.      I am John P. Brizek, technical advisor to AACS LA.  I have been involved with AACS LA and the development and deployment of technology licensed by AACS LA for 11 years, including serving for 6 years as the Chair of the AACS Technical Group with responsibility for development and maintenance of the AACS technical specifications.  I offer this declaration to show how the publication of Dr. Green's research would help purveyors of circumvention tools and to explain that the activities of NeTVCR cannot be isolated to HDCP-enabled devices.

A.      **Background**

2.      The Advanced Access Content System Licensing Administrator, LLC ("AACS LA"), is a cross-industry limited liability company with its principal offices in Beaverton, Oregon. The members of AACS LA are: International Business Machines Corporation, Panasonic Intellectual

1

Property Corporation of America, Microsoft Corporation, SCA IPLA Holdings, Toshiba America, Inc.,[1] Warner Bros. Entertainment Inc., Disney Worldwide Services, Inc. and DCP, LLC.

B.    **Licensing**

3.    AACS LA licenses the Advanced Access Content System ("AACS") technology that it developed for the protection of prerecorded high definition and, more recently, ultra high definition audiovisual content distributed on Blu-ray discs optical media ("BDs") and Ultra HD Blu-ray discs, respectively.  The original AACS technology for high definition content is called AACS or AACS1 technology.  The technology for Ultra HD content is called AACS2 technology.  Ultra HD content has up to four times the number of pixels of "full HD" 1080P content (hence, Ultra HD motion pictures are commonly referred to as "4K").  AACS2 is a separate and distinct technology and licensing system from AACS1, which protects only HD content distributed on Blu-ray discs.

4.    In order to persuade motion picture companies to agree to release motion pictures in the Ultra HD format, AACS LA made significant improvement in the technology used to protect Ultra HD motion picture content, as compared with the original AACS technology and licensing.  In anticipation of the distribution of Ultra HD content on Ultra HD Blu-rays, the Blu-ray Disc Association challenged AACS LA to meet or exceed industry requirements, as embodied in specifications issued by the motion picture company's research arm, MovieLabs (see https://movielabs.com/solutions-specifications/enhanced-content-protection-ecp/), for a content protection system for protection against unauthorized uses (access, copying and redistribution) of motion picture content from Ultra HD Blu-ray discs.  Meeting that goal took a two-year effort to produce a state-of-the-art content protection system for the Ultra HD Blu-ray discs.  Unlike earlier encryption based technological protection measures, AACS2 requires manufacturer products to be

---

[1] The LLC membership interest previously held by Toshiba America Information Systems, Inc. was recently transferred to Toshiba America, Inc.

capable of in the field updating, so if a hack revealed a vulnerability in a particular product, that vulnerability could be fixed using a firmware upgrade.  Internet connectivity of consumer devices and players makes this "field updating" functionality possible whereas before compromised players were static and could not be corrected.  Once connected to the Internet the manufacturer can deploy a firmware upgrade to the compromised player so that the player will be fully compliant and playback new titles like any other AACS2-compliant player.

5.      AACS LA licenses AACS and AACS2 to content owners, consumer electronics companies, computer software companies, and a large number of companies in related distribution and services industries.  Companies that prepare the media files for distribution and mass-produced Blu-ray discs and Ultra HD Blu-ray discs obtain an AACS and or an AACS2 license to become "Licensed Content Producers."  Manufacturers of consumer products and developers of computer software obtain a corresponding license from AACS LA in order to allow their playback devices (such as a Blu-ray disc player or major video game consoles) or their media player software to lawfully decrypt and play AACS-encrypted content embodied on Blu-ray discs and or AACS2-encrypted content embodied on Ultra HD Blu-ray discs, respectively.

6.      These products made by AACS licensees form the "ecosystem" into which motion picture and television programming rights holders can distribute their content on Blu-ray discs or Ultra HD Blu-ray discs for consumers to purchase or rent, and then view on playback devices or media player software (useable on computing devices), while having encryption measures in place to control access to and protect the copyrights in such content (including by preventing unauthorized copying or redistribution of the content across the Internet or similar networks).

7.      To date, more than one thousand companies license one or the other, or both, of the technologies offered by AACS LA.  AACS LA has issued more than 267 million decryption keys

to its manufacturer licensees for use in consumer playback devices for AACS1 technology and 7.5 million decryption keys for use in consumer playback devices for AACS2 technology.  Since a decryption key is issued for each individual player, then for every decryption key issued by AACS LA, there is a corresponding consumer device that can decrypt the respective AACS technologies (i.e., 267 million decryption keys means there are 267 consumer devices).   As far as copyrighted works distributed on BDs and Ultra HD Blu-ray discs, AACS LA has signed more than 197,000 certificates that are applied to content using AACS1 technology and 2300 certificates for content using AACS2 technologies to protect the content as recorded on BDs or Ultra HD Blu-ray discs. Based on those numbers, AACS LA estimates that there are more than 100,000 distinct movie and television titles distributed on Blu-ray discs protected by AACS1 and more than 1500 movie and television titles distributed on Ultra HD Blu-ray discs protected by AACS2.

     C.     **Relationship to HDCP**

8.     In order for a product to be licensed to decrypt the content, the terms of the original AACS license and the newer AAC2 license require the product manufacturer (licensee) to equip the product in a manner that adheres to certain rules that are specifically designed to protect copyrighted content from unauthorized access and use.  Under these rules (called "compliance rules"), a manufacturer must apply another authorized digital output protection technology to any digital outputs (since the content is decrypted within the player and then exists in a "clear" unprotected, digital form that could easily be accessed, copied and redistributed without the authorization of the copyright holders).

9.     In the United States, the universally applied protected digital output technology is HDCP, since, to my knowledge, all (or virtually all) digital televisions recently sold in the United States have HDMI inputs with HDCP decryption capabilities.  Use of HDCP serves to protect that

decrypted content as it is transmitted digitally to a television or computer monitor. If HDCP is not applied, then the content could be captured in the signal as it is passed to the monitor. For example, the cable to the monitor or TV could be just as easily attached to an HDMI video capture device as easily as the cable could be attached to the monitor. An HDMI video capture device can be a very small size device capable of copying the contents of the HDMI signal to a piece of widely available storage media such as a USB key or SD card. The application of HDCP to the video signal output from a AACS-compliant manufacturer's product prevents the HDMI video capture device from recording the content signal, at least in a useable form.

D.      **Enforcement**

10.     AACS LA works with copyright owners in preventing circumvention devices from getting a foothold in the marketplace. AACS LA regularly contacts licensees that have failed to comply with the compliance rules in one way or another and has been uniformly able to work with licensees to bring their products into compliance.

11.     AACS LA itself has pursued purveyors of circumvention products such as the DVDFAB software that circumvented AACS technology on Blu-ray discs.[2]  *See Advanced Access Content Sys. Licensing Admin., LLC v. Shen*, 2018 WL 4757939 (S.D.N.Y. Sept. 30, 2018)*.

E.      **Rulemaking Proceeding**

12.     AACS LA has participated in the triennial rulemaking since its technology was first offered into the market, starting with the 2008-2010 proceeding. To date, the rulemaking has resulted in only limited exemptions permitting the circumvention of AACS employed on Blu-ray discs for specific noninfringing uses (such as educational and documentary filmmaking purposes). These

---

[2] AACS LA also worked with the government of Antigua, in its criminal prosecution of Sly Soft and its principal for violating the nation island's antitrafficking law.

exemptions have not applied, and do not currently apply, to content encrypted on Ultra HD Blu-ray discs protected with AACS2 technology.  Furthermore, the rulemaking has rightly rejected requests that would permit circumvention for the purpose of making backup copies of the digital content distributed on protected optical  discs and most importantly for the purpose of space-shifting of HD content distributed on AACS-protected Blu-ray discs.

## II.    Potential Harm from Publication of Code Developed by Dr. Green

13.     AACS and AACS2, the technologies protecting Blu-ray and Ultra HD Blu-ray discs, respectively, have not yet suffered a generic hack.[3]  Thus, AACS LA and its copyright owner licensees have had to pursue far fewer enforcement actions against purveyors of circumvention devices.

14.     Today, Blu-ray discs and Ultra HD Blu-ray discs do not enjoy the status that DVDs once did among consumers and represent a smaller part of the overall digital marketplace.  So, if a hack was widely publicized, the size of these markets would not justify the risks to copyright owners in continuing to distribute their high value content using a compromised protection system for Blu-ray and Ultra HD Blu-ray discs.

15.     The risk is far greater due to the format offered on the discs.  AACS protects content distributed in the high definition format, while AACS2 protects content distributed in the ultra-high definition format.  The expectation is that more consumers are choosing the high definition format rather the standard definition (DVD-quality) and will eventually graduate to the ultra-high definition format.  Currently, the ultra-high definition format with certain favorable viewing features such as

---

[3] While some particular implementations of AACS and AACS2 in certain products and titles have been compromised, leading to the creation of a limited number of circumvention products and tools, the core technology has not been hacked.

HDR has been delivered only on Ultra HD Blu-ray discs.[4] Accordingly, copyright owners have been willing to use Ultra HD Blu-rays to distribute their highest value content because they were confident in the ability of AACS2 technology to protect such content.  Permitting the plaintiffs to publicize any hack of the AACS2 would certainly make copyright owners reconsider their plans to release content in the Ultra high definition format and most certainly on continuing to release it on the young medium, Ultra HD Blu-ray discs.

16.     Greater broadband penetration and technological improvements in compression and storage exacerbate the risk of digital piracy to the high definition and ultra-high definition formats. Today a full length 4k movie (36Gb) can be downloaded in approximately 1 hour and 43 minutes assuming 50 Mbps.  (My understanding is that download speeds in the United States routinely are at levels well above 50 Mbps.)  Improvements in storage space and compression reveal that there are no longer technological limitations that would hold back anybody from readily "sharing" the content from a hacked Blu-ray disc.

17.     DVD CCA's experience with DeCSS demonstrates that there is a marketplace for code that might be published as a result of Dr. Green's research.  Dr. Green proposes, inter alia, to publish the source code to decrypt HDCP.  In our opinion, publication of the decryption code for HDCP would likely lead to some number of actors incorporating that know-how into circumventing parts or products that would then be made widely available and potentially through legitimate consumer retail channels (since the publication would have been pursuant to a court order, thereby

---

[4]  Although 4K may be available with some streaming services, these streaming services cannot guarantee 4K quality delivery as steaming is dependent on the consumers' Internet speeds and delivery.  Similarly, streaming services advertise some offerings of HDR (high definition range) content, which ramps up contrast, brightness and color to the picture in the ultra-high definition format.  But since HDR content relies on the successful delivery of the 4K stream, broadband limitations make Ultra HD Blu-ray disc the only format that can guarantee delivery of HDR content.

potentially legitimizing the activities that could follow the order).

18.     The risk of inducing purveyors of circumvention products to target HDCP is far too high due to the role that HDCP plays.  Content delivery can be viewed as a chain of events which begins at a source and ends with the content displayed on a peripheral such as television or monitor.  Once the content is output as a signal to a display peripheral, and HDCP is intended to protect the signal, then there is nothing more than HDCP protecting the content in the signal.  In fact, any technological protection measure employed earlier in the chain such as AACS or AACS2, is meaningless if the HDCP is circumvented.

**III.    The Effects of NeTVCR Activities Cannot Be Isolated to HDCP-Enable Devices**

19.     To suggest that the market for copyrighted works distributed in physical media such as Blu-ray and Ultra HD Blu-ray discs is independent of the online market for copyrighted works represents a gross misunderstanding of the digital content ecosystem.  As previously discussed, HDCP protects the video signal sent from the playback device to an output peripheral such as a television.  At that point the video signal is protected solely by HDCP as the AACS or AACS2 employed to the protect the content on the disc has been decrypted at playback.  Consequently, if circumvention of the HDCP occurs, then the video output signal is completely "in the clear" (i.e., there is no longer any copy protection of the copyrighted work), and a copy of the copyrighted work can be readily produced from this signal transmitting "in the clear" content.  Although originating from physical media, this one "in the clear" copy can be redistributed readily and endlessly over networks with improved broadband speeds.  As previously discussed, the improved speeds make trading in HD movies and, particularly Ultra HD movies attractive.

I declare under the penalty of perjury that the foregoing is true and correct.

Date: _October 30, 2019_          _____
                                          John P. Brizek

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Matthew Green, *et al.*,                                )
                                                                      )
                    Plaintiff,                            )
                                                                      )
v.                                                                  )          Civil Action No. 16-cv-01492(EGS)
                                                                      )
U.S. Department of Justice, *et al.*,             )
                                                                      )
                    Defendants.                        )


## DECLARATION OF C. BRENDAN S. TRAW

I, C. Brendan S. Traw, an adult and over the age of twenty-one (21) years, hereby declare

pursuant to 28 U.S.C. Section 1746 as follows:

1.      I am currently an Intel Corporation ("Intel") Senior Fellow. I have personal knowledge of

all of the following facts and, if called as a witness, could and would competently testify thereto. Intel is

a Member of the DVD Copy Control Association LLC ("DVD CCA") and the Advance Access Content

System Licensing Administrator LLC ("AACS LA"). Digital Content Protection LLC ("DCP") – the

Licensor of the High-bandwidth Digital Content Protection ("HDCP") system – is a wholly owned

subsidiary of Intel.

2.      From April 1995 to date, I have occupied various positions at Intel. These positions

included Chief Content Protection Architect, Digital Home Group CTO, and General Manager of

several software products.

3.      In the spring of 1996, the motion picture industry was considering whether to distribute

in the home video market their valuable motion picture content in a new digital format – the Digital

Versatile Disc ("DVD"). Many properties of this new format would benefit consumers, including better picture quality, familiar physical format, better sound, etc. Members of the motion picture industry expressed to me one major concern; protection of the intellectual property embedded in the DVDs. Copies of existing analog VHS format tapes would be degraded in comparison to the original, inhibiting serial copying . Unprotected digital content, however, permitted perfect copy after perfect copy, ad infinitum. Those members of the motion picture industry made it clear they would not disseminate their valuable copyrighted movie content in the DVD format without adequate protection against infringing serial copying.

4.     The motion picture and consumer electronics ("CE") industries presented a solution, which, for the Information Technology ("IT") industry, had at least two flaws; (1) it would not have provided much protection (the content would be in the clear on the DVD) and (2) personal computers would not have been permitted to play the DVDs. The IT industry alternatively proposed the use of encryption and the licensing of keys and algorithms that would permit playing, but not copying of the DVDs content on authorized devices including personal computers with licensed playback software.

5.     Interested parties formed the Copy Protection Technical Working Group ("CPTWG") to discuss the concepts of a system that would enable the motion picture industry to launch distribution of protected DVDs. Some 54 motion picture, CE, IT companies, trade associations, and others, participated in CPTWG. During the spring of 1996, CPTWG developed the basic concepts now embedded in virtually all digital content protection systems. The approach was consumer focused, i.e., the consumers should never notice the protection system unless they attempted to make unauthorized copies. Nor should the system add significant cost to the discs or devices. Thus, CPTWG proposed the conceptual system of content encryption with licensed keys to unlock the content for playback.

6.     Entities desiring to incorporate DVD playback on their devices would sign licenses requiring the protection of the keys and the content on those devices. Taking this broad-based, consensus driven input, Matsushita Electric Industry Co. Ltd. (now known as Panasonic Corporation) and Toshiba Corporation developed the DVD Content Scramble System. Their proposal was presented to a wide range of parties, who provided feedback on both the technical and legal regime. Toshiba authorized Panasonic to be the initial licensor of the technology. The two companies subsequently licensed their intellectual property in this system to DVD CCA which, in turn, sublicensed it to companies to permit the technology to be implemented in DVD players and in the embedding process for content to be distributed on DVDs. The licensing system enabled the issuance of specifications and keys that permitted creation and playback of protected DVDs.

7.     At the outset of these activities, television sets and computer monitors only displayed analog signals. Accordingly, DVD players decrypted the CSS encrypted digital content and converted the resulting data into analog form for the DVD players to output to televisions and monitors for consumer enjoyment. However, the industries recognized there were still two missing elements: legal protection against circumvention and a secure digital connection between playback devices and digital screens (either part of computer systems or the soon-to-be developed digital televisions) and other connected devices.

8.     CPTWG participants acknowledged an experienced and well-resourced hacker could ultimately defeat any protection system. The distribution of the "hack" ("cracking" material such as unlicensed keys and code to extract the content in the clear) was a significant threat. Moreover, sale of devices that incorporated the circumventing material to make in-the-clear copies would further allow mass distribution of unprotected infringing copies. Without a solution, such circumvention would inhibit the dissemination of creative content in digital form. In other words, the technology could provide an

initial barrier to unauthorized access and use of the content, but legal protections were needed to pick up where technology left off. The participants in CPTWG activities in 1996 were well aware that the countries of the world were negotiating what became the Copyright Treaty of the World Intellectual Property Organization, which was agreed to in December 1996. That Treaty was then implemented in the United States through the Digital Millennium Copyright Act of 1998. This added legal regime was essential to the overall system that was developed by those participating in the CPTWG and, hence, those participants also supported the legal structure ultimately embodied in the DMCA.

9.      As noted above, the advent of displays with digital inputs for both computers and televisions meant that there needed to be a secure way to stream the content in digital form from the security of the DVD's CSS encryption to these new display products. Accordingly, the CPTWG embarked on its second task – examining and outlining the requirements for security mechanisms to be applied to content as it passed from one digital device to other digital devices, ultimately to the digital displays. The content companies made the logical point that it would do no good to distribute DVDs with CSS protections if those protections were immediately lost when the DVD player transmitted the content to the next device without applying some equivalent form of protection against unauthorized access and use.

10.     The CPTWG's Digital Transmission Discussion Group ("DTDG") took note of standards that other groups had developed, or were in the process of developing, that optimized the transmission of digital video content but also noted that those other groups were not incorporating a security system to protect the transmitted content from unauthorized interception and use. The DTDG focused its efforts on defining the requirements for, and encouraging the development of, solutions for protecting compressed digital content being exchanged between devices within the home via emerging serial busses like IEEE 1394.

11.     Within a couple of years, additional digital interfaces began to emerge for decompressed digital content.[1] The primary difference between the two systems was that the decompressed content, due to its very large size, was optimal for the final connection to the display, enabling the television and other display makers to avoid having to incorporate the decompression technology in their devices. Two decompressed transmission standards were developed – one of which was the Digital Video Interface (DVI) that focused primarily on computer application. Intel was a major participant in the development of DVI. For the stand-alone televisions, another standard – the High-Definition Multimedia Interface ("HDMI") - became the preferred technology. The size of the data comprising the content in decompressed form made it unwieldy for consumer products to do anything other than display it for consumer enjoyment. In the late 1990s and early 2000s, there was no feasible way for a consumer device to make a copy of such a large data set for later playback. Hence, the content protection system developed for the decompressed environment assumed that no copying of the content would be allowed – that the transmission would be purely for display purposes. It was in that context that Intel developed HDCP to protect decompressed content flowing between licensed devices via DVI and eventually for HDMI and other display interface standards. At a high level, like many other content protection systems, HDCP uses the encryption/licensing system to ensure protection of video content flow, as noted above primarily for the purpose of sending the content from a receiver or player to a digital screen. Most content protection systems, such as CSS for DVD content and, later on, the Advanced Access Content System ("AACS") for Blu-ray disc ("BD") content, limit permitted outputs, in order not to lose the protections their systems provide for the content as it is distributed on DVDs and BDs. Those and most other video content protection systems specify HDCP as a permitted output. Since the normal

---

[1] I use the term "decompressed" to describe digital content that has, at one point, been compressed but that is ultimately transmitted or delivered in uncompressed form (e.g., to the digital display). Nearly all digital content is compressed at some point in transit from the original source to sink.

expectation was that DVDs and BDs would be playable on a wide array of player products, there would be no need for a consumer to make additional copies. This, combined with the data size point made above, dictated that HDCP would be a "no copies allowed" system. The movie companies found that compatible with their needs, and player makers (for both computer and set-top environments) felt that this would present an excellent system for consumer enjoyment of movie and other video content. For this and other reasons noted below, the result is that HDCP has become the de facto transmission protection standard for content delivery from a receiver or player product to display products (including all televisions sold in the United States).

12.     The other situation – transmission of compressed video data – was addressed through other transmission standards and associated content protection technologies resulting from the DTDG work. Because the data remains compressed, it is much easier to create consumer devices that could make copies of the data for later playback and other uses from the copy. The initial contemplation was that a home network could include a set-top receiver of cable or satellite television programming that could be connected through a secure transmission cable (and later through wireless transmission) to a DVD or Blu-ray recorder that would make a copy of the content onto recordable discs to enable the time-shifting (i.e., viewing a copy of a television program at a later time than its original transmission). In fact, this system did develop and is still the widely deployed system for time-shifting that of television broadcast content in Japan. In the United States, however, the cable and satellite companies found it to be convenient to incorporate large hard disc drives in their own set-top-box ("STB") receiving devices, and the market for external consumer copying devices did not broadly develop here.

13.     The effect has been that the consumer marketplace for home copying has become one where consumers use the hard drive in the STBs supplied by their cable or satellite providers to make copies of television programming for time-shifting purposes. Those STBs are then linked to display

- 6 -

products by HDMI connections.  HDCP protects the decompressed content as it is transmitted over those HDMI connections to displays for view-only enjoyment by consumers. Accordingly, HDCP has become ubiquitous in the United States and is incorporated in every STB, DVD player, BD player, and other streaming device systems of which I am aware.

14.     Accordingly, the content protection ecosystem consists of the distribution of protected content, playback on licensed devices, and protected transmission over the last few feet for the consumer to enjoy on their display. Since ultimately all content is transmitted across that last HDCP-protected path, permitting HDCP circumvention devices or the cracking material to be freely available would effectively eviscerate virtually every video content protection system.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of October, 2019.

C. Brendan S. Traw