**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
MATTHEW GREEN, *et al.*,             )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )  Civil Action No. 16-1492 (EGS)
                                    )
U.S. DEPARTMENT OF JUSTICE,          )
*et al.*,                            )
                                    )
          Defendants.               )
_____   )

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Dr. Matthew Green, Dr. Andrew Huang, and Alphamax, LLC seek to engage in certain activities for which they fear they will be prosecuted under the "anti-circumvention" provision and one of the "anti-trafficking" provisions of the Digital Millennium Copyright Act ("DMCA"). Accordingly, Plaintiffs brought a pre-enforcement challenge to those provisions of the DMCA. Following this Court's resolution of Defendants' Motion to Dismiss, *see Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68 (D.D.C. 2019); the remaining claims are Plaintiffs' as-applied First Amendment Challenges to the DMCA and the remaining Defendants are the United States Department of Justice and Attorney General Merrick Garland.[1]

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as Defendant the United States Attorney General, Merrick Garland, for the former United States Attorney General William Barr.

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction, *see* Mot. for Prelim. Inj. ("Mot."), ECF No. 30-1; in which Plaintiffs request, among other things, that the Court enjoin Defendants from enforcing: (1) the DMCA's criminal prohibitions on trafficking against Dr. Green; and (2) the DMCA's criminal prohibitions on circumvention and trafficking against Dr. Huang and Alphamax. Upon consideration of Plaintiffs' motion, the response and reply thereto, the submissions of amici, the applicable law, and the entire record, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

## I.   Background

### A.   Statutory Background

Congress enacted the DMCA, 17 U.S.C. § 1201 *et seq.*, in 1998 to implement the World Intellectual Property Organization Copyright Treaty and the World Intellectual Property Organization Performances and Phonograms Treaty. S. Rep. No. 105-190, at 2 (1998). In implementing those treaties via the DMCA, Congress was primarily responding to "the ease with which digital works can be copied and distributed worldwide virtually instantaneously." *Id.* at 8. In short, Congress was concerned with the pirating of copyrighted works in the digital world. Three of the DMCA's central provisions respond directly to that concern.

The first——section 1201(a)(1)(A)——is an "anti-circumvention" provision. It prohibits a person from "circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17, governing copyright]." 17 U.S.C. § 1201(a)(1)(A). A "technological measure"——often referred to as a "technological protection measure" ("TPM"), Compl., ECF No. 1 ¶ 18——"effectively controls access to a work" if it, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work," 17 U.S.C. § 1201(a)(3)(B). To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). Section 1201(a)(1)(A) thus prohibits persons from bypassing technological barriers put in place to prevent access to copyrighted works.

The second and third provisions——sections 1201(a)(2) and 1201(b)——are "anti-trafficking provisions." That is, instead of prohibiting the circumvention of TPMs, they prohibit the dissemination of the technological means that enable such circumvention. The anti-trafficking provision at issue in this case, section 1201(a)(2), prohibits, in relevant part, a person

3

from "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted] work." *Id.* § 1201(a)(2)(A).[2]

The DMCA also includes certain fine-grained permanent exemptions, some of which apply to the anti-circumvention provision and to both anti-trafficking provisions, *see, e.g.*, *id.* § 1201(e) (broadly exempting official law enforcement activity); some of which apply to the anti-circumvention provision and only one of the anti-trafficking provisions, *see, e.g.*, *id.* § 1201(j) (exempting security testing "solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability"); and some of which apply only to the anti-circumvention provision *see, e.g.*, *id.* § 1201(d)

---

[2] Section 1201(b), in relevant part, prohibits a person from "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [Title 17, governing copyright]." 17 U.S.C. § 1201(b)(1)(A). Although sections 1201(a)(2) and 1201(b) employ similar wording, section 1201(a)(2) is aimed at circumvention technologies that permit access to a copyrighted work, whereas 1201(b) is aimed at circumvention technologies that permit copyrighted works to actually be copied. S. Rep. at 12.

(exempting nonprofit libraries, archives, and educational institutions that seek to circumvent TPMs to determine whether to purchase a copyrighted product).

Additionally, cognizant of its "longstanding commitment to the principle of fair use," H.R. Rep. No. 105-551, pt. 2, at 35 (1998) ("Commerce Comm. Rep."); Congress sought to balance its efforts to curtail digital piracy with users' rights of fair use by putting in place a triennial rulemaking process to exempt certain noninfringing uses of certain classes of copyrighted works from the anti-circumvention provision for three-year periods. *See* 17 U.S.C. §§ 1201(a)(1)(B)-(E). Accordingly, every three years, the Librarian of Congress, "upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding . . . of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the [anti-circumvention provision] in their ability to make noninfringing uses under [Title 17] of a particular class of copyrighted works." *Id.* § 1201(a)(1)(C). To make the relevant determination, the Librarian must consider: "(i) the availability for use of copyrighted works; (ii) the availability

5

for use of works for nonprofit archival, preservation, and
educational purposes; (iii) the impact that the prohibition on
the circumvention of technological measures applied to
copyrighted works has on criticism, comment, news reporting,
teaching, scholarship, or research; (iv) the effect of
circumvention of technological measures on the market for or
value of copyrighted works; and (v) such other factors as the
Librarian considers appropriate." *Id.*

### B.   Factual Background

Plaintiff Matthew Green is a computer science professor at
Johns Hopkins University. Compl., ECF No. 1 ¶¶ 5, 75;
Declaration of Mathew Green ("Green Decl."), ECF No. 30-2 ¶ 1.
Plaintiff Andrew Huang is a Singapore-based electrical engineer
who owns and operates several technology-related business
entities, including Plaintiff Alphamax, LLC. *Id.* ¶¶ 6-7, 88;
Declaration of Andrew "bunnie" Huang ("Huang Decl."), ECF No.
30-3 ¶ 1. Plaintiffs seek to engage in certain activities that
they fear will run afoul of section 1201(a)(1)(A)'s
circumvention prohibition and section 1201(a)(2)'s trafficking
prohibition, exposing them to potential civil liability under
the DMCA's private right of action, 17 U.S.C. § 1203, and
potential criminal liability under the DMCA's criminal offense
provision, 17 U.S.C. § 1204. Compl., ECF No. 1 ¶¶ 86-87, 109-10;

Green Decl., ECF No. 30-2; Compl., ECF No. 1 ¶¶ 26, 29; Huang
Decl., ECF No. 30-3 ¶¶ 12, 16, 17

Specifically, Dr. Green "investigates the security of
electronic systems," and "[h]e would like to include detailed
information regarding how to circumvent security systems" in a
forthcoming book, Compl., ECF No. 1 ¶ 75, Green Decl., ECF No.
30-2 ¶ 20; but he "has declined to investigate certain devices
due to the possibility of litigation based on [s]ection 1201,"
*id.* ¶ 80. Dr. Green requested an exemption to cover his security
research as part of the 2015 triennial rulemaking process, but
the exemption that the Librarian of Congress put in place was
not broad enough to cover all of his proposed research. *Id.* ¶¶
78-79, 84-85. Dr. Green did secure an exemption in the 2018
triennial rulemaking which "allows him and others to conduct
'good-faith security research.'" Mot., ECF No. 30-1 at 20.[3]
Accordingly, he is able "to circumvent TPMs in furtherance of
his research" and does "not seek[] to preliminarily enjoin the
Government's enforcement of section 1201(a)(1) against him." *Id.*

Dr. Huang and Alphamax are the creators of "NeTV," a device
for editing high-definition digital video. Compl., ECF No. 1 ¶
89; Huang Decl., ECF No. 30-3 ¶ 3. They seek to create an

---

[3] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

"improved" NeTV——a "NeTVCR"——that would allow its users "to save
content for later viewing, move content to a viewing device of
the user's choice, or convert content to a more useful format."
Compl., ECF No. 1 ¶¶ 90-91; Huang Decl., ECF No. 30-3 ¶ 3. To
create the NeTVCR, Huang and Alphamax have to circumvent the
TPMs——High-Bandwidth Digital Content Protection ("HDCP")——that
restricts the viewing of High-Definition Multimedia Interface
("HDMI") signals. *Id.* ¶¶ 92-93; Huang Decl., ECF No. 30-3 ¶ 12.
They have been deterred from doing so because of the risk of
prosecution under section 1201. *Id.* ¶¶ 109-10; Huang Decl., ECF
No. 30-3 ¶ 12. The "NeTVCR would dramatically expand users'
ability to create new, noninfringing speech." Mot., ECF No. 30-1
at 17 (citing Huang Decl., ECF No. 30-3 ¶¶ 13-16). For example,
"[a]n individual might use NeTVCR to create a short movie of
herself playing a video game, alongside commentary and remixes
of other gamers' videos." Mot., ECF No. 30-1 at 17 (citing Huang
Decl., ECF No. 30-3 ¶¶ 13, 19). Or "[m]edia organizations might
display news coverage of important events from multiple sources
at the same time, bringing different perspectives to viewers."
Mot., ECF No. 30-1 at 17 (citing Huang Decl., ECF No. 30-3 ¶
13). "And beyond creative and cultural expression, NeTVCR has
numerous applications that will improve people's lives in areas
such as education, news, and safety." Mot., ECF No. 30-1 at 18
(citing Huang Decl., ECF No. 30-3 ¶¶ 13).

Dr. Huang participated in the triennial rulemaking process for the first time in 2017, but did not receive an exemption. Mot., ECF No. 30-1 at 19. While some of Dr. Huang's proposes uses were recognized as being "potentially . . . fair use," U.S. COPYRIGHT OFFICE, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights (Oct. 2018) ("2018 Recommendation"), ECF No. 30-8 at 136; and that "possibly [] there may not be reasonable alternatives to each and every use listed by [Dr.] Huang, *id*. at 144; his petition was denied on the grounds that a "fuller description" of the potential fair uses was needed "in order to craft a sufficiently 'narrow and focused' exemption," *Id*. at 136.

C.   **Procedural History**

Plaintiffs filed their Complaint on July 21, 2016, seeking declaratory and injunctive relief on their claims. See Compl., ECF No. 1. On September 29, 2016, Defendants filed a Motion to Dismiss, *see* Mot. to Dismiss, ECF No. 15; and Dr. Green filed a Motion for Preliminary Injunction, *see* Mot. for Prelim. Inj., ECF No. 16. On September 30, 2016, the Court set a briefing schedule and stayed the Motion for Preliminary Injunction pending resolution of the Motion to Dismiss. *See* Minute Order (Sept. 30, 2016). On June 27, 2019, the Court issued a

Memorandum Opinion and Order dismissing all but the as-applied
First Amendment claims. *Green*, 392 F. Supp. 3d 68. After the
parties failed to reach agreement on proposed stipulated facts
for consolidated preliminary injunction proceedings with
dispositive proceedings on the merits, *see* Joint Status Report,
ECF No. 29; the Court adopted Plaintiffs' proposed scheduling
order, *see* Minute Order (Sept. 9, 2019). Thereafter, Dr. Green,
Dr. Huang, and Alphamax filed a Motion for Preliminary
injunction on September 19, 2019, *see* ECF No. 30; the remaining
Defendants filed their Opposition brief on October 24, 2019, *see*
ECF No. 38; and Plaintiffs filed their Reply brief on November
14, 2019, *see* ECF No. 44. The motion is ripe and ready for the
Court's adjudication.

## II.  Standard of Review

"A plaintiff seeking a preliminary injunction must
establish [1] that [they are] likely to succeed on the merits,
[2] that [they are] likely to suffer irreparable harm in the
absence of preliminary relief, [3] that the balance of equities
tips in his favor, and [4] that an injunction is in the public
interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)
(alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d
388, 392 (D.C. Cir. 2011)). Where the federal government is the
opposing party, the balance of equities and public interest
factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A

preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In the usual case, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). Where the terms of an injunction "would alter, rather than preserve, the status quo by commanding some positive act," pursuant to persuasive authority in this District, "the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp 2d 1 (D.D.C. 1997) (quotation marks and citations omitted). The power to issue such an injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation marks and citation omitted).

In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288,

11

1291–92 (D.C. Cir. 2009). In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

At the preliminary injunction stage, the Court may "rely on the sworn declarations in the record and other credible evidence in the record even though such evidence might not meet all of the formal requirements for admissibility at a trial." *AFGE v. Dist. of Columbia*, No. 05-472, 2005 WL 1017877, at *4 (D.D.C. May 2, 2005); *see Camenisch*, 451 U.S. at 395 (1981) (decision on a preliminary injunction may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (same).

### III. Analysis

#### A.    Plaintiffs' Requests For Injunctive Relief Pertaining to Dismissed Claims Are DENIED

Plaintiffs seek injunctive relief for dismissed claims. Because the Court dismissed Plaintiffs' facial First Amendment challenges, see *Green*, 392 F. Supp. 3d at 89, 90; the Court **DENIES** Plaintiffs' request that the Court enjoin the remaining Defendants from enforcing Section 1201(a)'s criminal prohibition on circumvention and trafficking, *see* Proposed Order, ECF No. 30-12 at 1. And because the Court dismissed Plaintiffs' Administrative Procedure Act claim, *see Green*, 392 F. Supp. 3d at 100; the Court **DENIES** Plaintiffs' request that "defendant Carla Hayden" be "enjoined to grant exemptions to 17 U.S.C. 1201(a)(1)(A) that would allow plaintiffs Green, Huang, Alphamax, and others to engage in conduct protected by the First Amendment," Proposed Order, ECF No. 31-12 at 1.

#### B.    Plaintiffs' Alternative Request For Relief Is DENIED

Though not articulated in their Proposed Order, Plaintiffs, in the alternative, ask the Court to

> construe the definition of "circumvent" included in Section 1201(a) such that a person may be considered to have the requisite "authority of the copyright owner" when their use of the copyrighted work at issue is non-infringing and therefore authorized by copyright law. In other words, the "authority of the copyright owner" element would be satisfied whenever the copyright owner would have no right to withhold that authority.

Mot. ECF No. 30-1 at 23. Defendants respond—and the Court agrees—that Plaintiffs' request would "invalidate the scheme mandated by Congress," and has been rejected by other courts. Opp'n, ECF No. 38 at 20-21. The Court is persuaded by other courts that have rejected Plaintiffs' proposed interpretation. *See, e.g.*, *Universal Studios, Inc. v. Corley*, 273 F.3d 429, 443-44 & n.13 (2d Cir. 2001) (rejecting an interpretation of subsection 1201(c)(1) that would "allow the circumvention of encryption technology protecting copyrighted material when the material will be put to 'fair uses' exempt from copyright liability" as "not only outside the range of plausible readings of the provision, but []also clearly refuted by the statute's legislative history").

### C. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

#### 1. The Sale of Dr. Green's Book Likely Would Not Constitute Trafficking Under Section 1201(a)(2)[4]

Dr. Green states that he seeks to publish an academic book "to instruct readers . . . [on] how to identify vulnerabilities in computer systems." Green Decl., ECF No. 30-2 ¶ 20. He "would like to include examples of code capable of bypassing security measures . . . [and] instructions written in English." *Id*. He

---

[4] Dr. Green does not seek injunctive relief with regard to his anti-circumvention claim because he received an exemption in the 2018 Rulemaking. Mot., ECF No. 30-1 at 20.

states that his "book must contain detailed descriptions about how [he] circumvented technological protection measures" so that: (1) other scientists can replicate how he circumvented the protection measure; (2) other scientists can find additional flaws rather than "rediscover the same flaws that [he] already found"; and (3) so "that the people who design computer systems (both technological protection measures and the underlying software code) will learn from [his] book how to design better systems that do not contain the kind of flaws that [he] discovered. *Id*. ¶¶ 21-23. Dr. Green states that when marketing the book, "[he] would like to highlight the detailed information it contains about bypassing security measures, since that will be part of what makes it an effective book for teaching a person how to engage in cutting-edge security research." *Id*. ¶ 25. The Complaint alleges that Dr. Green "would like to include detailed information regarding how to circumvent security systems in his book, and expects to earn royalties on the book's sale," Compl., ECF No. 1 ¶ 75; and that he "seeks to publish a book that would educate readers about how to circumvent access controls on copyrightable software," *id*. ¶ 112.

The Government contends that

> Academic publications typically are not primarily produced for the purpose of circumventing TPMs, so as to fall under § 1201(a)(2)(A); instead, they are produced for academic purposes, such as instruction or

> contributing to a field of research. In
> addition, to the extent an academic
> publication has a commercially significant
> purpose or use, it is generally not to enable
> circumvention of a TPM, so as to fall under §
> 1201(a)(2)(B), nor are academic publications
> typically marketed as circumvention tools,
> such that they would fall under §
> 1201(a)(2)(C).

Opp'n, ECF No. 38 at 42. The government states that whether an activity is subject to the anti-trafficking prohibition is "fact-specific" and that neither the allegations in the Complaint nor Dr. Green's Declaration indicate that the sale of his book would fall within the ambit of the anti-trafficking prohibition. *Id.* at 43-44. Plaintiffs do not respond to this argument other than to observe that "the government itself suggests that the statute plausibly may be construed so as not to prohibit publication of the book that Dr. Green wishes to publish." Reply, ECF No. 44 at 23.

To fall within the anti-trafficking prohibition, Dr. Green's academic book would have to be considered a "product . . . that (a) is primarily designed or produced for the purpose of circumventing a [TPM] that effectively controls access to a [copyrighted work]"; (b) "has only limited commercially significant purpose or use other than to circumvent" such a TPM; or (c) "is marketed . . . for use in circumventing" such a TPM. 17 USC § 1201(a)(2). Neither the allegations in the Complaint nor Dr. Green's averments in his Declaration indicate that the

book "is primarily designed or produced for the purpose of circumventing a [TPM] that effectively controls access to a [copyrighted work]," nor that the book "has only limited commercially significant purpose or use other than to circumvent" a TPM; rather the allegations and averments indicate that the primary purpose of the book is to provide scholarly information to improve computer design. Furthermore, neither the allegations nor the averments indicate that the book will be "marketed . . . for use in circumventing" a TPM; rather the book will be marketed "to highlight the detailed information it contains about bypassing security measures, since that will be part of what makes it an effective book for teacher a person how to engage in cutting-edge security research." Green Decl., ECF No. 38 ¶ 25. Neither the allegations in the Complaint nor the averments in Dr. Green's Declaration indicate that the sale of his book implicates the anti-trafficking prohibition. Accordingly, Dr. Green is unlikely to succeed on the merits of his as-applied anti-trafficking claim.[5]

---

[5] Because Dr. Green has not demonstrated that the sale of his book would fall within the ambit Section 1201(1)(2), the Court need not reach whether that section's application to Green satisfies intermediate scrutiny.

    2.    **Dr. Huang and Alphamax are Unlikely to Succeed on Their As-Applied Section 1201(1)(1)(A) and (a)(2) Claims**

The government makes a compelling argument that the code as used in the NeTVCR device Dr. Huang wants to create, use and distribute does not qualify as speech entitled to First Amendment protection, *see* Opp'n, ECF No. 38 at 21-27; but the Court need not resolve that question because assuming that Dr. Huang's intended use of the code in the NeTVCR is entitled to First Amendment protection, the government has met its burden under intermediate scrutiny to justify the regulation of that speech.

    a.    **Applicable Intermediate Scrutiny Standard**

"[T]he anti-circumvention and anti-trafficking provisions will be upheld so long as they further a substantial governmental interest; the interest furthered is unrelated to the suppression of free expression; and the provisions do not burden substantially more speech than is necessary to further the government's interest." *Green*, 392 F. Supp 3d at 94 (citing *Turner Broad. Sys., Inc.* 512 U.S. at 662 (citing *Ward*, 491 U.S. at 799; *O'Brien*, 391 U.S. at 377)). "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interest. 'Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be

achieved less effectively absent the regulation.'" *Turner*, 512
U.S. at 662 (quoting *Ward*, 491 U.S. at 799). A regulation is
narrowly tailored if "it does not burden substantially more
speech than is necessary to further the government's legitimate
interests." *Id.* at 665. In determining whether a regulation is
"narrowly tailored," the Court "must 'accord substantial
deference to the predictive judgments of Congress,' since '[a]s
an institution . . . Congress is far better equipped than the
judiciary to 'amass and evaluate the vast amounts of data'
bearing upon an issue as complex and dynamic as that presented
here.'" *321 Studios*, 307 F. Supp. 2d at 1101 (quoting *Turner*,
512 U.S. at 624).

"[T]he Government . . . bears the burden of showing that
the remedy it has adopted does not 'burden substantially more
speech than is necessary to further the government's legitimate
interests,'" *id*. at 665 (quoting *Ward*, 491 U.S. at 799); and to
establish "necessity" by showing that the government's interest
"would be achieved less effectively absent the regulation." *Id*.
at 662. Defendants state that they plan to meet their burden at
the summary judgment stage, but contend that "even the evidence
currently available suffices to demonstrate that Plaintiffs are
unlikely to succeed on the merits." Opp'n, ECF No. 38 at 29.

b.   **The DMCA Is Aimed at Furthering a Substantial Interest and That Interest is Unrelated to the Suppression of Free Expression**

As the Court stated in its prior Memorandum Opinion,

> Congress enacted the DMCA in large part because of substantial fears of "massive piracy" of copyrighted works in the digital environment. S. Rep. at 8. Thus, the government's interest is in "preventing trafficking in devices and technologies that would undermine the access controls that protect copyrighted works," Defs.' Mem. Supp., ECF No. 15-1 at 50, and that interest is "unquestionably substantial" and, moreover, "that interest is unrelated to the suppression of free expression." *Corley*, 273 F.3d at 454.

*Green*, 392 F. Supp 3d at 94. In their opposition briefing, Defendants cite the DMCA's legislative history,[6] declarations in this proceeding,[7] and evidence of which the Court can take judicial notice[8] to demonstrate that it was necessary for Congress to enact the anti-circumvention and anti-trafficking provisions in the DMCA in order to "launch and protect the digital marketplace for copyrighted works and address the risk of 'massive piracy' in the digital age." Opp'n, ECF No. 38 at

---

[6]   S. Rep. No. 105-190, at 2-8.

[7]   Declaration of C. Brendan S. Traw, ECF No. 38-1 ¶¶ 3, 8.

[8]   *See, e.g.*, *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 309 (S.D.N.Y. 2000) (explaining that the development of DVDs in the 1990s "brought with it a new problem—increased risk of piracy by virtue of the fact that digital files, unlike the material on video cassettes, can be copied without degradation from generation to generation"). The Court takes judicial notice of the factual findings in *Reimerdes*. *See id.* at 305 & n. 4.

29-33. Defendants further cite to testimony at more recent
congressional hearings indicating that "the balance struck by
the DMCA has served its purpose in allowing markets in new
technologies . . . to thrive"; and the report issued by the
Copyright Office, that "following a comprehensive study
including public input, . . . concluded that the DMCA has been
largely successful." *Id.* at 34.

Plaintiffs contend in their reply brief that "they have
never conceded that the government's purported interest is
substantial and unrelated to the suppression of free
expression." Reply, ECF No. 44 at 18. However, in its prior
Memorandum Opinion, the Court stated "[p]laintiffs do not
dispute that the DMCA is aimed at furthering a substantial
interest and that interest is unrelated to the suppression of
free expression," *Green*, 392 F. Supp. 3d at 94; and Plaintiffs
did not seek relief from the Court's Order. The Court sees no
reason to revisit its prior ruling. Accordingly, "the DMCA is
aimed at furthering a substantial interest and that that
interest is unrelated to the suppression of free expression."
*Green*, 392 F. Supp. 3d at 94.

      **c.  Defendants Have Met Their Burden of Showing
that the Anti-Circumvention and Anti-
Trafficking Provisions Do Not Burden
Substantially More Speech than Is Necessary**

Defendants contend that "[Dr.] Huang's proposed
circumvention and trafficking activity strikes at the heart of
today's digital audio visual contend marketplace." *Id.* at 34-35.
Defendants point out that Dr. Huang submitted a petition seeking
an exemption for his NeTVCR device for the first time in the
2017 triennial rulemaking, and cite evidence arising from that
rulemaking which shows that his "proposed circumvention if
allowed, would pose enormous risks to the digital content
marketplace." *Id.* at 35, 37-38. Defendants cite public records
that are admissible[9] and that can be judicially-noticed[10] to
demonstrate why Dr. Huang's NeTVCR, which is designed to
circumvent HDCP, "would enable unrestricted access to ['content
offered through cable and satellite subscription and on-demand
television services such as Comcast, Verizon, Fios, and DIRECT
TV; online streaming services such as Hulu, Netflix, and Amazon
Prime Video; network mobile apps, such as HBO NOW, digital
rental retailers, such as iTunes, Google Play, and Vuvu; []
video game consoles sold by Microsoft, Sony, and Nintendo'] and

---

[9] F.R.E. 803(8).
[10] *CREW v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (public
records can be judicially noticed); 44 U.S.C. § 1507 ("The
contents of the Federal Register shall be judicially noticed.").

[content on DVDs, Blu-ray discs, and Ultra HD discs] for any purpose, including piracy and other infringements of copyright." *Id.* at 36. Defendants contend that since the NeTVCR allows recording and "format-conversion functionality", it would "certainly facilitate the ability to engage in piracy." *Id.* Accordingly, the government's substantial interests "would be achieved less effectively," *Turner*, 512 U.S. at 662; if Dr. Huang's proposed conduct was not prohibited by Section 1201(a).

The record of the rulemaking proceeding indicates that "[Dr.] Huang does not dispute that [his proposed circumvention] could permit virtually anything displayable on a modern television screen to be recorded in the clear and made available online[.]" 2018 Recommendation, ECF No. 30-8 at 147. Evidence in the record before the Court indicates that "[i]f publication of hacking material for HDCP or products like a NeTVCR (as proposed here) are permitted, the effect would be to eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement." Declaration of Stephen P. Balogh[11] ("Balogh Decl."), ECF No. 38-2

---

[11] Stephen P. Balogh is the President of Digital Content Protection, L.L.C., the Licensor of the High-bandwidth Digital Content Protection ("HDCP") system. Balogh Decl., ECF No. 38-2 ¶ 2.

¶ 5; *accord* Declaration of C. Brendan S. Traw[12] ("Traw Decl."), ECF No. 38-1 ¶ 14.

Defendants also point to circumvention alternatives that are available to Dr. Huang:

> Opponents set forth a number of concrete examples of potential alternatives to circumvention that Huang fails to meaningfully challenge. For example, Huang fails to explain why using an existing laptop, smartphone, or tablet while watching TV, or even having multiple windows open on a computer, is an inadequate alternative to picture-in-picture, split screen, and certain rescale uses. While Huang argues that his NeTV device cannot create transparent overlays, he fails to explain why the opaque overlays that the NeTV does generate are inadequate for many of the described uses, such as smart home and home assistant messages, reminders, and alerts. Huang also fails to describe why current DVRs on the market, along with the myriad download, rental, streaming, on-demand, disc-to-digital, locker, and remote access options offered by copyright owners . . . are inadequate for his needs.

2018 Recommendation, ECF No. 30-8 at 144.

Furthermore, the burden on protected speech is low. As to Dr. Huang, the parties focus primarily on whether his interest in producing and distributing a device that would circumvent HDCP to giver users access and unencumbered use of audiovisual works, including those distributed through popular streaming services, is protected speech as applied. Even if Dr. Huang's

---

[12] C. Brendan S. Traw is an Intel Corporation Senior Fellow. Traw Decl., ECF No. 38-1 ¶ 1.

interest is protected, the anti-trafficking provision is constitutional if the government meets its burden under intermediate scrutiny. As the Court concludes below, here, it has.

Dr. Huang also asserts a personal interest in circumventing HDCP in order to make personal uses of "in the clear" versions of audiovisual works. During the rulemaking proceeding, the Register of Copyright lacked a sufficient record to determine whether the uses would be fair use, and therefore non-infringing—a necessary determination under the applicable legal standard. 2018 Recommendation, ECF No. 30-8 at 136-141.

The parties relitigate the question of fair use here. While fair use is potentially relevant, the legal issue before the Court is whether Dr. Huang's speech interests, as applied, outweigh the government's interest in regulation.[13] As a matter of constitutional law, a party seeking to circumvent a TPM to make even an infringing use of a copyrighted work could still have a cognizable speech interest in making such use. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003) (recognizing that the court below "spoke too broadly when it declared copyrights 'categorically immune to challenges under the First

---

[13] For this reason, the supplemental authority cited by Plaintiffs, *see* Notice of Supplemental Authority, ECF No. 50; is inapposite.

Amendment'"). But, the statutory question of whether such use is infringing or fair use is certainly relevant to the government's interest in regulating such speech. Thus, while the legal question before the Court is distinct from legal standard in the rulemaking, like the Register, the Court lacks a sufficient record from which it can conclude that Dr. Huang has met his burden to show that he is entitled to a preliminary injunction because he is likely to succeed on the merits as to his proposed personal interests in circumventing HDCP.

Furthermore, Dr. Huang has failed to provide evidence regarding the burden on his protected speech in relation to potential fair uses of these works by third parties. *See generally* Huang Decl., ECF No. 30-3; *see Corley*, 273 F.3d at 459 (noting that "to whatever extent the anti-trafficking provisions of the DMCA might prevent others from copying portions of DVD movies in order to make fair use of them, the evidence as to the impact of the anti-trafficking provision[s] of the DMCA on prospective fair users is scanty and fails to adequately address the issues.") (internal quotations marks omitted).

In view of the evidence that Defendants have cited, the Court is persuaded that the government has met its burden to demonstrate that the anti-circumvention and anti-trafficking provisions, as applied to Dr. Huang's proposed course of conduct, "do not burden substantially more speech than is

necessary to further the government's interest." *Green*, 392 F. Supp. 3d at 94 (citations omitted). Plaintiffs argue that Defendants have failed to meet their burden because they "rely on generalized claims of harm", "offer[ing] speculation and conjecture—specifically, private parties' supposed fears that TPMs and traditional copyright and other laws will be insufficient to deter unidentified third parties (not Plaintiffs themselves) from engaging in piracy." Reply, ECF No. 44 at 20. However, the evidence cited by Defendants is anything but generalized, speculative and conjectural.

In the rulemaking proceeding, Dr. Huang "d[id] not dispute that [his proposed circumvention] would permit virtually anything displayable on a modern television screen to be recorded in the clear and made available online[.]" 2018 Recommendation, ECF No. 30-8 at 147. Furthermore, opponents for granting the exemption to Dr. Huang "raise[d] a serious concern that the exemption, if granted, could potentially compromise a distribution system for audiovisual content that has matured seemingly in part due to the protections offered by section 1201." *Id*. Evidence in the record in this case indicates that "[i]f publication of hacking material for HDCP or products like a NeTVCR (as proposed here) are permitted, the effect would be to eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to

massive infringement." Balogh Decl., ECF No. 38-2 ¶ 5; *accord* Traw. Decl., ECF No. 38-1 ¶ 14.

This evidence is entirely distinguishable from the "paucity of evidence" cited by the Supreme Court in *Turner*, and upon which Plaintiffs rely. *Turner*, 512 U.S. at 667. And Plaintiffs' contention that Defendants "essentially manufacture a wide-scale crisis where there is none," Reply, ECF No. 44 at 20; is wholly unpersuasive in view of the evidence upon which Defendants' rely.

Plaintiffs argument that the government's interests are protected because "actual copyright infringers can still be punished" under copyright law that precedes the DMCA, Mot., ECF No. 30-1 at 24; is unpersuasive because the DMCA was enacted specifically to address the challenges posed by the Internet and digital content. *See Corley*, 273 F.3d. at 435 (Observing that "[f]earful that the ease with which pirates could copy and distribute a copyrightable work in digital form was overwhelming the capacity of conventional copyright enforcement to find and enjoin lawfully copied material, Congress sought to combat copyright piracy in its earlier states, before the work was even copied.").

For all of these reasons, Defendants have met their burden of showing that the anti-circumvention and anti-trafficking provisions do not burden substantially more speech than is

necessary as applied to Dr. Huang and Alphamax. Accordingly, Dr. Huang and Alphamax are unlikely to succeed on the merits of their as-applied claim.

**D.  Plaintiffs Have Failed to Demonstrate Irreparable Harm**

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs assert that they face "clear and irreparable harm" if a preliminary injunction is not issued because "[t]he First Amendment fully applies to" the activities in which they seek to engage, and because without a preliminary injunction, they will "have to wait until the conclusion of the lawsuit to learn whether they are free to engage in" the activities. Mot., ECF No. 30-1 at 34-35. In their reply brief, Plaintiffs assert that "i]nterference with an individual's First Amendment right to expression constitutes per se irreparable injury." Reply, ECF 44 at 29. However, Plaintiffs' arguments fail because, as

explained *supra* Section IV.A, they have not established a likelihood of success on their as-applied First Amendment challenges. *See Pursuing America's Greatness*, 831 F.3d at 511 (noting that "[i]n first Amendment cases, the likelihood of success 'will often be the determinative factor in the preliminary injunction analysis'" (citing *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)). Accordingly, because Plaintiffs have not established a likelihood of success on the merits, they have not demonstrated that they will suffer irreparable harm.

### E.   The Balance Of Equities And Public Interest Do Not Favor An Injunction

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "[T]he [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness v. Federal Election Commission*, 831 F.3d 500, 511 (D.C. Cir. 2016). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a

preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, 555 U.S. at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

Plaintiffs argue that in the absence of an injunction, their "harm far outweighs" that of the Government because they are: (1) deprived of "of core First Amendment Rights"; and (2) threatened with criminal liability, Mot., ECF No. 30-1 at 36; whereas the Government is not harmed because: (1) the statutory provisions are likely unconstitutional; (2) it "will suffer no harm in its efforts to 'promote the progress of the useful arts'" because "[t]he anti circumvention and anti-trafficking rules restrict—instead of promote—that progress"; and (3) "[t]he government has ample, and superior, alternative means of policing infringement, such as imposing liability for actual copyright infringement . . . ." *Id.* (quoting U.S. CONST. art I, § 8, cl. 8). Finally, Plaintiffs argue that the public interest would be served by an injunction because "'enforcement of an unconstitutional law is always contrary to the public interest.'" *Id.* at 37 (citing *Gordon*, 721 F.3d at 653.)

Defendants respond—and the Court agrees—that Plaintiffs' arguments fail because, again as explained *supra* Section IV.A, Plaintiffs have not established a likelihood of success on their as-applied First Amendment challenges. *See Pursuing America's Greatness*, 831 F.3d at 511 (noting that "[i]n first Amendment

cases, the likelihood of success 'will often be the determinative factor in the preliminary injunction analysis'" (citing *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("the final preliminary injunction factor, the public interest, also offers [Plaintiff] no support because it is inextricably linked with the merits of the case. If, as we have held, [Plaintiff] is not likely to establish [a likelihood of success on the merits], then the public interest considerations weigh against an injunction.")). Accordingly, because Plaintiffs have not established a likelihood of success on the merits, the balance of the equities and the public interest do not favor a preliminary injunction.

## IV. Conclusion

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **July 15, 2021**